# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

IN RE: AIR CRASH OVER THE SOUTHERN
INDIAN OCEAN ON MARCH 8, 2014

This Document Relates To:
1:16-cv-00053-KBJ,
*Wood v. Malaysia Airlines Berhad;*
1:16-cv-00419-KBJ,
*Gaspard v. Malaysia Airlines Berhad;*
1:16-cv-00439-KBJ,
*Smith v. Malaysia Airlines Berhad;*
1:16-cv-01047-KBJ,
*Ganguli v. Malaysia Airlines Berhad;*
1:16-cv-01048-KBJ,
*Zhang, et al. v. Malaysia Airlines Berhad;*
1:16-cv-01062-KBJ,
*Kanan, et al. v. Malaysia Airlines System Berhad;*
1:16-cv-01063-KBJ,
*Huang, et al. v. Malaysia Airlines Berhad.*

MDL Docket No:  2712

Misc. No. 16-1184 (KBJ)

**DEFENDANT MALAYSIAN AIRLINE SYSTEM BERHAD (ADMINISTRATOR APPOINTED)'S MEMORANDUM IN SUPPORT OF ITS RULE 12(b)(1) MOTION TO DISMISS PLAINTIFFS' COMPLAINTS ON THE GROUND OF LACK OF SUBJECT MATTER JURISDICTION PURSUANT TO THE MONTREAL CONVENTION**

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ........................................................................... iv

INDEX OF EXHIBITS .................................................................................. viii

INTRODUCTION ...........................................................................................1

ARGUMENT ..................................................................................................3

I.  The United States Is Not the Place Where any Decedent had His or Her "Principal and Permanent Residence" at "the Time of the Accident" because None of the Decedents were Residing in the United States. ...................................5

    A.  "Principal and Permanent Residence" Means "The One Fixed and Permanent Abode of the Passenger at the Time of the Accident." .........................7

    B.  The Clear Drafting History of the Montreal Convention Establishes that the "Principal and Permanent Residence" Must be Determined by Objective Facts Existing at the Time of the Accident, without Reference to a Passenger's Subjective Intent. .........................................................9

        1.  The Special Group Specifically Omitted Reference to a Passenger's "Domicile" or Subjective Intent from the Text of Article 33.2 and Article 33.3 Before the Delegates Convened in Montreal in 1999. .................................................11

        2.  The Minutes and Documents from the Drafting History of the Montreal Convention Confirm the Drafter's Goal of Divorcing Subjective Intent from the Concept of "Principal and Permanent Residence." ....................................................13

    C.  The Cases Importing the Concept of "Domicile" into the Definition of "Principal and Permanent Residence" are based on Flawed Reasoning and are in Derogation of the Plain Language of Article 33.3. ...........................................................................17

    D.  While Irrelevant, Plaintiffs Do Not Have Any Admissible Evidence of Any Decedent's Future Subjective Intent which Would Be Sufficient to Establish Domicile even under Standards of Federal Common Law. ...................................................19

        1.  Muktesh Mukherjee and Xiao Mo Bai's "Principal and Permanent Residence" and Domicile was in China where they were Residing with their Children. ..................................23

2.   Philip Wood's "Principal and Permanent Residence" and Domicile was in Malaysia where he was Residing with his Partner. ...................................................................................28

3.   Nicole and Leo Meng's "Principal and Permanent Residence" and Domicile was in China where they were Residing with their Chinese Citizen Parents................................................31

4.   Meng Zhang's "Principal and Permanent Residence" and Domicile was in China where she was Residing with her Husband. ......................................................................................33

II.   Plaintiffs Cannot Establish Article 33.1 Jurisdiction Because the United States is Not the Location of MAS's Place of Business Through Which the Decedents' Contracts of Carriage Were Made ...................................................................35

A.   No Binding Contract of Carriage Was Formed until the Passenger's Offer to Purchase Particular Transportation Was Accepted by MAS at One of MAS's Places of Business......................................38

B.   No Place of Business of MAS in the United States Accepted any of the Passengers' Offers to Purchase the Transportation which Included Flight MH370..................................................................41

III.   The United States Was Not The Place Of Destination (or Any Place) On Any Of The Passengers' Contracts Of Carriage. ...............................................................42

IV.   MAS Is Domiciled And Has Its Principal Place Of Business In Malaysia. ......................42

CONCLUSION...................................................................................................................43

# TABLE OF AUTHORITIES

**Page**

**Cases**

*American Fire & Cas. Co. v. Finn*, 341 U.S. 6 (1951) .................................................................. 3

*Auster v. Ghana Airways, Ltd.*, 514 F.3d 44 (D.C. Cir. 2008) .................................................. 2, 3

*Block v. Compagnie Nationale Air France*, 386 F.2d 323 (5th Cir.1967).................................. 37

*Boyar v. Korean Air Lines*, 664 F. Supp. 1481 (D.D.C.1987)........................................... 2, 36, 37

*Broadstone Realty Corp. v. Evans*, 213 F. Supp. 261 (S.D.N.Y.1962) ...................................... 34

*Chan v. Korean Air Lines, Ltd.*, 490 U.S. 122 (1989) ................................................................ 18

*Choi v. Asiana Airlines, Inc.*, No. 14-cv-03738,
    2015 WL 394198 (N.D. Cal. Jan. 29, 2015) ...................................................................... 17

*Core VCT PLC v. Hensley*, 89 F. Supp. 3d  (D.D.C. 2015)............................................ 25, 29, 31

*Dean Foods Co. v. Brancel*, 187 F.3d 609 (7th Cir. 1999)......................................................... 39

*E.C. Styberg Eng'g Co. v. Eaton Corp.*, 492 F.3d 912 (7th Cir. 2007)....................................... 40

*El Al Israel Airlines, Ltd. v. Tsui Yuan Tseng*, 525 U.S. 155 (1999)......................................... 2, 3

*Ex Parte Petterson*, 166 F. 536 (D. Minn.1908).......................................................................... 32

*Fadhilah v. Societe Air France*, 987 F. Supp. 2d 1057 (C.D. Cal.2013)...................................... 9

*Freeman v. Nw. Acceptance Corp.*, 754 F.2d 553 (5th Cir. 1985) .............................................. 21

*Freidrich v. Davis*, 767 F.3d 374 (3d Cir. 2014) ......................................................... 20, 25, 26

*Galva Foundry Company v. Heiden*, 924 F.2d 729 (7th Cir. 1991) ...................................... 16, 21

*Gayda v. LOT Polish Airlines*, 702 F.2d 424 (2d Cir.1983)................................................... 4, 42

*Gutierrez v. Fox*, 141 F.3d 425 (2d Cir. 1998) .......................................................................... 21

*Hawes v. Club Ecuestre El Comandante*, 598 F.2d 698 (1st Cir. 1979) ..................................... 24

*Hendry v. Masonite Corporation*, 455 F.2d 955 (5th Cir. 1972)................................................. 22

*Hinc v. Lime-O-Sol Co.*, 382 F.3d 716 (7th Cir. 2004)............................................................... 41

*Hornsby v. Lufthansa German Airlines*, 593 F. Supp. 2d 1132 (C.D. Cal. 2009) ....................... 17

*In re Air Crash Disaster at Malaga, Spain on Sept. 13, 1982,*
  577 F. Supp. 1013 (E.D.N.Y. Jan. 30, 1984) .................................................. 42

*In Re Air Crash Over Mid-Atlantic on June 1, 2009,*
  760 F. Supp. 2d 832 (N.D. Cal. 2010) ........................................................... 17

*In re Air Disaster Near Cove Neck, N.Y., on Jan. 25, 1990,*
  774 F. Supp. 718 (E.D.N.Y. 1991) ................................................................. 2

*Kapar v. Kuwait Airways Corp.*, 663 F. Supp. 1065 (D.D.C.1987) ........................... 37

*Kapar v. Kuwait Airways Corp.*, 845 F.2d 1100 (D.C. Cir.1988) ......................... 4, 37

*King v. Cessna Aircraft Co.*, 505 F.3d 1160 (11th Cir.2007) ............................ 22, 24

*Klocek v. Gateway, Inc.*, 104 F. Supp. 2d 1332 (D. Kan. 2000) ............................ 40

*Klos v. Polskie Linie Lotnicze*, 133 F.3d 164 (2d Cir. 1997) .............................. 42

*Lew v. Moss*, 797 F.2d 747 (9th Cir. 1986) ................................................... 21

*Linardos v. Fortuna*, 157 F.3d 945 (2d Cir. 1998) ..................................... 20, 21

*Malone v. Saxony Co-op. Apartments, Inc.*, 763 A.2d 725 (D.C. 2000) ..................... 39

*Masonite Corp. v. Hendry*, 409 U.S. 1023 (1972) ............................................ 22

*Maurice Elec. Supply Co. v. Anderson Safeway Guard Rail Corp.*,
  632 F. Supp. 1082 (D.D.C. 1986) ................................................................ 39

*McCormick v. Aderholt*, 293 F.3d 1254 (11th Cir. 2002) ................................... 21

*McNutt v. General Motors Acceptance Corp.*, 298 U.S. 178 (1936) ......................... 21

*Medellin v. Texas*, 552 U.S. 491, 128 S.Ct. 1346 (2008) ................................... 9

*Mississippi Band of Choctaw Indians v. Holyfield*,
  490 U.S. 30, 109 S.Ct. 1597 (1989) .............................................. 19, 20, 28, 32

*Mitchell v. United States*, 88 U.S. 350, 22 L.Ed. 584 (1874) ......................... 20, 21

*O'Callaghan v. AMR Corp.*, No. 04-cv-4005,
  2005 WL 1498870 (N.D. Ill. June 8, 2005) ................................................... 39

*Petrire v. Spantax, S.A.*, 756 F.2d 263 (2d Cir. 1985) ..................................... 42

*REO Acquisition Grp. v. Fed. Nat'l Mortgage Ass'n*,
  104 F. Supp. 3d 22 (D.D.C. 2015) ............................................................. 39

*Rowell v. Franconia Minerals Corp.*, 706 F. Supp. 2d 891 (N.D. Ill. 2010)................................. 3

*Sadat v. Mertes*, 615 F.2d 1176 (7th Cir. 1980) .................................................... 19, 22, 25, 28, 30

*Samra v. Shaheen Bus. & Inv. Grp., Inc.*, 355 F. Supp. 2d 483 (D.D.C. 2005) .......................... 41

*Seales v. Panamanian Aviation Co.*, 356 Fed. Appx. 461 (2d Cir.2009) ...................................... 7

*Seales v. Panamanian Aviation Company, Ltd.*,
     No. 07-cv-2901, 2009 WL 395821 (E.D.N.Y. Feb. 18, 2009) ................................... 7, 8, 9

*Singh v. Tarom Romanian Air Transport*, 88 F. Supp. 2d 62 (E.D.N.Y. 2000) .......................... 43

*Sinochem Intern. Co. Ltd v. Malaysia Intern. Shipping Corp.*, 549 U.S. 422 (2007)................. 20

*Slaughter v. Toye Bros. Yellow Cab Co.*, 359 F.2d 954 (5th Cir. 1966) ...................................... 20

*Steinberg v. Chicago Medical School*, 371 N.E.2d 634 (Ill. 1977) ............................................. 39

*Stine v. Moore*, 213 F.2d 446 (5th Cir.1954)............................................................. 20, 22, 30, 32

*United States v. Scott*, 472 F.Supp. 1073 (N.D. Ill. 1979)........................................................... 34

*Von Holdt v. A-1 Tool Corp.*, No. 04 C, 04123,
     2013 WL 53986 (N.D. Ill. Jan. 3, 2013) ........................................................................ 39

*Wyler v. Korean Air Lines Company, Ltd.*, 928 F.2d 1167 (D.C. Cir. 1991) .............................. 43

**Statutes**

28 U.S.C. § 1330.............................................................................................................................. 1

28 U.S.C. § 1332(a)(4)..................................................................................................................... 1

28 U.S.C. § 1391(f) .......................................................................................................................... 1

28 U.S.C. § 1441(d) ......................................................................................................................... 1

28 U.S.C. § 1602 *et seq.*................................................................................................................... 1

49 U.S.C. § 1502.............................................................................................................................. 2

**Rules**

Fed. R. Civ. P. 5 ............................................................................................................................. 46

Fed. R. Civ. Pro. Rule 12(b)(1)....................................................................................................... 1

Fed. R. Civ. Pro. Rule 12(b)(6)....................................................................................................... 1

**Other Authorities**

13B C. Wright, A. Miller & E. Cooper, *Federal Practice and Procedure*
§ 3612 (2d ed. 1984) ..................................................................................................... 20

Convention for the Unification of Certain Rules for International Carriage by Air,
May 28, 1999 (entered into force on Nov. 4, 2003),
*reprinted in* S. Treaty Doc. 106-45, 1999 WL 33292734 ...................................... 1, 2, 4, 5

Convention for the Unification of Certain Rules Relating to International Transportation by Air,
October 12, 1929, 49 Stat. 3000, T.S. No. 876, 137 L.N.T.S. 11 ...................................... 2

Restatement (Second) of Conflict of Laws, § 188 ........................................................ 41

Restatement (Second) of Contracts, § 26 ..................................................................... 39

Restatement (Second) of Contracts, § 63 ................................................................ 40, 41

