# EXHIBIT 2

Declaration of

Rizani Bin Hassan

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| IN RE: AIR CRASH OVER THE SOUTHERN INDIAN OCEAN ON MARCH 8, 2014 | |
| This Document Relates To: 1:16-cv-00053-KBJ, *Wood v. Malaysia Airlines Berhad;* 1:16-cv-00419-KBJ, *Gaspard v. Malaysia Airlines Berhad;* 1:16-cv-00439-KBJ, *Smith v. Malaysia Airlines Berhad;* 1:16-cv-01047-KBJ, *Ganguli v. Malaysia Airlines Berhad;* 1:16-cv-01048-KBJ, *Zhang, et al. v. Malaysia Airlines Berhad;* 1:16-cv-01061-KBJ, *Ries v. Malaysian Airline System Berhad;* 1:16-cv-01062-KBJ, *Kanan v. Malaysia Airlines System Berhad;* 1:16-cv-01063-KBJ, *Huang, et al. v. Malaysia Airlines Berhad.* | MDL Docket No: 2712<br><br>Misc. No. 16-1184 (KBJ) |

## DECLARATION OF RIZANI BIN HASSAN

I, Rizani Bin Hassan, hereby declare the following:

1.      I am currently Company Secretary for Malaysian Airline System Berhad (Administrator Appointed), and I have held this position since 1 September 2015. I was previously Company Secretary for Malaysian Airline System Berhad ("MAS"), prior to administration, from on or about 2002 to 31 August 2015. As such, I have personal knowledge of the facts set forth herein or I have gained knowledge of these facts through my position within MAS and my job responsibilities at the airline and I am authorized to make this Declaration on

behalf of Malaysian Airline System Berhad (Administrator Appointed). I am prepared to testify regarding the facts set forth herein if required.

    2.     I am over the age of twenty-one, of sound mind and otherwise competent to make this Declaration.

    3.     On 8 March 2014, MAS operated Malaysia Airlines Flight MH370 ("Flight MH370") as a scheduled passenger flight from Kuala Lumpur, Malaysia to Beijing, China.

    4.     MAS is an existing corporate entity formed and existing under the laws of Malaysia. MAS is neither a citizen of any State of the United States, nor was MAS created under the laws of any third country.

    5.     MAS was incorporated under the Laws of Malaysia, Act 125, Companies Act 1965 ("Companies Act") on 3 April 1971, a Public Limited Company to operate as the Malaysian national air carrier. *See* Malaysian Airline System Berhad's Memorandum and Articles of Incorporation, a true and correct copy which is attached hereto as **Exhibit A**.

    6.     On 8 March 2014, MAS operated Flight MH370 as the national carrier of Malaysia and was 69.37% owned by the Malaysian Government's sovereign wealth fund and investment arm, Khazanah Nasional Berhad ("Khazanah") – translated literally as National Treasury Limited – a political subdivision of the Malaysian Government.

    7.     On 29 August 2014, Khazanah announced a five-year, 12-point MAS Recovery Plan ("MAS Recovery Plan") and its plans to purchase the remaining ownership of MAS from minority shareholders of MAS and delist MAS from the Malaysian Stock Exchange to ensure the continued operation of the national carrier.

8.     The MAS Recovery Plan was initiated because of MAS's role as a critical enabler of national development. *See* "Rebuilding a National Icon – The 5-year 12-point MAS Recovery Plan," a true and correct copy of which is attached hereto as **Exhibit B**.

9.     The Board of Directors of MAS approved the MAS Recovery Plan on 8 August 2014.

10.     As part of the MAS Recovery Plan, Khazanah committed to a total restructuring and investment capital funding of MYR 6.0 billion to MAS over three phases on the condition that Khazanah secure ownership of all outstanding shares and delist the airline from the Malaysian stock exchange.

11.     By 31 December 2014, Khazanah owned 100% of the shares of MAS and MAS was no longer listed on the Malaysian stock exchange.

12.     On the date each of the above-captioned lawsuits was commenced, from 30 December 2015 through 7 March 2016, MAS was wholly owned by Khazanah.

13.     By means of the Malaysian Airline System Berhad (Administration) Act of 2015 (Act 765), which came into force on 20 February 2015, the Malaysian Government enacted "special laws for the administration of [MAS] . . . and the appointment of an administrator with the powers to administer and manage [MAS] . . . [and] to provide for the establishment of a new entity which will replace [MAS] as the national carrier." *See* Act 765, at Preamble, a true and correct copy of which is attached hereto as **Exhibit C**.

14.     Act 765 reflects the Malaysian Government's determination that special provisions were required in the public interest to ensure the continuity of the essential air services by MAS as the national carrier and the provision of uninterrupted connectivity to, from,

and within Malaysia and that legislation was the only means to expeditiously administer and manage MAS without disruption to its operations. *See* **Exhibit C**, at Preamble ¶ 2.

15.    The Malaysian Government also determined that the establishment of a new and separate entity, Malaysia Airlines Berhad ("MAB") was critical to ensure continued operations of a national carrier after MAS ceased performing carrier operations. *See* **Exhibit C**, at Preamble ¶¶ 3-4.

16.    On or about 25 May 2015, Khazanah appointed Dato' Mohammad Faiz bin Mohammad Azmi to serve as the Independent Administrator of MAS. Pursuant to Act 765, the Independent Administrator is the legal representative of MAS and is responsible for overseeing and managing the administration of MAS and the transfer certain assets and liabilities of MAS to the new entity incorporated to take over operations as the national carrier.  *See* 25 May 2015 Letter from Khazanah to the Board of Directors of MAS, a true and correct copy of which is attached hereto as **Exhibit D.**

17.    MAS performed its last flight as the national carrier on 31 August 2015.

18.    On the date each of the Lawsuits was commenced, from 30 December 2015 through 7 March 2016, MAS was (and still is) 100% owned by Khazanah, a political subdivision of the Malaysian Government, and the Independent Administrator appointed by the Government through Khazanah was (and still is) overseeing and managing the administration of the company and acting as the company's legal representative.

### MAS's Historical Function and Purpose

19.    Prior to administration, MAS served the public interest of the Malaysian Government by operating as the national carrier and the following facts are true and correct regarding MAS and its operations on 8 March 2014 and historically:

20.     As noted above, MAS was incorporated on 3 April 1971 (Company No. 10601-W) after the separation of Singapore Airlines from Malaysian Singapore Airways to serve as the national air carrier for Malaysia and to facilitate the development of the country.

21.     At the time of its incorporation, MAS operated as a regional carrier, connecting a myriad of remote destinations in Malaysia, including Sabah and Sarawak, in order to promote regional economic development.

22.     Since its incorporation, the Government of Malaysia was at all times vested with the Special Rights Redeemable Preference Share ("Special Rights Share") in MAS pursuant to Paragraph 5 of the Memorandum and Articles of Incorporation of Malaysian Airline System Berhad (hereinafter "Articles"). The Government of Malaysia was the single and only such holder of the Special Rights Share. Specifically, Paragraph 5 of the Articles provides that Special Rights Share may be held only by or transferred only to the Minister of Finance of the Government of Malaysia. The Minister of Finance is and always has been the Prime Minister of Malaysia. *See* **Exhibit A**, Memorandum and Articles of Incorporation.

23.     Up until the date MAS ceased operations as the national carrier, the Prime Minister of Malaysia, as the holder of the Special Rights Share, appointed the Chairman of the Board of Directors of MAS, and another director from the Ministry of Finance; namely, the Secretary General of the Ministry of Finance, also a high ranking official within the Malaysian Government. The Secretary of State of Sarawak – a Malaysian state – also held a seat on the Board of Directors, as did the Permanent Secretary of the Ministry of Finance of Sabah (another Malaysian state). The Prime Minister nominated all other directors and had the power to remove any director or terminate any nomination.

24.    MAS was (and still is) a Government-Linked Company ("GLC") which are defined by the Putrajaya Committee – an inter-ministerial committee – as companies that have a primarily commercial objective and in which the Malaysian Government (occasionally referred to hereafter as the "Government") has a direct controlling stake, which relates to the Malaysian Government's ability (not just percentage ownership) to appoint the Board of Directors and senior management positions, as well as make major company decisions, either directly or through a Government-Linked Investment Company ("GLICs").

25.    Khazanah is one of the seven GLICs falling within the definition of a GLIC, as defined by the Putrajaya Committee, which provides that a GLIC is a Malaysian Government linked investment company that allocates some or all of its funds to GLC investments.  The definition of a GLIC provides in express terms that the status is defined by the influence of the Malaysian Government to appoint, approve Board members and senior management, and to have such individuals report directly to the Malaysian Government, as well as in providing funds for operations and/or guaranteeing capital (and some income) placed by unit holders.

26.    While it operated as the national carrier, MAS's senior most executive, its Managing Director, was appointed by the Prime Minister of Malaysia. The Managing Director also had a seat on the Board of Directors. He was in charge of directing and managing the day-to-day operations of the airline as the national carrier.

27.    During the time MAS was operational, for reserved matters, the Managing Director would not make independent commercial decisions for MAS without consultation with the Government of Malaysia, who can veto or countermand any commercial decision made by the MAS executive management team, if such decisions are not consistent with the Government's agenda. Such decisions were made in accordance with the Government's needs,

directives, and demands. Company decisions and operations had to be in line with the Government's macro-economic policy and the Government's international relationships. In this regard, the Managing Director of the airline, or his specified delegate(s), would have regular pre-Cabinet meetings with the Minister of Finance of the Government of Malaysia to prepare the Minister for questions and answers regarding MAS's operations during the Government's Cabinet meetings.

28.     Thus, the Malaysian Government exercised its controlling stake in MAS through macro-level policy decisions at the Ministry and Cabinet level while leaving control of the day-to-day operations of the carrier to the Managing Director.

29.     The Government also had authority to decide where MAS should operate (destinations) in order to achieve its national objectives. MAS could not simply terminate a destination for fiscal reasons since it may have been required by the Government to operate to such a destination due to reasons of national interest.

30.     While it operated flights as the national carrier, MAS was required by the Government to provide domestic transportation throughout Malaysia, including Southeast Malaysia, Sabah, and Sarawak. The provision of air transportation to these regions was required to assist in their economic development, and this was a predicate for the Government's directions to MAS in this regard. The Government set MAS's rates and fares for such operations, and in turn reimbursed MAS for the fiscal losses that resulted from these operations. Fare pricing for transportation to these regions was to correspond to the domestic areas' economic conditions and development and MAS at times received Governmental fare subsidies for providing such transportation as directed by the Government of Malaysia.

31.    Up until the date it ceased flight operations as the national carrier, the Government secured all international traffic rights for MAS, and MAS was required to operate these routes – even if unprofitable – as directed by the Government. MAS's operation of international routes secured Government interests and needs with respect to its foreign relations.

32.    MAS also received special treatment under Malaysian law while it was operational. For example, pursuant to Income Tax (Exemption) (No. 25) Order 2001 of the Government of Malaysia, MAS was exempt from taxation by the Government of Malaysia on chargeable income as regards all sources of income. Further, while MAS operated as the national carrier, the Government of Malaysia created a structure to provide all financing to purchase all of MAS's commercial aircraft, which were then leased to MAS for its operation. This was the single greatest financial burden on MAS, and it was made possible through this Governmental assistance.

33.    At all times, MAS has been strategically important to the Government. Up until the date it ceased flight operations as the national carrier, MAS provided a primary component of Malaysia's domestic and international transportation system as required by the Government. MAS was also a component of Malaysia's national defense system. It was authorized to and could be compelled by the Government to aid Malaysia in the prosecution of any war or hostilities in which Malaysia was engaged. While it was operated flights as the national carrier, MAS employed 20,000 people, a substantial portion of the nation's workforce. Such employment was a vital part of the Malaysian economy and factored in to the Government of Malaysia's decision to enact Act 765 to initiate the administration of MAS and organization of a new company to perform the operations of the national carrier and ensure the employment opportunities MAS created for the Malaysian workforce remained available to a large extent.

Further, as part of the establishment of MAB as the new national carrier, the Government of Malaysia undertook to transfer MAS's Subang Headquarters land from the Federal Land Commissioner to Khazanah or MAS as trustee to be used for a one-stop centre for reskilling, redeployment, start-up assistance and retirement planning for MAS employees who did not reach new employment agreements with MAB.  *See*, **Exhibit B**, "Rebuilding a National Icon: The MAS Recovery Plan" at p. 32.

### The Malaysian Government's Ownership of MAS

34.    In the mid-1980s, 70 million of MAS's ordinary shares were converted to stock for public sale to increase MAS's paid-up capital and reserves. This has been referred to by the Company as a period of "*privatisation.*" At all times during this period in the 1980s, however, 55% of the ordinary shares of stock of MAS were owned by the Government of Malaysia or a political subdivision thereof and the Government of Malaysia retained its Special Rights Share.

35.    On 13 February 2001, after the Asian Financial Crisis, the Government of Malaysia, through the Minister of Finance Incorporated, took over 29.1% of MAS from Naluri Berhad to reduce MAS's indebtedness and prevented the financial collapse of Malaysia's national carrier through capital injections and restructurings. *See*, **Exhibit B**, "Rebuilding a National Icon: The MAS Recovery Plan" at Preamble.

36.    MAS' ownership was subsequently transferred to Khazanah in December 2004 as part of the GLC Transformation Programme and the Khazanah Revamp Program. *Id*. at p. 5.

37.    Over the next thirteen years, the Government (directly or through Khazanah) undertook several major restructurings to save MAS from the challenging financial and operational environment. *Id*.

38.    In 2013, the Government of Malaysia and Khazanah announced that MAS would cease operations on certain international routes, including routes to the United States, in an attempt to reduce losses MAS had incurred in previous years.  MAS operated its last flight to the United States on 30 April 2014 and closed its last remaining office in the United States on 31 August 2014.

39.    In February of 2014, the Cabinet of the Malaysian Government mandated that the Government of Malaysia and Khazanah undertake a comprehensive and unconstrained review of all options to address the losses MAS incurred in the previous two years and to develop the MAS Recovery Plan. *Id.*

40.    On the date of the Accident, 69.37% of the ordinary stock of MAS was owned by Khazanah, and those shares could not be sold without the approval by the Government of Malaysia via the Ministry of Finance.

41.    Currently, 100% of the ordinary stock of MAS is owned by Khazanah.

**Khazanah is a Political Subdivision of the Malaysian Government**

42.    Khazanah is a separate legal entity formed under the laws of Malaysia. Khazanah is neither a citizen of any State of the United States, nor was Khazanah created under the laws of any third country.

43.    Khazanah was incorporated under the Laws of Malaysia, Act 125, Companies Act 1965 ("Companies Act") on 3 September 1993 as a Public Limited Company and strategic investment arm of the Malaysian Government. *See*, **Exhibit A**, Memorandum and Articles of Incorporation.

44.    Khazanah is wholly owned by the Minister of Finance Incorporated, a body incorporated under Malaysian law pursuant to Act 375, Minister of Finance (Incorporated) Act 1957, except one share which is owned by the Federal Land Commission. *Id.*

45.    Khazanah operates as the sovereign wealth fund and strategic investment arm of the Government of Malaysia. It is a wholly owned entity of the government, and its core functions are to hold and manage Malaysia's commercial assets and undertake strategic investments in new sectors and markets.

46.    Khazanah is also tasked with shaping selected strategic industries in Malaysia, and nurturing their development with the aim of pursuing the nation's long-term economic interests.

47.    In addition to MAS, Khazanah holds investments in a number of GLCs in a range of sectors, including finance, telecommunications, utilities, communication services, property development, information technology, and transportation.

48.    Khazanah acts as the Secretariat to the Putrajaya Committee on GLCs High Performance ("PCG"), an inter-ministerial committee formed to oversee the GLC Transformation Programme.

49.    Khazanah's investments are directed by the Government of Malaysia's Mandate and Khazanah must ensure that any investment opportunities correlate with Malaysia's larger strategic and national objectives.

50.    However, as a shareholder Khazanah does not participate directly in GLC management.

51.    Khazanah is governed by an eleven-member Board comprising representatives from the Government and the corporate sector.

52.    Khazanah's senior most executive, its Managing Director, is appointed by the Prime Minister of Malaysia.

53.    The Managing Director is responsible for overseeing the day-to-day operations of Khazanah and reports to Khazanah's Board of Directors, which is chaired by the Prime Minister of Malaysia who concurrently serves as the Minister of Finance.

54.    The Second Finance Minister and Secretary General of Treasury, Ministry of Finance are also members of Khazanah's Board.

55.    Khazanah is funded by the retention of returns generated through its investments as well as by the issuance of bonds.

56.    Khazanah is able to sue and be sued in its own name. Khazanah may hold property in its own name but such property is held only for the benefit of the Malaysian Government.

57.    As the sovereign wealth fund, Khazanah's core functions – holding and managing the Malaysian Government's commercial assets and making strategic investments in certain sectors and geographies to promote the nation's economic interests – are governmental in nature.

58.    Khazanah fulfills the Government's role as investor in the realm of economic development and Khazanah is treated as a part of or an arm of the Malaysian Government (as opposed to an agent).

### MAS's Continued Existence

59.    On the date of this Declaration, MAS continues to exist as a separate corporate entity under the laws of Malaysia and remains wholly owned by the Malaysian Government through its' political subdivision and investment arm, Khazanah.

60.    An Independent Administrator was appointed by Khazanah to oversee the administration of MAS and the Independent Administrator continues to serve as MAS's legal representative under Malaysian law. *See* **Exhibit D**.

61.    Certain assets and liabilities of MAS have been acquired by and transferred to MAB pursuant to Act 765, but liability for Flight MH370 was specifically excluded from the transfer.

62.    MAS is the named insured on Airline Hull (Including Spares and Equipment) All Risks and Liabilities Insurance, Policy No. CAV-12518149-CI, for the Period 01 December 2013 to 30 November 2014, issued by Etiqa Insurance Berhad (the "Policy"), with sufficient limits to resolve all passenger family compensation claims arising out of the Accident. That Policy provides coverage to MAS for the loss of Flight MH370.

63.    MAS is named and legally represented in these Lawsuits and in other litigation arising from the loss of MH370, primarily in Malaysia, as a separate and distinct entity.

64.    MAS is participating in the defense of this litigation and the litigation filed by all but one of the plaintiffs in this matter in Malaysia arising out of the loss of MH370 as a separate and distinct entity.

65.    As part of the resolution of claims through negotiation and compromise MAS has settled claims with next of kin of eighty-eight passengers and settlement agreements have been executed releasing all claims they could have brought against MAS in its own name.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct to the best of my knowledge, information and belief.

Executed in Kuala Lumpur, Malaysia, on 20 September 2016

Rizani Bin Hassan

# EXHIBIT A

# DECLARATION OF
# RIZANI BIN HASSAN

# THE COMPANIES ACT, 1965

## COMPANY LIMITED BY SHARES

# MALAYSIAN AIRLINE SYSTEM BERHAD
### (Company No. 10601-W)

## Memorandum and Articles of Association

Incorporated on the 3rd day of April 1971



Company No:

| 10601 | W |
|---|---|

**FORM 11**

**COMPANIES ACT, 1965**
*Section 21(2)
~~*Section 26(1),(2)~~
~~*Section 28(9)~~
*Section 154(1)
~~*Section 254(2)~~

### NOTICE OF RESOLUTION

### MALAYSIAN AIRLINE SYSTEM BERHAD

To the Registrar of Companies,

At a general meeting of the members of **MALAYSIAN AIRLINE SYSTEM BERHAD** duly convened and held at the Auditorium, 1st Floor, South Wing, MAS Academy, No. 2 Jalan SS7/13, Kelana Jaya, 47301 Petaling Jaya, Selangor Darul Ehsan on the 6th day of November, 2014, the +special/+ordinary resolution set out +below/+in the annexure marked with the letter "A" and signed by me for purposes of identification #/were +duly passed/+agreed to:

### PLEASE REFER TO ANNEXURE "A" ATTACHED HERETO

Dated this **6th** day of **November**, 20**14**.

**RIZANI BIN HASSAN**
(LS0009520)
Secretary

| Lodged by | : | MALAYSIAN AIRLINE SYSTEM BERHAD  (Company No. 10601-W) |
|---|---|---|
| Address | : | 3rd Floor, Administration Building 1 |
| | | MAS Complex A |
| | | Sultan Abdul Aziz Shah Airport |
| | | 47200 Subang |
| | | Selangor Darul Ehsan |
| Telephone No | : | 03 – 7863 4550 |

---

| * | Strike out whichever references to sections are inapplicable. |
|---|---|
| + | Strike out whichever is in applicable. |
| # | Where the copy of the resolution is annexed, the annexure is to be endorsed as follows – "This is the annexure marked "A" referred to in the notice of resolution signed by me on the ......... day of ........................... 20 ......... |

(2)

Company No:

| 10601 | W |
|-------|---|

## MALAYSIAN AIRLINE SYSTEM BERHAD

This is the Annexure marked "A" referred to in the Notice of Resolution (Form 11) signed by me on the **6th** day of **November, 2014**.

_____

**RIZANI BIN HASSAN**
(LS0009520)
Secretary

---

## SPECIAL RESOLUTION

## PROPOSED SELECTIVE CAPITAL REDUCTION AND REPAYMENT PURSUANT TO SECTIONS 60 AND 64 OF THE COMPANIES ACT, 1965

"**THAT,** subject to the confirmation by the High Court of Malaya and to the requisite approvals (if any) of any relevant regulatory authority or person, and pursuant to Article 71 of the Company's Articles of Association and sections 60 and 64 of the Companies Act, 1965:

(a)    approval be and is given for the Company to reduce its issued and paid-up ordinary share   capital and share premium account in the following manner:

    (i)    all of the 5,118,392,000 issued and paid-up ordinary shares of nominal value RM0.10 each in the Company ("**Ordinary Shares**") which are not held by Khazanah Nasional Berhad as of a date to be determined and announced later by the Directors of the Company ("**Entitlement Date**") shall be cancelled, resulting in the issued and paid-up ordinary share capital of the Company being reduced from RM1,671,078,120.00 comprising 16,710,781,200 Ordinary Shares to RM1,159,238,920.00 comprising 11,592,389,200 Ordinary Shares; and

    (ii)    an amount of RM870,126,640.00 standing to the credit of the balance of the Company's share premium account shall be cancelled, resulting in the balance of the Company's share premium account being reduced from RM1,735,716,000.00 to RM865,589,360.00;

(b)    approval be and is given for the entire credit arising from the said reduction of the Company's share capital and share premium of RM1,381,965,840.00 to be utilised, forthwith after the said reduction, to pay each member of the Company as of the Entitlement Date (other than Khazanah Nasional Berhad) a cash sum of RM0.27 per Ordinary Share held by such member of the Company as of the Entitlement Date; and

(c)    approval and authority be and are given to the Directors of the Company, with full power to take all such steps and exercise all such discretion as they may deem necessary or desirable:

    (i)    to determine the Entitlement Date;

(3)

Company No:

| 10601 | W |
|---|---|

(ii)     to assent to any condition, stipulation, modification, variation or amendment imposed by any relevant regulatory authority and/or by the High Court of Malaya;

(iii)    to lodge an office copy of the order of the High Court of Malaya referred to in this resolution with the Companies Commission of Malaysia on such date as the Directors may determine in their sole discretion (subject to the terms of the said order of the High Court of Malaya); and

(iv)    to do all such acts, deeds and/or things, and execute and deliver on behalf of the Company all such instruments and documents, as are necessary, appropriate, expedient or incidental to give full effect to and complete the matters described in this resolution.".

Dated this **6**<sup>th</sup> day of **November**, 20**14**.


**RIZANI BIN HASSAN**
(LS0009520)
Secretary


Lodged by          :     MALAYSIAN AIRLINE SYSTEM BERHAD  (Company No. 10601-W)
Address            :     3rd Floor, Administration Building 1
                         MAS Complex A
                         Sultan Abdul Aziz Shah Airport
                         47200 Subang
                         Selangor Darul Ehsan
Telephone No       :     03 – 7863 4550

---

\*        Strike out whichever references to sections are inapplicable.
+        Strike out whichever is in applicable.
#        Where the copy of the resolution is annexed, the annexure is to be endorsed as follows – "This is the annexure marked "A" referred to in the notice of resolution signed by me on the ......... day of ........................... 20 .........



**SURUHANJAYA SYARIKAT MALAYSIA**
**COMPANIES COMMISSION OF MALAYSIA**

FORM 29
COMPANIES ACT 1965        [Section 64(7)]

Company No.

| 10601 | W |

## CERTIFICATE OF LODGEMENT OF ORDER OF HIGH COURT CONFIRMING REDUCTION OF SHARE CAPITAL

This is to certify that an order of the High Court dated the 9th day of April, 2013, confirming a reduction of the share capital of **MALAYSIAN AIRLINE SYSTEM BERHAD**, has this day been lodged with me.

Given under my hand and seal, at Kuala Lumpur, this 11th day of April 2013.



**ROHANAH BINTI HAMIM**
ASSISTANT REGISTRAR OF COMPANIES
MALAYSIA

UserID: rohanah   Date: 25/04/2013 03:49:08 PM

"TERJEMAHAN"

## IN THE HIGH COURT OF MALAYA AT KUALA LUMPUR
## IN THE FEDERAL TERRITORY OF KUALA LUMPUR
### PETITION NO. 26NCC – 33 – 03 / 2013

In the matter of reduction of share capital of Malaysian Airline System Berhad (Company No. 10601-W)

And

In the matter of Sections 60 and 64 of Companies Act 1965 and Companies (Reduction of Capital) Rules 1972

And

In the matter of Order 88 Rule 2 of Rules of Court 2012

**MALAYSIAN AIRLINE SYSTEM BERHAD**
**(COMPANY NO. 10601-W)**                                    ... PETITIONER

**BEFORE THE HONOURABLE JUDGE**
**MARY LIM THIAM SUAN**
**ON 9 APRIL 2013**                                          **IN OPEN COURT**

## O R D E R
### (Enclosure 1)

**UPON THE APPLICATION** of the Petitioner, Malaysian Airline System Berhad, in the Petition presented on 20.3.2013 (Enclosure 1) **AND UPON READING** the Petition presented on 20.3.2013 (Enclosure 1) **AND UPON HEARING** Mr Ramesh Sathasivam (Ms Melisa Tai Mein-Sze and Ms Lew Chui Ying with him), solicitors for the Petitioner, **IT IS HEREBY ORDERED**:-

1.    that this Honourable Court confirms the Petitioner's Proposed Capital Restructuring by way of Proposed Par Value Reduction and Proposed

Share Premium Account Reduction, to be effected pursuant to Special Resolution 1 and Special Resolution 2 as set out in paragraphs 25 and 26 of Enclosure 1, in which the share capital of the Petitioner shall be altered as follows:

(a)    whereby the Petitioner's existing issued and paid-up ordinary share capital of RM3,342,156,240 comprising 3,342,156,240 ordinary shares of RM1.00 each shall be reduced by cancellation of RM0.90 of the par value of each existing ordinary share of RM1.00 in the Petitioner thereby constituting the resulting altered paid up capital to RM334,215,624 comprising 3,342,156,240 ordinary shares of RM0.10 each; and

(b)    whereby the share premium account of the Petitioner of RM4,995,969,787 shall be reduced thereby constituting the resulting altered share premium account to zero;

2.    that the following directions be given to effect the capital reduction and share premium account reduction of the Petitioner:

(a)    that an office copy of the order obtained herein is to be lodged with the Companies Commission of Malaysia within thirty (30) days from the date of this order, and that upon such lodgement the capital reduction as confirmed by the order so lodged shall take effect;

2

(b)  the certificate of the Registrar of the Companies Commission of Malaysia shall be conclusive evidence that all the requirements of the Companies Act 1965 with respect to reduction of share capital have been complied with and that the resulting and reduced share capital of the Petitioner is such as is stated in this order;

3.  that the costs of the Petition be borne by the Petitioner;

4.  that the "Notice of the Lodgement of Capital Reduction Order" be advertised within seven (7) days from the date of lodgement of the order herein with the Companies Commissions of Malaysia, in:

(a)  one issue of English daily newspaper, the New Straits Times;

(b)  one issue of Malay daily newspaper, Berita Harian;

(c)  one issue of Chinese daily newspaper; and

(d)  one issue of Tamil daily newspaper;

5.  that the Petitioner be at liberty to apply.

Dated this 9th day of April 2013.

..................................................
Senior Assistant Registrar
High Court
Kuala Lumpur

This **Order** is filed by the solicitors for the Petitioner, Messrs Adnan Sundra & Low of Level 11, Menara Olympia, No. 8, Jalan Raja Chulan, 50200 Kuala Lumpur.
Ref: MAS-SUBG/20121044/MT/LCY / Tel: 03-2070 0466 / Fax: 03-2078 3382

3

**THE COMPANIES ACT, 1965**

**COMPANY LIMITED BY SHARES**

**MEMORANDUM OF ASSOCIATION**

**OF**

**MALAYSIAN AIRLINE SYSTEM BERHAD**
(Company No. 10601-W)

1.    The name of the Company is "MALAYSIAN AIRLINE SYSTEM BERHAD".  (Company No. 10601-W)

2.    The registered office of the Company will be situated in Malaysia.

3.    The objects for which the Company is established are :-

   (1)    To establish and carry on in Malaysia and in any other part of the world the business of an aerial transport Company, and in connection therewith to act as agents of, or in conjunction with other persons or companies engaged in the business of aerial or other transport.

   (2)    To manufacture, repair, buy, sell, import, export, develop, exchange, charter, hire, lease, otherwise acquire, and deal in aeroplanes, hovercraft, hydroplanes, airships, balloons and aircraft of all descriptions, and all component parts, fittings and accessories thereof, to provide and erect aerodromes, landing stations, buildings, and sheds; to make arrangements for and procure to be carried on air transport services in Malaysia and in any other parts of the world.

   (3)    To make arrangements for and procure to be carried on aviation meetings and exhibitions, and to give prizes and awards for persons taking part therein, and to give lessons and instructions in the art of aviation, and with a view thereto to engage and employ aviators, lecturers, teachers and demonstrators.

   (4)    To carry on in Malaysia and in any other part of the world the business of making, building or manufacturing, purchasing, hiring or otherwise acquiring all kinds of aircraft, whether lighter or heavier than air, motors, motor vans or wagons, motor cars, motor carriages, motor wheels, motor cycles, motor omnibuses, road vehicles or autocars, locomotives and engines propelled by steam, electricity, oil or other motive power, rolling stock, railway carriages and wagons and other carriages, cycles of all descriptions, including bicycles, tricycles and quadricycles, velocipedes, carriage bodies, cars, wagons, carts, trucks, vehicles and other conveyances of all kinds, whether for road, railway, train, tramway, field or other purposes, also ships or boats, and rails and railway and tramway plant, and all machinery, materials and things applicable or used as accessory thereto, and of selling, letting or supply at annual or other rents all or any of the things hereinbefore specified to any Company, and of repairing and maintaining the same respectively, whether belonging to the Company or not, and of exchanging or otherwise dealing in the same respectively.

   (5)    To carry on the business of manufacturers of, and dealers in all accessories to and component parts of aircraft, automobiles or any other vehicles or machine propelled by any motive power, whether by petrol, steam, gas or otherwise.

1

(6)  To carry on in Malaysia and in any other part of the world the business of manufacturers of machinery, tool makers, steel and brass founders, metal founders generally, metal workers, boiler makers, millwrights, machinists, smiths, woodworkers, builders, carriage builders, carriage body builders, painters, upholsterers, metallurgists, electrical engineers, water supply engineers, suppliers of power, gas makers, printers, carriers and merchants, and to buy, sell, manufacture, repair, convert, alter, let on hire, ply for hire, and deal in machinery, motors, motor wagons, motorcars, motor carriages, motor wheels, motor cycles, motor road vehicles, or autocars, ships, boats, horses, carts, aircraft and implements and rolling stock of all kinds.

(7)  To carry on the following businesses, namely, ironmasters, steel makers, iron and steel converters, smelters, engineers, iron founders, importers, exporters and manufacturers of, and dealers in, ores, metals, chemicals and other preparations, processes and articles, merchants, warehousement, ship-owners, ship or boat builders, wharfingers, storekeepers, charterers of ships and other vessels, lightermen, barge owners, carriers, agents, brokers, forwarding agents, bonded carmen and common carmen and contractors, or any other trade or business whatsoever which can in the opinion of the Directors be advantageously carried on by the Company in connection with or as auxiliary to the general business of the Company.

(8)  To construct, carry out, maintain, improve, develop, manage, work, control, and superintend any roads, ways, tramways, railways, bridges, reservoirs, watercourses, aqueducts, wharves, furnaces, saw-mills, crushing works, hydraulic works, electrical works, factories, warehouses, shops, buildings and other works and conveniences which may seem directly or indirectly conducive to any of the objects of the Company or to advance the Company's interests, and to contribute to, subsidise or otherwise assist or take part in any such operations.

(9)  To buy, sell, manufacture, repair, alter, improve, manipulate, prepare for market, let on hire, and generally deal in all kinds of plant, machinery, apparatus, tools, utensils, materials, produce, substances, articles and things for the purpose of any of the businesses specified herein, or likely to be required by customers or other persons having, or about to have dealing with the Company.

(10)  To carry on business or businesses of manufacturers and merchants or portable buildings and domestic offices and business furniture and appliances of every description.

(11)  To enter into contracts, agreements and arrangements with any other Company, whether in Malaysia, or in any other part of the world for carrying out by such other company on behalf of the Company of any of the objects for which the Company is formed.

(12)  To erect, construct, lay down, enlarge, alter and maintain buildings, works and machinery necessary or convenient for the Company's business.

(13)  To carry on any other business, whether manufacturing or otherwise, which may seem to the Company capable of being conveniently carried on in connection with the above or calculated directly or indirectly to enhance the value of or render profitable any of the property or rights of the Company.

(14)   To purchase, take on lease, or in exchange, build and construct upon, develop, hire or otherwise acquire any real or personal property, and any rights or privileges, or interests which the Company may think necessary, convenient or desirable with reference to any of these objects and capable of being profitably dealt with in connection with any of the Company's business, property or rights for the time being, and in particular any land, buildings, easements, concessions, patents, patent rights or rights of an analogous character whether Malaysian or foreign, licences, general or special farms or farmed privileges, monopolies, secret processes, trade marks, copyrights, plants, implements, tools, patterns of all kinds and stock-in-trade.

(15)   To purchase or otherwise acquire, undertake and carry on the whole or any part of the business, property and liabilities of any person, firm or company carrying on any business which the Company is authorised to carry on or possess or which may seem to the Company capable of being conveniently carried on or calculated directly or indirectly to enhance the value of or render profitable any of the Company's property or rights or any property suitable for the purposes of the Company.

(16)   To enter into any arrangements with any Government or authority, supreme, municipal, local or otherwise, that may seem conducive to the Company's objects, or any of them; to obtain from any such Government or authority any rights; privileges, and concessions which the Company may think it desirable to obtain; and to carry out, exercise and comply with any such arrangements, rights, privileges and concessions.

(17)   To apply for, or join in applying for, purchase or by other means acquire and protect, prolong any renew, whether in Malaysia or in any other part of the world, any patents, patent rights, brevets, copyrights, trademarks, formulas, inventions, licences, protections, concessions and the like, conferring any exclusive or non-exclusive or limited right to use, or any secret or other information, as to any invention which may seem capable of being used for any of the purposes of the Company or the acquisition of which may seem calculated directly or indirectly to benefit the Company, or which may appear likely to be advantageous or useful to the Company, and to use, exercise, develop, manufacture under or grant licences or privileges in respect of, or otherwise turn to account, and to expend money in experimenting and testing and making researches, and in improving or seeking to improve any patents, inventions or rights which the Company may acquire or propose to acquire.

(18)   To enter into partnership or into any arrangement for sharing profits, union of interest, co-operation, joint adventure, reciprocal concession, or otherwise with any person, firm or Company carrying on or engaged in or about to carry on or engage in, any business or transaction which this Company is authorised to carry on or engage in, or which is capable of being conducted so as directly or indirectly to benefit this Company.  And to lend money to, guarantee the contracts of, subsidise, or otherwise assist any such Company, and to take or otherwise acquire and hold shares or stock in, or securities of any such Company, and to sell, hold, re-issue, with or without guarantee, or otherwise deal with the same.

