**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **IN RE: AIR CRASH OVER THE SOUTHERN INDIAN OCEAN ON MARCH 8, 2014** | **MDL Docket No:  2712** |
| **This Document Relates To:** *Gaspard  v. Malaysia Airlines Berhad, et al.,* **16-cv-0419-KBJ** *Wood v. Malaysia Airlines Berhad;* **16-cv-00419-KBJ** | **Misc. No. 16-1184 (KBJ)** |

<u>**THE PLAINTIFFS' RESPONSE TO MALAYSIA AIRLINES' MOTION TO DISMISS FOR LACK OF SUBJECT MATTER JURISDICTION**</u>

# TABLE OF CONTENTS

TABLE OF CONTENTS ................................................................................................... i

TABLE OF AUTHORITIES .......................................................................................... ii

INDEX OF EXHIBITS ................................................................................................. vi

MEMORANDUM ......................................................................................................... 1

The Legal Standard ...................................................................................................... 1

Argument ..................................................................................................................... 1

    I.    The *Wood* Plaintiff has established Fifth Jurisdiction under the Montreal Convention ...... 2

        A.    The meaning of "principal and permanent residence" ...................................... 3

        B.    The federal cases unanimously support the Plaintiff's position ...................... 7

        C.    Malaysia Airlines' legal arguments are unpersuasive .................................... 14

        D.    Mr. Wood's domicile was in the United States ............................................. 23

    II.    The *Wood* and *Gaspard* Plaintiffs have established Third Jurisdiction ........................ 32

        A.    The Decedents' offers were accepted in the United States ............................ 33

        B.    The acceptance of the Decedents' offers was manifested in the United States ............. 40

        C.    The case law supports the Plaintiffs' position ............................................... 41

Conclusion ................................................................................................................. 45

# TABLE OF AUTHORITIES

**Cases**

*Abbott v. Abbott,*
    560 U.S. 1 (2010) ...................................................................................... 4, 7

*Acridge v. Evangelical Lutheran Good Samaritan Soc.,*
    334 F.3d 444 (5th Cir. 2003) ............................................................... 24

*Baah v. Virgin Atlantic Airways Ltd.,*
    473 F. Supp. 2d 591 (S.D.N.Y. 2007) .................................................. 44

*Boyar v. Korean Air Lines,*
    664 F. Supp. 1481 (D.D.C.1987) .................................................. passim

*Brink's Ltd. v. South African Airways,*
    93 F. 3d 1022 (2d Cir. 1996) ............................................................... 13

*Burlington Northern R.R. v. Oklahoma Comm'n,*
    481 U.S. 454 (1987) ........................................................................... 20

*Chan v. Korean Air Lines, Ltd.,*
    490 U.S. 122 (1989) .................................................................... 13, 20

*Choi v. Asiana Airlines, Inc.,*
    No. 14-cv-03738, 2015 WL 394198 (N.D. Cal. Jan. 29, 2015) ......... 5, 6, 7

*Companhia Brasileira v. Applied Indus. Materials Corp.*
    887 F.Supp. 2d 9 (D.D.C. 2012) ......................................................... 40

*Core VCT v. Hensley,*
    59 F.Supp. 3d 123 (D.D.C. 2014) .............................................. 24, 25, 32

*Dastar Corp. v. Twentieth Century Fox Film Corp.,*
    539 U.S. 23 (2003) ............................................................................ 6, 7

*Desmare v. U.S.,*
    93 U.S. 605 (1876) ............................................................................. 24

*Eastern Airlines, Inc. v. Floyd,*
    499 U.S. 530 (1991) ........................................................................... 20

*Eck v. United Arab Airlines,*
    360 F.2d 804 (2d Cir. 1966) ......................................................... passim

*Ehrlich v. American Airlines, Inc.*,
  360 F.3d 366 (2d Cir. 2004) .................................................................................. 16

*Freidrich v. Davis*,
  767 F.3d 374 (3d Cir. 2014) ................................................................................... 23

*Gutierrez v. Fox*,
  141 F.3d 425 (2d Cir. 1998) ................................................................................... 24

*Hornsby v. Lufthansa German Airlines*,
  593 F. Supp. 2d 1132 (C.D. Cal. 2009) .......................................................... passim

*In re Air Crash Over Mid-Atlantic on June 1, 2009*,
  760 F. Supp. 2d 832 (N.D. Cal. 2010) ............................................................ passim

*In re Auto-Train Corp.*,
  9 B.R. 159 (Bankr. D.D.C. 1981) ..................................................................... 33, 41

*Johnson v. Sullivan*,
  748 F.Supp. 2d 1 (D.D.C. 2010) ..................................................................... 1, 4, 40

*Lew v. Moss*,
  797 F.2d 747 (9th Cir. 1986) ................................................................................. 24

*Lockamy v. Truesdale*,
  182 F.Supp. 2d 26 (D.D.C. 2001) .................................................................... 1, 3, 40

*Lopes v. Jetsetdc, LLC*,
  4 F.Supp.3d 238 (D.D.C. 2014) ............................................................................. 24

*Marquez-Ramos v. Reno*,
  69 F. 3d 477 (10th Cir. 1995) ................................................................................ 19

*McCann v. Newman Irrevocable Trust*,
  458 F.3d 281 (3d Cir. 2006) ....................................................................... 23, 24, 25

*Medellin v. Texas*,
  552 U.S. 491 (2008) ................................................................................................. 4

*Mora v. New York*,
  524 F. 3d 183 (2d Cir. 2008) ................................................................................. 19

*Naegele v. Albers*,
  355 F.Supp.2d 129 (D.D.C. 2005) ......................................................................... 24

*National R.R. Passenger Corp. v. Boston and Maine Corp.*,

   503 U.S. 407 (1992) ............................................................................................. 5

*Prakash v. Am. Univ.*,

   727 F.2d 1174 (D.C. Cir. 1984) ............................................................. 23, 26, 27

*Regions Hosp. v. Shalala*,

   522 U.S. 448 (1998) ............................................................................................. 5

*Sandifer v. U.S. Steel Corp.*,

   134 S. Ct. 870 (2014) .......................................................................................... 6

*Seales v. Panamanian Aviation Co.*,

   2009 WL 395821 (E.D.N.Y. 2009) ...................................................... 11, 12, 13, 16

*Shafer v. Children's Hosp. Soc'y of Los Angeles*,

   265 F.2d 107 (D.C. Cir. 1959) ........................................................................... 24

*Slobojan v. United States*,

   136 Ct. Cl. 620 (1956) ................................................................................... 40, 41

*Snap-On Tools, Inc. v. United States*,

   26 Cl. Ct. 1045 (1992) ....................................................................................... 20

*Stifel v. Hopkins*,

   477 F.2d 1116 (6th Cir. 1973) ...................................................................... 24, 32

*Sullivan v. Kidd*,

   254 U.S. 433 (1921) ............................................................................................. 5

*U.S. v. Anderson*,

   15 F. 3d 278 (2d Cir. 1994) ................................................................................. 5

*United States v. Williams*,

   825 F.Supp. 2d 117 (D.D.C. 2011) .................................................................... 24

*Vlandis v. Kline*,

   412 U.S. 441 (1973) ........................................................................................... 23

*Wagshal v. Rigler*,

   947 F.Supp. 10 (D.D.C. 1996) ...................................................................... 24, 32

*Washington v. Hovensa, LLC*,

   652 F.3d 340 (3d Cir. 2011) ......................................................................... 24, 31

*World Holdings, LLC v. Fed. Republic of Germany,*

   794 F. Supp. 2d 1305 (S.D. Fla. 2011)........................................................................ 5

**Rules**

Fed. R. Evid. 803(3)........................................................................................................ 3

**Other Authoritie**s

*Black's Law Dictionary* (6th ed. 1990)…………………………………………………….5

*Black's Law Dictionary* (8th ed. 2004)…………………………………………………..6

Convention between the United States of America and Other Governments on Aviation, at,

   S. Treaty Doc. No. 106-45, May 29, 1999, T.I.A.S. No. 13038 (effective Nov. 4, 2003)

   (Montreal Convention).......................................................... 1, 2, 3, 5, 15, 21, 32,44

Convention for the Unification of Certain Rules Relating to International Transportation by Air,

   Concluded at Warsaw, Poland, October 12, 1929, T.S. No. 876 (Warsaw

   Convention)...................................................................................................15, 44

International Conference on Air Law (ICAO) , Convention for the Unification of Certain Rules

   for International Carriage by Air, Documents, Montreal, Canada, May 10-28, 1999……..20, 21

International Conference on Air Law (ICAO) , Convention for the Unification of Certain Rules

   for International Carriage by Air, Minutes, Montreal, Canada, May 10-28, 1999…………18,21

International Conference on Air Law (ICAO) , Convention for the Unification of Certain Rules

   for International Carriage by Air, Preparatory Material, Montreal, Canada, May 10-28,

   1999……………………………………………………………………………….15, 17, 18, 19, 20

Restatement (Second) of Contracts § 64(c) ................................................................. 33, 40, 41

*The New Warsaw Convention: The Montreal Convention,* 25 Air & Space L. 12 (2000)………..1

**INDEX OF EXHIBITS**

| Ex. No. | Description |
|:---:|:---|
| 1 | Declaration of Nicholas Wood |
| 2 | Declaration of Christopher Wood |
| 3 | Declaration of Elaine Wood |
| 4 | Declaration of Thomas Wood |
| 5 | Declaration of Aubrey Wood |
| 6 | Declaration of Stacey Blaustein |
| 7 | ICAO Preparatory Material, *Report of the First Meeting of the Special Group on the Modernization and Consolidation of the "Warsaw System,"* May 14-18, 1998 ("Special Group-Warsaw, First Report") (relevant pages) |
| 8 | ICAO Preparatory Material, *Council – 150th Session, Modernization of the "Warsaw System" – Rapporteur's Report and Matters Relating to the 30th Session of the Legal Committee,* Mar. 7, 1997 |
| 9 | ICAO Preparatory Material, *Council – 150th Session, Modernization of the "Warsaw System" – Rapporteur's Report and Matters Relating to the 30th Session of the Legal Committee,* Attachment A |
| 10 | ICAO Preparatory Material, *Council – 154th Session, Modernization of the "Warsaw System,"* May 27, 1998 |
| 11 | ICAO Minutes, *Minutes of the Fourth Meeting,* May 19, 1999 |
| 12 | ICAO Documents, DCW Doc No. 33, *Draft Convention for the Unification of Certain Rules for International Carriage by Air (Presented by France),* May 28, 1999 |
| 13 | ICAO Minutes, *Minutes of the Eighth Meeting,* May 17, 1999 |
| 14 | ICAO Documents, DCW Doc No. 12, *Draft Convention for the Unification of Certain Rules for International Carriage by Air (Presented by the United States of America),* May 10-28, 1999 |
| 15 | ICAO Minutes, *Minutes of the Thirteenth Meeting,* May 25, 1999 |
| 16 | Philip Wood and Malaysia IBM's employment contract |

| 17 | Summary of Philip Wood's monthly allowances while on assignment in Beijing |
|----|--------------------------------------------------------------------------|
| 18 | Relevant pages of Philip Wood's 2011, 2012, and 2013, United States Tax Returns |
| 19 | Philip Wood's Chase Checking Account Balance Summary |
| 20 | Philip Wood's Chase Savings Account Balance Summary |
| 21 | March 3, 2016 Letter regarding Chase Credit Card |
| 22 | Philip Wood's IBM 401(k) Statement |
| 23 | Philip Wood's Brokerage Account with Charles Schwab & Co' Statement |
| 24 | Philip Wood's State Farm Homeowner's Insurance Policy |
| 25 | Philip Wood's State Farm Life Insurance Policy |
| 26 | Cigna Medical Insurance Card |
| 27 | Philip Wood's Voter Registration Records |
| 28 | Philip Wood's Driver License Records |
| 29 | Philip Wood's Probate documents |
| 30 | Philip Wood's Itinerary Receipt |
| 31 | Philip Wood's "Journey Details" |
| 32 | Gaspard Orbitz Reservation |
| 33 | Gaspard Itinerary Receipt |
| 34 | Gaspard "Journey Details" |
| 35 | Galileo International Global Airline Distribution Agreement ("GIGADA") (filed under seal) |
| 36 | January 29, 2009 Letter (filed under seal) |
| 37 | February 26, 2010 Letter (filed under seal) |
| 38 | Lease agreement with Kilroy Realty (filed under seal) |
| 39 | Airline Content Agreement (AOC) (filed under seal) |

| 40 | Content Addendum – Agreement between Travelport and MAS (filed under seal) |
| 41 | Declaration of Brian Keith Ingram |

## MEMORANDUM

In its motion to dismiss the Plaintiffs'[1] complaint for lack of subject matter jurisdiction, Malaysia Airlines[2] stretches beyond recognition the meaning of the Montreal Convention's[3] jurisdictional provisions, ignores the federal cases interpreting those provisions, and flatly misconstrues—and, at times, cherry-picks from—the explanations the Convention gave in the course of promulgating those provisions. Its motion should be denied.[4]

## The Legal Standard

"In assessing whether a complaint sufficiently alleges subject matter jurisdiction, the Court accepts as true the allegations of the complaint and must liberally construe the pleadings such that the plaintiff benefits from all inferences derived from the facts alleged." *Johnson v. Sullivan*, 748 F.Supp.2d 1, 8 (D.D.C. 2010) (citation omitted). "In evaluating whether subject-matter jurisdiction exists, the court must accept all the complaint's well-pled factual allegations as true and draw all reasonable inferences in the plaintiff's favor." *Lockamy v. Truesdale*, 182 F.Supp.2d 26, 30 (D.D.C. 2001).

