## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

IN RE: AIR CRASH OVER THE
SOUTHERN INDIAN OCEAN ON MARCH
8, 2014

This Document Relates To:

***Gaspard  v. Malaysia Airlines Berhad, et al.,***
**16-cv-00419-KBJ**

***Wood v. Malaysia Airlines Berhad;***
**16-cv-00053-KBJ**

MDL Docket No:  2712

Misc. No. 16-1184 (KBJ)

## <u>THE PLAINTIFFS' RESPONSE TO MALAYSIA AIRLINES' RULE 12(b)(1) MOTION TO DISMISS UNDER THE FOREIGN SOVEREIGN IMMUNITIES ACT</u>

# TABLE OF CONTENTS

TABLE OF CONTENTS ..................................................................................................... i

TABLE OF AUTHORITIES ............................................................................................... ii

    Cases ................................................................................................................................ ii

    Statutes ............................................................................................................................. v

    Rules ................................................................................................................................ vi

    Other Authorities ............................................................................................................ vi

INDEX OF EXHIBITS ................................................................................................... viii

MEMORANDUM ............................................................................................................. 1

    The Legal Standard ......................................................................................................... 1

    Argument ......................................................................................................................... 2

        **I.**    Jurisdictional Nexus ........................................................................................ 4

        II.    Temporal Impossibility ................................................................................... 6

        III.    The "Act of State" Doctrine ............................................................................ 7

        IV.    Explicit Waiver ............................................................................................. 13

            A.    Malaysia Airlines cannot challenge the validity of the Permit ................ 14

            B.    The DOT's Authority ............................................................................... 15

            C.    The Scope of the DOT Permit .................................................................. 24

        V.    Implicit Waiver ............................................................................................. 34

            A.    28 U.S.C. § 1330(a) ................................................................................ 34

            B.    The Montreal Convention ........................................................................ 37

Conclusion ..................................................................................................................... 45

# TABLE OF AUTHORITIES

**Cases**

*Aboeid v. Saudi Arabian Airlines, Inc.,*
No. CV-10-2518, 2011 WL 2222140 (E.D.N.Y. June 1, 2011) ............................................... 33

*Adirondack Medical Center v. Sebelius,*
740 F. 3d 692 (D.C. Cir. 2014) ................................................................................................... 36

*Agudas Chasidei Chabad of U.S. v. Russian Fed'n,*
528 F. 3d 934 (D.C. Cir. 2008) ............................................................................................. 7, 8

*Alfred Dunhill v. Republic of Cuba,*
425 U.S. 682 (1976) ......................................................................................................... 8, 9, 10

*Am. Bankers Ass'n v. Nat'l Credit Union Admin.,*
271 F. 3d 262 (D.C. Cir. 2001) ................................................................................................... 36

*Argentine Republic v. Amerada Hess,*
488 U.S. 428 (1989) ......................................................................................... 4, 23, 27, 44, 45

*Austin Inv. Fund, LLC v. United States,*
No. CV 11-2300 (CKK), 2015 WL 7303514 (D.D.C. Nov. 19, 2015) ..................................... 11

*Banco Nacional de Cuba v. Sabbatino,*
376 U.S. 398 (1964) ..................................................................................................................... 8

*Barkanic v. General Administration of Civil Aviation,*
822 F. 2d 11 (2d Cir. 1987) ................................................................................................. 31, 32

*Barnhart v. Sigmon Coal Co.,*
534 U.S. 438 (2002) ................................................................................................................... 12

*Blue Ridge Investments, L.L.C. v. Republic of Argentina,*
735 F. 3d 72 (2d. Cir. 2013) ................................................................................................. 36, 39

*Brink's Limited v. South African Airways,*
93 F. 3d 1022 (2d Cir. 1996) ............................................................................................... 41, 42

*Callanan Road Improvement Co. v. United States,*
345 U.S. 507 (1953) ................................................................................................................... 15

*Capital Ventures Int'l v. Republic of Argentina,*
552 F. 3d 289 (2d Cir. 2009) ..................................................................................................... 45

*Chen v. Ashcroft*,
    381 F. 3d 221 (3d Cir. 2004) ............................................................................... 21

*Chevron U.S.A. Inc. v. Natural Resources Defense Council, Inc.*,
    467 U.S. 837 ................................................................................... 16, 17, 21, 22

*Compania Mexicana De Aviacion, S.A. v. U.S. Dist. Ct. for Central Dist. of Cal.*,
    859 F. 2d 1354 (9th Cir. 1988) ........................................................... 31, 33, 43, 44

*Coyle v. P.T. Garuda Indonesia*,
    363 F. 3d 979 (9th Cir. 2004) ............................................................... 30, 31, 32

*CSX Transp., Inc. v. Alabama Dep't of Revenue*,
    562 U.S. 277 (2011) ........................................................................................... 35

*Dan-Air Servs., Ltd. v. Civil Aeronautics Bd.*,
    475 F. 2d 408 (D.C. Cir. 1973) .................................................................... 15, 16

*de Csepel v. Republic of Hungary*,
    808 F. Supp. 2d 113 (D.D.C. 2011) ..................................................................... 8

*Diggs v. Shultz*,
    470 F. 2d 461 (D.C. Cir. 1972) .......................................................................... 36

*Dole Food Co. v. Patrickson*,
    538 U.S. 468 (2003) ............................................................................................. 6

*Duncan v. Walker*,
    533 U.S. 167 (2001) ........................................................................................... 28

*Ehrlich v. American Airlines, Inc.*,
    360 F. 3d 366 (2d Cir. 2004) ..................................................................... 37, 38, 40

*Firebird Glob. Master Fund II Ltd. v. Republic of Nauru*,
    915 F. Supp. 2d 124 (D.D.C. 2013) ................................................... 2, 3, 13, 34, 36

*F.P.C. v. Colorado Interstate Gas Co.*,
    348 U.S. 492 (1955) ........................................................................................... 15

*Gayda v. LOT Polish Airlines*,
    702 F. 2d 424 (2d Cir. 1983) ..................................................................... 36, 41, 42

*Gutch v. Fed. Republic of Germany*,
    444 F. Supp. 2d 1 (D.D.C. 2006) ....................................................................... 34

*Harris v. Polskie Linie Lotnicze*,
   820 F. 2d 1000 (9th Cir. 1987) ................................................................. 41, 42, 43

*Hunter v. Deutsche Lufthansa AG*,
   863 F. Supp. 2d 190 (E.D.N.Y.2012) ......................................................... 5, 6

*Int'l Ins. Co. v. Caja Nacional De Ahorro y Securo*,
   293 F. 3d 392 (7th Cir. 2002) ...................................................................... 37

*Kensington Int'l Ltd v. Itoua*,
   505 F. 3d 147 (2d Cir. 2007) ....................................................................... 5

*Lawson v. U.S.*,
   176 F. 2d 49 (D.C. Cir. 1949) ...................................................................... 44

*Marx v. General Revenue Corp.*,
   568 U.S. 371 (2013) ..................................................................................... 28

*Maysonet-Robles v. Cabrero*,
   323 F. 3d 43 (1st Cir. 2003) ......................................................................... 6

*Milner v. Dep't of Navy*,
   562 U.S. 562 (2011) ..................................................................................... 35

*Mount Royal Joint Venture v. Kempthorne*,
   477 F. 3d 745 (D.C. Cir. 2007) .......................................................... 16, 17, 21, 24

*Odhiambo v. Republic of Kenya*,
   764 F. 3d 31 (D.C. Cir. 2014) ...................................................................... 3, 4

*Olympia Exp. Inc. v. Linee Aeree Italiane, S.P.A.*,
   509 F. 3d 347 (7th Cir. 2007) ...................................................................... 6

*Owens v. Republic of Sudan*,
   374 F. Supp. 2d 1 (D.D.C. 2005) ....................................................... 1, 2, 16, 19

*Park 'N Fly, Inc. v. Dollar Park and Fly, Inc.*,
   469 U.S. 189 (1985) ..................................................................................... 35

*Phoenix Consulting, Inc. v. Republic of Angola*,
   216 F. 3d 36 (D.C. Cir. 2000) ............................................................. 1, 2, 16

*Practical Concepts, Inc., v. Republic of Bolivia*,
   811 F. 2d 1543 (1987) .................................................................................. 2

iv

*Princz v. Federal Republic of Germany,*
  26 F. 3d 1166 (D.C. Cir. 1994) ........................................................................... 40

*Reers v. Deutsche Bahn AG,*
  320 F. Supp. 2d  (S.D.N.Y. 2004) ...................................................................... 36

*Seetransport Wiking Trader Schiffarhtsgesellschaft MBH & Co. v. Navimpex Centrala Navala,*
  989 F. 2d 572 (2d Cir. 1993) .............................................................................. 45

*Sharon v. Time, Inc.,*
  599 F. Supp. 538 (S.D.N.Y. 1984) ..................................................................... 13

*Siderman de Blake v. Republic of Argentina,*
  965 F. 2d 699 (9th Cir. 1992) ............................................................................... 8

*Sparrow v. United Air Lines, Inc.,*
  216 F. 3d 1111 (D.C. Cir. 2000) ........................................................................... 2

*Straub v. A P Green, Inc.,*
  38 F. 3d 448 (9th Cir. 1994) ................................................................................. 6

*Tennessee Valley Authority  v. Hill,*
  437 U.S. 153 (1978) ........................................................................................... 22

*Underhill v. Hernandez,*
  168 U.S. 250 (1897) ............................................................................................. 7

*United States v. Mead Corp.,*
  533 U.S. 218 (2001) ........................................................................................... 17

*United States v. One Gulfstream G-V Jet Aircraft,*
  941 F. Supp. 2d 1 (D.D.C. 2013) .......................................................................... 7

*Verlinden B.V. v. Central Bank of Nigeria,*
  461 U.S. 480 (1983) ............................................................................................. 2

*Virtual Defense and Development Inter., Inc. v. Republic of Moldava,*
  133 F. Supp. 2d 1 (D.D.C. 1999) ................................................................. 8, 9, 11

*W.S. Kirkpatrick & Co. v. Envt'l. Tectonics Corp.,*
  493 U.S. 400 (1990) ...................................................................................... 7, 11

**Statutes**

28 U.S.C. 1605(a) ................................................................................ 3, 5, 13, 30

28 U.S.C. § 1330(a) ........................................................................................ 34, 37, 42

28 U.S.C. § 1330(b) ................................................................................................. 4

28 U.S.C. § 1391(f) .................................................................................................. 5

28 U.S.C. § 1602 .................................................................................................... 23

28 U.S.C. § 1604 .................................................................................................... 35

28 U.S.C. § 1608 ...................................................................................................... 4

49 U.S.C. § 40102(23) ........................................................................................... 20

49 U.S.C. § 40113(a) ............................................................................................. 18

49 U.S.C. § 41305(b) ................................................................................. 17, 20, 21

Pub. L. 85-726, 72 Stat. 737 (FAA)…………………………………..………………17, 18, 19

Pub. L. 103-272, 108 Stat. 1127 (recodificatin of FAA) ...................................... 17, 18

## Rules

Fed. R. Civ. P. 12(b)(1) ......................................................................................... **7**, 8

Fed. R. Civ. P. 12(b)(6) ......................................................................................... 8, 12

## Other Authorities

Abraham Lincoln, "House Divided," Speech at the Illinois State Capitol (June 16, 1858)……..25

Amendment of Foreign Air Carrier Permit and Exemption Authority,

   1986 WL 69761 ...................................................................... 18, 20, 25, 26

Amendment of Foreign Air Carrier Permit and Exemption Authority,

   1987 WL 111215, ................................................. 18, 19, 20, 22, 27, 28, 33

Convention between the United States of America and Other Governments on Aviation, at S.

   Treaty Doc. No. 106-45, May 29, 1999, T.I.A.S. No. 13038…………………………3, 29, 33, 38

DOT Order issuing MAS a Permit, 2002-09-26, 2002 WL 31189758 ................................. 40, 41

ICAO, International Conference on Air Law, Vol. II, Documents, 1999, Doc.

