**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

IN RE: AIR CRASH OVER THE
SOUTHERN INDIAN OCEAN ON MARCH
8, 2014

This Document Relates To:

1:16-cv-00439-KBJ
*Smith v. Malaysia Airlines Berhad et al;*

1:16-cv-01048-KBJ
*Zhang, et al, v. Malaysia Airlines Berhad et al;*

1:16-cv-01063-KBJ
*Huang, et al. v. Malaysia Airlines Berhad et al.*

2:17-CV-00608-KBJ
*Keith v. The Boeing Company*

1:16-cv-01062-KBJ
*Kanan, et al. v. Malaysia Airlines System Berhad et al.*

1:16-cv-01159-KB
*Kanan v. Boeing*

MDL Docket No:  2712

Misc. No. 16-1184 (KBJ)

**PLAINTIFFS' RESPONSE IN OPPOSITION TO DEFENDANTS' JOINT**

**MOTION TO DISMISS ON THE GROUND OF *FORUM NON CONVENIENS***

## TABLE OF CONTENTS

**TABLE OF CONTENTS** ................................................................................................ i

**TABLE OF AUTHORITIES** ....................................................................................... ii

**MEMORANDUM** ........................................................................................................ 1

   I.    **The President of the United States of America Promised Help** ...................................... 1

   II.    **Introduction: Very Little Evidence, If Any, Left in Malaysia** ................................. 1

   III.    **The Facts** .......................................................................................................... 3

     **The Australian Reports** ...................................................................................... 14

     **MAB Claims It Is Not MAS, Thus It Has No Montreal Protections** .... **Error! Bookmark not defined.**

     **One More Significant Disconnect in Defendant's Reasoning** ......... **Error! Bookmark not defined.**

   **CONCLUSION** ........................................................................................................ 19

## <u>TABLE OF AUTHORITIES</u>

**Cases**

*Ellis v. AAR Parts Trading, Inc.,* 357 IL, App. 3a 723, 743, 2005 Ill. App. LEXIS 77 (1st Dist. 2015)..............................................................................................................................3

*In re Air Crash Disaster Near Palinborg, Indonesia* on December 19, 1997, 200 U.S. Dist. LEXIS 22950 (W.P. Wash. 2000)..........................................................................................3

*In Re Air Crash Near Nantucket Island,* 2004 U.S. Dist. LEXIS 16085.......................................2

*Piper Aircraft Co. v. Reyno*, 454 U.S. 235(1981)................................................................... 1, 8

**Other Authorities**

Act 765 of the Laws of Malaysia................................................................................... 12, 13, 14

**Rules**

Rule 12(b)(1).......................................................................................................................... 20

The above-captioned Plaintiffs submit this memorandum in opposition to Defendants' Joint Motion to Dismiss on the Ground of Forum Non Conveniens (D.E. 37).

**MEMORANDUM**

### I.    The President of the United States of America Promised Help

On March 21, 2014, the President of the United States promised these plaintiffs, families of the relatives of MH370, in English and Chinese, that the United States of America would do "…all we can to help in the search efforts to find the plane that carried your [family members]". See **Exhibit A**. The loss of MH370 was no isolated incident affecting only Malaysia. The United States has an overwhelming interest in the loss of MH370 as clearly reflected in the words of the President, sent from the White House.

### II.    Introduction: Very Little Evidence, If Any, Left in Malaysia

Malaysian Airline System Berhad  ("MAS"), Malaysia Airlines Berhad ("MAB"), Allianz Global Corporate & Specialty SE ("AGCS") and The Boeing Company ("Boeing") (all defendants herein except Henning Haagen), moved this Honorable Court for an order dismissing the above captioned cases on the grounds of forum non conveniens.  D.E. 37-1.  The defendants state their reason therefore is that all of the evidence is in Malaysia, D.E. 37-1, p.1, ¶2;

It is not; almost no evidence is in Malaysia – a fact confirmed in Malaysia's Safety Investigation for MH370.  D.E. 37-4.  There is no finding of causation nor any conclusions in the Malaysia report.

Defendants request this court perform a "straightforward application of the Supreme Court's decision in *Piper Aircraft Co.  v. Reyno*, 454 U.S. 235(1981).  D.E. 37-1, p. 1, ¶3. Defendants also attached an Appendix A which they purport and entitle, "Federal Forum Non Conveniens Decisions Involving Aviation Accidents, 1980 – present."  D.E. 37-2, p. 1-5.