# INDEX OF EXHIBITS

| Exhibit No. | Description |
|:---:|:---|
| 1 | Plaintiffs' Answers to MAS's First Set of Interrogatories regarding Threshold Issues on behalf of decedent, Qingyuan Yang |
| 2 | Kanan's Answers to MAS's First Set of Interrogatories regarding Threshold Issues |
| 3 | Gaspard's Answers to MAS's First Set of Interrogatories regarding Threshold Issues on behalf of Rui Wang |
| 4 | Gaspard's Answers to MAS's First Set of Interrogatories regarding Threshold Issues on behalf of Wei Wei Jiao |
| 5 | Gaspard's Answers to MAS's First Set of Interrogatories regarding Threshold Issues on behalf of Shu Ling Dai |
| 6 | International Civil Aviation Organization, International Conference on Air Law, Vol. I, Minutes, pg. 38, Minutes of the First Plenary Meeting, 10 May 1999 (1100 h.) |
| 7 | International Conference on Air Law, Vol. III, Preparatory Materials, Doc. 9693-LC/190, Report on Agenda Item 4, pp. 159-187 ("ICAO Preparatory Materials") |
| 8 | ICAO Preparatory Materials, Special Group on the Modernization and Consolidation of the Warsaw System ("SGMW"), First Meeting Final Report, Report on Agenda Item 2 |
| 9 | SGMW/1-WP/17, Comments on the Draft Text Approved by the 30th Session of the ICAO Legal Committee, Comments on Article 27 Presented by the U.K., 7 April 1998 |
| 10 | International Civil Aviation Organization, International Conference on Air Law, Vol. II, Documents, DCW Doc. No. 28 |
| 11 | ICAO Minutes, DCW-Min. FCG/2, Minutes of the Second Meeting of the "Friends of the Chairman" Group, 18 May 1999 |
| 12 | ICAO Documents, DCW Doc. No. 3, 9 November 1998 |

| 13 | ICAO Minutes, Minutes of the Third Meeting of the "Friends of the Chairman" Group, 19 May 1999 |
| 14 | ICAO Documents, DCW Doc No. 33, Article 27 – Fifth Jurisdiction (Presented by France), 17 May 1999 |
| 15 | ICAO Documents, DCW Doc No. 36 (Presented by France), 19 September [sic] 1999 |
| 16 | ICAO Minutes, Minutes of the Thirteenth Meeting of the Commission of the Whole, 25 May 1999 |
| 17 | Marriage Certificate and Canadian Passports |
| 18 | Relevant pages from Mukherjee's L-1A Application, dated August 11, 2005 |
| 19 | Notice of action approving L-1A Application, dated August 16, 2005 |
| 20 | Relevant pages from Mukherjee's I-485 Application dated October 30, 2006 and U.S. Government Issued Identification for Mukherjee and Bai |
| 21 | Deed to 663 W. Wellington Ave. Property, dated January 13, 2006 |
| 22 | Application for Travel Document dated September 18, 2008 |
| 23 | Relevant pages from Mukherjee/Bai 2009 Joint U.S. Tax Return |
| 24 | Relevant pages from Mukherjee/Bai 2010 Joint U.S. Tax Return |
| 25 | Relevant pages from Mukherjee/Bai 2011 Joint U.S. Tax Return |
| 26 | Relevant pages from Mukherjee/Bai 2012 Joint U.S Tax Return |
| 27 | Mukherjee Xcoal Employment Agreement |
| 28 | Xcoal Lease Agreement for 6 Chaoyangmenwai Avenue, Tower 15, Unit 2003, Beijing, 100020, China dated November 8, 2012 |
| 29 | Relevant pages from Mukherjee/Bai 2013 Joint U.S. Tax Return |

| 30 | Relevant pages from Mukherjee/Bai 2014 Joint U.S. Tax Return |
|----|-------------------------------------------------------------|
| 31 | Lease and Lease Renewal for 663 West Wellington Ave., Chicago, Illinois for Period from December 31, 2011 through March 31, 2015 |
| 32 | Mukherjee/Bai Family Certificates of Canadian Citizenship |
| 33 | Copies of Canadian Passports of M.Q.M. and M.J.M. |
| 34 | Chinese Work Permit Issued July 30, 2012 |
| 35 | Chinese Tax Records, 2009-2014 |
| 36 | 2008 Form 1040-IL |
| 37 | Resume of Philip Wood |
| 38 | Summary of Allowances while on International Assignment in Beijing |
| 39 | Relevant Pages from Wood 2011 Joint U.S. Tax Return |
| 40 | Relevant Pages from Wood 2012 Joint U.S. Tax Return |
| 41 | Relevant Pages from Wood 2013 Individual U.S. Tax Return |
| 42 | IBM-Malaysia Employment Letter and Agreement |
| 43 | Wood's Travel Records |
| 44 | Answers to MAS's First Set of Interrogatories Regarding Threshold Motions on behalf of decedent, Bing Meng |
| 45 | Answers to MAS's First Set of Interrogatories Regarding Threshold Motions on behalf of decedent, Yan Zhang |
| 46 | Nicole Meng U.S. Passport |
| 47 | Leo Meng U.S. Passport |

| 48 | Birth Notarial Certificate |
|----|----|
| 49 | Form I-797C Notice dated September 22, 2005 |
| 50 | I-485 Application to Register Permanent Residence or Adjust Status, Approved December 9, 2008 |
| 51 | Plaintiffs' Answers to MAS's First Set of Interrogatories regarding Threshold Issues on behalf of decedent, Meng Zhang |
| 52 | Answers to MAS's First Set of Interrogatories regarding Threshold Issues on behalf of decedent, Peng Yan |
| 53 | Declaration of Alpa Devi Panalal |
| 54 | Declaration of Rizani Bin Hassan |
| 55 | Declaration of Mohd Fuad Bin Mohd Sharuji |

## MEMORANDUM

Subject to, and without waiver of, any rights, privileges, or defenses or conceding the convenience of this forum for resolution of this dispute, and without prejudice to its defense of immunity from the jurisdiction of the courts of the United States and of the States under the Foreign Sovereign Immunities Act, 28 U.S.C. §§ 1330, 1332(a)(4), 1391(f), 1441(d), 1602 *et seq.*,[1] Defendant, MALAYSIAN AIRLINE SYSTEM BERHAD (ADMINISTRATOR APPOINTED) ("MAS"), incorrectly sued as "Malaysian Airlines System Berhad," respectfully submits this Memorandum of Law in Support of its Fed. R. Civ. Pro. Rule 12(b)(1) Motion to Dismiss the above-captioned cases (the "Consolidated Lawsuits") against Defendant, MAS, on the ground of lack of Subject Matter Jurisdiction under the Convention for the Unification of Certain Rules for International Carriage by Air, May 28, 1999 (entered into force on Nov. 4, 2003), *reprinted in* S. Treaty Doc. 106-45, 1999 WL 33292734 ("Montreal Convention").[2]

## INTRODUCTION

Plaintiffs commenced the above-captioned cases between December 30, 2015 and March 7, 2016 to recover damages for the deaths of over fifty (50) passengers on board Malaysia Airlines Flight MH370 ("Flight MH370"), an international passenger flight operated by MAS from Kuala Lumpur, Malaysia to Beijing, China on March 8, 2014. Flight MH370 lost contact with aircraft controllers shortly after take-off and never arrived at its destination. It is presumed

---

[1] Defendant Malaysian Airline System Berhad (Administrator Appointed) ("MAS") and Defendant Malaysia Airlines Berhad ("MAB"), the former and current national carrier of Malaysia, are filing a Joint Motion to Dismiss Pursuant to Rule 12(b)(6) on the Ground of Immunity Pursuant to the Foreign Sovereign Immunities Act, 28 U.S.C. §§ 1330, 1332(a)(4), 1391(f), 1441(d), 1602 *et seq.*, contemporaneously herewith.

[2] Certain Plaintiffs have also named the current national carrier of Malaysia, Malaysia Airlines Berhad ("MAB"), as the alleged successor-in-interest to MAS and MAS's alleged insurer, Allianz Global Corporate & Specialty SE ("AGCS SE"), as an involuntary legal representative of MAS. For reasons explained in separate threshold motions, MAB and AGCS SE are not proper defendants and cannot be held liable for the loss of Flight MH370. However, in the event that this Court accepts the Plaintiffs unprecedented allegations, which MAB and AGCS SE expressly deny, MAB and/or AGCS SE would stand in the shoes of MAS.   MAB and AGCS SE have filed, contemporaneously herewith, their separate Joinders in this motion.

1

that Flight MH370 crashed somewhere over the Southern Indian Ocean (the "Accident") and all passengers on board are presumed to have perished in the Accident.

Because it is undisputed that Flight MH370 was "international carriage of persons, baggage or cargo performed by aircraft for reward[,]" these wrongful death lawsuits are all governed by the Montreal Convention. *See*, Article 1.1, Convention for the Unification of Certain Rules for International Carriage by Air, May 28, 1999 (entered into force on Nov. 4, 2003), *reprinted in* S. Treaty Doc. 106-45, 1999 WL 33292734 ("Montreal Convention" or "Convention"); *see also*, *Auster v. Ghana Airways, Ltd.*, 514 F.3d 44, 45 (D.C. Cir. 2008)(citing *El Al Israel Airlines, Ltd. v. Tsui Yuan Tseng*, 525 U.S. 155, 161 (1999)). Accordingly, the United States is an available jurisdiction under the Montreal Convention *only if* the United States is one of the five places identified under Article 33 as having the necessary relation with the carrier and the passenger. The jurisdictional provisions of Article 33, like the jurisdictional provisions of Article 28 of the predecessor Warsaw Convention,[3] are *restrictive* and intended to *limit* rather than broaden the permissible jurisdictions available under this international treaty. *See*, *Boyar v. Korean Air Lines*, 664 F. Supp. 1481, 1483 (D.D.C.1987). Article 33 identifies five "discrete points of jurisdiction, rather than [five] categories of locations which might each contain several appropriate points." *In re Air Disaster Near Cove Neck, N.Y., on Jan. 25, 1990*, 774 F. Supp. 718, 722 (E.D.N.Y. 1991) (interpreting Art. 28 of Warsaw Convention).

Plaintiffs are asking this Court to disregard longstanding principles of treaty construction and to import meanings inconsistent with the plain text of the treaty which would lead to an expansion of jurisdiction under the Montreal Convention.  If Plaintiffs' positions were to be accepted, it would essentially render the courts of any nation an available forum in any suit

---

[3] Convention for the Unification of Certain Rules Relating to International Transportation by Air, October 12, 1929, 49 Stat. 3000, T.S. No. 876, 137 L.N.T.S. 11, *reprinted in* 49 U.S.C. § 1502 note (1976), commonly referred to as the Warsaw Convention.

arising from any accident in the course of international transportation by air – regardless of any meaningful connection between the forum and the passenger, the airline or the accident. However, federal courts are expected to monitor their jurisdictional boundaries vigilantly and to guard carefully against expansion by judicial interpretation. *Rowell v. Franconia Minerals Corp.*, 706 F. Supp. 2d 891, 892 (N.D. Ill. 2010)(*citing American Fire & Cas. Co. v. Finn*, 341 U.S. 6, 17-18 (1951)). None of the provisions of the Montreal Convention, Article 33, provide a basis for any court in the United States to exercise subject matter jurisdiction over any of the above-captioned wrongful death lawsuits ("Lawsuits") and should be dismissed for lack of jurisdiction under the Montreal Convention.

## ARGUMENT

Cases arising as a result of injury or death during "international carriage by air" are governed exclusively by the Montreal Convention. *Auster*, 514 F.3d at 45 (citing *El Al Israel Airlines, Ltd.*, 525 U.S. at 161). Claims arising under the Montreal Convention may only be brought in a limited number of jurisdictions specified in Article 33 of the Convention. In this case, none of the available Montreal Convention jurisdictions are in the United States and all of the claims in these Lawsuits against MAS must be dismissed for lack of jurisdiction under the Convention.

Article 33 sets forth five discrete points of jurisdiction where an action may be brought, provided certain necessary conditions are met. Specifically, Article 33 provides in relevant part as follows:

> 1. An action for damages must be brought, at the option of the plaintiff, in the territory of one of the States Parties, either before the court of the [1] domicile of the carrier or [2] of its principal place of business, or [3] where it has a place of business through which the contract has been made or [4] before the court at the place of destination.

2. In respect of damage resulting from the death or injury of a passenger, an action may be brought . . . in the territory of a State Party [5] in which at the time of the accident the passenger has his or her principal and permanent residence *and* to or from which the carrier operates services for the carriage of passengers by air, either on its own aircraft or on another carrier's aircraft pursuant to a commercial agreement, *and* in which that carrier conducts its business of carriage of passengers by air from premises leased or owned by the carrier itself or by another carrier with which it has a commercial agreement.

3. For the purposes of paragraph 2,

*      *      *

(b) "principal and permanent residence" means the one fixed and permanent abode of the passenger at the time of the accident. The nationality of the passenger shall not be the determining factor in this regard.

*      *      *

Montreal Convention, Art. 33. (emphasis added).

In the above-captioned cases, Plaintiffs allege jurisdiction in the United States based on the passenger's alleged [5] "principal and permanent residence" in the United States "at the time of the accident" under the provisions of Art. 33.2, or [3] that the United States is "where MAS has a place of business through which the contract [with the passenger] has been made," under Art. 33.1, or both.