(19)   To guarantee payment or performance of any debts, contracts or obligations, or become security for any person, firm or Company for any purpose whatsoever, and to act as agents for the collection, receipt of payment of money, generally to act as agents for and render services to customers and others.

(20)   To promote any other Company for the purpose of acquiring all or any of the property, rights and liabilities of the Company, or of advancing directly or indirectly the objects of interest thereof, or for any other purpose which may seem directly or indirectly calculated to benefit this Company, and to take or otherwise acquire and hold shares, stocks or obligations of any such Company, or of any other Company having objects altogether or in part similar to those of this Company or carrying on any business capable of being conducted so as directly or indirectly to benefit this Company and to guarantee the payment of any debentures or securities issued by any such Company and upon a distribution of assets or division of profits to distribute any such shares, stocks or obligations amongst the members of this Company in specie.

(21)   To pay out of the funds of the Company all expenses which the Company may lawfully pay of or incident to the formation, registration and advertising of or raising money for the Company, and the issue of its capital, or for contributing to or assisting any issuing house or firm or person either issuing or purchasing with a view to issue all or any part of the Company's capital, in connection with the advertising or offering the same for sale or subscription, including brokerage or commission for obtaining applications for, or taking, placing or underwriting or procuring the underwriting of shares, debentures or debenture stock, and to apply at the cost of the Company to the Court for any extension of the Company's powers.

(22)   To invest, or otherwise deal with the moneys of the Company upon such security, or without security, and in such manner as may from time to time be determined.

(23)   Subject to any statutory prohibition, to lend money to such persons, and on such terms as may seem expedient, and in particular to customers and others having dealings with the Company, and to guarantee or engage as securities for the performance of contracts, undertakings, responsibilities, or liabilities of any person, firm or Company, but not to carry on the business of registered money-lender.

(24)   To borrow or raise money for the purpose of the Company, receive money on deposit at such interest or otherwise upon such terms as the Company may approve, and for the purpose of raising or securing money or any other purpose to issue any mortgages, debentures or debenture stock perpetual or otherwise, bonds, letters of hypothecation or lien, or obligations of the Company, either at par, premium or discount, and either redeemable or irredeemable, or perpetual, secured upon all or any part of the undertaking, revenue rights and property of the Company, present and future including uncalled capital, or the unpaid calls of the Company and to exchange or vary from time to time any such securities and to purchase, redeem or pay off any such securities.

(25)   To remunerate any person, firm or Company for services rendered or to be rendered in placing, or assisting to place, or guaranteeing the placing or procuring the underwriting of any of the shares or debentures or other securities of the Company, or of the Company in which this Company may be interested or propose to be interested, or in or about the conduct of business of the Company, whether by cash payment or by the allotment of shares or securities of the Company, credited as paid up in full or in part, or otherwise.

(26)   To purchase with a view to closing or re-selling or otherwise dealing with in whole or in part any business or properties which may be deemed likely to injure by competition or otherwise any business or branch of business which the Company is authorised to carry on.

(27)   To subscribe for either absolutely or conditionally, or otherwise acquire and hold shares, stocks, debentures, debenture stock or other obligations of any other Company having objects altogether or in part similar to those of this Company.

(28)   To draw, make accept, endorse, discount, execute, purchase and issue promissory notes, bills of exchange, bills of lading, warrants, debentures, and other negotiable and transferable instruments.

(29)   To sell or dispose of the undertaking of the Company, or any part thereof, for such consideration as the Company may think fit, and in particular for shares, whether fully or partly paid-up, debentures or securities of any other Company, whether or not having objects altogether or in part similar to those of the Company, and to hold and retain any shares, debentures or securities so acquired, and to improve, manage, develop, sell, exchange, lease, mortgage, dispose of, to turn to account, or otherwise deal with all or any part of the property or rights of the Company.

(30)   To adopt such means of making known the products of the Company as may seem expedient, and in particular by advertising in the press, by circulars, by purchase and exhibition of works of art or interest, by publication of books and periodicals, and by granting prizes, rewards and donations.

(31)   To support, subscribe or make donations for the patriotic, general, useful, charitable, benevolent or public object or purpose or for any exhibition; or to establish, support, subscribe or make donations to or aid in the establishment and support of any association, fund, trust, convenience, institution, society or club which may be for the benefit of the Company or its employees or directors or the past employees or Directors of the Company or of its predecessors in business, or the dependants or connection of any such persons, or which may be connected with any town or place where the Company carries on business; to grant pensions, gratuities, allowances or charitable aid to any person who may have served the Company or its predecessors in business, or to the wives, children or other connections of such persons; to make payments towards insurance and to form and contribute to provident and benefit funds for the benefit of any persons employed by the Company or by its predecessors in business; and to subsidise or assist any association of employers or employees, or any trade association.

(32)   To transact any lawful business in aid of Malaysia in the prosecution of any war or hostilities in which Malaysia in engaged.

(33)   To apply for, promote and obtain any Ordinance, Provisional Order, Regulation, Enactment, Act of Parliament, statute, order or other authorisation in Malaysia or in any other part of the world for enabling the Company to carry any of its objects into effect, or for effecting any modification of the Company's constitution, or for any other purposes which may seem expedient, and to oppose any proceedings or applications which may seem calculated directly or indirectly to prejudice the Company's interest.

(34)   To establish, grant, maintain and work agencies and branches and take up agencies, in any part of the world, and to act as agents for companies carrying on all classes or kinds of insurance business, and to do all such other things as the Company may deem conducive to the carrying on of the Company's business, either as principals or agents, and to remunerate any person in connection with the establishment or granting of such agencies, upon such terms and conditions as the Company may think fit.

(35)    To do all or any of the above things in Malaysia and in any other part of the world, either as principals, agents, contractors, trustees or otherwise, and by or through trustees, agents, sub-contractors corporation or otherwise, and either alone or in conjunction with others, and to procure the Company to be registered or recognised in Malaysia or any foreign country or place.

(36)    To distribute any of the property of the Company in specie or kind among the shareholders.

(37)    To purchase its own shares in the manner and to the extent permitted by and subject to the provision of the Companies Act, 1965 or any other written law for the time being in force and the requirements of any Stock Exchange upon which the shares are listed and any applicable laws, rules, regulations and guidelines for the time being in force, including any modifications, amendments and re-enactments in relation thereto, and to do or execute all acts, documents and things and/or other matters ancillary thereto and/or arising therefrom or in furtherance thereof.

(38)    To amalgamate or unite with or absorb into the Company any other company or association or business, or the members of any other company or association wherever formed for objects similar, analogous or subsidiary to any of the objects of the Company or carrying on any business capable of being conducted so as directly or indirectly to benefit the Company and to form, establish and bring out and assist in the formation or establishment of any such Company or association and to acquire, hold and deal in shares or interests therein.

(39)    To exercise the powers contained in the Third Schedule to the Act.

(40)    To do all such other things as are incidental or conducive to the attainment of the above objects, or any of them.

AND it is hereby expressly declared that the word "Company" in this clause shall be deemed to include any person or partnership or other body of persons, whether domiciled in Malaysia or elsewhere, and whether existing of hereafter to be formed, and words denoting the singular number only shall include the plural number and vice versa, and so that the objects specified in each sub-clause of this clause and all the powers thereof shall, except where otherwise expressed in such sub-clause be regarded as independent objects, and in no wise limited or restricted by reference to or inference from the terms of any other sub-clause or the name of the Company, nor is any general expression in any sub-clause to be narrowed or restricted by any particularly of expression in the same sub-clause or by the application of any rule of construction ejusdem generis or otherwise.

4.        The liability of the members is limited.

5.        The authorised share capital of the Company is **RM10,041,900,001/-** divided into **90,000,000,000** ordinary shares of **RM0.10** each, 1 Special Rights Redeemable Preference Share of RM1/-,100,000,000,000 Redeemable Convertible Preference Shares of RM0.01 each, 1,000,000 Redeemable Preference Shares of RM0.10 each and 418,000,000 Redeemable Convertible Preference Shares of RM0.10 each with power to increase and with power from time to time to issue any share of the original or new capital with any preference or priority in the payment of dividends or the distribution of assets or otherwise over any other shares, whether or preference, and whether issued or not, and to vary the regulations of the Company as far as necessary to give effect to any such preference or priority, and upon the sub-division of a share to apportion the rights to participate in profits or surplus assets with special rights, priorities and privileges to any of the sub-divided shares, or the right to vote in any manner as between the shares resulting from sub-division.

WE, the several persons whose names and addresses are subscribed, are desirous of being formed into a Company in pursuance of this Memorandum of Association, and we respectively agree to take the number of shares in the capital of the Company set opposite our respective names.

| Names, Address and Description of Subscribers | Number of Shares taken by each Subscriber |
|---|---|
| 1.   RAJA TAN SRI MOHAR BIN RAJA BADIOZAMAN, P.S.M., J.M.N., Secretary-General, Federal Treasury, Kuala Lumpur. | One |
| 2.   ENCHE' RAMLI BIN ABDUL HAMID, K.M.N., Secretary-General, Ministry of Transport, Kuala Lumpur. | One |

Dated this 2nd day of April, 1971

Witness to the above signatures :

SAW HUAT LYE, K.M.N.,
Ministry of Transport
Jalan Young,
Kuala Lumpur.

7

THE COMPANIES ACT, 1965

COMPANY LIMITED BY SHARES

ARTICLES OF ASSOCIATION

OF

MALAYSIAN AIRLINE SYSTEM BERHAD
(Company No. 10601-W)

INTERPRETATION

Interpretation

1.    (1)    The marginal notes hereto shall not affect the construction hereof, and in these presents unless there be something in the subject or context inconsistent therewith :

"Approved Market Place" means a stock exchange which is specified to be an approved market place in the Securities Industry (Central Depositories) (Exemption) (No. 2) Order 1998.

"Audit Committee" means the audit committee appointed in accordance with the regulations or requirements prescribed by the Exchange from time to time.

"Authorised Nominee" means a person who is authorised to act as nominee as specified under the Rules.

"Beneficial Owner" means in relation to Deposited Securities, the ultimate owner of the Deposited Securities who is the person who is entitled to all rights, benefits, powers and privileges and is subject to all liabilities, duties and obligations in respect of, or arising from, the Deposited Securities and does not include a nominee of any description.

"Book Closing Date" means the specified time and date set by the Company for the purpose of determining persons entitled to dividends, interest, or new securities, or rights to a priority of application of issues of securities or other distributions.

"Cash Settlement Notice" has the meaning set forth in Article 7C(8)(b).

"Cash Settlement Option" has the meaning set forth in Article 7C(8)(a).

"Cash Settlement Sum" means the sum payable by the Company to a Converting RCPS Holder upon the Company exercising the Cash Settlement Option, which sum shall be calculated in accordance with the following formula:

P x Q, where:

P  =  The number of Conversion Shares that would otherwise be required to be issued and allotted to a holder of RCPS of RM0.10 each upon the exercise of the Conversion Right at the Conversion Price in respect of any RCPS of RM0.10 each.

Q  =  The WAMP of the Ordinary Shares for the **ten (10)** Market Day period ending on and inclusive of the date of receipt by the Company of the Conversion Notice.

"Central Depositories Act" means Securities Industry (Central Depositories) Act 1991.

"Commission" means Securities Commission established under Section 3 of the Securities Commission Act 1993.

"Conversion Notice" means a notice delivered by a holder of RCPS of RM0.10 each to the Company exercising the Conversion Right and specifying the number of RCPS of RM0.10 each to be converted and the corresponding number of Conversion Shares to be issued therefrom, substantially in the form set out in **Article 7C(7)(c)(i)**.

"Conversion Period" means the period commencing from the first anniversary of the Issue Date and expiring on the Maturity Date, both dates inclusive.

"Conversion Price" means the price payable by a holder of RCPS of RM0.10 each for each of the Conversion Shares which it is entitled to receive upon its exercising the Conversion Right, which price shall be determined by the Board prior to the issuance of the RCPS of RM0.10 each and which shall be payable in accordance with **Article 7C(7)(b)(i)**.

Conversion Price shall be determined based on the theoretical ex-rights market price of the Ordinary Shares calculated based on the WAMP of the Ordinary Shares for the **five (5)**-Market Day period ending on and inclusive of the price fixing date to be determined by the Board and after taking into account the issue price of the Ordinary Shares to be issued pursuant to the Proposed Rights Issue, provided that the Conversion Price shall not be less than the par value of RM1.00 of the Ordinary Shares.

Conversion Right has the meaning set forth in **Article 7C(7)(a)**.

Conversion Shares has the meaning set forth in **Article 7C(7)(c)(iii)**.

"Converting RCPS Holder" means a holder of RCPS of RM0.10 each who has issued a Conversion Notice in accordance with **Article 7C(7)(c)(i)**.

"Convertible Securities" means securities which are convertible or exercisable by the holder, or automatically, by their terms of issue, into shares or stocks.

"Deposited Security" means a security standing to the credit of a securities account and includes securities in a securities account that is in suspense.

"Depositor" means a holder of securities account.

"Depository" means Bursa Malaysia Depository Sdn. Bhd.

"Dividend" includes bonus.

"Entitled Person" means a person who is a Malaysian citizen and who is not accustomed or under an obligation, whether formal or informal to act in accordance with the directions, instructions or wishes of a foreigner.

"Exempt Authorised Nominee" means an authorised nominee defined under the Securities Industry (Central Depositories) Act 1991 ("SICDA") which is exempted from compliance with the provisions of subsection 25A (1) of SICDA.

"Exercise Date" means, in relation to any RCPS of RM0.10 each, a date on which the Conversion Notice in respect of such RCPS of RM0.10 each is issued by the holder thereof to and received by the Company.

"Foreign Ownership Regulations" means the Securities Industry (Central Depositories) (Foreign Ownership) Regulations 1996.

"Foreigner" means

(a)     An individual who is not a citizen of Malaysia;

(b)     A body, corporate or unincorporate, which is incorporated or constituted, as the case may be, outside Malaysia;

(c)     A trustee administering a trust which is constituted under any foreign law;

(d)     A trust corporation which is incorporated under any foreign law;

(e)     A society, including a co-operative society or any other institution, which is constituted, registered or incorporated under any foreign law;

(f)     A nominee Company incorporated in Malaysia which :-

(i)     is identified with the word "(Asing)" in its name; and

10

(ii)    performs the services of a nominee, agent or trustee solely for or on behalf of legal or beneficial owners of securities who are foreigners; or

(g)    A Company, other than a Company described under paragraph (f), which is incorporated in Malaysia and any one of the persons or a combination of the persons or a combination of the persons referred to in paragraph (a), (b), (c), (d), or (e) is entitled to exercise or control the exercise of more than fifty per centum of the voting rights of the Company.

"Independent Director" means a director as defined under the Bursa Malaysia Exchange Berhad Main Market LR.

"In writing" and "written" include printing, lithography, and other modes of representing and reproducing words in a visible form.

"Issue Date" means in relation to any RCPS of RM0.10 each, the date on which the RCPS of RM0.10 each is issued by the Company.

"Main Market LR" means the Main Market Listing Requirements of Bursa Malaysia Securities Berhad including any amendment to the Listing Requirements that may be made and such practice notes or circulars as may be issued from time to time.

"Market Day" means any day on which the stock market of the Exchange is open for trading in securities;

"Maturity Date" means the Market Day immediately preceding the fifth (5th) anniversary of the Issue Date;

"Member" means any person/persons for the time being holding shares in the Company and whose names appear in the Register of Members (except Malaysian Central Depository Nominees Sdn. Bhd.), including, subject to the provisions of the Foreign Ownership Regulations, depositors whose names appear on the Record of Depositors.

"Month" means calendar month.

"Ordinary Shares" means ordinary shares of RM1.00 each in the capital of the Company.

"Principal Subsidiary" means a subsidiary which accounts for 25% or more of (i) the latest audited consolidated profit after tax of the group or (ii) the total assets employed of the group.

"Proxy" includes attorney duly constituted under a power of attorney.

"Rights Issue" refers to the renounceable rights of:-

(a)    up to 418 million Ordinary Shares ("**Rights Share**"), at a price to be determined by the Board; and

11

(b)    up to 418 million RCPS of RM0.10 each at an issue price of RM1.00 each,

on the basis of one (1) Rights Share and one (1) RCPS of RM0.10 each for every three (3) existing Ordinary Shares held, as announced by or on behalf of the Company to the Exchange on 15 January 2007.

"RCPS of RM0.01 each" means the Redeemable Convertible Preference Shares of RM0.01 each.

"RCPS of RM0.10 each" means the Redeemable Convertible Preference Shares of RM0.10 each.

"Record of Depositors" means a record provided by the Central Depository to the Company under chapter 24.0 of the Rules.

"Rights And Obligations" means all the rights, benefits, powers, privileges, liabilities, duties and obligations under sub-regulation 6(1) of the Foreign Ownership Regulations.

"RPS" means the Redeemable Preference Shares of RM0.10 each.

"Rules" means The Rules of the Central Depository.

"Seal" means the common seal of the Company.

"Securities" means shares, debentures, stocks or bonds issued or proposed to be issued and includes any right, option or interest in respect thereof.

"Securities Account" means an account established by the Central Depository for a Depositor for the recording of deposit or withdrawal of securities and for dealing in such securities by the Depositor.

"Share" as regards the Company or any other Corporation means and includes a preference or deferred as well as an ordinary share and also stock, and, any security which carries any power of voting with respect to the management of the Company or such other corporation issuing or creating the same but shall not include the "Special Share".

"Special Resolution" has the meaning assigned thereto by the Act.

"Special Share" means the one Special Rights Redeemable Preference Share of RM1.00 and may be held only by or transferred only to the Special Shareholder.

"Special Shareholder" means the Minister of Finance (Incorporated) or its successors or any Minister, representative or any person acting on behalf of the Government of Malaysia.

"Stock Exchange" or "Exchange" means Bursa Malaysia Securities Berhad

"The Act" means the Companies Act, 1965 and all subsidiary legislation thereunder for the time being in force and affecting the Company.

"The Chairman" means the person appointed to the office of Chairman of the Board under Article 144.

"The Company" means Malaysian Airline System Berhad.

"The Directors" means the Directors of the Company for the time being.

"The office" means the Registered Office for the time being of the Company.

"The Register" means the Register of Members to be kept pursuant to the Act.

"The Secretary" means any person or persons appointed to perform the duties of secretary of the Company.

"These Articles" means these Articles of Association as originally framed or as from time to time altered by Special Resolution."

"WAMP" means the weighted average market price.

Words importing the singular number only include the plural number, and vice versa.

Words importing the masculine gender only include the feminine gender.

Words importing persons include corporations.

AND THAT all references to the abovementioned interpretations throughout the whole Articles of Association be changed accordingly.

(2)     The regulations in Table A in the Fourth Schedule to the Act shall not apply to the Company, except so far as the same are repeated or contained in these Articles.

(3)     Unless the context otherwise requires, words or expressions contained in these Articles shall bear the same meaning as in the Act or any statutory modification thereof in force at the date at which these Articles become binding on the Company.

(4)     The marginal notes are inserted for convenience and shall not affect the construction of these Articles.

## CONTROL

Control

2.    (1)     The Company shall not enter into any combination, amalgamation or other arrangement which will have the effect of transferring the management or control of the Company to any foreigner.

Only Entitled Person to hold
office as Chairman

(2)     No person other than an Entitled Person as defined in Article 1(1) hereof shall be qualified to hold office as Chairman and/or Principal Executive Officer.

## SHARE BUY BACKS

Share Buy Backs

3.     (1)     Subject always to the compliance with the provisions of the Act and the requirements of the Stock Exchange and all other applicable laws, Rules, regulations and guidelines for the time being in force, the Company may, with the sanction of the Members in a general meeting, purchase its own shares upon and subject to such terms and conditions as the Directors may, in their discretion deem fit or necessary, PROVIDED THAT the total aggregate number of shares to be acquired does not exceed ten percent (10%) of the issued and paid-up share capital of the Company for the time being and the prior approval of the Stock Exchange has been obtained.

(2)     Where the Company has purchased its own shares in the manner as provided in Article 3 (1) above, the Directors may, if the applicable laws for the time being in force so allow

(a)     cancel the shares so purchased; or

(b)     retain the shares so purchased as treasury shares; or

(c)     retain part of the shares so purchased as treasury shares and cancel the remainder; or

(d)     deal with the shares so purchased in the manner as may from time to time be prescribed and/or allowed by applicable laws, Rules, regulations and guidelines then in force.

(3)     Where the shares so purchased or any part thereof are retained as treasury shares, the Directors may at any time, subject to the provisions of and in compliance with all applicable laws, Rules, regulations and guidelines for the time being in force

(a)     distribute the treasury shares as dividends to the Members in the manner as may be allowed by applicable law; or

(b)     re-sell the treasury shares on the market of the Stock Exchange in accordance with the relevant guidelines, Rules and/or requirements of the Stock Exchange; or

(c)     deal with the treasury shares in the manner as may from time to time be prescribed and/or allowed by the applicable laws, Rules, regulations and guidelines then in force.

(4)    While the shares are held as treasury shares, the rights attached to such shares as to voting, dividends and participation in other distribution and otherwise shall be and are suspended and the treasury shares shall not be taken into account in calculating the number or percentage of shares or of a class of shares in the Company for any purposes including, without limiting the generality of Section 67A(3) of the Act, the provisions of any law or requirements of the Articles of Association of the Company or the Main Market LR on substantial shareholding, takeovers, notices, the requisitioning of meetings, the quorum for a meeting and the result of a vote on a resolution at a meeting.

## SHARES

**Authorised Capital**

4.    The authorised share capital of the Company is RM10,041,900,001 divided into 90,000,000,000 Ordinary Shares of RM0.10 each, 1 Special Share of RM1/-, 100,000,000,000 RCPS of RM0.01 each, 1,000,000 RPS of RM0.10 each and 418,000,000 RCPS of RM0.10 each. The RCPS of RM0.01 each, RPS of RM0.10 each and RCPS of RM0.10 each shall carry the rights, benefits and privileges and be subject to the restrictions and limitations set out in Articles 7A, 7B and 7C, respectively.

**The Special Share**

5.    (1)    The Special Share may be held only by or transferred only to the Minister of Finance (Incorporated) or its successors or any Minister, representative or any person acting on behalf of the Government of Malaysia.

**Right to appoint Government Appointed Directors and the Chairman**

(2)    Subject to Article 2(2) of these Articles, the Special Shareholder shall have the right from time to time to appoint or nominate in accordance with Article 119 of these Articles, three (3) Government Appointed Directors and to appoint one of them to be the Chairman in accordance with Article 144.

**Right to attend and speak at General Meetings**

(3)    The Special Shareholder or any person acting on behalf of the Special Shareholder shall be entitled to receive notice of and to attend and speak at all general meetings or any other meeting of any class of shareholders of the Company, but the Special Share shall carry no right to vote nor any other rights at any such meeting.

**No rights to dividends**

(4)    The Special Share shall confer no rights to any dividend at any time.

**Rights of redemption and repayment of Capital**

(5)    The Special Shareholder may subject to the provisions of the Act, require the Company to redeem the Special Share at par at any time by serving written notice upon the Company and delivering the relevant share certificate. In a distribution of capital in a winding up of the Company, the Special Shareholder shall be entitled to repayment of the capital paid up on the Special Share in priority to any repayment of capital to any other Member. The Special Share shall confer no other right to participate in the capital or profits of the Company.

| | | |
|---|---|---|
| Matters requiring consent of Special Shareholder | (6) | Each of the following matters shall be deemed to be a variation of the rights attaching to the Special Share and shall accordingly only be effective with the consent in writing of the Special Shareholder :- |

| | | |
|---|---|---|
| Amendment of certain articles | (a) | The amendment, or removal, or alteration of the effect of all or any of the following Articles: |

definitions of "share", "Special Share" and "Special Shareholder" in Article 1, Articles 5, 66 and 119.

| | | |
|---|---|---|
| Winding up | (b) | A proposal for the voluntary winding-up or dissolution of the Company. |

| | | |
|---|---|---|
| Disposal by the Company | (c) | Any disposal which, because of its size, is required by the Bursa Malaysia Securities Berhad or any other Exchange on which the Company's shares are listed to be subject to approval by the Company in General Meeting. |

| | | |
|---|---|---|
| Acquisition, take-over etc. by the Company | (d) | Any acquisitions, take-over by the Company, amalgamation, merger or change in the operations carried on by the Company, which because of its significance is required by the Companies Act, The Bursa Malaysia Securities Berhad or any other Exchange on which the Company's shares are listed to be subject to approval by the Company in General Meeting. |

**Shares to be under Control of Directors**

6.    Without prejudice to any special rights previously conferred on the holders of any existing shares or class of shares but subject to the Act and the provisions of these Articles, the shares of the Company shall be under the control of the Directors who may allot or otherwise dispose of the same to such persons and on such terms and conditions with such preferred, deferred or other special rights or such restrictions whether in regard to dividend, voting, return of capital and with full power to give to any person the call on any shares either at par or at a premium during such time and for such consideration as the Directors determine, PROVIDED ALWAYS

(a)    the Company shall not issue shares to transfer controlling Shares interest without the prior approval of shareholders in a general meeting;

(b)    no Director shall participate in an issue of shares to employees unless shareholders in general meeting have approved of the specific allotment to be made to such Director and unless he holds office in an executive capacity; and

(c)    the rights attaching to shares of a class other than ordinary shares shall be expressed in the resolution creating the same.

(d)    that notwithstanding the existence of a resolution issued pursuant to Section 132D of the Act, the Company shall not issue any shares or Convertible Securities if the nominal value of those shares or Convertible Securities, when aggregated with the nominal value of any such shares or Convertible Securities issued during the preceding 12 months, exceeds 10% of the nominal value of the issued and paid-up capital of the listed company, unless shareholders in general meeting have approved of the precise terms and conditions of the proposed issue. In working out the number of shares or Convertible Securities that may be issued by the Company, if the security is a Convertible Security, each such Security is counted as the maximum number of shares into which it can be converted or exercised.

**Preference shares**

7.    Subject to the Act, the provisions of these Articles and the requirements of the Exchange, the Company shall have power to issue preference shares, whether redeemable, convertible or otherwise and on such other terms and conditions and carrying such rights or restrictions as may be approved by the shareholders in general meeting. The Company shall not, unless with the consent of existing preference shareholders at a class meeting, issue preference shares ranking in priority to the preference shares already issued but may issue preference shares ranking equally therewith.

**Rights of redeemable convertible preference shareholder**

7A.    (1)    Holders of the RCPS shall have the same rights as ordinary shareholders as regards receiving notices, reports and audited accounts and attending general meetings of the Company PROVIDED always that holders of the RCPS shall not have the right to vote or to move or second any resolutions at any general meeting of the Company except on each of the following circumstances -

(a)    on a proposal to reduce or increase the Company's share capital;

(b)    on a proposal for the disposal of the whole of the Company's property, business and undertaking;

(c)    on a proposal that directly or indirectly varies or affects rights, privileges or conditions attached to the RCPS, or the exercise of any of those rights, privileges or conditions;

(d)    on a proposal to wind up the Company; and

(e)    during the winding up of the Company.

In any such case a holder shall have one (1) vote for each RCPS held. Any holder may demand a poll at a general meeting of the Company on any resolution on which that holder may vote.

(2)    Each RCPS shall on a winding-up or upon a reduction of capital or other return capital (other than on the redemption or conversion of the RCPS) rank pari passu with each other and confer on the holder thereof the right to receive, in priority to the holders of any other class of shares in the capital of the Company the cash repayment in full of the nominal amount (and premium payable) of that RCPS after the payment and discharge of all debts and liabilities of the Company and the costs of winding up or such capital reduction exercise.

(3)    The RCPS shall not be entitled to receive any dividends out of the profits of the Company or to participate in the profits of the Company.

(4)    RCPS shall not entitle the holder thereof to participate in the profits or surplus assets of the Company in a winding up or upon reduction of capital beyond such rights as are expressly set out in this Article.

(5)    The RCPS shall rank pari passu among themselves.

(6)    The RCPS in the present capital shall be liable to be redeemed in accordance with the following provisions:

(i)    Subject to the Act, each RCPS shall at the option of the Company be redeemed by payment by the Company in cash to the holder thereof on any date within a period of thirty (30) days commencing immediately after the end of the fifth anniversary year from the date of the issue of the RCPS ("the Fifth Anniversary Date") (the period to be referred to as "the Redemption Period") of an amount which shall be at a price equivalent to the amount which is at a premium to the issue price of the RCPS to be calculated to give the holders of the RCPS an equivalent return similar to the 5-year zero coupon fixed income papers issued or guaranteed by the Government of Malaysia that are issued or trading at around the time when the RCPS are issued plus interest accrued from the Fifth Anniversary Date to the actual date of redemption by the Company within the Redemption Period, calculated using one (1) month Treasury Bills ("the Redemption Amount"). For this purpose, the Company shall give not less than seven (7) days' notice in writing ("the Redemption Notice") to the holders of the RCPS of its intention to redeem all (but not part only) of the RCPS held by such holders which have been issued and are fully paid up, on a date ("the Redemption Date") within the Redemption Period which shall be specified in the Redemption Notice.

(ii)    In the event of the Company determining to redeem a part only of the RCPS those to be redeemed shall be selected by drawings in such manner as the directors shall approve or a rateable proportion (as nearly as practicable without involving fractions of shares) of each holding of such shares on the Redemption Date.

(iii)   On the Redemption Date the Company shall be entitled and bound to redeem the RCPS specified in the Redemption Notice at the Redemption Amount subject to the Redemption Notice and shall be dealt with in accordance with the code of conduct and market practices for Malaysian scripless securities market under the Real Time Electronic Transfer of Funds and Securities System issued by Bank Negara Malaysia, as modified or revised from time to time, or the Central Depositories Act or the Rules, if applicable.

(iv)    No RCPS shall be redeemed otherwise than out of distributable profits or the proceeds of fresh issue of shares made for the purpose of the redemption, but the premium payable on redemption shall be paid either out of distributable profits or, to the extent permitted by law, out of the share premium account of the Company. All the provisions of the Act relating to the redemption of shares and the creation or increase where requisite of a capital redemption reserve shall be duly observed.

(v)     The Redemption Notice referred to in Article 7A(6)(i) above shall substantially be in the following form:

Notice of Redemption

To:  …………………………….

TAKE NOTICE that on …………… 2006, being no less than seven (7) days after the date hereof, the Company intends to redeem the Redeemable Convertible Preference Shares set out in the schedule hereto pursuant to the provisions of Article 7A of the articles of association of the Company.

DATED the ………… day of ……… 2006.

[Company Seal]

…………………….                    …………………
Secretary                                      Director

(vi)    Upon the Company giving notice of its intention to redeem in accordance with Article 7A(6)(v) above the Company will be obliged to redeem the RCPS the subject of the notice, on the Redemption Date as specified in the notice.

(vii)   Until all the RCPS have been redeemed no further shares may be created and/or issued by the Company ranking in priority to the RCPS unless all the holders consent thereto in writing.

(viii)  Until all the RCPS have been redeemed no further shares may be issued ranking in any respect pari passu with the RCPS unless the holders of not less than three-quarters of the redeemable preference shares in each class consent thereto in writing.

(ix)    Notwithstanding anything to the contrary expressed or implied in these Articles there shall be no restriction on the transfer of RCPS and the directors shall be obliged to register any transfer of any RCPS.

(x)     All payments of Redemption Amounts, and any other payments to be made pursuant to this Article shall be made to a holder at the registered address of such holder and shall be deemed to be made on the due date only if paid on or before 12 noon on the said due date, unless the holder receiving such payment shall otherwise consent in writing provided that in the event that such payment is due to be made on a day which is not a business day the holder shall be deemed to have consented to such payment being made on or before 12 noon on the next day which is a business day. Such payments shall be paid to the holders of the RCPS Shares in RM (i) free of any restriction or condition, (ii) free and clear of and (except to the extent required by law) without any deduction or withholding on account of any tax and (iii) without deduction or withholding (except to the extent required by law) on account of any other amount, whether by way of set-off or otherwise.  In the event of any withholding or deduction required by law, the amount payable to the holder shall be grossed up to the extent that the net amount to be paid to the holder shall be such amount the holder would receive had no such deduction or withholding been required.

(xi)    No alteration to this Article 7A shall be made without the prior consent in writing of each holder.

     (xii)    In the event of a class meeting of holders of RCPS, the quorum shall be all the holders of that class of share and the chairman of such meeting shall be elected by the holders as aforesaid, and otherwise the provisions of the Articles relating to proceedings at general meetings shall apply mutatits mutandis.

     (7)    The RCPS in the present capital shall be converted in accordance with the following provisions:

     (i)    The conversion price of the RCPS into new ordinary shares of the Company is fixed at a ten per centum (10%) premium to the five (5) days' weighted average market price of the existing ordinary shares of the Company, ("Conversion Price"), which shall be a date between the date of the approval of the Securities Commission for the issue of the RCPS under the Securities Commission Act 1993 and the closing date for the determination of the subscribers to the RCPS.

     (ii)    The RCPS which are not redeemed within the Redemption Period will be automatically converted into new ordinary shares of the Company on a Market Day falling immediately after the expiry of the Redemption Period ("the Conversion Date") whereby the Company will mandatorily apply the amount equal to the Conversion Price in relation to each remaining and existing RCPS (calculated based on the respective number of RCPS held by each such holder) towards the subscription for ordinary shares to be issued by the Company at the Conversion Price save to the extent (if any) that such amount represents a fraction of an ordinary share which fraction shall be disregarded.

     (iii)    For the purpose of Article 7A(7)(ii) above, each and every such holder of RCPS shall be deemed to have appointed the Secretary of the Company (or any other person appointed for that purpose by the Board of Directors of the Company) as the agent of that holder with authority to apply an amount equal to the proceeds payable to that holder in subscribing and paying on his behalf for ordinary shares at the Conversion Price.

     (iv)    The ordinary shares issued and allotted pursuant to this Article 7A(7) shall rank pari passu in all respects with all other ordinary shares in issue on the Conversion Date whereupon the RCPS shall cease to have any preference or priority as set out in this Article, or to be called RCPS.

(v)    The new ordinary shares shall not be entitled to any dividends, rights, allotments and/or other distributions which entitlement date precedes the allotment date of the new ordinary shares.

(vi)    The Conversion price will be adjusted, at the determination of the Company in all or any of the following cases:-

(a)    an alteration of the par value of the ordinary shares of the Company by reason of consolidation or subdivision; or

(b)    a bonus issue of fully paid-up ordinary shares of the Company; or

(c)    a distribution of capital to shareholders made by the Company whether on a reduction of capital or otherwise, but excluding any cancellation of capital which is lost or unrepresented by assets; or

(d)    a rights issue of ordinary shares of the Company; or

(e)    any other circumstances that are deemed necessary

PROVIDED however that under no circumstances will any adjustment result in the Conversion Price falling below the par value of the ordinary shares for the time being. In any event no adjustment to the Conversion Price shall be made unless it has been duly certified by a merchant bank or the auditors of the Company.

(vii)    Subject to Article 7A(7)(i) above, the RCPS will be converted into new ordinary shares of the Company in accordance with the following ratio:-

Number of new ordinary shares = Redemption Value of the Redeemable
of the Company to be issued          Convertible Preference Share
                                     _____
                                     Conversion Price per new ordinary
                                     Shares of the Company

(viii)    The Company shall take all such steps as may be necessary or requisite to credit such ordinary shares so allotted into the securities accounts of those holders of the RCPS, details whereof shall be notified in writing to the Company by those holders.

Allotment of shares or
other convertible securities

(8)    All sums payable to the holders of RCPS are exclusive of all taxes and free and clear of any deduction or withholding if any (whether imposed in Malaysia or elsewhere) which shall where applicable be paid by the Company in addition to the sums otherwise payable, at the rate in force at the due time for payment or such other time as is stipulated under the relevant legislation.