## Argument

The Montreal Convention confers jurisdiction upon the following five places for claims of injury or death arising from international carriage: (1) "the domicile of the carrier"; (2) the carrier's "principal place of business"; (3) any state where the carrier "has a place of business

---

[1] The motion is directed at the claims of Thomas Wood ("the *Wood* Plaintiff") and Thomas Gaspard ("the *Gaspard* Plaintiff"). Thomas Wood is Personal Representative of the Estate of Philip Talmadge Wood, deceased ("Mr. Wood"). Mr. Gaspard is Personal Representative of the Estates of Rui Wang, Weiwei Jiao, and Shuling Dai, all of whom are deceased ("the *Gaspard* Decedents").

[2] There are, in fact, two Malaysia Airlines Defendants: Malaysian Airlines System Berhad (Administrator Appointed) ("MAS") and Malaysia Airlines Berhad ("MAB"). For purposes of this Response, the Plaintiffs refer to them together as "Malaysia Airlines."

[3] Convention between the United States of America and Other Governments on Aviation, at S. Treaty Doc. No. 106-45, May 29, 1999, T.I.A.S. No. 13038 (effective Nov. 4, 2003) (hereinafter the "Montreal Convention").

[4] The Plaintiffs hereby incorporate the "Facts" and "Parties" Sections from the Plaintiffs' Response to Malaysia Airlines' Motion to Dismiss under the doctrine of *forum non conveniens*.

1

through which the contract has been made"; (4) "the place of destination"; or (5) any state "in which at the time of the accident the passenger has his or her *principal and permanent residence* and to or from which the carrier operates services for the carriage of passengers by air, either on its own aircraft or on another carrier's aircraft pursuant to a commercial agreement, and in which that carrier conducts its business of carriage of passengers by air from premises leased or owned by the carrier itself or by another carrier with which it has a commercial agreement." *See* Montreal Convention, Art. 33(1)-(2) (emphasis added).

Of these five jurisdictional alternatives, only the Third and Fifth Jurisdictions, as they are commonly known, are applicable here. Specifically, jurisdiction is proper with respect to Mr. Wood because he was, at the time of his death, a "principal and permanent" resident of the United States (Fifth Jurisdiction), and because the United States—specifically Dulles Airport in Washington, D.C.—is the place where the contract for his ticket was made (Third Jurisdiction). Likewise, with respect to the three *Gaspard* Decedents, jurisdiction is proper in the United States because, like Mr. Wood, the United States is the place where the contracts for their tickets were made (Third Jurisdiction).

## I.   The *Wood* Plaintiff has established Fifth Jurisdiction under the Montreal Convention

This Court may lawfully exercise Fifth Jurisdiction over the *Wood* Plaintiff's claims because Mr. Wood's "principal and permanent residence" at the time of the accident was in the United States. To establish Fifth Jurisdiction, the Montreal Convention requires a plaintiff to satisfy the following three elements:

> In respect of damage resulting from the death or injury of a passenger, an action may be brought … in the territory of a State Party in which at the time of the accident [1] the passenger has his or her principal and permanent residence *and* [2] to or from which the carrier operates services for the carriage of passengers by air, either on its own aircraft or on another carrier's aircraft pursuant to a

> commercial agreement, *and* [3] in which that carrier conducts its business of
> carriage of passengers by air from premises leased or owned by the carrier itself
> or by another carrier with which it has a commercial agreement.

Montreal Convention, Art. 33(2) (emphasis added). In its motion, Malaysia Airlines does not contend that the *Wood* Plaintiff has failed to satisfy its burden with respect to either the second or third elements. That is, Malaysia Airlines concedes that, for purposes of Fifth Jurisdiction under the Montreal Convention, the United States was, "at the time of the accident," a place "to or from which [Malaysia Airlines] operate[d] services for the carriage of passengers by air, either on its own aircraft or on another carrier's aircraft pursuant to a commercial agreement, and in which [Malaysia Airlines] conduct[ed] its business of carriage of passengers by air from premises leased or owned by [Malaysia Airlines] itself or by another carrier with which it ha[d] a commercial agreement." *Id.*

The only question here, then, is whether Mr. Wood's "principal and permanent residence" at the time of the accident was in the United States or somewhere else. Fortunately, the Montreal Convention defines the term "principal and permanent residence":

> For the purposes of paragraph 2, "principal and permanent residence" means the
> one *fixed and permanent abode of the passenger at the time of the accident*. The
> nationality of the passenger shall not be the determining factor in this regard.

Montreal Convention, Art. 33(3)(b) (emphasis added). Under this definition, the United States was Mr. Wood's "principal and permanent residence" at the time of the accident.

## A.   The meaning of "principal and permanent residence"

*All* of the available evidence in this case confirms that Mr. Wood intended to return to live in the United States after his temporary assignments abroad, and that he at all times continued to view himself, notwithstanding these foreign assignments, as an American.[5] N.

---

[5] Malaysia Airlines several times suggests, without citation to any authority, that statements about Mr. Wood's intentions would constitute inadmissible hearsay. [ECF 38-1, at 16, 17 & 30]. Of course, this is not the case. As Fed.

Wood Decl., at ¶¶ 4, 14 (**Ex. 1**); C. Wood Decl., at ¶¶ 4, 15 (**Ex. 2**); E. Wood Decl., at ¶¶ 5, 12 (**Ex. 3**); T. Wood Decl., ¶¶ 4, 10 (**Ex. 4**); A. Wood Decl., at ¶¶ 4, 8 (**Ex. 5**); S. Blaustein Decl., ¶¶ 4, 5 (**Ex. 6**). Indeed, despite the unanimous attestations of Mr. Wood's family and his employer to the effect that Mr. Wood never relinquished his intent to return to live in the United States, Malaysia Airlines has managed, in the year or so since discovery began, to conjure *not a single piece of evidence* contradicting or rebutting this intention. Instead, Malaysia Airlines contorts the language of the Montreal Convention in its efforts to persuade the Court that the phrase "principal and permanent residence" means, in effect, nothing more than mere "residence." [ECF 38-1, at 7-9]. And, Malaysia Airlines says, because "principal and permanent residence" is synonymous, not with "domicile," but with "residence," this Court should not consider Mr. Wood's intentions in deciding the question of Fifth Jurisdiction. *Id.* at 7-17. In support, Malaysia Airlines skips over the words of Article 33 and delves instead into a protracted—and, as described below, rather selective—analysis of the Convention's drafting history. But, as the Supreme Court has instructed many times, "the interpretation of a treaty, like the interpretation of a statute, begins with its text." *Abbott v. Abbott*, 560 U.S. 1, 10 (2010); *see also Medellin v. Texas*, 552 U.S. 491, 506 (2008). And, inasmuch as Malaysia Airlines ignores it, the plain text of Article 33 strongly supports the *Wood* Plaintiff's view that the adjectives "principal and permanent" necessarily qualify the noun "residence."

First, Malaysia Airlines' strained interpretation renders the qualifiers "principal and permanent," which were material enough to appear in both Articles 33(2) and 33(3)(b), entirely superfluous—a crucial flaw the Supreme Court has repeatedly admonished courts to avoid. *See World Holdings, LLC v. Fed. Republic of Ger.*, 794 F.Supp.2d 1305, 1333 (S.D. Fla. 2011)

---

R. Evid. 803(3) makes pellucid, there is an exception to the hearsay rule for "[a] statement of the declarant's then-existing state of mind (such as motive, *intent*, or plan)[.]" (emphasis added).

("Treaties should not be interpreted to be superfluous." (citing *Sullivan v. Kidd*, 254 U.S. 433, 439 (1921))).[6] The *Wood* Plaintiff's more natural reading of Article 33, on the other hand, acknowledges that "principal and permanent residence" must mean something more than mere "residence"—must mean, in short, something more "permanent," something like the American notion of "domicile." *See Choi v. Asiana Airlines, Inc.*, No. 14-cv-03738, 2015 WL 394198, at *3 (N.D. Cal. Jan. 29, 2015) ("Courts in the United States have interpreted 'principal and permanent residence' to mean something akin to the concept of "domicile," which includes an evaluation of both the objective facts establishing the plaintiff's actual residence, and the plaintiff's subjective intent to remain in that residence.").

Second, Malaysia Airlines' reading of Article 33 ignores wholesale the definition provided in Article 33(3)(b). As that definition makes clear, "principal and permanent residence" means "the *one fixed and permanent abode* of the passenger at the time of the accident." Montreal Convention Art. 33(3)(b) (emphasis added). As more than one court has noted, Black's Law Dictionary defines a person's "permanent abode" as a "*domicile* or *fixed* home which the party may leave as his interest or whim may dictate, but which he has no *present intention* of abandoning." *Permanent Abode*, BLACK'S LAW DICTIONARY 1339 (6th ed. 1990) (emphasis added). In other words, the words "fixed and permanent abode"—so integral to the Montreal Convention's definition of "principal and permanent residence"—are, according to Black's Law Dictionary, themselves interchangeable with the word "domicile," and not with the word

---

[6] *See also Regions Hosp. v. Shalala*, 522 U.S. 448, 467 (1998) ("As early as in Bacon's Abridgment, sect. 2, it was said that 'a statute ought, upon the whole, to be so construed that, if it can be prevented, no clause, sentence, or word shall be superfluous, void, or insignificant. This rule has been repeated innumerable times." (quoting *Washington Marker Co. v. Hoffman*, 101 U.S. 112, 115-116 (1879))); *U.S. v. Anderson*, 15 F.3d 278, 283 (2d Cir. 1994) ("This conclusion is consistent with the canon of construction that courts will avoid statutory interpretations that render provisions superfluous." (citing *Nat'l R.R. Passenger Corp. v. Boston and Maine Corp.*, 503 U.S. 407 (1992))).

"residence." No less significantly, the dictionary definition of the phrase "permanent abode" encompasses an assessment of the domiciliary's "intention."

Third, Malaysia Airlines' interpretation of "principal and permanent residence" disregards the generally-accepted, and long-recognized, distinction between "residence" and "domicile." To quote again from Black's Law Dictionary: "A person [] may have more than one residence at a time but only one domicile." *Domicile*, BLACK'S LAW DICTIONARY 1335 (8th ed. 2004). Given this distinction, a person's "one fixed and permanent abode" can refer only to her "domicile"—which is necessarily singular and permanent—and not to her "residence," which countenances a multiplicity of impermanent locales.

Malaysia Airlines criticizes the *Wood* Plaintiff for importing extraneous words into the text of Article 33. [ECF 38-1, at 4-5].[7] We have done no such thing. To the contrary, the *Wood* Plaintiff's reading relies only on the text of Articles 33(2) *and 33(3)(2)*. To discern the meaning of the words in that text, the *Wood* Plaintiff has done precisely as the U.S. Supreme Court has repeatedly instructed: We have consulted a dictionary. *See Sandifer v. U.S. Steel Corp.*, 134 S. Ct. 870, 876-877 (2014); *Dastar Corp. v. Twentieth Century Fox Film Corp.*, 539 U.S. 23, 31-32 (2003). And, as much as Malaysia Airlines might wish it were otherwise, the dictionary definition of the words "fixed and permanent abode" include the word "domicile."

It is, rather, Malaysia Airlines that has unjustifiably injected words into the text of Article 33. To list but one ubiquitous example, Malaysia Airlines draws from whole cloth a dichotomy between objective and subjective evidence of residence—telling the Court, with a disconcerting degree of certainty, that Article 33 sanctions only the former and strictly eschews any reliance

---

[7] "The bases on which Plaintiffs premise Montreal Convention jurisdiction in the United States rely on the importation of words or concepts that are not part of Art. 33.2 of the Convention." *Id.*

upon the latter.[8] But the Montreal Convention never draws any such distinction—neither in Article 33 or elsewhere—and Malaysia Airlines points to no treaty, case, or dictionary to support its contention that this objective/subjective dichotomy is anything but a construct of its own imaginings.

### B.    The federal cases <u>unanimously</u> support the *Wood* Plaintiff's position

Unsurprisingly, every single federal court in the United States that has analyzed this question has held that the words "principal and permanent residence" in the Montreal Convention reflect, not mere "residence," but something analogous to the American concept of "domicile." *See Hornsby v. Lufthansa German Airlines*, 593 F.Supp.2d 1132 (C.D. Cal. 2009); *In re Air Crash Over Mid-Atlantic on June 1, 2009*, 760 F.Supp.2d 832 (N.D. Cal. 2010) ("*Mid-Atlantic*"); *Choi*, 2015 WL 394198, at *3-4.

In *Hornsby*, the plaintiff—who, like Mr. Wood here, was a U.S. citizen temporarily working abroad at the time of the accident—brought suit in the Central District of California against the defendant, a German air carrier, under the Montreal Convention. 593 F.Supp.2d at 1133. The defendant moved to dismiss the complaint for lack of subject matter jurisdiction. *Id*. In

---

[8] [ECF 38-1, at 5 ("The sole objective of Plaintiffs' allegations is to introduce a subjective element into Art.33.2[.]"); *id*. at 8 ("Plaintiff could not overcome the *objective fact* that he was residing in Panama at the time of the events in question"); *id*. at 8 ("Under the Montreal Convention, the relevant inquiry is where the passenger *actually resided* on the date of the accident and the determination must be made based on objective evidence[.]"); *id*. at 9 ("Rather, the objective facts establish that the decedents were all residing in China or Malaysia at the time of the Accident."); *id*. ("The meaning of 'principal and permanent residence,' as defined by Article 33.3, is clear and the drafting history confirms that 'principal and permanent residence' must be determined by the objective facts existing at the time of the accident in question, without reference to a passenger's subjective intent as to the permanency of that residence."); *id*. at 13 ("Ultimately, the Special Group … agreed that the determination would be based only on objective facts contemporaneous with the time of the accident[.]"); *id*. at 15 ("The final definition in Article 33.3(b) was agreed upon as giving the new concept of 'principal and permanent residence' an objective, specific and precise content[.]"); *id*. at 16 ("The definition of 'principal and permanent residence' included in the Convention is clear and must be determined by reference to specific and objective evidence."); *id*. ("Unlike 'domicile,' the drafters ensured that 'principal and permanent residence' was defined by reference to a tangible thing—an abode—which can be located based on objective facts without consideration of any subjective intent."); *id*. at 19-20 ("Accordingly, this Court must reject Plaintiffs' invitation to consider any evidence other than the objective facts establishing where the decedent was actually living at the time of the accident."); *id*. at 22 ("Plaintiffs have not produced the objective documents and information necessary[.]").

support, the defendant contended—in an argument Malaysia Airlines has essentially regurgitated here—that "principal and permanent residence" under the Montreal Convention means nothing more than "residence." *Id.* at 1136-37. Accordingly, the defendant said, the court could not consider the decedent's intent to return to the United States in deciding whether the United States was his "principal and permanent residence." *Id*. The court disagreed. After a meticulous examination of the Montreal Convention's text, its drafting history, and the minutes of the ICAO's meetings,[9] the court held that the phrase "principal and permanent residence" was akin to the American concept of "domicile," *id*. at 1137, and that, as such, the decedent's intent to return to live in the United States must be an important factor in the court's analysis. *Id*. at 1139.