9775-DC/2……………………………………………………………………………...38, 39 40

*Immunities of Foreign States: Hearings on H.R. 3493 Before the Subcomm. on Claims and*

   *Governmental Relations of the House Comm. on the Judiciary,* 93rd Cong., 1st Sess. 16-17

   (1973) ......................................................................................................... 22

S. Rep. 103-265, 1994 WL 261999 (Leg. History) ...................................................... 21

*The Fifth Jurisdiction Under the Montreal Liability Convention: Wandering American or Wandering Everybody?*, 68 J. Air L. & Com. 717 (2003) ........................................................ 39

**INDEX OF EXHIBITS**

| Exhibit No. | Description |
|:---:|:---|
| A | Order to Show Cause, Amendment of Foreign Air Carrier Permit and Exemption Authority, Department of Transportation, January 21, 1986 |
| B | Amendment of Foreign Air Carrier Permit and Exemption Authority, Department of Transportation, July 31, 1987 |
| C | Foreign Air Carrier Permit and Permit Conditions issued to MAS on September 30, 2002 |
| D | Foreign Air Carrier Permit issued to Garuda Indonesia Airlines at issue in *Coyle v. P.T. Garuda Indonesia,* 363 F. 3d 979 (9th Cir. 2004), relied on by the Plaintiffs |
| E | Declaration of Tommy Thomas |

## MEMORANDUM

In its motion to dismiss the Plaintiffs'[1] complaint under the Foreign Sovereign Immunities Act ("FSIA"),[2] Malaysia Airlines[3] resurrects the ghosts of dying doctrines;[4] proffers, without citation, legal theories belied by both the structure and the letter of executive power;[5] and, on the crucial question of the scope of its DOT permit, conveniently ignores the applicable holding of a federal court of appeals—not to mention the explicit opinion of the DOT itself—in favor of an older decision interpreting a completely different, and long-abrogated, permit. Its motion should be denied.[6]

## The Legal Standard[7]

Consistent with the "restrictive view of sovereign immunity reflected in FSIA, the defendant bears the burden of proving that the plaintiff's allegations do not bring its case within a statutory exception to immunity." *Phoenix Consulting, Inc. v. Republic of Angola*, 216 F.3d 36, 40 (D.C. Cir. 2000) (quotation omitted). "A court may dismiss a complaint brought pursuant to the FSIA only if it appears beyond doubt that plaintiffs can prove no set of facts that would establish the jurisdiction of the court and a viable claim for relief." *Owens v. Republic of Sudan*, 374 F.Supp.2d 1, 10 (D.D.C. 2005). In evaluating a motion to dismiss, the Court must "treat the

---

[1] Malaysia Airlines' FSIA motion is directed at the claims of Thomas Wood ("the *Wood* Plaintiff") and Thomas Gaspard ("the *Gaspard* Plaintiff"). Thomas Wood is Personal Representative of the Estate of Philip Talmadge Wood, deceased ("Mr. Wood"). Mr. Gaspard is Personal Representative of the Estates of Rui Wang, Weiwei Jiao, and Shuling Dai, all of whom are deceased ("the *Gaspard* Decedents").

[2] 28 U.S.C. § 1602 *et seq.*

[3] There are, in fact, two Malaysia Airlines Defendants: Malaysian Airlines System Berhad (Administrator Appointed) ("MAS") and Malaysia Airlines Berhad ("MAB"). For purposes of this Response, the Plaintiffs refer to them together as "Malaysia Airlines."

[4] *See* Malaysia Airlines' argument on the "act of state" doctrine. [ECF 39-1, at 22-23].

[5] *See* Malaysia Airlines' argument on the U.S. Department of Transportation's ("DOT") authority to negotiate FSIA waivers. [ECF 39-1, at 35-41].

[6] The Plaintiffs agree with Malaysia Airlines both that it is an "agency or instrumentality" of the Malaysian Government for purposes of the FSIA, 28 U.S.C. § 1603(b), and that the FSIA's "commercial activity" exception, 28 U.S.C. § 1605(a)(2), does not apply here.

[7] The Plaintiffs hereby incorporate the "Facts" Sections from the Plaintiffs' Response to Malaysia Airlines' Motion to Dismiss Under the Doctrine of *forum non conveniens* ("FNC Response"). [ECF 65].

[c]omplaint'[s] factual allegations as true … and must grant [P]laintiff[s] 'the benefit of all inferences that can be derived from the facts alleged.'" *Sparrow v. United Air Lines, Inc.*, 216 F.3d 1111, 1113 (D.C. Cir. 2000) (quotation omitted). Where "the defendant challenges only the legal sufficiency of the plaintiff's jurisdictional allegations, the district court should take the plaintiff's allegations as true and determine whether they bring the case within any of the exceptions to immunity invoked by the plaintiff." *Phoenix*, 216 F.3d at 40. But, where a defendant challenges the factual basis for the court's jurisdiction, "the court must go beyond the pleadings and resolve any disputed issues of fact the resolution of which is necessary to a ruling upon the motion to dismiss." *Id.* "The district court retains 'considerable latitude in devising the procedures it will follow to ferret out the facts pertinent to jurisdiction,' but it must give the plaintiff 'ample opportunity to secure and present evidence relevant to the existence of jurisdiction.'" *Id.* (quoting *Prakash v. Am. Univ.*, 727 F.2d 1174, 1179-80 (D.C. Cir. 1984)).

## <u>Argument</u>

The FSIA "is the sole basis for obtaining jurisdiction over a foreign state in [United States] courts and must be applied by the district courts in every action against a foreign sovereign." *Firebird Glob. Master Fund II Ltd. v. Republic of Nauru*, 915 F.Supp.2d 124, 126 (D.D.C. 2013) (internal citations omitted). "The FSIA renders a foreign state immune from suit unless the case falls within one of the statutory exceptions to immunity." *Owens*, 374 F.Supp.2d at 10. That is, "[i]f one of the specified exceptions to sovereign immunity applies, a federal district court may exercise subject-matter jurisdiction under §1330(a)[.]" *Verlinden B.V. v. Central Bank of Nigeria*, 461 U.S. 480, 489 (1983); *cf. Practical Concepts, Inc., v. Republic of Bolivia*, 811 F.2d 1543, 1548 n.11 (1987) ("If an exception to the main rule applies, then the FSIA confers subject-matter jurisdiction on the district courts.").

As relevant here, the FSIA provides that:

> A foreign state shall not be immune from the jurisdiction of courts of the United States or of the States in any case—
>
> (1) in which the foreign state has waived its immunity either explicitly or by implication, notwithstanding any withdrawal of the waiver which the foreign state may purport to effect except in accordance with the terms of the waiver[.]

28 U.S.C. § 1605(a)(1). With respect to "explicit[]" waivers of sovereign immunity, "a foreign state sovereign will not be found to have waived its immunity unless it has clearly and unambiguously done so." *Firebird*, 915 F.Supp.2d at 126. On the other hand, federal courts have found that a foreign state has waived its immunity "by implication" under the FSIA where that state has "at some point indicated its amenability to suit." *Odhiambo v. Republic of Kenya*, 764 F.3d 31, 35 (D.C. Cir. 2014).

Malaysia Airlines explicitly waived its sovereign immunity for claims precisely like the ones the *Wood* and *Gaspard* Decedents have brought here when it applied for and obtained a foreign air carrier permit from the U.S. Department of Transportation (hereinafter, the "Permit" or the "DOT Permit"). Malaysia Airlines likewise implicitly waived its sovereign immunity when the Malaysian government signed, adopted, and ratified the Montreal Convention. *See* Montreal Convention, Art. 33.

To this, Malaysia Airlines proffers five arguments. First, it contends that, "[b]ecause these wrongful death actions" have "absolutely no connection with the United States, Plaintiffs cannot establish an applicable exception to immunity as a matter of law." [ECF 39-1, at 21]. Second, it says that Malaysian Airlines System Berhad ("MAS")—the successor entity to Malaysia Airlines Berhad ("MAB"), created by the Malaysian government from the ashes of MAB—cannot be liable for the Plaintiffs' damages because it did not exist at the time of the accident. Third, it claims that the "act of state" doctrine bars the Plaintiffs' claims against MAB,

irrespective of any exception under the FSIA.[8] Fourth, it insists that it did not explicitly waive its sovereign immunity under the FSIA for the claims at issue here because (1) the DOT did not, it says, have the authority to negotiate such a waiver, and (2) that waiver applies only to flights with a stopping point in the United States. Fifth and finally, Malaysia Airlines argues that it did not implicitly waive its sovereign immunity under the FSIA when Malaysia ratified the Montreal Convention. These arguments are unpersuasive. Accordingly, Malaysia Airlines' motion should be denied.

## I.   Jurisdictional Nexus

Malaysia Airlines contends, first, that the "Plaintiffs Cannot Establish the Significant Jurisdictional Nexus Between the Conduct on Which the Suit is Based and the United States." [ECF 39-1, at 21]. At its essence, Malaysia Airlines' argument is that "each exception to immunity that is necessary to give this Court both subject-matter and personal jurisdiction over Plaintiffs' actions against MAS and MAB incorporates and requires a significant jurisdictional nexus between the conduct on which the suit is based and the United States." *Id*. In saying so, however, Malaysia Airlines adds an extra element to the FSIA's jurisdictional requirements that can be found nowhere in the text of the FSIA itself—cannot be found because it does not exist.

Quite to the contrary, the Supreme Court has specifically held that "personal jurisdiction,[9] like subject-matter jurisdiction, exists only when one of the exceptions to foreign sovereign immunity in §§ 1605–1607 applies." *Argentine Republic v. Amerada Hess*, 488 U.S. 428, 435 n.3 (1989). The FSIA's jurisdictional scheme is comprehensive and, therefore, permits

---

[8] We note that the second and third arguments apply only to MAB. Because the Plaintiffs have sued both MAS and MAB, neither argument affects the Plaintiffs' ultimate right to recover against Malaysia Airlines in the United States for the deaths of the Decedents.

[9] Under the FSIA, "[p]ersonal jurisdiction over a foreign state shall exist as to every claim for relief over which the district courts have [subject-matter] jurisdiction under subsection (a) where service has been made under [28 U.S.C. § 1608]." 28 U.S.C. § 1330(b).

no additions or deletions. *Id*. ("Congress' intention to enact a comprehensive statutory scheme [through the FSIA] is also supported by the inclusion in the FSIA of provisions for venue, 28 U.S.C. § 1391(f), removal, § 1441(d), and attachment and execution, §§ 1609–1611."). In other words, the "FSIA 'sets forth the *sole and exclusive* standards to be used in resolving questions of sovereign immunity raised by sovereign states before Federal and State courts in the United States,' and 'prescribes ... the jurisdiction of U.S. district courts in cases involving foreign states.'" *Id*. (quoting H.R. Rep. No. 94–1487, p. 12 (1976) (H.R. Rep.), and S. Rep. No. 94–1310, pp. 11–12 (1976) (S. Rep.), U.S. Code Cong. & Admin. News 1976, pp. 6604, 6610)) (emphasis added). In short, this Court should reject Malaysia Airlines' invitation to supplement the FSIA's comprehensive jurisdictional provisions with an additional "significant jurisdictional nexus" element.

The two cases Malaysia Airlines cites do not suggest otherwise. *See Kensington Int'l Ltd v. Itoua*, 505 F.3d 147, 155 (2d Cir. 2007); *Hunter v. Deutsche Lufthansa AG*, 863 F.Supp.2d 190, 204 (E.D.N.Y.2012). *Kensington* implicated only the FSIA's "commercial activity" exception—an exception that expressly requires proof of a "connection" between the alleged "commercial activity" and the United States. *See* 28 U.S.C. § 1605(a)(2). Notably, however, the FSIA's waiver exception—the only exception at issue here—includes no such requirement. *See* 28 U.S.C. § 1605(a)(1).

Similarly, in *Hunter*, the plaintiff argued that the airline had waived its FSIA immunity "because its filings with the United States Department of Transportation [] waived its sovereign immunity for operations in international air transportation that, according to the contract of carriage, include a point in the United States as a point of origin, point of destination, or agreed stopping place." 863 F.Supp.2d at 204 (quotation marks omitted). By its terms, then, the

document upon which the plaintiff relied for his waiver argument required a nexus to the United States. Unfortunately for the plaintiff, he had not purchased his ticket in the United States, and his "contract of carriage" did not include any stopping point in the United States. *Id*. Under these circumstances, then, the court rejected the plaintiff's argument that the airline's decision to do "business in the United States" was sufficient "*by itself* to defeat sovereign immunity." *Id*. (emphasis added). Here, by contrast, as we describe more fully below, the DOT Permit that formed the basis of Malaysia Airlines' explicit waiver of sovereign immunity did not require such a "nexus"; specifically, it did not require a stopping point in the United States. *See* Malaysia Airlines DOT Permit ¶ 7(a)-(b) (attached as Exhibit C). In either event, unlike the *Hunter* Plaintiff, the *Wood* and *Gaspard* Decedents all purchased their "contracts of carriage" in the United States.[10]

## II. Temporal Impossibility

Malaysia Airlines argues, next, that MAB cannot be liable for the Decedents' deaths because Flight MH370 disappeared on March 8, 2014—eight months before MAB was incorporated.[11] [ECF 39-1 at 22.] But, though Malaysia Airlines does not say so, it is well-settled "that jurisdiction is determined by the facts that exist *when the suit is filed*," and not when the wrong occurred. *See Olympia Exp. Inc. v. Linee Aeree Italiane, S.P.A.*, 509 F.3d 347, 349 (7th Cir. 2007) (emphasis added); *Dole Food Co. v. Patrickson*, 538 U.S. 468, 478 (2003) (stating that "instrumentality" status under the FSIA is determined at the time the suit is filed and not at the time the alleged tort occurred); *Maysonet-Robles v. Cabrero*, 323 F.3d 43, 49 (1st Cir. 2003) (applying the "time of filing rule" to questions of subject matter jurisdiction and successor law);

---

[10] For an examination of this argument, please see Section II of the Plaintiffs' Response to Malaysia Airlines' Motion to Dismiss under the Montreal Convention ("Montreal Convention Response"). [ECF 63].

[11] MAB was incorporated on November 7, 2014 [ECF 39-1, at 22]—after a second accident involving Malaysia Airlines Flight MH17 resulted in the deaths of 298 people.