Defendants' Appendix A is <u>not</u> a complete list – defendants omitted decisions in federal courts refusing to invoke forum non conveniens and refusing to dismiss the case.  There are many such cases in which the federal courts rejected forum non conveniens motions and defendants know this – Boeing and even MAS were themselves the moving defendant in several cases in which the forum non conveniens motion was rejected by U.S. courts.  But even if Defendants' Exhibit A was an accurate and complete list, the defendants' Appendix A would not be determinative, because the Court's analysis of forum non conveniens <u>depends on the facts of each case</u>.

Boeing, Delaware corporation, which manufactures planes in the states of Washington and South Carolina, and reaps billions of domestic tax benefits from Washington and South Carolina, has been forum shopping for decades. Boeing almost never claims, argues or concedes that the honorable courts of the United States of America and litigation in the United States of America, its home nation where it makes its planes and takes billions from U.S. taxpayers, is a more convenient forum for Boeing than litigating in, for example, Indonesia, Taiwan, Peru, Mexico or other lonely planet outposts. There are exceptions – Boeing agreed to stay in the United States when Egypt Air blamed it for the crash of Egypt Air into Atlantic Ocean off Nantucket Island on Oct. 31, 1999.  See *In Re Air Crash Near Nantucket Island,* 2004 U.S. Dist. LEXIS 16085.

Boeing prefers litigation in the far flung countries of the world than its own home nation, our nation's capital, homes of its corporate offices in Illinois or New York, or its first and second largest facilities in the world—Washington and South Carolina.  (See Kuker, Amanda S. (2011) "An Analysis of South Carolina's Incentives to the Boeing Company,"*South Carolina Journal of International Law and Business:* Vol. 8: Iss. 1, Article 6) Even courts in some of Boeing's "back yards" found Boeing's claims of inconvenience to litigate at home to be "incredulous," *Ellis v. AAR Parts Trading, Inc.,* 357 Ill. App.3d 723, 743, 2005 Ill. App. LEXIS 77 (1ˢᵗ Dist. 2015), *In re*

*Air Crash Disaster Near Palinborg, Indonesia* on December 19, 1997, 200 U.S. Dist. LEXIS 22950 (W.P. Wash. 2000).  MAS and MAB too are suspect in these FNC claims, having been parties to lawsuits in many U.S. states, sued in the U.S. to answer for Warsaw claims, assault and battery, price fixing and antitrust activities and all manner of complained of activities.  (See Plaintiffs' Response to Defendants' Motion to Dismiss based on the Foreign Sovereign Immunities Act, incorporated herein by reference, D.E. 65, pages 16-19)

### III.    The Facts

A. The Plane Was Designed and Manufactured in the U.S.

The MH370 Boeing 777-200, like all Boeing 777-200s, was designed, engineered, manufactured and assembled in the United States of America.  On May 29, 2002, the United States Federal Aviation Administration (FAA) certified for export the MH370 plane.  (See D.E. 37-4, p. 43.)  No part of the design, engineering, manufacturing or assembly was accomplished in Malaysia, nor do Defendants so allege.

Plaintiffs in their complaints alleged defects in design, manufacturing and assembly of the MH370 aircraft and alleged it was unreasonably dangerous. See, for example, *Keith* complaint, D.E. 1, 2:17-cv-00608-KBJ. Boeing contracted with suppliers from around the world to deliver parts to the United States of America to assemble the 777.  If any of those suppliers to MH370 was in Malaysia, Defendants failed to mention them in their myriad submissions to this Honorable Court.  For Boeing's own description of its relationship with Malaysia, MAB and MAS, See **Exhibit B**.  All the design, engineering, manufacturing and assembly records for the Boeing 777-200 are in the United States of America and these are the records Plaintiffs need to litigate a products liability case.

B. Records and Investigations of Problems on the Aircraft Type are in the U.S.

After the design, engineering, manufacture and assembly of an aircraft, the design engineering, manufacture and/or assembly are often found to be defective and unreasonably dangerous. Boeing, like all aircraft designers, engineers, manufacturers and assemblers, has experienced hundreds of thousands of defects after delivery of its aircraft. United States law requires Boeing, like all United States aircraft companies, to be responsible and take action to warn users of its products of defects. In fact, despite its flaws and occasional failures, the U.S. system to warn through airworthiness directives and other warnings may be the only way that aircraft operators get warnings and advice about problems with its aircraft. These alerts have the force of law in the United States of America. Airworthiness directives are so serious that failure to inspect and repair as set forth in the warnings results in the aircraft being deemed unairworthy. When an aircraft is deemed unairworthy it is against the law to fly it in the United States or for any United States flagged air carrier or anyone operating with United States flight certification (with exceptions granted by the FAA for empty "ferry flights" to transport a plane to a repair facility).