Article 33 of the Montreal Convention "'operates as an absolute bar to federal jurisdiction in cases falling outside its terms.'" *Kapar v. Kuwait Airways Corp.*, 845 F.2d 1100, 1104 (D.C. Cir.1988)(quoting *Gayda v. LOT Polish Airlines*, 702 F.2d 424, 425 (2d Cir.1983) (per curiam)). As will be demonstrated below, the Plaintiffs cannot satisfy the requirements of Article 33 to establish jurisdiction because:  (1) none of the deceased passengers had a "principal and permanent residence" in the United States at the "time of the accident"; and/or (2) MAS's "place of business through which the contract [with the passenger] was made" was outside the United States. The bases on which Plaintiffs premise Montreal Convention jurisdiction in the

United States rely on the importation of words or concepts that are not part of Art. 33.2 of the

Convention, or essentially disregard basic principles of contract law in attempting to make the

United States a forum under Art. 33.1.

I.      **The United States Is Not the Place Where any Decedent had His or Her "Principal and Permanent Residence" at "the Time of the Accident" because None of the Decedents were Residing in the United States.**

Article 33.2 of the Montreal Convention does not provide a basis for this Court to

exercise subject matter jurisdiction over these wrongful death lawsuits. Article 33.2 of the

Montreal Convention, sometimes referred to as the "fifth jurisdiction," provides that, in cases

involving death or injury of a passenger, an action for damages "*may* be brought":

> . . . in the territory of a State Party in which at the time of the accident the passenger has his or her principal and permanent residence *and* to or from which the carrier operates services for the carriage of passengers by air, either on its own aircraft or another carrier's aircraft pursuant to a commercial agreement, *and* in which that carrier conducts its business of carriage of passengers by air from premises leased or owned by the carrier with which it has a commercial agreement.

Montreal Convention, Art. 33.2 (emphasis added). Pursuant to Article 33.3(b), "'principal and

permanent residence' means the one fixed and permanent *abode* of the passenger at the time of

the accident. The nationality of the passenger shall not be the determining factor in this regard."

*Id.* at Art. 33.3(b) (emphasis added). Noticeably absent from the text of Article 33.2 is any

reference to the passenger's "domicile," a United States common law concept that Plaintiffs seek

to inject into the meaning of "principal and permanent residence" as used in an international

treaty that is meant to be a framework that interfaces with varying legal systems of the signatory

countries. The sole objective of Plaintiffs' allegations is to introduce a subjective element into

Art.33.2 in an effort to claim Montreal Convention jurisdiction in the country of their choosing

rather than the country where the Plaintiffs' decedents actually resided.

Here, the *Ganguli* Plaintiff's decedents, Muktesh Mukherjee and Xiao Mo Bai, had their residence in China where they were living with their children at the time of the Accident. The *Wood* decedent, Philip Wood, had established his residence with his partner in Malaysia at the time of the Accident, where he had recently moved from his previous residence in China. The lead Plaintiffs' decedent in the *Huang, et al.*, matter, Meng Zhang, had her residence in China, where she was living with her husband and his family, all of whom were Chinese citizens, at the time of the accident; and the lead Plaintiffs' decedents in the *Zhang, et al.*, matter who claim jurisdiction on the basis of Article 33.2, Leo and Nicole Meng, were one and three years old at the time of the Accident and were living in China with their Chinese citizen parents. The Plaintiffs for the remaining forty-one decedents in the *Huang, et al.*, *Zhang, et al.* and *Smith* matters (the "Motley Rice Plaintiffs") do not specifically rely on Article 33.2 as a basis for this Court's jurisdiction and have not alleged any residence in the United States at the time of the Accident.[4] The *Kanan* Plaintiffs and the *Gaspard* Plaintiffs also do not rely on Article 33.2 to establish jurisdiction and have conceded that the Decedents were living in Malaysia and China, respectively.[5]

---

[4] The Motley Rice Plaintiffs attempt to confuse the record by making vague allegations in the operative complaints that "each, all and any" of the jurisdictional bases apply to the Plaintiffs' claims, and again in their Answers to MAS's First Set of Interrogatories regarding Threshold Issues answer that there is jurisdiction in the United States under Article 33 because "*some passengers*" had their "principal and permanent residence" in the United states, and "*some passengers*" may have purchased their ticket for carriage on Flight MH370 in the United States, but provide no facts whatsoever on which jurisdiction is premised for those decedents. *See, e.g.*, **Ex. 1**, Plaintiffs' Answers to MAS's First Set of Interrogatories regarding Threshold Issues on behalf of decedent, Qinqyuan Yang. As a matter of law, the absence of necessary jurisdictional allegations requires dismissal. To the extent counsel suggests that Montreal Convention jurisdiction over one passenger claim can confer jurisdiction over all other passenger claims joined in the same complaint that is obviously incorrect. Taken to its logical extreme that would mean in every air crash disaster in the course of international transportation, *every claim* of *every passenger* on board the aircraft could be brought in the United States so long as the United States was an appropriate forum to adjudicate the claim of a *single passenger*.

[5] *See*, **Ex. 2**, Kanan's Answers to MAS's First Set of Interrogatories regarding Threshold Issues, at Answer to Interrogatory Nos. 12-13; **Ex. 3**, Gaspard's Answers to MAS's First Set of Interrogatories regarding Threshold Issues on behalf of Rui Wang, at Answer to Interrogatory Nos. 12-13; **Ex. 4**, Gaspard's Answers to MAS's First Set of Interrogatories regarding Threshold Issues on behalf of Wei Wei Jiao, at Answer to Interrogatory Nos. 12-13; **Ex. 5**, Gaspard's Answers to MAS's First Set of Interrogatories regarding Threshold Issues on behalf of Shu Ling Dai, at Answer to Interrogatory Nos. 12-13.

As the above discussion demonstrates, none of the Plaintiffs' Decedents actually resided in the United States at the time of the Accident.   Therefore, the United States is not the place where any passenger had his or her "principal and permanent residence." Accordingly, Article 33.2 does not provide a basis for this Court to exercise subject matter jurisdiction over any of these wrongful death lawsuits and this Court must dismiss all of the above-captioned cases to the extent that jurisdiction is premised on Article 33.2 of the Montreal Convention.

**A.      "Principal and Permanent Residence" Means "The One Fixed and Permanent Abode of the Passenger at the Time of the Accident."**

As a term defined in the Convention itself, the definition of "principal and permanent residence" in Article 33.3(b) is controlling and must be given effect. According to the definition, the phrase "principal and permanent residence" means "the one fixed and permanent abode of the passenger at the time of the accident. The nationality of the passenger shall not be the determining factor in this regard." Accordingly, the place of a passenger's "principal and permanent residence" refers only to the place where the passenger was actually residing contemporaneous with the accident that caused the injury or death.

In *Seales v. Panamanian Aviation Company, Ltd.*, No. 07-cv-2901, 2009 WL 395821 (E.D.N.Y. Feb. 18, 2009), *aff'd sub nom. Seales v. Panamanian Aviation Co.*, 356 Fed. Appx. 461 (2d Cir.2009), the United States District Court for the Eastern District of New York found that it lacked subject matter jurisdiction over the Plaintiff's Montreal Convention claim because the United States was not the Plaintiff's "principal and permanent residence." Notwithstanding that the Plaintiff was a United States citizen and retained his domicile of choice in the State of New York for purposes of diversity jurisdiction, the district court found that the Plaintiff did not

have his "principal and permanent residence" in the United States because he was not residing anywhere in the United States on the date of the accident.  2009 WL 395821, at \*5-\*10.

In *Seales*, the Plaintiff was a dual citizen of the United States and Panama who moved to the United States in 1976 and lived in New York from 1989 to 1998. *Id.* at \*1. The court concluded that although the airline had not shown a change in domicile from the United States to either Panama or Jamaica for purposes of defeating diversity jurisdiction, "*it does not follow* that plaintiff, who bears the burden of establishing subject matter jurisdiction, has established that New York was his 'principal and permanent residence' [at the time of the events leading to the suit'] in October 2005" *Id.* at \*10 (emphasis added). Notwithstanding Plaintiff's testimony that he never intended to make Jamaica or Panama his permanent home and always intended to return to the United States, Plaintiff could not overcome the *objective fact* that he was residing in Panama at the time of the events in question and testified that he maintained his residence there at the time of his deposition. *Id.* (emphasis added). Accordingly, the court dismissed the Plaintiff's Montreal Convention claim on the ground of lack of subject matter jurisdiction to hear that claim.

The *Seales* Court recognized that "principal and permanent residence" is specifically defined by the Montreal Convention and means something distinctly different from the concept of "domicile" as understood under United States common law for purposes of diversity jurisdiction. Under the Montreal Convention, the relevant inquiry is where the passenger *actually resided* on the date of the accident and the determination must be made based on objective evidence and taking into account the recognition that jurisdiction under the Montreal Convention is to be strictly construed to limit jurisdiction. Accordingly, evidence of a passenger's subjective future intent to establish or reestablish residence in a particular country is irrelevant. Apart from

the logical reading and plain language of Article 33.2 applied by the court in *Seales*, the drafting history of Article 33.2 demonstrates that the drafters intended to avoid or exclude the United States common law concept of "domicile" and its concomitant reference to the subjective element of intent from Article 33.2.

Here, as explained above, none of the passengers named in the above-captioned cases were residing or had any place to reside in the United States on the date of the Accident. Rather, the objective facts establish that the decedents were *all* residing in China or Malaysia at the time of the Accident. Accordingly, Article 33.2 does not provide this Court a basis for exercising subject matter jurisdiction over any of the above-captioned cases.

**B.    The Clear Drafting History of the Montreal Convention Establishes that the "Principal and Permanent Residence" Must be Determined by Objective Facts Existing at the Time of the Accident, without Reference to a Passenger's Subjective Intent.**

The meaning of "principal and permanent residence," as defined by Article 33.3, is clear and the drafting history confirms that "principal and permanent residence" must be determined by the objective facts existing at the time of the accident in question, without reference to a passenger's subjective intent as to the permanency of that residence. As a treaty ratified by the United States, the Montreal Convention is an agreement among sovereign powers and this Court may consider the negotiation and drafting history of the Montreal Convention as well as the post-ratification understanding of signatory nations as aids to its interpretation. *Fadhilah v. Societe Air France*, 987 F. Supp. 2d 1057, 1062 (C.D. Cal.2013)(*quoting Medellin v. Texas*, 552 U.S. 491, 507, 128 S.Ct. 1346 (2008)). Consistent with the holding in *Seales*, the drafting history of the Montreal Convention indicates that the drafters of the Montreal Convention specifically intended to eschew a meaning similar to the concept of *domicile* as used under United States law

for determining federal subject matter jurisdiction when it included the fifth jurisdiction in the country of a passenger's "principal and permanent residence."

As the drafting history shows, the draft text considered by the delegations at the International Conference on Air Law beginning on May 10, 1999 at Montreal was "the outcome of more than three years of spirited consultations and deliberations in the various bodies of the ICAO which were involved in the preparatory process." *See* **Ex. 6**, International Civil Aviation Organization, International Conference on Air Law, Vol. I, Minutes, pg. 38, Minutes of the First Plenary Meeting, 10 May 1999 (1100 h.) ("ICAO Minutes"). The so-called "fifth jurisdiction" was among the most controversial of the provisions discussed during the preparatory process. *Id.*

Following the 30th Session of the Legal Committee, a draft text was approved which contained a number of provisions in square brackets. *Id.* Further refinement of the draft text was assigned to be carried out by the "Special Group on the Modernization and Consolidation of the Warsaw Convention," (the "Special Group"), a body of experts who met in April of 1998. *Id.* The phrase "principal and permanent residence" was developed during these preparatory sessions and was included in the draft text considered by the delegations in Montreal the following year. Review of the complete drafting history of the Montreal Convention, including the ICAO Minutes, Documents and Preparatory Materials, unquestionably demonstrates that the determination of a passenger's "principal and permanent residence" must be based on the passenger's actual residence or abode contemporaneous with the time of the accident, and forecloses the possibility that a passenger can have his or her "principal and permanent residence" anywhere other than when he or she was residing at the time of the accident.

1.      **The Special Group Specifically Omitted Reference to a Passenger's "Domicile" or Subjective Intent from the Text of Article 33.2 and Article 33.3 Before the Delegates Convened in Montreal in 1999.**

The Montreal Convention preparatory materials demonstrate that the fifth jurisdiction was never intended to be based on the concept of "domicile" as that concept is used and understood under United States law and that from the outset, an agreement was reached to delete any reference to domicile or subjective intent from the text of Article 33.2 and 33.3 of the draft Convention. From these materials, it is apparent that the basis for the fifth jurisdiction was the subject of extensive discussions during the meetings of the Special Group. *See* **Ex. 7**, International Conference on Air Law, Vol. III, Preparatory Materials, Doc. 9693-LC/190, Report on Agenda Item 4, pp. 159-187 ("ICAO Preparatory Materials").  Significantly, the draft convention that was prepared and approved during the 30th Legal Session identified the fifth jurisdiction in relevant part as follows:

> In respect of damage resulting from the death or injury of a passenger, the action may be brought before one of the Courts mentioned in paragraph 1 of this Article or in the territory of a State Party in which the passenger has his or her *domicile or permanent residence . . .*

*Id.*, at Attachment D, p. 219, Draft Convention for the Unification of Certain Rules for International Carrier by Air (emphasis added).