(9)    So long as any RCPS remain in issue:-

(i)    The Company will send to each holder of RCPS, by way of information, one copy of every circular, notice or other document sent to any other shareholders in the Company in their capacity as shareholders, at the same time as it is sent to such other shareholders; and

(ii)    The Company shall keep available, free from pre-emptive or other rights, out of its authorised but unissued share capital such number of ordinary shares as would be required to be issued upon conversion of all the RCPS from time to time then in issue and to satisfy in full all other rights of conversion into or exchange or subscription for ordinary shares and shall ensure that all ordinary shares delivered upon conversion will be duly and validly issued and fully-paid.

Rights of redeemable preference
shareholder

7B.    (1)    Holders of the RPS shall have the same rights as ordinary shareholders as regards receiving notices, reports and audited accounts and attending general meetings of the Company PROVIDED always that holders of the RPS shall not have the right to vote or to move or second any resolution at any general meeting of the Company except on each of the following circumstances:

(a)    on a proposal to reduce the Company's share capital;

(b)    on a proposal for the disposal of the whole of the Company's property, business and undertaking;

(c)    on a proposal that directly or indirectly varies or affects rights, privileges or conditions attached to the RPS, or the exercise of any of those rights, privileges or conditions;

(d)    on a proposal to wind up the Company; and

(e)    during the winding up of the Company.

In any such case a holder shall have one (1) vote for each RPS held. Any holder may demand a poll at a general meeting of the Company on any resolution on which that holder may vote.

(2)    Each RPS shall on winding-up or upon a reduction of capital or other return of capital (other than on the redemption of the RPS) rank pari passu with each other and confer on the holder thereof the right to receive, in priority to the holders of any other class of shares

(except for Special Share and RCPS) in the capital of the Company the cash repayment in full of the nominal amount (and premium payable, and the amount of any dividend in arrears) of that RPS after the payment and discharge of all debts and liabilities of the Company and the costs of winding up or such capital reduction exercise.

(3)     The RPS shall be, at the option of the Company, entitled to a non-cumulative Cash Dividend at the end of every six (6) month period or any other period to be determined by our Board and the lender commencing from the date of issue of the RPS.

"Cash Dividend" refers to the tax exempt cash dividend payable for each six (6) month period or any other period to be determined by our Board and the lender(s) which shall be equal to the outstanding principal amount of borrowings packaged together with the RPS to be raised by MAS x A/365 x [MDIR – (MDIR x prevailing Malaysian corporate income tax rate x B)].

"A" refers to the number of calendar days elapsed in that six (6) month period or any other period to be determined by our Board and the lender(s).

"MDIR" refers to the interest rate per annum based on prevailing market conditions and determined by the Board and the lender(s) prior to the drawdown of such borrowings packaged together with the RPS by the Company.

"B" refers to the appropriate ratio between 70% and 100% as determined by the Board and the lender(s) prior to the drawdown of such borrowings packaged together with the RPS by the Company.

(4)     An RPS shall not entitle the holder thereof to participate in the profits or surplus assets of the Company in a winding up or upon reduction of capital beyond such rights as are expressly set out in this Article.

(5)     The RPS shall be unsecured and shall rank pari passu among themselves. However, the RPS shall rank after the holders of the Special Share and RCPS in respect of capital repayment and dividends.

(6)     The RPS does not have a fixed tenure and maturity date. However, the RPS shall be liable to be redeemed in accordance with the following provisions:

(i)     Subject to the Act, each RPS shall at the option of the Company be redeemed by payment by the Company in cash to the holder thereof on any date of an amount equivalent to the issue price of RM1.00 for each RPS ("Redemption Amount"). For this purpose, the Company shall give not less than seven (7) days' notice in writing

("Redemption Notice") to the holders of the RPS of its intention to redeem all or a part only of the RPS held by such holders which have been issued and are fully paid up, on a date ("Redemption Date") which shall be specified in the Redemption Notice.

(ii)     In the event of the Company determining to redeem a part only of the RPS those to be redeemed shall be selected by drawings in such manner as the directors shall approve or a rateable proportion (as nearly as practicable without involving fractions of shares) of each holding of such shares on the Redemption Date.

(iii)    On the Redemption Date, the registered holders of the RPS to be redeemed shall be bound to deliver up to the Company the relevant share certificates for cancellation.

(iv)     On the Redemption Date, the Company shall be entitled and bound to redeem the RPS specified in the Redemption Notice at the Redemption Amount subject to the Redemption Notice.

(v)      If any of the holders of the RPS shall fail or refuse to surrender the certificate or certificates for such RPS or shall fail or refuse to accept the Redemption Amount payable in respect of them, such money shall be retained and held by the Company in trust for such holder but without interest or further obligation whatsoever.

(vi)     No RPS shall be redeemed otherwise than out of distributable profits or the proceeds of fresh issue of shares made for the purpose of the redemption, but the premium payable on redemption shall be paid either out of distributable profits or, to the extent permitted by law, out of the share premium account of the Company.  All the provisions of the Act relating to the redemption of shares and the creation or increase where requisite of a capital redemption reserve shall be duly observed.

(vii)    The Redemption Notice referred to in Articles 7B(6)(i) above shall substantially be in the following form:

Notice of Redemption

To:  ..........................................................

TAKE NOTICE that on .................., being no less than seven (7) days after the date hereof, the Company intends to redeem the Redeemable Preference Shares set out in the schedule thereto pursuant to the provisions of Article 7B of the articles of association of the Company.

DATED the ...... day of ..............................

[Company Seal]

....................                    ....................
Secretary                              Director

(viii)    Upon the Company giving notice of its intention to redeem in accordance with Article 7B(6)(vii) above the Company will be obliged to redeem the RPS the subject of the notice, on the Redemption Date as specified in the notice.

(ix)    All payments of Redemption Amounts, and any other payments to be made pursuant to this Article shall be made to a holder at the registered address of such holder on the due date of such payment, unless the holder receiving such payment shall otherwise consent in writing provided that in the event that such payment is due to be made on a day which is not a business day the holder shall be deemed to have consented to such payment being made on the next day which is a business day. Such payments shall be paid to the holders of the RPS in RM (i) free of any restriction or condition, (ii) free and clear of and without any deduction or withholding (except to the extent required by law) on account of any tax and (iii) without deduction or withholding (except to the extent required by law) on account of any other amount, whether by way of set-off or otherwise. In the event of any withholding or deduction required by law, the amount payable to the holder shall be grossed up to the extent that the net amount to be paid to the holder shall be such amount the holder would receive had no such deduction or withholding been required.

(x)    No alteration to this Article 7B shall be made without the prior consent in writing of each holder.

(xi)    In the event of a class meeting of holders of RPS, the quorum shall be all the holders of that class of share and the chairman of such meeting shall be elected by the holders as aforesaid, and otherwise the provisions of the Articles relating to proceedings at general meetings shall apply mutatits mutandis.

(7)    The RPS shall not be convertible into ordinary shares of the Company.

(8)    The RPS shall not be listed on the Exchange or any other stock exchange. The RPS shall be transferable, subject to the Company's consent, which consent shall not be unreasonably withheld, only by instrument in writing in the usual or common form or such other form as the directors and the relevant authorities may approve.

(9)      All sums payable to the holder of RPS are free and clear of any deduction or withholding (except to the extent required by law) if any which shall where applicable be paid by the Company in addition to the sums otherwise payable, at the rate in force at the due time for payment or such other time as is stipulated under the relevant legislation.

(10)      So long as any RPS remains in issue, the Company will send to each holder of RPS, by way of information, one copy of every circular, notice or other document sent to any other shareholders in the Company in their capacity as shareholders, at the same time as it is sent to such other shareholders.

Rights of Holders of Redeemable Convertible Preference Shares of RM0.10 each

7C.   In addition to and without prejudice to the rights and privileges that are conferred on holders of the Special Share, the RCPS of RM0.01 each and the RPS, the RCPS of RM0.10 each shall upon allotment confer on the holders thereof, the following rights, priorities and privileges and be subject to the following restrictions and limitations:

Voting rights

(1)      The holders of the RCPS of RM0.10 each shall have the same rights as any holder of the Ordinary Shares as regards receiving notices, reports and audited accounts and attending general meetings of the Company but shall not be entitled to any voting right at any general meeting of the Company except on any of the following circumstances:

(a)      on a proposal to reduce or increase the Company's share capital;

(b)      on a proposal for the disposal of the whole of the Company's property, business and undertaking;

(c)      on a proposal that directly or indirectly varies or affects the rights, privileges or conditions attached to the RCPS of RM0.10 each, or the exercise of any of those rights, privileges or conditions;

(d)      on a proposal to wind up the Company; and

(e)      during the winding up of the Company.

In any such case a holder of RCPS of RM0.10 each shall have one (1) vote for each RCPS of RM0.10 each held.  Any holder of the RCPS of RM0.10 each may demand a poll at a general meeting of the Company on any resolution on which that holder may vote.

Return of capital

(2)      Each RCPS of RM0.10 each shall, on winding-up or upon a reduction of capital or other return of capital (other than on redemption or on the exercise of the Cash Settlement Option pursuant to the terms herein) rank pari passu with each other and confer on the holder thereof the right to receive, in priority to the holders of any other class of shares (except for the Special Share, the RCPS of

RM0.01 each and the RPS) in the capital of the Company the cash repayment in full of the nominal amount (and the premium payable and the amount of any dividend that have been declared and remaining in arrears) of that RCPS of RM0.10 each after the payment and discharge of all debts and liabilities of the Company and the costs of winding-up of such capital reduction exercise.

Dividend (3)(a) Until the RCPS of RM0.10 each shall have been converted in accordance with these Articles or redeemed or be subject to the Cash Settlement Option, the RCPS of RM0.10 each will confer on the holders and to the extent that there are sufficient net profits after taxation available for distribution for the relevant financial year (including any retained profits and distributable reserves brought forward) as may be determined by the Directors in their discretion, and in priority to all other classes of shares in the capital of the Company (save for the RPS), a non-cumulative preferential dividend of thirty per cent (30%) per annum, calculated based on the par value of the RCPS of RM0.10 each.

(b) The dividends, if any, shall be paid within ten (10) Market Days from every anniversary of the Issue Date for a period of five (5) years or at such other time or times as may be determined by the Directors.

Entitlement to surplus capital (4) On the winding-up, liquidation or other return of capital of the Company, the holders of the RCPS of RM0.10 each shall not in any event be entitled to participate in any surplus assets or surplus profits of the Company beyond such rights as are expressly set out in this Article.

Ranking of RCPS of RM0.10 each (5) The RCPS of RM0.10 each shall be unsecured and shall rank pari passu amongst themselves.

However, the RCPS of RM0.10 each shall rank:-

(a) in respect of repayment of capital on winding-up, reduction of capital or other return of capital (other than on the redemption or on the exercise of the Cash Settlement Option), after the holders of the Special Share, the RCPS of RM0.01 each and the RPS; and

(b) in respect of payment of dividends, after the RPS.

Redemption (6)(a) Any RCPS of RM0.10 each which has not been converted or which is not for the time being subject to any Conversion Notice or any Cash Settlement Option by 3:00 p.m. on the Maturity Date will be automatically redeemed by the Company at the issue price of RM1.00 for each RCPS of RM0.10 each, within thirty (30) days

from the Maturity Date.

(b)     Once redeemed, the RCPS of RM0.10 each shall not be capable of re-issuance.

Conversion

(7)(a)     <u>Conversion Right</u> – Subject to all applicable laws, rules and regulations, and without prejudice to the provision of **Article 7C(8)**, each holder of the RCPS of RM0.10 each shall be entitled at any time to exercise the right ("**Conversion Right**") during the Conversion Period to convert all or any part of the RCPS of RM0.10 each held by them into Ordinary Shares in the capital of the Company, at the Conversion Price, in the manner set out in this Article. The Conversion Right shall only be exercised in integral multiples of one (1) board lot of RCPS of RM0.10 each. A board lot in respect of the RCPS of RM0.10 each shall bear the meaning set out in the Rules of Bursa Securities.

(b)     <u>Payment of Conversion Price</u>

(i)     The number of RCPS of RM0.10 each that a Converting RCPS Holder must tender upon the exercise of the Conversion Right in order to receive one (1) Conversion Share for the purpose of satisfying the Conversion Price shall be determined in accordance with the following formula:

$A = B \div C$, where:

$A$ =     The number of RCPS of RM0.10 each required to be tendered by a Converting RCPS Holder upon the exercise of the Conversion Right subject however to Article 7C(7)(b)(ii), in order to be entitled to receive one (1) Conversion Share;

$B$ =     The Conversion Price

$C$ =     The issue price of RM1.00 for each RCPS of RM0.10 each.

(ii)     The Converting RCPS Holders shall not be entitled to fractional Ordinary Shares or any cash payment of the value of such fractional shares from the Company upon exercise of the Conversion Right nor to any amount towards payment of a fraction of an Ordinary Share ("**Fractional Amount**"). Such Fractional Amount, if any, shall be forfeited and be applied for the benefit of the Company and the Company shall not be under any obligation to

issue any fractional Ordinary Shares to the Converting RCPS Holders.

(c)    Conversion Mechanism

(i)    The conversion of the RCPS of RM0.10 each shall be exercised by the relevant holder of RCPS of RM0.10 each delivering a duly completed and signed conversion notice to the Company at the Office during business hours of the Company on any Market Day during the Conversion Period.   The conversion notice shall be in such form as may be prescribed from time to time by the Company or in accordance with any applicable laws and regulations from time to time ("**Conversion Notice**"), and may be requested by or on behalf of the holders of the RCPS of RM0.10 each from time to time from the Company. The Conversion Notice is irrevocable upon receipt by the Company.  A Converting RCPS Holder shall further furnish to the Company such supporting documents or information as may be prescribed by the Company or as may be required under any applicable laws or regulations from time to time. The conversion shall be carried out in accordance with such procedures as may be prescribed by any applicable laws and regulations.

(ii)    Once a Conversion Notice has been submitted to the Company, the Converting RCPS Holder shall not sell, transfer, dispose or otherwise encumber the RCPS of RM0.10 each in respect of which the Conversion Right has been exercised.

(iii)    Subject to all applicable laws, rules and regulations and subject further to the provision of **Article 7C(8)**, within **eight (8)** Market Days from the date of receipt by the Company of a Conversion Notice (or if such date falls on a date on which the Record of Depositors / register of members is closed, the next following Market Day on which the Record of Depositors / register of members is opened) or such other period as may be prescribed or allowed by the Exchange or under any applicable laws and regulations, the Company shall:-

(aa)    allot    and    issue    to    the    relevant Converting    RCPS    Holders,    such number    of    Ordinary    Shares    to    which

such holders are entitled to receive by virtue of the exercise of the Conversion Right, credited as fully paid up ("**Conversion Shares**"), and shall cause the securities account of the said holders to be credited with such number of Conversion Shares;

(bb)    despatch a notice of allotment to the relevant Converting RCPS Holders in respect of the Conversion Shares; and

(cc)    make an application to the Exchange for the listing of and quotation for the Conversion Shares.

(iv)    Any fraction of a new Ordinary Share resulting from the exercise of the Conversion Right shall be disregarded and the Company shall not be required to make cash payment of the value of such fractions to the Converting RCPS Holder or cause the securities account of the Converting RCPS Holder to be credited for such fractions.

(v)    Once converted, the RCPS of RM0.10 each shall not be capable of reissuance.

(d)    <u>Adjustment of Conversion Price</u> – The Conversion Price shall be adjusted at the determination of the Company, in all or any of the following events:

(i)    an alteration of the par value of the Ordinary Shares by reason of consolidation or subdivision; or

(ii)    a bonus issue of fully paid-up Ordinary Shares or any other capitalisation issue for accounting purposes;

(iii)    a distribution of capital to shareholders made by the Company whether on a reduction of capital or otherwise, but excluding any cancellation of capital which is lost or unrepresented by assets; or

(iv)    a rights issue involving any Ordinary Shares; or

(v)    any other circumstances that the Directors deem necessary,

provided that any adjustment to the Conversion Price will be rounded to the nearest one Sen and in no event shall any adjustment involve a reduction of the Conversion Price below the par value of the Ordinary Shares for the time being.

(e)    Ranking of Conversion Shares

(i)    The Conversion Shares to be issued pursuant to the conversion of any RCPS of RM0.10 each hereunder shall, upon allotment and issue, rank pari passu in all respects with the Ordinary Shares in issue at the time the Conversion Shares are issued, save that the holders of the Conversion Shares shall not be entitled to any right, allotment and other distributions paid or made by reference to a Book Closing Date which precedes the date of allotment of the Conversion Shares.

(ii)    In addition, the holders of the Conversion Shares shall not be entitled to participate in any dividend which may be declared in respect of the financial year immediately preceding the Exercise Date even if the Book Closing Date in respect of such dividends falls after the Exercise Date.

(f)    Rights to receive Preferential Dividends - The right to receive the non-cumulative preferential dividends pursuant to **Article 7C(3)(a)** in respect of the relevant RCPS of RM0.10 each subject to a Conversion Notice shall cease as from the Exercise Date.

Cash Settlement Option    (8)(a)    Notwithstanding the Conversion Right attached to each RCPS of RM0.10 each, at any time upon the delivery of a Conversion Notice, the Company shall, in lieu of the issuance and allotment of the Conversion Shares, have the option to pay to the Converting RCPS Holder a cash amount equivalent to the Cash Settlement Sum ("**Cash Settlement Option**").

(b)    In order to exercise the Cash Settlement Option, the Company shall provide a notice of the exercise of the Cash Settlement Option ("**Cash Settlement Notice**") to the Converting RCPS Holders, within **eight (8)** Market Days from the date of the receipt by the Company of the relevant Conversion Notice. The Cash Settlement Notice shall specify the number of Ordinary Shares to which the Converting RCPS Holders would otherwise have been entitled to receive upon the exercise of the Conversion Right and the amount of the Cash Settlement Sum payable by the Company.

(c)    The Cash Settlement Sum shall be paid within **eight (8)** Market Days from the Cash Settlement Notice.

(d)    Any RCPS of RM0.10 each subject to the Cash Settlement Option shall, upon payment of the Cash Settlement Sum be cancelled and shall not be capable of re-issuance.

Further issue    (9)    Until all of the RCPS of RM0.10 each shall have been converted or subject to the Cash Settlement Option or redeemed, as the case may be, no further shares may be issued by the Company ranking in priority to the RCPS of RM0.10 each unless the approval of the holders of not less than 75% of the total nominal amount of the RCPS of RM0.10 each in issue is obtained.

Undertakings    (10)    So long as any RCPS of RM0.10 each remains in issue:

(a)    the Company will send to each holder of the RCPS of RM0.10 each, by way of information, one copy of every circular, notice or other documents sent to any other shareholders in the Company, at the same time as it sends to such other shareholders;

(b)    the Company will not vary or abrogate the rights attaching to the RCPS of RM0.10 each unless the approval of the holders of not less than 75% of the total nominal amount of the RCPS of RM0.10 each in issue is obtained. No variation of this **Article 7C** shall be made unless the approval of the holders of not less than 75% of the total nominal amount of the RCPS of RM0.10 each in issue is obtained; and

(c)    The Company shall keep available during the Conversion Period, free from pre-emptive or other rights, out of its authorised or unissued share capital such number of Ordinary Shares as would be required to be issued upon the exercise of the Conversion Rights from time to time by the holders of the RCPS of RM0.10 each during the Conversion Period, and to satisfy in full all other rights of conversion into or exchange or subscription for Ordinary Shares and shall ensure that all Ordinary Shares delivered upon conversion will be duly and validly issued and fully paid-up.

Transfers    (11)(a)    The holders of the RCPS of RM0.10 each shall be entitled to transfer the RCPS of RM0.10 each from time to time, subject to its obtaining such necessary approvals from the relevant authorities for the transfer.

(b)    All transfer of the RCPS of RM0.10 each shall be effected by way of book entry by the Depository in accordance with the Rules. For the purpose of trading of the RCPS of RM0.10 each on the stock market of Bursa

Securities, a board lot in respect of the RCPS of RM0.10 each shall bear the meaning set out in the Rules of Bursa Securities.

(c)    The Company shall be precluded from registering and effecting any transfer of the RCPS of RM0.10 each save as permitted under section 107C (2) of the Act or under any other written law for the time being in force.

Listing status

(12)    The RCPS of RM0.10 each shall be listed and quoted on the stock market of the Exchange.

Pre-emption rights

8.    Subject to any direction to the contrary that may be given by the Company in general meeting, all new shares or other convertible securities shall, before issue, be offered to such persons as at the date of the offer are entitled to receive notices from the Company of general meetings, in proportion as nearly as the circumstances admit, to the amount of the existing shares or securities to which they are entitled. The offer shall be made by notice specifying the number of shares or securities offered and limiting a time within which the offer, if not accepted, will be deemed to be declined and, after the expiration of that time, or on the receipt of an intimation from the person to whom the offer is made that he declines to accept the shares or securities offered, the Directors may dispose of those shares or securities in such manner as they think most beneficial to the Company. The Directors may likewise also dispose of any new shares or securities which (by reason of the ratio which the new shares or securities bear to shares or securities held by persons entitled to an offer of new shares or securities) cannot, in the opinion of the Directors, be conveniently offered under this article.

Rights of Preference Shareholders

9.(1)    Preference shareholders shall have the same rights as ordinary shareholders as regards receiving notices, reports and audited accounts, and attending general meetings of the Company. Preference shareholders shall also have the right to vote at any meeting convened :-

(a)    for the purpose of reducing the Company's share capital, or winding up the Company, or sanctioning a sale of the whole of the Company's property, business and undertaking, or

(b)    where the proposition to be submitted to the meeting directly affects their rights and privileges attached to the share, or

(c)    when the dividend or part of the dividend on the preference shares is in arrears for more than six (6) months, or

(d)    during the winding up of the Company.

(2)    Deleted

34

| | |
|---|---|
| Power to differentiate | 10.    The Directors may, on the issue of shares differentiate between the holders of such shares as to the amount of calls to be paid and the times of payment of such calls. |
| Instalments on shares to be duly paid | 11.    If by the conditions of allotment of any share the whole or part of the amount or issued price thereof shall be payable by installments, every such installment shall, when due, be paid to the Company by the person who for the time being shall be the registered holder of the share. |
| Waiver | 12.    Notwithstanding Article 8 above, the Company may apply to the Exchange to waive the convening of a general meeting to obtain Members' approval for further issues of shares (other than bonus or rights issue) where |

      (a)    the aggregate issues of which in any one financial year do not exceed ten per cent (10%) of the issued share capital of the Company; and

      (b)    there is still in effect a resolution under Section 132D of the Act approving the issuance of shares by the Company.

| | |
|---|---|
| Payment of commission | 13.    The Company may exercise the powers of paying commissions conferred by the Act, provided that the rate or the amount of the commission paid or agreed to be paid shall be disclosed in the manner required by the Act and the commission shall not exceed the rate of 10 percent of the price at which the shares in respect whereof the same is paid are issued or an amount equal to 10 percent of that price (as the case may be).  Such commission may be satisfied by the payment of cash or the allotment of fully or partly paid shares or partly in one way and partly in the other.  The Company may also on any issue of shares pay such brokerage as may be lawful. |
| Interest on capital raised for buildings, etc. | 14.    If any shares of the Company are issued for the purpose of raising money to defray the expenses of the construction of any works or buildings or the provision of any plant which cannot be made profitable for a lengthened period the Company may pay interest on so much of that share capital as is for the time being paid up for the period subject to the conditions and restrictions prescribed by the Act and may charge the sum so paid by way of interest to capital as part of the costs of construction of the work or building or the provision of plant. |
| Trust affecting shares | 15.    No person shall be recognized by the Company as holding any share upon any trust, and the Company shall not be bound by or be compelled in any way to recognize (even when having notice thereof) any equitable, contingent, future or partial interest in any share or any interest in any fractional part of a share or any other rights in respect of any share except an absolute right to the entirety thereof in the registered holder, except only as by these Articles otherwise provided for or as required by the Act or Central Depositories Act or the Rules or pursuant to any Order of Court. |

Power to ask for particulars

16.     The Company is empowered to require any member or transferee prior to registration of transfer, to furnish the nature of his shareholding and may also require a trustee or nominee to provide such particulars to enable the Company to identify the beneficial owners and the nature of their interest.

Shares not to be registered in the name of minor, person of unsound mind, etc.

17.     Shares may be registered in the name of an incorporated company or other corporate body but not in the name of a minor or a person of unsound mind or who is insolvent or in the name of any firm or partnership.

## CERTIFICATES

Issue of certificates

18.     The certificates of title to shares shall be issued under the Seal and bear the signatures or the autographic signatures of one Director and the Secretary or another Director or such other person as may by authorised by the Directors, and shall specify the shares to which it relates, and the amount paid up thereon provided that the Directors may by resolution determine that such signature, or either of them, shall be affixed by such other person as may be authorised by the Directors or by means of some method or system of mechanical signature.

Allotment of Shares or securities

19(a)    Subject to the provisions of the Act, the Securities Industry Act, 1991, the Main Market LR and the Rules, the Company shall allot shares and despatch notices of allotment to the allottees and make an application for the quotation of such securities within the stipulated time frame as may be prescribed by the Exchange.

(b)     Save and except where it is specifically exempted from compliance with Section 38 of the Central Depositories Act, all new issues of shares or securities for which listing is sought shall be made by way of crediting the securities accounts of the allottees with such shares or securities, and for this purpose, the Company shall notify the Central Depository of the names of the allottees and all such particulars required by the Central Depository, to enable the Central Depository to make the appropriate entries in the securities accounts of such allottees.

Additional share certificates

20.     If the Central Depository shall require more than one certificate in respect of the shares registered in their name, they shall pay such fee as shall be determined by the Directors, the Stock Exchange or any other Exchange on which the Company's shares are listed.

New certificate may be issued

21.     Subject to the provisions of the Act, the Central Depositories Act, these Articles and the Rules, if any share certificate shall be defaced, worn out, destroyed, lost or stolen, it may be renewed on such evidence being produced and a letter of indemnity (if required) being given by the Central Depository. In case of defacement or wearing out on delivery of the old certificate and in any case on payment of such sum not exceeding Ringgit Malaysia Three (RM3.00) or such sum as shall from time to time be permitted by the Exchange. In the case of destruction, loss or theft, the Central Depository who shall be entitled to

such renewed certificate shall also bear the loss and pay to the Company all expenses incidental to the investigations by the Company of the evidence of such destruction or loss.

Fee and costs

22.     For every certificate issued under the last preceding clause there shall be paid to the Company such sum as shall be determined by the Directors, the Bursa Malaysia Securities Berhad or any other Exchange on which the Company's shares are listed with such costs of the said indemnity and security and such out-of-pocket expenses of the Company for investigating evidence, as the Directors think fit.

Jumbo certificates

23.     The Central Depository or its nominee Company shall be entitled to receive jumbo certificates in denominations requested by the Central Depository or its nominee Company for shares that are deposited securities which shall be issued in accordance with the Central Depositories Act and the Rules. If the Central Depository or its nominee company shall require more than one jumbo certificate in respect of the shares that are deposited securities, it shall pay such fee as the Directors may from time to time determine and which the Company may be permitted to charge by law plus any stamp duty levied by the Government from time to time.

## PRINCIPAL SUBSIDIARY

Principal subsidiary

24.     Subject to the Act, the provisions of these Articles and the requirements of the Exchange, any issue of shares or Convertible Securities by a Principal Subsidiary that dilutes or could potentially dilute the Company's equity interest in the Principal Subsidiary by 25% or more shall require the prior approval of the Company in general meeting.

## CALL ON SHARES

Directors may make calls

25.     The Directors may from time to time make such calls as they think fit upon the members in respect of all moneys unpaid on the shares held by them respectively and not by the conditions of the allotment thereof made payable at fixed times and each member shall pay the amount of every call so made on him to the persons and at the times and places appointed by the Directors.  A call may be made payable by installments, a date fixed for payment may be postponed, and a call may be wholly or in part revoked.

Notice of call

26.     Not less than fourteen clear days' notice of any call shall be given specifying the time and place of payment and to whom the same shall be paid.

When call deemed to be made

27.     A call shall be deemed to have been made at the time when the resolution of the Directors authorising such call was passed.

Revocation/extension of time of payment

28.     Before the time for payment the Directors may by notice in writing to the members revoke the call wholly or in part or extend the time for payment.

**Instalments on allotment deemed call**

29.    If by the conditions of the allotment any amount is duly payable in respect of any shares by installments, every such installments shall be payable as if it were a call duly made by the Directors of which due notice had been given.

**Interest on calls or instalments**

30.    If the sum payable in respect of any call or installment be not paid on or before the day appointed for payment thereof, the person from whom the sum or the installment shall be due, shall pay interest for the same at such rate, as the Directors shall from time to time determine, from the time appointed for payment thereof until the actual payment thereof, and shall not receive any dividend in respect of the amount unpaid, but the Directors may where they think fit remit altogether or in part any sum becoming payable under this Article.

**Sums payable on allotment deemed to be calls**

31.    If by the terms of the issue of any shares or otherwise any amount is made payable at any fixed time or by installments at any fixed times, whether on account of the amount of the shares or by way of premium, every such amount or installment shall be payable when due as if it were a call duly made by the Directors and of which due notice had been given and shall be paid to the Company by the person from whom it is due, and all the provisions hereof with respect to the payment of calls and interest thereon or to the forfeiture of shares for non-payment of calls shall apply to every such amount or installment and the shares in respect of which it is payable.

**Payment of calls in advance**

32.    The Directors may, if they think fit, receive from any member willing to advance the same all or any part of the money due upon the shares held by him beyond the sums actually called for, and upon the money paid in advance or so much thereof as from time to time exceeds the amount of the calls then made upon the shares in respect of which such advances shall have been made, the Directors may pay or allow such interest as the member paying such sum in advance and the Directors agree upon; but any amount so for the time being paid in advance of call shall not be included or taken into account in ascertaining the amount of dividend payable upon the shares in respect of which such advance has been made, and until appropriated towards the satisfaction of any call shall be treated as a loan to the Company and not as part of its capital and shall be repayable at any time if the Directors so decide.  Capital paid on shares in advance of calls shall not, whilst carrying interest, confer a right to participate in profits.

**Prof of money due for call at trial or hearing for recovery of such money**

33.    On the trial or hearing of any action for the recovery of any money due for any call, it shall be sufficient to prove that the name of the member sued is entered in the Register or Record of Depositors as the holder of the shares in respect of which such debt accrued, that the resolution making the call is duly recorded in the minute book, and that notice of such call was duly given to the member sued in pursuance of these Articles; and it shall not be necessary to prove the appointment of the Directors who made such call, nor that the meeting at which any call was made was duly convened and constituted nor any other matters whatsoever, but the proof of the matters aforesaid shall be conclusive evidence of the debt.

**FORFEITURE**

Notice of forfeiture

34.     If any member fails to pay any call or instalments on or before the day appointed for the payment of the same, the Directors may, at any time thereafter, during such time as the call or instalment remains unpaid, serve a notice on such member requiring payment of so much of the call or instalment as is unpaid together with any interest that may have accrued and all expenses incurred by the Company by reason of such non-payment.

Form of notice

35.     The notice shall name a further day (not earlier than the expiration of fourteen days from the date of service of the notice) and a place or places on or at which such call or instalment and such interest and expenses as aforesaid are to be paid.  The notice shall also state that in the event of non-payment at or before the time and at the place appointed, the shares in respect of which the call was made or instalment is payable will be liable to be forfeited.

Forfeiture for non-payment

36.     If the requirements of any such notice as aforesaid are not complied with, any share in respect of which such notice has been given may at any time thereafter and before the payment of all calls or instalments, interest and expenses due in respect thereof be forfeited by a resolution of the Directors to that effect.  Such forfeiture shall include all dividends declared in respect of the forfeited shares and not actually paid before the forfeiture.

Notice of resolution of forfeiture and entry on Register

37.     When any share has been forfeited in accordance with these Articles, notice of the forfeiture shall forthwith be given to the member in whose name it stood immediately prior to the forfeiture or to the person entitled to the share by reason of his death or bankruptcy, as the case may be and an entry of such notice having been given and the forfeiture with the date thereof shall forthwith be made in the Register of Members or Record of Depositors opposite to the share but the provisions of this Article are directory only and no forfeiture shall be in any manner invalidated by any omission or neglect to give any such notice or to make such entry as aforesaid.

Certificate to be delivered

38.     In the event of a forfeiture of shares, the member shall be bound to deliver, and shall forthwith deliver to the Company the certificate or certificates held by him for the shares so forfeited.

Disposal of forfeited shares

39.     Any share so forfeited shall be deemed to be the property of the Company, and the Directors may sell, re-allot and otherwise dispose of the same in such manner as they think fit, and either with or without any past or accruing dividends, and in the case of re-allotment, with or without any money paid thereon by the former holder being credited as paid up.  If any shares are forfeited and sold any residue after the satisfaction of the unpaid calls and accrued interest and expenses, shall be paid to the person whose shares have been forfeited, or his executors, administrators or assignees or as he directs.

Power to annul forfeiture

40.     The Directors may at any time, before any share so forfeited shall have been sold, re-allotted or otherwise disposed of, annul the forfeiture upon such conditions as they think fit.

Liability on forfeiture

41.    A person whose shares have been forfeited shall cease to be a member in respect of the forfeited shares, but shall notwithstanding remain liable to pay to the Company and shall forthwith pay to the Company all calls, installments, interest and expenses owing upon or in respect of such shares at the time of forfeiture, together with interest thereon from the time of forfeiture until payment, and the Directors may enforce payment thereof if they think fit, but shall be under no obligation to do so; the liability of such person shall, however, cease if and when the Company shall have received payment in full of all such moneys in respect of the shares.

Surrender of shares

42.    The Directors may accept the surrender of any share, upon such terms and conditions as may be agreed upon when they are in a position to forfeit such share or by way of a compromise of any question as to the holder being properly registered in respect thereof or in any other case allowed by law.  Any share so surrendered may be disposed of in the same manner as a forfeited share.

Statutory declaration of forfeited share

43.    A statutory declaration in writing that the declarant is a Director or the Secretary of the Company, and that a share in the Company has been duly forfeited on a date stated in the declaration, shall be conclusive evidence of the facts therein stated as against all persons claiming to be entitled to the share.

Title of purchaser of forfeited share

44.    The Company may receive the consideration, if any, given for a forfeited share on any sale or disposition thereof and may execute a transfer of the share in favour of the person to whom the share is sold or disposed of and he shall thereupon be registered as the holder of the share, and shall not be bound to see to the application of the purchase money, if any, nor shall his title to the share be affected by any irregularity or invalidity in the proceedings in reference to the forfeiture, sale or disposal of the share.

Application of forfeited provisions

45.    The provisions of these Articles as to forfeiture shall apply in the case of non-payment of any sum which, by the terms of issue of a share, becomes payable at a fixed time, whether on account of the nominal value of the share or by way or premium, as if the same had been payable by virtue of a call duly made and notified.

## LIEN

Company's lien on shares

46.    Subject to the provisions of the Act, the Central Depositories Act and the Rules :-

(a)    The Company shall have a first and paramount lien on every share (not being a fully paid share) for all moneys (whether presently payable or not) called or payable at a fixed time in respect of that share and the Company shall also have a first and paramount lien on all shares (other than fully paid shares) registered in the name of single person for all monies presently payable by him or his estate to the Company.

(b)    The Directors may at any time declare any share to be wholly or in part exempt from the provisions of these Article.

(c)    The Company's lien, if any, on a share shall extend to all dividends payable in respect of the share and to such amounts as the Company may be called upon by law to pay in respect of the Member or deceased Member. Unless otherwise agreed, the registration of the transfer of a share shall operate as a waiver of the Company's lien, if any, on such shares.

(d)    The Company's lien on shares and dividends from time to time declared in respect of such shares, shall be restricted to unpaid calls and installments upon the specific shares in respect of which such moneys are due and unpaid and to such amounts as the Company may be called upon by law to pay and has paid in respect of the shares of the Member or deceased Member.

**Power of sale**

47.    For the purpose of enforcing such lien, the Directors may sell the shares subject thereto in such manner as they think fit, but no such sale shall be made unless a sum in respect of which the lien exists is presently payable, nor until notice in writing of the intention to sell shall have been served on such member, his executors or administrators or other person recognised by the Company as the owner thereof, and default shall have been made by him or them in the payment, fulfillment or discharge of such debts, liabilities, or engagements for seven (7) days after such notice.