The court began by acknowledging the long-accepted distinction between the concepts of "domicile" and "residence." *Id*. at 1136 ("A person thus may have more than one residence at a time but only one domicile." (citing *Domicile*, BLACK'S LAW DICTIONARY 1335 (8th ed. 2004))). Noting that Article 33 uses the phrase "principal and permanent residence," the court concluded that "[i]t seems highly unlikely that the words 'principal and permanent' are pure surplusage, added by the drafters of the Montreal Convention simply for decorative purposes." *Id.* at 1137. As the court pointed out, "whatever 'residence' on its own may mean, while a relevant starting point, is not necessarily the same as what 'principal and permanent residence' means." *Id*. In fact, the court said, "principal and permanent residence" could not mean mere "residence" precisely because "under the Montreal Convention, it is not possible to have several 'principal and permanent residences' at a time," even though "[u]nder the common understanding of the word 'residence,' … it is quite possible to have more than one at a time." *Id*. Instead, the court found persuasive the Montreal Convention's own definition of "principal and permanent

---

[9] "[T]he International Civil Aviation Organization ("ICAO"), International Conference on Air Law, held at Montreal May 10–28, 1999, … resulted in the final draft of the Montreal Convention." *Id.* at 1138.

residence" as a party's "fixed and permanent abode." *Id*. Recognizing that the 6th edition of Black's Law Dictionary—"which may have been the most up-to-date version available when the final version of the Montreal Convention was negotiated"—defines "permanent abode" as a "domicile or fixed home which the party may leave as his interest or whim may dictate, but which he has no present intention of abandoning," *id*., the court determined that "the phrase 'fixed and permanent abode' is closer in meaning to the word 'domicile' than the word 'residence.'" *Id*. Accordingly, the court concluded, "the intent of the party is relevant to determining his or her 'fixed and permanent abode.'" *Id*. By extension, "intent must also be relevant to the phrase 'principal and permanent residence,' which is defined by the Montreal Convention as 'fixed and permanent abode.'" *Id*. at 1137-38 (page number omitted). Indeed, the court went further, Article 33(2)'s use of the word "permanent" supports the inference that courts must consider a passenger's "intent to remain." *Id*. at 1138. As the court said:

> This is consistent with the plain meaning of the phrase "principal and permanent residence," in which the key word is "permanent." As Plaintiff concedes, without the word "permanent," Defendant's position must prevail. But the Court agrees with Plaintiff that the word "permanent" imports some notion of an "intent to remain" into the phrase, similar to that inherent in the word "domicile." As Defendant itself explains in its Motion, federal common law regarding "domicile" generally provides that one does not abandon one's domicile simply by physically leaving the place; one must move to a new location with the intent to remain there.

*Id*. at 1138.

The court then addressed and rejected the *Hornsby* Defendant's contention—which Malaysia Airlines recycles here—that the ICAO's removal of the word "domicile" from a prior version of Article 33(2) evidenced the drafters' intent to remove "subjective intent" from the jurisdictional inquiry. *Id*. at 1139.[10] As the court correctly noted, the minutes of the ICAO's drafting history suggest that "the change appears to have been motivated, at least in part, by

---

[10] For Malaysia Airlines' identical argument on this point, please see ECF 38-1, at 11-13.

confusion engendered by the multilingual nature of the negotiations." *Id*. In other words, "the French word '*domicile*,' despite its orthographic similarity to the American term 'domicile,' is not a direct translation of that term." *Id*. Because the word "domicile" meant different things to different people, the Convention was understandably concerned that its inclusion would cause similarly situated factual scenarios to be decided differently based only on the forum in which the dispute was adjudicated. *Id*. ("Thus, the use of those terms in the identical location had been producing a non-uniform result in the French and English language versions of the Convention." (quotation marks omitted). And to the extent that this incongruity of results was precisely what the Convention was enacted to avoid, the Convention voted to remove the word "domicile," not to excise "intent" from the jurisdictional inquiry, but to fend off confusion. *Id*. ("Given this confusion, it is not surprising that the language was changed."). In short, the court found, far from "clearly" excluding intent from the jurisdictional analysis [ECF 38-1, at 9-24], "the fact that the language was changed does not necessarily indicate that the new language in the English version was intended to have a substantially different meaning." *Id*. at 1139.

One year later, the Honorable Charles Breyer, United States District Court, Northern District of California, agreed that Article 33(2)'s use of "principal and permanent residence" is equivalent to the American notion of domicile. *Mid-Atlantic*, 760 F.Supp.2d at 837-38. As here, the plaintiffs, who were the representatives of two U.S. citizens killed when an Air France flight departing from Brazil to Paris crashed in the Mid-Atlantic, filed suit in federal court in California under the Montreal Convention. Air France—noting that the decedents had been living in Brazil, that they had been working for a Brazilian affiliate of an American company, and that they had been paying their taxes in Brazil—moved to dismiss the complaint for lack of subject matter

jurisdiction under the Montreal Convention. *Id.* at 836.[11] The issue before the court, as here, was "the meaning of 'principal and permanent residence' and 'fixed and permanent abode.'" *Id.* at 837. "If those phrases combine to mean something like 'domicile' then Plaintiffs prevail, but if they combine to mean something like 'residence' then Air France prevails." *Id.* Air France, evidently reading from the same playbook as Malaysia Airlines, argued that "principal and permanent residence" meant nothing more than mere "residence." After examining the *Hornsby* decision, the court came to the same conclusion. In pertinent part, it explained:

> The conclusion drawn by the court in *Hornsby* makes sense. The word "permanent" implies something other than just a determination of where a person was living at the time of the accident, and the available drafting history does not support the conclusion that the drafters meant to eschew a meaning similar to "domicile." Although there was some disagreement among the delegates about including the word "domicile," and it ultimately was not included, that disagreement stemmed from the word's different meaning in English than in French. To avoid confusion, the drafters used the phrase "principal and permanent residence," "[b]ut the fact that the language was changed does not necessarily indicate that the new language in the English version was intended to have a substantially different meaning [than domicile]." Moreover, treating "principal and permanent residence" like "domicile" is consistent with the purpose of the fifth jurisdiction—"enhanc[ing] passengers' rights under the [ ] treaty."

*Id.* at 837-838 (citations and page number omitted).

The court then addressed and rejected each of the three arguments Air France proffered in support of its position that *Hornsby* had been wrongly decided—the same three arguments that Malaysia Airlines has tossed against the wall here. First, Air France cited *Seales v. Panamanian Aviation Co.*, No. 07-cv-2901, 2009 WL 395821 (E.D.N.Y. 2009), for the proposition that the phrase "principal and permanent residence" does not mean "domicile." *Id.* at 838. But the court, having read *Seales*, correctly determined that *Seales* was inapposite to the question before it because "*Seales* did not conduct any analysis of the meaning of 'principal and permanent

---

[11] "Air France sets forth facts that it believes show that the domestic Plaintiffs—representing Mr. and Mrs. Harris who perished in the crash—cannot invoke the 'fifth jurisdiction' because the decedents' 'principal and permanent residence' 'at the time of the accident' was in Brazil, not the United States." *Id.*

residence.' Rather, the [*Seales*] court simply held that the plaintiff failed to meet his burden of establishing that his 'principal and permanent residence' was in the United States." *Id*. Second, Air France argued that the phrase "at the time of the accident" delimited the relevant scope of the court's analysis to the facts as they existed at the time of the accident. *Id*. Because a passenger's future intent to return to the United States was a fact that would have materialized, if at all, at some point after the accident, Air France cleverly contended that the Montreal Convention precluded any reference to a passenger's intentions. The court found this argument "unpersuasive because the phrase 'at the time of the accident' merely tells the court the time period upon which it should focus in deciding the location of the 'principal and permanent' residence. It does not tell the court whether the inquiry amounts to asking where the passenger was 'residing' or instead where the passenger was 'domiciled.'" *Id*. Third, straining to find meaning in its view of the purpose of the Montreal Convention, Air France suggested that the phrase "principal and permanent residence" could not mean "domicile" because, it said, the Convention's drafters intended for a "straightforward, simple test that did not turn on nationality." *Id*. The court, however, found two flaws in Air France's reasoning:

> First, if the drafters wanted the fifth jurisdiction to turn on where the passenger was residing at the time of the accident they could have excluded the words "principal and permanent" before the word "residence." Second, treating "principal and permanent residence" like "domicile" does not make the fifth jurisdiction turn on nationality.

*Id*. Accordingly, the court concluded, "based on the evidence that the Harrises were temporarily living in Brazil while Mr. Harris completed an international work assignment, their 'principal and permanent residence' (their 'one fixed and permanent abode') was in the United States at the time of the crash." *Id*.

12

Malaysia Airlines offers two principal retorts to these holdings. First, it speculates that "[t]hose decisions may have been made without the benefit or consideration of the complete drafting history, the overwhelming weight of which establishes that there is no room for consideration of a passenger's subjective intent for purposes of determining his or her 'principal and permanent residence.'" [ECF 38-1, at 17-18]. But, even if that drafting history suggested anything of the sort—which it does not—the Supreme Court has repeatedly instructed courts not to rely on legislative history when the text of a statute or treaty is clear. *See Brink's Ltd. v. South African Airways*, 93 F.3d 1022, 1026-27 (2d Cir. 1996) ("Our interpretation of the Warsaw Convention must begin 'with the literal language.' If the language is 'reasonably susceptible of only one interpretation,' our task of interpretation ends there. We may apply secondary tools of interpretation only when the treaty text is ambiguous." (citing *Chan v. Korean Air Lines, Ltd.,* 490 U.S. 122, 134 (1989) (citation omitted))). And, as Malaysia Airlines time and again concedes, the text of Article 33 is clear.[12] Accordingly, the drafting history of Article 33—upon which Malaysia Airlines spends the bulk of its analysis—is relatively insignificant here.

In either event, Malaysia Airlines' supposition that the *Hornsby* and *Mid-Atlantic* Courts had not reviewed the drafting history of Article 33 is expressly belied by the text of those opinions. *See Hornsby*, 593 F.Supp.2d at 1138 ("If the terms of a treaty are ambiguous or unclear, courts may turn to the negotiation and drafting history of the treaty for guidance. To that end, Defendant references excerpts from *the minutes of the [ICAO] International Conference on Air Law, held at Montreal May 10–28, 1999, which resulted in the final draft of the Montreal Convention*.") (emphasis added) (citation omitted); *Mid-Atlantic*, 760 F.Supp.2d at 838 ("The word 'permanent' implies something other than just a determination of where a person was living at the time of the accident, *and the available drafting history* does not support the

---

[12] [ECF 38-1, at 9 ("The meaning of "principal and permanent residence," as defined by Article 33.3, is clear[.]")].

conclusion that the drafters meant to eschew a meaning similar to 'domicile.'") (emphasis added).

Second, Malaysia Airlines argues that these decisions are "factually dissimilar to the facts … at issue here." [ECF 38-1, at 18]. Malaysia Airlines does not elaborate on this point— presumably because it recognizes that the respective facts of these cases could have absolutely no bearing on the *legal* definition of the words "principal and permanent residence." In any case, the salient facts of *Hornsby* and *Mid-Atlantic* appear to be on all fours, so to speak, with ours. After all, Hornsby was an American citizen who was temporarily living and working in Germany when he was killed in a German plane crash. The *Mid-Atlantic* Plaintiffs were U.S. citizens who were temporarily living and working in Brazil when an Air France flight crashed en route from Brazil to Paris. And Mr. Wood was an American citizen temporarily living and working in Malaysia when his Malaysian flight crashed en route to China.

### C.    Malaysia Airlines' legal arguments are unpersuasive

In the face of all this, Malaysia Airlines can conjure nothing more than the same tired arguments that two federal courts have addressed and rejected already. First, it says that "[t]he jurisdictional provisions of Article 33, like the jurisdictional provisions of Article 28 of the predecessor Warsaw Convention, are *restrictive* and intended to *limit* rather than broaden the permissible jurisdictions available under this international treaty." [ECF 38-1, at 2]. Second, it contends that the Eastern District of New York's decision in *Seales* somehow stands for the proposition that a passenger's intent to return to the United States is not relevant to the jurisdictional inquiry under Article 33(2). [ECF 38-1, at 7-9]. Third, noting again that the drafters of the Montreal Convention opted not to use the word "domicile" in Article 33, Malaysia Airlines argues that Article 33 does not permit courts to consider a passenger's intent. *Id.* at 11-

13. Fourth, Malaysia Airlines quotes from the minutes of an early meeting of the Special Group on the Modernization and Consolidation of the Warsaw System ("Special Group-Warsaw") for the proposition that the drafters of the Montreal Convention precluded courts from relying on the passenger's intent. *Id*. at 13. Fifth, it says that the phrase "principal and permanent residence" necessarily requires courts to ask only where the passenger was *actually living* at the time of the accident. [*Id*. at 15]. Each of these arguments is meritless and should be rejected.