*Straub v. A P Green, Inc.*, 38 F.3d 448, 451 (9th Cir. 1994) (holding that the FSIA applies when a party is a foreign state at the time the lawsuit is filed, even if that party was not a foreign state at the time of the alleged wrongdoing). In fact, the Defendants appear to agree. [ECF 39-1, at 12 n.3 ("For purposes of determining an entity's status under the FSIA, the relevant time is the dates on which the Lawsuits were filed.")]. Here, the Plaintiffs' Complaints were filed after MAB's November 7, 2014 incorporation. *See Wood v. Malaysia Airlines Berhard*, No. 16-cv-00053-KBJ (D.D.C., filed January 12, 2016); *Gaspard v. Malaysia Airlines Berhard, et al.*, No. 16-cv-00419 (D.D.C., filed March 2, 2016). Acordingly, this Court should reject Malaysia Airlines' "temporal impossibility" argument.

### III. The "Act of State" Doctrine

"The act of state doctrine precludes domestic courts from inquiring into the validity of the public acts that a recognized foreign sovereign power committed within its own territory." *United States v. One Gulfstream G-V Jet Aircraft*, 941 F.Supp.2d 1, 11 (D.D.C. 2013) (citing *McKesson Corp. v. Islamic Republic of Iran*, 539 F.3d 485, 491 (D.C. Cir. 2008)); *see also Underhill v. Hernandez*, 168 U.S. 250, 252 (1897). "The doctrine applies when the relief sought or the defense interposed would require a court in the United States to declare invalid the official act of a foreign sovereign performed within its boundaries." *One Gulfstream*, 941 F.Supp.2d at 11 (D.D.C. 2013) (citing *W.S. Kirkpatrick & Co. v. Envt'l. Tectonics Corp.*, 493 U.S. 400, 405 (1990)). Importantly, "[t]he burden of proving an act of state rests on the party asserting the defense." *Agudas Chasidei Chabad of U.S. v. Russian Fed'n*, 528 F.3d 934, 952 (D.C. Cir. 2008).

In two paragraphs, Malaysia Airlines suggests that the "act of state" doctrine precludes this Court from finding that MAB is the successor-in-interest to MAS. [ECF 39-1 at 22-23]. But

what Malaysia Airlines has filed is a motion to dismiss, pursuant to Fed. R. Civ. P. 12(b)(1), for lack of subject matter jurisdiction under the FSIA. [ECF 39-1]. Unlike the FSIA, however, the "act of state" doctrine is prudential, not jurisdictional. *See Virtual Defense and Development Inter., Inc. v. Republic of Moldava*, 133 F.Supp.2d 1, 7 (D.D.C. 1999); *Siderman de Blake v. Republic of Argentina*, 965 F.2d 699, 707 (9th Cir. 1992) ("In contrast to the jurisdictional nature of foreign sovereign immunity under the FSIA, the act of state doctrine is not a jurisdictional limit on courts.") (quotation marks and brackets omitted). Because the "act of state" doctrine does not implicate the Court's subject matter jurisdiction, "a motion to dismiss based on the act of state doctrine is therefore properly considered under Rule 12(b)(6), not Rule 12(b)(1)." *de Csepel v. Republic of Hungary*, 808 F.Supp.2d 113, 142 (D.D.C. 2011), aff'd in part, rev'd in part, 714 F. 3d 591 (D.C. Cir. 2013); *Siderman*, 965 F.2d at 707 ("In terms of the Federal Rules of Civil Procedure, the act of state doctrine does not bar an action for lack of subject matter jurisdiction, Fed.R.Civ.P. 12(b)(1), but rather for failure to state a claim upon which relief can be granted, Fed.R.Civ.P. 12(b)(6)."). Because Malaysia Airlines has elected not to file a motion to dismiss for failure to state a claim under Fed. R. Civ. P. 12(b)(6), its motion for dismissal under the "act of state" doctrine is not cognizable here.

In either event, Malaysia Airlines bears the burden of establishing the applicability of the "act of state" doctrine, *see Alfred Dunhill v. Republic of Cuba*, 425 U.S. 682, 691 (1976); *Agudas*, 528 F.3d at 951—something its paltry, two-paragraph reference to the doctrine has woefully failed to do here. Spurning its burden, Malaysia Airlines never even bothers to engage in the "balancing approach" the U.S. Supreme Court has instructed courts to undertake before applying the "act of state" doctrine. *See Banco Nacional de Cuba v. Sabbatino*, 376 U.S. 398, 428 (1964) ("Some aspects of international law touch more sharply on national nerves than do

8

others; the less important the implications of an issue are for our foreign relations, the weaker the justification for exclusivity in the political branches."). That balancing approach amply demonstrates the inapplicability of the doctrine here.

As this Court has explained, "[i]n balancing" the interests of a foreign state against the interests of a party seeking relief from that state, "a court should be mindful that the decision to deny judicial relief to a party should not be made lightly." *Virtual Defense*, 133 F.Supp.2d at 8. "To meet its burden and show that the act of state doctrine should apply … [Malaysia Airlines] must show that [the Malaysian Government] was acting in the public interest of its country and that a judicial inquiry into this action would either (1) cause harm to the interests of another branch of the United States government, or (2) question the legality of [Malaysia's] sovereign actions." *Id*. Malaysia Airlines makes absolutely no effort to show how Act 765—the act that incorporated MAB, *see* **Ex. E** ¶¶ 15-35—was "in the public interest of its country." 133 F.Supp.2d at 8. Nor does it point to any particular "branch of the United States government," let alone explain how this Court's adjudication of these wrongful death claims would "cause harm" to that as-yet unspecified branch.

In any case, the U.S. Supreme Court has since 1976 "declined to extend the act of state doctrine to acts committed by foreign sovereigns *in the course of their purely commercial operations*." *Alfred Dunhill*, 425 U.S. at 706 (emphasis added). In so holding, the Supreme Court "drew a line … between the historically recognized governmental functions of a State and businesses engaged in by a State of the kind which theretofore had been pursued by private enterprise." *Id*. at 696 (citing *South Carolina v. United States*, 199 U.S. 437 (1905)); *cf. id.* at 697-98 ("[B]ased on the presently expressed views of those who conduct our relations with foreign countries, we are in no sense compelled to recognize as an act of state the purely

commercial conduct of foreign governments in order to avoid embarrassing conflicts with the Executive Branch.") (page number omitted).

Malaysia Airlines does not dispute that its government's incorporation of a commercial airline is a "purely commercial business." Indeed, Malaysia's act of extracting the assets of one company—MAS—and transferring them to a newly incorporated MAB are no less commercial than were Cuba's actions in *Dunhill*. In that case, the plaintiff (Dunhill) had mistakenly made payments to a number of Cuban cigar companies, which the Cuban Government had expropriated. When the Cuban cigar companies, now run by the Cuban government, refused to pay back the monies, Dunhill sued. *Id*. at 685-87. As here, the Cuban government claimed that its "refusal to honor the obligation was an act of state not subject to question in our courts." *Id*. at 687. The Supreme Court disagreed, noting that "[b]ecause the act relied on by respondents in this case was an act arising out of the conduct by Cuba's agents in the operation of cigar businesses for profit, the act was not an act of state." *Id*. at 706. The Malaysian government's operation of an airline business for commercial profit is likewise "not an act of state," nor are the Malaysian government's decisions (1) to incorporate a new business or (2) to transfer the assets and liabilities of the old business (MAS) to that new business (MAB). *See id*. at 704 ("In their commercial capacities, foreign governments do not exercise powers peculiar to sovereigns. Instead, *they exercise only those powers that can also be exercised by private citizens*. Subjecting them in connection with such acts to the same rules of law that apply to private citizens is unlikely to touch very sharply on 'national nerves.'") (emphasis added).

Malaysia Airlines' "act of state" defense is inapplicable for yet another reason: The Plaintiffs are not asking this Court to declare an act of the Malaysian government invalid. "In every case in which [the courts] have held the act of state doctrine applicable, the relief sought or

the defense interposed would have required a court in the United States to declare invalid the official act of a foreign sovereign performed within its own territory." *W.S. Kirkpatrick*, 493 U.S. at 405; *cf. Virtual Defense*, 133 F.Supp.2d at 8 (holding the "act of state" doctrine inapplicable where "the court is not asked to question the validity of a sovereign action, such as price fixing, but is merely asked to adjudicate a contract claim"); *Austin Inv. Fund, LLC v. United States*, No. CV 11-2300 (CKK), 2015 WL 7303514, at *7 (D.D.C. Nov. 19, 2015) (holding the "act of state" doctrine inapplicable because "the application of section 482 in this case does not involve determining the legality of the mandate, under Chinese law, that China Orient pay Bank of China full face value for the non-performing loan portfolio. It simply involves determining the meaning of that face-value acquisition for the purposes of United States tax law").

Far from asking this Court to declare Act 765 invalid, the Plaintiffs seek only a finding that MAB is, for purposes of the liabilities arising from Flight MH370, a successor to MAS. Malaysia Airlines suggests that Act 765 specifically excluded MH370's liabilities in its transfer of MAS' assets and liabilities to MAB. [ECF 39-3 (Decl. of Rizani Bin Hassan, at ¶ 18 ("Certain assets and liabilities of MAS have been acquired by and transferred to MAB pursuant to Act 765, but liability for Flight MH370 was specifically excluded from the transfer.")]. But a close inspection of both Act 765 and the many declarations Malaysia Airlines has attached to its motion reveals that neither says any such thing. To the contrary, Act 765 never mentions Flight MH370, and the "Exhibit D" to which Rizani Bin Hassan refers in his declaration says only that "[t]he Administrator is expected to play a critical role which includes facilitating the transfer of selected assets and liabilities to MAB whilst ensuring that the transition is seamless with no interruption to the airline services." [ECF 39-3, at 187 (May 25, 2015 Letter Appointing an Administrator of MAS)].

11

Indeed, a review of the text of Act 765 rather suggests that the liabilities from Flight MH370 are *not excluded* from transfer to MAB. After all, Act 765 does engage in a meticulous recitation of those liabilities which the Malaysian government excluded from the transfer to MAB. [ECF 39-3, Act 765, at ¶ 25(1)-(2)]. But none of these exclusions mentions Flight MH370 or any liability that could reasonably be interpreted as arising from Flight MH370. *See* **Ex. E ¶¶** 27-34. Instead, each of these exclusions is primarily concerned with liabilities arising from employment disputes. *See, e.g.*, *id.* at ¶ 25(2) ("[MAB], the appointer and the Administrator shall not be named as a party in any claim or application made or joined as a party in any proceeding commenced or continued by or on behalf of any employees or former employees of the Administered Companies pursuant to the Industrial Relations Act of 1967, Employment Act 1955, Sabah Labour Ordinance 1950, Sarawak Labour Ordinance 1952 or the Trade Unions Act 1959."). Under the doctrine of *expressio unius est exclusio alterius* ("to express one is to exclude the other), this Court should presume, barring other evidence, that Act 765's specific exclusion of employer-employee liability works an implicit inclusion of other, unmentioned liabilities. *See Barnhart v. Sigmon Coal Co.*, 534 U.S. 438, 452 (2002) ("[I]t is a general principle of statutory construction that when Congress includes particular language in one section of a statute but omits it in another section of the same Act, it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion."). The Malaysian government should be held to no lesser standard.

In short, even if Malaysia Airlines had moved to dismiss the Plaintiffs' complaint properly under Fed. R. Civ. P. 12(b)(6)—which it elected not to do—"the act of state" doctrine is, for several reasons, inapplicable here. Moreover, given Malaysia Airlines' burden, its failure to provide even a single shred of evidence in support of its position that some act of the

Malaysian government precluded the transfer of MH370's liabilities to MAB should preclude the doctrine's application here. *See Sharon v. Time, Inc.*, 599 F. Supp. 538, 546 (S.D.N.Y. 1984)) ("The issue in this litigation is not whether [the alleged] acts are valid, but whether they occurred.").

## IV. Explicit Waiver

Malaysia Airlines "clearly and unambiguously" waived its sovereign immunity, *Firebird*, 915 F. Supp. 2d at 126, when it sought and obtained a foreign air carrier permit from the DOT. In pertinent part, that Permit provides as follows:

> This permit and the exercise of the privileges granted in it shall be subject to the terms, conditions and limitations in both the order issuing this permit and the attachment to this order, *and to all applicable provisions of any treaty, convention or agreement affecting international air transportation now in effect, or that may become effective during the period this permit remains in effect, to which the United States and the holder's homeland are or shall become parties*.

[ECF 39-6, at 7, attached as **Exhibit E** (emphasis added)]. An attachment to the Permit included the following additional language:

> In the conduct of the operations authorized, the holder shall: …
>
> (7) Agree that operations under this authority *constitute a waiver of sovereign immunity, for the purposes of 28 U.S.C. 1605(a)*, but only with respect to those actions or proceedings instituted against it in any court or other tribunal in the United States that are:
>
> > *(a)* based on its operations in international air transportation that, according to the contract of carriage, include a point in the United States as a point of origin, point of destination, or agreed stopping place, *or for which the contract of carriage was purchased in the United States*; or
> >
> > *(b) based on a claim under any international agreement or treaty cognizable in any court or other tribunal of the United States*.
>
> In this condition, the term "international air transportation" means "international transportation" as defined by the Warsaw Convention, except that all States shall be considered to be High Contracting Parties for the purpose of this definition.

[ECF 39-6, at 9 (emphasis added)].

13

As the plain text of the Permit makes clear, Malaysia Airlines waived its sovereign immunity with respect to the *Wood* and *Gaspard* claims in two separate ways. First, because both the *Wood* and *Gaspard* Decedents "purchased" their "contract[s] of carriage"—that is, their tickets for Flight MH370—from authorized agents of Malaysia Airlines in the United States, the *Wood* and *Gaspard* claims satisfy the waiver set out in the final clause of paragraph 7(a) of the Permit. [ECF 63 § II].[12] Second, because this Court may lawfully exercise both Third and Fifth Jurisdiction under the Montreal Convention, *see id.* § I,  the *Wood* and *Gaspard* claims fall within the scope of Section 7(b) of the Permit.