According to the United States FAA, right now the Boeing 777-200 has 169 current and 195 previous (but still posted on the FAA website and thus still being accomplished and completed in some cases) airworthiness directive warnings to operators of 777-200 aircraft to make inspections and repairs on the Boeing 777-200 or risk unairworthiness or even the loss of the plane. See **Exhibit C**.

All those records, investigations, and findings and even identification of where in the world fleets the affected aircraft are in service relevant to the 364 Airworthiness Directives currently posted on the FAA website are in the United States of America, and almost all of it at Boeing, because Boeing develops the submission to the United States government to get the airworthiness directives with the FAA for Boeing aircraft. As shown on Exhibit C, many of those defects

4

concern potential electrical and structural failure of the 777-200. Plaintiffs alleged electrical systems and structural failure on the MH370 777-200.

The Malaysia investigation similarly concluded MAS had complied with the Airworthiness Directives due to be complied with by the date of loss. That means the airline had acted on the airworthiness directive by the deadline for compliance with the particular airworthiness directive. D.E. 37-4, p. 47, ¶1.6.3.5. No mention was made of any examination into the subsequent Airworthiness Directives which affected this 777-200 aircraft. All the records of those problems known to affect the 777-200 are in the possession of Boeing.

C. The Malaysian Investigation Did Not Identify Problems

The Cockpit Voice Recorder (CVR) which records all flight deck sounds and crew communications picked up on different channels from microphones in the cockpit, and the Flight Data Recorder (FDR) which records the most recent 25 hours of 1300 parameters such as engine and control settings, are among the most important pieces of evidence of an airplane disaster. They are so important they have their own emergency locator transmitters that are supposed to work underwater. They have their own battery power too. D.E. 37-4, p.77-80. The battery on the MH370 FDR expired in 2012. The battery on the MH370 CVR was to expire in 2014. The FDR and the CVR were never found. Therefore there is no FDR and CVR evidence or analysis in Malaysia. There were problems experienced in finding MH370 because the FDR and CVR as designed, installed and equipped by Boeing as alleged in Plaintiffs' complaints and all records of this design, install and equipping are in the United States.

The Malaysia investigation report found no problems with the pilots and other crew, training, maintenance, security and cargo. Therefore, since the Malaysian report concludes there were no problems found with these personnel and systems, there are no records pertaining to

problems with the pilots, crew, training, maintenance and security and cargo in Malaysia. See Defendants' Exhibit 4, D.E. 37 for the full report.

D. The Investigation Was In English

The Malaysia report is in English.  In Defendants' memorandum and affidavits filed with the motion, Boeing stated it provided everything the Malaysia investigators requested of Boeing. The requests were in English.  Boeing provided its data, responses and studies in English.  The Australian investigation was largely conducted in English, and is discussed below.

No Plaintiffs herein are Malaysian. No plaintiff speaks Malay or any Malay dialect.  No Plaintiffs' damages information is in Malay. All reports from Australia are in English.

E. The Investigation After the Government Concludes

The Malaysia report (D.E. 37-4) did not conclude what happened to cause the loss of MH370.  Some may assume that therefore the factual inquiry and investigation are at an end—that the plaintiffs present the official investigation to the court as evidence of what happened.  Of course this Honorable Court knows that is not the case.  Parties to litigation do not and cannot use the conclusions of the safety investigation as evidence in court.  In the United States the law is 49 U.S.C. § 1154(b) which states: "No part of a report of the [National Transportation Safety] Board, related to an accident or an investigation of an accident may be admitted into evidence or used in a civil action for damages resulting from a matter mentioned in the report."  Thus, in air crash litigation, plaintiffs' and defendants' with their assembled team of experts literally must re-do the investigation.  Parties assess the facts that are known or can be gleaned from the evidence--- including design, engineering, manufacturing, assembly, air worthiness directives, information gleaned from other air crashes, scientific studies and tests—and parties' experts opine for the court and jury what occurred and what caused the loss.

Boeing in its Memorandum in Support and in Affidavits (D.E. 37) described what it provided to MH370 investigators. Boeing undoubtedly kept copies, but that is a small part of the evidence and information the parties need to re-investigate, re-construct, and determine what likely happened and present conclusions of causation and responsibility to the court and jury. Boeing did not specifically state in Defendants' Memorandum in Support, if it provided design, engineering, manufacturing and assembly records, the operating and training manuals, any internal investigations and analysis of MH370 and similar accidents, airworthiness directives, and reports from other carriers to Boeing of similar problems on 777-200s. Boeing may have, but Plaintiffs don't have access to the Boeing submissions.