During subsequent meetings of the Special Group, proponents of the fifth jurisdiction argued that jurisdiction based on a passenger's domicile was necessary to enhance passengers' rights under the treaty and they referred to previous amendments to the Warsaw Convention, including the Guatemala Protocol of 1971, in which a fifth jurisdiction was incorporated on that basis. *See* **Ex. 8**, ICAO Preparatory Materials, Special Group on the Modernization and Consolidation of the Warsaw System ("SGMW"), First Meeting Final Report, Report on Agenda Item 2, ¶ 2:43. Opponents of the provision, however, objected to basing the fifth jurisdiction

merely on the domicile of the passenger, and this was of particular concern in light of the ongoing negotiations regarding the inclusion of a provision for unlimited liability, which was not included in the Guatemala Protocol of 1971. *Id.* ¶ 2:41, ¶ 2:46. During those meetings, it was also suggested that the concepts of "residence" and "domicile" as used in the Article on Jurisdiction "should be rendered more precise and defined to avoid confusion which might arise from different perceptions of these terms." *Id.* at ¶ 2:42. The United Kingdom, another common law jurisdiction, specifically objected to the use of the word "domicile" as the basis for the fifth jurisdiction as "the reference to domicile introduces a concept which is capable of *unacceptably wide meaning*[,]" and demanded that "[a] more realistic association with a State for the purpose of determining the value of damages must be residence."  *Id.* at ¶ 2:44; **Ex. 9,** SGMW/1-WP/17, Comments on the Draft Text Approved by the 30th Session of the ICAO Legal Committee, Comments on Article 27 Presented by the U.K., 7 April 1998 (emphasis added).

In an effort to reach a compromise, the Special Group agreed to devise a generic, universally applicable term such as a "permanent home" that would adequately capture the concepts presently denoted by the terms "domicile", "permanent residence", or "ordinary residence." *See* **Ex. 8,** at ¶ 2:47. The development of the new concept was to be "guided by the overriding consideration of devising *adequate and acceptable connecting criteria* between the passenger and the State of the jurisdiction before which the claim is brought . . ." *Id.* at ¶ 2:48.

Notably, as subsequent discussions revealed:

a clear preference *not* to retain any reference to the phrase 'to which, if absent, for less than three years, he or she intends to return' *as it was believed that the element of 'intent' opened the door to too many subjective criteria . . .* a consensus was reached within the Group to indicate that in any future definition the criterion to be used for the determination of the passenger's *home* be considered *on the basis of the facts existing at the time of the accident*.

*Id.* at ¶ 2:53 (emphasis added).

Ultimately, the Special Group *replaced* the phrase "in which the passenger has his *domicile* or permanent residence" with the place "in which *at the time of the accident* the passenger has his or her *principal and permanent residence*," and agreed that the determination would be based only on objective facts contemporaneous with the time of the accident without consideration of intent to return to a former residence. Thus, the Special Group specifically tailored the wording of the fifth jurisdiction to highlight the importance of the passenger's actual residence at the time of the accident in question. This fact *alone* conclusively establishes that the drafters intended that "principal and permanent residence" would mean something substantially different from the concept of "domicile" as understood under United States law. *See id.* at ¶ 2:113, ¶ 2:118; *see also*, Appendix 4, Revised Draft of Articles 16, 20 and 27, pp. 269-270."[I]t was the understanding of the group that the term 'principal and permanent residence' referred to the *one factual place* where the passenger had his or her fixed and permanent abode." *Id.* at ¶ 2:114. Thus, even at this early stage in the drafting process there was a consensus that a passenger's subjective intent with respect to his or her actual residence could not be considered in the determination of "principal and permanent residence" for purposes of the fifth jurisdiction.

**2.      The Minutes and Documents from the Drafting History of the Montreal Convention Confirm the Drafter's Goal of Divorcing Subjective Intent from the Concept of "Principal and Permanent Residence."**

The conclusion that "principal and permanent residence" is to be determined by actual residence at the time of the accident is further supported by the subsequent negotiations that took place when the delegations convened in Montreal beginning May 10, 1999. By that time, it was already agreed to eschew any concept which incorporated a passenger's subjective intent. *See, e.g.*, **Ex. 10,** International Civil Aviation Organization, International Conference on Air Law,

13

Vol. II, Documents, DCW Doc. No. 28 ("ICAO Documents"), Presented by the International

Union of Aviation Insurers, pp. 155-59 (noting that"[t]he substitution of 'principal and

permanent residence' for 'domicile' is welcomed. This signals a clear intent on the part of the

drafters which should aid subsequent interpretation."). Nonetheless, considerable time was

devoted to developing the precise definition of "principal and permanent residence," a process

which was contingent on the negotiations regarding potential provisions for unlimited liability

and other provisions designed to enhance consumer protections. *See, e.g.*, **Ex. 11,** ICAO

Minutes, DCW-Min. FCG/2, Minutes of the Second Meeting of the "Friends of the Chairman"

Group, 18 May 1999, at p. 134; *see also*, **Ex. 12**. ICAO Documents, DCW Doc. No. 3, 9

November 1998; **Ex. 13,** ICAO Minutes, Minutes of the Third Meeting of the "Friends of the

Chairman" Group, 19 May 1999, at p. 147 (noting that during previous discussions the Group

recognized that the issue of compensation was intricately bound to the issue of jurisdiction).

     With respect to the fifth jurisdiction, there were concerns about the adequacy of a

jurisdictional provision based only on a passenger's residence in that forum, which did not

ensure an adequate connection between the forum, the passenger and the carrier:

> An attempt had been made in paragraph 2 to *circumscribe* the conditions under
> which such a fifth jurisdiction could be invoked, and it was necessary to examine
> those conditions with great care in order to determine whether or not, if it were to
> be an acceptable basis, they were adequate to provide protection against the fears
> which had been expressed.

*Id.* at p. 148.

     The most critical opponent of the fifth jurisdiction was the French Delegation which

repeatedly expressed concern that the new concept of "principal and permanent residence" under

international law needed to be carefully defined to *avoid* subsequent interpretation by courts of

the State Parties by reference to pre-convention concepts such as "domicile" under U.S. common

law. *See* **Ex. 14,** ICAO Documents, DCW Doc No. 33, Article 27 – Fifth Jurisdiction (Presented

14

by France), 17 May 1999, pp. 195-198 (emphasis added). In particular, France was concerned

that if not specifically defined, the new concept could be deemed to correspond to:

> . . . *the notion of "permanent abode", to which the person concerned intends to return even if he lives elsewhere temporarily*. Such an interpretation could be easily given by the courts. It is therefore the claimant's nationality which would become the decisive element. A citizen of a given country would thus be able to escape the jurisdiction of a foreign country and would have the assurance of being judged in his country in accordance with its legislation. *A true jurisdictional privilege would thus be created*.

*Id.* at p. 197 (emphasis added). Thus, the agreement to draft a precise definition of "principal and

permanent residence" in the Convention itself was intended to preclude courts from interpreting

the fifth jurisdiction by reference to a passenger's subjective intent to reside somewhere other

than where he or she was actually residing at the time of the accident in question.

The final definition in Article 33.3(b) was agreed upon as giving the new concept of

"principal and permanent residence" an objective, specific and precise content so that the fifth

jurisdiction would be based on the passenger's actual residence and not his or her nationality. *See*

**Ex. 15**, ICAO Documents, DCW Doc No. 36 (Presented by France), 19 September [sic] 1999,

pp. 203-205. Importantly:

> This definition ensured that it was *not* possible to have *several principal and permanent residences from among which to choose the most convenient one in which to bring an action*. The last sentence had been added in light of the considerable concerns expressed regarding some jurisdictions which would view nationality as being equivalent to 'principal and permanent residence.'

*See* **Ex. 16**, ICAO Minutes, Minutes of the Thirteenth Meeting of the Commission of the Whole,

25 May 1999, at pp. 204-205 (emphasis added).

Consideration of the drafting history in its entirety overwhelmingly demonstrates that

Plaintiffs here cannot establish jurisdiction under Article 33.2 by reference to a decedent's prior

residence in the United States or a decedent's alleged intent to establish residence in the United

States at some future time. In fact, what the Plaintiffs who are asserting Article 33.2 jurisdiction

here are attempting to accomplish is precisely what the drafters feared with regard to the addition of the fifth jurisdiction. Notwithstanding that none of the Plaintiffs' decedents maintained a residence in fact in the United States at the time of the Accident, Plaintiffs invite this Court to look back years before this Accident (or years into the future) and exercise subject matter jurisdiction over MAS on the basis that some passengers on board Flight MH370 *used to* live in the United States and nothing more than inadmissible hearsay regarding the Decedents' alleged subjective intention to someday return.

Any such invitation must be rejected. The definition of "principal and permanent residence" included in the Convention is clear and must be determined by reference to specific and objective evidence. The inclusion of the phrase "at the time of the accident" specifically precludes any conclusion that a passenger's "principal and permanent residence" was located in a country where the passenger was *not* living at the time of the accident but may have intended to return to at some future time.

The following observation by Judge Posner of the Seventh Circuit regarding "domicile" as understood under United States law illustrates why the concept of "principal and permanent residence" must be treated as a new concept under international law:

> . . . [I]n this age of second homes and speedy transportation, picking out . . . an individual's domicile can be a difficult, even rather arbitrary, undertaking. Domicile is not a thing, like a rabbit or a carrot, but a legal conclusion, though treated as a factual determination for purposes of demarcating the scope of appellate review.

*Galva Foundry Company v. Heiden*, 924 F.2d 729, 730 (7th Cir. 1991) (Posner, J.). Unlike "domicile," the drafters ensured that "principal and permanent residence" was defined by reference to a tangible thing – an abode – which can be located based on objective facts without consideration of any subjective intent. Accordingly, because all of the decedents in the above-captioned cases were residing in identifiable abodes outside of the United States at the time of

the Accident, Article 33.2 cannot provide a basis for this Court to exercise subject matter jurisdiction over these cases and this Court should not be burdened to undertake the fact-intensive inquiry into any of the Decedent's subjective intent, undoubtedly to be based on hearsay, to live somewhere else at some future time.

C.     **The Cases Importing the Concept of "Domicile" into the Definition of "Principal and Permanent Residence" are based on Flawed Reasoning and are in Derogation of the Plain Language of Article 33.3.**

Despite the clear meaning of Article 33.2 and 33.3, certain Plaintiffs' do make allegations regarding the decedent's "intent" to return to the United State or that the decedent had never "relinquished" his or her permanent residency or "domicile" in the United States. These allegations establish, by their very nature, that none of these decedents were residing in the United States at the time of the accident, and that, MAS contends, should be the end of the inquiry.

Although not alleged in their complaints, these Plaintiffs have pointed to certain district court decisions as support for their reliance on the concept of "domicile" for purposes of determining a passenger's "principal and permanent residence" under Art. 33.2. *See*, *e.g.*, *Choi v. Asiana Airlines, Inc.*, No. 14-cv-03738, 2015 WL 394198 (N.D. Cal. Jan. 29, 2015)(interpreting "principal and permanent residence" as akin to concept of "domicile," requiring evaluation of objective facts establishing actual residence and passenger's subjective intent to remain in that residence); *In Re Air Crash Over Mid-Atlantic on June 1, 2009*, 760 F. Supp. 2d 832 (N.D. Cal. 2010) ("*In Re Air Crash*")(treating "principal and permanent residence" like "domicile" under United States jurisdictional jurisprudence); *Hornsby v. Lufthansa German Airlines*, 593 F. Supp. 2d 1132 (C.D. Cal. 2009) (same).

Those decisions may have been made without the benefit or consideration of the complete drafting history, the overwhelming weight of which establishes that there is no room

for consideration of a passenger's subjective intent for purposes of determining his or her "principal and permanent residence." Even without the complete drafting history, MAS respectfully contends that the cases relied on by Plaintiffs were incorrectly decided because there is no support in the text of Article 33.2 for adding the concept of "domicile" as the basis for determining "principal and permanent residence," as the definition of Article 33.3(b) is clear. *See Chan v. Korean Air Lines, Ltd.*, 490 U.S. 122, 135 (1989) (where text of a treaty is clear, court may not "alter, amend, or add to any treaty, by inserting any clause, whether small or great, important or trivial.") (citation omitted).

More importantly, those decisions are not binding on this Court and were also factually dissimilar to the facts of the cases at issue here. They also perpetuate the notion that any U.S. Citizen or Lawful Permanent Resident living abroad for however long and under whatever circumstances may maintain an action under the Montreal Convention in the courts of the United States simply by alleging an intention to reside in the United States at some as-yet-unknown time in the future. As demonstrated amply above, Article 33.2 was not intended to create such a jurisdictional privilege based solely on citizenship or an immigration status.

The determination of a passenger's "principal and permanent residence" by reference to a passenger's subjective future intent would render the question of jurisdiction under Article 33.2 a mixed question of law and fact, requiring extensive discovery in essentially every case in which "principal and permanent residence" is alleged. As the cases here demonstrate, the problems with considering subjective intent are particularly acute in wrongful death cases where the passenger is unable to corroborate any allegations that may be asserted on behalf of the estate to manufacture jurisdiction in a particular forum. Accordingly, this Court must reject Plaintiffs'

invitation to consider any evidence other than the objective facts establishing where the decedent was actually living at the time of the accident.