**Application of proceeds of sale**

48.    The net proceeds of any such sale after payment of costs of such sale shall be received by the Company and applied in or towards satisfaction of the debts, liabilities, or engagements of such member as are presently payable and the residue (if any) should (subject to a like lien for sums not presently payable as existed upon the shares before the sale) be paid to the person entitled to the shares at the date of the sale or his executors, administrators or assigns or as he directs.

**Transfer or sale under lien**

49.    Upon any sale for enforcing a lien in purported exercise of the powers hereinbefore given, the Directors may appoint some person to execute an instrument of transfer of the shares sold and cause the purchaser's name to be entered in the Register or Record of Depositors in respect of the shares sold and the purchaser shall not be bound to see to the regularity of the proceedings or to the application of the purchase money and after his name has been entered in the Register or Record of Depositors in respect of the shares, the validity of the sale shall not be impeached by any person and the remedy of any person aggrieved by the sale shall be in damages only and against the Company exclusively.

**Certificate of proprietorship**

50. (1)    In the event of the re-allotment or sale of a forfeited or surrendered share, or the sale of any share to enforce a lien of the Company, a certificate in writing under the common seal of the Company that the share has been duly forfeited, surrendered or sold in accordance with these Articles shall be sufficient evidence of the facts therein stated as against all persons claiming the share and he shall be registered in respect

thereof, and thereupon he shall be deemed the holder of the share discharged from all calls or other money, interests and expenses due prior to such purchase or allotment, and he shall not be bound to see to the application of the purchase money or consideration nor shall his title to the share be affected by any irregularity in the forfeiture, surrender or sale, and the remedy of any person aggrieved by the sale shall be in damages only and against the Company exclusively.

(2)     In the event of sale of shares to satisfy the Company's lien thereon, the Member who held the same prior to such forfeiture or sale shall be bound to deliver and shall forthwith deliver to the Company, the certificate or assignees certificates held by him.  For this purpose, the Directors may authorise in writing the Central Depository to execute on behalf of the person in question a transfer or transfers of the shares to the purchaser or purchasers.

## TRANSFER OF SHARES

Execution of instrument of transfer, etc

51.     Subject to the restriction imposed by these Articles, the Central Depositories Act and the Rules (with respect to transfer of Deposited Security), the transfer of any listed security or class of listed security of the Company, shall be by way of book entry by the Central Depository in accordance with the Rules and, notwithstanding sections 103 and 104 of the Act , but subject to subsection 107C(2) of the Act and any exemption that may be made from compliance with subsection 107C(1) of the Act, the Company shall be precluded from registering and effecting any transfer of the listed securities.

No restriction on fully paid shares

51 A.     There shall be no restriction on the transfer of fully paid shares which are quoted or have been approved for future quotation except where required by law.

Refusal to transfer

52.     The Directors may decline to register the transfer of a share (not being a fully paid share) to a person of whom they shall not approve, and they may also decline to register the transfer of a share on which the Company has a lien or the transfer of a share to which the restriction under Article 66(3) applies.

Instrument of transfer

53.     Every instrument of transfer shall be in writing and in the prescribed form as approved under the Rules and shall be presented to the Central Depository with such evidence (if any) as the Central Depository may require, from time to time to prove the title of the intending transferor and that the intended transferee is a qualified person from time to time.

Suspension of registration of transfer

54.     The registration of transfer may be suspended at such times and for such periods as the Directors may from time to time determine, provided always that such registration shall not be suspended for more than thirty (30) days in any year or such number of days as may be prescribed by the Exchange. The Company shall give the Exchange prior written notice and published in a daily newspaper circulating in Malaysia the period of the intended suspension or closure and the purposes thereof, which notice shall be at least twelve (12) Market

Days after the date of announcement to the exchange or such number of days as may be prescribed by the Exchange. In relation to the closure, the Company shall give written notice in accordance with the Rules to prepare the appropriate Record of Depositors.

Record of Depositors

55.    At least three (3) Market Days prior notice or such other period as may be required by the Exchange (or, subject to any written laws to the contrary, such other period provided for under the Rules) of any such suspension shall be given to the Central Depository to enable the Central Depository to prepare the appropriate Record of Depositors.

Non-liability of Company, its Directors and officers in respect of transfer

56.    Neither the Company nor its Directors nor any of its officers shall incur any liability for registering or acting upon a transfer of shares apparently made by sufficient parties, although the same may, by reason of any fraud or other cause not known to the Company or its Directors or other officers be legally inoperative or insufficient to pass the property in the shares proposed or professed to be transferred, and although the transfer may, as between the transferor and transferee, be liable to be set aside, and notwithstanding that the Company may have notice that such instrument or transfer was signed or executed and delivered by the transferor in blank as to the name of the transferee of the particulars of the shares transferred, or otherwise in defective manner. And in every such case, the person registered as transferee, his executors, administrators and assigns alone shall be entitled to be recognised as the holder of such shares and the previous holder shall, so far as the Company is concerned, be deemed to have transferred his whole title thereto.

Registration of transfer of deposited security

57.    The Central Depository may refuse to register any transfer of deposited security that does not comply with the Central Depositories Act, the Rules and Foreign Ownership Regulations.

No transfer to minor etc.

58.    No transfer shall be made to a minor or a person of unsound mind or who is insolvent or to a firm or partnership.

Transfer restricted to one class of shares

59.    An instrument of transfer must be in respect of only one class of shares.

## TRANSMISSION OF SECURITIRES

Transmission of securities from foreign register

60.    (1)    Where:-

(a)    the securities of a Company are listed on another stock exchange; and

(b)    such Company is exempted from compliance with Section 14 of the Securities Industry (Central Depositories) Act 1991 or section 29 of the Securities Industry (Central Depositories) (Amendment) Act 1998, as the case may be, under the Rules of the Depository in respect of such securities,

43

such Company shall, upon request of a securities holder, permit a transmission of securities held by such securities holder from the register of holders maintained by the registrar of the Company in the jurisdiction of the other stock exchange, to the register of holders maintained by the registrar of the company in Malaysia vice versa provided that there shall be no change in the ownership of such securities.

(2)    Deleted

## TRANSMISSION OF SHARES

Death of holder

61.    Subject to the provisions of the Act, the Central Depositories Act and Rules, in case of the death of a member, the legal personal representatives of the deceased shall be the only persons recognised by the Company as having any title to his interest in the shares; but nothing herein contained shall release the estate of a deceased holder from any liability in respect of any shares which had been held by him.

Shares of deceased of bankrupt member

62.    Any person becoming entitled to a share in consequence of the death or bankruptcy of a Member may, upon such evidence being produced, as may from time to time properly be required by the Central Depository and subject to the Rules and as hereinafter provided, elect either to be registered himself as holder of the share or to have some person nominated by him registered as the transferee thereof, but the Central Depository shall in either case in accordance with the provisions of written law, have the same right to decline or suspend registration as they would have had in the case of a transfer of the share by that Member before his death or bankruptcy. Provided always that where the share is a Deposited Security, subject to the provisions of any written law, a transfer or withdrawal of the share may be carried out by the person becoming so entitled. In the event that the person entitled to a Deposited Security by transmission or a nominee of such person is a foreigner, neither such person nor his nominee shall be entitled to exercise in any manner whatsoever any voting rights whatsoever in respect of the aforesaid shareholdings in any general meeting where such shareholdings raises the beneficial ownership of the Company by the foreigners beyond the prescribed limit as defined in Article 66(2) of these Articles.

Election

63.    If the person so becoming entitled shall elect to be registered himself, he shall deliver or send to the Company a notice in writing signed by him stating that he so elects provided that where there is a deposited security and the person becoming entitled elects to have the share transferred to him, the aforesaid notice must be served by him on the Central Depository.   If he shall elect to have another person registered he shall testify his election by executing to that person a transfer of the share.   All the limitations, restrictions and provisions of these Articles relating to the right to transfer and the registration of transfers of shares shall be applicable to any such notice or transfer as

aforesaid as if the death, bankruptcy or insolvency of the member had not occurred and the notice or transfer were a transfer signed by that member.

**Evidence of representative**

64. (1)    Subject to the provisions of the Act, the Central Depositories Act and Rules, where the registered holder of any share dies or becomes bankrupt, his personal representatives or the assignees of his estate as the case may be, shall, upon the production of such evidence as may from time to time be properly required by the Central Depository in that behalf, be entitled to the same dividends and other advantages and to the same rights (whether in relation to meetings of the Company or to voting or otherwise) as the registered holder would have been entitled to if he had not died or become bankrupt.

(2)    The Company shall be entitled to charge a fee not exceeding Ringgit Malaysia Three (RM3.00) or such sum as may from time to time be permitted by the Exchange on the registration of every probate, letter of administration, certificate of death or marriage, power of attorney or other instrument.

**Payment of amount due**

65.    The executors or administrators of a deceased member shall be entitled at any time to pay up in full all the moneys due upon the shares held by such member alone beyond the amount called up thereon, unless within two calendar months after being requested in writing so to do, the Directors shall procure some person or persons to purchase such shares at a price equal to the amount paid up or credited as paid up thereon.

## LIMITATIONS ON SHAREHOLDERS

**Limitation on shareholdings**

66.(1)(a)    Subject to paragraph (b), no foreigner (alone, with or through his or its Associates) shall be entitled to hold, directly or indirectly, shares representing more than 20 per cent of the total paid-up capital of the Company.

(b)    The aggregate holdings of the shares by foreigners referred to in paragraph (a) shall not at any one time exceed 45 per cent of the total paid-up capital of the Company.

(c)    For the purpose of 1 (a) and (b) above the Company shall make public announcements at quarterly intervals of the percentage of the then paid-up capital of the Company which in its opinion is beneficially owned or controlled by such foreigners as referred to in paragraph (a) and whenever such percentage reaches the maximum percentage, shall make an immediate public announcement to that effect.

(2)    In this Article :-

"person" includes an individual, a body of trustees, a body corporate, a government, a government department, a governmental agency or body and a municipal, local or

45

statutory body.

"Associate" means in relation to any person (below referred to in this definition as the "first named person") :-

(a)    a body corporate (whether registered in Malaysia or elsewhere) of which one half or more of the voting power exercisable at any general meeting of the body corporate may be exercised or controlled or of which one half or more of the Directors are appointed (or can be appointed) in either case by the first named person (alone or with any Associates of the first named person); or

(b)    any other person who has (whether or not in a manner which is legally binding) agreed or committed himself or become obliged or arranged to exercise or refrain from exercising any rights attaching to any share, or any power to dispose of or retain any share or any interest therein, in accordance with the suggestions, instructions or directions of the first named person (or of any other Associate of the first named person) provided that where a person has been appointed to act as the proxy for the first named person to vote at a meeting of the Company neither such proxy for the first named person shall be the Associate of the other by reason solely of such appointment; or

(c)    if the first named person is a government or government department or government agency or body, such government or any other department agency or body of such government or any body corporate which is an Associate of any of the same by virtue of (a) above; or

(d)    if the first named person is a trustee of any trust, any or all of the other trustees, any or all settlors of such trust and any or all beneficiaries (including contingent beneficiaries) under such trust; or

(e)    if the first named person is a body corporate, any director of such body corporate and vice versa;

and any Associate of the first named person shall (unless the Directors otherwise determine) be deemed also to be an Associate of all other Associates of the first named person.

"control" means to be in the position of such a person as is the first named person in paragraph (b) of "Associate" above.

"prescribed limit" means the percentage limits prescribed under (1) (a) or (1) (b) above, as the case may be.

(3)(a)    All foreigners upon seeking to register their shares shall declare in such form as the Directors shall from time to time prescribe that they are foreigners and in the case of Associates, the foreigners in respect of whom they are Associates.

(b)    If it appears to the Directors that in relation to any person the prescribed limit may be exceeded the Directors shall be entitled to refuse to register any shares in the name of that person or his Associates (other than as an allotee under an issue of share by way of capitalisation of profits or reserves made pursuant to these presents) unless that person or his Associates can satisfy the Directors that the prescribed limit shall not be exceeded by the registration of any such shares.

(4)    Subject to the provisions of this Article, the Directors shall, unless they have reason to believe otherwise, be entitled to assume without enquiry that no person (and his Associates if any) hold more than the prescribed limit. Nevertheless, the Directors may at any time give notice in writing to any such person or Associates requiring him to make a declaration (in such form as the Directors shall prescribe) within such period as may be specified in the notice as to the total number of shares held by him and any Associates.

(5)    If within twenty one (21) days after the giving of the notice referred to in (4) above (or such shorter or longer period as in all the circumstances the Directors shall consider reasonable and shall specify in the notice) the Directors are satisfied that the person referred to in such notice holds more than the prescribed limit the Directors may give a further notice in writing to such person or Associates requiring him and/or any of his Associates to transfer within such period as the Directors may prescribe such number of shares ("Excess shares") to other persons as will result in the Directors being satisfied that the number of shares held by him and his Associates does not exceed the prescribed limit. Upon failure to comply with the said notice to transfer the Directors shall have the right to arrange for the Company to sell the Excess shares at the best price reasonably obtainable within such period as the Directors deem fit. For this purpose the Directors may authorise in writing the Central Depository to execute on behalf of the person in question a transfer or transfers of the Excess shares to the purchaser or purchasers. The net proceeds of the sale of such Excess shares shall be received by the Company whose receipt shall be a good discharge for the purchase money and shall be paid over by the Company to the former holder or holders, but such proceeds shall in no circumstances carry interest against the Company.

(6)    The Directors shall not be required to give any reasons for any decision or declaration taken or made in accordance with this Article.

(7)     In respect of shares held by a foreigner in his securities account, in the exercise of its obligations pursuant to the Foreign Ownership Regulations, the Company shall at its discretion determine whether the foreigner shall be entitled to any or all rights, benefits, powers and privileges and be subject to all liabilities, duties and obligations in respect of or arising from such shares whether conferred or imposed by the Companies Act, 1965 or the Memorandum and/or Articles of Association or otherwise as if he is a Member whose name appears on the Record of Depositories or the Register and upon such determination the provisions of these Articles shall be construed subject thereto.

## CONVERSION OF SHARES INTO STOCK

**Conversion of shares into stock and reconversion**

67.     The Company may, from time to time, by resolution of a general meeting convert all or any of its paid up shares into stock and may from time to time, in like manner, reconvert any such stock into paid up shares of any denomination.

**Holders of stock and reconversion**

68.     When any shares have been converted into stock, the several holders of such stock may transfer their respective interests therein, or any part of such interest, in such manner as the Company in general meeting shall direct, but in default of any such direction in the same manner and subject to the same regulations as and subject to which the shares from which the stock arose might previously to conversion have been transferred, or as near thereto as circumstances will admit.  But the Directors may, if they think fit, from time to time fix the minimum amount of stock transferable, and restrict or forbid the transfer of fractions of that minimum, provided that such minimum shall not exceed the nominal amount of the shares from which the stock arose.

**Participation in dividends and profits**

69.     The several holders of stock shall be entitled to participate in the dividends and profits of the Company according to the amount of their respective interests in such stock, and such interests shall, in proportion to the amount thereof, confer on the holder thereof respectively the same privileges and advantages for the purpose of voting at meetings of the Company and for other purposes as if they held the shares from which the stock arose, but so that none of such privileges or advantages, except the participation in the dividends, profits and assets of the Company, shall be conferred by any holding or part of a holding of stock as would not, if existing in shares, have conferred such privileges or advantages.

**Provisions applicable to shares shall apply to stock**

70.     All such provisions of these Articles as are applicable to paid up shares shall apply to stock, and in all such provisions the words "share" and "shareholder" shall include "stock" and "stockholder".

## ALTERATION OF CAPITAL

**Company may alter its capital in certain ways**

71.     The Company may so far alter the conditions of its Memorandum of Association by Ordinary Resolution:-

(1)    to consolidate and divide its share capital into shares of larger amount than its existing shares; or

(2)    to cancel any shares not taken or agreed to be taken by any person; or

(3)    to divide its share capital or any part thereof into shares of smaller amount than is fixed by its Memorandum of Association by subdivision of its existing shares or any of them, subject nevertheless to the provisions of the Act and so that as between the resulting shares, one or more of such shares may by the resolution by which such subdivision is effected be given any preference or advantage as regards dividend, capital, voting or otherwise over the others or any of the such shares.

and by Special Resolution :-

(4)    to reduce its capital and any capital redemption reserve fund or any share premium account in any manner authorised and subject to any conditions prescribed by the Act.

## INCREASE OF CAPITAL

**Company may increase its capital**

72.    The Company in general meeting may from time to time, whether all the shares for the time being authorised shall have been issued or all the shares for the time being issued shall have been fully called up or not, increase its share capital by the creation of new shares, such new capital to be of such amount and to be divided into shares of such respective amounts and (subject to any special rights for the time being attached to any existing class of shares) to carry such preferential, deferred or other special rights (if any), or to be subject to such condition or restriction (if any) in regard to dividend, return of capital, voting or otherwise, as the general meeting resolving upon such increase directs.

**Offer of a new shares or other convertible securities o existing members**

73.    Subject to any direction to the contrary that may be given by the Company in general meeting, all new shares or other convertible securities shall, before issue, be offered to such persons as the date of the offer are entitled to receive notices from the Company of general meetings in proportion as nearly as the circumstances admit, to the amount of the existing shares or securities to which they are entitled. The offer shall be made by notice specifying the number of shares or securities offered, and limiting a time within which the offer, if not accepted, will be deemed to be declined, and, after the expiration of that time, or on the receipt of an intimation from the person to whom the offer is made that he declines to accept the shares or securities offered, the Directors may dispose of those shares or securities in such manner as they think most beneficial to the Company. The Directors may likewise also dispose of any new shares or securities which (by reason of the

ratio which the new shares or securities bear to shares or securities held by persons entitled to an offer of new shares or securities) cannot, in the opinion of the Directors, be conveniently offered under this Article. Notwithstanding the foregoing, the Company may apply to the committee of The Bursa Malaysia Securities Berhad or any other Exchange on which the Company's shares are listed, for waiver of convening extraordinary general meeting to obtain shareholders approval for further issues of shares (other than bonus or rights issues) where the aggregate issues of which in any one financial year do not exceed 10 percent of the issued capital.

## MODIFICATION OF RIGHTS

Modification of Rights

74.    The repayment of preference capital other than redeemable preference capital or any other alteration of preference shareholders' rights, may only be made pursuant to a special resolution of the preference shareholders concerned, PROVIDED ALWAYS that where the necessary majority for such a special resolution is not obtained at the meeting, consent in writing if obtained from the holders of three-fourths of the preference capital concerned within two (2) months of the meeting, shall be as valid and effectual as a special resolution carried at the meeting.

## BORROWING POWERS

Power to borrow

75.    The Directors may from time to time borrow or raise such sums of money as they think necessary for the purposes of the Company.

Classification of securities and terms

76.    The Directors may borrow or raise any such money as aforesaid upon or by the issue or sale of any bonds, debentures, debenture stock, or securities, and upon such terms as to time of repayment, rate of interest, price of issue or sale, payment of premium or bonus upon redemption or repayment or otherwise as they may think proper.  The Company may in general meeting grant a right for the holders of bonds, debentures, debenture stock or securities to exchange the same for shares in the Company of any class authorised to be issued.

Restrictions on borrowing powers

76A.    The Directors shall not borrow any money or mortgage or charge any of the Company's or the subsidiaries' undertaking, property, or any uncalled capital, or to issue debentures and other securities whether outright or as security for any debts, liability or obligation of an unrelated third party.

Nature of security

77.    Subject as aforesaid, the Directors may secure or provide for the payment of any moneys to be borrowed or raised by a mortgage of or charge upon all or any part of the undertaking or property of the Company, both present and future, and upon any capital remaining unpaid upon the shares of the Company, whether called up or not or by any other security, and the Directors may confer upon any mortgagees or persons in whom any debentures, debenture stock or security is

vested, such rights and powers as they think necessary or expedient; and they may vest any property of the Company in trustees for the purpose of securing any moneys so borrowed or so raised, and confer upon the trustees or any receiver to be appointed by them or by any debenture holder, such rights and powers as the Directors may think necessary or expedient in relation to the undertaking or property of the Company, or the management, or the realisation thereof, or the making, receiving or enforcing of calls upon the members in respect of unpaid capital and otherwise, and may make and issue debentures to trustees for the purpose for further security, and any such trustees may be remunerated.

Security for payments due

78.    The Directors may give security for the payment of any moneys payable by the Company in like manner as for the payment of money borrowed or raised, but in such case the amount shall be reckoned as part of the money borrowed.

Register of mortgages to be kept

79.    The Directors shall cause a proper register to be kept, in accordance with the requirements of the Act, of all mortgages and charges specifically affecting the property of the Company.

Debentures and other securities may be issued at discount, etc.

80.    Any debenture or other security may be issued at a discount, premium or otherwise and (with the sanction of the Company in general meeting) with any special privilege as to allotment of shares, attending and voting at general meetings of the Company, appointment of Directors or otherwise.

## RESERVE AND DEPRECIATION FUNDS

Reserve funds

81.    The Directors may, from time to time, before recommending any dividend, whether preferential or otherwise, set apart any such portion of the profits of the Company and also any such portion of any premium received upon the issue of shares, securities or obligations of the Company as they think fit, and also any such portion of any surplus realised on the sale of any fixed assets of the Company or arising from a revaluation of the Company's properties or assets as they think fit, as a reserve fund to meet contingencies or for the liquidation of any debentures, debts or other liabilities of the Company, for equalisation of dividends or for repairing, improving, and maintaining any of the property of the Company and for such other purposes of the Company as the Directors in their absolute discretion think conducive to the interest of the Company; and may invest the several sums so set aside upon such investments (other than shares of the Company) as they may think fit, and from time to time deal with and vary such investments, and dispose of all or any part thereof for the benefit of the Company, and may divide the reserve fund into such special funds as they think fit, with full power to employ the reserve funds or any part thereof in the business of the Company, and that without being bound to keep the same separate from the other assets, the income arising from any reserve fund shall be treated as part of the gross profits of the Company; the Directors may also without placing the same to reserve carry over any profits which they may think it not prudent to divide.

Depreciation fund

82.    The Directors may, from time to time before recommending any dividend, set apart any such portion of the profits of the Company, as they think fit, as a depreciation fund applicable at the discretion of the Directors, for providing against any depreciation in the investments of the Company or for rebuilding, restoring, replacing or for altering any part of the buildings, works, plant, machinery or other property of the Company destroyed or damaged by fire, flood, storm, tempest, accident, riot, wear and tear, or other means and for repairing, altering and keeping in good condition the property of the Company, or for extending and enlarging of the buildings, machinery and property of the Company, with full power to employ the assets constituting such depreciation fund in the business of the Company, and what without being bound to keep the same separate from the other assets.

Investment of money

83.    All moneys carried to the reserve fund and depreciation fund respectively, shall nevertheless remain and be profits of the Company applicable subject to due provision being made for actual loss or depreciation for the payment of dividends, and such moneys and all the other moneys of the Company not immediately required for the purposes of the Company may be invested by the Directors in or upon such investments or securities as they may select or may be used as working capital or may be kept at any bank on deposit or otherwise as the Directors may from time to time think proper.

## GENERAL MEETINGS

The statutory meeting

84.    The statutory meeting of the Company shall be held at such time not being less than one month nor more than three months from the date at which the Company shall be entitled to commence business and at such place as the Directors may determine.  The statutory meeting shall be deemed to be the first ordinary general meeting.

When subsequent meetings to be held

85.    Other general meetings shall be held once at least in every year at such time (not being more than fifteen months or such period as provided for in Section 143 of the Act after the holding of the last preceding general meeting) and such place as may be determined by the Directors.  Such general meetings shall be called "ordinary meetings" and all other meetings of the Company shall be called "extraordinary meetings".

Extraordinary General Meeting

86.    The Directors may, whenever they think fit, convene an extraordinary meeting, and they shall, on the requisition of the holders of not less than one-tenth of such of the paid up capital of the Company as at the date of the deposit of the requisition carries the right of voting at general meetings, forthwith proceed to convene an extraordinary meeting of the Company, and in the case of such requisition the provisions of section 144 of the Act shall have effect.

Business on requisitioned meeting

87.    In the case of an extraordinary general meeting called in pursuance of a requisition no business other than that stated in the requisition as the objects of the meeting shall be transacted.

Notice of meeting

88.(1)    The notices convening meetings shall specify the place, day and hour of the meeting, and shall be given to all Members at least fourteen (14) days before the meeting or at least twenty one (21) days before the meeting where any special resolution is to be proposed or where it is an annual general meeting. Any notice of a meeting called to consider special business shall be accompanied by a statement regarding the effect of any proposed resolution in respect of such special business. At least fourteen (14) days' notice or twenty one (21) days' notice in the case where any special resolution is proposed or where it is the annual general meeting, of every such meeting shall be given by advertisement in at least one (1) nationality circulated Bahasa Malaysia or English daily newspaper and in writing to each Stock Exchange upon which the Company is listed.

(2)    Provided that a meeting of the Company shall, notwithstanding that it is called by shorter notice than that specified in these Articles, be deemed to have been duly called if it is so agreed subject to the provisions of the Act by members entitled to attend and vote at such meeting.

(3)(a)    The Company shall request the Central Depository in accordance with the Rules, to issue a Record of Depositors to whom notices of general meetings shall be given by the Company.

(b)    The Company shall also request the Depository in accordance with the Rules, to issue a Record of Depositors, as at the latest date which is reasonably practicable which shall in any event be not less than 3 Market Days before the general meeting (hereinafter referred to as "the General Meeting Record of Depositors").

(c)    Subject to the Securities Industry (Central Depositories) (Foreign Ownership) Regulations 1996 (where applicable), a depositor shall not be regarded as a member entitled to attend any general meeting and to speak and vote thereat unless his name appears in the General Meeting Record of Depositors.

Omission of notice

89.    The accidental omission to give notice of any meeting to, or the non-receipt of any such notice by any of the members shall not invalidate any resolution passed at any such meeting or any proceedings at such meeting.

Notice of Annual General Meeting

90.    The notice convening an Annual General Meeting shall specify the meeting as such.

Notice of special or ordinary resolution

91.    The notice convening a meeting to consider a special or ordinary resolution shall specify the intention to propose the resolution as a special or ordinary resolution as the case may be.

Member's right to
appoint proxy

92.    In every notice calling a meeting there shall appear with reasonable prominence a statement that a member entitled to attend and vote is entitled to appoint a proxy to attend and vote instead of him.

## PROCEEDINGS AT GENERAL MEETINGS

Quorum

93.    For all purposes, the quorum for a general meeting shall be two members present in person or by proxy.

Special business

94.    All business shall be deemed special that is transacted at an extraordinary general meeting, and all that is transacted at an Annual General Meeting shall also be deemed special, with the exception of sanctioning a dividend, the consideration of the accounts and balance sheets and the reports of the Directors and Auditors and any other documents annexed to the balance sheet, appointing Directors in place of those retiring by rotation or otherwise, the fixing of the Directors' remuneration and the appointment and fixing of the remuneration of the Auditors.

Quorum to be present
when business commenced

95.    No business shall be transacted at any general meeting unless the requisite quorum shall be present at the commencement of the business.

No business to be
transacted without
chairman

96.    No business except the choice of a chairman or the adjournment of the meeting shall be transacted or discussed at any general meeting while the chair is vacant.

Chairman of general meeting

97.    The Chairman or in the absence of the Chairman, the Deputy Chairman (if any) shall be entitled to take the chair at every general meeting or if there be no such Chairman, or Deputy Chairman or if at any meeting neither of them is present within fifteen minutes after the time appointed for holding such meeting or neither of them is willing to act, the Directors present shall choose one of their number to be chairman of the meeting, or if all the Directors present decline to take the chair, then the members present shall choose one of their number being a member entitled to vote to be a chairman of the meeting.

When if quorum not present
meeting to be dissolved and
when to be adjourned

98.    If within half an hour from the time appointed for the meeting a quorum be not present, the meeting shall be adjourned to such time and place as the Chairman shall appoint, provided however that in the case of a meeting convened on requisition of members, the meeting shall be dissolved.  In any case it shall stand adjourned to the same day in the next week at the same time and place, and if at such adjourned meeting a quorum is not present within half an hour from the time appointed for holding the meeting, the members present shall be a quorum.

How questions to be
decided at meetings;
casting vote

99.    Every question submitted to a meeting shall be decided in the first instance by a show of hands unless before or upon declaration of the result of the show of hands, a poll be demanded as hereinafter provided.  In the case of an equality of votes the Chairman as defined in Article 1(1) shall both on a show of hands and at the poll have a casting

vote in addition to the vote or votes to which he may be entitled as a member, saved and except as provided in Article 164.

Voting on resolution

100. (1)     At any general meeting a poll may be demanded:

(a)     by the chairman of the meeting; or

(b)     by at least three members present in person or by proxy; or

(c)     by any member or members present in person or by proxy and representing not less than one-tenth of the issued share capital of the Company and entitled to vote in respect thereof.

(2)     Unless a poll be so demanded a declaration by the chairman of the meeting that a resolution has on a show of hands been carried or carried unanimously, or by a particular majority, or lost and an entry to that effect in the book containing the minutes of the proceedings of the Company shall be conclusive evidence of the fact without proof of the number or proportion of the votes recorded in favour of or against such resolution.

(3)     The demand for a poll may be withdrawn.

Poll

101.     If a poll be demanded as aforesaid it shall (subject to the provisions of Article 99) be taken in such manner and at such time and place as the chairman of the meeting directs and either at once or after an interval or adjournment or otherwise, and the result of the poll shall be deemed to be the resolution of the meeting at which the poll was demanded.  In case of any dispute as to the admission or rejection of a vote, the chairman of the meeting shall determine the same, and such determination made in good faith shall be final and conclusive.

Power to adjourn general meting

102.     The chairman of a general meeting may with the consent of the meeting adjourn the same from time to time and from place to place, and without such consent he may adjourn any meeting at which a proposal of importance is made for the consideration whereof in his judgment, which shall not be challenged, a larger attendance of members is desirable.  No business shall be transacted at any adjourned meeting other than the business left unfinished at the meeting from which the adjournment took place.

Notice of adjournment

103.     Whenever a meeting is adjourned for ten days or more notice of the adjourned meeting shall be given in the same manner as of an original meeting.  Save as aforesaid the members shall not be entitled to any notice of adjournment or of the business to be transacted at an adjourned meeting.

In what case poll shall not demanded

104.     A poll may be demanded on the election of a chairman of a meeting or on any question of adjournment.

55

**Business may proceed notwithstanding demand on poll**

105.　　The demand of a poll shall not prevent the continuance of a meeting for the transaction of any business other than the question on which a poll has been demanded.

## VOTES OF MEMBERS

**Vote of Members**

106.　　Subject to any special terms as to voting upon which any shares may be issued or may for the time being be held, on a show of hands every member present in person or by proxy shall have one vote and upon a poll every member present in person or by proxy shall have one vote for every share held by him. Subject to Article 108, there shall be no restriction as to the qualification of the proxy. A proxy appointed to attend and vote at a meeting of a company shall have the same rights as the member to speak at the meeting.

**Voting rights**

107.(1)　　A holder may appoint more than two (2) proxies to attend the same meeting.

Where a holder appoints two or more proxies, he shall specify the proportion of his share-holding to be represented by each proxy.

(2)　　Where a member of the Company is an exempt authorised nominee which holds ordinary shares in the Company for multiple beneficial owners in one security account ("omnibus account"), there is no limit to the number of proxies which the exempt authorised nominee may appoint in respect of each omnibus account it holds.

(3)　　Where the capital of a Company consists of shares of different monetary denominations, voting rights shall be prescribed in such a manner that a unit of capital in each class, when reduced to a common denominator, shall carry the same voting power when such right is exercisable.

**Member of unsound mind**

108.　　A member who is of unsound mind or whose person or estate is liable to be dealt with in any way under the law relating to mental disorder may vote, whether on a show of hands or on a poll, by his committee or by such other person as properly has the management of his estate, and any such committee or other person may vote by proxy.

**No member entitled to vote while call due to the Company**

109.　　Subject to Article 88 (3), a member of the Company shall be entitled to be present and to vote at any general meeting in respect of any share or shares upon which all calls or other sums presently payable by him due to the Company have been paid.

**Objections to vote**

110.　　No objection shall be raised to the qualification of any voter except at the meeting or adjourned meeting at which the vote objected to is given or tendered, and every vote not disallowed at such meeting shall

be valid for all purposes. Any such objection made in due time shall be referred to the chairman of the meeting, whose decision shall be final and conclusive.

**Proxies permitted; instrument appointing proxies to be in writing**

111.    Votes may be given personally or by proxy. The instrument appointing a proxy shall be in print or writing under the hand of the appointer or his duly constituted attorney, or if such appointer is a corporation, under its common seal or under the hand of its officers or attorney duly authorised. Subject to Article 106, a corporation or a corporation sole or a statutory corporation may appoint any person (whether a member of the Company or not) as its proxy. The instrument appointing a proxy shall be deemed to confer authority to demand or join in demanding a poll. A proxy may but need not be a member of the Company and a member may appoint any person to be his proxy and the provisions of Section 149(1)(b) of the Act shall not apply to the Company.

**Corporations can appoint representative**

112.    Any corporation which is a member of the Company may by resolution of its directors or other governing body authorise such person as it thinks fit to act as its representative at any meeting of the Company, and the person so authorised shall be entitled to exercise the same powers on behalf of the corporation which he represents as that corporation could exercise it as if it were an individual member of the Company.

**Instrument appointing proxy to be deposited**

113.    The instrument appointing a proxy and the power of attorney or other authority, if any, under which it is signed or a notarially certified copy of that power or authority shall be deposited at the office of the Company, or at such other place within Malaysia as is specified for that purpose in the notice convening the meeting, not less than forty-eight hours before the time for holding the meeting or adjourned meeting at which the person named in the instrument proposes to vote.

**When vote by proxy valid though authority revoked**

114.    A vote given in accordance with the terms of an instrument of proxy or attorney shall be valid notwithstanding the previous death or unsoundness of mind of the principal or revocation of the instrument or of the authority under which the instrument was executed, or the transfer of the share in respect of which the instrument is given, if no intimation in writing of such death, unsoundness of mind, revocation, or transfer as aforesaid has been received by the Company at the office before the commencement of the meeting or adjourned meeting at which the instrument is used.

**Votes on transmission shares**

115.    Any person entitled under Article 62 to transfer any share may vote at any general meeting in respect thereof in the same manner as if he were the registered holder of such share provided that 48 hours at least before the time of holding the meeting or adjourned meeting, as the case may be, at which he proposes to vote, he shall satisfy the Directors of his right to transfer such shares or the Directors shall have previously admitted his right to vote at such meeting in respect thereof.

Form of instrument
appointing a proxy

116.    Every instrument appointing a proxy shall, as nearly as circumstances will admit, be in the form or to the effect following or in such other form as the Directors may approve, and shall be retained by the Company.

## MALAYSIAN AIRLINE SYSTEM BERHAD

I/We,...............................................................................................
......... of ..................................................................... being a member/members of Malaysian Airline System Berhad, hereby appoint
................................................................................................ of
................................................................................................ or
failing him ................................................................................... of
.................................................................... as my/our proxy in my/our absence to attend and vote for me/us on my/our behalf at the (ordinary, or Extraordinary, as the case may be) General Meeting of the Company, to be held on the ........... day of ..................., 20........ and at any adjournment thereof.

My / Our proxy is to vote as indicated hereunder: -

| Resolutions | For | Against |
|---|---|---|
|  |  |  |
|  |  |  |
|  |  |  |

Signed this ................. day of ................... 20 .....

Unless otherwise instructed, the proxy may vote as he thinks fit.

## DIRECTORS

Number of Directors;
First Directors

117. (1)    The number of Directors shall be not less than two nor (unless otherwise determined by the Company in general meeting) more than thirteen,

(2)    The following shall be the first Directors:

(a)    G.K. Rama Iyer, K.M.N.

(b)    Ramli bin Abdul Hamid, K.M.N.

(c)    Malek Ali Merican, A.M.N.

(d)    Azman Bin Hashim.