To begin with, the Montreal Convention intended the Fifth Jurisdiction, not, as Malaysia Airlines argues, as a limitation, but as an "expansion of jurisdictional choices." ICAO Preparatory Material, *Report of the First Meeting of the Special Group on the Modernization and Consolidation of the "Warsaw System*," May 14-18, 1998, at 243 ¶ 2:47 ("Special Group-Warsaw, First Report") (**Ex. 7**). To support its view that Article 33(2) should be read restrictively, Malaysia Airlines cites to a 1987 case from this Circuit, *Boyar v. Korean Air Lines*, 664 F.Supp. 1481, 1483 (D.D.C. 1987), that—though relevant to the four jurisdictions under the Warsaw Convention, *see* Montreal Convention Art. 33(1)—could not have had anything to do with the Montreal Convention's Fifth Jurisdiction, Art. 33(2), which did not become law until 2003. Prior to the Montreal Convention's enactment, of course, the Warsaw Convention had restricted a plaintiff's jurisdictional choices to the four jurisdictions now set out in Article 33(1). *See* Warsaw Convention, Art. 28(1). Each of these choices centered around the airline's contacts. Article 33(2) of the Montreal Convention, however, created a jurisdictional nexus based on the passenger's contacts—that is, the Fifth Jurisdiction. Thus, as Judge Breyer has noted, "the purpose of the fifth jurisdiction" was to "enhanc[e] passengers' rights under the treaty," *Mid Atlantic*, 760 F.Supp.2d at 838 (brackets omitted), and not, as Malaysia Airlines contends, to

limit or restrict them.[13]

Second, *Seales* did not, as Malaysia Airlines suggests, "recognize[] that 'principal and permanent residence' is specifically defined by the Montreal Convention and means something distinctly different from the concept of 'domicile' as understood under United States common law for purposes of diversity jurisdiction." [ECF 38, at 8]. In saying that it did, Malaysia Airlines wisely does not quote from the *Seales* opinion itself—does not quote from it because, in fact, *Seales* said no such thing. To the contrary, as Judge Breyer explained in *Mid-Atlantic*, "*Seales* did not conduct any analysis of the meaning of 'principal and permanent residence.'" *Mid-Atlantic*, 760 F.Supp.2d at 838. Indeed, neither party in *Seales* had even briefed the question of Fifth Jurisdiction. *Seales*, 2009 WL 395821, at \*10. As a result, far from deciding that "principal and permanent residence" meant, in Malaysia Airlines' words, "something distinctly different" from domicile, the *Seales* "court simply held that the plaintiff failed to meet his burden of establishing that his 'principal and permanent residence' was in the United States." *Mid-Atlantic*, 760 F.Supp.2d at 838. In short, *Seales* has absolutely no bearing here, and Malaysia Airlines'

---

[13] This understanding of the Montreal Convention's *expansive* scope appears to be widely held. As the Second Circuit has said:

> Whereas the "primary aim of the contracting parties to the [Warsaw] Convention" was to limit "the liability of air carriers in order to foster the growth of the ... commercial aviation industry," *Sulewski*, 933 F.2d at 184 (internal citations and quotation marks omitted), the contracting parties to the Montreal Convention expressly approved that treaty because, among other reasons, they recognized "the importance of ensuring protection of the interests of consumers in international carriage by air and the need for equitable compensation based on the principle of restitution." Montreal Convention, pmbl. The Senate has similarly recognized that "[t]he new Montreal Convention represents the culmination of decades of efforts by the United States and other countries to establish a regime providing increased protection for international air travelers and shippers." S. Exec. Rep. No. 108–8, at 2 (2003). Hence, commentators have described the Montreal Convention as a treaty that favors passengers rather than airlines. *See, e.g.,* Thomas J. Whalen, *The New Warsaw Convention: The Montreal Convention,* 25 Air & Space L. 12, 14 (2000) ("The Montreal Convention is no longer a Convention for airlines. It is a Convention for consumers/passengers."); Batra, *supra,* at 443 ("the Montreal Convention recognizes the importance of ensuring protection of the interests of consumers in international air carriage").

*Ehrlich v. American Airlines, Inc.,* 360 F.3d 366, 366 n.4 (2d Cir. 2004).

attempt to extract some special significance from the case speaks volumes about the state of the law on this question.

Third, far from supporting Malaysia Airlines' contention that the Convention opted not to use the word "domicile" in order to preclude courts from relying on a passenger's subjective intent, the Convention's drafting history shows that the word was removed because it meant different things in different languages. In fact, the Convention based its decision to replace the word "domicile" on the Report of the Rapporteur, which the Rapporteur composed during the 150th Session. [14] In relevant part, that Report noted:

> Use of "domicile" or "ordinary residence" of the carrier should be examined by the Legal Committee. Where the authentic text of the Warsaw Convention uses the expression "*domicile du transporteur*" it has been translated as "where the carrier is ordinarily resident" in the UK whilst the American translation is "domicile of the carrier". In the Guatemala City Protocol the French wording "*si le passage a son domicile*" appears as "if the passenger has his domicile" in the authentic English version. [The Alvor Draft Convention], however, uses "domicile" in English in respect of both the carrier and the passenger. This is a delicate area requiring detailed consideration and, possibly new definitions for the avoidance of doubt and dispute.

ICAO Preparatory Material, *Council—150th Session*, Mar. 7, 1997, *Modernization of the "Warsaw System"—Rapporteur's Report and Matters Relating to the 30th Session of the Legal Committee,* Attachment A at 70-71 ¶ 5.4.21 (**Ex. 9**). By the 154th Session, which occurred one year later, on May 27, 1998, the Special Group replaced "domicile or permanent residence" with "principal and permanent residence." *See* ICAO Preparatory Material, *Council—154th Session*, *Modernization of the "Warsaw System,"* May 27, 1998, at 124 (**Ex. 10**). As the Chairman of the Convention made clear, this change was made, not to remove the notion of subjective intent, but

---

[14] The Convention referred the drafting of the text of the Fifth Jurisdiction to the Legal Committee. The Legal Committee presented a first draft to the Convention. At that point, a Rapporteur was appointed who reviewed and revised that draft. The Rapporteur then presented a report of his revisions to the Convention. *See* ICAO Preparatory Material, *Council—150th Session*, *Rapporteur's Report and Matters Relating to the 30th Session of the Legal Committee* Mar. 7, 1997, at 49 ¶ 1.2 (**Ex. 8**).

to eliminate the confusion that had surrounded the various definitions each country had attributed to the word "domicile." ICAO Minutes, *Minutes of the Fourth Meeting*, May 19, 1999, at 153 ¶ 2 (statement of the Chairman) (**Ex. 11**).[15]  In the end, the change was based upon the recommendations of the Rapporteur from the 150th Session. *See* **Ex. 10**, at 109-10 ¶¶ 1.1-2.1, 124.

Notably, this was precisely the conclusion of the *Hornsby* Court after its review of Article 33(2)'s drafting history. In relevant part, the court explained:

> [The ICAO minutes] suggest[] that the United States may originally have sought to use the word "domicile" in the language of the fifth jurisdiction provision, which was then changed to "principal and permanent residence" during the negotiating process. However, the change appears to have been motivated at least in part, by confusion engendered by the multi-lingual nature of the negotiations. The French word "*domicile*," despite its orthographic similarity to the American term "domicile," is not a direct translation of that term. Thus, the use of those terms in the identical location had been producing a non-uniform result in the French and English language versions of the Convention. Given this confusion it is not surprising that the language was changed. But the fact that the language was changed does not necessarily indicate that the new language in the English version was intended to have a substantially different meaning.

*Hornsby*, 593 F.Supp.2d at 1139. Not surprisingly, Judge Breyer, writing one year later in *Mid-Atlantic*, arrived at the same conclusion:

> Although there was some disagreement among the delegates about including the word "domicile," and it ultimately was not included, that disagreement stemmed from the word's different meaning in English than in French. To avoid confusion, the drafters used the phrase "principal and permanent residence," "but the fact that the language was changed does not necessarily indicate that the new language in the English version was intended to have a substantially different meaning [than domicile]."

*Mid-Atlantic*, 760 F.Supp.2d at 837-38 (quoting *Hornsby*, 593 F.Supp.2d at 1139).

---

[15]  The Chairman noted "that, on the one hand, there had been an American notion, memorialized in prior instruments, of 'domicile' of the passenger while, on the other hand, there had been the French concept of *domicile*, which was also reflected in prior instruments. With great good will on both sides, the Special Group has come up with 'principal and permanent residence', considered by both sides at the time to be a *reasonable compromise*, although not an ideal solution from their perspectives." *Id.*

Fourth, Malaysia Airlines cites to a portion of the minutes of an early meeting of the

Special Group-Warsaw, which noted the following:

> The ensuing discussion revealed a clear preference not to retain any reference to
> the phrase 'to which, if absent, for less than three years, he or she intends to return
> as it was believed that the element of "intent" opened the door to too many
> subjective criteria. Furthermore, any attempt to devise a determinative time period
> during which the passenger had to return was considered to be controversial.
> Following a proposal by one delegation, a consensus was reached within the
> Group to indicate that in any future definition the criterion to be used for the
> determination of the passenger's home be considered on the basis of the facts
> existing at the time of the accident.

**Ex. 7** at 244 ¶ 2:53. From this selection, Malaysia Airlines draws two related propositions. First,

it claims that the quoted passage proves that "even at this early stage in the drafting process there

was a consensus that a passenger's subjective intent with respect to his or her actual residence

could not be considered in the determination of 'principal and permanent residence' for purposes

of the fifth jurisdiction." [ECF 38-1, at 13]. But the selectively cherry-picked perspective of one

small group of drafters—drafters who did not all vote on the final text—long before the Montreal

Convention was enacted cannot supplant the plain meaning of the words that were actually

debated, voted on, and ratified in the final text of the treaty. *Chan*, 490 U.S. at 134 (rejecting the

use of a treaty's drafting history in interpreting the unambiguous text of the treaty); *Mora v. New*

*York*, 524 F.3d 183, 207 (2d Cir. 2008);[16] *Marquez-Ramos v. Reno*, 69 F.3d 477, 480 (10th Cir.

1995) (quoting *Eastern Airlines, Inc. v. Floyd*, 499 U.S. 530, 534 (1991));[17] *Snap-On Tools, Inc.*

*v. United States*, 26 Cl. Ct. 1045, 1070 (1992), aff'd sub nom. *Snap-On Tools Corp. v. United*

*States*, 26 F.3d 137 (Fed. Cir. 1994) (citing *Burlington Northern R.R. v. Oklahoma Comm'n*, 481

---

[16] "The terms in which the Supreme Court has described the interpretive effect of the negotiating and drafting history of a treaty, the *travaux preparatoires*, suggest a usefulness that is conditional and secondary to the text and context of the treaty." *Id.*

[17] "[H]is argument … is not based on the Treaty itself, but rather on the legislative history behind the Act.  However, in interpreting a treaty, we do not look first to the legislative history of its implementing act…Where the text is clear, we interpret as written." *Id.*

U.S. 454, 461 (1987)).[18] After all, the *Wood* Plaintiff could just as easily—and no less speciously—quote from a separate paragraph from the minutes of that same meeting of the Special Group-Warsaw for the proposition that the drafters of Article 33 recognized that the phrase "permanent home"—an early precursor of "principal and permanent residence"—incorporated the American concept of "domicile." *See* **Ex. 7**, at 243 ¶ 2:47.[19]

In either event, there can be no dispute that the French delegation—the Fifth Jurisdiction's primary opponent—understood that the phrase "principal and permanent residence" incorporated an element of intent. *See* ICAO Documents, DCW Doc No. 33, *Draft Convention for the Unification of Certain Rules for International Carriage by Air (Presented by France)*, May 28, 1999, at 197 (emphasis added) (**Ex. 12**).[20] Fearing the inclusion of this language, the French delegation insisted upon its removal or, barring that, upon the inclusion of Article 33(2)'s two additional elements and a clause precluding jurisdiction solely on the basis of a passenger's nationality.[21] *See Hornsby*, 593 F.Supp.2d at 1138;[22] *see also* **Ex. 7** at 244 ¶ 2:48;[23]

---

[18] "In the case of interpretation of statutes, legislative history, including any Committee Reports and statements included in the legislative record, provide only indicia of congressional intent, and may be referred to only in instances when the statutory terms are ambiguous and the intent is unclear." *Id.*

[19] "[An unnamed delegation] emphasized the need for a compromise which could be found by attempting to devise a generic, universally applicable term such as 'permanent home' that would adequately capture the concepts presently denoted by the terms 'domicile,' 'permanent residence,' or 'ordinary residence.' This approach was supported by a large number of delegations." *Id.*

[20] "It is to be feared that ['principal and permanent residence'] corresponds to the notion of 'permanent abode,' to which the person concerned *intends to return even if he lives elsewhere temporarily*." *Id.* (emphasis added).

[21] These additional elements are "to or from which the carrier operates services for the carriage of passengers by air, either on its own aircraft or on another carrier's aircraft pursuant to a commercial agreement," and "in which that carrier conducts its business of carriage of passengers by air from premises leased or owned by the carrier itself or by another carrier with which it has a commercial agreement." Montreal Convention, Art. 33(2).

[22] "[T]here was opposition to the idea of basing jurisdiction solely on a passenger's nationality. Led by France, this opposition stemmed from the reluctance of developing countries whose carriers conducted no operations to or in the United States to agree that such a carrier should be subjected to jurisdiction in the United States any time a U.S. citizen was injured while traveling on one of the carrier's planes." *Id.* (citation omitted).