Malaysia Airlines offers two arguments in support of its position that the Permit did not work an explicit waiver of its sovereign immunity. First, it says that the DOT exceeded its authority when it conditioned the issuance of the Permit on Malaysia Airlines' waiver of sovereign immunity. [ECF 39-1, at 34]. Second, relying on a case that pre-dates the relevant 1987 DOT Amendment, Malaysia Airlines claims that the Permit only operates as a waiver of sovereign immunity for flights with a stopping point in the United States. [ECF 39-1, at 34]. Because Flight MH370 included no such stopping point, Malaysia Airlines insists, the Plaintiffs' claims do not fall within the ambit of the Permit's waiver. [*Id.*]. Both arguments are meritless and should be rejected.

### A.    Malaysia Airlines cannot challenge the validity of the Permit

Malaysia Airlines asks "this Court [to] reject any contention that the waiver of sovereign immunity contained in the Permit Conditions *is valid.*" [ECF 39-1, at 47 (emphasis added)]. As a preliminary matter, this Court should apply "traditional equity principles" and refuse to entertain what amounts to a collateral assault on the validity of a Permit whose financial benefits Malaysia

---

[12] The Plaintiffs hereby incorporate all of the arguments they have made in their separate Montreal Convention Response. [ECF 63].

Airlines has enjoyed without challenge or interruption since 2002. *See Dan-Air Servs., Ltd. v. Civil Aeronautics Bd.*, 475 F.2d 408, 412 (D.C. Cir. 1973) ("Moreover, under traditional equity principles, review is inappropriate. Petitioners accepted their permits containing condition (5) without objection and have enjoyed the benefits conferred by those permits for approximately two years. In these circumstances petitioners should not now be heard to complain of the terms and conditions upon which they were granted the right to operate."); *F.P.C. v. Colorado Interstate Gas Co.*, 348 U.S. 492, 502 (1955) ("After the merger was approved on that condition, respondent sought no review of it. On the other hand, respondent consummated the merger and has enjoyed its benefits ever since. It cannot now be allowed to attack an officially approved condition of the merger while retaining at the same time all of its benefits."); *Callanan Road Improvement Co. v. United States*, 345 U.S. 507, 513 (1953) ("If the appellant then had taken the position it seeks now, the Commission might conceivably have refused its approval of the transfer. The appellant accepted the transfer with the limitations contained in the certificate. The appellant now will not be heard to say it is entitled to receive more than its transferor had or the certificate transferred gave.") (page number omitted).

Malaysia Airlines never challenged the validity of the Permit—or the scope of the DOT's authority to include a sovereign immunity waiver in that Permit—either when the DOT first promulgated the waiver language in 1987 or when the DOT issued Malaysia Airlines its Permit in 2002. Malaysia Airlines has enjoyed the tremendous benefits that flow from access to the American aviation market ever since, and it "should not now be heard to complain of the terms and conditions upon which they were granted the right to operate." *Dan-Air Servs.*, 475 F. 2d at 412.

### B.    The DOT's Authority

Malaysia Airlines argues, first, that the DOT "was without authority to force a state-owned carrier to waive its right to sovereign immunity as a condition of receiving a foreign air carrier permit." [ECF 39-1, at 34].[13] But Malaysia Airlines has failed to cite a single case for the proposition that the DOT lacks authority to require state-owned airlines to waive their sovereign immunity as a condition to receipt of a DOT permit.[14] Because Malaysia Airlines bears the burden of establishing its immunity under the FSIA, this absence of evidence should be dispositive here. *See Phoenix Consulting*, 216 F.3d at 40 (noting that "the defendant bears the burden of proving that the plaintiff's allegations do not bring its case within a statutory exception to immunity"); *Owens*, 374 F.Supp.2d at 10 ("A court may dismiss a complaint brought pursuant to the FSIA only if it appears beyond doubt that plaintiffs can prove no set of facts that would establish the jurisdiction of the court and a viable claim for relief.").

In any case, in reviewing an agency's interpretation of the laws it administers, the Supreme Court "appl[ies] the principles of *Chevron U.S.A. Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837[] (1984)." *Mount Royal Joint Venture v. Kempthorne*, 477 F.3d 745, 754 (D.C. Cir. 2007). *Chevron* instructs courts to examine the agency's action through the lens of a two-part test: "If the intent of Congress is clear, that is the end of the matter; for the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress." *Chevron*, 467 U.S. at 842–43. "If, however, the court determines Congress has not directly

---

[13] Malaysia Airlines' contention that the DOT "forced" it to waive its sovereign immunity, [ECF 39-1, at 34],  is belied by the facts. The DOT did not, for instance, travel to Malaysia and impose itself on the Malaysian government. It was, rather, Malaysia Airlines who, for business reasons, sought from the DOT permission to fly into, and out of, the United States. In exchange for the (no-doubt lucrative) financial benefits which access to the American aviation market facilitates, the DOT required Malaysia Airlines to agree to certain conditions—conditions the DOT attaches to all foreign air carrier permits. Any air carrier that wishes to engage in business in the United States must abide by these conditions. Of course, any carrier is free to decide that the benefits of doing business in the United States do not justify the burdens imposed by those conditions. In either case, by acceding to the DOT's conditions, Malaysia Airlines—a sophisticated international company—made an informed business decision, a decision that significantly undermines its suggestion that the DOT *forced* it to do anything.

[14] The undersigned likewise has been unable to find a single case in the history of American jurisprudence in which the DOT's authority to condition the issuance of a foreign air carrier permit on a state-owned airline's waiver of sovereign immunity was successfully challenged.

addressed the precise question at issue, the court does not simply impose its own construction on the statute." *Id.* Rather, "[i]f the agency enunciates its interpretation through notice-and-comment rule-making or formal adjudication, we give the agency's interpretation *Chevron* deference." *United States v. Mead Corp.*, 533 U.S. 218, 231 (2001).[15] That is, "we determine whether its interpretation is 'permissible' or 'reasonable,' *Chevron*, 467 U.S. at 843[], giving 'controlling weight' to the agency's interpretation unless it is 'arbitrary, capricious, or manifestly contrary to the statute,' *id*. at 844[.]" *Mount Royal*, 477 F.3d at 754.

As relevant here, Congress has authorized the DOT to condition the issuance of a foreign air carrier permit on a state-owned airline's waiver of its sovereign immunity. Specifically, Section 402(e) of the Federal Aviation Act of 1958 ("F.A.A.") unambiguously authorized the Civil Aeronautics Board ("CAB")—and, after 1984, the DOT[16]—to "prescribe the duration of any permit and [] attach to such permit such reasonable terms, conditions, or limitations as, *in its judgment*, the public interest may require." F.A.A. § 402(e), Pub. L. 85-726, 72 Stat. 737 (1958), recodified and renumbered as 49 U.S.C. § 41305(b) by Pub. L. 103-272, 108 Stat. 1127 (1994) (emphasis added). This expansive grant of rule-making power was accompanied by a kind of "necessary and proper" clause that further broadened the scope of the DOT's authority. *See* F.A.A. § 204(a), Pub. L. 85-726, 72 Stat. 737 (1958), recodified and renumbered as 49 U.S.C. § 40113(a) by Pub. L. 103-272, 108 Stat. 1127 (1994). Under Section 204(a):

> The [CAB] is empowered to perform such acts, to conduct such investigations, to issue and amend such orders, and to make and amend such special rules, regulations, and procedure [sic], pursuant to and consistent with the provisions of this Act, as it shall deem necessary to carry out the provisions of, and to exercise and perform its duties under, this Act.

---

[15] Malaysia Airlines concedes that the DOT "enunciate[ed] its interpretation" of the relevant statutes "through notice-and-comment rule-making," *Mead Corp.*, 533 U.S. at 231. [ECF 39-1, at 37-38].

[16] Pursuant to the Civil Aeronautics Board Sunset Act of 1984, Pub.L. No. 95–504, Congress transferred the CAB's authority to issue foreign air carrier permits to the DOT. *See* F.A.A. § 1601.

F.A.A. § 204(a).

In 1987, the DOT did precisely what Congress authorized it to do: it amended its rules, regulations, and procedures. Prior to 1987, the CAB—and later the DOT—required foreign airlines to agree to the following waiver of sovereign immunity in exchange for a foreign air carrier permit:

> [The holder shall] Waive any right it may possess to assert any defense of sovereign immunity from suit in any action or proceeding instituted against it in any court or other tribunal in the United States (or its territories or possessions) based upon any claim *arising out of operations under this* [permit or exemption].

Order to Show Cause, Amendment of Foreign Air Carrier Permit and Exemption Authority, 1986 WL 69761, at *1 ("Order to Show Cause"), attached as **Exhibit A** (emphasis added). In 1987, the DOT promulgated an amendment to this sovereign immunity waiver. *See* Amendment of Foreign Air Carrier Permit and Exemption Authority, 1987 WL 111215, at *3 (the "1987 Amendment"), attached as **Exhibit B**. In pertinent part, the 1987 Amendment required, as a condition precedent to the issuance of any foreign air carrier permit, that a foreign air carrier agree to the following, far broader, waiver of sovereign immunity:

> The holder agrees that operations under this [permit or exemption] constitute a waiver of sovereign immunity for the purposes of 28 U.S.C. g 1605(a), but only with respect to those actions or proceedings instituted against it in any court or other tribunal in the United States that are: (a) based on its operations in international air transportation that, according to the contract of carriage, include a point in the United States as a point of origin, point of destination, or agreed stopping place, or for which the contract of carriage was purchased in the United States; or (b) based on a claim under any international agreement or treaty cognizable in any court or other tribunal of the United States.

**Ex. B**, at *3 (footnotes omitted). Notably, this waiver language is virtually identical to the waiver language included in the Permit Malaysia Airlines signed in 2002—the Permit at issue here. *See* DOT Permit [ECF 39-6 ¶ 7(a)-(b)], attached as **Exhibit C**.

To summarize, then: In 1958, Congress authorized the DOT to include in its foreign air carrier permits any conditions "as, *in its judgment*, the public interest may require," F.A.A. § 402(e) (emphasis added)—an almost-unbridled investment of rule-making power circumscribed only by the very general requirement that "such … conditions" be "reasonable." F.A.A. § 402(e). And, in promulgating the 1987 Amendment, the DOT offered at least five "reasonable" explanations for its position that, "in its judgment, the public interest," in fact, "require[d]" the broader sovereign immunity waiver at issue here.

First, the DOT manifested a clear desire to protect the interests of U.S. citizens injured abroad. As it explained:

> It is our intention that, if jurisdiction properly lies in the United States under an international treaty or agreement, a foreign air carrier will not be able to defeat that jurisdiction by claiming sovereign immunity. In particular, it would ensure that, under the Montreal Protocols (upon their entry into force), U.S. citizens may have their legitimate Warsaw Convention claims heard in their own courts.

**Ex. B**, at *4 (emphasis added). Second, the DOT sought to promote the uniformity in international air litigation that was a hallmark of the Warsaw Convention. *Id.* at *5 ("We think the public interest requires us to see that foreign air carriers operating to and from the United States do so consistently with relevant international agreements, and comply with the liability obligations imposed by those agreements."). Third, taking adequate stock of the powerful imprimatur that attends the receipt of an official permit from the U.S. Government, the DOT believed it was important "that a foreign air carrier operating under a license *that we have granted* be fully accountable in U.S. courts to the extent mandated by international treaties or agreements, as well as for its operations under that license." *Id.* (emphasis added). Fourth, noting that, in Section 102(12) of the FAA, Congress "admonished" the DOT "to strengthen 'the competitive position of United States air carriers to at least assure equality with foreign air

carriers,' the DOT concluded that "we would be remiss in that responsibility if we did not ensure that foreign air carriers exploiting the U.S. aviation market shoulder the same liabilities as do U.S. air carriers." *Id*. Fifth, the DOT sought to "place governments operating commercial enterprises on an equal footing with private entrepreneurs engaged in the same activities." **Ex. A**, at \*2. Malaysia Airlines may disagree with some or all of these justifications, but it cannot—and does not—say that they are not "reasonable." And that is all Section 402(e) requires.

Malaysia Airlines points to the 1994 recodification of the FAA as proof that the DOT's rule-making grant was more circumscribed than the Plaintiffs have suggested. In that recodification, the old Section 402(e) became 49 U.S.C. § 41305(b), which now reads: "The Secretary may impose terms for providing foreign air transportation under the permit that the Secretary finds may be required in the public interest." Malaysia Airlines suggests that, to the extent that "foreign air transportation" is defined as "the transportation of passengers … by aircraft … between a place in the United States and a place outside the United States," 49 U.S.C. § 40102(23), Congress' inclusion of the phrase in the 1994 recodification implies that the DOT's authority to issue permits is now limited only to flights with a stopping point in the United States. [ECF 39-1, at 37]. But, in enacting the 1994 recodification, Congress made clear that it was making no substantive change to any part of the law. As it explained:

> As in other codification bills enacting titles of the United States Code into positive law, this bill makes no substantive change in the law. It is sometimes feared that mere changes in terminology and style will result in changes in substance or impair the precedent value of earlier judicial decisions and other interpretations. This fear might have some weight if this were the usual kind of amendatory legislation when it can be inferred that a change of language is intended to change substance. In a codification law, however, the courts uphold the contrary presumption: the law is intended to remain substantively unchanged.