These documents are all in the United States of America.  The personnel Boeing states it sent to the investigation are all in the United States of America.  See D.E. 37.  All the experts plaintiffs will call in their products liability case are located in the United States of America. Plaintiffs agree to travel to the United States of America from China to give depositions and will provide translators to translate from Mandarin (or other Chinese dialects) into English.  There is no burden on defendants for this litigation to be carried out in the United States; there is an incontrovertible burden to the Plaintiffs if it is not in the United States.

Now, if MAS and MAB provided all its relevant records to the Malaysia investigators; and Boeing provided all the records the investigators requested; and if Malaysia investigators, did not find the causal facts, it is clear the answers to this mystery are not in Malaysia. The investigators in Malaysia obviously did not have the evidence they needed. Plaintiffs have alleged the evidence that evidence is with Boeing in the United States.

G. Australia

With the Malaysia investigation failing to identify the causes, we turn our attention to the Australia investigation.  According to the affidavits, Boeing also provided analysis and personnel to Australia. Surely Boeing kept copies of its work, but if it did not, that work is in Australia, not Malaysia, and that work is in English.  Australia issued its own separate reports—in English.  The Australian reports are attached hereto as **Exhibits D - Q.** The Australian reports provide more information about causation than the Malaysian reports.

H. Defendants Request to Go to Malaysia to Litigate

Boeing states it will agree to go to Malaysia to litigate, but there is no such agreement from the witnesses from Australia and China, and no such agreement from MAS, MAB and AGCS (or Haagen), and no agreement from any defendant to agree to U.S.-style discovery. With the defendants providing no agreement to participate in U.S.-style discovery, sending the Plaintiffs from the U.S. would be a fatal blow to Plaintiffs' products liability case.

I.      Argument

    A.  Not an Adequate Forum

 This court must first consider whether Malaysia is an available and adequate forum. The defendants state Malaysia is an adequate forum, but the cases Defendants cite for that position are D.E. 37-1, p.3 ¶1.   Instead of providing demonstrative cases, Defendants claim Malaysia is adequate because it "derives from British rule and has been held adequate in other cases." Id.  But defendants' reliance on "British rule" is misplaced because the United States Supreme Court states in *Piper v. Reyno* this Honorable Court's analysis must be based on the facts specific to the case, and in this case Malaysia is neither available or adequate based <u>on the facts of this case</u>.  In addition to the Malaysia investigation with no cause found, there are many additional reasons why Malaysia

is not an available forum. First and foremost is the fact Malaysia already acted to destroy the ability of Plaintiffs to proceed in Malaysia.

By Malaysia Law 765, there is nothing left of MAS except one "Administrator" who has no MAS property, records or assets to administer. All of MAS was transferred to MAB. See Zhang complaint p. 14. Defendants at D.E. 37-9 attach Malaysia Act 765, which was extensively pled in Plaintiffs' Complaints. Defendants argue that because there is an Administrator, MAS is still in existence and can be sued.

The fact that Malaysia is not an adequate and available forum is also demonstrated by the great lengths to which Malaysia went to insulate MAS and MAB. For example:

The facts as set forth in Plaintiffs' complaint and Plaintiff's response to Defendant's ACGS and Haagen, include but are not limited to the following:

1. On August 8, 2014, according to the Malaysian Airlines System Berhad (MAS Company No.: 10601-W) Quarterly Report for the Third Quarter Ended 30 June 2014, the Government of Malaysia through its wholly owned fund the Khazanah Nasional Berhad (KNB), told MAS that it was, "proposing the privatization of the company by way of selective capital reduction and repayment exercise."

2. No notice was given to the families of the missing on MH370 about the planned looting of MAS assets, gutting of MAS, delisting of MAS, and death of MAS. Selective payments or transfers of assets were made to creditors (also called "charges") deemed by MAS and/or the Malaysia government to be "relevant" and no passengers or families of passengers of MH370 were included among the creditors or charges listed by MAS 10601-W or by MAB 1116944-X.

3. MAS also admitted in its Quarterly Report for the Second Quarter Ended 30 June 2014, and in its Quarterly Report for the Third Quarter ended 30 September 2014, that it intended to leave the passengers and families of MH370 with no recourse other than the insurance policy, which it has failed and refused to disclose stating as follows:

(ii) Flight MH370

"Following the disappearance of flight MH370, next-of-kin of the passengers are entitled to receive compensation for the losses they suffered upon the announcement of a declaration of loss. The

> compensation amounts payable to the next-of-kin of the passengers will be covered by the Company's aviation liability insurance policy and will be determinable upon submission and verification of the losses suffered by the respective next-of-kin.