> **D.**   **While Irrelevant, Plaintiffs Do Not Have Any Admissible Evidence of Any Decedent's Future Subjective Intent which Would Be Sufficient to Establish Domicile even under Standards of Federal Common Law.**

Finally, even if this Court finds that "domicile" is the test and subjective intent is relevant for purposes of establishing the fifth jurisdiction, which MAS disputes, the available information demonstrates that none of the Plaintiffs can establish any Decedent was domiciled in the United States on the date of the Accident. It should be noted that MAS is filing its Motions in compliance with this Court's Initial Scheduling Order [ECF No. 14] without the benefit of Plaintiffs' complete discovery responses. For the avoidance of doubt, MAS specifically reserves the right to rely on any information produced in the course of ongoing discovery and raise arguments in its Reply based on any subsequently discovered information. Even on the current record, however, it is apparent that Plaintiffs cannot satisfy their burden of proving domicile in the United States at the time of the Accident for any Decedent.

While irrelevant for purposes of determining whether the United States is an available forum under the Montreal Convention, the Plaintiffs who rely on Article 33.2 cannot even establish domicile in the United States utilizing the standards for determining domicile under federal common law. *See*, *e.g.*, *Mississippi Band of Choctaw Indians v. Holyfield*, 490 U.S. 30, 43-47, 109 S.Ct. 1597 (1989) ("*Holyfield*") (holding uniform federal law of domicile applied to determining jurisdiction under Indian Child Welfare Act as federal statutes are generally intended to have uniform nationwide application); *Sadat v. Mertes*, 615 F.2d 1176, 1180 (7th Cir. 1980) (per curiam) (holding standards for determining domicile in context of diversity jurisdiction found by resort to federal common law.). Domicile has been described as the place where a person has his or her true fixed home and principal establishment and to which,

whenever he or she is absent, he or she has the intention of returning. *Linardos v. Fortuna*, 157 F.3d 945, 948 (2d Cir. 1998) (*citing* 13B C. Wright, A. Miller & E. Cooper, *Federal Practice and Procedure* § 3612, at 526 (2d ed. 1984)).

One acquires a "domicile of origin" at birth, based on the domicile of one's parents, and there is a presumption that the domicile continues until a person reaches the age of majority and effects a change of domicile (the "domicile of choice"). *Holyfield*, 490 U.S. at 48; *Mitchell v. United States*, 88 U.S. 350, 353, 22 L.Ed. 584 (1874). A person can have only one domicile at any given time, and there is a *presumption* of domicile in the place of residence. *Seales*, 2009 WL 395821, at *6. Indeed, the presumption of continuance of domicile is met by the strong counter-presumption of domicile in the jurisdiction where the individual is a resident at the crucial time – which here is the date of the Accident.[6] *See Slaughter v. Toye Bros. Yellow Cab Co.*, 359 F.2d 954, 956 (5th Cir. 1966). The concept of domicile "imports permanent residence in a particular state with the intention of remaining, and is not dependent on birth. Residence alone is not the equivalent of citizenship, although the place of residence is prima facie the domicile." *Stine v. Moore*, 213 F.2d 446, 448 (5th Cir.1954). To establish domicile, two things are indispensable:

> First, residence in the new locality; and, second, the intention to remain there. The change cannot be made except *facto et animo*. Both are alike necessary. Either without the other is insufficient. Mere absence from a fixed home, however long continued, cannot work the change. There must be the *animus* to change the prior domicile for another. Until the new one is acquired, the old one remains. These principles are axiomatic in the law upon the subject.

---

[6] The burdens of proof and production with respect to establishing domicile in the context of diversity jurisdiction are complicated and shifting depending on the party asserting jurisdiction, whether they are relying on domicile of origin or domicile of choice and whether they are attempting to show a continuing domicile or establishment of domicile in the jurisdiction of residence. *See Freidrich v. Davis*, 767 F.3d 374, 379 (3d Cir. 2014); MAS notes that this Court can avoid sorting out the shifting burdens of production and persuasion and the fact-intensive domiciliary inquiry in these cases by dismissing all cases on the ground of *forum non conveniens. See Sinochem Intern. Co. Ltd v. Malaysia Intern. Shipping Corp.*, 549 U.S. 422, 436 (2007).

*Mitchell*, 88 U.S. at 353 (emphasis in original); *see also*, *McCormick v. Aderholt*, 293 F.3d 1254, 1258 (11th Cir. 2002); *Gutierrez v. Fox*, 141 F.3d 425, 427-28 (2d Cir. 1998) (collecting cases). "The place where a person lives is taken to be his domicile until facts adduced establish the contrary." *Mitchell*, 88 U.S. at 352.

Here, the crucial date is the time of the Accident and it is undisputed that all of the Decedent Passengers resided outside of the United States on that date. Specifically, Wood had moved from China and was residing, or establishing his residence, in Kuala Lumpur, Malaysia with his partner, and Mukherjee and Bai, Leo and Nicole Meng, and Meng Zhang were all residing in China with their families. Accordingly, there is a strong presumption of domicile in those countries – not the United States. Plaintiffs, as the party asserting jurisdiction, bear the burden of proving facts to overcome that presumption by a preponderance of the evidence. *Linardos*, 157 F.3d at 947 (*citing McNutt v. General Motors Acceptance Corp.*, 298 U.S. 178, 189 (1936)); *McCormick*, 293 F.3d at 1257; *Gutierrez*, 141 F.3d at 427.

Courts have held that determination of an individual's domicile involves a number of factors, including: current residence, voting registration and voting practices, location of personal and real property, location of brokerage and bank accounts, location of spouse and family, membership in unions and other organizations, place of employment or business, driver's license and automobile registration, and payment of taxes. *Lew v. Moss*, 797 F.2d 747, 750 (9th Cir. 1986) (collecting cases). These factors serve as a proxy for locating the "center of gravity" of a person's life and no single factor is controlling. *Id.*; *Galva Foundry Co.*, 924 F.2d at 730. Importantly, they are evaluated in terms of *objective facts* and although domicile involves an element of state of mind, "statements of intent are entitled to little weight when in conflict with facts." *Lew*, 797 F.2d at 750 (*quoting Freeman v. Nw. Acceptance Corp.*, 754 F.2d 553, 556 (5th

Cir. 1985)(*quoting Hendry v. Masonite Corporation*, 455 F.2d 955, 956 (5th Cir. 1972), *cert. denied sub nom.*, *Masonite Corp. v. Hendry*, 409 U.S. 1023 (1972)); *see also*, *Sadat*, 615 F.2d at 1181 (explaining intent is a state of mind which must be evaluated through the circumstantial evidence of a person's *manifested conduct* and affording little weight to plaintiff's disclaimed intention of settling abroad where plaintiff's conduct conflicted with disclaimed intent.); *Stine*, 213 F.2d at 448 (explaining mere mental fixing of domicile is insufficient; what is in another's mind must be determined by what he does as well as what he says.). In these wrongful death cases, the domicile that counts is domicile of the *decedent* on the date of the Accident. *See King v. Cessna Aircraft Co.*, 505 F.3d 1160, 1170 (11th Cir.2007)(in context of determining diversity jurisdiction where estate is a party, citizenship that counts is that of the decedent and decedent is deemed to be citizen of the state where he/she was domiciled at time of his/her death).

Here, jurisdiction under Article 33.2 is alleged as to the following six passengers on Flight MH370: Muktesh Mukherjee and Xiao Mo Bai in *Ganguli v. Malaysia Airlines Berhad, et al.*, No. 1:16-cv-01047-KBJ; Philip Wood in *Wood v. Malaysia Airlines Berhad, et al.*, No. 1:16-cv-00053-KBJ; and Leo and Nicole Meng and Meng Zhang in *Smith v. Malaysia Airlines Berhad, et al.*, No. 1:16-cv-00439-KBJ / *Zhang, et al. v. Malaysia Airlines Berhad, et al.*, No. 1:16-cv-01048-KBJ / *Huang, et al. v. Malaysia Airlines Berhad, et al.*, No. 1:16-cv-01063-KBJ.[7] None of these passengers had a residence/abode in the United States and for the reasons discussed below, Plaintiffs have not produced the objective documents and information necessary to overcome the presumption that they were domiciled outside of the United States in China or Malaysia where they were residing at the time of the Accident. Accordingly, this Court

---

[7] Because no other Plaintiff has specifically alleged Article 33.2 Jurisdiction in these cases, MAS submits that these Plaintiffs, other than those identified herein, have conceded that Article 33.2 is not applicable to their cases. Based on the lack of allegations, MAS does not address them specifically herein.

must dismiss all of the above-captioned cases for lack of subject matter jurisdiction under Article 33.2 of the Montreal Convention.

> **1.** **Muktesh Mukherjee and Xiao Mo Bai's "Principal and Permanent Residence" and Domicile was in China where they were Residing with their Children.**

The facts in the *Ganguli* matter (16-cv-01047-KJB) overwhelmingly demonstrate that decedents Muktesh Mukherjee ("Mukherjee") and Xiao Mo Bai ("Bai") were domiciled in China and exemplify the precise concerns the Montreal Convention drafters had regarding the addition of the fifth jurisdiction. Specifically, the facts establish that Mukherjee, an Indian citizen by birth, and Bai, a Chinese citizen by birth, had become Canadian citizens by law and were married in Canada, which they claimed as their domicile, in 2002.[8] In 2005, Mukherjee accepted a temporary assignment in Chicago, Illinois through August, 2008, with the U.S. subsidiary of his Canadian employer, Mittal Steel, and the couple relocated to the United States from Canada.[9] While in Chicago, Illinois they obtained Permanent Resident Status based on Mukherjee's classification as a Manager of a Multinational Corporation.[10] The couple also purchased a condominium in Chicago where they resided for only a short time.[11]

As projected, in 2008, Mukherjee's U.S. assignment came to an end and Mukherjee agreed to take another international assignment with his employer, by that time known as ArcelorMittal, in China to work on a specific project that was expected to last an unspecified duration of over one year.[12] Mukherjee thereafter moved his family to Beijing, China and established a residence at Central Park Residences, 6 Chaoyangmenwai Avenue, Tower 15, Unit

---

[8] *See* **Ex. 17**, Marriage Certificate and Canadian Passports.
[9] *See* **Ex. 18**, Relevant pages from Mukherjee's L-1A Application, dated August 11, 2005; **Ex. 19**, Notice of action approving L-1A Application, dated August 16, 2005.
[10] *See* **Ex. 20**, Relevant pages from Mukherjee's I-485 Application dated October 30, 2006 and U.S. Government Issued Identification for Mukherjee and Bai.
[11] *See* **Ex. 21**, Deed to 663 W. Wellington Ave. Property, dated January 13, 2006.
[12] *See* **Ex. 22**, Application for Travel Document dated September 18, 2008.

2003, Beijing, 100020, China, by at least November 24, 2008.[13]   At the time of the Accident, on March 8, 2014, the Mukherjee family was residing at the same address, although by May of 2012 Mukherjee had accepted further employment in China with a different employer, Xcoal Energy & Resources ("Xcoal").[14] Thus, while his employment changed, the family's residence remained the same, an objective fact which squarely negates any alleged inference that Mukherjee's employer, as opposed to Mukherjee and Bai themselves, controlled the location where the family lived.

There is no objective evidence that the Mukherjee family had any set plans to leave China at the time of the Accident. More importantly, the objective facts establish that they had no residence in the United States, as at all times while they were residing in China their Chicago condominium was leased and occupied by tenants.[15] Although Plaintiff's responses to written discovery suggest that Plaintiff would like to ignore the Mukherjee family's residence in China from the period of November 2008 through 2012 while Mukherjee was employed by ArcelorMittal, prior to his subsequent employment at Xcoal from 2012 to the date of the Accident on March 8, 2014, the salient facts of their residency in China during those years are an essential factor supporting domicile in China. *See Hawes v. Club Ecuestre El Comandante*, 598 F.2d 698, 699 (1st Cir. 1979).

While Plaintiff has tried to gloss over the Mukherjee family's continuous residence in China for over five years – from at least November 2008 until the date of the Accident on March

---

[13] *See* **Ex. 23**, Relevant pages from Mukherjee/Bai 2009 Joint U.S. Tax Return, Form 2555.
[14] *See Id.*; **Ex. 24**, Relevant pages from Mukherjee/Bai 2010 Joint U.S. Tax Return; **Ex. 25,** Relevant pages from Mukherjee/Bai 2011 Joint U.S. Tax Return; **Ex. 26**, Relevant pages from Mukherjee/Bai 2012 Joint U.S Tax Return; *See also* **Ex. 27**, Mukherjee Xcoal Employment Agreement; **Ex. 28**, Xcoal Lease Agreement for 6 Chaoyangmenwai Avenue, Tower 15, Unit 2003, Beijing, 100020, China dated November 8, 2012.
[15] *See* **Ex. 23**, at Schedule E; **Ex. 24**, at  Schedule E; **Ex. 25**, at Schedule E; **Ex. 26**, at Schedule E; **Ex. 29**, Relevant pages from Mukherjee/Bai 2013 Joint U.S. Tax Return, at Schedule E; **Ex. 30**, Relevant pages from Mukherjee/Bai 2014 Joint U.S. Tax Return, at Schedule E; *see also* **Ex. 31**, Lease and Lease Renewal for 663 West Wellington Ave., Chicago, Illinois for Period from December 31, 2011 through March 31, 2015.

8, 2014 – the Plaintiff does not dispute the facts. The dispute, rather, concerns the proper interpretation of the objective facts. Plaintiff claims that Mukherjee and Bai were domiciled in the United States and living in China only on a temporary assignment, while always intending to return to the United States. But that begs the question: if *Mukherjee's* temporary assignment in the United States for three years was sufficient to effect a change of domicile from Canada to the United States, why was the "temporary assignment" in China insufficient to again effect a change in domicile from the United States to China?  Plaintiff cannot have it both ways. *See*, *e.g.* *Sadat*, 615 F.3d at 1181-82.