At all times no less than 75 per cent of the Directors shall be Entitled Persons.

(3)     Unless otherwise determined by the Company in general meeting, at least two (2) directors or one-third of the Board of directors, whichever is higher, shall be Independent Directors. If the number of directors is not 3 or multiple of 3, then the number nearest one-third shall be used for purposes of determining the requisite number of Independent Directors.

Director not required
to hold Qualification share

118.     A Director shall not be required to hold any qualification share.

Government appointed
Directors'

119. (1)     The Special Shareholder shall have the right from time to time: -

(a)     to appoint any person; or

(b)     to nominate any existing director (with the consent of the Director concerned)

to be a Government Appointed Director so that there shall not be more than three (3) Government Appointed Directors at any time comprising :-

(i)     The Chairman; and

(ii)     Two representatives of the Government;

and he may remove the same in the case of a Director appointed pursuant to para (a) of this Article or terminate the nomination in the case of an existing Director nominated pursuant to para (b) of this Article and appoint or nominate another or others in their place. Any such appointment, nomination, removal or termination shall be in writing served on the Secretary together with where appropriate, the consent of the person concerned to act, and shall be signed by or on behalf of the Special Shareholder.

(2)     Save as provided in this Article, the provisions of these Articles shall apply to the Government Appointed Directors as they apply to other Directors.

(3)     Notwithstanding anything to the contrary in the Articles, but subject to the Act:-

(a)     The Government Appointed Director shall be required to retire from office once at least in each 3 years but shall be eligible for re-election.

(b)     If a Government Appointed Director ceases to hold such office the vacancy may only be filled by appointment by the Special Shareholder pursuant to this Article.

(c)   The provisions of the Articles relating to the appointment of Directors shall apply to Government Appointed Directors.

(4)   If an existing Director is appointed to be a Government Appointed Director he shall on the termination of his appointment continue to be a Director of the Company but shall retire at the next following Annual General Meeting.

**Remuneration of Directors**

120.     The Directors shall be paid by way of remuneration for their services such fixed sum (if any) as shall from time to time be determined by the Company in general meeting and such remuneration shall be divided among the Directors in such proportions and manner as the Directors may determine.  Provided always that :-

(1)   Fees payable to Directors who hold no executive office in the Company shall be paid by a fixed sum and not by a commission on or percentage of profits or turnover.

(2)   Salaries payable to Directors who do hold an executive office in the Company may not include a commission on or percentage of turnover.

(3)   Fees payable to Directors shall not be increased except pursuant to a resolution passed at a general meeting where notice of the proposed increase has been given in the notice convening the meeting.

(4)   Any fee paid to an alternate Director shall be agreed between himself and the Director nominating him and shall be paid out of the remuneration of the latter.

**Special remuneration of Directors**

121.     If any Director being willing shall be called upon to perform extra services or to make any special exertions in going or residing away from his usual place of business or residence for any of the purpose of the Company or in giving special attention to the business of the Company as a member of a Committee of Directors, the Company may pay the Director remuneration and expenses therefore either by a fixed sum or otherwise (other than by a sum to include a commission on or percentage of turnover) as may be determined by the Company in general meeting and such remuneration and expenses may be either in addition to or in substitution for his or their share in the remuneration from time to time provided for the Directors.

122.     The Directors shall also be entitled to be repaid all reasonable travelling, hotel and other expenses incurred by them respectively in or about the performance of their duties as Directors, including any expenses incurred in attending meetings of the Directors or of a Committee of Directors or general meetings.

Disqualification Directors

123. (1)  The office of any Director including a Government Appointed Director shall ipso facto be vacated if such Director :-

(a)  ceases to be a Director by virtue of the Act;

(b)  becomes bankrupt or makes any arrangement or composition with his creditors generally during his term of office;

(c)  becomes prohibited from being a Director by reason of any order made under the Act;

(d)  becomes of unsound mind or becomes a person whose estate is liable to be dealt with in any way under the  law relating to mental disorder during his term of office

(e)  resigns his office by notice in writing to the Company;

(f)  is absent from more than 50% of the total board of directors' meetings held during a financial year save and except in a case where the Exchange has granted a waiver to the director from compliance with this requirement; or

(g)  is removed by a resolution of the Company in general meeting.

Acts done in good faith by Director whose office is vacated

(2)  Any act done in good faith by a Director whose office is vacated as aforesaid shall be valid unless prior to the doing of such act written notice has been served upon the Director or an entry has been made in the Directors' Minute Book stating that such Director has ceased to be a Director of the Company.

Right to hold office or profit under the Company

124. (1)  Subject to the provisions of the Act, a Director shall not be disqualified by reason of his holding any other office, or place of profit under the Company in conjunction with his office of Director, except that of Auditor, and may be appointed thereto for such period and upon such terms as to remuneration and otherwise as the Directors may determine and no Director shall be disqualified by his office from contracting with the Company with regard to his tenure of such other office or place of profit.

Effect of quorum

(2)  A Director shall not be counted in the quorum at a meeting in relation to any resolution on which he is debarred from voting.

Directors interest in contracts

125.  Subject to the provisions of the Act, no Director shall be disqualified from contracting with the Company either as vendor, purchaser or otherwise, nor shall any such contract or arrangement entered into by or on behalf of the Company with any company or partnership of or in which any Director shall be a member or otherwise

interested be avoided nor shall any Director so contracting or being such member or so interested be liable to account to the Company for any profit realised by any such contract or arrangement by reason of such Director holding that office or of the fiduciary relation thereby established but the nature of his interest must be disclosed by him at the meeting of the Directors at which the contract of arrangement is determined on, if the interest then exists or in any other case at the first meeting of the Directors after the acquisition of the interest. A Director shall not vote in respect of any contract or arrangement or proposed contract or arrangement, in which he may be interested as a Director, officer or shareholder of another Company, or in which he has directly or indirectly any interest.

**When Director of the Company appointed Director of a subsidiary Company**

126.    A Director of the Company may be or become a Director or other officer of, or otherwise interested in, any company promoted by the Company or in which it may be interested as a vendor, shareholder or otherwise, upon such terms and subject to such conditions as the Directors may determine.

**Right to payment for professional services**

127.    Any Director may act by himself or his firm in a professional capacity for the Company, and he or his firm shall be entitled to remuneration for professional services as if he were not a Director; provided that nothing herein contained shall authorise a Director or his firm to act as auditor to the Company.

## ALTERNATE DIRECTORS

**Appointment and Remuneration of Alternate Director**

128.(1)    Each Director shall have the power to appoint in writing under his hand any person approved for that purpose by a majority of the other Directors to act as his alternate Director in his place and on such appointment being so made and approved the Alternate Director shall in all respects be subject to the terms and conditions existing with reference to the other Directors and each Alternate Director, whilst acting in the place of the Director whom he represents, shall exercise and discharge all the duties and functions of such Director but shall look to such Director solely for his remuneration and shall not be entitled to claim remuneration from the Company.

(2)    Subject to the provisions of the Main Market LR, an alternate Director shall not be appointed as a member of the Audit Committee of the Company.

**Cessation of appointment of Alternate Director**

129.    The appointment of an Alternate Director shall be cancelled and the Alternate Director shall cease to hold office whenever the Director who appointed him shall cease to be a Director or shall give notice in writing to the Secretary that the Alternate Director representing him has ceased to represent him, provided that a Director retiring at any ordinary meeting and being re-elected shall not for the purpose of this Article be deemed to have ceased to be a Director. The appointment of an Alternate Director may at any time be revoked by a majority of the Directors (excluding the Director who appointed him).

Responsibility of an
Alternate Director

130.     Every person acting as an Alternate Director shall be deemed to be an officer of the Company, and shall alone be responsible to the Company for his own acts and defaults, and he shall not be deemed to be the agent of or for the Director appointing him.

Voting where Alternate Director
is himself a Director

131.     Where an Alternate Director is himself a Director, he shall have a separate vote on behalf of the Director he is representing in addition to his own vote.

## PRINCIPAL EXECUTIVE OFFICER

Principal Executive Officer

131A.     The Directors may appoint the Chairman or any of the Directors (including the Managing Director if any), to be the principal executive officer of the Company under any designation as may be decided by the Directors for such period and on such terms as the Directors think fit and, subject to the terms of any agreement entered into in any particular case, may revoke any such appointment and may appoint any other person qualified under this Article in his place.

Powers of Principal Executive
Officer

131B.     The principal executive officer of the Company (by whatever designation) shall be principally responsible for the supervision, direction and control of the daily administration and management of the Company and he shall have full authority to appoint such subordinates or other officers and managers of the Company and to delegate to such persons any of the powers exercisable by him as he deems fit and proper.

## MANAGING DIRECTORS

Power to appoint
Managing Director

132.     The Directors may from time to time, appoint one or more of their body to be a Managing Director or Managing Directors of the Company for such period and upon such terms as they may think fit at any one time but if the appointment is for a fixed term, the term shall not exceed three (3) years; with power to reappoint thereafter on such terms as the Directors think fit and may from time to time (subject to the provisions of any contract between the Managing Director and the Company) remove or dismiss him or them from office and appoint another or others in his or their place.  The Directors may vest in such Managing Directors as may be appointed by them such of the powers hereby vested in the Directors generally as they may think fit.  A Managing Director shall be subject to the control of the board of Directors.

**Managing Director subject to retirement by rotation**

133.    The Managing Director shall subject to provisions of any contract between him and the Company, be subject to the same provisions as to resignation, retirement by rotation and removal as the other Directors of the Company and if he ceases to hold the office of a Director for any cause shall ipso facto and immediately cease to be a Managing Director.

**Remuneration of Managing Director**

134.    The remuneration of a Managing Director shall (subject to the provisions of any contract between him and the Company) from time to time be fixed by the Directors, and may be by way of fixed salary, or commission on dividends or profits of the Company or of any other company in which the Company is interested or by participation in any such profits or by any, of all of those modes or otherwise as may be expedient, but shall not include a commission on or percentage of turnover.

**Powers of Managing Director**

135.    The Directors may from time to time subject to Article 131B entrust to and confer upon a Managing Director for the time being such of the powers exercisable under these provisions by the Directors as they may think fit, and may confer such powers for such time, and to be exercised for such object and purposes and upon such terms and conditions, and with such restrictions as they think expedient; and may from time to time revoke, withdraw, alter, or vary all or any of such powers.

### APPOINTMENT AND REMOVAL OF DIRECTORS

**Election, increase, reduction and rotation of Directors**

136.    The Company in general meeting, but subject to these Articles, may at any time elect any person to be a Director and may from time to time increase or reduce the number of Directors and may also, subject to the provisions of the Act, determine in what rotation such increased or reduced number is to go out of office.

**Directors' power to fill casual vacancies and appoint additional directors**

137.    Subject to Article 119, the Directors shall have power at any time and from time to time to appoint any other person to be a Director of the Company either to fill a casual vacancy or as an addition to the existing Directors but so that the total number of Directors shall not at any time exceed the maximum number fixed by these Articles. Any Director so appointed shall hold office only until the next following annual general meeting of the Company at which Directors are due to retire under these Articles, when he shall retire but shall then be eligible for re-election. But he shall not be taken into account in determining the Directors who are to retire by rotation at that meeting.

**Candidature for election as Director**

138.    No person not being a retiring Director shall be eligible for election to the office of Director at any general meeting unless some member intending to propose him has, at least eleven clear days before the meeting, left at the office of the Company a notice in writing duly signed by the nominee, giving his consent to the nomination and signifying his candidature for the office, or the intention of such member to propose him, provided that in the case of a person recommended by

the Directors for election, nine (9) clear days' notice only shall be necessary, and notice of each and every candidature for election as a Director shall be served on the registered holders of shares at least seven days prior to the meeting at which the election is to take place.

## ROTATION OF DIRECTORS

Retirement of Directors by rotation

139.     At the first Annual General Meeting of the Company all the Directors shall retire from office and that all Directors, shall retire from office once at least in each three (3) years but shall be eligible for re-election. A retiring Director shall be eligible for re-election and shall retain office until the close of the meeting at which he retires. The Directors to retire at such Annual General Meetings (other than the first) shall be the Directors who shall have been longest in office. As between two or more who have been in office an equal length of time the Director to retire shall in default of agreement between them be determined by lot. The length of time a Director has been in office shall be computed from his last election or appointment when he has previously vacated office. An election of directors shall take place each year.

Re-election of Directors at meeting

140.     The Company at the meeting at which a Director retires in manner aforesaid shall fill up the vacated office by electing a person thereto and, in default, the retiring Director shall be deemed to have been re-elected unless at such meeting it is expressly resolved not to fill up the vacated office or a resolution for his re-election shall have been put to the meeting and lost.

## PROCEEDINGS OF DIRECTORS

Directors meeting not to be held outside Malaysia

141.     No meeting of the Directors shall be held outside Malaysia and the proceedings of any meeting purported to be held outside Malaysia shall not be valid.

Proceedings, meetings of Directors and quorum

142.     The Directors may meet together for the despatch of business, adjourn and otherwise regulate their meetings and proceedings as they think fit. Two Directors shall be a quorum for the transaction of business.   Questions arising at any meeting shall be decided by a majority of votes except in cases where a unanimous vote is required under these Articles or the decision of question is regulated by any special agreement.

Calling of meetings

143.     Two Directors may at any time summon a meeting of the Directors, and the Secretary, upon the request of the Chairman or any two Directors, shall convene a meeting of the Directors.   Notice of a meeting of Directors need not be given to a Director who is not in Malaysia and who has given notice that he is leaving Malaysia temporarily or otherwise.

Chairman or Deputy
Chairman of Directors

144.        The Special Shareholder shall appoint the Chairman as defined in Article 1(1).  The Directors may elect a Deputy Chairman from their number and the Directors may determine the period for which such officer shall hold office.  The Chairman or in the absence of the Chairman, the Deputy Chairman (if any) shall preside at the meeting of Directors.  If no such officers are present within five minutes after the time appointed for holding of the meeting of the Directors, the Directors present shall choose one of their number to be chairman of the meeting.

Power of quorum

145.        A meeting of the Directors at which a quorum is present shall be competent to exercise all or any of the authorities, powers and discretions by or under the Articles of the Company for the time being vested in or exercisable by the Directors generally.

Decision at a meeting
of Directors

146.        Questions arising at any meeting of the Directors shall be decided by a majority of votes, each Director having one vote and in case of an equality of votes the Chairman as defined in Article 1(1) shall have a second or casting vote.   Provided that at a meeting of the Directors where two Directors form a quorum and only such quorum is present, or at a meeting of the Directors at which only two Directors are competent to vote on the question at issue, the Chairman of such meeting shall not have a casting vote.

When acts of Directors of
committee valid notwithstanding
defective appointment, etc

147.        All acts done by any meeting of the Directors or of a committee of Directors or by any person acting as a Director shall, notwithstanding that it shall afterwards be discovered that there was some defect in the appointment of such Directors or persons acting as aforesaid or that they or any of them were disqualified, be as valid as if every such person had been duly appointed and was qualified to be a Director.  Provided that nothing in this Article shall be deemed to give validity to acts done by such Directors, committee or persons acting as aforesaid after it has been shown that there was some defect in such appointment or that they or any of them were disqualified.

Resolution in writing binding

148. (1)        A resolution in writing signed or approved by letter, telex, telefax or telegram or other written electronic communications by all the Directors who may at the time be present in Malaysia, being not less than are sufficient to form a quorum, shall be as valid and effectual as if it had been passed at a meeting of the Directors duly called and constituted.  Provided that where a Director is not so present but has an Alternate who is so present then such resolution must also be signed by such Alternate.  All such resolutions shall be described as "Directors' Resolutions" and shall be forwarded or otherwise delivered to the Secretary without delay, and shall be recorded by him in the Company's minute book and submitted for confirmation at a meeting of the Directors next following the receipt thereof by him.   A Directors' Resolution shall be inoperative if it shall purport to authorise or to do any act which a meeting of Directors has decided shall not be authorised or done, until confirmed by a meeting of the Directors. Any such resolution may consist of several documents in like form, each signed by one or more directors.

Directors meeting via
Instantaneous
telecommunications device

(2) (a)    For the purpose of Article 142, and subject to the laws for the time being in force in this jurisdiction, the contemporaneous linking together by an instantaneous telecommunication device of a number of directors no less than the quorum required by Article 142, whether or not any one or more of the directors is out of Malaysia, is deemed to constitute a meeting of the directors and all provisions of these Articles as to meetings of the directors will apply to such meeting held by instantaneous telecommunication device so long as the following conditions are met:-

(1)    all the directors shall have received notice of a meeting by instantaneous telecommunication device for the purpose of such meeting. Notice of any such meeting will be given on the instantaneous telecommunication device or in any other manner permitted by these Articles;

(2)    each of the directors taking part in the meeting by the instantaneous telecommunication device must be able to hear and/or see each of the other directors taking part at the commencement and for the duration of the meeting;

(3)    at the commencement of the meeting each director must acknowledge his presence for the purpose of the meeting to all of the other directors taking part.

(b)    A director may not leave the meeting by disconnecting his instantaneous telecommunication device unless he has previously obtained the express consent of the chairman of the meeting and a director will be conclusively presumed to have been present and to have formed part of the quorum at all times during the meeting by instantaneous telecommunication device unless he has previously obtained the express consent of the chairman of the meeting to leave the meeting.

(c)    Minutes of the proceedings at a meeting by instantaneous telecommunication device will be sufficient evidence of such proceedings and of the observance of all necessary formalities if certified as correct minutes by the chairman of the meeting.

(d)    For the purpose of this Article, "instantaneous telecommunication device" means any telecommunication conferencing device with or without visual capacity.

Power to act
notwithstanding
vacancy

149.    The remaining Directors may continue to act notwithstanding any vacancy in their body, but if and so long as their number is reduced below the minimum number fixed by or pursuant to these Articles, the remaining Directors may, except in an emergency, act only for the purpose of increasing the number of Directors to such minimum number, or to summon a general meeting of the Company.

Committees

150.     The Directors may delegate any of their powers to a committee consisting of such number of members of their body as they think fit; any committee so formed shall, in the exercise of the powers so delegated, conform to any regulations that may from time to time be imposed on them by the Directors in accordance with the regulations or requirements prescribed by the Exchange from time to time.

Meetings and proceedings of a committee

151.     The meetings and proceedings of any such committee, if consisting of two or more members shall be governed by the provisions herein contained for regulating the meetings and proceedings of the Directors so far as the same are applicable thereto and are not superseded by any regulations made by the Directors under the last preceding Article.

Decisions by a committee

152.     In the case of committee consisting of three (3) or more members, questions arising at any meeting shall be determined by a majority of votes of the members present, and in case of any equality of votes the chairman of such meeting shall have a second or casting vote and in the case of a committee consisting of two members only the decision shall be arrived at in such manner as shall be determined by regulations imposed by the Directors.

## MINUTES

Minutes

153. (1)     The directors shall cause minutes to be duly entered in books provided for the purpose :-

(a)     of all appointment of officers;

(b)     of the names of the Directors present at each meeting of the Directors and of any committee of Directors;

(c)     of all orders and resolutions made by the Directors and committee of Directors; and

(d)     of all resolutions and proceedings of general meetings and of meetings of the Directors and committees of Directors.

(2)     Any such minutes of any meetings of the Directors, or of any committee of Directors or of the Company, if purporting to be signed by the Chairman of such meeting, or by the Chairman of the next succeeding meeting, shall be receivable as prima facie evidence of the matter stated in such minutes.

## POWER OF DIRECTORS

General power of Company vested in Directors

154.     The business of the Company shall be managed by the Directors who may, in addition to the powers and authorities by these presents or otherwise expressly conferred upon them, exercise all such powers and do all such things as the Company is by its Memorandum of

Association or otherwise authorised to exercise and do and are not hereby or by law expressly directed or required to be exercised or done by the Company in general meeting but subject, nevertheless, to the provisions of any law for the time being in force and of these Articles and to any regulations from time to time made by the Company in general meeting (not being inconsistent with provisions of such law or of these Articles), provided that no regulation so made shall invalidate any prior act of the Directors which would have been valid if such regulation had not been made.

**Restriction on Directors' power of undertaking the Company**

155.    The Directors shall not, save with the consent of the Company in general meeting, dispose of the whole or substantially the whole of the undertaking or property of the Company.

## INDEMNIFICATION OF OFFICERS

**Indemnification of officers**

156.    Subject to the provisions of the Act, every Director, Manager, Trustee, Auditor, Secretary and other officer or servant of the Company shall be indemnified by the Company for any travelling expenses and other costs, charges and expenses and losses incurred by him in or about the discharge of his duties, except such losses or expenses as happen from his own willful acts or defaults; and it shall be the duty of the Directors, out of the funds of the Company to pay all costs, losses and expenses which any such officer or servant may incur or become liable to by reason of any contract entered into or act or deed done by him as such officer or servant or in any way in the discharge of his duties.

**Liability**

157.    No Director or other officer of the Company shall be liable for the acts, receipts, neglects or defaults of any other Director of officer or for joining in any receipt or other act for conformity, or for any loss or expense happening to the Company through the insufficiency or deficiency of title to any property acquired by order of the Directors for or on behalf of the Company or for the insufficiency or deficiency of any security in or upon which any of the moneys of the Company shall be invested, or for any loss or damage arising from the bankruptcy, insolvency or tortious act of any person with whom any moneys, securities or effects shall be deposited, or for any loss, damage or misfortune whatever which shall happen in the execution of the duties of his office or in relation thereto, unless the same happen through his own negligence, default, breach of duty, breach of trust or dishonesty of which he may be guilty in relation to the Company.

## SECRECY CLAUSE

**Secrecy**

158.    Save as may be expressly provided by the Act, no member shall be entitled to enter into or upon or inspect any premises or property of the Company nor to require discovery of any information respecting any detail of the Company's trading or any matter which is or may be in the nature of a trade secret, mystery of trade or secret process which may relate to the conduct of the business of the Company and which, in

the opinion of the Directors, would be inexpedient in the interest of the Members of the Company to communicate to the public.

## DIVIDENDS

Profits of Company which are to be distributed by way of dividend

159.    Subject to any rights or privileges for the time being attached to any shares in the capital of the Company having preferential or special rights in regard to dividend and to the provisions of these Articles as to the reserve and depreciation funds, the profits of the Company which it shall from time to time be determined to distribute by way of dividend, shall be applied in payment of dividends upon the ordinary shares of the Company in proportion to the amounts respectively paid up thereon or credited as paid up thereon at the end of the period in respect of which the dividend is declared, other than the amounts paid in advance of calls.

Dividends

160.    The Company in general meeting may declare a dividend to be paid to the members according to their rights and interest in the profits and may fix the time for the payment of such dividend.

Extent of dividend

161.    No larger dividend shall be declared than is recommended by the Directors, but the Company in general meeting may declare a smaller dividend.

Retention of dividends

162.    The Directors may retain the dividends payable upon any share in respect of which any person is under Article 62 entitled to become a member or which any person under that Article is entitled to transfer, until such person shall become a member in respect thereof or shall duly transfer the same. No such dividend shall bear interest as against the Company.

Retention of dividend on which Company has a lien

163.    The Directors may retain any dividends on which the Company has a lien and may apply the same in or towards satisfaction of any unpaid liabilities in respect of which the lien exists as hereinbefore provided by these Articles.

Payment of dividend

164. (1)  Subject to the rights of persons (if any) entitled to shares with preferential or special rights as to dividend, all dividends shall be declared and paid according to the amounts paid or credited as paid on the shares in respect of which the dividend is paid.

.     (2)  All dividends shall be apportioned and paid proportionately to the amounts paid or credited as paid on the shares during any portion or portions of the period in respect of which the dividend is paid, but, if any share is issued on terms providing that it will rank for dividend as from a particular date, that share ranks for dividend accordingly.

.     (3)  An amount paid or credited as paid on a share in advance of a call shall not be taken for the purpose of this Article to be paid or credited as paid on the share.

| | |
|---|---|
| Interim dividends | 165.    The Directors may from time to time declare and pay an interim dividend to the members in proportion to the amount paid up or credited as paid up at the time of such declaration on the shares as aforesaid, having regard to the rights of the holders of different classes of shares, if it appears to the Directors to be probable, having regard to the state of accounts, that all payments which require to be paid before the dividends to the shareholders will be duly provided for out of the income of the year. |
| Payment out of net profits to be conclusive | 166.    No dividend shall be payable except out of the profits of the year or any other undistributed profits of the Company, but this provision shall be without prejudice to the right of the Directors to apply any part of any such reserve funds as may represent undistributed profits to provide, make, equalise or increase any dividend or to pay a bonus from time to time.  No dividend or other moneys payable on or in respect of a share shall carry interest as against the Company. |
| Directors' declaration of net profits to be conclusive | 167.    The declaration of the Directors as to the amount of the net profits of the Company shall be conclusive. |
| Ranking for dividends | 168.    When a share is issued after the commencement of any financial year it shall, unless otherwise provided by the terms of issue, rank pari passu with previously issued shares as regards any dividend subsequently declared in respect of such year. |
| Right to dividend in respect of a transferred share | 169.    A transfer of shares shall not pass the right to any dividend declared thereon before the registration of the transfer. |
| Unclaimed dividends | 170.    Subject to the Unclaimed Money's Act, 1965 all dividends unclaimed for one year, after having been declared, may be invested or otherwise made use of by the Directors for the benefit of the Company until claimed. |
| Payment of dividend according to Register or Record of Depositors | 171.    Every dividend shall belong and be paid (subject to the Company's lien) to those members who shall be on the Register or Record of Depositors at the date fixed for the payment of such dividend, notwithstanding any subsequent transfer or transmission of share. |
| Deduction | 172.    The Directors may deduct from the dividends payable to any member all such sums as may be due from him to the Company on account of calls or otherwise. |
| Bonus issue in lieu | 173.    Any general meeting declaring a dividend may, upon the recommendation of the Directors, resolve that such dividend be paid wholly or in part by the distribution of specific assets, and in particular of paid up shares, debentures or debenture stock of the Company, or paid up shares, debentures or debenture stock of any other company, or in any one or more of such ways; and any general meeting may, upon the recommendation of the Directors, resolve that any moneys, investment or other assets forming part of the undivided profits of the Company standing to the credit of the reserve fund or funds or other special account or in the hands of the Company and available for |

dividend and including any profits arising from the sale or revaluation of the assets of the Company or any part thereof or by reason of any other accretion to capital assets (or representing premiums received on the issue of shares and standing to the credit of the share premium account) be capitalised and distributed amongst such of the shareholders as would be entitled to receive the same if distributed by way of dividend and in the same proportion on the footing that they become entitled thereto as capital and that all or any part of such capitalised funds be applied on behalf of such shareholders in paying up in full any unissued shares of the Company or debentures or debenture stock of the Company which shall be distributed accordingly or in or towards payment of the uncalled liability on any issued shares and that such distribution or payment shall be accepted by such shareholders in full satisfaction of their interest in the said capitalised sum.    For the purpose of giving effect to any resolution under this Article the Directors may settle any difficulty which may arise in regard to the distribution as they think expedient, and in particular may issue fractional certificates and may fix the value for distribution of any specific assets, and may determine that cash payments shall be made to any members upon the footing of the value so fixed or that fractions of less value than one dollar may be disregarded in order to adjust the rights of all parties and may vest any such cash or specified assets in trustees upon such trusts for the persons entitled to the dividend or capitalised fund as may seem expedient to the Directors.    Where requisite, a proper contract shall be filed in accordance with the provisions of the Act, and the Directors may appoint any person to sign such contract on behalf of the persons entitled to the dividend or capitalised fund, and such appointment shall be effective.

Capitalization of reserves

174.    The Company in general meeting may from time to time and at any time pass a resolution  to the effect that it is desirable to capitalise any part of the undivided profits of the Company standing to the credit of any of the Company's reserve funds or to the credit of the profit and loss account, and that accordingly such sum be set free for distribution among the members in accordance with their rights and interest in the profits or otherwise as may be agreed, on the footing that the same be not paid in cash, but be applied in payment in full or in part of the shares of the Company, and that such shares be distributed among the members in accordance with their rights and interest in the profits or otherwise as aforesaid.  When such resolution has been passed on any occasion the Directors may allot and issue the shares therein referred to credited as fully or partly paid up, as the case may be, to the members according to their rights and interest in the profits or otherwise as aforesaid, with full power to make such provision by the issue of fractional certificates or otherwise as they think expedient for the case of fraction.  Prior to such allotment the Directors may authorise any persons, on behalf of the members to receive such allotment to enter into an agreement with the Company providing for the allotment to them of such shares credited as fully or partly paid up, and any agreement made under such authority shall be effective.

Payment by post and Discharge

175.     Any dividend, interest, or other money payable in cash in respect of shares may be paid directly into the accounts opened and maintained with a financial institution based in Malaysia by way of electronic transfer or by banker's draft, money order, cheque or warrant sent through the post to the registered address of the member of person entitled thereto as the holder may direct. Every such draft, money order, cheque or warrant shall be made payable to the order of the persons to whom it is sent or to such person as the holder may direct and payment of same if purporting to be endorsed shall be a good discharge to the Company. Every such draft, money order, cheque or warrant shall be sent at the risk of the persons entitled to the money represented thereby.

## ACCOUNTS

Accounts

176.  (1)     The Directors shall cause to be kept proper books of account with respect to :-

(a)     all sums of money received and expended by the Company, and the matters in respect of which the receipt and expenditure takes place;

(b)     all sales and purchases of goods and services by the Company; and

(c)     the assets and liabilities of the Company.

(2)     the books and accounts shall be kept at the office of the Company or at such other place as the Directors think fit, and shall at all times be opened to inspection by the Directors.

Inspection

177.     The Directors shall from time to time determine whether and to what extent and at what times and places, and under what conditions or regulations the accounts and books of the Company, or any of them, shall be opened to the inspection of members not being Directors, and no member (not being a Director) shall have any right of inspecting any account or book or document of the Company except as conferred by the Act or authorised by the Directors.

Profit and loss account and balance sheet

178.     The Directors shall from time to time in accordance with the provisions of the Act, cause to be prepared and laid before the Company in general meeting such profit and loss accounts, balance sheet and reports as are required under the Act PROVIDED always that the interval between the close of a financial year of the Company and the issue of the annual audited accounts, the directors' and auditors' reports to the Exchange shall not exceed four (4) Months or such period as may be prescribed by the Main Market LR.

Copy to be sent to members.

179.     A copy of every balance sheet and profit and loss account which is to be laid before the Company in general meeting (including every document required by law to be annexed thereto) together with a copy of the auditors' report relating thereto and of the Directors' report

shall not more than six months after the close of the financial year and not less than twenty one days before the date of the meeting, be sent to every member of, every holder of debenture of, and trustees for every debenture holder of, the Company and to every other person who is entitled to receive notice of general meetings from the Company under the provisions of the Act, or of these Articles.

Particulars of investments

180.     Save as may be necessary for complying with the provisions of the Act, the Directors shall not be bound to publish any list or particulars of the securities or investments held by the Company or to give any information with reference to the same to any member.

## AUDIT

Audit

181.     Once at least in every year the accounts of the Company shall be examined and the correctness of the profit and loss account and balance sheets shall be ascertained by one or more auditors and the provisions of the Act and the regulations and requirements prescribed by the Exchange in regard to the audit and the powers, rights, duties, appointment and qualifications of auditors shall be observed.

Auditors' right to receive notices of and attend and speak at general meeting

182.     The Auditor or Auditors shall be entitled to attend any general meeting and to receive all notices of and other communications relating to any general meeting which any member is entitled to receive and to be heard at any general meeting on any part of the business of the meeting which concerns him as auditor.

Audited accounts

183.     Every account of the Company when audited and approved by a general meeting shall be conclusive except as regards any error discovered therein within three (3) months next after the approval thereof; whenever any such error is discovered within that period the account shall forthwith be corrected and thenceforth shall be conclusive.

## COMMON SEAL

184.     The Directors shall forthwith provide a common seal for the Company and they shall have power from time to time to destroy the same and substitute a new Seal in lieu thereof.

Custody of seal

185.     The Common Seal of the Company shall be deposited at the office, and subject to Article 18 shall never be affixed to any document except by the authority of a resolution of the Directors, and in the presence of one Director and countersigned by the Secretary or another Director or some other person appointed by the Directors and such persons shall sign every instrument to which the Common Seal shall be affixed in their presence, and in favour of any purchaser or person bona fide dealing with the Company, such signatures shall be conclusive evidence of the fact that the Common Seal has been properly affixed. The Company may also have a "Share Seal" pursuant to the Act. The Company may exercise the power conferred by the Act with regard to

having an official seal for use abroad, and such powers shall be vested in the Directors.

## SECRETARY

Secretary / Secretaries

186.    The Secretary or Secretaries shall, in accordance with the Act, be appointed by the Directors for such term, at such remuneration and upon such conditions as the Directors may think fit, and any Secretary so appointed may be removed by them, but without prejudice to any claim he may have for damages for breach of any contract of service with the Company.  The Director may from time to time by resolution appoint a temporary substitute for any Secretary during the vacancy of such post who shall be deemed to be the Secretary during the term of his appointment. The appointment and duties of the Secretary or Secretaries shall not conflict with the provisions of the Act and in particular Section 139 thereof.

## MANAGEMENT

Management

187.    The Directors may from time to time provide for the management and transaction of the affairs of the Company in any specified locality in any part of the world in such manner as they think fit, and the provisions contained in the two next following articles shall be without prejudice to the general powers conferred hereby.

Powers of attorney

188.    The Directors may at any time and from time to time, by powers of attorney under the Seal appoint any person or persons to be the attorney or attorneys of the Company for such purposes and with such powers, authorities and discretions (not exceeding those vested in or exercisable by the Directors under these presents), and for such period and subject to such conditions as the Directors may from time to time think fit and any such appointment may (if the Directors think fit) be made in favour of any officer or agent of the Company or any company or of the members, Directors, nominees or Managers of any company or firm, or otherwise in favour of any fluctuating body of persons, whether nominated directly or indirectly by the Directors, and any such power of attorney may contain such powers for the protection or convenience of persons dealing with such attorneys as the Directors think fit.   Any such delegates or attorneys as aforesaid may be authorised by the Directors to sub-delegate all or any of the powers, authorities and discretions for the time being vested in them.

Appointment of Solicitors

189.    Notwithstanding the provisions of Articles 187 and 188 and the Directors may appoint a Solicitor to prosecute or defend any proceedings by or against the Company in any court of law and for this purpose may cause the Seal of the Company to be affixed to any warrant, power of attorney or other authority and may in the case of any emergency arising requiring the appointment of an agent or officer of the Company make the temporary appointment of an agent or officer to hold office until the next meeting of the Directors.

## BILLS, NOTES, CHEQUES AND RECEIPTS

Negotiable instruments

190.    The Directors may draw make, accept or endorse or authorise any other person or persons to draw, make accept or endorse any cheques, bills of exchange, promissory notes or other negotiable instruments, provided that every cheque, bill of exchange, promissory note or other negotiable instrument drawn, made or accepted shall be signed by such person or persons as the Directors may appoint for the purpose.

Receipt

191.    Receipts for money payable to the Company may be signed by a Director or the Secretary, or the person acting as Secretary, or by any other person authorised by the Directors to receive money either generally or any particular sum of money on behalf of the Company and such receipt shall be deemed to be valid, and any money paid by the authority of the Directors to the bankers of the Company on account of the Company shall be deemed to be duly paid to the Company.

## NOTICES

How notices to be served on members

192.    Subject to the provisions of any written law, a notice may be given by the Company to any Member either by serving it on him personally or by sending it by post to him at his address as shown in the Register of Members or the Record of Depositors or the address (if any) in Malaysia supplied by him to the Company for the giving of notices to him. In the case of overseas Securities holders, any notice or other documents shall be forwarded by airmail or any speedier form of transmission.

Members to notify and register his address

193.    Any member described in the Register of Members or Record of Depositors shall from time to time give the Company an address at which notices and documents may be served upon him and service upon him at such address in the manner provided for in Article 192 shall be deemed to be good and effectual service, but, save as aforesaid, no member other than a member described in the Register of Members or Record of Depositors by an address within Malaysia shall be entitled to receive any notice or document from the Company.