[23] "A compromise solution should be guided by the overriding consideration of devising adequate and acceptable connecting criteria between the passenger and the State of jurisdiction before which the claim is brought as well as an effective nexus between the air carrier's commercial presence and the chosen jurisdiction." *Id.*

ICAO Minutes, *Minutes of the Eighth Meeting*, May 17, 1999, at 104-105 ¶ 47 (**Ex. 13**).[24] To

placate the French, the Convention, at the behest of the American delegation, ultimately included

these additional elements along with the Article's final line.[25] *See* ICAO Documents, DCW Doc

No. 12, *Draft Convention for the Unification of Certain Rules for International Carriage by Air

(Presented by the United States of America)*, May 10-28, 1999, at 106-09 (**Ex. 14**); [26] *see also*

ICAO Minutes, *Minutes of the Thirteenth Meeting*, May 25, 1999, at 205 ¶ 16 (**Ex. 15**);[27]

*Hornsby*, 593 F.Supp.2d at 1138.[28] This compromise, then, strongly suggests that the French

delegation understood "principal and permanent residence" to include an assessment of the

passenger's intent, that France objected to the phrase on that ground, but that France ultimately

allowed the phrase to be included anyway—despite, that is, its objectionable meaning—in

exchange for three clauses *that have nothing to do with domicile or the passenger's intent*.

The second argument Malaysia Airlines extracts from the Special Group-Warsaw's First

Report is that the phrase "at the time of the accident" was intended to prevent courts from

considering a passenger's intent in the Fifth Jurisdiction analysis.[29] Writing in *Mid-Atlantic*,

---

[24] "[P]revious reference had been made to 'domicile or permanent residence,' as in … the Guatemala City Protocol. [The French delegation] expressed concern that the present wording … would make the nationality of the plaintiff a decisive factor in the acceptance or dismissal of a case and would ultimately create a jurisdictional privilege." *Id.*

[25] That line is: "The nationality of the passenger shall not be the determining factor in this regard." Montreal Convention, Art. 33(3)(b).

[26] "The fifth jurisdiction is consistent with general principles of international law, in that it requires significant nexus between both parties and the forum…. Accordingly, the Special Group draft convention has significant protection against forum shopping. The fifth jurisdiction applies only where it is the passenger's 'principal and permanent residence,' and then only if the carrier has a significant presence in that state." *Id.*

[27] "The definition [of "principal and permanent residence"] ensured that it was not possible to have several principal and permanent residences from among which to choose the most convenient one in which to bring an action. The last sentence had been added in light of the considerable concerns expressed regarding some jurisdictions which would view nationality as being equivalent to 'principal and permanent residence.'" *Id.*

[28] "Thus, the final compromise reached to include a fifth jurisdiction specifically addressed this concern, extending jurisdiction only over those carriers who 'operate services' within a jurisdiction, and noting that the nationality of the injured party is not alone sufficient to establish jurisdiction." (citations omitted). *Id.*

[29] [ECF 38-1, at 13 ("[Th]e Special Group replaced the phrase 'in which the passenger has his domicile or permanent residence' with the place 'in which *at the time of the accident* the passenger has his or her *principal and permanent residence*,' and agreed that the determination would be based only on objective facts contemporaneous with the time of the accident without consideration of intent to return to a former residence. Thus, the Special Group

Judge Breyer found this exact argument "unpersuasive because the phrase 'at the time of the accident' merely tells the court the time period upon which it should focus in deciding the location of the 'principal and permanent' residence. It does not tell the court whether the inquiry amounts to asking where the passenger was 'residing' or instead where the passenger was 'domiciled.'" *Mid-Atlantic*, 760 F.Supp.2d at 838. Malaysia Airlines does not even attempt to explain how or why Judge Breyer's reasoning on this point was flawed.

Fifth and finally, Malaysia Airlines—again, cribbing from Air France's playbook— contends that "the agreement to draft a precise definition of 'principal and permanent residence' … was intended to preclude courts from interpreting the fifth jurisdiction by reference to a passenger's subjective intent to reside somewhere other than where he or she was actually residing at the time of the accident in question." [ECF 38-1, at 15]. But, as Judge Breyer pointed out in rejecting this very same argument, "if the drafters wanted the fifth jurisdiction to turn on where the passenger was residing at the time of the accident they could have excluded the words 'principal and permanent' before the word 'residence.'" 760 F.Supp.2d at 838. Again, Malaysia Airlines makes no effort to prove Judge Breyer wrong.

Indeed, the facts of Mr. Wood's case demonstrate just how right Judge Breyer was. After all, the IBM contract under which Mr. Wood was living and working, first in China and later in Malaysia, specifically referenced the "temporary"—as opposed to "permanent"—nature of those assignments. **Ex. 16** (Malaysian employment contract). Moreover, each of Mr. Wood's foreign assignments had a specific end date—a date that, in short, underscored the _im_permanence of his presence abroad. *Id.*; **Ex. 17.** IBM itself has submitted a declaration attesting that Mr. Wood's foreign assignment in Malaysia was temporary, that IBM always considered Mr. Wood to be a

---

specifically tailored the wording of the fifth jurisdiction to highlight the importance of the passenger's actual residence at the time of the accident in question.") (emphasis in original)].

full-time employee of IBM-U.S., and that IBM treated Mr. Wood as an American resident. *See* **Ex. 6** at ¶¶ 4, 5 (Blaustein Decl.). Under Malaysia Airlines' reading of the statute, however, Mr. Wood would have been deemed a permanent resident of Malaysia, whether his assignment in Kuala Lumpur had been two years (as it was) or one—or, for that matter, six months or three months or even two—so long as he was actually residing in Malaysia at the time of the accident.[30] As this logical extension makes clear, Malaysia Airlines' reading of the phrase "principal and permanent residence" strips the adjectives "principal and permanent" completely out of Article 33(2) and stretches the meaning of the phrase beyond recognition.

In short, as every federal court that has looked at this question has found, the phrase "principal and permanent residence" is akin to the American notion of "domicile" and, as such, requires an assessment of the passenger's intent to return to the United States.

## D.  Mr. Wood's domicile was in the United States

A person's domicile is her "true, fixed and permanent home and place of habitation. It is the place to which, whenever [she] is absent, [she] has the intention of returning." *Freidrich v. Davis*, 767 F.3d 374, 377 (3d Cir. 2014) (quoting *McCann v. Newman irrevocable Trust*, 458 F.3d 281, 286 (3d Cir. 2006), and *Vlandis v. Kline*, 412 U.S. 441, 454 (1973)). "Domicile is determined by two factors: physical presence in a state, and intent to remain there for an unspecified or indefinite period of time." *Prakash v. Am. Univ.*, 727 F.2d 1174, 1180 (D.C. Cir. 1984). Although "residency is indicative of domicile, it is not determinative." *Naegele v. Albers*, 355 F.Supp.2d 129, 134–35 (D.D.C. 2005); *see also Shafer v. Children's Hosp. Soc'y of Los Angeles*, 265 F.2d 107, 121 (D.C. Cir. 1959) ("[D]omicile and residence are two different

---

[30] Indeed, as we point out below, Mr. Wood had spent no more than thirty (30) days in Malaysia when he died— hardly the indicia of permanence.  *See* **Ex. 6** at ¶ 27-29.

things."); *United States v. Williams*, 825 F.Supp.2d 117, 124 (D.D.C. 2011).[31] "Indeed, a person may have multiple residences, but may have only one domicile, and a person may be a resident of one locality, but be domiciled in another." *Core VCT Plc, v. Hensley*, 59 F.Supp.3d 123, 126 (D.D.C. 2014); *Williams*, 825 F.Supp.2d at 124; *Lopes v. Jetsetdc, LLC*, 4 F.Supp.3d 238, 241–42 (D.D.C. 2014). Thus, "a prolonged absence from one's domicile is not determinative of abandonment." *Wagshal v. Rigler*, 947 F.Supp. 10, 13 (D.D.C. 1996); *Core*, 59 F.Supp.3d at 125. Notably, "a person's old domicile is not lost until a new one is acquired." *Lew v. Moss*, 797 F.2d 747, 750 (9th Cir. 1986). As such, "courts apply a presumption of continuing domicile, so that domicile in one place remains until domicile in a new place is established." *Core*, 59 F.Supp.3d at 125.[32]

This Court's evaluation of domicile "must be fact-specific." *Wagshal*, 947 F.Supp. at 13. The Sixth Circuit, collecting sources, set out a number of factors that courts should consider in establishing domicile, including "affidavits of intention, transfer requests, registration for driver's licenses, opening bank accounts, addressing tax returns, motive for establishing domicile, and other physical facts evidencing that the desire to remain will not expire when the order requiring presence does." *Stifel*, 477 F.2d 1116, 1122 (6th Cir. 1973); *Hovensa*, 652 F.3d at 344; *Lew*, 797 F.2d at 750; *Core*, 59 F.Supp.3d at 125. Likewise, this Court has said that "[i]ndicia of domiciliary status may include a person's current residence, a sworn declaration of domicile, ownership of real and personal property, voting registration, bank accounts, automobile registration, driver's license and club membership." *Core*, 59 F.Supp.3d at 126.

---

[31] Residence, *Williams* held, is "[t]he act or fact of living in a given place for some time, while domicile is a person's true, fixed, principal, and permanent home, to which that person intends to return and remain even though currently residing elsewhere." *Id.*

[32] *See also Desmare v. United States*, 93 U.S. 605, 610 (1876); *Washington v. Hovensa, LLC*, 652 F.3d 340, 345 (3d Cir. 2011) (citing *McCann*, 458 F.3d at 286-87); *Acridge v. Evangelical Lutheran Good Samaritan Soc.*, 334 F.3d 444, 448 (5th Cir. 2003); *Gutierrez v. Fox*, 141 F.3d 425, 427 (2d Cir. 1998).

We begin, then, with the presumption that Mr. Wood's domicile was in the United States. *See McCann*, 458 F.3d at 286-87 ("This principle gives rise to a presumption favoring an established domicile over a new one."); *Core*, 59 F.Supp.3d at 125 ("[D]omicile in one place remains until domicile in a new place is established."). Malaysia Airlines suggests that this presumption applies only in diversity cases and not to the question of domicile under the Montreal Convention. [ECF 38-1, at 42]. But Malaysia Airlines cites not a single source for this proposition, which, so far as the Plaintiffs have been able to discern, has no basis whatever in the annals of Montreal Convention jurisprudence. To the contrary, the two applicable Montreal Convention cases—*Hornsby* and *Mid-Atlantic*—readily apply domicile concepts from other areas of the law to the notion of domicile under the Fifth Jurisdiction. *See Hornsby*, 593 F.Supp.2d at 1137-1140; *Mid-Atlantic*, 760 F.Supp.2d at 837- 839. And there is no reason to believe that this presumption of domicile—alone out of all the other domicile concepts—would not apply here also.

In either event, the evidence is overwhelming that Mr. Wood's domicile was in the United States. Malaysia Airlines concedes that Mr. Wood was, for the first 47 years of his life, domiciled in the United States, but says that his domicile changed as soon as he took a temporary, three-year work assignment in China in January of 2011. [ECF 38-1, at 39]. Here, again, Malaysia Airlines appears to conflate the concept of "domicile" with its preferred notion of "residence." After all, domicile requires an "intent to remain there for an *unspecified or indefinite period of time*." *Prakash*, 727 F.2d at 1180 (emphasis added). And Mr. Wood only ever intended to remain in China for three years. In fact, his employment in China had, by the terms of his contract, a specific end date of December 31, 2014, which was extended until February 2014 (**Ex. 17**); his temporary Chinese residence permit had a specific expiration of

25

May 15, 2014 (**Ex. 6** at ¶ 8, Ex. 3); his temporary alien employment permit had a specific expiration of May 19, 2014 (*Id.* at ¶ 8, Ex. 4); and his lease at the Chinese hotel at which he was staying expired on January 14, 2014 (*Id.* at ¶ 9, Ex. 9). Mr. Wood's intention to remain in China for a definite period of three years thus could not have altered his domicile because, by definition, a period of three years is not _in_definite or _un_specified. Indeed, Mr. Wood's intention of remaining no more than three years in China was reified when, in November 2013, he did not remain in China, but instead sought and obtained a separate, two-year assignment in Malaysia. [ECF 38-1, at 40].

Unsurprisingly, Malaysia Airlines—continuing to confuse domicile for residence—argues that Mr. Wood's domicile then changed again from China to Malaysia. *Id.* The airline says so even though, again, Mr. Wood's temporary, two-year assignment in Malaysia had a specifically defined end date of January 1, 2016. [ECF 38-43, at 2 ¶ 3].[33] Notably, Mr. Wood's IBM-China assignment had to be extended until February 2014 because his IBM-Malaysia assignment's original start date of January 2, 2014 was pushed back to February, 10, 2014, so that Mr. Wood could obtain a *temporary work visa*. [ECF 38-39]. Mr. Wood then traveled to Texas at the end of February for ten days for his father, Aubrey's, birthday, which was on March 1, 2014. **Ex. 5** at ¶ 5(f); **Ex. 1** at ¶ 6(f); **Ex. 2** at ¶ 6(f); **Ex. 3** at ¶ 6(f); **Ex. 4** at ¶ 5(f). He did not return to Malaysia until March 4, 2014. **Ex. 6** at ¶ 29. In this respect, it is worth noting that Mr. Wood's apartment lease in Malaysia did not begin until March 1, 2014 and was set to expire on February 28, 2016—an end date consistent with the expiration of his temporary work assignment

---

[33] "[T]he Employee will be employed by the Employer for a period of 24 months commencing from January 2, 2014 … to January 1, 2016." *Id.*

in Malaysia.[34] *Id.* at ¶ 11, Ex. 11. Tellingly, then, the country Malaysia Airlines calls Mr.

Wood's "principal and permanent residence" at the time of the accident was also a country in

which Mr. Wood had spent no more than thirty (30) days[35] prior to his death, a country in which

he was living on a temporary work permit and working on a temporary assignment from his

American employer. *Id.* at ¶¶ 5, 12, 27-29. Again, domicile requires an "intent to remain there

for an *unspecified or indefinite period of time*." *Prakash*, 727 F.2d at 1180 (emphasis added).