S. Rep. 103-265, 1994 WL 261999 (Leg. Hist.), at \*5 (1994); *see also id.* at \*2 ("The purpose of H.R. 1758 is to restate in comprehensive form, *without substantive change*, certain general and

permanent laws related to transportation and to enact those laws as subtitles II, III, and V-X of title 49, United States Code[.]") (emphasis added); *id.* at \*3 ("In making changes in the language, precautions have been taken against making substantive changes in the law."). In light of Congress' clearly expressed intention that the law remain substantively unchanged, the most natural reading of Section 41305(b) is that, far from delimiting the scope of the DOT's authority, it left unaltered the expansive rule-making powers conferred by Section 402(e), while clarifying only that the foreign air carrier permits in question were permits for travel into and out of the United States. Any other reading would create an irreconcilable conflict with the almost-unfettered rule-making grant embodied in Section 402(e)—a conflict Congress has expressly said it did not intend.

Even if the 1994 recodification rendered the scope of the DOT's authority at the time of the 2002 Permit ambiguous—that is, subject to multiple, reasonable interpretations—under *Chevron*, this Court must then "determine whether [the DOT's] interpretation is 'permissible' or 'reasonable,' *Chevron*, 467 U.S. at 843[], giving 'controlling weight' to the agency's interpretation unless it is 'arbitrary, capricious, or manifestly contrary to the statute,' *id*. at 844[.]" *Mount Royal*, 477 F.3d at 754. This is a very low standard, *Chen v. Ashcroft,* 381 F. 3d 221, 224, 229 (3d Cir. 2004), which the DOT's 1987 Amendment easily satisfies. As the DOT explained in 1987:

> [W]e believe that our action implements congressional intent. Congress was clearly concerned about the ability of foreign government-owned airlines to assert sovereign immunity. However, during hearings on the FSIA, Congress was assured by the Department of Justice that "with respect to foreign government airlines, … as a condition to being licensed by the FAA [sic] to obtain landing rights here, they must, beforehand, waive any immunity and subject themselves to suit in this country." We think it entirely likely that Congress would have addressed problems unique to the aviation industry had it not been led to believe that foreign air carriers would not normally be entitled to sovereign immunity.

**Ex. B**, at *4 (quoting *Jurisdiction of U.S. Courts in Suits Against Foreign States: Hearings on H.R. 11315 before the Subcomm. on Admin. Law and Governmental Relations of the House Comm. On the Judiciary*, 4th Cong., 2nd Sess. 51 (1976) ("FSIA Hearing") (testimony of Bruno A. Ristau)) (footnotes omitted). Indeed, the DOT's understanding of Congress' intent found further support in the following colloquy, which took place during hearings on a predecessor to the FSIA:

> Mr. [Harold V.] Froelich [R – IL]: Wouldn't that airline have to submit to the CAB and FAA rules and, as a matter of fact, even without this bill being passed, wouldn't you be able to sue that under those rules in this country in our courts now?
> Mr. Ristau. Congressman, you are absolutely correct as far as airlines are concerned. They are already subject to the jurisdiction of the domestic courts by virtue of the FAA [sic] requirements that you have just mentioned.

*Immunities of Foreign States: Hearings on H.R. 3493 Before the Subcomm. on Claims and Governmental Relations of the House Comm. on the Judiciary*, 93rd Cong., 1st Sess. 16-17 (1973). In other words, the DOT's determination that Congress had authorized it to include in its foreign air carrier permits waivers of sovereign immunity that extend to flights with no stopping point in the United States was neither "arbitrary, capricious, or manifestly contrary to the statute." *Chevron*, 467 U.S. at 844.[17]

Malaysia Airlines also quotes from 28 U.S.C. § 1602 for the proposition that the "FSIA grants to the courts alone, not agencies of the Executive branch, the power to adjudicate claims of sovereign immunity." [ECF 39-1 at 36]. But the FSIA says no such thing. It merely requires that, in deciding questions of sovereign immunity, courts should act "in conformity with the

---

[17] Malaysia Airlines' reliance on *Tennessee Valley Authority v. Hill*, 437 U.S. 153 (1978), is for similar reasons misplaced. [ECF 39-1, at 39-40]. In that case, the Supreme Court held that an agency's interpretation of a statute is invalid when it "ignore[s]" the "plain language" of the statute. 437 U.S. at 173. But, as we have shown, the DOT's interpretation of its authority to condition foreign air carrier permits on an airline's waiver of sovereign immunity is supported by both the plain language of the authorizing statutes and the legislative history of the FSIA.

principles set forth in this chapter." 28 U.S.C. § 1602.[18] In any case, the Plaintiffs are not asking the "Executive Branch" to "adjudicate"[19] the applicability of the FSIA's waiver exception here. To the contrary, the Plaintiffs have filed this Response precisely so that this Court—and not the Executive Branch—may decide, "in conformity with the principles set forth in" the FSIA, 28 U.S.C. § 1602, whether or not Malaysia Airlines is immune from suit for the deaths of the *Wood* and *Gaspard* Decedents.

Citing a statute that authorizes the DOT to exempt airlines from certain antitrust laws, Malaysia Airlines next argues that, "[w]hen Congress desires to give the D.O.T. authority to exempt airlines from application of other laws, []Congress does so expressly" [ECF 39-1, at 37]—the implication being that, had Congress intended to exempt state-owned airlines from the protections of the FSIA, it would have amended the FSIA to say so. But this argument presumes that Congress did not already contemplate that airlines could, in the course of their commercial dealings with the DOT, waive their sovereign immunity—a waiver that, by virtue of the exception contained in 28 U.S.C. § 1605(a)(1), would require no amendment to the FSIA. As the congressional record amply demonstrates, however, "during hearings on the FSIA, Congress was assured by the Department of Justice that 'with respect to foreign government airlines, … as a condition to being licensed by the FAA [sic] to obtain landing rights here, they must, beforehand,

---

[18] The Supreme Court's opinion in *Amerada Hess* lends further support to the Plaintiffs' position that this provision of the FSIA was aimed, not at precluding the Executive Branch from negotiating sovereign immunity waivers, but at defining the principles by which courts adjudicating FSIA claims should be guided. 488 U.S. at 437-38 ("Congress provided in the FSIA that '[c]laims of foreign states to immunity should *henceforth* be decided by courts of the United States in conformity with the principles set forth in this chapter,' and very likely it thought that should be sufficient. § 1602 (emphasis added); *see also* H.R. Rep., at 12; S. Rep., at 11, U.S. Code Cong. & Admin. News 1976, p. 6610 (FSIA 'intended to preempt any other State and Federal law (excluding applicable international agreements) for according immunity to foreign sovereigns.'))."

[19] The act of "adjudicating" necessarily involves a form of "judicial authority" which the DOT's rule-making functions never implicate. *See Adjudicate,* Black's Law Dictionary Online (2d ed.).

waive any immunity and subject themselves to suit in this country.'" **Ex. B**, at *4 (quoting FSIA Hearing, at 51).[20] As such, no amendment to the FSIA was necessary.

Because this Court must give "controlling weight to the [DOT's] interpretation" of the applicable statutes, *Mount Royal*, 477 F.3d at 754 (quotation marks omitted)—and because the DOT's reading of the delicate interplay between the FSIA, the FAA, and the 1994 recodification of the FAA is supported by both the plain meaning of the words in those statutes and by the legislative history of the FSIA—Malaysia Airlines' argument that the DOT lacked authority to condition its foreign air carrier permit on a waiver of sovereign immunity should be rejected.

### C.  The Scope of the DOT Permit

Malaysia Airlines also argues that, even if the DOT had authority to negotiate a waiver of sovereign immunity, "the purported waiver of sovereign immunity applies only with respect to 'the conduct of the operations authorized' by the MAS Permit and therefore does not apply to MAS's operation of Flight MH370." [ECF 39-1, at 41 (quoting Ex. 5, DOT Permit, at 3)]. Here, however, Malaysia Airlines has argued its way into a dialectical vice from which it cannot extricate itself, for having contended that the DOT exceeded its authority by requiring a waiver

---

[20] Citing two statutes—the Anti-Terrorism and Effective Death Penalty Act ("AEDPA") and the Flatow Amendment—in which Congress has "waived foreign sovereign immunity and created a cause of action for individuals harmed by state-sponsored acts of terrorism," Malaysia Airlines points out again that "Congress is aware of its power to amend the FSIA to add exceptions to immunity that are otherwise not covered." [ECF 39-1, at 41 n.8]. But, again, Malaysia Airlines misses the obvious point that Congress saw no need to amend the FSIA for this purpose precisely because the exception that applies here *is already built into the FSIA*. *See* 28 U.S.C. § 1605(a)(1) ("A foreign state shall not be immune from the jurisdiction of courts of the United States or of the States in any case … in which the foreign state has waived its immunity."). Because the DOT permit works a waiver of sovereign immunity—and because waivers of sovereign immunity are already excepted from the FSIA—any additional exclusion for foreign air transportation waivers would have been mere surplusage. By contrast, both AEDPA and the Flatow Amendment were necessary amendments to the FSIA because neither implicated foreign behavior that, prior to those amendments, fell within the ambit of any of the FSIA's exceptions. *See* Antiterrorism and Effective Death Penalty Act of 1996, Pub. L. No. 104-132, 110 Stat. 1214 (codified as amended in scattered sections of 8, 18, 22, 28, 40, and 42 U.S.C.); Flatow Amendment, Pub. L. No. 104-208, § 589, 110 Stat. 3009-172 (1996).

of sovereign immunity for flights with no stopping point in the United States,[21] it cannot then

argue that the DOT's waiver does not encompass flights with no stopping point in the United

States. Like Lincoln's "House Divided," Malaysia Airlines' argument must be either "all one

thing or all the other,"[22] but it cannot be both.

As we have noted, prior to 1987, the CAB's standard sovereign immunity waiver read as

follows:

> [The holder shall] [w]aive any right it may possess to assert any defense of
> sovereign immunity from suit in any action or proceeding instituted against it in
> any court or other tribunal in the United States (or its territories or possessions)
> based upon any claim *arising out of operations under this* [permit or exemption].

**Ex. A**, at 1 (emphasis added). On  January 21, 1986, the DOT issued an Order to Show Cause

directing "interested persons to show [] why it should not amend all foreign air carrier operating

authority to make it clear that the required waiver of sovereign immunity extends to all a foreign

carrier's air service operations[.]" **Ex. A**, at 1. In that Order to Show Cause, the DOT proposed to

amend the original waiver language so as to require state-owned airlines to waive their sovereign

immunity for *any* flight, whether that flight had a connection to the United States or not, and

irrespective of whether the flight was subject to an international treaty. In pertinent part, the

DOT explained:

> Under standard practice, every foreign air carrier operating to the United States
> today is required to relinquish its right to the defense of sovereign immunity as a
> condition of holding operating authority under the following standard condition:
>
> [The holder shall] [w]aive any right it may possess to assert any defense of
> sovereign immunity from suit in any action or proceeding instituted against it in
> any court or other tribunal in the United States (or its territories or possessions)
> based upon any claim arising out of operations under this [permit or exemption].

---

[21] [ECF 39-1, at 37 ("And nowhere in the authorizing statute is the D.O.T. granted authority over operations by
foreign air carriers that do not involve foreign air transportation, meaning the 'transportation of passengers ... by
aircraft...between a place in the United States and a place outside the United States . . .".") (emphasis added)].
[22] Abraham Lincoln, "House Divided," Speech at the Illinois State Capitol (June 16, 1858).

This condition was first imposed in 1951 by the CAB ….

This condition reflects our policy that an airline enjoying the benefits of operating in the U.S. market should also be subject to the responsibilities that attach to doing business in the United States, and seeks to place governments operating commercial enterprises on an equal footing with private entrepreneurs engaged in the same activities. *However, the exact words of the condition make it possible to argue that the CAB intended that the waiver should be limited to claims arising out of a carrier's operations to and from the United States made possible as a result of the permit or exemption*.

We think that such a narrow interpretation would be contrary to the CAB's intent, as quoted above. *Moreover, even if the CAB had intended to limit the waiver to operations clearly in foreign air transportation, we do not agree that the waiver should be so limited. We think that the public interest, and U.S. international aviation policy, demand that foreign air carriers owned by foreign governments waive any claims they may otherwise enjoy to claim sovereign immunity in U.S. courts, whether or not the particular air service activity complained of takes place between the United States and some foreign place, or between two foreign places*.

….

We think that the requirement that airlines be commercially liable for their airline activities in U.S. courts is reasonable. It is consistent with U.S. law and policy, as set forth in the Foreign Sovereign Immunities Act and enunciated by U.S. courts and administrative agencies. An airline is universally recognized to be a commercial enterprise, and most foreign carriers benefit substantially from their U.S. operations. Accordingly, they should not be permitted to avoid the obligations and responsibilities that are a part of operating a business. *The logic of this principle is not diluted by the fact that the airline's action took place in the context of operations between foreign points rather than directly between a foreign point and a point in the United States*.