4. These compensation amounts payable are expected to have no significant impact to the Company's financial statements.

5. On November 6, 2014, the "shareholders" of MAS (and the Government of Malaysia, through its wholly owned government fund KNB) approved the so called "privatization".

6. On November 7, 2014, MAB was registered and incorporated.

7. On November 27, 2014, a bill was introduced and approved to help MAS avoid its liability, responsibility and damages to MH370 (and other) passengers by the Government of Malaysia (specifically the Dewan Rakat, The House of Representatives or "People's House" of Malaysia). This bill became Act 765 when adopted.

8. On December 30, 2014, the Royal Assent (signed by the King) of the Government of Malaysia was affixed to Act 765 of the Laws of Malaysia, marking the death and end of MAS.

9. Despite claiming that MAS and MAB are separate companies, and that MAB is not a successor company to MAS, according to official filings with the Suruhaujaya Syarikat Malaysia Companies Commission (the Malaysia Registrar of Companies) of Malaysia, Defendant Malaysian Airlines System Berhad (MAS), known as "Malaysia Airlines" Company Number 10601-W, incorporation date April 3, 1971 states that its old name is "Malaysia Airlines Berhad." Defendant Malaysia Airlines Berhad (MAB), which is also known as "Malaysia Airlines" is company number 1116941-X, incorporation date November 7, 2014, is also known as "Malaysia Airlines" and the persons in leadership positions at the alleged two separate Malaysia Airlines are virtually identical, except for one individual who did not transfer from MAS to the MAB Board of Directors, as summarized in the following chart:

|  | Malaysia Airlines 03-04-1971 | Malaysia Airlines 07-11-2014 |
|---|---|---|
| **Type** | Limited by Shares Public Limited | Limited by Shares Public Limited |
| **Status** | Existing | Existing |
| **Directors** | Md. Nor Bin Md. Yusof, Tan Sri Mohamadon Bin Abdullah, DR David Lau Nai Pek | Md. Nor Bin Md. Yusof, Tan Sri Mohamadon Bin Abdullah, DR David Lau Nai Pek |

| | | |
|---|---|---|
| | Tan Boon Seng<br>Sukarti Bin Wakiman<br>Mohamad Morshidi Bin Abdul Ghani<br>Mohd Irwan Serigar Bin Abdullah<br>Mohammad Izani Bin Ashari<br>Mohammed Shazalli Bin Ramly, Dato<br>Mohd Shahazwan Bin Mohd Harris<br>Christopher Romanus Mueller<br>Ahmad Jauhari Bin Yahya | Tan Boon Seng<br>Sukarti Bin Wakiman<br>Mohamad Morshidi Bin Abdul Ghani<br>Mohd Irwan Serigar Bin Abdullah<br>Mohammad Izani Bin Ashari<br>Mohammed Shazalli Bin Ramly, Dato<br>Mohd Shahazwan Bin Mohd Harris<br>Christopher Romanus Mueller |
| **Manager** | Christopher Romanus Mueller | Christopher Romanus Mueller |
| **Shareholders** | Khazanah Nasional Berhad (a fund totally owned by the Government of Malaysia)<br>Total shares – 11,592,389,201 | Khazana Nasional Berhad (a fund totally owned by the Government of Malaysia)<br>Total shares – 999,998<br><br>Azizah Hanum Binti Haji Md. Tamat<br>Total shares – 1<br><br>Rosemun Bin Hassan<br>Total shares - 1 |
| **Charges or Obligations of Company**[1] | <u>319 Listed</u><br>113 satisfied<br>206 unsatisfied | <u>100 Listed</u><br>All unsatisfied |

10. Even the Twitter accounts are identical for the alleged two Malaysia Airlines, both using the handle @MAS, including on the same day.

11. But the Court of Malaysia <u>refused</u> to allow Plaintiffs to sue MAB in Malaysia. Therefore, Malaysia is unequivocally <u>not</u> an available forum for MAB because the court and administrator have already forbidden it and thrown the cases out.

---

[1] Many are the same for both companies. No claims or damages of any passenger of MH370 (or MH17) and no personal representatives, family member or estate of any MH370 (or MH17) passenger were listed as charges of either company.




12. Act 765 of the Laws of Malaysia was enacted to assist Malaysia Airlines, both MAS and MAB, defeat their liabilities, obligations, responsibilities, and damages owed to the passengers of MH370 (and presumably also to the passengers of MH17). Act 765 impaired the rights and abilities of the families to seek redress for the loss of their loved ones and left no viable airline defendant as defined by M99 and no assets other than the aviation liability insurance now controlled by Defendant Allianz's defense attorneys.