Plaintiff relies almost exclusively on the fact that Mukherjee and Bai owned real estate in the United States and maintained a few other contacts with this country during the over five years the family was residing in China. As discussed above, the fact that Mukherjee and Bai owned real estate in the United States that they treated as rental property for over five years is not evidence of domiciliary intent. The fact that Mukherjee and Bai had no right to reside at that property – given that it was subject to leases and legal occupancy by tenants for over five years – and had no actual place where they resided in the United States weighs heavily against domicile. *See Core VCT PLC v. Hensley*, 89 F. Supp. 3d 110, 110-11 (D.D.C. 2015) (Plaintiff's claim of Defendant's domicile rejected because "[I]t is uncontested that defendant had nowhere to live in Illinois; he has leased out his Chicago condominium since he moved to France in 1989, and the Court agrees that '[t]he lack of an Illinois residence weighs heavily against domicile.'").

Nor are other contacts with the United States for the apparent purpose of leaving their future options open sufficient to overcome the overwhelming evidence of domicile in China. *See Freidrich v. Davis*, 767 F.3d 374, 379 (3d Cir. 2014) (fact that Defendant completed Registration and Ballot Request Form stating he was a U.S. citizen living abroad and intended to return to the

25

United States did not satisfy the preponderance of the evidence standard for Plaintiff to establish continuing domicile after Defendant produced sufficient evidence supporting change of domicile where Defendant explained he made the selection on the form because he could not rule out the possibility that he may one day return to the U.S.; "History, and the uncertainty of the world situation, show the wisdom of that caution.").

In reality, Mukherjee and Bai never established a domicile of choice in the United States during their temporary residence in this country from 2005-2008. The contention to the contrary is belied by the fact that Bai, after moving to Chicago, pursued and obtained Canadian citizenship in 2006.  This establishes by objective evidence that Mukherjee and Bai did not abandon their domicile in Canada upon relocating to the United States in 2005. *See* **Ex. 32**, Mukherjee/Bai Family Certificates of Canadian Citizenship. Similarly, although their two minor children were both born in the United States and were thus U.S. citizens by operation of law, the couple registered their sons' Canadian citizenship and obtained Certificates of Canadian Citizenship for the children within 6-7 months of each child's birth. *Id.* Mukherjee and Bai also secured a Canadian passport for their eldest son while the family was residing in China. *See* **Ex. 33**, Copies of Canadian Passports of M.Q.M. and M.J.M.

Even if the evidence were sufficient to show Mukherjee and Bai established a domicile of choice in the United States while the family lived here from 2005-2008, the objective facts require the conclusion that the move to China again effected a change of domicile. Indeed, the following additional facts establish that China was the "center of gravity" of the Mukherjee family's life on the date of the Accident:

- Bai's parents, Chinese citizens, resided near the Mukherjee family in China;

- Mukherjee's parents reside in India and neither Mukherjee nor Bai had any immediate family in the United States;

- In 2012, after his employment with ArcelorMittal ended, rather than return "home" to Chicago and their purported domicile in the United States, Mukherjee took yet another position stationed in Beijing with Xcoal, a different U.S. company, as the Vice President, China Operations & Chief Representative, Xcoal China Representative Office with a term from May 14, 2012 through April 30, 2015, subject to automatic renewal for one-year terms in the absence of notice of non-renewal. There is no objective evidence either party ever gave such notice;

- The term of the Xcoal's lease of the apartment where the family had been living since 2008, was for the period from January 1, 2013 through July 15, 2015 is objective evidence that the parties contemplated a continuing employment relationship beyond the April 30, 2015 "Ending Date" set forth in the Xcoal Employment Agreement. *See* **Ex. 28.**

- Mukherjee had a Chinese Alien Worker Permit which was valid through 2017; *See* **Ex. 34**, Chinese Work Permit Issued July 30, 2012;

- Mukherjee reported deposit accounts with Chinese financial institutions in the couple's U.S. Tax Returns; *See* **Ex. 23**, at p. 4, Schedule B; **Ex. 24**, at p. 4, Schedule B; **Ex. 25**, at p. 4, Schedule B; **Ex. 26**, at p. 3, Schedule B; **Ex. 29**, at p. 3, Schedule B, at pp, 6-8, Form 8938; **Ex. 30**, at p. 3, Schedule B, at pp. 5-7, Form 8938 ; and

- Mukherjee paid taxes in China from 2009-2014, *see* **Ex. 35**, Chinese Tax Records, 2009-2014. Although the couple paid Illinois State Income tax in 2008, *see* **Ex. 36**, 2008 Form 1040-IL, they did not pay income tax to any State within the United States any year thereafter, except approximately $200 in 2009.

For all of these reasons, the objective facts require the conclusion that Mukherjee and Bai were domiciled in China, as Plaintiff cannot overcome the strong presumption of domicile at the place of residence on the date of the Accident. Plaintiff simply cannot establish that Mukherjee and Bai were ever domiciled in the United States, much less that they had their "principal and permanent residence" here for purposes of the Montreal Convention. Accordingly, Plaintiff cannot establish jurisdiction under Article 33.2 of the Montreal Convention and, unless Plaintiff can establish jurisdiction under one of the available bases pursuant to Article 33.1, which he cannot, this Court lacks subject matter jurisdiction and must dismiss the *Ganguli* matter, No. 1:16-cv-01047-KBJ.

### 2.       Philip Wood's "Principal and Permanent Residence" and Domicile was in Malaysia where he was Residing with his Partner.

Philip Wood was domiciled in Kuala Lumpur, Malaysia at the time of the Accident where he was physically present and residing with the intent to remain.  As discussed above, domicile requires physical presence, i.e. a residence in fact, coupled with a certain state of mind concerning one's intent to remain there. *Holyfield*, 490 U.S. at 48. Wood was a United States citizen and until the end of 2010 he was a resident of the State of Texas where he resided with his wife, with whom he had two sons, and worked for IBM.[16] At some time, Wood and his wife separated. By January 1, 2011, Wood had moved to China to start a nearly three-year international assignment at IBM's office in Beijing beginning March 1st and projected to end on December 31, 2013.[17]

Although Plaintiff has not produced the Employment Agreement between Wood and IBM-China setting forth the terms of that agreement or any lease documents evidencing Wood's residence in China, the Summary of Allowances indicates IBM reimbursed Wood for the costs of establishing a residence in China while he worked and resided there.[18] *Id.* Wood's 2011 U.S. Tax Return also indicates Wood was residing abroad and he reported having a financial interest in or signature authority over at least one financial account in China.[19] Accordingly, Wood's domicile changed from the United States to China as early as January of 2011 when he moved there, established a residence in fact, and intended to remain for at least the next three years. *See Sadat*, 615 F.2d at 1181.

---

[16] *See* **Ex. 37**, Resume of Philip Wood, produced by Plaintiff.
[17] *See* **Ex. 38**, Summary of Allowances while on International Assignment in Beijing produced by Plaintiff ("Summary of Allowances").
[18] *Id.*
[19] *See* **Ex. 39**, Relevant pages from Wood's 2011 Joint U.S. Tax Return produced by Plaintiff, at Form 1040 and Schedule B.

This conclusion is consistent with the objective fact that Wood and his wife reported the sale of their "home" in their 2012 Joint Federal Tax Return for that year.[20]  Further, by the time Wood filed his 2013 U.S. Tax Return, he and his wife had divorced.[21]  Thus, the objective evidence demonstrates that Wood had no residence in the United States and, as in the *Ganguli* matter, this fact weighs heavily against continuing domicile in the United States.  *See Core VCT PLC*, 89 F. Supp. 3d at 110-11 ("lack of . . . residence weighs heavily against domicile.").

Further, while domiciled in China, Wood met and developed a relationship with Sarah Bajc. Although Wood's assignment with IBM-China was projected to end December 31, 2013, at which time he could have returned to his position in the United States, Wood negotiated and accepted another two-year assignment in Kuala Lumpur with IBM-Malaysia in November of 2013, effectively extending the term of his Beijing assignment through February of 2014 and further extending his international assignment in Malaysia through February of 2016, at least.[22] Although Plaintiff has not produced any documentation showing any lease or other residence in Malaysia, logic requires the conclusion that Wood had established his residence in Kuala Lumpur at the time of the Accident. Thus, Wood's entire course of conduct demonstrates that at that time he had effected a change in his domicile from China to Malaysia where he intended to remain through at least 2016, with the option to renew upon mutual agreement of the parties.[23]

Accordingly, on the date of the Accident, Wood had a residence in fact in Malaysia, but had no residence in the United States and therefore could not have been domiciled in the United States. That Wood did not have a residence in Texas but *did* have a residence in both China and Malaysia can be gleaned from travel documents Plaintiff produced in discovery. As those records

---

[20] *See* **Ex. 40**, Relevant pages from Wood's 2012 Joint U.S. Tax Return produced by Plaintiff.
[21] *See* **Ex. 41**, Relevant pages from Wood's 2013 Individual U.S. Tax Return produced by Plaintiff.
[22] *See* **Ex. 42**, Employment Letter and Agreement produced by Plaintiff; *see also* **Ex. 38**.
[23] *See* **Ex. 42**.

show, Wood had no need to make hotel arrangements as part of his round-trip itinerary from Beijing to Kuala Lumpur, but he did require hotel accommodations during his separate side trip from and to Kuala Lumpur which included an agreed stopover in Dallas, Texas, immediately prior to the Accident.[24] Nor did Wood list the Keller, Texas residence, claimed by Plaintiff, as his address on his federal tax return in 2013.[25]

Here, even if Wood's employment in Beijing with IBM-China did not effect a change of his domicile from Texas to Beijing, his subsequent agreement to accept the position with IBM-Malaysia and move to Kuala Lumpur rather than return to the United States, was sufficient to abandon any claim to a continuing domicile in the United States. *See*, *Sadat*, 615 F.2d at 1181; *Stine*, 213 F.2d at 448 Any argument that Wood's overseas employment and residence was expected to be only of a temporary nature, or in the exercise of some particular profession, office or calling is thus contradicted by Wood's entire course of conduct over the years preceding the Accident. *See Stine*, 213 F.2d at 448. Any testimony regarding Wood's alleged oral representations to Plaintiff or his children is inadmissible hearsay and in any event, should be afforded little weight. *Sadat*, 615 F.2d at 1181 (citations omitted).

Any person *sui juris* may make a bona fide change in domicile at any time. *Stine*, 213 F.2d at 448. Plaintiff here may attempt emphasize the presumption of continuing domicile to gain the advantage of making the United States an appropriate forum for this wrongful death lawsuit and to obscure the fact that this suit has absolutely no meaningful connection to the United States. In reality, the circumstances of this case illustrate the improper application of the concept of domicile for purposes of determining a person's "principal and permanent residence." The presumption of continuing domicile was intended to address the problems created by a

---

[24] *See* **Ex. 43**, Wood's Travel Records produced by Plaintiff showing hotel charges.
[25] *See* **Ex. 41**, at Form 1040.

"homeless wanderer" theory where diversity jurisdiction would be denied to any person with a transient lifestyle because the individual lacked an intention to permanently reside anywhere. *See Core VCT PLC*, 89 F. Supp. 3d at 111. For purposes of determining jurisdiction on the basis of Article 33.2 of the Montreal Convention, however, those concerns are simply not implicated because the definition of "principal and permanent residence" was drafted to avoid precisely such problems.

Plaintiff invites this Court to set a dangerous precedent that any United States citizen living abroad for however long and under whatever circumstances may maintain an action governed by the Montreal Convention in the courts of the United States simply by alleging continuing domicile in the United States and intent to return at some indefinite date in the future. That invitation must be declined. The only logical conclusion is that Wood's "principal and permanent residence" and domicile was in Malaysia on the date of the Accident, and Article 33.2 does not provide a basis for this Court to exercise subject matter jurisdiction over this matter.

3.      **Nicole and Leo Meng's "Principal and Permanent Residence" and Domicile was in China where they were Residing with their Chinese Citizen Parents.**

The Plaintiffs in the *Huang, et al.*, *Zhang, et al.*, and *Smith* matters[26] asserting claims for the wrongful death of Leo and Nicole Meng, one- and three-year-old minor children residing with their parents in China at the time of the Accident, also cannot establish that the infant children were domiciled in the United States at the time of the Accident. Plaintiffs argue that the children were domiciled in the United States solely on the basis that they were born in California

---

[26] The Plaintiffs asserting claims for the death of decedents Nicole and Leo Meng in the three lawsuits are as follows: in *Huang, et al.*, No. 1:16-cv-01063-KBJ, Plaintiff, Jin Liu, Individually and on behalf of the Estates of Nicole and Leo Meng and on behalf of Jianguo Zhang, Huatian Hu and Luyue Zhang; in *Zhang, et al.*, No. 1:16-cv-01048-KBJ, Plaintiffs, Jianguo Zhang, Huatian Hu, Jin Liu and Luyue Zhang, Individually and as Representatives of the Estates of Nicole and Leo Meng; and in *Smith*, No. 1:16-cv-00439-KBJ, Plaintiff, Elizabeth Smith, as Personal Representative of the Spouses, Next of Kin, Other Statutory Beneficiaries, and the Estates of MH370 Passengers Nicole Meng and Leo Meng.

and thus were U.S. citizens by operation of law, despite their actual residence with their Chinese

citizen parents in China. Contrary to Plaintiff(s)' position, however, one's domicile of origin is

*not* equated with place of birth. *See Stine*, 213 F.2d at 448 (domicile is not dependent on birth.).