Members not entitled to receive notice

194.    Notwithstanding Article 192 and in furtherance of Article 193, in respect of any notices and documents which are required by the laws of any jurisdiction outside Malaysia to be lodged or registered with any governmental, statutory or regulatory authority of such jurisdiction, any member whose registered place of address as appearing in the Register of Members or Record of Depositors is situated in such jurisdiction shall not be entitled to receive such notices and documents.

Notice by advertisement

195.    Any notice given by advertisement shall be deemed to have been given on the day on which the advertisement shall first appear.

| | |
|---|---|
| When notice by post deemed to be served | 196.    Any notice or document sent by post shall be deemed to have been served and received at the time when the same would have been delivered in the ordinary course of post and in proving such service or sending it shall be sufficient to prove that the notice or document was properly addressed and put into the post. |
| Notice to registered holders | 197.    Every person who by operation of law, transfer, transmission or other means whatsoever shall become entitled to any share shall be bound by every notice which have been duly served to the person from whom he derives the title of such shares, prior to his name and address being entered in the Register or Record of Depositors as the registered holder of such shares notwithstanding the Company may have notice of the death, lunacy, bankruptcy, insolvency or disability of such member or of the transfer of such share. |
| Notice to persons entitled to a share in consequence of death, bankruptcy or insolvency | 198.    A notice may be given by the Company to the persons entitled to a share in consequence of the death, bankruptcy or insolvency of a member by sending it through the post in a prepaid letter addressed to them by name, or by the title of the representative of the deceased, or assignee of the bankrupt or insolvent or by any like description, at the address (if any) in Malaysia supplied for the purpose by the persons claiming to be so entitled, or (until such an address has been so supplied) by giving the notice in any manner in which the same might have been given if the death, bankruptcy or insolvency had not occurred. |
| Notice in respect of deceased holders | 199.    Any notice of document delivered or sent by post to or left at the registered address of any member in pursuance of these presents shall, notwithstanding such member be then deceased, and whether or not the Company have notice of his decease, be deemed to have been duly served in respect of any registered shares, and such service shall, for all purposes of these presents, be deemed a sufficient service of such notice or document on his heirs, executors or administrators. |
| Notice of general meeting | 200. (1)    Notice of every general meeting shall be given in any manner hereinbefore authorised to :- |

(a)    every Member;

(b)    every person entitled to a share in consequence of the death or bankruptcy of a Member who but, for his death or bankruptcy, would be entitled to receive notice of the meeting;

(c)    the auditor for the time being of the Company;

(d)    the Exchange; and

(e)    the Commission.

(2)    No other person shall be entitled to receive notices of general meetings.

Period of notice

201.    Where a given number of days' notice or notice extending over any other period is required to be given, the day of service and the day on which the notice is to be operative shall be excluded in computing such number of days or other period.

Authority

202.    The signature to any notice to be given by the Company may be written or printed.

## WINDING UP

Distribution of assets

203.    If the Company shall be wound up and the assets available for distribution among the members shall be insufficient to pay the whole of the paid up capital, such assets shall be distributed so that as nearly as may be the losses shall be borne by the members in proportion to the capital paid up or which ought to have been paid up at the commencement of the winding up on the shares held by them respectively.  And if in a winding up the assets available for distribution among the members shall be more than sufficient to repay the whole of the capital paid up at the commencement of the winding up, the assets shall be distributed among the members in proportion to the capital at the commencement of the winding up paid up, or which ought to have been paid up, on the shares held by them respectively, but this Article is to be without prejudice to the rights of the holders of shares issued upon special terms and conditions.

No commission to be paid on voluntary liquidation

204.    On the voluntary liquidation of the Company, no commission or fee shall be paid to a liquidator unless it shall have been approved by the Members. The amount of such payment shall be notified to all Members at least seven (7) days prior to the meeting at which it is to be considered.

Distribution of assets in specie or kind

205.    The liquidator on any winding up of the Company (whether voluntarily or otherwise) may with the authority of a Special Resolution divide amongst the members in specie or kind the whole or any part of the assets of the Company, (whether they shall consist of property of the same kind or not) and may, for such purpose, set such value as he deems fair upon any property to be divided as aforesaid, and may determine how such division shall be carried out as between the members or different classes of members, and may, with the like sanction, vest the whole of any part of the assets of the Company in trustees upon such trusts for the benefit of the contributories or any of them as the liquidator, with the like sanction shall think fit.

Proceeds of sale by liquidator

206.    In the case of a sale by the liquidator under Section 269 of the Act the liquidator may by the contract of sale agree so as to bind all the members for the allotment to the members direct of the proceeds of sale in proportion to their respective interests in the Company, and may further by the contract limit a time at the expiration of which obligations or shares not accepted or required to be sold shall be deemed to have been irrevocably refused and be at the disposal of the Company, but so that nothing herein contained shall be taken to diminish, prejudice or

affect the rights of dissenting members conferred by the said section.

Liquidator's power of sale

207.    The power of sale of a liquidator shall include a power to sell wholly or partially for debentures, debenture stock or other obligations of another Company, either then already constituted or about to be constituted for the purpose of carrying out of the sale.

## GENERAL MANDATE

General mandate

208.    Subject to the Act, the provisions of the Articles and the Main Market LR, the Company may seek its shareholders' mandate which is renewable on an annual basis to enter into, deal with, act in or handle all related- party transactions involving recurrent transactions of a revenue or trading nature which are necessary for the day-to-day operations of the Company.

## WAIVER

Waiver

209.    Where permitted under law, the Company is empowered to apply as the Directors think fit, to the Exchange to (1) waive or modify the Company's compliance with any of the Main Market LR or part thereof and/or (2) vary or revoke any decision(s) made by the Exchange in respect of the Company's compliance with any of the Main Market LR or part thereof.

## ALTERATIONS OF ARTICLES

Alteration of Articles

210.    These Articles have been drafted in a manner to incorporate the requirements of the relevant governing statutes, regulations and guidelines. Without prejudice to any provisions in the Act or under these Articles pertaining to the amendments of the Articles, in the event the applicable provisions of any relevant governing statutes, regulations and guidelines are from time to time amended, modified or varied, such amendments, modifications or variations shall be deemed inserted herein whereupon these Articles shall be read and construed subject to and in accordance with the amended, modified or varied statutes, regulations and guidelines. The Company shall comply with the provisions of the relevant governing statutes, regulations and/or guidelines as may be amended, modified or varied from time to time and any applicable directives or requirements imposed by the relevant stock exchange and/or any other regulatory authorities, to the extent required by law, notwithstanding any provisions in these Articles to the contrary.

## LISTING OF SUBSIDIARY COMPANY

Listing of Subsidiaries Company

211.    Subject to the Act and the Main Market LR, the Company shall not, unless with the consent of its shareholders in a general meeting, list the Securities of any of its subsidiaries on any stock exchange.

## EFFECT OF THE MAIN MARKET LR

Effect of the Main Market LR

212.  (1) Notwithstanding anything contained in these articles, if the Main Market LR prohibit an act being done, such act shall not be done.

(2)    Nothing contained in these articles prevents an act being done that the Main Market LR require to be done.

(3)    If the Main Market LR require an act to be done or not to be done, authority is given for that act to be done or not to be done (as the case may be).

(4)    If the Main Market LR require these articles to contain provisions and they do not contain such provision, these articles are deemed to contain that provision.

(5)    If the Main Market LR require these articles not to contain a provision and they contain such a provision, these articles are deemed not to contain that provision.

(6)    If any provision of these articles is or becomes inconsistent with the Main Market LR, these articles are deemed not to contain that provision to the extent of that inconsistency.

Names, Address and Descriptions of Subscribers

1.    RAJA TAN SRI MOHAR BIN RAJA BADIOZAMAN, P.S.M., J.M.N.,
      Secretary-General , Federal Treasury,
      Kuala Lumpur.

2.    ENCHE' RAMLI BIN ABDUL HAMID, KMN.,
      Secretary-General, Ministry of Transport,
      Kuala Lumpur.

Dated this 2nd day of April, 1971

Witness to the above signatures:-

                              SAW HUAT LYE, K.M.N.,
                              Ministry of Transport,
                              Jalan Young,
                              Kuala Lumpur.

81

# EXHIBIT B

# DECLARATION OF
# RIZANI BIN HASSAN



KHAZANAH
NASIONAL

# Rebuilding A National Icon

## The MAS Recovery Plan

**29 AUGUST 2014**

 

In loving memory of those still
missing and those departed
on **MH370** and **MH17**.

Al-Fatihah and our prayers
are with you.

MAS is more than just a company;
it is a **critical enabler of national development**
and **a national icon**.

...

However, it must be anchored on **operational
excellence, financial sustainability,** and the
**prudent use of public funds**.

...

We owe this to MAS' **customers** and **staff**, our
**shareholder** and **stakeholders**,
and to the ***Rakyat*** of Malaysia.

> 1      Message from the Prime Minister

> 2      Message from the Chairman of MAS, the
         Nominated Representative of the Special
         Shareholder, Minister of Finance, Incorporated

> 3      Message from the Managing Director,
         Khazanah Nasional Berhad

> 5      Preamble

> 7      Executive Summary

> 14     The Context:
         Challenges and Strengths

> 20     The Task:
         A Complete Overhaul

> 22     The MAS Recovery Plan:
         12 Distinctive Features

> 31     Closing Ranks:
         A National Compact

> 36     The Future:
         MAS@2020

> 37     Glossary

## MESSAGE FROM THE **PRIME MINISTER**



On 8th August, I called on all parties to work together in support of a comprehensive and holistic restructuring plan for Malaysia Airlines — the first step needed to return our national carrier to profitability.

I believed then — as I do today — that MAS is part of Malaysia's history. It is a symbol of national pride, of our ambitions and our place in the world. In short, it is more than just a company to us.

So as we prepare for our 57th Merdeka Day, I welcome the unveiling of "Rebuilding a National Icon — The MAS Recovery Plan".

Today's announcement marks the next step towards ensuring that our national carrier is part of Malaysia's future. Only wholesale change will deliver a genuinely strong and sustainable Malaysia Airlines. If we seek a different outcome from past experiences, we must have the courage to choose a different method. Piecemeal change will not work.

**"MAS is part of Malaysia's history. It is a symbol of national pride, of our ambitions and our place in the world. In short, it is more than just a company to us."**

The complete overhaul of the company set out in this plan will ask much of everyone at Malaysia Airlines. But we will look to all those who work with Malaysia's flag-carrier — and all Malaysians — to play their part in ensuring MAS' future success.

For MAS to survive and thrive, we need a new national compact for our national airline. Everyone has a role to play, and I give you my assurance that the Government is wholehearted in its commitment to supporting that compact.

As we turn our minds to celebrating our independence, I ask that each of you consider how you can support this national effort. More than an airline, MAS is a national icon; much-loved, and steeped in our history. The plan before you today will ensure it has a bright future.

**Dato' Sri Mohd Najib bin Tun Abdul Razak**
**29 August 2014**

## MESSAGE FROM THE **CHAIRMAN OF MAS,** THE **NOMINATED REPRESENTATIVE** OF THE **SPECIAL SHAREHOLDER,** MINISTER OF FINANCE, INCORPORATED



In my role as Chairman of Malaysia Airlines, I have spent much time over recent weeks leading *Turun Padang* meetings across the airline. In total, we have talked to some 2,500 colleagues. And I have, of course, been engaging with many others who interact with our national airline — from trade unions and Parliamentarians to vendors and suppliers.

Two things have stood out from these conversations — uncertainty and determination. That uncertainty is entirely understandable. After many years of persistent difficulties and financial losses at MAS — and, of course, the tragic events of MH370 and MH17 — it has been clear that things could not go on as they were. Indeed, at the airline's Annual General Meeting in June, I indicated that radical change was the only way in which our national carrier could survive and thrive.

**"...there are many elements of MAS which, as Chairman, make me truly proud every day — in particular the warmth, pride and humility with which we serve."**

To be clear, there are many elements of MAS which, as Chairman, make me truly proud every day — in particular the warmth, pride and humility with which we serve. But those evergreen strengths, on their own, are not enough. Change, of course, brings with it uncertainty. But change we must. There is, put simply, no alternative. And you will see that deep-seated, fundamental change shines out from every page of "Rebuilding a National Icon — The MAS Recovery Plan".

Certainly, there will be changes to every facet of the airline — structural, financial, operational, procedural and cultural — because we must put the airline on an organisational footing on which success will be built. However, those organisational changes alone — though critical to achievement of today's plan — will not unlock a secure and prosperous future for MAS.  Successful change always starts with ourselves. As you read the plan unveiled today, I ask every individual within MAS — and working with the airline — to consider how you can support this crucial endeavour. And as you do so, to draw on the proud, dogged determination I see and hear in every conversation I have about MAS, to help set the airline on a path to sustained success.

The Prime Minister has spoken about a new national compact for our national carrier. It is by starting with ourselves — our mindset, our attitudes and our behaviours — that we will ensure everyone involved plays their role and enables us — together — to rebuild our much-loved national icon.

**Tan Sri Md. Nor bin Md.Yusof**
**29 August 2014**

## MESSAGE FROM THE **MANAGING DIRECTOR, KHAZANAH NASIONAL BERHAD**



MAS is much more than just a company.

Its proud 77-year history is intertwined not just with our collective history as a nation, but also with many a citizen's personal history. I am no exception. Like many, I boarded my first ever flight, on MAS, to Sarawak to join my parents who were stationed there in 1978 at the age of 17. A year later, as a scholarship student, I left for the United Kingdom on my first flight overseas. Of course it was on MAS.

And again and again, over the many years since, as we grew older together, as our careers progressed, as we took our families and children on their first holidays, rushed back to attend weddings and, sometimes, funerals too, MAS was always there — just as MAS has been there for every customer, on so many flights, for the last 77 years. MAS has brought us to the world and the world to us. The heartbreaking twin tragedies of this year have only served to remind us of our deep affection for our national carrier.

> "…this is an enabling plan by Khazanah, as MAS' major shareholder and the strategic investment fund of the Government of Malaysia. It provides the necessary enabling framework for change."

Like the great majority of Malaysians, I too strongly believe that MAS needs to be turned around and set on a path to recovery. But we also know that we cannot do so at any cost. For MAS to be sustained, its future must be anchored in operational excellence, financial competitiveness, and ultimately, the prudent and proper use of public funds.

We have put together the MAS Recovery Plan over the last six months with a view to addressing the many structural impediments and constraints that, ultimately, hampered earlier restructurings. Terms like "complete overhaul", "hard reset", and "tough but fair" have been repeated in the national discussion and debate and it is no coincidence that these principles are indeed present in these accompanying pages. As you read further you may agree that there are many critical aspects that are significantly different this time.

To be clear, this is an enabling plan by Khazanah, as MAS' major shareholder and the strategic investment fund of the Government of Malaysia. It provides the necessary enabling framework for change. To execute this enabling plan, MAS — or more precisely the New MAS — will be tasked with preparing and then executing its own detailed Business and Operational Turnaround Plan in the months and years ahead.

We thank the many people and organisations who have contributed to this endeavour. There will, no doubt, be many challenges ahead. But we sincerely believe that we now have a genuine chance to deliver lasting and sustainable change. We also have no doubt that in spite of our best efforts, the plan can and will be improved as we move it forward over the five-year horizon that will take us to 2020. In that regard, we ask for both your patience and your contributions to help make it better. InsyaAllah, God willing, if we persevere and do this together, we have every chance of succeeding in reviving our national icon.

Tan Sri Dato' Azman Hj. Mokhtar
29 August 2014

# Preamble

The Government of Malaysia ("the Government"), through the Minister of Finance, Incorporated took over 29.1% of Malaysian Airline System Berhad ("MAS") on 13 February 2001 from Naluri Berhad. MAS' ownership was subsequently transferred to Khazanah Nasional Berhad ("Khazanah") in December 2004 as part of the Government-Linked Companies Transformation ("GLCT") Programme.

The purchase of MAS by the Government after the Asian Financial Crisis, coincided with the start of a particularly difficult period for the global aviation industry. This period witnessed multiple adverse events such as the September 11 attacks, the SARS pandemic, fuel-price escalation, a sharp increase in industry capacity, the rise of new low-cost carriers ("LCCs") and new full-service carriers ("FSCs"), and the Global Financial Crisis of 2008.

As a measure of the financial and operational stress at the point of takeover in 2001, the indebtedness of MAS, as measured by its net gearing (net debt over shareholders' funds), stood at nearly 700%. Today, after several rounds of capital injections and restructurings, the equivalent number is 290%, albeit worsening rapidly.

Given its importance as a national carrier, it is against this backdrop that the Government, and subsequently Khazanah, undertook several major restructurings over the 13 years between 2001 and today. For the record, in spite of the multiple challenges, in seven out of the 13 years MAS actually recorded audited net profits. Nonetheless, the quantity and quality of the profits were modest at best, far outweighed by the quantum of losses in the other years, including a RM750 million loss in the first half of 2014, resulting in cumulative net adjusted losses of RM8.4 billion from 2001 to June 2014 (based on company fillings and current accounting standards).

While the GLCT Programme and the Khazanah revamp programme that started in 2004 have been successful in delivering multiple financial and strategic objectives, MAS remains unresolved. Over the 10-year period since it began, the GLCT Programme saw total shareholder returns of the G20 grow at a compound annual growth rate of 13.4% from a market capitalisation of RM140 billion in May 2004 to RM425 billion in May 2014, closely tracking the FTSE Bursa Malaysia Kuala Lumpur Composite Index ("FBMKLCI"). Khazanah's net worth adjusted ("NWA") portfolio has more than trebled from RM33.3 billion in December 2004 to RM106.5 billion in July 2014. This is in spite of MAS' total shareholder returns declining by 18.9%, and a negative contribution of RM8.5 billion to Khazanah's NWA portfolio over the same period.

In spite of the various restructuring attempts, each of which had various structural or market-imposed constraints, losses over the last two years continue to be alarming. It is against the context of on-going MAS restructuring work that the Government and Khazanah undertook the development of this recovery plan, which commenced in earnest in February 2014. The terms of reference for the MAS Recovery Plan, as mandated by the Cabinet in February 2014, were to undertake a comprehensive and unconstrained review of all options in order to understand and overcome all previous structural impediments.

The tragic events of MH370 and MH17 in March and July 2014 have, sadly, intensified and accelerated this case for change.

## The context, limitations and applicability of the plan

The MAS Recovery Plan is from Khazanah, as the major shareholder of MAS and as the strategic investment fund of the Government of Malaysia, which in turn is the Special Shareholder of MAS.

While the MAS Recovery Plan is comprehensive and holistic in nature, and will employ detailed, and where applicable, independent analysis and benchmarking, it is not, and is not intended to be, a business operating plan or a business restructuring plan. The latter is in the domain of MAS as the operating company.

The MAS Recovery Plan as issued by Khazanah, mainly covers the enabling environment to effect comprehensive change. It principally covers the major levers of a controlling and special shareholder, inter alia, the strategic, regulatory and industry environment; funding; leadership; and performance management. This will both shape and complement the Business and Operational Turnaround Plan that MAS, and the New MAS operating company, will build further at the operational level.

Khazanah conducted the exercise drawing on multiple sources, including previous and updated strategy work conducted by MAS and independent views from industry specialists. It involved consultation with current and former MAS management, MAS staff, the Government, and industry stakeholders. It also included the views of the *Rakyat* from a specially commissioned public sentiment survey.

This plan was approved by the Khazanah Board of Directors at its meeting on 26 August 2014 and by the Malaysian Cabinet at its meeting on 27 August 2014. Subsequently, Khazanah received on 28 August 2014, a letter of commitment from the Government on various aspects of support from the Government, including the required regulatory and legal measures, as well as other relevant areas.

It must be noted, however, that MAS is a separate legal entity and hence, the MAS Board of Directors will have to adopt the MAS Recovery Plan in order for it to be implemented. The funding made available under this plan is conditional upon achieving the milestones laid out in the plan.

# Executive Summary

## The case for a complete overhaul

In spite of various intense efforts, MAS has been unable to establish itself as a sustainably profitable and financially self-sufficient airline. It has seen RM8.4 billion[1] in cumulative net adjusted losses from 2001 to June 2014.

MAS' core problem is simply that its unit cost has remained persistently higher than unit revenue[2]. Its small cost advantage versus its FSC competitors is dwarfed by a large revenue disadvantage. Furthermore, its revenue per employee is only 51% of Cathay Pacific and 38% of Singapore Airlines[3]. Its small revenue advantage versus its LCC competitors, is dwarfed by a large cost disadvantage of approximately 40% (Analysis based on Airlineanalyst.com, OAG, company annual reports and OANDA exchange rates).

Many issues have contributed to MAS' historical financial difficulties. These include the fact that MAS fulfils national developmental obligations, such as investing in socially important, but unprofitable, routes to develop tourism for Malaysia. MAS operates with a workforce that is about 30% larger than comparable airlines (Analysis based on OAG, ACAS3, company annual reports and company websites). There are also gaps in leadership across the airline and capability gaps in several core functions. This remains the case even though the airline has some excellent, internationally-recognised talent.

MAS has little margin for error. The airline industry is notoriously difficult.  A total of USD390 billion[3] in global industry losses have been experienced over the last 30 years (or an average of USD13 billion a year). The Malaysian market is particularly competitive, with between three and six carriers on most major routes and airline capacity growing at 10% a year, outstripping demand growth of 8%[4].

## Despite its challenges, MAS can draw on several distinctive strengths

Despite its challenges and the recent tragic events, MAS at its core has some distinct inherent strengths. It has a long and proud history of a product and brand synonymous with outstanding, warm hospitality. It has an impeccable track record of contributing to national development and is a talent factory for skilled employees, especially its pilots and cabin crew.

---

1  Based on company filings and current accounting standards
2  Unit cost is defined as passenger costs per available seat-kilometre. Unit revenue is defined as passenger revenue per available seat-kilometre
3  *Profitability and the air transport value chain*, International Air Transport Association ("IATA"), 2013. Economic loss/ profit is the difference between revenue and the opportunity cost of the inputs used. Opportunity costs are the alternative returns foregone (with the weighted average cost of capital used as a proxy)
4  Company annual reports, Official Airline Guide ("OAG"), IATA World Air Transport Statistics ("WATS")

With an average active fleet age of 4.2 years, it has one of the youngest fleets in the industry (Analysis based on data from the FlightGlobal ACAS database).  This is partly a function of the capital injected by the Government over the last decade. It also has the natural advantage of a home location in a prime tourism market and arguably one of the most economically dynamic regions in the world.

## Rebuilding MAS is a vital task for the nation

From its first commercial flight in 1947, MAS has served as a critical enabler to connect Malaysia to the world, while simultaneously integrating the nation. But the MAS story is much more than just its network. It is one of product and service excellence, presenting the face of Malaysia to the world, and bringing the world to Malaysia — an embassy on wings. It is how people from across the globe have been introduced to Malaysian hospitality, and it has helped millions of international tourists and business people take advantage of Malaysia's natural beauty, rich culture, and dynamic economy.

MAS plays a critical role in Malaysia's development, and driving it towards its goal of becoming a high-income nation. Studies have shown that MAS contributes an estimated RM6.9 billion toward Malaysia's annual gross domestic product ("GDP")[5]. The aviation industry has one of the highest economic multipliers of any sector — 12x, versus the typical 1-3x of most other industries[6]. For every person employed by the company, another four jobs are supported elsewhere in the economy[5].

This unique combination of attributes — MAS as a national icon, economic enabler, domestic bond, and link to the world — makes the success of the national airline an imperative for the Government and the *Rakyat*.

In the absence of any credible private sector interest, and in view of the need for comprehensive, multi-disciplinary collective actions, Khazanah has been entrusted with the role of driving the MAS Recovery Plan, a role to which it brings its significant strengths.

---

**5** *Malaysia Airlines contribution to the Malaysian economy*, Oxford Economics, 2014
**6** Bain & Company study commissioned in 2005

## MAS requires a complete overhaul, defined by 12 distinctive features

The Prime Minister, in his statement on 8 August 2014, defined the principles for recovery as : "complete overhaul", "piecemeal changes will not work", "painful steps and sacrifices from all parties", "principle of fairness, transparency, compassion", and "close ranks and work closely together". Previous attempts at restructuring were all constrained and ultimately unsustainable.

Piecemeal changes will not enable this restructuring to succeed. Only a complete overhaul can renew the airline. This entails the transformation of MAS' corporate structure, financial position, operating performance, and human capital management. The approach to the overhaul will be guided by the principles of transparency, fairness, and compassion.

In this regard, there are 12 principal actions to be taken together, which we believe will make this effort unprecedented:

### A. Governance and Financial Framework

1. **Creation of a new legal entity to house New MAS ("NewCo"), delist and relist**

   a. Delist MAS ("OldCo") by the end of 2014. This process has already commenced with the delisting announcement on 8 August 2014;

   b. Migrate the relevant operations, assets and liabilities of OldCo to NewCo by 1 July 2015;

   c. NewCo will critically involve a significantly corrected cost and operational structure and workforce, properly benchmarked to competitive industry practices and norms;

   d. NewCo is targeted to return to profitability within three years of delisting, and to relist within 3-5 years, that is, between the end of 2017 and the end of 2019; and

   e. If certain conditions are met, Khazanah will consider a sell-down or partial sell-down of its stake to appropriate strategic buyers from the private sector.

2. **Funding of up to RM6 billion on a strict conditional basis, and reduction of net gearing to approximately 120%**

   a. Total restructuring and investment funding of up to RM6 billion to be disbursed on a staggered basis, subject to fulfilment of strict restructuring conditions; and

   b. Reduce net gearing (net debt over shareholders' funds) from the current 290% to a target range of 100-125% through, inter alia, debt to equity swaps.

## B. Operating Business Model

3. **Reset the operating business model through a more regionally-focused network, lower cost structure, and greater focus on revenue yield management**

   a. MAS (both OldCo and subsequently NewCo), as the operating airline entity, will continue to rationalise the network. The network will be principally regionally-focused, with strong global connectivity through the **one**world alliance and other partners;

   b. The migration to NewCo, with strong funding conditionality imposed, is envisaged to result in a lower cost structure based on work practices benchmarked to competitive industry standards, and further savings from improved supply contracts and labour practices; and

   c. A renewed focus on revenue yield management.

4. **Consolidate core operations and the corporate headquarters at KLIA**

   a. MAS is currently an exception among airlines in having its HQ and operations away from its principal home airport;

   b. One of the conditions of the MAS Recovery Plan is for MAS to move its HQ and principal operations from Subang to KLIA; and

   c. This will allow MAS to consolidate its operations, improve working conditions and signify a new beginning under New MAS.

5. **Strengthen assurance, integrity and safety functions**

   a. Another condition of the MAS Recovery Plan will be the strengthening of key control and operational systems; and

   b. These include, inter alia, the creation of a Governance and Ethics Board Committee and the voluntary adoption of the Enhanced IATA Operational Safety Audit ("Enhanced IOSA").

6. **Review, and where appropriate, renegotiate supply contracts**

   a. It is intended that NewCo will honour all properly benchmarked contracts under OldCo; and

   b. The migration to NewCo will nonetheless give New MAS the opportunity to reset and renegotiate supply and other contracts based on market norms and benchmarks.

## C. Leadership and Human Capital

7. **Strengthen Leadership**

   a. The transition period between OldCo and NewCo over the next 10 months to 1 July 2015 will see significant changes to leadership that will be executed in an orderly fashion;

   b. The Board of OldCo will also continue over the same period until further notice; and

11

    c.  The search process involves reviewing both local Malaysian leadership talent, as well as from global aviation industry executives. The final decision on the CEO of NewCo will be made in consultation with the Special Shareholder, the Minister of Finance, Incorporated.

**8.  Right-size the workforce to an estimated 14,000 employees at NewCo**

    a.  It is a critical requirement that NewCo starts on the right footing in terms of its staff size and work practices;

    b.  It is estimated that NewCo will require a workforce of approximately 14,000;

    c.  This is a net reduction of 6,000 (or 30%) from the approximately 20,000 employees currently at OldCo; and

    d.  Khazanah is nonetheless committed to ensuring that the process of transfer, migration, and separation is conducted with utmost care, fairness and due process.

**9.  Strengthen industrial relations and internal alignment**

    a.  A critical component of the MAS Recovery Plan involves significantly improved industrial relations; and

    b.  New measures and practices, including an enhanced Employee Consultative Panel ("ECP") to better align staff, unions, and management, are critical conditions of the MAS Recovery Plan.

**10.  Reskilling, job creation, and redeployment**

    a.  Khazanah will invest in a Corporate Reskilling Centre ("CRC"), to be located in the Subang area, to specifically address the reskilling of appropriate MAS staff who do not migrate to NewCo; and

    b.  Khazanah envisages that this will involve a reskilling and redeployment programme and the active creation of new jobs.

## D. Regulatory and Enabling Environment

**11.  Appropriate Government support on key initiatives**

    a.  Subject to Parliamentary approval, the enactment of appropriate enabling legislation including a standalone Act specific to MAS, with a finite period, to facilitate the restructuring in a comprehensive and timely manner; and

    b.  The establishment of an Aviation Commission.

**12.  Continuous communication and stakeholder engagement**

    a.  Regular communications and engagement with key external stakeholders; and

    b.  Periodic public accountability briefings.

## Closing ranks: the restructuring will require a new national compact and collective action

Given the nature of the challenge and scope of the restructuring, MAS cannot do this alone. Success will require the nation to close ranks, and that each stakeholder honours a set of specific responsibilities. Continuing a blame culture of finger-pointing across multiple players or a narrow entitlement culture will be both useless and irresponsible, especially at this time. We envisage the objectives of each partner in this noble collective action to be as follows:

▶ **MAS management** to lead the airline to return to profitability by the end of 2017, and to demonstrate sustained profitability and financial self-sufficiency by 2020;

▶ **MAS employees and unions** to continue to perform their jobs at the highest levels, while supporting the restructuring;

▶ **Khazanah** to develop and drive the overall enabling the MAS Recovery Plan, monitor progress, prepare an enabling environment and provide progressive, contingent funding;

▶ **The Government of Malaysia** to accelerate progress on legal and regulatory enablers (including establishing an Aviation Commission);

▶ **Suppliers, contractors, and financiers** to deliver services and terms consistent with market norms; and

▶ **The *Rakyat*** to provide appropriate support for the airline during the restructuring.

13

The success of this plan will depend on thorough individual and collective action, as well as on execution by each and every stakeholder — if any one fails, the whole plan will fail. While this is an outcome that the Government and Khazanah are determined to avoid, it is one that they could ultimately, reluctantly have to accept. It would be irresponsible to commit the *Rakyat* to further supporting MAS if it is not on a clear path to sustainable profitability and self-sufficiency.

## The restructuring will be staged across five years with clear milestones

**By the end of 2014,** Khazanah will have completed the delisting, taking complete ownership of MAS, and MAS will have launched key performance improvement initiatives.

**By 1 July 2015,** MAS will complete migration to the new legal entity — the New MAS. The new CEO and management team will have taken on the leadership mantle.

**By the end of 2017**, the New MAS is targeted to return to profitability.

**By 2020,** Khazanah hopes to have the option of relisting (or selling) MAS for a positive return, and for the New MAS@2020 to be an unequivocal source of pride for Malaysia.

## The migration to New MAS and New MAS@2020 begins today

Today, 29 August 2014, two days before the 57th anniversary of Merdeka, we embark on this noble and solemn duty to revive our national icon. We are humbled to be tasked with this most challenging and important endeavour, and we ask all Malaysians and friends of Malaysia, and the Malaysia Airlines family around the world to join us in undertaking this journey to recovery. Thank you for your great support and indeed for your previous, current and future contributions, and indeed constructive criticism.  May we be rightly guided by the Almighty in this endeavour. The MAS Recovery Plan has a five year horizon that will take us to 31 December 2019, indeed on the eve of when New MAS@2020 will be rebuilt as a National Icon, InsyaAllah.

# The Context: Challenges and Strengths

In spite of various intense efforts, MAS has been unable to establish itself as a sustainably profitable, financially self-sufficient airline. It has seen RM8.4 billion[7] in cumulative net adjusted losses from 2001 to June 2014. A total of RM17.4 billion has been funded by the Government during a similar time period.

At its core, today's challenge is that unit operating costs (passenger costs per available seat-kilometre) have remained persistently higher than unit revenue (revenue per available seat-kilometre). The tragic events of MH370 and MH17 have exacerbated these difficulties. On its current course, investment analysts estimate that MAS could lose between RM3.0 and RM4.5 billion between 2014 and 2016, and run out of cash before the end of 2015.

## EXHIBIT 1

**MAS has, in the last 14 years, faced financial difficulties which required funding support**



1  Penerbangan Malaysia Berhad ("PMB") became MAS' parent company with 69.4% of MAS shares, in exchange for assuming the airline's aircraft assets and aircraft related liabilities in 2002. KNB acquired PMB from the Ministry of Finance in 2004
2  Based on published annual reports
3  Redeemable Convertible Preference Shares ("RCPS")
4  From 2002 until 2013, PMB accumulated RM2.8b in net accounting losses

**Source**: Analysis using Airlineanayst.com, OAG, company annual reports and OANDA exchange rates
*If adjusted for derivative losses in 2008 due to FRS139, this leads to a loss after tax of RM3.6b

15

Every ringgit spent on MAS either takes spending away from other national priorities or affects the country's fiscal position. Based on Khazanah's analysis, the RM17.4 billion that MAS has cost the Government could have funded the operation of 1,700 Trust Schools or linked over 200,000 rural households to running water and electricity.

The Government cannot continue to financially support the airline without a clear path to sustainable profitability and financial self-sufficiency, despite MAS' importance to the broader economy.

## MAS' problems result from business model and execution challenges

MAS' financial difficulties are a direct reflection of a business model that has not adapted to an increasingly difficult market environment, for example:

▶ Revenue performance trails that of its FSC competitors;

▶ The cost gap to LCCs is greater than the revenue premium; and

▶ Workforce productivity lags the competition, at only 50% that of its FSC competitors.

This is further illustrated on the following page.

## EXHIBIT 2

MAS has a revenue disadvantage to its FSC peers, which eliminates its slight cost advantage

OUTSIDE-IN ESTIMATES



MAS has a significant cost disadvantage to its LCC competition, which its revenue premium fails to cover



**1**  Yield adjusted for load factor differences or RASK = passenger revenue per available seat-kilometre, assuming cargo business is breakeven only

**2**  CASK = passenger operating cost per available seat-kilometre, assuming cargo business is breakeven only

**Source**: Analysis using Airlineanalyst.com, OAG, company annual reports and OANDA exchange rates

## The airline industry is notoriously difficult and the Malaysian market is particularly competitive

### EXHIBIT 3



**Airlines consistently lose money…**

**Economic profit,** USD billions

Average = -13.0b



**…and are the most financially fragile part of the overall aviation "value chain"**

**Average economic profit over 8 year cycle[1],** USD billions, 2004-2011

1   Based on invested capital excluding goodwill, extrapolated to total industry
2   Sample too small to give meaningful estimate
3   Economic profit for airport sector extrapolated based on weighted average of sample excluding AENA. AENA subsequently added back to sector estimate

**Source**: *Profitability and the air transport value chain*, IATA, 2013

MAS has little margin for error. The overall airline industry is extremely challenging, having experienced a total of USD390 billion in global losses over the last 30 years (an average of USD13 billion a year[8]). This challenge is compounded by a particularly competitive market in Malaysia, with between three and six carriers on most major routes. Airline capacity in the Malaysian market is growing at 10% a year[9]. While this increase has certainly induced more passengers to fly, demand is not growing as fast (8% a year[10]). As a result, fares are expected to decline by 8% over the next five years[11].

8   *Profitability and the air transport value chain*, IATA, 2013. Economic loss/ profit is the difference between revenue and the opportunity cost of the inputs used. Opportunity costs are the alternative returns foregone (with the weighted average cost of capital used as a proxy)
9   Based on composite analysis using data from Economist Intelligence Unit (EIU), FlightGlobal ACAS database, ICAOdata.com, Malaysia Airports Holdings Berhad (MAHB), OAG
10  Ibid
11  Using yield as a proxy for fares, where yield denotes revenue per passenger-kilometre, where one passenger-kilometre equals one passenger traveling one kilometre

LCCs, Middle East carriers, and other FSCs are looking to continue their aggressive expansion (together buying hundreds of new aircraft). LCCs are also improving their product, effectively encroaching on traditional FSC "turf" — supplementing their new aircraft with flat seats, wi-fi connectivity, and more.