On the other hand, Mr. Wood, an American citizen who had lived in the United States for

his entire life until 2011, continued to center his economic and financial life in the United States

while he was abroad. For example, he continued to file his tax returns in the United States every

year while he was away—a bizarrely complicated and unnecessary hassle for someone who, in

Malaysia Airlines' telling, had given up his status as an American domiciliary and who had no

intention of returning. *See* 2011-2013 tax returns, (**Ex. 18**). Notably, Mr. Wood never sought

permanent residence or citizenship in either China or Malaysia. Mr. Wood also kept, until the

time of his death, a Chase checking account, Account Number xxxxx1486 (**Ex. 19**); a Chase

savings account, Account Number xxxxxx7687 (**Ex. 20**); and a Chase credit card, Account

Number xxxxxxx6955 (**Ex. 21**)—all opened and operated through American banks at American

branches. What is more, at the time of the accident, Mr. Wood owned a 401(k) retirement

account with a balance of one million dollars, Account Number Cxxxxxx9311 (**Ex. 22**), and he

retained an active brokerage account with Charles Schwab & Co., Account Number xxx4553

(**Ex. 23**)—both owned and operated in the United States. Notably, all of these accounts were

active at the time of the accident and all of them listed Mr. Wood's address as 104 Dalton Street,

---

[34] For these reasons, even if this Court were to find that "principal and permanent residence" means something different than "domicile"—something, say, between domicile and residence—neither Malaysia nor China can be that "residence" because, by definition, neither was "permanent."

[35] **Ex. 6** at ¶ 27-29, Ex. 16.

Keller, Texas 76248—the home in which Mr. Wood had lived with his wife and children. *See* **Exs. 19-23**.

Despite his foreign assignment, Mr. Wood also continued to insure virtually every aspect of his life through American policies with American companies. For example, IBM "funded life insurance policies for Mr. Wood, which were issued in the United States, and Mr. Wood designated his two sons as his beneficiaries upon Mr. Wood's death…. [N]o similar policies were issued in China or Malaysia because Mr. Wood was only on temporary assignment in China and Malaysia." **Ex. 6** at ¶ 15.[36] Mr. Wood kept a homeowner's insurance policy on the family home at 104 Dalton Street, in Keller, Texas, *see* State Farm Homeowner's Ins. Policy No. 58B4L1423 (**Ex. 24**), and he maintained his health insurance policy in the United States through American insurance companies that had contracted with his American employer. *See* Cigna card, Acct. No. 02776E003 (**Ex. 26**); **Ex. 16**, at 14. Indeed, this option was left open to Mr. Wood in his temporary contract with IBM-Malaysia. **Ex. 16**, at 14. Moreover, according to the State Farm Mutual Automobile Insurance Company, Mr. Wood was the registered insured on one motorcycle insurance policy (Policy Number 2441785A1143B), *see* **Ex. 2** at ¶¶ 13, 14, Exs. D & E, as well as an automobile insurance policy (Policy Number 038644F143L) for three separate vehicles, *all of which Mr. Wood kept in the United States*—again, a needless administrative annoyance, not to mention an unnecessary expenditure of cash, for a man who, Malaysia Airlines says, never intended to return. **Ex. 1** at 13, Ex. C; **Ex. 2** at ¶ 13, Ex. C.

Mr. Wood's civic and political life were also centered in the United States. Until his death, Mr. Wood maintained an *active* voter registration in Texas, *see* **Ex. 27** (voter registration

---

[36] In fact, Mr. Wood maintained four separate life insurance policies in the United States—three life insurance policies funded by his employer, IBM, **Ex. 6** at ¶ 16, Ex. 13 (Prudential Group Universal Life Ins. Policy No. 8413213; Prudential Group Life Ins. Policy, IBM Serial No. 597601; and IBM Travel Accident Insurance); and a life insurance policy with State Farm. *See* State Farm Life Ins. Policy No. LF28511338 (**Ex. 25**).

records) & **Ex. 41** (Ingram Decl.), kept an active Texas driver's license, *see* **Ex. 28**, and owned a stake in a commercial property venture located at 530 Silicon Drive, Southlake, Texas 76092. **Ex. 5** (A. Wood Decl.) at ¶ 7, Ex. A. In fact, on February 27, 2013, Mr. Wood applied for and received a renewal of his Texas driver's license—again, strange behavior for someone who intended to abandon his status as an American domiciliary. *See* **Ex. 28** at 22. In addition, Mr. Wood maintained his membership in the AAA, AARP, and the NRA; he regularly received his mail at 104 Dalton Street in, Keller, Texas; and he continued to subscribe to a number of American periodicals, including the Wall Street Journal and IBM Systems Magazine. **Ex. 1** at ¶¶ 11, 12; **Ex. 2** at ¶¶ 11, 12. Moreover, as of his death, Mr. Wood's registered address with the Texas Secretary of State was in Texas. *See* **Ex. 27**. Indeed, although Mr. Wood and his wife divorced in 2013, he regularly visited Texas during his temporary assignments abroad and, when he did so, his relationship with his ex-wife and their two sons, Nick and Chris, remained so close that he continued to stay at the family home at 104 Dalton Street. **Ex. 1** at ¶ 7; **Ex. 2** at ¶ 7; **Ex. 3** at ¶ 7; **Ex. 4** at ¶ 6; **Ex. 5** at ¶ 6.[37] In this respect, we note that <u>*all of Mr. Wood's family*</u> remained in Texas while he was away, including both of his parents, his brother, Thomas—the Plaintiff here whom Mr. Wood, in his last will and testament, named the personal representative of his estate—and his two beloved sons, to whom Mr. Wood had assigned the benefits of his estate and his life insurance policies. No less important, Mr. Wood kept the bulk of his personal property at either the family home in Keller, Texas, or, for larger items, in a storage facility in Texas. *See* **Ex. 1** at ¶¶ 8-10; **Ex. 2** at ¶¶ 8-10; **Ex. 3** at ¶¶ 10-11; **Ex. 4** at ¶¶ 7-9.[38] Mr. Wood continued to

---

[37] Malaysia Airlines incorrectly claims that Mr. Wood and his ex-wife sold the home when they divorced. [ECF 38-1, at 29]. This is not true. In fact, Mr. Wood gave the home to his ex-wife as part of the divorce so that she and their two sons could live there while he was away. *See* **Ex. 3** at ¶ 9, Exs. A & B.

[38] "This storage unit contained many of his clothes, a number of expensive watches (including Rolexes), some important family memorabilia (for example, a sign from his grandfather's car dealership), his personal artwork and journals kept since childhood, his personal Bible, his guns, his ammunition, all of his welding equipment, all of his tools (including a tabletop saw), large amounts of gold bullion, and deposits of cash he had saved up over the years.

pay the fees on this storage unit until his death—powerful proof that he intended to return to the United States. **Ex. 1** at ¶ 10; **Ex. 2** at ¶ 10; **Ex. 4** at ¶ 9. Finally, upon his death, Mr. Wood's estate was duly opened and probated in Texas. **Ex. 29** (probate documents).

All of this, of course, is in addition to the unanimous attestations of Mr. Wood's sons, his father, and his brother to the effect that Mr. Wood always considered himself, until his death, an American; that Mr. Wood never established himself as a domiciliary of any other country; and that Mr. Wood always intended to return to live in the United States after his temporary foreign assignments abroad. *See* **Exs. 1-5**. Indeed, even Mr. Wood's employer, IBM, has confirmed that Mr. Wood's assignment abroad was only a temporary one, that IBM always intended for Mr. Wood to return to the United States after his temporary foreign assignment, and that it at all times considered Mr. Wood to be an American employee. *See* **Ex. 6** at ¶¶ 4, 5.[39]

Against all this, Malaysia Airlines can point only to a single bank account that Mr. Wood maintained in China from 2011-2012. [ECF 38-1, at 28]. Of course, the *Wood* Plaintiff does not deny that Mr. Wood was living in China during this time, nor do we disagree that, while living in China, Mr. Wood was undoubtedly eating Chinese food, taking Chinese transportation, using Chinese bathrooms, and spending Chinese money. Given all this, Mr. Wood's decision to open a Chinese bank account appears only sensible. But this one account cannot predominate over the many banking, brokerage, automobile, and insurance accounts Mr. Wood kept in the United States while he was away. After all, the goal in this "fact-intensive" inquiry into Mr. Wood's domicile is to locate his "center of business, domestic, social, and civic life." *Hovensa*, 652 F.3d

---

According to his last will and testament, the items in this storage unit were worth approximately $80,000." **Ex. 1** at ¶ 10, Ex. B; **Ex. 2** at ¶ 10, Ex B; **Ex. 4** at ¶ 9, Ex. B.

[39] Malaysia Airlines suggests that these statements of intent cannot override the "objective facts" with which those statements are in conflict. [ECF 38-1, at 21-22]. This may be true so far as it goes. But, as we have shown, the "objective facts" in this case support, rather than detract from, the *Wood* Plaintiff's position that Mr. Wood never gave up his status as an American domiciliary.

at 344. In any event, Mr. Wood's 2013 U.S. Tax Return shows that, by then, Mr. Wood had closed his only foreign account. *See* **Ex. 18**. Accordingly, "at the time of the accident"—the only relevant time for purposes of this analysis—*all* of the checking, security, brokerage, insurance, automobile, and savings accounts Mr. Wood owned were in the United States.

Indeed, despite having had more than one year in which to conduct discovery, Malaysia Airlines has not shown that Mr. Wood ever owned a home either in China or in Malaysia;[40] that he ever owned or leased a car in China or Malaysia; that he ever registered to vote in China or Malaysia; that he ever took out a life insurance policy in China or Malaysia; that he ever sought or obtained a retirement plan or account in China or Malaysia; that he ever bought insurance for a car in China or Malaysia; that he ever sought or obtained health or long-term care insurance in China or Malaysia; that he ever joined a single civic or political organization in China or Malaysia; that he ever invested in a commercial real estate venture—or in any venture of any kind—in China or Malaysia; that he ever sought or obtained a driver's license in China or Malaysia; that any member of his family ever lived in China or Malaysia; that he ever sought or obtained Chinese or Malaysian citizenship; or that, at the time of the accident, he owned any checking, security, brokerage, savings, or investment accounts in China or Malaysia.

In short, of the factors listed by this Court as relevant to the domicile analysis—"current residence, a sworn declaration of domicile, ownership of real and personal property, voting registration, bank accounts, automobile registration, driver's license and club membership," *Core*, 59 F. Supp. 3d at 126—only the first, "current residence," was outside of the United States. To the extent that "principal and permanent residence" must mean something more than

---

[40] Tellingly, while Mr. Wood was living in China, he was staying at the Kempiniski Hotel Beijing Lufthansa Center with an address of Beijing Lufthansa Center No. 50 Liangmaqiao Road, Chaoyang District 100125, P.R.C. **Ex. 6** at ¶ 9, Ex. 9. And, as Malaysia Airlines concedes, there is no evidence whatsoever that Mr. Wood had bought a home in Malaysia either. In any event, under the terms of his contracts, all of Mr. Wood's foreign housing expenses were paid, not out of his own pocket, but by his American employer. *Id.* at ¶ 10-11, Exs. 6 & 10.

mere residence, this is surely not sufficient.[41] Indeed, of the factors deemed relevant by the Sixth Circuit Court of appeals—"affidavits of intention, transfer requests, registration for driver's licenses, opening bank accounts, addressing tax returns, motive for establishing domicile, and other physical facts evidencing that the desire to remain will not expire when the order requiring presence does," *Stifel*, 477 F.2d at 1122—*not one* suggests that Mr. Wood ever changed his domicile from the United States to either China or Malaysia.

To summarize, then, Mr. Wood's "principal and permanent residence" at the time of the accident—as ever—was in the United States.

## II.   The *Wood* and *Gaspard* Plaintiffs have established Third Jurisdiction

This Court may lawfully exercise Third Jurisdiction over the *Wood* and *Gaspard* Cases because (1) the contracts between Malaysia Airlines and, respectively, the *Wood* and *Gaspard* Decedents were made in the United States, and because (2) Malaysia Airlines had a place of business in the United States. Under Article 33(1) of the Montreal Convention, a plaintiff may seek wrongful death damages against an international air carrier "in one of the State Parties … where [the defendant] has a place of business through which the contract has been made" (Third Jurisdiction). Malaysia Airlines argues that the *Wood* and *Gaspard* Plaintiffs have failed to establish Third Jurisdiction because the "place of business through which the contract has been made" can only be the location "where MAS accepts the offer and issues the E-Ticket number— not when (or where) the acceptance is received by the passenger." [ECF 38-1, at 52]. But Malaysia Airlines' position is contradicted by basic tenets of contract law, flies in the face of a federal court decision, and is belied by the drafting history of Article 33. Malaysia Airlines' motion should be denied.

---

[41] While Mr. Wood had been away from home for three years when he died, this Court has pointed out that "a prolonged absence from one's domicile is not determinative of abandonment." *Core*, 59 F.Supp. at 12 (quoting *Wagshal*, 947 F.Supp. at 13).

A.        **The Decedents' offers were accepted in the United States**

"A contract '... is held to be made in the place wherein the last act occurs necessary to make the contract binding.'" *In re Auto-Train Corp.*, 9 B.R. 159, 161–62 (Bankr. D.D.C. 1981). The last act necessary for the formation of a contract occurs "at the place where the acceptor speaks or otherwise completes his manifestation of assent." Restatement (Second) of Contracts § 64(c). Because the *Wood* and *Gaspard* Plaintiffs' offers to purchase airline tickets were accepted in the United States by United States travel agents, the contracts of carriage for their tickets "were made" in the United States. Accordingly, Third Jurisdiction is proper in the United States.