**Ex. A**, at 1-2 (footnotes omitted) (emphasis added)**.** With these principles in mind, the DOT

proposed to amend the standard sovereign immunity waiver "contained in all foreign air carrier

permits" as follows:

Waive any right [the air carrier] may possess to assert any defense of sovereign immunity from suit in any action or proceeding instituted against it in any court or other tribunal in the United States (or its territories or possessions) based upon any claim arising out of operations *by* the holder of this [permit].

*Id*. at 3 (emphasis added). As this language made clear, this waiver would have applied to *any flight* operated "by" a state-owned air carrier.

In response to the Order to Show Cause, several foreign air carriers objected that the proposed waiver language was too broad. **Ex. B**, at *1. After reviewing those objections, the DOT agreed that its proposed waiver was too broad insofar as it encapsulated *any flight by* a foreign air carrier. *Id*. But, in doing so, the DOT did not, as Malaysia Airlines suggests, simply revert to the old waiver. [ECF 39-1, at 42]. Instead, it opted for a middle ground, saying:

> Accordingly, we have decided to accept the suggestion of some commenters that we accomplish our purpose by narrowing the condition's formulation. IATA[23] offered two alternative formulations that it believes will prevent possible circumvention of a treaty and, at the same time, preserve the rights of foreign air carriers. We decided to adopt IATA's approach, with modifications, so that our new permit and exemption condition will read as follows:

> The holder agrees that operations under this [permit or exemption] constitute a waiver of sovereign immunity for the purposes of 28 U.S.C. g 1605(a), but only with respect to those actions or proceedings instituted against it in any court or other tribunal in the United States that are: (a) based on its operations in international air transportation that, according to the contract of carriage, include a point in the United States as a point of origin, point of destination, or agreed stopping place, or for which the contract of carriage was purchased in the United States; or (b) based on a claim under any international agreement or treaty cognizable in any court or other tribunal of the United States.

**Ex. B**, at *3 (footnotes omitted). The DOT then presaged and eviscerated the argument Malaysia Airlines raises here—that the waiver only applies to flights with a stopping point in the United States. In relevant part, it explained:

> Clause (a) is intended to preclude foreign air carriers from asserting immunity in cases arising from their operations in international air transportation that have substantial contact with the United States. Clause (b) forecloses a foreign air carrier from frustrating the intent of an international treaty or agreement to permit certain suits in specified jurisdictions.… *It is our intention that, if jurisdiction properly lies in the United States under an international treaty or agreement, a foreign air carrier will not be able to defeat that jurisdiction by claiming sovereign immunity. In particular, it would ensure that, under the Montreal*

---

[23] The International Air Transport Association.

27

> _Protocols (upon their entry into force), U.S. citizens may have their legitimate_
> _Warsaw Convention claims heard in their own courts_.

*Id*. at \*4 (emphasis added). Going further, the DOT made clear that "we seek only to preclude foreign government-owned airlines from avoiding the jurisdiction of U.S. courts merely because they happen to be owned by a foreign government." *Id*. Notably, the waiver language the DOT promulgated in 1987 is still in effect today and is, in every salient respect, identical to the waiver language contained in the DOT Permit at issue here. We therefore find it of particular relevance that, although Malaysia Airlines cites to this DOT Order for other purposes, it conveniently makes no effort to answer or rebut the Order's pellucid exposition—an exposition made by the DOT itself—on the unambiguous meaning of the words Malaysia Airlines purports to interpret.

What Malaysia Airlines does say is that the waiver's opening phrase—"In the conduct of the operations authorized"—limits the waiver's scope to flights authorized by the Permit, that is, to flights with a stopping point in the United States. [ECF 39-1, at 41]. But Malaysia Airlines' interpretation impermissibly reads Sections 7(a) and 7(b) right out of the Permit, rendering them pure "surplusage"—something the Supreme Court has admonished courts not to do. *See Marx v. General Revenue Corp.*, 568 U.S. 371, 386 (2013) ("[T]he canon [against surplusage] is strongest when an interpretation would render superfluous another part of the same statutory scheme."); *Duncan v. Walker*, 533 U.S. 167, 174 (2001) ("We are thus reluctant to treat statutory terms as surplusage in any setting."). Indeed, if Malaysia Airlines is right that the phrase "in the conduct of the operations authorized" limits the scope of the waiver only to flights with a stopping point in the United States, then we are left to wonder why the drafters of the Permit felt it necessary, in Section 7(a), to reiterate that the waiver applies to "operations … that … include a point in the United States as a point of origin, point of destination, or agreed stopping place." Malaysia Airlines makes no effort to address this crucial flaw in its position.

28

More than that, Malaysia Airlines' reading of the phrase directly conflicts with the plain meaning of the words in Sections 7(a) and 7(b), for, as is evident here, the universe of cases encapsulated by those sections is broader than the range of cases involving a stopping point in the United States. After all, Section 7(a) countenances a waiver of sovereign immunity when, as here, a passenger purchases his ticket in the United States, even if the passenger's flight never stops in the United States. *See* DOT Permit, **Ex. C**, at § 7(a) ("based on its operations that … include a point in the United States as a point of origin, point of destination, or agreed stopping place, *or for which the contract of carriage was purchased in the United States*") (emphasis added). Likewise, Section 7(b) contemplates a waiver of sovereign immunity whenever a claim falls within the ambit of the Montreal Convention. *Id.* at § 7(b). That Convention, in turn, imbues U.S. Courts with jurisdiction over at least two kinds of cases—where the ticket was purchased in the United States ("Third Jurisdiction") and where the passenger had her "principal and permanent" residence in the United States ("Fifth Jurisdiction")—even if the operative flight never stopped in the United States. *See* Montreal Convention, Art. 33(1)-(2). In these cases, then, Malaysia Airlines' interpretation of one part of the waiver directly contradicts the unambiguous words in another part of that same waiver. Tellingly, Malaysia Airlines never even attempts to address this fatal conflict.

The Plaintiffs' far more natural reading, on the other hand, would read the phrase "in the conduct of the operations authorized" to mean precisely what it says—that, in conducting operations authorized by the Permit (flying commercial airplanes into and out of the United States), Malaysia Airlines waives its sovereign immunity as to a broader class of cases. Which class of cases? The class of cases listed in Sections 7(a) and 7(b), of course. This reading has the

dual benefits of rendering no aspect of the Permit superfluous, while, at the same time, avoiding inter-clausal contradictions.

Unsurprisingly, then, the only federal court of appeals that has interpreted the scope of the DOT Permit's sovereign immunity waiver *after the 1987 Amendment* has agreed, as the Plaintiffs argue here, that it *does apply* to international flights with no stopping point in the United States. *See Coyle v. P.T. Garuda Indonesia,* 363 F.3d 979 (9th Cir. 2004). Given *Coyle*'s holding and its direct application to this case, perhaps the most surprising thing that can be said about it is that no citation to it appears anywhere in Malaysia Airlines' 45-page Motion.

In *Coyle,* the plaintiff brought claims under the Warsaw Convention in the United States District Court, District of Oregon, against a state-owned, Indonesian airline ("Garuda"). *Coyle,* 363 F.3d at 983. The plaintiff's parents were killed when an intrastate Garuda flight crashed into the side of an Indonesian mountain. *Id.* "Coyle argued first that Garuda's foreign air carrier operating permit in place at the time of the accident included an express waiver of its sovereign immunity for actions arising under an international treaty[.]" *Id.* (footnote omitted). The district court determined that, by seeking and obtaining a DOT Permit in 1988, Garuda had waived its FSIA immunity, and Garuda appealed. *Id.* at 984.

On appeal, "Coyle contend[ed] that Garuda's possession of a U.S. Department of Transportation (USDOT) foreign air carrier operating permit at the time of the accident constituted a waiver of foreign sovereign immunity." *Id.* at 985.[24] Like Malaysia Airlines,

---

[24] Notably, the *Coyle* permit, signed after the 1987 Amendment, was in all salient respects identical to the DOT Permit at issue here. In relevant part, it provided:

> (3) The holder agrees that operations under this permit constitute a waiver of sovereign immunity for purposes of 28 U.S.C. §1605(a), but only with respect to or proceedings instituted against it in any Court or Tribunal in the United States that are:
>
> > (a) Based upon its operations in international air transportation that, according to the contract of carriage, include a point in the United States as a point of origin, point of destination, or agreed stopping place, or for which the contract of carriage was purchased in the United States; or

Garuda argued that the "first paragraph of Section 3 of the permit—which states that '[t]he holder agrees that _operations under this permit_ constitute a waiver of sovereign immunity' for certain enumerated claims—affirmatively excludes Flight 152 because, as a trip between two foreign cities wholly within the borders of Indonesia, it did not constitute an 'operation[ ] under this permit.'" _Id._ (emphasis added). The court disagreed, noting, as we do here, that:

> The enumerated claims for which acceptance of its permit constituted a waiver of sovereign immunity are defined as those "(a) Based on its operations in international air transportation that, according to the contract of carriage, include a point in the United States ..." and those "(b) Based upon a claim under any international agreement." If, as Garuda contends, its sovereign immunity could be waived only for flights "between a place in the United States and a place outside the United States," the first of the above cited clauses would be rendered surplusage, and the second of the above cited clauses would spur an irreconcilable interclausal contradiction[.]

_Id._ at 985.

In response, Garuda relied on a single case, _Barkanic v. General Admin. of Civil Aviation_, 822 F.2d 11 (2d Cir. 1987). But, like Malaysia Airlines' reliance on _Compania Mexicana De Aviacion, S.A. v. U.S. Dist. Ct. for Central Dist. of Cal._, 859 F.2d 1354 (9th Cir. 1988), _Barkanic_ involved a permit issued _before_ the DOT's 1987 Amendment. The Ninth Circuit found this distinction dispositive. It explained:

> The lone case Garuda cites in support of its reading of the permit, _Barkanic v. General Administration of Civil Aviation_, 822 F.2d 11 (2d Cir.1987), does little to advance its argument. Faced with a wrongful death claim arising from the crash of a domestic flight in China, the Second Circuit in _Barkanic_ reversed the district court's finding that the defendant was entitled to immunity. Before reaching its ultimate conclusion—that the defendant's sale of tickets to the plaintiffs in the United States constituted a "commercial activity" waiver under the FSIA—the Second Circuit noted that the defendant's permit waiver "did not cover the

---

(b) Based upon any claim under any international agreement or treaty cognizable in any Court or other Tribunal of the United States.

_Coyle,_ 363 F. 3d at 984. The Permit at issue in _Coyle_ is attached hereto as **Exhibit D.**

entirely domestic flight between the terminal points Beijing and Nanjing in China." *Barkanic*, 822 F.2d at 12.

Garuda seizes upon this language, but ignores the terms of the permit at issue in *Barkanic:* "Attached to the ... permit was a waiver of any defense of sovereign immunity from suit 'based upon any claim arising out of operations by the holder under this permit.'" *Id.* Thus, while the *Barkanic* waiver was limited to "claim[s] *arising out of operations* ... under this permit," Garuda's waiver is far broader and reaches suits "based on [the holder's] operations in international air transportation" and those "based upon a claim under any international agreement or treaty." Quite in contrast to the permit at issue in *Barkanic*, then, Garuda's waiver cannot plausibly be limited only to those claims "arising from" operations under its permit. Instead, Garuda is subject to suits arising out of the circumstances enumerated in sections 3(a) and 3(b) of its permit.

*Coyle,* 363 F. 3d at 985.[25]

As in *Coyle*, the waiver at issue here applies to "actions or proceedings" that are "based on [the air carrier's] operations in international air transportation that, according to the contract of carriage, include a point in the United States as a point of origin, point of destination, or agreed stopping place, *or for which the contract of carriage was purchased in the United States*," as well as those "*based on a claim under any international agreement or treaty cognizable in any court or tribunal of the United States*." **Ex. C**, at § 7(a)-(b) (emphasis added); *accord* **Ex. D**, at § 3(a)-(b) (the permit at issue in *Coyle*). For the reasons articulated in the Plaintiffs' Montreal Convention Response [ECF 63], the *Wood* and *Gaspard* claims fall comfortably within the ambit of this expansive waiver, insofar as (1) the *Wood* and *Gaspard* Decedents purchased their "contract[s] of carriage" in the United States, *see* **Ex. C**, at § 7(a); and (2) the *Wood* and *Gaspard* claims are "based on a claim  under any … treaty cognizable in any court … of the United States," **Ex. C**, at § 7(b)—specifically, Article 33 of the Montreal Convention.

---

[25] The court then went onto hold that, even though Garuda was not immune from suit under the FSIA, the plaintiff had, for reasons that are not relevant here, failed to establish that jurisdiction was appropriate under the Warsaw Convention. *Id.* at 989.