13. In Paragraph 21(3), Act 765 provides in part: Prior to the implementation of the proposal, the Administrator shall send a copy of the proposal and the report of the Independent Advisor by registered post to the last known address of or through electronic medium to each of the creditors of the Administered Companies affected by the terms of the proposal.

14. But Plaintiffs were denied legal notice. No Plaintiffs, nor any other family members of Plaintiffs' passengers, nor their personal representatives, nor their attorneys, were sent a copy of the report of the Independent Advisor by registered post or by electronic medium, or by any means whatsoever. No Plaintiffs, the next of kin of passengers of MH370 or other family members of MH370, nor their representatives, were given any notice under Act 765 or as described in or contemplated by Act 765.

15. Act 765 further states, in Paragraph 21(6): Notwithstanding the failure to notify any creditors of the Administered Companies and persons affected by the terms of the proposal in accordance with the requirements of subsection (3), such failure shall not affect the validity of the proposal.

16. Therefore Paragraph 21(6) further destroyed any reasonable opportunity for

Plaintiffs to be advised that the Administrator under Act 765 could proceed despite ignoring and failing to include among any of the charges (creditors) of the company, the liabilities, obligations, responsibilities and damages owed to families of passengers of MH370.

17. Act 765 states that the successor MAB formed on November 7, 2014 is not a successor to the previous MAS, but that provision is not further defined other than to state it addresses employment related issues with Malaysia Airlines' former and or current employees and unions.

18. There is no statement in Act 765 that MAB may not be deemed to have successive liability in areas other than employment issues. However, Act 765, Paragraph 29(1), states that any liability that may be transferred to the successor Malaysia Airlines (MAB) must be transferred by the Administrator, but the Administrator has failed and or refused to transfer MAS liability to MAB.

19. Furthermore, in MH370 cases filed in Malaysia, the Administrator and MAB have insisted that the Malaysia Airlines formed on November 7, 2014 (MAB), is not a successor corporation to MAS and the Administrator and/or MAB have moved to dismiss all such claims and cases.

20. Therefore, pursuant to the action of the laws of Malaysia, specifically Act 765, Malaysia Airline System Berhad Company Number 10601-W (MAS), the carrying or actual carrier and "the person liable" has ceased to exist and is effectively "dead" under the definitions of M99; all operations have ceased and all assets, shares and equity of MAS have been disposed or assigned; Act 765 states the new Malaysia Airline Berhad Company Number 1116944-X (MAB), is not a successor corporation and is in no way liable for MH370; and the MAS Administrator has moved and dismissed all cases against MAB.

Thus, the facts and Malaysia Law 765 makes it clear that in this case Malaysia is not an available and adequate forum, despite Defendant's insistence that Malaysia is an available and adequate forum, and it has been held adequate in other cases." D.E. 37-1, p.13 ¶1

Defendants claim Malaysia an available and adequate forum because, "The Malaysia legal system derives from British rule." D.E. 37-1, p.13 ¶1 This is tantamount to claiming American patriots in 1776 could have received a fair trial in King George's England. Plaintiffs herein have openly opposed the "King" and government of Malaysia. The Administrator carrying out the orders of the King and government as set forth in Act 765 <u>refused</u> plaintiffs permission to sue until

they filed suit in the United States of America.  The legislature and the administrator of the King in Malaysia have already proclaimed that MAB cannot be sued, and they have already ruled nothing is left of MAS.

J. Only Boeing Provided Assurance of Appearance if Dismissed to Malaysia

There is little hope for these families to seek justice in Malaysia, until and unless all Defendants provide the same assurance Boeing did – to submit to the jurisdiction of the courts, to provide evidence and witnesses, to waive statutes of limitations, to pay any judgment, to participate in discovery, etc.  But only Boeing provided such assurances -- no airline defendant did.

Given the actions of the Malaysian government and the failure of Defendants to provide assurances they will not contest liability, will participate in the U.S.-style discovery, and will promptly pay judgments, will produce evidence and witnesses, it is clear what the Plaintiffs may face in Malaysia. Boeing blames MAS; MAS no longer exists; MAB can't be sued; no assets of MAS exist; and the defendants refuse to provide discovery documents and witnesses, and claim they are beyond the jurisdiction of the Malaysia court.

Unless and until <u>all</u> Defendants provide assurances as Boeing did, this Honorable Court should not consider Defendants' FNC motion.

## <u>The Australian Reports</u>

As discussed above, the Australian investigation, not the Malaysian investigation, provides the only statements about causes for what happened to MH370. The Australian reports are attached hereto as **Exhibits D to S**. They are all in English; some are also in Chinese; none are in Malay or any other language or dialects spoken in Malaysia except Mandarin. The ATSB credits Boeing and Boeing analysis in most of the reports.