Rather, the domicile of origin of a minor child is determined by the domicile of his or her parents

because minors are incapable of forming the requisite intent to establish a domicile. *Holyfield*,

490 U.S. at 48. These principles apply even where a child's "domicile of origin" will be in a

place where that child has never been. *Id.*

Here, Plaintiffs do not contend that Leo and Nicole Meng's parents, Bing Meng and Yan

Zhang, were residing in the United States, much less domiciled here, at the time of the

Accident.[27] Rather, Plaintiffs contend that Leo and Nicole "were citizens of the United States of

America and of the state of California, and were temporarily in China with no intent to ever

relinquish their citizenship . . . or domicile in the United States of America." *See Huang, et al. v.

Malaysia Airlines Berhad, et al.*, First Amended Complaint, at ¶ 8, No. 16-cv-01063-KBJ [ECF

No. 9]. Not only is this allegation without any legal foundation,  it misses the obvious point that

these minor children never acquired domicile in the United States in the first place and one

cannot relinquish something which was never acquired. *See*, *Ex Parte Petterson*, 166 F. 536, 545

(D. Minn.1908)(citations omitted)(explaining authorities are unanimous in holding that during

minority the domicile of an infant continues to be the same as that of the person from whom he

took his domicile of origin, and *changes only with the domicile of that person*, thus the minor

---

[27] *See* **Ex. 44**, Plaintiffs' Answers to MAS's First Set of Interrogatories Regarding Threshold Motions for decedent, Bing Meng (relevant answers marked); **Ex. 45**, Plaintiffs' to MAS's First Set of Interrogatories Regarding Threshold Motions for decedent, Yan Zhang (relevant answers marked). MAS notes that while Plaintiffs' discovery responses are wholly insufficient under the Federal Rules of Civil Procedure and are also unverified, MAS relies on those answers to the extent they demonstrate that Plaintiffs are foreclosed from establishing Leo and Nicole Meng's domicile in the United States as a matter of law

was *absolutely incapable* of acquiring domicile in the U.S. during her minority despite physical presence in the United States) (emphasis added).

Plaintiffs' efforts to confuse the record are also unavailing. For example, Plaintiffs claim that the family resided in California from 2010 to 2011 and again in 2012 but cannot identify any residential address.[28] Nicole Meng was born on December 31, 2010 and her passport was issued on January 10, 2011.[29] Leo Meng was born in California on August 9, 2012 and his passport was issued on August 22, 2012.[30] Thus, while it certainly appears correct that at least the mother of the family was *present* in the United States from December 2010 through January 2011, and again in August of 2012, Plaintiffs have produced absolutely no objective evidence that the family ever established a residence, let alone domicile, during the brief time they were present in this country.

For all of these reasons, Leo and Nicole Meng were domiciled in China on the date of the Accident as a matter of law. Accordingly, Article 33.2 cannot provide a basis for this Court's exercise of subject matter jurisdiction over the wrongful death claims asserted on behalf of the Estates of Nicole and Leo Meng.[31]

### 4.      Meng Zhang's "Principal and Permanent Residence" and Domicile was in China where she was Residing with her Husband.

Similarly, Plaintiff's reliance on decedent Meng Zhang's ("Zhang") status as a United States Lawful Permanent Resident does not mean she was domiciled in the United States on the date of the Accident.  Zhang was born in China to Chinese citizen parents residing in China and

---

[28] *See* **Ex. 44**, at Answer to Interrogatory No. 3.
[29] *See* **Ex. 46**, Nicole Meng U.S. Passport.
[30] *See* **Ex. 47**, Leo Meng U.S. Passport.
[31] The same result is required with respect to the Plaintiffs asserting claims for the wrongful death of the family members who were also aboard Flight MH370 – specifically, Bing Meng and Yan Zhang, the children's parents, and Fanquan Meng and Chuane Xu, the children's paternal grandparents.

therefore her domicile of origin is China, where she resided until at least 2005.[32]   In or around

2005, just before she turned twenty-one, Zhang applied for derivative asylum in the United

States as the child of a person granted asylum.[33]   In 2008, Zhang applied for and was granted

Permanent Resident status by the United States Department of Customs and Immigration

Services based on her derivative asylee status.[34]

In 2012, however, Zhang returned to China and married her husband, Peng Yan, with

whom she was traveling on Flight MH370.[35] At the time of the Accident, she was residing in

China with her husband and his parents, establishing that Zhang's domicile at the time of the

Accident was China, not the United States.[36] Plaintiff's efforts to characterize Zhang's home at

11 Dapu Village, Miaoli Town, Jinshui District, Zhengzhou City in Henan Province, China with

her husband and his parents as Zhang's "temporary address" is plainly a contrivance  to bolster a

claim for U.S. jurisdiction and is contradicted by the objective facts.[37]

The only logical conclusion to be drawn from the objective evidence and documentation

is that the "center of gravity" of Zhang's life and thus her domicile at the time of the Accident

was in China, not the United States. *See United States v. Scott*, 472 F.Supp. 1073, 1079 (N.D. Ill.

1979) ("[T]he residence of a spouse and other family members is a highly persuasive indication

of the place intended as a permanent home.") (citing *Broadstone Realty Corp. v. Evans*, 213 F.

Supp. 261, 265 (S.D.N.Y.1962)). Therefore Article 33.2 does not provide a basis for this Court's

exercise of subject matter jurisdiction over this wrongful death claim and this Court should grant

---

[32] *See* **Ex. 48**, Birth Notarial Certificate.
[33] *See* **Ex. 49**, Form I-797C Notice dated September 22, 2005.
[34] *See* **Ex. 50**, I-485 Application to Register Permanent Residence or Adjust Status, Approved December 9, 2008.
[35] *See* **Ex. 51**, Answers to MAS's First Set of Interrogatories regarding Threshold Issues for Meng Zhang, at Answer to Interrogatories Nos. 2-3.
[36] *Id.*; *see also*, **Ex. 52**, Answers to MAS's First Set of Interrogatories regarding Threshold Issues for Peng Yan, at Answer to Interrogatories Nos. 2-3.
[37] *See* **Ex. 51**, at Answer to Interrogatory No. 3.

this Motion in favor of MAS and against the Plaintiffs in the *Huang, et al.*, *Zhang, et al.*, and

*Smith* matters.[38]

## II.   Plaintiffs Cannot Establish Article 33.1 Jurisdiction Because the United States is Not the Location of MAS's Place of Business Through Which the Decedents' Contracts of Carriage Were Made

A number of Plaintiffs also allege Montreal Convention jurisdiction under Article 33.1

claiming that they purchased a ticket through a travel agent located in the United States,

notwithstanding that none of the decedent passengers were present in the United States. The

proper focus of any inquiry regarding Montreal Convention Article 33.1 jurisdiction relates to

the *carrier's place of business* through which the contract of carriage was made.   As set forth

above, Article 33.1 provides that "[a]n action for damages must be brought, at the option of the

plaintiff, in the territory of one of the States Parties . . . before the court . . . where [the carrier]

has a place of business through which the contract has been made . . ."

Although Plaintiffs concede that none of the passengers were physically present in the

United States when they offered to purchase the transportation which included Flight MH370,

certain Plaintiffs allege that because the passenger used booking procedures that involved travel

agencies or online reservation systems with a physical address in the United States, that

transforms those third-parties' physical addresses into MAS's "place of business through which

the contract was made" and is sufficient to establish the United States as a proper forum for these

wrongful death lawsuits. Specifically, the Plaintiff in the *Wood* matter, No, 1:16-cv-00053-KBJ,

alleges that although Wood was physically present in Malaysia when he offered to purchase the

transportation on Flight MH370, the United States is "[MAS's] . . . place of business through

---

[38] The Plaintiffs asserting a claim for the death of decedent, Meng Zhang, in the three cases are as follows: in *Huang, et al.*, No. 1:16-cv-01063-KBJ, Plaintiff, Min Huang, Individually and on behalf of the Estate of Meng Zhang and Zhaojun Zhang; in *Zhang, et al.*, No. 1:16-cv-01048-KBJ, Plaintiffs Min Huang and Zhaojun Zhang, Individually, and as representatives of the Estate of Meng Zhang; and in *Smith*, No. 1:16-cv-00419-KBJ, Plaintiff, Elizabeth Smith, as Personal Representative of the Spouses, Next of Kin, Other Statutory Beneficiaries, and the Estate of Meng Zhang.

which the contract [with Wood] was made" because, in accordance with IBM's business travel procedures, he accessed IBM's intranet which connected to an online reservation system using American Express as its travel agent to arrange the booking request. Similarly, the Plaintiff in the *Ganguli* matter, No. 1:16-cv-01047-KBJ, alleges that the United States is "[MAS's] . . . place of business through which the contract [with Mukherjee and Bai] was made" because Mukherjee asked his employer's corporate travel agent with a physical address in Oakdale, Pennsylvania, to arrange the booking request and transmit payment information to MAS in Malaysia. Finally, the Plaintiff in the *Gaspard* matter, No. 1:16-cv-00419-KBJ, alleges that the United States is "[MAS's] . . . place of business through which the contract [with Rui Wang, Wei Wei Jiao and Shu Ling Dai] was made" because decedent Rui Wang accessed Orbitz's website from a computer in China and arranged a reservation request and Orbitz's physical address is located in Chicago, Illinois. Established contract principles and the policies underlying the Montreal Convention, however, preclude any such conclusion.

The third provision of Article 33.1 providing for jurisdiction where the "[carrier] . . . has a place of business through which the contract was made" does not provide this Court with a basis to exercise subject matter jurisdiction over these wrongful death actions. Pursuant to the Montreal Convention, whether the United States is an appropriate forum depends on whether the contract between the carrier and the passenger was formed at the carrier's place of business in the United States. *Boyar v. Korean Air Lines*, 664 F. Supp. 1481, 1483-84. Plaintiffs who allege that this provision provides this Court with jurisdiction over these lawsuits rely on the fact that courts in this country have, somewhat carelessly, stated that the contract was made where the passenger's "ticket was purchased or issued." *Id.*

The applicability of the Montreal Convention, however, is premised on a contract of carriage that arises from the relationship between the "carrier" and the "passenger." *Block v. Compagnie Nationale Air France*, 386 F.2d 323, 330 (5th Cir.1967). That contractual relationship is formed upon mutual consent, i.e. the passenger must consent to the carrier undertaking the international transportation of the passenger from one designated spot to another and the carrier likewise must consent to transport the passenger on the particular route and date for the particular fare. *Id.* at 330-31; *Boyar*, 664 F. Supp. at 1485. It is the place where this mutual consent occurs that constitutes "the place of business through which the contract has been made" for purposes of the third provision of Article 33.1. *Boyar*, 664 F. Supp. at 1485.

Moreover, consistent with the policies underlying the jurisdictional provisions of the Montreal Convention, the place where mutual consent occurs cannot be altered by the procedure a passenger uses to make an offer to book carriage on a particular flight or the sequence of events through which the ticket – evidencing the mutual consent previously formed – was delivered to the passenger. *See, e.g., Kapar v. Kuwait Airways Corp.*, 663 F. Supp. 1065, 1067 (D.D.C.1987) (finding contract of carriage entered into in Yemen "and that fact is not altered by the procedure through which reservations were made through a carrier not operating the flight at issue . . . whatever else may flow from the sequence of events through which the ticket was issued to plaintiff, it did not transform the United States into the place through which the contract of carriage was made) *aff'd in part, remanded in part on other grounds*, 845 F.2d 1100, 1102 n.6 (D.C. Cir.1988)(explaining Plaintiff abandoned claim that actual carrier amenable to suit in United States under Montreal Convention on appeal but noting in any event claim was lacking in merit.). A ticket is merely the manifestation of the contract of carriage already made between the carrier and the passenger and where it may have been purchased or issued/delivered is not

determinative of the carrier's place of business through which the contract of carriage was made for purposes of jurisdiction under Article 33.1.

A.      **No Binding Contract of Carriage Was Formed until the Passenger's Offer to Purchase Particular Transportation Was Accepted by MAS at One of MAS's Places of Business**

The Itinerary Receipts forming a part of the E-Ticket and memorializing the contracts of carriage between MAS and the Decedents named in the above-captioned lawsuits indicate that reservation requests for the transportation which included Flight MH370 were made directly at one of MAS's booking offices (in China or Malaysia – but not the United States), or transmitted to MAS electronically through MAS's website or a Global Distribution System ("GDS").  *See* Declaration of Alpa Devi Panalal, a true and correct copy of which is attached hereto as **Ex. 53** (hereinafter "**Ex. 53,** Panalal Decl., at __").

In the ordinary course of business, MAS advertised and published its scheduled flights and fares on its website and customers could offer to purchase transportation directly at one of MAS's offices and ticketing counters or electronically offer to purchase transportation by accessing MAS's online website and submitting a booking request or flight reservation request to MAS's reservation system located in Malaysia. *Id.* at ¶ 5. MAS also advertised and published its scheduled flights and fares through agreements with various Global Distribution Systems ("GDS"), such as Amadeus IT Group SA, Travelsky Technology Limited, Travelport International Operations, Travelport d/b/a Worldspan and Travelport d/b/a Galileo International. *Id.* The GDS companies made this information available to their customers such as travel agents or third-party travel reservation websites or systems with access to the particular GDS as authorized users or subscribers with whom the GDS companies have contracts. Those authorized users or subscribers can access the GDS platform anywhere in the world remotely via the internet. *Id.* at ¶¶ 5-6.