**EXHIBIT 4**

**The Malaysian market is especially competitive**



| Airlines are rapidly adding seats to the Malaysian market | Supply is growing faster than demand, forcing fares down |
|---|---|
| Capacity to/from Malaysia¹ — Seats, millions | Capacity vs. demand growth to/ from Malaysia¹ — Indexed |

1  Capacity growth derived based on current airline orders allocated based off of historical pattern, public announcements, and assumed growth
2  Fare index is based off of change in yield

**Source**: Analysis based on data from EIU, FlightGlobal ACAS database, ICAOdata.com, Malaysia Airports Holdings Berhad, OAG

## Despite its challenges, MAS can draw on several distinctive strengths

Despite its challenges, MAS has, at its core, some distinct strengths:

▶ World-renowned pilots and cabin crew, distinctively warm service, and a high-quality premium product (including signature cuisine), with industry awards to prove it. Skytrax[12] recognised the airline for having the world's best cabin crew in seven of 12 years between 2001 and 2012. The World Travel Awards judged MAS to be "Asia's Leading Airline" and the "World's Leading Airline to Asia" in 2010 and 2011, and again as "Asia's Leading Airline" in 2013;

▶ A large pool of skilled workers available at competitive wages. On average, Malaysia's salary and wage costs for engineers, service professionals, and accountants are lower than in the home markets of most of MAS' main competitors (e.g., Thailand, Singapore, Hong Kong, Qatar, and UAE)[13];

▶ A relatively modern and efficient fleet, with an average age of 4.2 years (compared with 7.1 for Singapore Airlines and 9.3 for Cathay Pacific)[14];

▶ High-quality engineering services, used extensively by the rest of the industry, having provided maintenance services to more than 100 global customers; and

▶ The natural endowment of a home base in one of the world's largest tourism markets, and arguably one of the most economically dynamic regions in the world. By 2025, more than half of the world's consuming class will live within a six-hour flight of Malaysia[15]. Growth in intra-regional trade — and therefore business travel — is likely to accelerate with the implementation of the ASEAN Economic Community integration plan, which will promote freer movement of skilled labour and capital.

---

13  2013 Gemini Salary Survey, Government sources, Salaryexplorer.com
14  Based on data from FlightGlobal ACAS database
15  Those able to buy goods and services other than those that satisfy their basic needs. Analysis based on data from Comtrade, IHS Economic & Country Risks, World Trade Organisation, Telegeography, World Development Indicators and the World Bank

# The Task:
# A Complete Overhaul

## Despite MAS' difficulties, Malaysia wants and needs a national airline

From its first commercial flight in 1947, MAS has helped integrate the nation, while also connecting Malaysia to the world. Within two decades, the airline had grown from a single aircraft into a company with 2,400 employees operating the latest aircraft. By 1972, MAS was flying to more than 34 regional and six international destinations. By the end of the 1990s, the MAS network included 68 international destinations including London, Sydney, Los Angeles, Honolulu and Buenos Aires. Today, MAS flies to 30 Malaysian destinations, and connects Malaysia to some 850 destinations in 150 countries as a member of the **one**world alliance. Its MASWings subsidiary provides rural connectivity, flying to 22 destinations in Sabah and Sarawak.

But the MAS story is more than one of growth. It is one of product and service excellence, presenting the face of Malaysia to the world, and bringing the world to Malaysia — an embassy on wings. It is how people from across the globe have been introduced to Malaysian hospitality, and it has helped millions of international tourists and business people take advantage of Malaysia's natural beauty, rich culture, and dynamic economy.

MAS plays a crucial role in Malaysia's development, and in driving it toward its goal of becoming a high-income nation. It contributes an estimated RM6.9 billion to Malaysia's GDP[16]. For every person employed by the company, another four jobs are supported elsewhere in the economy[17].The aviation industry has one of the highest economic multipliers of any sector — 12x , versus the typical 1-3x of most other industries[17].

---

**16** *Malaysia Airlines contribution to the Malaysian economy*, Oxford Economics, 2014
**17** Bain & Company study commissioned in 2005

## EXHIBIT 5

**MAS plays a major role in the Malaysian economy, contributing RM6.9b in direct, indirect and induced GDP impact (0.7% of total GDP)**



Source: *Malaysia Airlines contribution to the Malaysian economy*, Oxford Economics, 2014

## The Government is determined to rebuild the airline, and has set clear parameters for this restructuring

MAS' unique combination of attributes — as national icon, economic enabler, domestic bond, and link to the world — makes the success of the national airline an imperative for the Government.

After careful consideration, the Government has also laid down clear parameters for the restructuring effort:

▶ MAS will adopt a principally commercial model as the best antidote against inefficiency and the best guarantee for sustainability. The Government will expect MAS to achieve profitability by the end of 2017;

▶ MAS will undergo a complete overhaul, involving the creation of a new legal entity, coupled with a complete transformation of MAS' corporate structure, financial position, operating performance, and human capital management.

# The MAS Recovery Plan:
# 12 Distinctive Features

Since 2001, MAS has also seen four, ultimately unsuccessful, restructuring efforts. Though some have provided temporary relief to the business, none were able to achieve the comprehensive changes that MAS required to be consistently profitable and competitive. Previous "piecemeal changes" involved MAS cancelling unprofitable routes and selling non-core assets, but these ultimately failed to resolve the core challenge: an inflated cost structure without the revenue to offset it.

Full ownership by Khazanah will enable the complete overhaul called for by the Government — i.e., transformation of MAS' corporate structure, financial position, operating performance, and human capital management.

In contrast to private ownership, typically focused only on financial outcomes, the Khazanah approach to rebuilding MAS will be guided by the principles of transparency, fairness, and compassion.

Listed below are the defining features of this complete overhaul. In no previous restructuring attempt were all 12 actions implemented, or even, attempted together.

23

## EXHIBIT 6

### 12 key elements in four categories

**GOVERNANCE AND FINANCIAL FRAMEWORK**


**Creation of a new legal entity to house New MAS, delist and relist**

- Delist MAS by the end of 2014. This process has already commenced with the delisting announcement on 8 August 2014;
- Migrate the relevant operations, assets and liabilities of OldCo to New MAS by 1 July 2015;
- New MAS will critically involve a significantly corrected cost and operational structure and workforce, properly benchmarked to competitive industry practices and norms;
- New MAS is targeted to return to profitability within three years of delisting, and to relist within 3-5 years, that is, between the end of 2017 and the end of 2019; and
- If such financial conditions are met, Khazanah will consider a sell-down or partial sell-down of its stake to appropriate strategic buyers from the private sector.

**Funding of up to RM6 billion on a strict conditional basis, and reduction of net gearing to approximately 120%**

- Total restructuring and investment funding of up to RM6 billion to be disbursed on a staggered basis, subject to fulfilment of strict restructuring conditions; and
- Reduce net gearing (net debt over shareholders' funds) from the current 290% to a target range of 100-125% through, inter alia, debt to equity swaps.


**Consolidate core operations and the corporate headquarters at KLIA**

- MAS is currently an exception among airlines in having its HQ and operations away from its principal home airport;
- One of the conditions of the MAS Recovery Plan is for MAS to move its HQ and principal operations from Subang to KLIA; and
- This will allow MAS to consolidate its operations, improve working conditions and signify a new beginning under New MAS.

**OPERATING BUSINESS MODEL**


**Reset the operating business model through a more regionally-focused network, lower cost structure, and greater focus on revenue yield management**

- MAS (both OldCo and subsequently NewCo), as the operating airline entity, will continue to rationalise the network. The network will be principally regionally-focused, with strong global connectivity through the **one**world alliance and other partners;
- The migration to NewCo, with strong funding conditionality imposed, is envisaged to result in a lower cost structure based on work practices benchmarked to competitive industry standards, and further savings from improved supply contracts and labour practices; and
- A renewed focus on revenue yield management.


**Strengthen assurance, integrity and safety functions**

Another condition of the MAS Recovery Plan will be the strengthening of key control and operational systems. These include, inter alia:
- The creation of a Governance and Ethics Board Committee; and
- The voluntary adoption of the Enhanced IATA Operational Safety Audit.

**REGULATORY AND ENABLING ENVIRONMENT**


**Continuous communication and stakeholder engagement**

- Regular communications and engagement with key external stakeholders; and
- Periodic public account-ability briefings.


**Appropriate Government support on key initiatives**

- Subject to Parliamentary approval, the enactment of appropriate enabling legislation including a standalone Act specific to MAS, with a finite period, to facilitate the restructuring in a comprehensive and timely manner; and
- The establishment of an Aviation Commission.


**Review and, where appropriate, renegotiate supply contracts**

- It is intended that New MAS will honour all properly benchmarked contracts under OldCo; and
- The migration to NewCo will nonetheless give New MAS the opportunity to reset and renegotiate supply and other contracts based on market norms and benchmarks.

**LEADERSHIP AND HUMAN CAPITAL**


**Reskilling, job creation, and redeployment**

- Khazanah will invest in a Corporate Reskilling Centre, to be located in the Subang area, to specifically address the reskilling of appropriate MAS staff who do not migrate to NewCo; and
- Khazanah envisages that this will involve a reskilling and redeployment programme and the active creation of new jobs.


**Right-size the workforce to an estimated 14,000 employees at NewCo**

- It is a critical requirement that NewCo starts on the right footing in terms of its staff size and work practices;
- It is estimated that NewCo will require a workforce of approximately 14,000;
- This is a net reduction of 6,000 (or 30%) from the approximately 20,000 employees currently at OldCo and;
- Khazanah is nonetheless committed to ensuring that the process of transfer, migration, and separation is conducted with utmost care, fairness and due process.

**Strengthen industrial relations and internal alignment**

- A critical component of the MAS Recovery Plan involves significantly improved industrial relations; and
- New measures and practices, including an enhanced Employee Consultative Panel to better align staff, unions, and management, are critical conditions of the MAS Recovery Plan.


**Strengthen leadership**

- The transition period between OldCo and NewCo over the next 10 months to 1 July 2015 will see significant changes to leadership that will be executed in an orderly fashion;
- The Board of OldCo will also continue over the same period, until further notice; and
- Strengthen the Board, top management, and especially middle management – the top 500, of NewCo. This will involve significant infusion of globally-sourced aviation specialists, while leveraging the best talent in Malaysia and at MAS.

**Source :** Khazanah

Further detail on the 12 distinguishing features is provided below:

## A. Governance and Financial Framework

## 1. Creation of a new legal entity to house NewCo, delist and relist

Currently, MAS is jointly owned by Khazanah (69.4%) and a fragmented group of minority-interest shareholders (30.6%). Delisting the OldCo with Khazanah taking 100% ownership is a necessary first step for the complete overhaul, for the following reasons:

▶ It will protect minority shareholders from execution risk, placing responsibility squarely on the shoulders of MAS, Khazanah, and the Government; and

▶ Delisting will allow Khazanah and MAS to make the necessary hard decisions quickly and effectively.

The delisting process is targeted to be completed by the end of 2014. A new legal entity will be created — a "NewCo" into which the relevant operations, assets, and liabilities of OldCo would migrate by 1 July 2015. NewCo will critically involve a significantly corrected cost and operational structure and workforce, properly benchmarked to competitive industry practices and norms. NewCo will also enable the airline to function as a commercial enterprise. Creating NewCo will serve both practical (e.g., reset of work rules) and symbolic (transition from old to new) purposes.

The new business model, outlined in the section below, is designed to achieve profitability by the end of 2017, and potentially relist by 2020. If these conditions are met, Khazanah will consider a sell-down or partial sell-down of its stake to appropriate strategic buyers from the private sector.

## 2. Funding of up to RM6 billion on a strict conditional basis, and reduction of net gearing to approximately 120%

The Government and Khazanah recognise that MAS will not be able to achieve this complete overhaul without significant funding support. An amount up to RM6 billion will be made available over the next three years.

This funding will be disbursed on a staggered basis, subject to fulfilment of strict restructuring conditions.

As a capital-intensive enterprise, MAS will also need to put in place a capital structure that is easy to manage over time. Where appropriate and necessary, MAS will examine options for financial restructuring and negotiation — including debt-equity swaps and debt term-outs. These efforts will reduce net gearing (net debt over shareholders' funds) from the current 290% to a target range of 100-125%.

### B. Operating Business Model

## 3. Reset the operating business model through a more regionally-focused network, lower cost structure, and greater focus on revenue yield management

MAS has a very constrained "solution space" in order to become a profitable, financially self-sufficient airline with a sustainable competitive advantage. The New MAS business model gives MAS Management a set of firm guidelines that it can use to create a detailed and actionable business plan. Key areas include:

▶ **Reset to a competitive cost position.** Bring short-haul costs within 15% of the LCC competition, at parity with Middle-East FSCs, and below those of the regional FSC competition. Cost-competitiveness is the foundation upon which the rest of the business will be built.

Resetting the cost structure is particularly important given the Malaysian market context, especially for short-haul travel. The importance of price-sensitive leisure travellers is growing (they make up the majority of MAS' current customer base). There is increasing emphasis on the short-haul business traveller's preference for efficiency and convenience versus a premium product, and MAS' premium advantages are eroding as LCCs move upmarket (e.g., LCCs moving to the state-of-the-art new terminal at klia2 and bringing new aircraft on line).

MAS can draw on a range of initiatives to help it achieve its target cost structure, including, but not limited to: increasing seat capacity, raising utilisation of short-haul aircraft, redesigning the short-haul product and service model, reducing fuel costs, improving labour productivity, and increasing direct sales.

▶ **Focus the network on where MAS can win.** The New MAS will apply principally commercial criteria to its route decisions; only flying profitable routes while securing global connectivity through **one**world and other alliances. It will focus and build scale on routes which have a high proportion of customers for whom Malaysia is primarily an origin or destination (versus a transit point), i.e., the ASEAN region; and improve the design and scheduling of its hub to increase operational efficiency and network connectivity. MAS will also re-configure its fleet to better fit MAS' network and markets, which could include moving to smaller aircraft, retiring specific aircraft types, and/ or adding seats to aircraft to reduce unit costs.

▶ **A renewed focus on revenue management to increase unit revenue by 10-15%.** MAS has a significant revenue disadvantage to its full-service peers. It can close this revenue performance gap through improved pricing and revenue management capabilities, marketing and sales force excellence, and other initiatives (e.g., a revamped loyalty programme, unbundling ancillary products and services). While they will not improve performance in isolation, these initiatives represent the most immediate cash-generation opportunity and are also critical to the long-term sustainability of the business.

## 4. Consolidate core operations and the corporate headquarters at KLIA

MAS will streamline its operations, break down siloes, and bring management closer to the front line by consolidating its operations at KLIA. This will entail relocating its corporate headquarters from Subang, and placing them under the same roof as the core airport, aircraft, and flight functions. Firefly would continue to run its turboprop related operations out of Sultan Abdul Aziz Shah Airport in Subang.

## 5. Strengthen assurance, integrity and safety functions

Another condition of the MAS Recovery Plan will be the strengthening of key control and operational systems. These include, inter alia:

- ▶ The creation of a Governance and Ethics Board Committee; and
- ▶ The voluntary adoption of the Enhanced IOSA.

## 6. Review and, where appropriate, renegotiate supply contracts

It is intended that NewCo will honour all properly benchmarked contracts under OldCo. The migration to NewCo will nonetheless give it the opportunity to reset and renegotiate supply and other contracts based on market norms and benchmarks.

### C. Leadership and Human Capital

## 7. Strengthen Leadership

The transition period between OldCo and NewCo over the next 10 months, to 1 July 2015, will see significant changes to leadership that will be executed in an orderly fashion. The Board of OldCo will also continue over the same period, until further notice. Khazanah will strengthen the NewCo Board, top management, and especially middle management — the top 500. This will involve significant infusion of globally-sourced aviation specialists, while leveraging the best talent in Malaysia and at MAS. The final decision on the CEO of NewCo will be made in consultation with the Special Shareholder, the Minister of Finance, Incorporated.

# 8. Right-size the workforce to an estimated 14,000 employees at NewCo

It is a critical requirement that NewCo starts on the right footing in terms of its staff size and work practices. It is estimated that NewCo will require a workforce of approximately 14,000. This represents a net reduction of 6,000 (or 30%) from the approximately 20,000 employees currently at OldCo (See Exhibit 7 and 8). Khazanah is committed to ensuring that this process of transfer, migration, and separation is conducted with utmost care, fairness, and due process.

Every effort will be made to retain high-performers in key positions, with tailored retention packages developed for these employees.

## EXHIBIT 7

**MAS lags the industry in terms of workforce productivity**



**1** Available Seat Kilometre
**2** In addition to labour productivity, comparison will also be impacted by network shape and size, level of premium traffic, and services in-house vs. outsourced
**Source**: Company annual reports, OAG, IATA WATS

## EXHIBIT 8

High level industry benchmarks from a sample of global airlines suggest that the MAS workforce could be reduced by approximately 30%



Employees per aircraft
Number of FTE

1  Does not include MAS Kargo, MASWings, Firefly, 2014 numbers

**Note :**  High level benchmark does not account for differences in airline operating model which can drive differences in headcount

**Source**: OAG, FlightGlobal ACAS database, company annual reports, company websites

## 9. Strengthen industrial relations and internal alignment

A critical component of the MAS Recovery Plan involves significantly improved industrial relations. MAS will achieve this through increased dialogue and collaboration between management and the unions on critical issues (e.g., the reconfiguration of work rules). The consolidation of operations at KLIA will help foster this closer collaboration.

An Employee Consultative Panel ("ECP") will work with the MAS Board to address employee-related concerns and align the mind-sets of MAS staff with the new business model and recovery plan. The ECP is designed to enable a genuine exchange of views and ideas between the CEO, management, and staff, allowing all parties to take ownership of the right-sizing process and productivity improvement initiative.

## 10. Reskilling, job creation, and redeployment

MAS and Khazanah are committed to helping each exiting employee — minimising the negative impact to their livelihoods and quality of life. In addition to appropriate financial compensation, Khazanah is also undertaking an active programme of sourcing positions from its business partners and the creation of new jobs.

Khazanah will invest in a Corporate Reskilling Centre ("CRC"), to be located in the Subang area, to specifically address the reskilling of appropriate MAS staff who do not migrate to NewCo.

### D. Regulatory and Enabling Environment

## 11. Appropriate Government support on key initiatives

The Government is wholeheartedly committed to the restructuring and is prepared to support key areas, including:

- ▶ The enactment of a standalone Act specific to MAS, with a finite period — the "MAS Act" — to facilitate the restructuring in a comprehensive, timely and holistic manner;
- ▶ The establishment of an Aviation Commission with regulatory capabilities to develop the aviation industry, which, in Khazanah's view, would benefit consumers and industry players. An Aviation Commission, when established, would bring Malaysia in line with international best practices, found in countries such as Australia, Ireland, the UK and the U.S., where their key features include some of the following:

– Promoting the development of the sector through a more regulated structure, where growth of tourism and business is appropriately balanced;

– Protecting consumers through transparent, easily comprehensible reporting of fares, service levels, and passenger rights;

– Arbitrating disputes between industry players; and

– Managing developmental air routes (i.e., those that are not commercially viable) through a competitive bidding process similar to the "Essential Air Services" programme in the U.S. or similar arrangements in China and Indonesia.

## 12. Continuous communication and stakeholder engagement

Given the scale and scope of the restructuring, it will be critical for MAS to have the right enablers in place — primarily in the form of public support and engagement. As a result, MAS will be proactive in communicating to its stakeholders through means including, but not limited to, public accountability sessions, detailed reports (e.g., releasing an annual report despite delisting), and continuous engagement with the press and public.

# Closing Ranks:
# A National Compact

## Success will require commitment to a national compact

The challenge facing MAS is daunting, and the deep, comprehensive nature of the restructuring means that MAS cannot do it alone. Success will require that the nation closes ranks, a commitment to a fair and even-handed approach, and that each stakeholder honours a set of specific responsibilities.

Should this national compact hold, MAS will have a fighting chance.  Conversely, if any one fails, the whole plan fails.  We envisage the responsibility of each stakeholder to be as follows:

### MAS management: Develop and deliver an operational plan that leads to a successful new Malaysia Airlines

▶ Develop a detailed operational restructuring plan (approved by Khazanah) and regularly report on progress relative to the plan;

▶ Implement a new business model and return to profitability by the end of 2017. Key operational targets will include:

  – Achieving a cost advantage versus Asian FSCs[18] , cost parity with Middle East FSCs[19], and short-haul costs within 15% of the LCC competition; and

  – Improving unit revenue by 10-15%, with an advantage over FSCs in comparable markets.

▶ Implement a right-sizing exercise that brings the workforce in line with industry standards for successful airlines — approximately 14,000 people, via a professional, transparent, fair and compassionate process;

▶ Reset work rules, processes, and employment terms to industry standards, following independent review;

▶ Upgrade the top 500 leadership with global aviation specialists while leveraging the best talent in Malaysia and MAS;

▶ Renegotiate contracts with suppliers, lessors and creditors to industry benchmarks;

▶ Strengthen integrity including the set-up of a Governance and Ethics Board Committee;

▶ Improve internal alignment, including through increased dialogue and collaboration with unions, and by setting up an Employee Consultative Panel ("ECP"); and

▶ Consolidate core operations and the corporate headquarters at KLIA.

---

**18**  Specifically: Cathay Pacific, Garuda Indonesia, Singapore Airlines, Thai Airways
**19**  Specifically: Emirates Airline, Etihad Airways, Qatar Airways

## MAS employees and unions: Continue to perform their jobs at the highest levels, while supporting the restructuring

▶ Continue to perform their jobs with the highest levels of professionalism and service quality;

▶ Collaborate with MAS management on the review and reset of work rules, processes, and employment terms, helping reset them to industry standards;

▶ Commit to the new business model and stay the course through the restructuring; and

▶ Actively participate in the ECP to ensure that their voice is heard on major decisions.

## Khazanah: Develop and drive the overall enabling recovery plan, monitor progress, prepare an enabling environment, and provide progressive, contingent funding

▶ Delist MAS, and then relist, sell or enter a strategic partnership once MAS has established sustainable profitability and financial self-sufficiency;

▶ Appoint new Board members and a top management leadership bench with an optimal mix of turnaround, functional, and aviation industry experience, following a global search;

▶ Actively guide the overall restructuring plan, setting high-level objectives and transaction parameters;

▶ Provide contingent funding: Capital injection of up to RM6 billion to support the recovery plan; and

▶ Facilitate the appropriate transition for exiting MAS staff through a mix of placement in pre-identified jobs, reskilling and deployment, new job creation, start-up assistance, and retirement.

## The Government: Maintain resolve in support of the restructuring

▶ Allow MAS to operate on a principally commercial business model;

▶ Support the enactment of a standalone Act specific to MAS;

▶ Support the establishment of the Aviation Commission to promote a fair and progressive industry playing field;

▶ Provide the specific approvals required for the restructuring, including the transfer of operating licenses and the preservation of tax status; and

▶ Transfer of MAS' Subang headquarters land from the Federal Land Commissioner to Khazanah or MAS as trustee to be used for a one-stop centre for reskilling, redeployment, start-up assistance, and retirement planning.

33

### Suppliers, contractors, and financiers: Deliver services and terms consistent with market norms

▶ Reset contracts, where appropriate, to service levels and terms in line with market norms and industry standards.

### The *Rakyat*: Provide appropriate support for the airline during the restructuring

▶ Offer sustained support for the complete overhaul; and

▶ Continue to fly MAS.

## Despite the comprehensiveness of the plan, success is not assured

The plan outlined in this document is just that — a plan. Success will depend on thorough individual and collective action, as well as on execution by each and every stakeholder — if any one fails, the whole plan will fail. While this is an outcome that the Government and Khazanah are determined to avoid, it is one that they could ultimately, reluctantly have to accept. It would be irresponsible to commit the *Rakyat* to further supporting MAS if it is not on a clear path to sustainable profitability and self-sufficiency.

## The restructuring will be staged across five years, with clear milestones along the way

The overhaul is anticipated to span five years.

### EXHIBIT 9

**The overhaul will span five years, with clear milestones along the way**



**Source :** Khazanah

**By the end of 2014**, Khazanah plans to delist MAS. While the OldCo continues to operate the airline, the NewCo will be set up as a new legal entity. A Business and Operational Turnaround Plan will be developed and core restructuring initiatives will be launched (e.g., defining network changes, reconfiguring work rules and processes, and building commercial capabilities).

**By 1 July 2015**, MAS will formally migrate relevant operations, liabilities and assets to the NewCo and phase out OldCo. The leadership team of the New MAS will then drive core restructuring initiatives.

**By the end of 2017,** the New MAS is targeted to achieve profitability.

**By 2020,** MAS should have established a clear competitive advantage, achieved sustainable profitability and financial self-sufficiency, and earned recognition as an industry leader. It should be in position for a relisting, sale, or strategic partnership that generates a positive return for the *Rakyat* (i.e., allows the Government to at least cover the cost of the planned funding support).

35

## Governance during the migration to the New MAS

The governance has been designed to keep the airline operating, while restructuring and migrating to the New MAS.

1. Khazanah will create the enabling environment, and provide contingent funding;

2. The MAS leadership team will continue to run the current business;

3. The Board Restructuring Committee, reporting to the MAS Board, will be responsible for developing the Business and Operational Turnaround Plan, driving restructuring initiatives, setting up the New MAS, and migrating the current MAS to the New MAS; and

4. The leadership of the New MAS will complete the restructuring and running of the airline with a new business model.

# The Future:
# MAS@2020

Today, 29 August 2014, two days before the 57th anniversary of Merdeka, we embark on this noble and solemn duty to revive our national icon. We are humbled to be tasked with this most challenging and important endeavour, and we ask all Malaysians and friends of Malaysia, and the Malaysia Airlines family around the world to join us in undertaking this journey to recovery. Thank you for your great support and indeed for your previous, current and future contributions, and indeed constructive criticism. May we be rightly guided by the Almighty in this endeavour. The MAS Recovery Plan has a five year horizon that will take us to 31 December 2019, indeed on the eve of when New MAS @2020 will be rebuilt as a National Icon, InsyaAllah.

# Glossary

| | |
|---|---|
| AENA | Aeropuertos Españoles y Navegación Aérea |
| ASEAN | Association of Southeast Asian Nations |
| BTP1: | Business Turnaround Plan 1, that MAS used to restructure in 2006 |
| BTP2: | Business Transformation Plan 2, that MAS used as a follow-on to build off the success of BTP 1 in 2008 |
| CASK: | Cost per Available Seat-Kilometre is a common airline metric that gives the average unit cost for an airline |
| CEO: | Chief Executive Officer |
| ECP: | Employee Consultative Panel |
| Enhanced IOSA: | Enhanced IATA Operational Safety Audit |
| EIU: | Economist Intelligence Unit |
| FBMKLCI: | FTSE Bursa Malaysia Kuala Lumpur Composite Index |
| Firefly: | A MAS subsidiary that offers full service point to point service  primarily from Subang to points in Malaysia, Indonesia, Singapore, and Thailand with turboprop aircraft |
| FSC: | Full Service Carriers are airlines that offer expanded amenities and services; these include airlines like Malaysia Airlines, Thai Airways, Singapore Airlines, Garuda Indonesia, British Airways, and Qantas |
| G20: | G20 is a selection of large GLCs controlled by Government-Linked Investment Companies under the GLCT Programme. This list originally comprised 20 GLCs. It currently consists of 17 GLCs due to various mergers, demergers and other corporate exercises over the years |
| GDP: | Gross Domestic Product |
| GLC: | Government-Linked Company |
| GLCT: | Government-Linked Companies Transformation programme |
| HQ: | Headquarters for MAS; currently at Subang |
| IATA: | International Air Transport Association |
| ICAO: | International Civil Aviation Organization |
| IOSA: | IATA Operational Safety Audit |
| Khazanah: | Khazanah Nasional Berhad |
| KLIA: | Kuala Lumpur International Airport |
| LCC: | Low-Cost Carrier |
| MAS: | Malaysian Airline System Berhad |
| MH: | Airline code for Malaysia Airlines |
| MH17: | Malaysia Airlines flight #17 that was brought down over Ukraine  on 17 July 2014 while en route from Amsterdam to Kuala Lumpur |
| MH370: | Malaysia Airlines flight #370 that lost contact on 8 March 2014 while en route from Kuala Lumpur to Beijing |

**NewCo:** New holding company that will assume the MAS business including its assets and liabilities

**NWA:** Net Worth Adjusted

**OAG:** Official Airline Guide

**OANDA:** Financial Services provider of currency conversion, online retail foreign exchange trading, online foreign currency transfers, and forex information

**OldCo:** The exisiting MAS legal entity

**one**world: Global airline alliance that Malaysia Airlines is a member of along with other international airlines including American Airlines, British Airways, Cathay Pacific, Finnair, Iberia, JAL, LAN, Qantas, Royal Jordanian, S7, and TAM

**PMB:** Penerbangan Malaysia Berhad, a wholly owned subsidiary of Khazanah engaged in the acquisition, sale and lease of aircraft and aircraft engines, and investment holding

*Rakyat:* Citizens of Malaysia

**RASK:** Revenue per Available Seat-Kilometre is a common airline metric that gives the average unit revenue for an airline

**RCPS** Redeemable Convertible Preference Shares

**RM:** Ringgit Malaysia

**SARS:** Severe Acute Respiratory Syndrome

**Skytrax:** A UK based consultancy which runs reviews and ranking sites for airlines and airports

**Sukuk:** Islamic financial instrument similar to a bond

**UAE:** United Arab Emirates

**WAU:** Widespread Asset Unbundling exercise undertaken in 2002

39

## Notes

# EXHIBIT C

# DECLARATION OF

# RIZANI BIN HASSAN



# LAWS OF MALAYSIA

## Act 765

**MALAYSIAN AIRLINE SYSTEM BERHAD
(ADMINISTRATION) ACT 2015**

2

| Date of Royal Assent | ... | ... | 30 December 2014 |

Date of publication in the
*Gazette*          ...     ...     ...     5 January 2015

**Publisher's Copyright** Ⓒ
**PERCETAKAN NASIONAL MALAYSIA BERHAD**
All rights reserved. No part of this publication may be reproduced, stored in a retrieval system or transmitted in any form or by any means electronic, mechanical, photocopying, recording and/or otherwise without the prior permission of **Percetakan Nasional Malaysia Berhad (Appointed Printer to the Government of Malaysia).**

# LAWS OF MALAYSIA

## Act 765

## MALAYSIAN AIRLINE SYSTEM BERHAD (ADMINISTRATION) ACT 2015

―――――――――

ARRANGEMENT OF SECTIONS

―――――――――

### PART I

PRELIMINARY

Section

1. Short title and commencement

2. Application

3. Interpretation

### PART II

ADMINISTRATION

4. Placement of the Company, *etc*., under administration

5. Appointment of Administrator

6. Duration of administration

7. Qualifications of Administrator

8. Notification of appointment of Administrator

9. Functions of Administrator

10. Powers of Administrator

11. Effect of appointment of Administrator

12. Moratorium

13. Undue preference

14. Transition services

15. Investigation by Administrator

16. Duties of officers to assist in investigation

### PART III

PROPOSAL OF ADMINISTRATOR AND APPOINTMENT OF INDEPENDENT ADVISOR

17. Administrator may re-negotiate contracts or prepare proposal or both

4 *Laws of Malaysia* **ACT 765**

Section

18. Appointment and qualifications of Independent Advisor

19. Review of proposal by Independent Advisor

20. Decision of the appointer

21. Implementation of proposal

22. Transfer of property or liabilities

PART IV

MALAYSIA AIRLINES BERHAD

23. Incorporation of Malaysia Airlines Berhad

24. Offer of employment

25. Malaysia Airlines Berhad, *etc*., not a successor employer

26. Work rules, code of conduct and regulations

27. Negotiation with trade unions and associations

28. Matters relating to productivity or effective utilization of workforce

PART V

VESTING OF PROPERTY AND LIABILITIES

29. Vesting provisions

30. Replacement vesting order

PART VI

GENERAL

31. Non-application of section 132E of the Companies Act 1965

32. Indemnity for Administrator, *etc*.

33. Immunity

34. Limits on the grant of orders of court

35. Validity of transaction

36. Things done in anticipation of the enactment of this Act

SCHEDULE

# LAWS OF MALAYSIA

## Act 765

## MALAYSIAN AIRLINE SYSTEM BERHAD (ADMINISTRATION) ACT 2015

An Act to provide special laws for the administration of the Malaysian Airline System Berhad, its wholly owned subsidiary companies, and its partially owned subsidiary companies providing goods or carrying out services or both that are essential to the operations of the Malaysian Airline System Berhad and the appointment of an administrator with the powers to administer and manage the Malaysian Airline System Berhad, its wholly owned subsidiary companies, and its partially owned subsidiary companies providing goods or carrying out services or both; to provide for the establishment of a new entity which will replace the Malaysian Airline System Berhad as the national carrier; and to provide for related matters.

[                                    ]

WHEREAS special provisions are required in the public interest to ensure the continuity of the essential air services by the Malaysian Airline System Berhad as the national carrier and the provision of uninterrupted connectivity to and from and within Malaysia by the national carrier:

AND WHEREAS legislation is the only means to expeditiously administer and manage the Malaysian Airline System Berhad, its wholly owned subsidiary companies and its partially owned subsidiary companies providing goods or carrying out services or both that are essential to the operations of the national carrier without disruption to their operations:

AND WHEREAS the establishment of a new entity, that is the Malaysia Airlines Berhad, with a new business model is critical to ensure continuity, profitability and viability, and to assume certain businesses, property, rights, liabilities and affairs of the Malaysian Airline System Berhad:

AND WHEREAS it is in the public interest to ensure the continued existence of a national carrier to facilitate Malaysia's economic development:

AND WHEREAS legislation provides an effective, efficient and seamless means to transition the business, property, rights, liabilities and affairs of the Malaysian Airline System Berhad to the new entity:

**NOW, THEREFORE, IT IS ENACTED** by the Parliament of Malaysia as follows:

Part I

PRELIMINARY

**Short title and commencement**

**1.** (1) This Act may be cited as the Malaysian Airline System Berhad (Administration) Act 2015.

(2) This Act comes into operation on a date to be appointed by the Minister by notification in the *Gazette*.

**Application**

**2.** (1) This Act shall apply—

   *(a)* for a period of five years from the date of the coming into operation of this Act; or

   *(b)* until the listing and quotation of the shares of the Malaysia Airlines Berhad on the official list of Bursa Malaysia Berhad,

whichever is earlier.

(2) Notwithstanding subsection (1), the Minister may, by order published in the *Gazette*, declare an earlier cessation of this Act.

*Malaysian Airline System Berhad (Administration)*      7

(3) Notwithstanding subsection (1), this Act may, by a resolution passed by both Houses of Parliament, be extended for a further period as may be specified in the resolution.

**Interpretation**

**3.** In this Act, unless the context otherwise requires—

"regulatory body" means an authority that is responsible for the enforcement of laws;

"proposal" means the proposal under paragraph 17(1)*(b)*;

"rights" means all rights, powers, privileges and immunities, whether actual, contingent or prospective;

"property" includes all property, movable and immovable, and all interests, easement or rights, whether equitable or legal in, to or out of the property, choses in action, money and goodwill;

"Malaysia Airlines Berhad" means the corporation referred to in section 23;

"Minister" means the Prime Minister of Malaysia;

"officer" has the meaning assigned to it in section 4 and subsection 132(6) of the Companies Act 1965 [*Act 125*];

"appointer" means the person who appoints an Administrator under section 5;

"creditor" includes counterparties in an agreement, contract or arrangement with the Administered Companies;

"Independent Advisor" means the person appointed under section 18;

"Administrator" means the person appointed under section 5;

"Company" means the Malaysian Airline System Berhad;

8 *Laws of Malaysia* ACT **765**

"specified subsidiary companies" means the partially owned subsidiary companies listed in paragraph 4*(c)*;

"Administered Companies" means the Company, its wholly owned subsidiary companies, and the specified subsidiary companies that have been placed under administration under section 4;

"liabilities" includes debts, charges and obligations of every description whether  present or future, actual or contingent, and whether payable or to be observed or performed in Malaysia or elsewhere.