For example, Mr. Wood, while in Malaysia, booked his ticket for Flight MH370 through the American Express user interface system. *See* **Ex. 6** at ¶ 18. At the time Mr. Wood bought his ticket, American Express used a computerized reservation system ("CRS") for its bookings called Apollo CRS. *Id.* at ¶ 19. The Apollo CRS is owned and operated by Travelport Global Distribution System B.V., and Travelport L.P. (collectively "Travelport"), d/b/a Galileo International Partnership (hereinafter "Galileo"). [ECF 38-54, at 6 ¶ 20]. Mr. Wood's Itinerary Receipt included the following International Air Transport Association ("IATA") code: "RLOC 1V – LDHCWC." *See* **Ex. 30** (*Wood* itinerary receipt). According to Malaysia Airlines, "[t]he IATA code assigned to the GDS company Travelport d/b/a Galileo International is '1V' and any Itinerary Receipt evidencing a booking request or flight reservation request arranged and transmitted to [Malaysia Airlines] through Galileo is also assigned Record Locator identified on the Itinerary Receipt as 'RLOC 1V.'" [ECF 38-54, at 6 ¶ 20]. In simple English, Mr. Wood purchased his ticket for Flight MH370 through Galileo's system.

In addition, Apollo's CRS assigned Mr. Wood's reservation the following electronic code: "5UL – AMEX GLOBAL TVL IAD." *See* **Ex. 6** at ¶¶ 20-22. The code "5UL" is a "Pseudo

City Code," which indicates that Mr. Wood's "ticket was issued from the United States on the Apollo CRS through American Express." *Id.* at ¶ 23. The code "IAD" indicates that the ticket was issued through a server system at Washington Dulles International Airport in the United States. *Id.* at ¶ 24. Finally, the electronic file indicates that Malaysia Airlines acknowledged Mr. Wood's reservation on January 8, 2014, at 5:54 AM MYT, through a server at Hartsfield-Jackson Atlanta International Airport—also in the United States. *See* **Ex. 31** (*Wood* "Journey Details"). In short, the electronic evidence shows that, although Mr. Wood was physically in China when he reserved his ticket, he purchased his ticket through an American travel agency, which issued his ticket from a server in the United States, after which Malaysia Airlines acknowledged the reservation—again, through a server system in the United States.

Likewise, on December 14, 2013, while they were in China, the *Gaspard* Decedents—Rui Wang, Shuling Dai, and Weiwei Jiao— booked their tickets for Flight MH370 through Orbitz Worldwide, LLC ("Orbitz"), an online travel agency headquartered in Chicago, Illinois. *See* **Ex. 32** (*Gaspard* Orbitz reservation). At the time the *Gaspard* Decedents booked their tickets, Orbitz used the Worldspan CRS. *See* **Ex. 33** (*Gaspard* Itinerary Receipt). The Worldspan CRS, like the Apollo CRS, was owned and operated by Travelport. The *Gaspard* Decedents' Itinerary Receipt included the following IATA code: "RLOC 1P – 2HZC29." *See* **Ex. 33**. According to Malaysia Airlines, "[t]he IATA code assigned to the GDS company Travelport d/b/a Worldspan is '1P' and any Itinerary Receipt evidencing a booking request or flight reservation request arranged and transmitted to [Malaysia Airlines] through Galileo is also assigned Record Locator identified on the Itinerary Receipt as 'RLOC 1P.'" [ECF 38-54, at 6 ¶ 19-20]. Put simply, the *Gaspard* Decedents, like Mr. Wood, purchased their tickets for Flight MH370 through Galileo's system.

In addition, the *Gaspard* Decedents' Itinerary Receipt indicates that their tickets were issued by Orbitz out of Chicago, Illinois. *See* **Ex. 33** at 1 (*Gaspard* "Itinerary Receipt"). What is more, the "Journey Details" Malaysia Airlines provided to the Plaintiffs with respect to the *Gaspard* Decedents' tickets indicate that Malaysia Airlines acknowledged the reservations on, respectively, December 14, 2013, February 21, 2014, March 1, 2014, and March 7, 2014,[42] through a server at Hartsfield-Jackson Atlanta International Airport—also in the United States. *See* **Ex. 34** (*Gaspard* "Journey Details"). In short, the electronic evidence shows that, although the *Gaspard* Decedents were physically in China when they reserved their tickets, they purchased their tickets for Flight MH370 through an American travel agency, which issued the tickets from a server in the United States, after which Malaysia Airlines acknowledged the reservation through a server system in the United States. As this Court has said, "in most situations, the place that the ticket is issued is also the place where the mutual consent of the parties or the sale and purchase of transportation occurs." *Boyar*, 664 F.Supp. at 1485 (quotation marks omitted).

Despite the fact that the tickets were issued in the United States through American travel agencies—and despite Malaysia Airlines' acknowledgement of the reservations through a server system in the United States—Malaysia Airlines argues that the contracts for those tickets were made in Malaysia because, it says, Malaysia is where Malaysia Airlines accepted the passengers' offers. [ECF 38-1, at 40]. In support, Malaysia Airlines offers the declaration of its own employee for the proposition that Malaysia Airlines has the authority to accept or reject any ticket Galileo issues on its behalf. [ECF 38-54, at ¶¶ 8-9 (Decl. of Alpa Devi Panalal)].[43]

---

[42] The multiple dates likely results from the fact that the *Gaspard* Decedents purchased four tickets.

[43] In pertinent part, Panalal says:

But the terms of the agreement between Malaysia Airlines and Galileo suggest otherwise—suggest, in fact, that Malaysia Airlines had no authority to reject these reservations. On December 9, 1993, Malaysia Airlines and Galileo entered into the Galileo International Global Airline Distribution Agreement ("GIGADA"). *See* **Ex 35** (filed under seal). At the time of the GIGADA, Galileo owned the Apollo CRS through which Mr. Wood booked his ticket for Flight MH370. In a letter to Malaysia Airlines dated January 29, 2009, Travelport notified Malaysia Airlines that Galileo had been renamed Travelport, and that the GIGADA would thereafter be referred to as the Travelport International Global Airline Distribution Agreement ("TIGADA").[44] *See* **Ex. 36** (filed under seal). In addition, Travelport informed Malaysia Airlines that, in the TIGADA, it would "continue to honour the terms and conditions" of the GIGADA. *Id.* In short, the TIGADA, originally called the GIGADA, was binding on January 7, 2014, when Mr. Wood purchased his ticket for Flight MH370. *See* **Exs. 30** (*Wood* "Itinerary Receipt") & **31** (*Wood* "Journey Details").

The TIGADA was also binding on December 14, 2013, when the *Gaspard* Decedents purchased their tickets for Flight MH370. In the same letter dated January 29, 2009, Travelport notified MAS that it had consolidated the Worldspan CRS into the Travelport GDS. *See* **Ex. 36** (filed under seal). Thirteen months later, in a letter dated February 26, 2010, Travelport

---

Upon Receipt of a booking request or flight reservation request, the MAS reservation system must first determine whether to accept or reject the request by confirming whether the proposed booking/reservation is still within the booking capacity of the particular flight(s) such that MAS can agree to perform the transportation subject to applicable rules and conditions.

If MAS's reservation system confirms capacity for the proposed booking/flight reservation (and when the booking/flight reservation request is accompanied by payment information), MAS will accept the offer and MAS's reservation system will communicate the acceptance by transmitting a MAS Record Locator associated with the booking and E-Ticket number created in the MAS reservation system in Malaysia.

[ECF 38-4, at ¶¶ 8-9].

[44] Malaysia Airlines disclosed both the GIGADA and the TIGADA in response to the Plaintiffs' requests for jurisdictional discovery.

confirmed that any Malaysia Airlines bookings made on the Worldspan CRS after February 28, 2010 would be subject to the terms and conditions of the TIGADA. *See* **Ex. 37** (filed under seal). In other words, the TIGADA was binding at the time the *Gaspard* Decedents purchased their tickets for Flight MH370 through Orbitz, which used the Worldspan CRS. *See* **Exs. 33**, **34**, **36** & **37**. Under the TIGADA, MAS agreed to:

> C. *[P]articipate in every CRS in which Galileo International has a direct or indirect ownership interest* in every country in which services of such a CRS are offered ….
>
> ….
>
> I. [Malaysia Airlines] *shall not reject a booking* that has been made through the [Travelport] System where [Malaysia Airlines'] System has not responded to the [Travelport] System within twelve (12) hours of the message origination, even though overbooking may result therefrom and denied boarding compensation may be required.
>
> J. [Malaysia Airlines] *shall not reject a booking* for a passenger that has been made in the [Travelport] System where that booking has been made via an optional service described in Schedule 6, 7, *11*, or 12.
>
> L. [A]ccept a ticket for transportation at the fare shown on that ticket provided that the ticket was *automatically* issued by a Galileo … Subscriber location outside Europe at a fare consistent with the data in the System at the time of its *automatic* issuance, so long as the booking related to that ticket has not been altered in any material respect as to affect directly the fare quotation since the date of the *automatic* issuance.

**Ex. 35**, at 6 ¶ 3 (emphasis added). Importantly, the TIGADA contained a "Governing Law" provision, which provided that any dispute under the agreement would be governed by the laws of Illinois. *Id*. at 17 ¶ 21.

The TIGADA also included an attachment of various "Schedules"—each with its own series of additional terms—in which Malaysia Airlines could choose to participate. Malaysia Airlines elected to participate only in Schedules 6 ("Interactive Display"), 7 ("Last Seat

Availability"), 11 ("Interactive Sell"), 15 ("Servicing Facility via Airline Servicing Terminal"),

and 21 ("Participant Briefing"). *Id.* at 29-31. Notably, Schedule 11 provides:

> Interactive Sell refers to the functionality whereby, when a sell transaction is being made for [Malaysia Airlines'] services using the [Travelport] System, *a real time query of [Malaysia Airlines'] inventory is simultaneously transmitted by the [Travelport] System via a computer-to-computer communications capability between the [Travelport] System and [Malaysia Airlines'] System, with immediate confirmation or response required from [Malaysia Airlines'] System.*

*Id.* at 49 ¶ 1 (emphasis added). In selecting Schedule 11, Malaysia Airlines decided to forego

Schedule 12, titled "Positive Acknowledgment," which provides:

> 1. General. Positive Acknowledgment refers to the functionality by which, upon completion of a Booking File, [Malaysia Airlines'] System will return its Record Locator to the [Travelport] System in order to confirm that a booking or change to a booking has been received and recorded in [Malaysia Airlines'] System.
>
> 2. Responsibilities of Galileo International.
>
> A. The [Travelport] System will, upon completion of a new or amended Booking File containing [Malaysia Airlines'] flights, send a message to [Malaysia Airlines'] System using an action/advice code agreed upon by [Malaysia Airlines] and Galileo ….
>
> B. Where, after a pre-determined period, the [Travelport] System still has not received the Record Locator response from [Malaysia Airlines'] System, the [Travelport] System may send an automatic message to [Malaysia Airlines'] System requesting the Record Locator.
>
> 3. Responsibilities of [Malaysia Airlines].
>
> A. Upon completion of a new or amended [Passenger Name Record], resulting from a message received from the [Travelport] System, [Malaysia Airlines'] System will transmit to the [Travelport] System a confirmation in the form of [Malaysia Airlines'] Record Locator in a format determined by Galileo[.]

*Id.* at 51.

Malaysia Airlines chose to participate in Schedule 11, which required the booking to be

made "with immediate confirmation or response" from Malaysia Airlines' system, rather than

Schedule 12, which allowed Malaysia Airlines to confirm flight reservations with a Record

Locator response. *Id*. at 49 ¶ 1.  Importantly, under the terms of the TIGADA, this "immediate confirmation" of the booking is accomplished via a "computer-to-computer" query from Travelport's system to Malaysia Airlines' system for the sole purpose of permitting Travelport, prior to issuing the ticket, to confirm that space on the flight is available. *Id*. at 49. Accordingly, the "immediate confirmation" occurs without any affirmative action—either acceptance or rejection—from Malaysia Airlines.  Indeed, the TIGADA requires Malaysia Airlines to "accept a ticket for transportation at the fare shown on that ticket provided that the ticket was *automatically* issued by a Galileo … Subscriber location outside Europe at a fare consistent with the data in the System at the time of its *automatic* issuance, so long as the booking related to that ticket has not been altered in any material respect as to affect directly the fare quotation since the date of the *automatic* issuance." **Ex. 35** at 5-6 ¶ 3 (emphasis added). And, as noted, the TIGADA makes clear that "[Malaysia Airlines] *shall not reject a booking* for a passenger that has been made in the System where that booking has been made via an optional service described in Schedule … 11[.]" *Id.*  (emphasis added). Malaysia Airlines, as we have shown, agreed to participate in the "optional service described" in Schedule 11.

In other words, Mr. Panalal's declaration that Malaysia Airlines can choose whether to accept or reject a passenger's booking is directly contradicted by the express language of both Schedule 11 and Paragraphs 3(J) and 3(L) of the TIGADA. *Id.* at 49 ¶ 3. Indeed, because the TIGADA require immediate confirmation from Malaysia Airlines' computer system, any acceptance" by Malaysia Airlines was merely perfunctory—a foregone conclusion required, as such, by the TIGADA. For all practical purposes, then, the *Wood* and *Gaspard* bookings were actually "accepted" by Malaysia Airlines' agents in the United States—American Express and Orbitz, respectively—who, after using an American computer system to query Malaysia

Airlines' system to make sure there were seats available on the flight, then confirmed the reservation in the United States and issued the tickets from servers located in the United States. *See* **Exs. 30**, **31**, **33 & 34**.[45]

To summarize, then, the *Wood* and *Gaspard* contracts were made in the United States because the Decedents made their offers through American travel agencies whose servers were located in the United States, because those offers were accepted by those travel agencies in the United States, because Malaysia Airlines acknowledged those reservations from servers in the United States, and because the travel agencies then issued those tickets in the United States.[46]

## B.   The acceptance of the Decedents' offers was manifested in the United States

Even if this Court were to find that Malaysia Airlines, rather than its agents, accepted the *Wood* and *Gaspard* bookings from Malaysia, those contracts were still made in the United States because that acceptance was manifested in the United States. *See Slobojan v. United States*, 136 Ct. Cl. 620, 626 (1956)[47]; Restatement (Second) of Contracts § 64(c).[48]

As we have shown, the American Express system, using the Apollo CRS, communicated to Mr. Wood its confirmation of his booking request—that is, manifested the acceptance of his offer—from a server in Washington, D.C. Similarly, Orbitz, through the Worldspan CRS, communicated to the *Gaspard* Decedents its confirmation of their booking requests from a server in Chicago, Illinois. Whatever Malaysia Airlines did—and, as noted above, it did precious

---

[45] Again, "in most situations, the place that the ticket is issued is also the place where the mutual consent of the parties or the sale and purchase of transportation occurs." *Boyar*, 664 F.Supp. at 1485 (quotation marks omitted).