Malaysia Airlines cites only one case in support of its position that the DOT Permit did not operate as a waiver of sovereign immunity for flights with no stopping point in the United States. [ECF 39-1, at 42 n.10 (quoting *Compania Mexicana*, 859 F.2d 1354)]. But *Compania Mexicana* is, for two reasons, inapposite here. First, *Compania Mexicana* involved the same pre-1987 permit that was at issue in *Barkanic*, under which foreign air carriers arguably were required to waive their FSIA immunity only for flights into and out of the United States. *See Compania Mexicana*, 859 F. 2d at 1359.[26] As we have shown, however, in 1987, the DOT amended the old waiver language so that it thereafter applied to flights with no stopping point in the United States. **Ex. B**, at 3; **Ex. C**, at § 7(a)-(b). Second, even under the post-1987 waiver language, the *Compania Mexicana* claims would not have worked a waiver of the airline's sovereign immunity because (1) the "contracts of carriage" for the *Compania Mexicana* flight were "purchased," not in the United States, but in Mexico, *see Compania Mexicana*, 859 F.2d at 1359; (2) the *Compania Mexicana* Plaintiffs were "principal and permanent" residents, not of the United States, but of Mexico, *id.*; and (3) the *Compania Mexicana* flight was a purely domestic flight that did not qualify as international air travel for purposes of the Warsaw Convention. *Id.* Accordingly, the *Compania Mexicana* action was neither based on a "contract of carriage [] purchased in the United States," nor "based on a claim under any … treaty cognizable in any court … of the United States." *See* Warsaw Convention Art. 28(1); Montreal Convention Art. 33. In short, *Compania Mexicana* is simply inapplicable here.[27]

---

[26] The *Compania Mexicana* crash occurred in 1986. *Compania Mexicana*, 859 F. 2d at 1356.

[27] Malaysia Airlines also cites *Aboeid v. Saudi Arabian Airlines, Inc.*, No. CV-10-2518, 2011 WL 2222140 (E.D.N.Y. June 1, 2011), an unpublished decision from the Eastern District of New York, for the proposition that, all things being equal, courts should interpret sovereign immunity waivers "narrowly." [ECF 39-1, at 43]. Whatever the merits of this position in the abstract, the words in the waiver provision at issue here "clearly and unambiguously" apply to the *Wood* and *Gaspard* claims. *Firebird*, 915 F. Supp. 2d at 126. Accordingly, the Plaintiffs respectfully ask this Court to find that Malaysian Airlines' accession to the waiver provisions in its DOT Permit constituted "an intentional and knowing relinquishment of" its sovereign immunity. *Gutch v. Fed. Republic of Germany,* 444 F.Supp.2d 1, 8 (D.D.C. 2006).

### V. Implicit Waiver

Malaysia Airlines also waived its sovereign immunity "by implication," 28 U.S.C. § 1605(a)(1), when the Malaysian government signed and ratified the Montreal Convention. Malaysia Airlines posits two[28] arguments in support of its position that it did not waive its sovereign immunity when its government ratified the Montreal Convention. First, citing 28 U.S.C. § 1604, it says that, because the Montreal Convention was not in effect at the time the FSIA was passed, the Plaintiffs cannot establish jurisdiction over a foreign state under 28 U.S.C. § 1330(a). [ECF 39-1, at 29-30]. Second, it claims that Malaysia did not indicate its "amenability to suit" when it ratified the Montreal Convention. [*Id.* at 31-34]. These arguments are unpersuasive.

### A. 28 U.S.C. § 1330(a)

The FSIA confers upon district courts "original jurisdiction … of any nonjury civil action against a foreign state … as to any claim for relief in personam with respect to which the foreign state *is not entitled to immunity either under sections 1605–1607 of this title or under any applicable international agreement*." 28 U.S.C. § 1330(a) (emphasis added). By its terms, then, the FSIA authorizes district courts to adjudicate claims against sovereign states in one of two situations: (1) where that state "is not entitled to immunity" under Sections 1605-1607 of the FSIA, or (2) where that state "is not entitled to immunity" as a result of an applicable international treaty. Deploying a dazzling routine of syntactical gymnastics, Malaysia Airlines says that its government's ratification of the Montreal Convention fits into neither of these jurisdictional grants.

---

[28] Malaysia Airlines also denies that it "explicitly" waived its FSIA immunity when it ratified the Montreal Convention. [ECF 39-1 at 31-32]. We agree and thus do not address that argument here.

First, quoting 28 U.S.C. § 1604, Malaysia Airlines says that the Montreal Convention cannot operate as a waiver of sovereign immunity under 28 U.S.C. § 1605 because it was not an "existing international agreement[]" at the time the FSIA was enacted. In saying so, however, Malaysia Airlines misreads the plain language of Section 1604, which provides as follows:

> Subject to existing international agreements to which the United States is a party at the time of enactment of this Act a foreign state shall be immune from the jurisdiction of the courts of the United States and of the States except as provided in sections 1605 to 1607 of this chapter.

28 U.S.C. § 1604. Examining this language, Malaysia Airlines somehow arrives at the conclusion that, "[b]ecause the Montreal Convention was not in effect on the date the FSIA was enacted, it cannot be an existing international agreement contemplated by Section 1604." [ECF 39-1, at 30].[29]

But this Court is bound by the plain meaning of the words in the statute. *See Milner v. Dep't of Navy*, 562 U.S. 562, 569 (2011) ("Our consideration of Exemption 2's scope starts with its text."); *CSX Transp., Inc. v. Alabama Dep't of Revenue*, 562 U.S. 277, 283 (2011) ("We begin, as in any case of statutory interpretation, with the language of the statute."); *Park 'N Fly, Inc. v. Dollar Park and Fly, Inc.*, 469 U.S. 189, 194 (1985) ("Statutory construction must begin with the language employed by Congress and the assumption that the ordinary meaning of that language accurately expresses the legislative purpose."). According to the text of Section 1604, a foreign state's immunity from suit—and the exceptions to that immunity—are subject to "existing international agreements to which the United States is a party at the time of enactment of this Act." This exemption for existing international agreements makes sense. After all, to the extent that Congress did not intend for the FSIA to displace conflicting provisions in earlier treaties, it had to provide the courts with explicit guidance to that effect because of the long-

---

[29] The FSIA was enacted in 1976; the Montreal Convention was ratified in 2003.

standing rule that "abrogation or modification of a treaty by superseding legislation presents political questions with which courts may not involve themselves." *Gayda v. LOT Polish Airlines*, 702 F.2d 424, 425 (2d Cir. 1983) (citing *Franklin Mint Corp. v. Trans World Airlines, Inc.*, 690 F.2d 303 (2d Cir. 1982), and *Diggs v. Shultz*, 470 F.2d 461, 465–66 (D.C. Cir. 1972)). But nothing in Section 1604 precludes a foreign state from, say, entering into a treaty *after 1976*, pursuant to which that state waives its sovereign immunity under Section 1605(a)(1). Under Malaysia Airlines' reading, however, Section 1604 would invalidate that state's waiver of sovereign immunity, even if that waiver was made "clearly and unambiguously" for purposes of Section 1605(a)(1), *Firebird*, 915 F. Supp. 2d at 126—thus creating an irreconcilable contradiction between two sections of the same statute. *See Adirondack Medical Center v. Sebelius*, 740 F. 3d 692, 697 (D.C. Cir. 2014) (directing courts to consider statutes as a whole); *Am. Bankers Ass'n v. Nat'l Credit Union Admin.*, 271 F. 3d 262, 267 (D.C. Cir. 2001) (same). The Plaintiffs' reading, on the other hand, remains loyal to the text of Section 1604 while avoiding an unnecessary—and, frankly, illogical—conflict with the plain language of Section 1605(a)(1).

Unsurprisingly, then, the federal courts have routinely upheld waivers of FSIA immunity in cases where, as here, foreign states have, long after 1976, enacted treaties that operated as waivers of sovereign immunity. *See Blue Ridge Investments, L.L.C. v. Republic of Argentina*, 735 F.3d 72, 84 & n.20 (2d Cir. 2013) (holding that Argentina implicitly waived its FSIA immunity when, in 1994, it became a party to the The Convention on Settlement of Investment Disputes between States and Nationals of Other States); *Reers v. Deutsche Bahn AG*, 320 F.Supp.2d 148 (S.D.N.Y. 2004) (recognizing that Germany's 1980 ratification of the Convention Concerning International Carriage by Rail constituted a "very narrow waiver of sovereign

36

immunity"); *Int'l Ins. Co. v. Caja Nacional De Ahorro y Securo*, 293 F.3d 392, 394 & n.4 (7th Cir. 2002) (holding that Argentina waived its FSIA immunity when, in 1989, it adopted the New York Convention).

Rather than distinguish any of these cases—all of which directly contradict its position— Malaysia Airlines cites to a footnote from *Ehrlich v. American Airlines, Inc.*, 360 F.3d 366, 371 & n.4 (2d Cir. 2004), which could hardly affect this analysis less. In fact, *Ehrlich* never even mentions the FSIA and, by extension, does not come anywhere near answering the question presented here—whether Section 1604 prevents foreign states from waiving their FSIA immunity by ratifying treaties that were enacted after 1976. To the contrary, *Ehrlich* examined the quite unrelated question of whether, under Article 17 of the Warsaw Convention, a plaintiff was entitled to damages for mental injuries where those injuries accompanied, but were not caused by, any bodily injury. *Id*. at 375. The Court should disregard this citation out of hand.

In short, nothing in Section 1604 prevents Malaysia's ratification of the Montreal Convention from operating as a waiver of sovereign immunity. Accordingly, if the Malaysian government did waive its sovereign immunity by ratifying the Montreal Convention (more on this below), then the FSIA would confer upon this Court original jurisdiction over these claims. 28 U.S.C. § 1330(a) (granting the district courts jurisdiction "as to any claim … with respect to which the foreign state is not entitled to immunity … under sections 1605–1607 of this title").[30]

### B.    The Montreal Convention

The Warsaw Convention, enacted in 1929, was primarily concerned with facilitating the growth—and delimiting the liabilities—of air carriers. *See Ehrlich*, 360 F.3d at 371 n.4

---

[30] In this way, "Sections 1604 and 1330(a) work in tandem: § 1604 bars federal and state courts from exercising jurisdiction when a foreign state is entitled to immunity, and § 1330(a) confers jurisdiction on district courts to hear suits brought by United States citizens and by aliens when a foreign state is not entitled to immunity." *Amerada Hess*, 488 U.S. at 434.

(recognizing that the primary aim of the Warsaw Convention "was to limit the liability of air carriers in order to foster the growth of the … commercial aviation industry"). In light of this concern, the Warsaw Convention conferred jurisdiction upon the following four places: (1) the carrier's domicile; (2) the carrier's principal place of business; (3) the carrier's place of business through which the contract of carriage was made; or (4) the place of final destination. *See* Warsaw Convention, Art. 28(1). As Article 28(1) made clear, the places in which an injured passenger could bring a Warsaw Convention claim were, strictly speaking, centered around the *air carrier's*—rather than the passenger's—contacts.

The Montreal Convention, drafted in 1999 and ratified in 2003, changed all of that and, in so doing, revolutionized the aviation industry. As the Second Circuit has said, "the Montreal Convention is not an amendment to the Warsaw Convention…. Rather, the Montreal Convention is an entirely new treaty that unifies and replaces the system of liability that derives from the Warsaw Convention." *Ehrlich*, 360 F.3d at 371 n.4.

In 1999, the United States sent delegates to the 1999 International Conference on Air Law in Montreal—what became the Montreal Convention. One of the American delegation's principal objectives was to introduce a "Fifth Jurisdiction"—a jurisdiction that, unlike the four jurisdictions set out in the Warsaw Convention, would focus, not on the airline's contacts, but on the passenger's.[31] Consistent with its focus on passenger rights, the United States took the position that "passengers or their heirs who have claims against an airline resulting from an accident in international transportation should have the right to bring suit in the courts of the

---

[31] *See* ICAO, International Conference on Air Law, Vol. II, Documents, 1999, Doc. 9775-DC/2, at 101 ("It has long been the view of the United States that passengers or their heirs who have claims against an airline resulting from an accident in international air transportation should have the right to bring suit in the courts of the State where the passenger lived.  The four bases for court jurisdiction under the Warsaw Convention indirectly permit this in most cases.  However, in a limited number of cases, the four jurisdictions may not include the passenger's homeland.").

State where the passenger lives."[32] Specifically, the United States felt that the Fifth Jurisdiction

would afford the families of injured or dead passengers with a kind of fundamental fairness that,

in the American view, was absent from the Warsaw Convention. *Id.* at 101-108.[33] In fact, so

adamant was the United States about the centrality of the Fifth Jurisdiction that "[i]nclusion of an

acceptable fifth jurisdiction provision [was] essential for United States ratification of any new

convention." *Id.* at 102. Unsurprisingly, given the radical jurisdictional shifts contemplated by

the Fifth Jurisdiction, its inclusion was the most hotly debated issue during the drafting.[34]

 Despite this opposition, the United States ultimately succeeded in passing the Fifth

Jurisdiction—marking a revolution for the rights of international air travelers as against the

obligations of international air carriers. As the Second Circuit has recognized:

> Whereas the "primary aim of the contracting parties to the [Warsaw] Convention"
> was to limit "the liability of air carriers in order to foster the growth of the ...
> commercial aviation industry," *Sulewski,* 933 F.2d at 184 (internal citations and
> quotation marks omitted), the contracting parties to the Montreal Convention
> expressly approved that treaty because, among other reasons, they recognized "the
> importance of ensuring protection of the interests of consumers in international
> carriage by air and the need for equitable compensation based on the principle of
> restitution." Montreal Convention, pmbl. The Senate has similarly recognized that
> "[t]he new Montreal Convention represents the culmination of decades of efforts
> by the United States and other countries to establish a regime providing increased
> protection for international air travelers and shippers." S. Exec. Rep. No. 108–8,
> at 2 (2003). Hence, commentators have described the Montreal Convention as a
> treaty that favors passengers rather than airlines.