Those reports make several findings. The June 26, 2014 report concluded, "The first stages of the unresponsive crew/hypoxia event type appeared to best fit the available evidence for the final period of MH370's flight…". (**Exhibit E**, page 34.)

The December 3, 2015 report states, "Power loss occurred at some point between the times [17:07:48 and 18:03:41]." The content of the report makes it clear this refers to electrical power, not that engines have stopped. (**Exhibit F**, page 9, chart.)

The December 3 report was amended on December 10, 2015, and states, "Power loss to the SD11 occurred at the same point between these times [17:07:48 and 18:03:41]." Again, the content of the report makes it clear there is electrical power loss, not engine loss. (**Exhibit F**, page 9, chart.)

The fact that there are two versions of the December 2015 reports appears to concern defendant Boeing as Boeing has in pleadings criticized Plaintiffs for citing the December 3 report rather than the December 10 report. Plaintiffs were not allowed to participate in the investigation; Boeing did. Any changes in the December 3 report would appear to be something about which Boeing is knowledgeable.

Defendant Boeing's great concern about the "loss of power" as discussed in the Australia reports is highly significant. A flight crew confronted with such a loss of power would, if time permitted, resort to aircraft, flight and operation manuals, and their training, all developed and sold by Boeing in English in the United States.

And while no word was ever heard again from the pilots, the ATSB report, aided of course by Boeing, provided invaluable information absent from any Malaysian report. The Australian reports tell us the last voice contact with MH370 came 37 minutes after takeoff. The Captain signed off with air traffic controllers in Kuala Lumpur stating, "Good night, Malaysia 370." Thereafter

15

the transponder blip indicating the aircraft's position on the Kuala Lumpur air traffic control radar screens disappeared indicating that the transponder was no longer sending signals and at the same time the aircraft turned around and headed back towards Malaysia. The ATSB did not indicate what caused the power loss, but one system on the aircraft was able to recover its on its own after the power loss and continue functioning.  This is highly significant. After contact was lost with MH370, the airplane itself sent a message, what the world has come to know as an electronic "handshake," to an Inmarsat satellite. An Inmarsat ground station in Australia, not Malaysia, recorded seven electronic handshakes or data points that were transmitted automatically from the 777 aircraft. The first handshake was recorded before MH370 took off. Thereafter handshakes were sent at hourly intervals. The SDU system used to transmit the handshakes to the satellite was able to reboot itself after the power failure and was able to send the subsequent handshakes for the rest of the flight while the other aircraft systems like the transponder and ACARS remained silent. The ATSB explained the power loss in one of four possible ways:

1. Loss of AC power requiring an APU auto-start or

2. Intermittent technical failures

3. The circuit breakers in the electronic and equipment bay being pulled and then later reset or

4. The cycling of the left generator and backup generator switches with the bus tie isolated (all switches are located on the overhead panel in the cockpit), or

 (See **Exhibit F**, page 9)

The source of these electrical scenarios and the other analyses in the Australian reports are credited to the Australian Defense Science and Technology Group and Boeing, and the report states they agreed with each other. (**Exhibit F**, page 3) Two of these scenarios, the two human

16

scenarios, #3 and #4 above, would require Boeing 777-200 training and Boeing aircraft, operations and flight manuals – including how to cycle the generators and back-up generators with the "bus tie isolated"; how to open in the hatch in the floor, go down below the flight deck level into the main equipment center and pulled out circuit breakers; and then later repeat these steps to go back down under the aircraft floor to reset the circuit breakers.

Is this expertise included in Boeing training and manuals, or is this the most unlikely of the 4 scenarios? Did Boeing training and manuals teach pilots to cycle the generators? If so, were pilots following any Boeing prescribed procedures in the event of emergency, abnormal or nonnormal situations? Are procedures #3 and #4 a response to an aircraft system failure or aircraft emergency?

But here's the irony. The satellite data unit (hereinafter SDU) which sent the "handshakes" to Inmarsat in Australia was not located on the overhead panel of the cockpit or in the main equipment center below the flight deck below the aircraft floor, but in the roof of the cabin where the SDU antenna is also located. According to the ATSB, it was Boeing and the DST group that hypothesized MH370 flew on autopilot until the aircraft ran out of fuel, first the right engine followed by the left engine 15 minutes later, and then the 777 descended in a gliding circle covering as many as 100 nautical miles hitting the water, uncontrolled (but meaning that only no pilot was directing it) but it was still stable. The seventh "handshake" from the aircraft was sent approximately 10 minutes before the aircraft hit the water. The satellite data unit lost power from both engines but the auxiliary power unit automatically started again. That took about a minute to restore power because the power had been interrupted. Then the satellite data unit began to automatically log on again with the Inmarsat satellite and had completed the process within seconds of the aircraft crash thereby giving Inmarsat, the ATSB and Boeing one more clue as to

17

the final position of the airplane which Boeing used in its analysis to provide to the investigators in Australia. Plaintiffs can obtain that information in U.S. discovery. Will Boeing agree to cooperate to provide such information if the case is transferred to Malaysia?