The advertisement and publication of MAS's scheduled flights and fares constitute an "invitation for an offer" from a potential passenger/customer or an "invitation to enter into negotiations." *See Dean Foods Co. v. Brancel*, 187 F.3d 609, 619 (7th Cir. 1999) ("A price quotation is 'commonly understood as inviting an offer rather than making one, even when directed to a particular customer.'") (citing Restatement (Second) of Contracts, § 26)); *Von Holdt v. A-1 Tool Corp.*, No. 04 C 04123, 2013 WL 53986, at *16 (N.D. Ill. Jan. 3, 2013) ("[t]he general rule is that price quotations are not offers, but rather are mere invitations to enter into negotiations or to submit offers") (internal citation omitted); *O'Callaghan v. AMR Corp.*, No. 04-cv-4005, 2005 WL 1498870, *2 (N.D. Ill. June 8, 2005) (in context of airline tickets, carrier accepts a passenger's offer to purchase transportation on terms stated in advertisements) (citing *Steinberg v. Chicago Medical School*, 371 N.E.2d 634, 639 (Ill. 1977)); *Maurice Elec. Supply Co. v. Anderson Safeway Guard Rail Corp.*, 632 F. Supp. 1082, 1087 (D.D.C. 1986) ("The general rule is that a mere price quotation is not an offer, but rather is an invitation to enter into negotiations or a mere suggestion to induce offers by others") (internal citation omitted); *see also* **Ex. 53**, Panalal Decl., at ¶7.

As with all forms of contract, the contract of carriage cannot be formed without an offer and acceptance. *See REO Acquisition Grp. v. Fed. Nat'l Mortgage Ass'n*, 104 F. Supp. 3d 22, 29 (D.D.C. 2015) (citing *Malone v. Saxony Co-op. Apartments, Inc.*, 763 A.2d 725, 728 (D.C. 2000)). Consistent with other types of consumer transactions, a potential passenger wishing to purchase transportation advertised by MAS in its published fares can make or submit an *offer to purchase* in the form of a booking request or reservation request, to MAS directly or through a GDS used by the potential passenger's travel agent. *O'Callaghan*, 2005 WL 1498870, at *2 (contract formed when carrier accepts passenger's offer to purchase transportation on terms

advertised); *Klocek v. Gateway, Inc.*, 104 F. Supp. 2d 1332, 1340 (D. Kan. 2000) ("In typical consumer transactions, the purchaser is the offeror, and the vendor is the offeree"); *see also*, **Ex. 53**, Panalal Decl., at ¶ 7.  "It is the submission of a purchase order by a buyer in response to a price quote that usually constitutes the offer." *Id.; see also E.C. Styberg Eng'g Co. v. Eaton Corp.*, 492 F.3d 912, 918 (7th Cir. 2007) ("typically, a price quotation is considered an invitation for an offer, rather than an offer to form a binding contract").

Upon receiving the potential passenger's booking request or flight reservation request, MAS must first determine whether it still has the capacity to perform the particular transportation the passenger has offered to purchase at the advertised price. *See* Ex. **53**, Panalal Decl., at ¶ 8.  If, when MAS receives the booking request or flight reservation request in Malaysia, its reservation system determines available capacity to perform the particular transportation as requested in the proposed booking request or reservation request (and when the booking request or reservation request is accompanied by payment information), MAS can accept the offer to purchase.  *Id.* at ¶ 9. MAS's reservation system at its headquarters in Malaysia will then communicate the acceptance to the passenger by transmitting a MAS Record Locator Code associated with the booking and the E-Ticket number created in the MAS reservation system. *Id.* at ¶ 10.

Acceptance by MAS of the offer to purchase transportation is the last act necessary to form the mutual obligation and binding contract – i.e. the passenger is obligated to pay the fare for the transportation purchased and comply with MAS's terms and conditions and MAS is obligated to undertake the transportation of the passenger on the particular route and date.  *See* Restatement (Second) of Contracts, § 63, cmt. a, illus. 1 (1981). Accordingly, the formation of

the contact occurs when and where MAS accepts the offer and issues the E-Ticket number – not when (or where) the acceptance is received by the passenger.  *Id.*

**B.     No Place of Business of MAS in the United States Accepted any of the Passengers' Offers to Purchase the Transportation which Included Flight MH370.**

Applying the law to the facts of this case, the Record Locator Code(s) identified in Itinerary Receipts for all Decedents reflect that all of the passengers involved either: (1) purchased the ticket from MAS's physical ticketing office outside of the United States; (2) made the purchase electronically through MAS's website; or (3) made the purchase through a travel agent accessing a GDS. *See* **Ex. 53**, Panalal Decl., at ¶¶ 10-20. Accordingly, MAS's "place[s] of business through which the contract[s] [were] made" for all of the contracts with the Decedents named in the above captioned cases are thus in Malaysia or China, not anywhere within the United States, because those are the locations of MAS's places of business that accepted the Decedents' offers and where MAS generated the E-Ticket number and Itinerary Receipt evidencing the contract that was formed between the parties. *Id.* at ¶¶ 9-10; *see also*, *Samra v. Shaheen Bus. & Inv. Grp., Inc.*, 355 F. Supp. 2d 483, 499 (D.D.C. 2005) (the "place of contracting" is the place of acceptance of the offer) (citing Restatement (Second) of Conflict of Laws, § 188, cmt. e); *Hinc v. Lime-O-Sol Co.*, 382 F.3d 716 (7th Cir. 2004) ("The place of contracting is the jurisdiction wherein is accomplished the last act necessary to give validity to the contract.").

For these reasons the courts in the United States do not have jurisdiction to adjudicate these wrongful death lawsuits under the third provision of Article 33.1. Accordingly, MAS's Motion to Dismiss should thus be granted in favor of MAS and against all Plaintiffs.

III.    **The United States Was Not The Place Of Destination (or Any Place) On Any Of The Passengers' Contracts Of Carriage.**

Finally, the "destination" clause of Article 33.1 precludes subject matter jurisdiction in the United States because no point in the United States was a point of origin, a point of destination, or any agreed stopping point included on any of the passengers' contracts of carriage. For purposes of jurisdiction under Convention, it is the "ultimate destination listed in the contract for carriage that controls." *Gayda v. LOT Polish Airlines*, 702 F.2d 424, 425 (2d Cir.1983). There can be only one "destination" for each passenger for purposes of determining jurisdiction under the Montreal Convention. *Id.* When a passenger has purchased a round-trip ticket, the "destination" of a round trip international airline ticket is the starting point of the journey. *Klos v. Polskie Linie Lotnicze*, 133 F.3d 164, 167-68 (2d Cir. 1997); *Petrire v. Spantax, S.A.*, 756 F.2d 263, 265 (2d Cir. 1985). For a one-way ticket, the ultimate destination is the location where the carriage ends. *In re Air Crash Disaster at Malaga, Spain on Sept. 13, 1982*, 577 F. Supp. 1013, 1014 (E.D.N.Y. Jan. 30, 1984).

It is undisputed that no place in the United States was the point of origin, point of destination or agreed stopping place according to any contract of carriage between MAS and any of the Passengers. *See* **Ex. 53**, Panalal Decl., at ¶ 75. Accordingly, the United States cannot be the place of "destination" and this provision of Article 33.1 likewise does not provide a basis for this Court to exercise treaty jurisdiction over any of the above captioned cases. For this reason as well, this Court should grant MAS's Motion to Dismiss.

IV.    **MAS Is Domiciled And Has Its Principal Place Of Business In Malaysia.**

It is undisputed that the remaining provisions of Article 33.1 also do not point to the United States as an appropriate forum to adjudicate these wrongful death lawsuits. The first and second provisions of Article 33.1 identify the place of the carrier's "domicile" and "principal

place of business" as available fora, both of which for MAS are in Malaysia. Under the Montreal Convention, the "domicile" and "principal place of business" are where the carrier is incorporated and has its headquarters. *Wyler v. Korean Air Lines Company, Ltd.*, 928 F.2d 1167, 1175 (D.C. Cir. 1991); *Singh v. Tarom Romanian Air Transport*, 88 F. Supp. 2d 62, 65 (E.D.N.Y. 2000) (noting that "domicile" of a carrier is the carrier's place of incorporation and that for purposes of the Warsaw Convention, a foreign corporation has only one "principal place of business" – its corporate headquarters).

Here, MAS was incorporated under the laws of Malaysia to operate as the national carrier for Malaysia. *See* Declaration of Rizani Bin Hassan, at ¶ 5, a true and correct copy of which is attached hereto as **Ex. 54**. MAS's corporate and operational headquarters were and are located at the Sultan Abdul Aziz Shah Airport in Subang, Selangor, Malaysia. *See* Declaration of Mohd Fuad Bin Mohd Sharuji, at ¶ 5, a true and correct copy of which is attached hereto as **Ex. 55**. Accordingly, neither of these clauses of Article 33.1 provides a basis for this Court to exercise jurisdiction over any of the Plaintiffs' claims.

## CONCLUSION

The Montreal Convention does not provide a basis for this Court or any court in the United States to exercise subject matter jurisdiction over any of the above-captioned cases for the simple reason that there is absolutely no meaningful connection between this forum and MAS or the passengers. Article 33.2 does not create jurisdiction in the United States because none of the Plaintiffs' decedents had their "principal and permanent residence" in the United States. Specifically, the *Ganguli* matter, No. 1:16-cv-01047-KBJ, must be dismissed because the decedents, Muktesh Mukherjee and Xiao Mo Bai, had the "principal and permanent residence" in China, where they were living at the time of the Accident. The *Wood* matter, No. 1:16-cv-

00053-KBJ, must be dismissed because decedent Philip Wood's "principal and permanent residence" was in Malaysia at the time of the Accident. Similarly, the Plaintiffs asserting claims for the wrongful deaths of Leo and Nicole Meng in the *Huang, et al.* matter, No. 1:16-cv-01063-KBJ and the *Zhang et al.* matter, No. 1:16-cv-01048-KBJ, as well as those claims asserted in the *Smith* matter, No. 1:16-cv-00439-KBJ, must be dismissed because the minor children were living in China with their parents at the time of the Accident and thus their "principal and permanent residence" was in China, not the United States. Similarly, Plaintiffs asserting claims for the wrongful death of decedent, Meng Zhang in the *Huang, et al.* matter, No. 1:16-cv-01063-KBJ and the *Zhang et al.* matter, No. 1:16-cv-01048-KBJ, as well as the claim asserted in the *Smith* matter, No. 1:16-cv-00439-KBJ, must be dismissed because the decedent was living in China with her husband and thus China was her "principal and permanent residence" at the time of the Accident. The claims asserted for the wrongful deaths of all other decedents named in the *Huang, et al.* matter, No. 1:16-cv-01063-KBJ, the *Zhang et al.* matter, No. 1:16-cv-01048-KBJ, and the *Smith* matter, No. 1:16-cv-00439-KBJ must be dismissed because Plaintiffs have not specifically alleged jurisdiction based on Article 33.2 and in any event it has not been alleged that any decedent had their "principal and permanent residence" in the United States. Finally, the *Kanan, et al.* matter, No. 1:16-cv-01062-KBJ, must be dismissed because Plaintiff concedes that the decedent was living in Malaysia at the time of the Accident and therefore cannot establish "principal and permanent residence" in the United States. Dismissal of the *Gaspard* matter, No. 1:16-cv-00419-KBJ, is likewise required because Plaintiff concedes the decedents were living in China and had their "principal and permanent residence" there at the time of the Accident.

Article 33.1 of the Montreal Convention also does not provide a basis for subject matter jurisdiction to hear any of the above-captioned wrongful death cases and all cases must be

dismissed because: (1) MAS's domicile and principle place of business is in Malaysia; (2) the

United States is not the place of destination on MAS's contracts of carriage with any decedent;

and (3) MAS's "place[s] of business through which the contract[s] [were] made" for all of the

contracts with all Decedents named in the above captioned cases are in Malaysia or China, not

the United States.

Accordingly, this Court lacks subject matter jurisdiction over these lawsuits and MAS

respectfully submits that this Court must dismiss all of the above-captioned cases with prejudice.


October 1, 2016                           Respectfully submitted,

                                          KAPLAN, MASSAMILLO & ANDREWS LLC


                            By:     /s/ Richard A. Walker
                                    Telly Andrews, IL Bar No. 6242431
                                    *tandrews@kmalawfirm.com*
                                    Richard A. Walker, IL Bar No. 6196947
                                    *rwalker@kmalawfirm.com*
                                    200 W. Madison Street, 16th Floor
                                    Chicago, Illinois 60606
                                    Telephone:  (312) 345-3000
                                    Facsimile:   (312) 345-3119


                                    Attorneys for Defendant Malaysian Airline System
                                    Berhad (Administrator Appointed)

## CERTIFICATE OF SERVICE

The undersigned certifies that, on October 1, 2016, pursuant to Fed. R. Civ. P. 5 and LCvR 5.3, a true and correct copy of the foregoing Defendant Malaysian Airline System Berhad (Administrator Appointed)'s Memorandum in Support of its Rule 12(b)(1) Motion to Dismiss for Lack of Subject Matter Jurisdiction was filed with the Clerk of Court using the CM/ECF System, which will send notification of such filing to the attorneys of record at the email addresses on file with the Court.

/s/ Richard A. Walker
Richard A. Walker