PART II

ADMINISTRATION

**Placement of the Company, *etc.*, under administration**

**4.**  Subject to the prior written approval of the Minister, a member of the Company, or the board of directors of the Company pursuant to a resolution of the board of directors, may place—

*(a)* the Company;

*(b)* any wholly owned subsidiary company of the Company; and

*(c)* the following partially owned subsidiary companies of the Company:

(i) Abacus Distribution Systems (Malaysia) Sdn. Bhd. (Company No. 180535-T);

(ii) Aerokleen Services Sdn. Bhd. (Company No. 277266-X); and

(iii) MAS Awana Services Sdn. Bhd. (Company No. 372384-D),

under administration in accordance with this Act.

*Malaysian Airline System Berhad (Administration)*    9

**Appointment of Administrator**

**5.** (1) The member of the Company or the board of directors of the Company referred to in section 4 shall appoint an Administrator for the Administered Companies.

(2) The appointer may at any time after the appointment of the Administrator under subsection (1) appoint a new Administrator to replace the existing Administrator.

(3) Where the Administrator is released from his appointment, he shall, with effect from such release, be discharged from all duties and liabilities in respect of his administration or in relation to his conduct as the Administrator.

**Duration of administration**

**6.** The administration of the Administered Companies by the Administrator shall commence from the date of appointment of the Administrator under subsection 5(1) and shall continue until the administration is terminated by the appointer.

**Qualifications of Administrator**

**7.** (1) No person shall be appointed as an Administrator unless he—

    *(a)* is a natural person; and

    *(b)* has consented in writing to his appointment.

(2) The following persons shall be qualified to be appointed as an Administrator:

    *(a)* a company auditor approved under the Companies Act 1965; or

    *(b)* a person who is, in the opinion of the appointer, capable of performing the duties of an administrator.

*Laws of Malaysia*

(3) The following persons shall not be qualified to be appointed as an Administrator:

    *(a)* an undischarged bankrupt;

    *(b)* a mortgagee of any property of the Administered Companies;

    *(c)* a person with direct or indirect shareholding in the Administered Companies;

    *(d)* a person who is, directly or indirectly, interested in any contract or arrangement to provide goods or services to the Administered Companies;

    *(e)* an auditor of the Administered Companies; or

    *(f)* an officer of the Administered Companies.

**Notification of appointment of Administrator**

**8.** (1) The Administrator shall within seven days after his appointment—

    *(a)* lodge a notice of the appointment with the Registrar of Companies; and

    *(b)* cause a notice of his appointment to be published in at least two national daily newspapers, one of which shall be in the national language.

(2) Every invoice, order for goods or services, business letter, cheque, credit note, negotiable instrument or bill of lading which is issued by or on behalf of the Administered Companies or the Administrator after the appointment of the Administrator shall contain the words "Administrator Appointed".

(3) Any non-compliance of subsections (1) and (2) shall not affect the validity of the acts of the Administrator in the administration of the Administered Companies.

(4) For the purpose of this section, "Registrar of Companies" has the meaning assigned to it under section 4 of the Companies Act 1965.

*Malaysian Airline System Berhad (Administration)*    11

**Functions of Administrator**

**9.** (1)  The Administrator shall have the following functions:

(a) to carry out the business and operations (including  the restructuring of such operations) of the Administered Companies;

(b) to take into his custody or under his control the property, liabilities, businesses and affairs of the Administered Companies and all the property to which the Administered Companies are or appear to be entitled;

(c) to manage the property, business, liabilities and affairs of the Administered Companies in the name and on behalf of the Administered Companies, including the disposal of property and liabilities;

(d) to assume control and exercise all powers conferred on the directors under the Companies Act 1965 or by the constitution of the Administered Companies, and the powers of the directors of the Administered Companies shall then cease except in so far as the Administrator may permit;

(e) to make any arrangement or compromise on behalf of the Administered Companies with their creditors or any class of them or between the specified subsidiary companies and their members or any class of them or between the Administered Companies and their debtors or any class of them; and

(f) to perform any function that the Administered Companies or any of their officers could perform or exercise if the Administrator had not been appointed.

(2)  Nothing in paragraph (1)*(d)* shall require the Administrator to call any meetings of the Administered Companies.

**Powers of Administrator**

**10.**    In performing his functions under section 9, the Administrator shall have the following powers:

(a) to carry on the business of the Administered Companies;

*Laws of Malaysia*

(b) to do all things (including the carrying out of works) as may be necessary for the management, realization and preservation of the property, undertakings and affairs of the Administered Companies;

(c) to appoint any person as a director of any of the Administered Companies, whether to fill a vacancy or otherwise, and to remove or suspend from office any director of the Administered Companies notwithstanding the Memorandum and Articles of Association or any other law;

(d) to take possession of the property of the Administered Companies and for that purpose, to take such proceedings as may seem to him expedient;

(e) to sell or otherwise dispose of all or part of the property, business, undertaking or property of the Administered Companies by public auction or private contract;

(f) to raise or borrow money and grant security over the property of the Administered Companies for the raising or borrowing of such money;

(g) to appoint a solicitor or an accountant, or other professionally qualified person to assist him in the performance of his functions;

(h) to bring or defend any action or other legal proceedings in the name and on behalf of the Administered Companies;

(i) to refer to arbitration any question affecting the Administered Companies;

(j) to effect and maintain insurances in respect of the property of the Administered Companies;

(k) to use the common seal of the Administered Companies;

(l) to do all acts and to execute in the name and on behalf of the Administered Companies any deed, receipt or other document;

(m) to draw, accept, make and endorse any bill of exchange or promissory note in the name and on behalf of the Administered Companies;

*Malaysian Airline System Berhad (Administration)*    13

*(n)* to employ or terminate employees, and to determine the compensation payable to such dismissed employees;

*(o)* to transfer any property, business, liabilities and affairs of the Administered Companies to the Malaysia Airlines Berhad or any of the Malaysia Airlines Berhad's subsidiary companies;

*(p)* to purchase the shares, property and equipment of any company, in which the Administered Companies are existing shareholders, that supplies goods or services or both which are essential to ensure the uninterrupted continuation of the business vested or to be vested in the Malaysia Airlines Berhad pursuant to Part V;

*(q)* to grant or accept a surrender of a lease or tenancy of the property of the Administered Companies, and to take a lease or tenancy of any property required or convenient for the property of the Administered Companies;

*(r)* to call up any uncalled capital of the Administered Companies, alter or reduce all or part of the share capital of the Administered Companies;

*(s)* to rank and claim in the bankruptcy, insolvency or liquidation of any person indebted to the Administered Companies and to receive dividends, and to accede to trust deeds for the creditors of any such person;

*(t)* to present or defend a petition for the winding up of the Administered Companies;

*(u)* to change the location of any of the Administered Companies' registered offices;

*(v)* to appoint any agent to do any business which the Administrator is unable to do himself or which can more conveniently be done by an agent;

*(w)* to make any payment which is necessary or incidental to the performance of his functions; and

*(x)* to do all other things incidental to the performance of the Administrator's functions.

14                    *Laws of Malaysia*                    Act **765**

**Effect of appointment of Administrator**

**11.** (1) On the appointment of the Administrator, a moratorium shall take effect during which—

> *(a)* no petition for the winding up of the Administered Companies may be filed by any person in any court;

> *(b)* no resolution may be passed or order made for the winding up of the Administered Companies;

> *(c)* no receiver, receiver and manager or provisional liquidator, may be appointed, or if appointed, his appointment shall immediately cease and he shall vacate his office;

> *(d)* no steps may be taken—

>> (i) to create, perfect or enforce any security over any property of the Administered Companies;

>> (ii) to enforce a judgment over any property of the Administered Companies;

>> (iii) to re-possess any property in the possession, custody or control of the Administered Companies; or

>> (iv) to set off any debt owing to the Administered Companies in respect of any claim against the Administered Companies,

> except with the prior written consent of the Administrator;

> *(e)* no proceedings and no execution or other legal process in any court or tribunal may be commenced or continued with, and no distress may be levied, against the Administered Companies or their property except with the prior written consent of the Administrator;

> *(f)* any application made under section 176 of the Companies Act 1965 shall be adjourned *sine die* and any restraining order issued under subsection 176(10) of the Companies Act 1965 shall be immediately discharged and set aside; and

*Malaysian Airline System Berhad (Administration)*    15

    *(g)* no proceedings and no execution or other legal process in any court or tribunal may be commenced, or continued with, against any person providing a guarantee or acting as a guarantor for the liability of the Administered Companies in respect of that liability except with the prior written consent of the Administrator.

(2) The Administrator shall not be liable to an action or other damages in respect of a refusal to give his consent under subsection (1).

(3) The appointment of the Administrator shall not—

    *(a)* be regarded as placing the Administrator or the Administered Companies in breach of or in default under any contract, or in breach of confidence;

    *(b)* be regarded as placing the Administered Companies in breach of or in default under any contract or be regarded as giving rise to a right or duty for any person to—

        (i) terminate, cancel or modify an agreement;

        (ii) enforce or accelerate the performance of an obligation of the Administered Companies;

        (iii) require the performance of an obligation not otherwise arising for performance; or

        (iv) refuse or discontinue the performance of his obligations;

    *(c)* be regarded as placing the Administrator or the Administered Companies in breach of any law or agreement prohibiting, restricting or regulating the assignment, sale, disposition or transfer of any property or disclosure of information;

    *(d)* release a surety from an obligation;

    *(e)* invalidate or discharge a contract or security;

    *(f)* be regarded as terminating, cancelling or varying any right, privilege, exemption or priorities in relation to a property of the Administered Companies; or

*Laws of Malaysia*

    *(g)* be regarded as placing the Administered Companies or the Administrator in breach of any law or any order of any court.

(4) Nothing in this section shall prevent any civil or criminal proceedings from being instituted or continued by any regulatory body against the Administered Companies.

**Moratorium**

**12.** (1) The duration of the moratorium referred to in section 11, unless the administration is sooner terminated under section 6 or paragraph 20(3)*(c)*, shall be for a period of twelve months commencing from the date of the appointment of the Administrator under subsection 5(1).

(2) The Minister may, upon the written request of the Administrator or the appointer, extend the moratorium for a period of not more than twelve months upon being satisfied that the circumstances warrant such extension, and such power of extension shall not be exercisable more than once.

(3) If the period of the moratorium is extended under subsection (2), the Administrator shall cause a notice of the extension to be published in at least two national daily newspapers, one of which shall be in the national language.

**Undue preference**

**13.** (1) On the appointment of the Administrator, any transfer, mortgage, execution, attachment, obligation, settlement, charge, assignment, delivery of goods, payment or other act relating to any property made, incurred or done by or against the Administered Companies which, had it been made, incurred or done by or against an individual, would in his bankruptcy under the law of bankruptcy be void or voidable, may be avoided or recoverable by the Administrator.

(2) Where a reference is made in the law of bankruptcy to a date for the purpose of determining the effect of bankruptcy on transactions mentioned in subsection (1), that date shall be the date on which this Act comes into operation.

**Transition services**

**14.** (1) Where any person is under a contract or obligation to provide goods or services or both to the Administered Companies, such person shall continue to provide the goods or services or both to the Malaysia Airlines Berhad and its subsidiary companies instead of the Administered Companies, where required by the Administrator, and the Malaysia Airlines Berhad and its subsidiary companies shall pay for such goods or services or both at the same rate as would have been paid by the Administered Companies.

(2) Notwithstanding any other provisions of this Act or any other law, where the person fails to provide the goods or services or both to the Malaysia Airlines Berhad and its subsidiary companies as required under subsection (1), the Malaysia Airlines Berhad and its subsidiary companies shall have the right to recover from such person any costs incurred or damages for any loss suffered.

**Investigation by Administrator**

**15.** (1) The Administrator may require any officer of the Administered Companies to verify and submit to the Administrator a statement as to the affairs of the Administered Companies within twenty-one days.

(2) The statement shall be in such form as may be determined by the Administrator and shall contain the following information:

    *(a)* the particulars of all property and liabilities;

    *(b)* the names and addresses of the creditors;

    *(c)* the securities held by the creditors and the dates when the securities were given;

    *(d)* a statutory declaration made under the Statutory Declarations Act 1960 [*Act 13*], declaring the information in the statement of affairs as being true and correct; and

    *(e)* any other information as may be required by the Administrator.

*Laws of Malaysia*

**Duties of officers to assist in investigation**

**16.** (1) An officer of the Administered Companies shall within seven days after a request from the Administrator—

    *(a)* deliver to the Administrator all books, records and documents of the Administered Companies in the possession of the officer; and

    *(b)* if the officer knows the location of other books, records and documents relating to the Administered Companies, inform the Administrator of the location of those books, records and documents.

  (2) An officer of the Administered Companies shall—

    *(a)* attend to the Administrator at such times; and

    *(b)* give the Administrator such information concerning the Administered Companies' property, affairs and financial circumstances,

as the Administrator may reasonably require.

  (3) The Administrator shall, on the completion of the administration under this Act, return to the Administered Companies any books, records and documents received under subsection (1).

PART III

PROPOSAL OF ADMINISTRATOR AND APPOINTMENT OF
INDEPENDENT ADVISOR

**Administrator may re-negotiate contracts or prepare proposal or both**

**17.** (1) The Administrator may, in the administration of the Administered Companies, at his sole discretion, take any one or both of the following actions:

    *(a)* re-negotiate the terms and conditions of any contracts or agreements of the Administered Companies with the counterparties;

*Malaysian Airline System Berhad (Administration)*    19

    *(b)* prepare a proposal with respect to the Administered Companies or any claims and liabilities against or of the Administered Companies.

(2) The proposal referred to in subsection (1)*(b)* may include any provision as the Administrator thinks fit.

(3) Without prejudice to the generality of subsection (2), the proposal may provide for the transfer of any property, business or liability of the Administered Companies to a person named in the proposal—

    *(a)* by means of vesting under Part V; or

    *(b)* in accordance with the relevant law applicable to effect the transfer of such property, business or liability.

(4) The Administrator shall, upon the completion of the proposal under subsection (1), submit the proposal to the Independent Advisor and the appointer.

**Appointment and qualifications of Independent Advisor**

**18.** (1) Upon being notified by the Administrator that a proposal will be prepared under section 17, the appointer shall appoint an Independent Advisor.

(2) No person shall be appointed as an Independent Advisor unless—

    *(a)* the person has consented in writing to the appointment;

    *(b)* the person is independent of the appointer, management and board of directors of the Administered Companies and the Malaysia Airlines Berhad, and has no interest whatsoever in the Administered Companies and the Malaysia Airlines Berhad; and

    *(c)* the person is—

        (i) an investment bank;

        (ii) a firm of accountants; or

20          *Laws of Malaysia*          Act **765**

   (iii) a person (other than a natural person) who is permitted to carry on the activity of advising on corporate finance which is a regulated activity under the Capital Markets and Services Act 2007 [*Act 671*] and who, in the opinion of the appointer, has the requisite experience or is capable of performing the duties of an Independent Advisor.

**Review of proposal by Independent Advisor**

**19.** (1) The Independent Advisor shall carry out a review of the proposal prepared by the Administrator under section 17.

 (2) In reviewing the proposal, the Independent Advisor may take into consideration—

   *(a)* the interests of all persons affected by the proposal, including the creditors, the Administered Companies and the Malaysia Airlines Berhad, if applicable, giving each category of persons affected by the proposal such weightage as he thinks fit; or

   *(b)* such other matters or consideration as the Independent Advisor may consider relevant or appropriate under the circumstances.

 (3) Upon the completion of the review, the Independent Advisor shall prepare a report on his review and submit the report to the Administrator and the appointer.

**Decision of the appointer**

**20.** (1) The appointer shall consider the proposal of the Administrator together with the report of the Independent Advisor submitted to the appointer under subsection 19(3).

 (2) Where the appointer approves the proposal, the Administrator shall implement the proposal in accordance with its terms.

 (3) Where the appointer rejects the proposal, the appointer may—

   *(a)* direct the Administrator to revise the proposal;

*Malaysian Airline System Berhad (Administration)*    21

(b) direct the Administrator to prepare a new proposal; or

(c) terminate the administration of the Administered Companies.

## Implementation of proposal

**21.** (1) Where the approval of a regulatory body is required to implement the proposal and conditions are imposed by the regulatory body, the Administrator shall refer the conditions imposed to the appointer.

(2) If the appointer thinks that the conditions are not in the interest of the Administered Companies, the appointer may—

(a) direct the Administrator to revise the proposal;

(b) direct the Administrator to prepare a new proposal; or

(c) terminate the administration of the Administered Companies.

(3) Prior to the implementation of the proposal, the Administrator shall send a copy of the proposal and the report of the Independent Advisor by registered post to the last-known address of or through electronic medium to each of the creditors of the Administered Companies affected by the proposal and any other persons affected by the terms of the proposal.

(4) Notwithstanding the provisions of any law or contract, the Administrator shall have the power to implement and do all things necessary to fully and effectively carry out and give effect to the proposal or any part of the proposal without the need for any notice to or approval or consent of any member or creditor of the Administered Companies or any other person affected by the proposal and the proposal shall be binding on the Administered Companies, the creditors of the Administered Companies and all persons affected by the terms of the proposal, including the Malaysia Airlines Berhad, if applicable.

(5) Notwithstanding anything to the contrary in any law of guarantee—

(a) the implementation of a proposal under this section shall not release or discharge any security provided by any person to secure any duty or liability owed by the Administered Companies to any of its creditor; and

*Laws of Malaysia*

   (b) each such security and any such duty or liability of the person providing the security shall remain valid and enforceable against that person notwithstanding the implementation of the proposal, or any compromise, arrangement, reconstruction or amalgamation in connection with the Administered Companies.

   (6) Notwithstanding the failure to notify any creditors of the Administered Companies and persons affected by the terms of the proposal in accordance with the requirements of subsection (3), such failure shall not affect the validity of the proposal.

**Transfer of property or liabilities**

**22.** (1) If the proposal directs that property or liabilities are to be transferred, the Administrator shall transfer the property or liabilities to the transferee in accordance with the vesting provisions under Part V and the terms and conditions set out in the proposal.

   (2) For the purpose of this section, a reference to "Malaysia Airlines Berhad" in Part V shall be construed as a reference to the proposed transferee named in the proposal.

## PART IV

### MALAYSIA AIRLINES BERHAD

**Incorporation of Malaysia Airlines Berhad**

**23.** The corporation incorporated under the Companies Act 1965 by the name of "Malaysia Airlines Berhad" shall have the main objective of operating the national carrier of Malaysia and shall carry on the business of the national carrier as a commercial enterprise and such other businesses as the board of directors of the Malaysia Airlines Berhad thinks fit.

**Offer of employment**

**24.** The Malaysia Airlines Berhad may, in its sole discretion, offer employment to any person who immediately before the date of that offer is in the employment or service of the Administered Companies on such terms and conditions as the Malaysia Airlines Berhad may determine.

**Malaysia Airlines Berhad, *etc.*, not a successor employer**

**25.** (1) Notwithstanding anything to the contrary in this Act or under any law, where the Administrator assumes control of the Administered Companies, or where the Malaysia Airlines Berhad makes an offer of employment to a person in the employment or service of the Administered Companies, or where the Malaysia Airlines Berhad enters into a transition service agreement with the Administered Companies, the Administrator, appointer or the Malaysia Airlines Berhad shall not—

    *(a)* be regarded as the successor, assignee or transferee or a successor employer to the Administered Companies;

    *(b)* be liable for any obligation relating to any retirement plan or other post-employment benefit plans in respect of the employees or former employees of the Administered Companies or any predecessor of the Administered Companies that exists prior to the assumption of control or appointment; or

    *(c)* be liable for any sum which is calculated by reference to a period of time prior to the Malaysia Airlines Berhad becoming the employer of the person in question.

(2) The Malaysia Airlines Berhad, the appointer and the Administrator shall not be named as a party in any claim or application made or joined as a party in any proceeding commenced or continued by or on behalf of any employees or former employees of the Administered Companies pursuant to the Industrial Relations Act 1967 [*Act 177*], Employment Act 1955 [*Act 265*], Sabah Labour Ordinance 1950 [*Sabah Cap. 67*], Sarawak Labour Ordinance 1952 [*Sarawak Cap. 76*] or the Trade Unions Act 1959 [*Act 262*].

**Work rules, code of conduct and regulations**

**26.** The Malaysia Airlines Berhad may, if it thinks fit, impose any work rules, code of conduct and regulations in relation to its employees in accordance with all applicable laws.

24                    *Laws of Malaysia*                    Act **765**

**Negotiation with trade unions and associations**

**27.** (1) All matters to be discussed or negotiated between the Malaysia Airlines Berhad and—

    *(a)* any trade union duly recognized by the Malaysia Airlines Berhad in accordance with the Industrial Relations Act 1967 and the Trade Unions Act 1959; and

    *(b)* any association recognized by the Malaysia Airlines Berhad,

shall be by way of meetings, of which fourteen days' notice shall be given to the trade unions and associations by the Malaysia Airlines Berhad.

(2) A meeting to be convened under subsection (1) shall not proceed unless all of the trade unions and associations are duly represented in the meeting.

(3) If after half an hour from the time appointed for a meeting, not all of the trade unions and associations are duly represented, the meeting shall stand adjourned to the subsequent week, on the same day and time and at the same venue without any further notice.

(4) If the meeting is adjourned to a day which is a public holiday, the adjourned meeting shall be reconvened on the next working day.

(5) When the adjourned meeting is reconvened on the new date, the non-attendance by any trade union or association shall not prevent the meeting from proceeding.

(6) Any decision made during the meeting by the Malaysia Airlines Berhad and the trade unions and associations present at the meeting shall be valid and binding on the Malaysia Airlines Berhad and all of the trade unions and associations recognized by the Malaysia Airlines Berhad.

(7) In a meeting under this section, where the trade unions and associations unanimously resolve that the matter for discussion or negotiation relates solely to a specific trade union or association, the meeting shall be dissolved and a separate meeting shall be convened between the Malaysia Airlines Berhad and that specific trade union or association.

(8)  The separate meeting between the Malaysia Airlines Berhad and the specific trade union or association shall not discuss any matter other than the matter resolved under subsection (7).

## Matters relating to productivity or effective utilization of workforce

**28.**  (1)  Notwithstanding section 27, the following matters that relate to or impact the productivity or effective utilization of the workforce in the Malaysia Airlines Berhad shall be determined by the Malaysia Airlines Berhad:

    *(a)* resourcing and allocation of resources;

    *(b)* assessment of employees;

    *(c)* leave entitlement; and

    *(d)* working hours and scheduling of work, including flight time limitation and flight duty periods.

(2)  The Malaysia Airlines Berhad in determining any matters under subsection (1) shall comply with all applicable laws and international standards.

PART V

VESTING OF PROPERTY AND LIABILITIES

## Vesting provisions

**29.**  (1)  The Minister may, from time to time, by order published in the *Gazette*, appoint a vesting date for each order and on such date any property or liabilities of the Administered Companies specified by the Minister in such order shall be transferred to and vested in the Malaysia Airlines Berhad without any conveyance, assignment or transfer whatsoever.

(2)  The vesting pursuant to subsection (1) shall have the effect set out in the Schedule notwithstanding any written law or rule of law and shall be binding on any person affected by such vesting.

26 *Laws of Malaysia* Aᴄᴛ **765**

**Replacement vesting order**

**30.** (1)  The Minister may issue a new vesting order ("replacement vesting order") to replace any vesting order previously issued in order to rectify any omission or error in the vesting order.

(2)  Any replacement vesting order issued under subsection (1), stating that a property or liability has been transferred to and vested in the Malaysia Airlines Berhad, shall be conclusive evidence of such transfer and vesting as of the vesting date stipulated in the replacement vesting order.

(3)  If any law stipulates a time period within which a transfer of any property or liability stated to be the subject of a replacement vesting order shall be registered or filed, that period shall commence from the vesting date stipulated in the replacement vesting order or the date the replacement vesting order is issued, whichever is later.

(4)  Any act done by the Malaysia Airlines Berhad or any other person, in reliance on a vesting order previously issued shall not be affected by any omission or error rectified in a replacement vesting order.

(5) For the purposes of this Act, any reference to a vesting order shall be deemed to include a reference to a replacement vesting order.

Pᴀʀᴛ VI

GENERAL

**Non-application of section 132ᴇ of the Companies Act 1965**

**31.**  Section 132ᴇ of the Companies Act 1965 shall not apply to any disposition by any arrangement or transaction between the Company and the Malaysia Airlines Berhad.

**Indemnity for Administrator, *etc*.**

**32.** (1) The Administrator, the appointer and any other person are entitled to be indemnified out of the Administered Companies' property for—

    *(a)* in the case of the Administrator, his costs, expenses and remuneration as provided under the terms of his appointment;

*Malaysian Airline System Berhad (Administration)*    27

(b) in the case of the appointer, the repayment of any credit facility provided by the appointer to the Administrator or to the Administered Companies during the administration of the Administered Companies;

(c) in the case of the Malaysia Airlines Berhad, the repayment of any credit facility provided by the Malaysia Airlines Berhad to the Administrator or to the Administered Companies during the administration of the Administered Companies; or

(d) in the case of any other person, the repayment of any credit facility provided by that person to the Administrator or the Administered Companies during the administration of the Administered Companies with the approval of the appointer.

(2) Notwithstanding any other law, a right of indemnity under subsection (1) shall have priority over the property of the Administered Companies and shall be paid in priority to all other secured and unsecured debts.

**Immunity**

**33.** (1) No action, suit, prosecution or proceeding whatsoever shall lie or be brought, instituted or maintained in any court or tribunal or before any authority against–

(a) the Minister;

(b) the appointer;

(c) the Administrator;

(d) the Independent Advisor;

(e) any officer of the persons referred to in paragraphs *(b)* and *(d)*; or

(f) any person lawfully acting on behalf of the appointer, the Administrator and the Independent Advisor,

for any loss or damage for or on account of, or in respect of, any act or matter done or ordered to be done or omitted to be done by him in good faith and in the exercise of any power or discharge of any duty conferred on him or it under this Act.

*Laws of Malaysia*

(2) No action, suit, prosecution or proceeding whatsoever shall lie or be brought, instituted or maintained in any court or tribunal or before any authority against the Administrator appointed under this Act and any person lawfully acting on behalf of the Administrator by any party for any loss or damage caused by any act or matter done or statement made or omitted to be done by him in good faith and in the exercise of any function or power, conferred or imposed on him under this Act except where such loss or damage is due to wilful misconduct or gross negligence of the Administrator appointed under this Act and any person lawfully acting on behalf of the Administrator.

### Limits on the grant of orders of court

**34.** (1) Notwithstanding any law, an order of a court cannot be granted—

> *(a)* which stays, restrains or affects the powers of the Administrator under this Act;
>
> *(b)* which stays, restrains or affects any action taken or proposed to be taken by the Administrator under this Act; or
>
> *(c)* which compels the Administrator to do or perform any act,

and any such order, if granted, shall be void and unenforceable and shall not be the subject of any process of execution whether for the purpose of compelling obedience of the order or otherwise.

(2) The decisions of the appointer in sections 4 and 5, the Minister in subsection 12(2) and the Administrator in subsection 17(1) shall be final.

### Validity of transaction

**35.** Notwithstanding any written law or rule of law, any payment made, transaction entered into, or any other act or thing done in good faith by or with the consent of the Administrator shall be valid and effective for the purposes of this Act and shall not be considered as an undue preference in the winding up of the Administered Companies.

*Malaysian Airline System Berhad (Administration)*     29

## Things done in anticipation of the enactment of this Act

**36.** (1) All acts and things done by any person in connection with the property, liabilities, businesses and affairs of the Administered Companies in preparation for or in anticipation of the enactment of this Act and any expenditure incurred in relation to the acts and things done shall be deemed to have been authorized under this Act, if the acts and things done are consistent with the general intention and purposes of this Act.

(2) The incorporation of the Malaysia Airlines Berhad and all acts and things done by any person on behalf of the Malaysia Airlines Berhad and all rights and obligations acquired or incurred on behalf of the Malaysia Airlines Berhad shall, upon the coming into operation of this Act, be deemed to be done under this Act and shall be the rights and obligations of the Malaysia Airlines Berhad.

SCHEDULE

[Section 29]

VESTING OF PROPERTY AND LIABILITIES

**Interpretation**

1. (1) In this Schedule, unless the context otherwise requires—

"transferor" and "transferee" mean the respective parties identified as such in the vesting order;

"vesting order" means the order made by the Minister under section 29;

"transfer date" means the date stated in the vesting order on which any property or liability is transferred and vested.

(2) A reference in this Schedule to "liability" means the whole or such part of a liability as is transferred by way of the vesting order.

**Effect of vesting order**

2. (1) Where a property is transferred under the vesting order—

    *(a)* in the case where the property is held by the transferor alone immediately before the transfer date, the property shall on and from the transfer date vest in the transferee; and

*Laws of Malaysia*

*(b)* in the case where the property is held jointly by the transferor with any other person immediately before the transfer date, the property shall on and from the transfer date vest in the transferee jointly with that other person.

(2) The transferee shall, on and from the transfer date of the property, acquire and be vested with all of the transferor's present and future rights, title and interest in, and obligations with respect to, such property, free of any encumbrances save for any registered interest prevailing as at the transfer date.

(3) A vesting order stating that a property or liability has been transferred to and vested in the transferee shall be conclusive evidence of such transfer and vesting as of the transfer date.

(4) No provision in any agreement limiting or prohibiting the right of the transferor or requiring any consent to assign, sell, dispose of or transfer of a property shall have any application or effect in respect of the transfer and vesting of the property to the transferee.

(5) In relation to a liability transferred under a vesting order—

*(a)* the transferee shall be deemed to assume the liability and be liable to discharge the liability; and

*(b)* the transferor shall be released and discharged from the liability.

(6) In relation to a transfer under a vesting order—

*(a)* an existing agreement, instrument, or an order of any court under or by virtue of which the transferor has title, ownership, interest or rights to such property or liability shall be construed and shall have effect as if the reference to the transferor in that agreement, instrument or order were substituted with a reference to the transferee;

*(b)* an existing agreement to which the transferor is a party shall have effect as if the transferee had been a party to that agreement instead of the transferor;

*(c)* an existing instruction, direction, mandate, power of attorney, authority, undertaking or consent, whether or not in relation to an account that was given to the transferor, either alone or jointly with another person, shall have effect as if given to the transferee either alone or jointly with the other person;

*(d)* any security held immediately before the transfer date by the transferor or by a nominee or trustee of the transferor as security for the payment or discharge of any liability of any person, shall be held by the transferee or that nominee or trustee as the nominee or trustee of the transferee, with the same priority as the transferor had, and to the extent of that liability shall be available to the transferee as security for the payment or discharge of that liability; and if any

such security extends to future advances or future liabilities, the security shall be held by and be available to the transferee as security for future advances by or future liabilities of the transferee in the same manner as the future advances by or future liabilities of the transferor were secured immediately before the transfer date;

*(e)* in addition to any other right, power or remedy granted to the transferee, the transferee shall have the rights, powers and remedies (and in particular the rights and powers as to taking or resisting legal or other proceedings or making or resisting applications to any authority) for ascertaining, protecting or enforcing the rights, titles and interests vested in the transferee including those rights, titles or interests in respect of any legal or other proceedings or applications to any authority pending immediately before the transfer date by or against the transferor, and resisting any claim, liability or registered interest as if they had at all times been the rights, titles and interests of the transferee;

*(f)* a judgement, award or order obtained by the transferor and not fully satisfied before the transfer date shall be enforceable by the transferee;

*(g)* no transfer to or acquisition by the transferee shall be void or voidable by reason of the application of any law;

*(h)* where the custody of any goods, things or documents is held by the transferor as bailee immediately before the transfer date, such goods, things or documents shall be deemed to have passed to the transferee and the rights and obligations of the transferor under any contract of bailment relating to such goods, things or documents shall be transferred to the transferee;

*(i)* a negotiable instrument or order for payment of money given to or drawn on or accepted by the transferor, or payable at the place of business of the transferor, whether so given, drawn or accepted before, on or after the transfer date, shall have the same effect on and from the transfer date, as if that negotiable instrument or order for payment of money had been given to or drawn on or accepted by the transferee or were payable at the place of business of the transferee; and

*(j)* any account between the transferor and its customer shall become an account between the transferee and the customer, subject to the conditions and incidents that relate to such account up to the transfer date, and such account shall be deemed for all purposes to be a single continuing account.

(7) A transfer of a property or liability under a vesting order shall not—

*(a)* be regarded as placing the transferor, transferee or any person deriving title from the transferee or any other person in breach of or default under any contract or in breach of confidence;

32 *Laws of Malaysia* **ACT 765**

    *(b)* be regarded as giving rise to a right or duty for any person to—

        (i) terminate or amend an agreement;

        (ii) enforce or accelerate the performance of an obligation; or

        (iii) require the performance of an obligation not otherwise arising for performance;

    *(c)* be regarded as placing the transferor, transferee or any other person in breach of any law, rule of law or agreement prohibiting, restricting or regulating the assignment, sale, disposal or transfer of any property or liability or disclosure of information;

    *(d)* release a surety from an obligation;

    *(e)* invalidate or discharge a contract or security; or

    *(f)* be regarded as terminating or varying any rights, privileges, exemptions (including any tax exemptions) or priorities to which the transferor was entitled and which by virtue of this Schedule have vested in the transferee or existed in favour of the transferor in relation to any property or liability transferred to the transferee pursuant to this Schedule.

DICETAK OLEH
PERCETAKAN NASIONAL MALAYSIA BERHAD,
KUALA LUMPUR
BAGI PIHAK DAN DENGAN PERINTAH KERAJAAN MALAYSIA

# EXHIBIT D

# DECLARATION OF RIZANI BIN HASSAN



**KHAZANAH NASIONAL**

25 May 2015

The Board of Directors
Malaysian Airline System Berhad
3rd Floor, Administration Building 1
MAS Complex A
Sultan Abdul Aziz Shah Airport
47200 Subang Jaya
Selangor Darul Ehsan

*[handwritten stamp: RECEIVED 2? May 20?? CHAIRMAN'S OFFICE]*

*[handwritten note: Copy: Company Sec.]*

*[handwritten note: The notice was presented at Special Briefing of MAS Act by the Administrator. Please file and report at next Board meeting for ratification]*

*[handwritten: Y. Bhg. Tan Sri Md. Nor]*

## NOTICE OF APPOINTMENT OF ADMINISTRATOR OF MALAYSIAN AIRLINE SYSTEM BERHAD (10601-W) ("MAS")

We wish to notify the board of directors of MAS (" the Board") that Khazanah has obtained the approval of the Prime Minister on 22 May 2015 to put MAS under administration pursuant to the Malaysian Airline System Berhad (Administration) Act 2015 ("MAS Act"), a copy of the approval is appended to this letter for your reference. In relation to this administration, we hereby appoint Dato' Mohammad Faiz Azmi of PricewaterhouseCoopers as the Administrator of MAS. The appointment of Dato' Mohammad Faiz Azmi is to take effect from today, 25 May 2015.

The appointment is a significant step to ensure a smooth transition from MAS to Malaysia Airlines Berhad ("MAB"). The Administrator is expected to play a critical role which includes facilitating the transfer of selected assets and liabilities to MAB whilst ensuring that the transition is seamless with no interruption to the airline services.

Under the MAS Act, the effect of the Administrator's appointment is that all powers of directors shall cease except in so far as the Administrator may permit. In connection to this, the Administrator will brief the Board of its role during the period of administration which will be reflected through a governance structure that would be put into effect in due course.

We trust that the Board will extend the necessary cooperation and assistance to the Administrator.

Wassalam,

AZMAN HJ. MOKHTAR

Khazanah Nasional Berhad 275505-K
Level 33, Tower 2, Petronas Twin Towers, Kuala Lumpur City Centre, 50088 Kuala Lumpur, Malaysia
T +603 2034 0000  F +603 2034 0300  www.khazanah.com.my