[46] To the extent that there is some disagreement about what the terms of the TIGADA mean—or about how the TIGADA works—that conflict should be construed in the Plaintiffs' favor. *Companhia Brasileira*, 887 F.Supp.2d 9, 15 (D.D.C. 2012) ("When reviewing a motion to dismiss for lack of jurisdiction, a court must review the complaint liberally, granting the plaintiff the benefit of all inferences that can be derived from the facts alleged."); *accord Johnson*, 748 F.Supp.2d at 8; *Lockamy*, 182 F.Supp.2d at 30.

[47] "[I]t is necessary that acceptance of the offer be communicated to the offerer before a valid and binding contract is made." *Id.*

[48] "[A] contract is created *at the place where the acceptor speaks* or otherwise completes his manifestation of assent.") (emphasis added); *accord In re Auto-Train*, 9 B.R. at 161–62 ("A contract is held to be made in the place wherein the last act occurs necessary to make the contract binding.") (quotations omitted).

little—it never manifested, communicated, or spoke a word to the Decedents. At most, if Malaysia Airlines' version of the facts is to be believed, Malaysia Airlines communicated its acceptance to its agents in the United States, and then those agents communicated that acceptance to the Decedents from the United States.[49] After all, had Malaysia Airlines' American agents not communicated their acceptance of the booking requests to the Decedents, the Decedents would not have known of the acceptance and no contract would have been formed. *Slobojan*, 136 Ct. Cl. at 626.[50] Accordingly, because the acceptances were manifested to the Decedents from the United States—and because, prior to those manifestations, no contracts existed—the *Wood* and *Gaspard* contracts necessarily were made in the United States.

### C.    The case law supports the Plaintiffs' position

The Second Circuit's decision in *Eck v. United Arab Airlines*, 360 F.2d 804 (2d Cir. 1966), confirms that Third Jurisdiction is appropriate in the United States because (1) the *Wood* and *Gaspard* Decedents' tickets were issued by Malaysia Airlines' agents in the United States and because (2), at the time of the accident, Malaysia Airlines operated a ticketing office in the United States.[51] In *Eck*, the plaintiff was set to travel from Los Angeles to Europe for a ski trip. *Id.* at 807. The plaintiff's arrangements were handled by the ski association. *Id*. Before departing from Los Angeles to Europe, however, the plaintiff decided to take advantage of her time in Europe by purchasing an additional trip to the Middle East. While in Los Angeles, then, the plaintiff bought a series of tickets through Scandinavian Airlines System's ("SAS") California

---

[49] That the Decedents were located outside of the United States when they booked their tickets is not relevant since the focal point is "the place where the acceptor speaks." Restatement (Second) of Contracts § 64(c) (1981).

[50] "[I]t is necessary that acceptance of the offer be communicated to the offeror before a valid and binding contract is made." *Id.*

[51] Malaysia Airlines concedes that it leased office space in the United States for the purpose of making flight reservations. *See* Def.'s First Supp. Resp. to Gaspard Interrog., at 9 ("MAS also operates a ticket office from leased space located at 909 N. Sepulveda Boulevard, Suite 100, El Segundo, California 90245 during 2014 until 31 August 2014."); *see also* **Ex. 38** (Lease Agreement with Kilroy Realty) (filed under seal).

office, which had Zurich as both the place of departure and destination. *Id.* The ticket had eight

other European cities as stopping places, including Jerusalem and Cairo. *Id*. The Jerusalem to

Cairo portion of the plaintiff's side trip was provided by United Arab Airlines ("UAA"). *Id*. This

UAA flight crashed, and the plaintiff was seriously injured. *Id*. The procedures by which the

ticket was issued confirmed that UAA *accepted the booking in Cairo*—precisely what Malaysia

Airlines claims it did in Malaysia here:

> [The SAS clerk in California] sold [plaintiff] reserved space on an appropriate
> [UAA] flight and collected the fare. SAS then contacted the home office of UAA,
> located in Cairo, in order to confirm this reservation, thereby avoiding the
> confusion of duplicate or conflicting reservations. Finally, SAS made
> arrangements to forward to UAA the fare it had collected.

*Id*. Importantly, UAA also had ticketing offices in the United States, but neither was involved in

the sale of the plaintiff's ticket. *Id*. The court found that "UAA might have decided to channel all

ticket purchases through one of its offices in the United States, but it did not." *Id*. at 808. Instead,

it chose to confirm all reservations through its Cairo office. *Id*. On appeal, UAA claimed that

jurisdiction was improper under the Warsaw Convention because "the contract between

[plaintiff] and UAA was made through the Oakland office of SAS and directly confirmed by

UAA's Cairo office." *Id*. at 813. The court disagreed. *Id*.

 As a preliminary matter, the court noted that the Third Jurisdiction "clearly manifests the

[Warsaw Convention] framers' intention to permit, at least in some cases, the maintenance of

suit in the courts of the country where the ticket was purchased." *Id*. It was also clear that the

provision was meant "to prevent the maintenance of suit in the courts of the country where the

ticket was purchased if the airline has no ticketing and booking office there." *Id*. The "close

question," however, was "whether this provision prevents the maintenance of suit in the courts of

the country where the ticket was purchased, when the airline has a place of business in that

country at which its tickets are regularly sold, but the passenger had purchased his ticket at the office of another airline or at a travel agency." *Id*. As the court noted, UAA's argument—like Malaysia Airlines' position here—rested on two assumptions:

> [F]irst, it assumes the framers recognized that an airline might establish a regular place of business and permit the sale of its tickets in the territory of a High Contracting Party, and yet, by means of interline agreements, arrange for all sales of its tickets to be "made" at the offices of other airlines or travel agencies and further requires that all such sales be confirmed abroad; second, the argument assumes that, having adverted to this problem, the framers intended to permit airlines to avoid the letter of this provision in this manner.

*Id*. But the court found "no indication in the language of [the Third Jurisdiction] or in the relevant legislative history that the framers intended the scope of this provision to vary depending on the ticketing and booking practices of international carriers." *Id*. at 814. To the contrary, the court explained, the "central purpose of … [the] third provision was to make venue always proper in the country where the ticket was purchased—assuming it is a High Contracting Party—if, but only if, the defendant has a place of business there." *Id*. Thus, the court determined "that if the framers had recognized this problem they would have wished that an airline that had a place of business in the territory of a High Contracting Party and permitted its tickets to be sold in that country be subject to suit in that country's courts." *Id*. Accordingly, it held:

> [V]enue is proper under … [the] third provision in the courts of a High Contracting Party when the defendant has a place of business in that country at which it regularly issues tickets even though the injured passenger's ticket is purchased at the office of another airline and confirmed abroad on the ground that the office that issued the ticket to the passenger should be regarded as a "place of business" of the defendant airline "through which the contract has been made."

*Id*. at 814-15. Put another way, the court said: "Our holding simply means that a foreign airline which has done this cannot avoid the reach of this provision if it instructs other airlines and

travel agencies that occasionally act as its sales agent in that country to confirm the sales directly with the foreign airline's overseas office." *Id*. at 815.[52]

Notably, the court found that the California SAS office "acted as UAA's agent for the purposes of issuing UAA's ticket and collecting UAA's fare." *Id*. at 814. This was true, the court said, even though the plaintiff's sale was the only instance in which an SAS office *had ever issued a ticket for a UAA flight*. *Id*. As the court saw it, "this single instance of an agency relationship between SAS and UAA tends to establish that when this ticket was sold at least a tacit arrangement existed between SAS and UAA whereby each would issue tickets and collect fares for air transportation to be performed by the other." *Id*.[53]

Here, as the TIGADA amply demonstrates, Travelport, as owner of American Express and Orbitz, acted as Malaysia Airlines' agent for the purpose of issuing Malaysia Airlines' airline tickets and collecting Malaysia Airlines' fares. Indeed, Malaysia Airlines and Travelport entered into a separate Airline Content Agreement ("AOC"), *see* **Ex. 39** ("AOC") (filed under seal), which further cemented their principal-agent relationship. In that AOC, Malaysia Airlines agreed to:

---

[52] As this holding suggests, *Eck* did not turn on the fact that the plaintiff was in the United States when she booked her ticket. To the contrary, the court's holding focused on the airline's business—and on the airline's conduct in avoiding the strictures of the Third Jurisdiction—rather than on the plaintiff's location. And this makes sense. After all, as we have noted, the Third Jurisdiction—like the First, Second, and Fourth—is a vestige of Article 28(1) of the Warsaw Convention, under which the only relevant criteria were, in every instance, *the airline's* contacts with a particular jurisdiction. *See* ICAO, International Conference on Air Law, Vol. II, Documents, 1999, Doc. 9775-DC/2, at 101 ("It has long been the view of the United States that passengers or their heirs who have claims against an airline resulting from an accident in international air transportation should have the right to bring suit in the courts of the State where the passenger lived.  The four bases for court jurisdiction under the Warsaw Convention indirectly permit this in most cases.  However, in a limited number of cases, the four jurisdictions may not include the passenger's homeland."). Put another way, under the Warsaw Convention—that is, before the implementation of Montreal's Fifth Jurisdiction—the passenger's location was, in every respect, irrelevant to the analysis. *Compare* Warsaw Convention, Art. 28(1), *with* Montreal Convention, Art. 33(1) and (2). And, because Article 33(1) of Montreal is to be treated identically to Article 28(1) of Warsaw, the passenger's location under any of the first four jurisdictions remains inapposite after Montreal. *See Baah v. Virgin Atlantic Airways Ltd.*, 473 F.Supp.2d 591, 597 (S.D.N.Y. 2007).

[53] Although *Eck* predates the Montreal Convention, its interpretation of Warsaw's Third Jurisdiction is equally applicable to our analysis of the Third Jurisdiction under Montreal. *See Baah*, 473 F. Supp. 2d at 597. After all, unlike the Fifth Jurisdiction, which finds no parallel in the Warsaw Convention, Article 33(1) of the Montreal Convention is an untouched vestige of Warsaw's Article 28(1).

(1) "provide Content[54] to Travelport via a System for the use and benefit of Travelport Subscribers;"

(2) "provide Content to Travelport for the use and benefit of Travelport Subscribers at no less favourable levels and no less favourable terms than it makes any Content available for sale through other Distribution Channels;"

(3) "offer Content parity on Participant Flights between the System and any Distribution Channel for the use and benefit of Travelport Subscribers" and

(4) "provide to Travelport the same or substantially similar sales, promotional and marketing opportunities which it provides to Distribution Channel, and will not discriminate against Traveleport or the System in relation to promotional or marketing activities."

*Id.* at 4 ¶ 3.1. This formal series of agreements establishes a far more comprehensive agency relationship than did the single ticket offering the Second Circuit found sufficient in *Eck*.

In short, because the *Wood* and *Gaspard* contracts were made in the United States—and because Malaysia Airlines operated an office in the United States—this Court may exercise Third Jurisdiction over the *Wood* and *Gaspard* claims. *See Eck*, 360 F.2d at 814-15.

## **Conclusion**

For the reasons set forth in this Response, the Court should deny Malaysia Airlines' Motion to Dismiss for Lack of Subject Matter Jurisdiction under the Montreal Convention.

---

[54] "Content" is defined as:  [A]ll functionality and products for all Participant Flights available to any Distribution Channel (excluding the Participant Channel), and includes all fares, schedules and associated inventory for all Participant Flights including, but not limited to: (i) domestic flights, international flights and group bookings; (ii) fares, schedules and associated inventory distributed by the Participant through any CRS; (iii) all other promotional fares and associated inventory; and (iv) all other promotions, incentives, and commissions or other substantially similar programs for Participant Flights which are distributed by the Participant through any CRS[.] *See* **Ex. 40** (agreement between Malaysia Airlines and Travelport) (filed under seal), at 2 ¶ 2.1.

Dated:  July 21, 2017

Respectfully Submitted,

PODHURST ORSECK, P.A

 /s/  Roy K. Altman

Steven C. Marks, Esq.
DC Bar No.: FL0004
FL Bar No. 516414
smarks@podhurst.com
Roy K. Altman, Esq.
FL Bar No. 116885
raltman@podhurst.com
One SE 3rd Avenue, 2700
Miami, FL 33131
(305) 358-2800
*Counsel for Plaintiffs*

**<u>CERTIFICATE OF SERVICE</u>**

The undersigned certifies that, on July 21, 2017, pursuant to Fed. R. Civ. P. 5 and LCvR5.3, a true and correct copy of the foregoing PLAINTIFFS' RESPONSE TO MALAYSIA AIRLINES' MOTION TO DISMISS FOR LACK OF SUBJECT MATTER JURISDICTION was filed with the Clerk of Court using the CM/ECF System, which will send notification of such filing to the attorneys of record at the e-mail addresses on file with the Court.

*/s/   Roy K. Altman*
Roy K. Altman