*Ehrlich*, 360 F. 3d 366 at n.4. Thus, whereas Article 33 of the Montreal Convention includes the

same four jurisdictions that once formed the whole of Article 28(1) of Warsaw, it now also

---

[32] *See* Position Paper in Support of the Fifth Jurisdiction presented by the United States at the International
Conference on Air Law, Montreal, May 10-28, 1999 (DCW DOC No. 12, Dated May 4, 1999), Vol. II Documents,
pp. 101-109, at p. 101.
[33] "Most domestic flights today carry at least a few passengers who are on connecting segments of an international
itinerary. The growth in numbers and types of international air travelers … has lead [sic] to an increase in the
number of claimants for whom jurisdiction is not available in the passenger's home State under the Warsaw
Convention. This change in circumstances requires a change in the jurisdictional rules under Warsaw." *Id.* at 103.
[34] *See, e.g.*, Devendra Pradham, *The Fifth Jurisdiction Under the Montreal Liability Convention: Wandering
American or Wandering Everybody?*, 68 J. Air L. & Com. 717, 724 (2003).

confers jurisdiction over international air accidents "in the territory of a State Party in which at the time of the accident the passenger has his or her principal and permanent residence." Montreal Convention, Art. 33(2).

The D.C. Circuit has held that the question of whether a foreign state has waived its sovereign immunity "by implication," 28 U.S.C. § 1605(a)(1), "depends on the government's having at some point indicated its amenability to suit." *Princz v. Federal Republic of Germany*, 26 F.3d 1166, 1174 (D.C. Cir. 1994). The issue here, then, is whether, by ratifying the Montreal Convention—which, by its terms, "clearly and unambiguously" confers jurisdiction upon the courts of a passenger's "principal and permanent residence"—the Malaysian government was indicating its amenability to suit in the United States. In light of the heated debate around the inclusion of the Fifth Jurisdiction—including the many objections raised about the likelihood that the Fifth Jurisdiction would subject air carriers to suit all over the world,[35] we submit that it does. In particular, we submit that the Malaysian government's ratification of the Montreal Convention—specifically, the Fifth Jurisdiction—strongly conveyed the Malaysian government's understanding that the airline it owned, which has always carried American passengers,[36] might one day suffer an accident,[37] that Americans might be injured or killed in that accident, and that the families of those injured or dead Americans might employ the Fifth Jurisdiction to sue Malaysia Airlines in the United States. Understanding all this, Malaysia signed and ratified the Montreal Convention in 2007. *See Signatories to the Convention for the*

---

[35] *See* ICAO, International Conference on Air Law, Vol. II, Documents, 1999, Doc. 9775-DC/2, at 143, 195.

[36] On September 8, 1999, eight years before it signed the Montreal Convention, Malaysia Airlines applied to the United States DOT for a foreign air carrier permit to conduct scheduled foreign air transportation between Malaysia and the United States. That permit was granted by the DOT and became effective on September 30, 2002. *See* D.O.T. Order 2002-09-26, 2002 WL 31189758.

[37] Malaysia Airlines had suffered at least two major aviation accidents prior to Malaysia's ratification of the Montreal Convention: On December 4, 1977, Flight MH653 crashed, killing all 100 people on board; and on September 15, 1995, Flight MH2133 crashed, killing 32 passengers and 2 crew members.

*Unification of Certain Rules for International Carriage by Air Done at Montreal on 28 May 1999*, www.icao.int/secretariat/legal/List of Parties/Mtl99_EN.pdf.

For the most part ignoring this logic, Malaysia Airlines raises two arguments. First, it points out that the Plaintiffs have found no case in support of our view that, by ratifying the Montreal Convention, the Malaysian government implicitly waived its sovereign immunity. This we concede, though we note with not-a-little irony that Malaysia Airlines has likewise cited no case for the opposite position. Indeed, although Malaysia does say that, "contrary to Plaintiff's allegations, it is well-established that in cases against state-owned carriers arising out of international carriage by air, *the Montreal Convention* and FSIA apply concurrently and a basis for jurisdiction under *both* are necessary to give courts in the United States the power to hear such cases," [ECF 39-1, at 30-31 (emphasis added)], all three of the cases it cites for this proposition applied, not the Montreal Convention, but the Warsaw Convention. *See id.* (citing *Brink's Limited v. South African Airways*, 93 F.3d 1022, 1026-27 (2d Cir. 1996); *Harris v. Polskie Linie Lotnicze*, 820 F.2d 1000, 1002 n.1 (9th Cir. 1987); *Gayda*, 702 F.3d at 425). As noted, however, by signing onto the Montreal Convention, Malaysia recognized that it was subjecting itself to suit in any country in which any one of its passengers retained her "principal and permanent residence," Montreal Convention, Art. 33(2)—that is, subjecting itself to suit, in cases where American passengers were injured or killed, in the United States.

More importantly, while the three cases Malaysia Airlines cites do establish "that in cases against state-owned carriers," the Montreal Convention and the FSIA "apply concurrently and a basis for jurisdiction under both are [sic] necessary to give courts in the United States the power to hear such cases," [ECF 39-1, at 30-31], none of the cases held—or even suggested—that the Warsaw Convention did not, as a matter of law, operate as a waiver of sovereign immunity under

Section 1605(a)(1). So, for example, in *Brink's*, the Second Circuit correctly found that the "Warsaw Convention provides the cause of action, but the FSIA provides the sole basis of federal court jurisdiction." 93 F.3d at 1026-27 (page number and quotation mark omitted). But this selection from *Brink's* simply begs the question whether, by signing the Montreal Convention, a foreign state has waived its FSIA immunity for claims arising under that Convention. And, as we have established, if in fact a foreign state did waive its sovereign immunity by ratifying an international treaty, the FSIA would operate to confer original jurisdiction upon the district courts. *See* 28 U.S.C. § 1330(a) (granting the district courts original jurisdiction "as to any claim … with respect to which the foreign state is not entitled to immunity … under sections 1605–1607 of this title").

*Gayda* likewise does not help Malaysia Airlines. In that case, the plaintiffs had asked the court to find that Congress' passage of the FSIA "somehow effect[ed] an implied repeal of the jurisdictional limitations of Article 28 [of Warsaw]." 702 F.2d at 425. The Second Circuit rejected this argument, noting the FSIA's specific exemption for "existing international agreements to which the United States is a party." *Id.* (quoting 28 U.S.C. § 1604). But *Gayda* did not address—and provides no answer for—the contrapositive at issue here: whether ratification of the Warsaw or Montreal Conventions operates, not as an abrogation, but as a waiver, of a country's sovereign immunity under the FSIA. Since the *Gayda* Plaintiffs could not establish jurisdiction under the Warsaw Convention, this question—which is really the only question here—never came up.

Lastly, in *Harris*, the plaintiffs argued the converse of the *Gayda* Plaintiffs' contention—"that the Warsaw Convention preempts the FSIA." 820 F.2d at 1002 n.1. The court rightly found this position "impossible," since, in the court's view, "[t]he Warsaw Convention and the FSIA

apply concurrently, and both are necessary to give the district court jurisdiction in this case." *Id*. Again, however, the Plaintiffs do not here suggest that either the Warsaw Convention or the Montreal Convention "preempt[ed]" the FSIA. To the contrary, we agree with the *Harris* Court that "the Warsaw Convention [] gives United States courts jurisdiction in this case vis-a-vis the courts of other countries. However, only the FSIA gives the federal district court jurisdiction vis-a-vis other United States courts." 820 F.2d at 1002.[38] We simply point out that, by ratifying the Montreal Convention, a foreign state has also waived its immunity for claims arising out of that Convention, and that, in those cases, the FSIA operates to confer jurisdiction on district courts.

We submit, also, that the Ninth Circuit's analysis in *Compania Mexicana*—a case Malaysia Airlines cites for different reasons—supports the Plaintiffs' position that a foreign state's ratification of the Warsaw (or Montreal) Convention would work a waiver of that country's FSIA immunity for claims cognizable under that Convention. *Compania Mexicana*, 859 F. 2d at 1359. In *Compania Mexicana*, the plaintiffs argued that the airline had waived its sovereign immunity in three ways: first, by obtaining a DOT foreign air carrier permit; second, by engaging in "commercial activity"; and third, by ratifying the Warsaw Convention. *Id*. The court rejected all three arguments. But, for our purposes, the most relevant thing about *Compania Mexicana* is that the court did not reject the plaintiffs' third argument—the one the Plaintiffs here advance—out of hand. Instead, accepting the argument's premise, it went through the four jurisdictions set out in Article 28(1) of the Warsaw Convention and found that the plaintiffs had not established jurisdiction under any of them. In pertinent part, it explained:

> a. Waiver
> …

---

[38] Because the court found that the airline was not entitled to immunity as a result of the FSIA's "commercial activity" exception, no one raised—and the court did not address—the question of whether the airline also waived its immunity under Section 1605(a)(1). 820 F.2d at 1002.

> Moreover, Article 28 of the Convention establishes exclusive jurisdiction before either the court of the domicile of the carrier or its principal place of business, or the place of business where the contract was made, or the place of destination. The place of destination is the final destination according to the contract of carriage. (internal citations omitted)  Mexicana's domicile and principal place of business are Mexico.  The contracts of carriage for the decedents involved in this case were all made in Mexico, for destinations within Mexico; the fact that the airplane was ultimately destined to arrive in Los Angeles does not provide a basis for jurisdiction.

*Id*. Accordingly, the court concluded, the defendant had not waived sovereign immunity *for the claims at issue in that case*. *Id*. Had the court believed—as Malaysia Airlines suggests—that ratification of the Warsaw (or Montreal) Convention could never, *ipso facto*, constitute a waiver of FSIA immunity, it would not have undergone a meticulous evaluation of whether the plaintiffs had established Warsaw Convention jurisdiction and, by extension, a waiver of sovereign immunity. Although *Compania Mexicana* is not binding here, we note that this aspect of its decision was holding, not *dicta*. *See Lawson v. United States*, 176 F.2d 49, 51 (D.C. Cir. 1949) ("The courts of the land have many times defined the terms 'obiter dicta' and 'dicta' as 'language unnecessary to a decision,' 'ruling on an issue not raised,' or 'opinion of a judge which does not embody the resolution or determination of the court, and made without argument or full consideration of the point.'").

Malaysia Airlines' final—and, candidly, its most persuasive—argument is that the Supreme Court's decision in *Amerada Hess*, 488 U.S. 428, precludes a finding that Malaysia impliedly waived its sovereign immunity when it ratified the Montreal Convention. [ECF 39-1 at 33]. In *Amerada Hess*, the Supreme Court held that a foreign state does not waive its immunity by "signing an international agreement that contains no mention of a waiver of immunity to suit in United States courts or even the availability of a cause of action in the United States." 488

U.S. at 442.[39] But *Amerada Hess* said nothing about whether the Montreal Convention contemplates "the availability of a cause of action in the United States." To this point, as we have said, Malaysia Airlines must have understood, when it ratified the Fifth Jurisdiction, that its wholly-owned airline, which regularly carried American passengers, might one day find itself haled into an American court for injuries those passengers sustained on an international flight. *See Seetransport Wiking Trader Schiffarhtsgesellschaft MBH & Co. v. Navimpex Centrala Navala*, 989 F.2d 572, 578 (2d Cir. 1993) (finding an implied waiver where a state was a signatory to the Convention on the Recognition and Enforcement of Arbitral Awards and holding that "when a country becomes a signatory to the Convention, by the very provisions of the Convention, the signatory State must have contemplated enforcement actions in other signatory States"); *id*. ("Liberia clearly contemplated the involvement of the courts of any of the Contracting States, including the United States as a signatory to the Convention, in enforcing the pecuniary obligations of the award."); *cf. Blue Ridge*, 902 F. Supp.2d at 374.

## Conclusion

For the foregoing reasons, the Plaintiffs respectfully request that the Court deny the Defendants' Motion to Dismiss Under the FSIA.

---

[39] To the extent that Malaysia Airlines reads this sentence from *Amerada Hess* as precluding sovereign immunity waivers where the United States itself is not expressly referenced, the Second Circuit—the only federal court of appeals to have decided this particular question—has held that *Amerada Hess* requires no such thing. *See Capital Ventures Int'l v. Republic of Argentina*, 552 F.3d 289, 295 (2d Cir. 2009) ("Argentina would have us read this language as a requirement that, for a waiver to satisfy the FSIA's explicitness requirement, it must mention the United States in some way. That is not the holding of *Amerada Hess*.").

Dated:  July 21, 2017

Respectfully Submitted,

PODHURST ORSECK, P.A.


*/s/   Roy K. Altman*
Steven C. Marks, Esq.
DC Bar No.: FL0004
FL Bar No. 516414
smarks@podhurst.com
Roy K. Altman, FL Bar No. 116885
raltman@podhurst.com
One SE 3rd Avenue, 2700
Miami, FL 33131
(305) 358-2800
*Counsel for Plaintiffs*

## CERTIFICATE OF SERVICE

The undersigned certifies that, on July 21, 2017, pursuant to Fed. R. Civ. P. 5 and LCvR5.3, a true and correct copy of the foregoing PLAINTIFFS' RESPONSE TO MALAYSIA AIRLINES' RULE 12(b)(1) MOTION TO DISMISS UNDER THE FOREIGN SOVEREIGN IMMUNITIES ACT was filed with the Clerk of Court using the CM/ECF System, which will send notification of such filing to the attorneys of record at the e-mail addresses on file with the Court.

/s/  Roy K. Altman
Roy K. Altman