K. Debris Reports

Boeing had other pieces of evidence provided to it, but not from Malaysia. A piece of wreckage called a flaperon washed ashore on Reunion Island near Madagascar, off the coast of Africa. A flaperon is a part unique to the Boeing 777. There's one flaperon on each wing it and is close to the fuselage. A flaperon is a control surface. When the flaperon was found on Reunion Island and thereafter flown to France to the French BEA, France called Boeing to interpret this piece of evidence. Australia has issued five wreckage reports, after consultation with Boeing, which means Boeing still has the manufacturing records for this aircraft.

According to the defendant's brief, (Doc. 37-1, page 16, paragraph 2) Boeing claims its role in the investigation was limited to providing technical advice under the direction of the NTSB. It is clear from the Australian reports Boeing did much more than the NTSB.  Boeing also claims on page 16 of Decendant's Memorandum (D.E. 37-1) that it has no copies of documents collected or created by the investigative authority relating to many aspects of the investigation. That is hard to fathom – U.S.-style discovery is needed to examine what Boeing retained.

Defendants also claim that defendants could not be impleaded in the United States. No explanation or examples are provided. Defendants also erroneously state that if litigation went forward in the U.S. and Malaysia at the same time, there would be a risk of inconsistent verdicts. This statement is plainly disingenuous because the plaintiffs would simply dismiss the litigation in Malaysia, or seek dismissal of those Defendants against which Plaintiffs can proceed in the U.S. litigation. Defendants already know that plaintiffs moved to stay the Malaysia proceedings, and to

date they have been stayed because there is an appeal on the initial decision not to stay the proceedings. Thus the cases have not proceeded in Malaysia. Further, the Malaysia court at the insistence of MAB is already dismissing MAB from the Malaysian litigation. Finally, the defendants summarily contend that the greatest public interest is Malaysia, not the U.S. Defendants are wrong. The greatest public interest is obviously with the citizens of the United States of America, flying on planes that Boeing manufactures in the states of Washington and South Carolina, and it is Americans who fly on them more than any other nation in the world.

The greatest interest in this investigation is obviously the United States of America where Boeing manufactures, designs, engineers and assembles its aircraft, and produces its training and manuals for the 777-200 and its other lines of aircraft – Americans build these planes and they have the greatest interest in seeing they are safe and built right.

## CONCLUSION

For the foregoing reasons, Plaintiffs request this Honorable Court deny Defendants MAS's and MAB's Rule 12(b)(1) motion to dismiss their complaints on the ground of Forum Non Conveniens.

July 21, 2017                          Respectfully submitted,

 /s/Mary Schiavo
Mary Schiavo
D.C. Bar No. 440175
**MOTLEY RICE LLC**
28 Bridgeside Blvd.
Mount Pleasant, SC 29464
Telephone: (843) 216-9000
Facsimile: (843) 216-9450
mschiavo@motleyrice.com

ATTORNEYS   FOR   SMITH,   ZHANG,
HUANG, AND KEITH PLAINTIFFS

Eric J. Rhine
SDTX ID No. 1786163
SPAGNOLETTI & CO.
401 Louisiana Street, 8th Floor
Houston, Texas 77002
Telephone: 713-653-5600
Facsimile: 713-653-5656
Email: erhine@spaglaw.com

ATTORNEYS FOR KANAN PLAINTIFFS

## CERTIFICATE OF SERVICE

The undersigned certifies that, on July 21, 2017, pursuant Fed. R. Civ. P. 5 and LCvR 5.3, a true and correct copy of the foregoing **PLAINTIFFS' OPPOSITION TO MALAYSIAN AIRLINE SYSTEM BERHAD'S (ADMINISTRATOR APPOINTED) AND MALAYSIA AIRLINE BERHAD'S RULE 12(b)(1) MOTION TO DISMISS PLAINTIFFS' COMPLAINTS ON THE GROUND OF FORUM NON CONVENIENS** was filed with the Clerk of Court using the CM/ECF System, which will send notification of such filing to the attorneys of record at the email addresses on file with the Court.

/s/Mary Schiavo
Mary Schiavo