# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

_____

IN RE: AIR CRASH OVER THE
SOUTHERN INDIAN OCEAN, ON
MARCH 8, 2014

_____

**MDL Docket No. 2712**
**Misc. No. 16-1184 (KBJ)**

**This Document Relates To:**
**Wood v. Malaysia Airlines Berhad, et al., C.A., No.: 1:16-cv-00053 KBJ**
**Gaspard v. Malaysia Airlines Berhad, et al., C.A. No.: 16-cv-00419 KBJ**
**Wood v. The Boeing Company, C.A. No. 1: 16-cv-01149-KBJ**
**Gaspard v. The Boeing Company, C.A. No. 1: 16-cv–01296-KBJ**
**Gaspard v. The Boeing Company, C.A. No. 1:16-cv-01148-KBJ**
**Gaspard v. The Boeing Company, C.A. No. 1: 16-cv-01299-KBJ**
**Jia v. The Boeing Company, C.A. No. 1: 16-cv-01147-KBJ**
**Wang v. The Boeing Company, C.A. No. 1: 16-cv-01140-KBJ**
**Hu v. The Boeing Company, C.A. No. 1: 16-cv-01137-KBJ**
**Shirsath v. The Boeing Company, C.A. No. 1:16-cv-01146-KBJ**
**Gao v. The Boeing Company, C.A. No. 1: 16−cv-01130-KBJ**
**Xiao v. The Boeing Company, C.A. No. 1: 16-cv-01129-KBJ**
**Li v. The Boeing Company, C.A. No. 1:16−cv-01145-KBJ**
**Kolekar v. The Boeing Company, C.A. No. 1: 16-cv-01153-KBJ**
**Zhang v. The Boeing Company, C.A. No. 1: 16-cv-01306-KBJ**
**Liang v. The Boeing Company, C.A. No. 1: 16-cv-01136-KBJ**
**Kolekar v. The Boeing Company, C.A. No. 1: 16-cv-01166-KBJ**
**Li v. The Boeing Company, C.A. No. 1: 16-01128-KBJ**
**Zhang v. The Boeing Company, C.A. No. 1: 16-cv-01164-KBJ**
**Santhanam v. The Boeing Company, C.A. No. 1: 16-cv-01151-KBJ**
**Feng v. The Boeing Company, C.A. No. 1: 16−cv-01131-KBJ**
**Han v. The Boeing Company, C.A. No. 1: 16-cv-01161-KBJ**
**Wang v. The Boeing Company, C.A. No. 1: 16-cv-01134-KBJ**
**Tian v. The Boeing Company, C.A. No. 1: 16-cv-01144-KBJ**
**Zhou v. The Boeing Company, C.A. No. 1: 16-cv-01138-KBJ**
**Kokekar v. The Boeing Company, C.A. No. 1: 16-cv-01143-KBJ**
**Yuan v. The Boeing Company, C.A. No. 1: 16-cv-01307-KBJ**
**Pang v. The Boeing Company, C.A. No. 1: 16-cv-01135-KBJ**
**Chen v. The Boeing Company, C.A. No. 1:16-cv-01165-KBJ**
**Wang v. The Boeing Company, C.A. No. 1: 16-cv-01132-KBJ**
**Huang v. The Boeing Company, C.A. No. 1: 16-cv-01152-KBJ**
**Hu v. The Boeing Company, C.A. No. 1: 16-cv-01139-KBJ**
**Weeks, et al. v. The Boeing Company, CA No. 1:16-1167-KBJ**
**Richards et al. v. The Boeing Company, C.A. No. 1:17-cv-00503-KBJ**

_____

**PLAINTIFFS' RESPONSE TO THE DEFENDANTS' MOTION TO DISMISS UNDER THE DOCTRINE OF *FORUM NON CONVENIENS***

# TABLE OF CONTENTS

TABLE OF CONTENTS...................................................................................................iii

MEMORANDUM ......................................................................................................... 1

The Facts ...................................................................................................................... 2

   I.   The Flight ............................................................................................................ 2

   II.  The Search for Flight MH370 ............................................................................ 3

   III. The Investigations............................................................................................... 5

The Parties ................................................................................................................... 6

   I.   The Plaintiffs ...................................................................................................... 6

   II.  The Defendants ................................................................................................... 7

The Law ....................................................................................................................... 8

   I.   The Private Interest Factors................................................................................ 9

      a.   The Residence of the Parties.................................................................. 10

      b.   Convenience to the Litigants ................................................................. 16

      c.   The Location of Relevant Evidence; the Residence of Witnesses; and the Cost of Bringing Those Witnesses to Trial ..................................... 19

      d.   Compulsory Process............................................................................... 31

      e.   Enforceability of Judgments ................................................................. 34

   II.  Any other factors.............................................................................................. 35

   III. The Public Interest Factors .............................................................................. 36

      a.   Interest in the Lawsuit and the Costs of Resolving a Dispute ............... 36
            Unrelated to the Forum ......................................................................... 36

      b.   Court's Familiarity with the Governing Law......................................... 42

      c.   Burden on Local Courts and Juries; Congestion in the Court ............... 44

Conclusion ................................................................................................................. 45

# TABLE OF AUTHORITIES

## Cases

*Aboeid v. Saudi Arabian Airlines, Inc.*,
No. CV-10-2518, 2011 WL 2222140 (E.D.N.Y. June 1, 2011) ........................45

*Aerolineas Argentinas S.A. v. U.S. Dep't of Transp.*,
415 F.3d 1 (D.C. Cir. 2005) ........................45

*Ahmed v. Boeing Co.*,
720 F.2d 224 (1st Cir. 1983) ........................14

*Air France v. Saks*,
470 U.S. 392 (1985) ........................19

*Allstate Life Ins. Co. v. Linter Grp. Ltd.*,
994 F.2d 996 (2d Cir. 1993) ........................34

*Anglo Am. Ins. Grp., P.L.C. v. CalFed Inc.*,
940 F.Supp. 554 (S.D.N.Y. 1996) ........................32

*Armco Inc., v. N. Atl. Ins. Co.*,
68 F.Supp.2d 330 (S.D.N.Y. 1999) ........................32

*Baumgart v. Fairchild Aircraft Corp.*,
981 F.2d 824 (5th Cir. 1993) ........................14, 27, 29

*Bos. Telecomms. Grp., Inc. v. Wood*,
588 F.3d 1201 (9th Cir. 2009) ........................9, 25, 36

*Can v. Goodrich Pump & Engine Control Sys., Inc.*,
711 F. Supp. 2d 241 (D. Conn. 2010) ........................14

*Carijano v. Occidental Petroleum Corp.*,
643 F.3d 1216 (9th Cir. 2011) ........................ passim

*Carlenstolpe v. Merck & Co., Inc.*,
819 F.2d 33 (2d Cir. 1987) ........................37

*Cheng v. Boeing Co.*,
708 F.2d 1406 (9th Cir. 1983) ........................30

*Chhawchharia v. Boeing Co.*,
657 F. Supp. 1157 (S.D.N.Y. 1987) ........................14, 36

*Ciprari v. Servicos Aereos Cruzeiro do Sul, S.A.*,
232 F.Supp. 433 (S.D.N.Y. 1964) ........................11

*Clerides v. Boeing Co.*,
534 F.3d 623 (7th Cir. 2008) ........................14, 27, 28

*Credit Foncier du Cameroun,*
    558 F.Supp.2d 21 (D.D.C. 2008) ................................................................................38

*Da Rocha v. Bell Helicopter Textron, Inc.,*
    451 F. Supp. 2d 1318 (S.D. Fla. 2006) ...............................................................14, 27, 29

*Dahl v. United Techs. Corp.,*
    632 F.2d 1027 (3d Cir. 1980)...........................................................................14, 38

*Dammarell v. Islamic Republic of Iran,*
    No. CIV.A. 01-2224JDB, 2005 WL 756090 (D.D.C. Mar. 29, 2005).................................42

*De Aguilar v. Boeing Co.,*
    11 F.3d 55 (5th Cir. 1993)................................................................................30

*Design Strategy, Inc. v. Davis,*
    469 F.3d 284 (2d Cir. 2006)..............................................................................22

*DiRienzo v. Philip Servs. Corp.,*
    294 F.3d 21 (2d Cir. 2002)............................................................................30, 32

*Dole Food Co., Inc. v. Watts,*
    303 F.3d 1104 (9th Cir. 2002)...........................................................................8, 9

*Duha v. Agrium, Inc.,*
    448 F.3d 867 (6th Cir. 2006)...........................................................................21, 32

*Elliott v. Fed. Bureau of Prisons,*
    No. CIV. A. 04-1702 CKK, 2006 WL 5217760 (D.D.C. Oct. 17, 2006) .................................5

*Ericson v. Wyndham Worldwide Corp.,*
    No. 12-20103-civ-Cooke, 2014 WL 11822749 (S.D. Fla. Feb. 28, 2014) ..............................43

*Esfeld v. Costa Crociere, S.P.A.,*
    289 F.3d 1300 (11th Cir. 2002).........................................................................11

*Esheva v. Siberia Airlines,*
    499 F.Supp.2d 493 (S.D.N.Y. 2007)....................................................................15

*Faat v. Honeywell Int'l, Inc.,* No.,
    CIV.A.04-4333, 2005 WL 2475701 (D.N.J. Oct. 5, 2005).............................................14

*Finley v. Marathon Oil Co.,*
    75 F.3d 1225 (7th Cir. 1996).............................................................................22

*Fosen v. United Techs. Corp.,*
    484 F. Supp. 490 (S.D.N.Y. 1980).......................................................................14

*Founding Church of Scientology of Washington, D. C., v. Verlag,*
    536 F.2d 429 (D.C. Cir. 1976) ...........................................................................15

*Fredriksson v. HR Textron, Inc.,*
    484 F. App'x 610 (2d Cir. 2012)........................................................................29

*Fredriksson v. Sikorsky Aircraft Corp. Inc.*,
   CIV No. 3:08 CV 450 (WWE), 2009 WL 2952225 (D. Conn. Sept. 2, 2009) ................................................27, 29

*Galbert v. W. Caribbean Airways*,
   715 F.3d 1290 (11th Cir. 2013)..............................................................................................................................14

*Gambra v. Int'l Lease Fin. Corp.*,
   377 F.Supp.2d 810 (C.D. Cal. 2005) ...............................................................................................................15, 37

*Gates Learjet Corp. v. Jensen*,
   743 F.2d 1325 (9th Cir. 1984)................................................................................................................................31

*Grodinsky v. Fairchild Indus., Inc.*,
   507 F. Supp. 1245 (D. Md. 1981) ..........................................................................................................................14

*Gschwind v. Cessna Aircraft Co.*,
   161 F.3d 602 (10th Cir. 1998)..........................................................................................................................14, 15

*Gulf Oil Corp. v. Gilbert*,
   330 U.S. 501 (1947)................................................................................................................................9, 10, 27

*Harp v. Airblue Ltd.*,
   879 F. Supp. 2d 1069 (C.D. Cal. 2012) .................................................................................................................30

*Hassanti v. Int'l Lease Fin. Corp.*,
   No. CV1102251MMMMAN, 2012 WL 12950285 (C.D. Cal. Aug. 3, 2012) .......................................................35

*Helog Ag v. Kaman Aerospace Corp.*,
   228 F. Supp. 2d 91 (D. Conn. 2002) ......................................................................................................................14

*ICC Chem. Corp. v. TCL Indus. (Malaysia SDN)*,
   206 F. App'x 68 (2d Cir. 2006) .............................................................................................................................21

*In re Air Crash Disaster Over Makassar Strait, Sulawesi*,
   No. 09-CV-3805, 2011 WL 91037 (N.D. Ill. Jan. 11, 2011) .................................................................................14

*In re Air Crash Near Peixoto De Azeveda, Braz., on Sept. 29,*
   *2006*, 574 F.Supp.2d 272 (E.D.N.Y. 2008) ..........................................................................................................35

*In re Air Crash Over Mid-Atl. on June 1,*
   *2009*, 760 F.Supp.2d 832 (N.D. Cal. 2010) ..............................................................................................14, 27, 28

*In re Aircrash Disaster Near Roselawn, Ind. on Oct. 31, 1994*,
   948 F.Supp. 747 (N.D. Ill. 1996) ...........................................................................................................................42

*In re Cessna 208 Series Aircraft Prod. Liab. Litig.*,
   546 F.Supp.2d 1191 (D. Kan. 2008) ......................................................................................................................16

*In re Livent, Inc. Sec. Litig.*,
   78 F.Supp.2d 194 (S.D.N.Y. 1999)........................................................................................................................32

*In re W. Caribbean Crew Members*,
   632 F.Supp.2d 1193 (S.D. Fla. 2009) ...............................................................................................................34, 37

*Ingram v. Eli Lilly & Co.,*
   251 F.Supp.2d 1 (D.D.C. 2003) ...................................................................................36

*Iragorri v. United Techs. Corp.,*
   274 F.3d 65 (2d Cir. 2001) ............................................................................11, 13, 21

*Irwin v. World Wildlife Fund, Inc.,*
   448 F.Supp.2d 29 (D.D.C. 2006) .............................................................................38, 40

*ISI Int'l, Inc. v. Borden Ladner Gervais LLP,*
   256 F.3d 548 (7th Cir. 2001) ....................................................................................10

*Itoba Ltd. v. LEP Group PLC,*
   930 F.Supp. 36 (D. Conn. 1996) ................................................................................31

*Jennings v. Boeing Co.,*
   660 F. Supp. 796 (E.D. Pa. 1987) ..............................................................................14

*Kern v. Jeppesen Sanderson, Inc.,*
   867 F. Supp. 525 (S.D. Tex. 1994) .............................................................................30

*King v. Cessna Aircraft Co.,*
   562 F.3d 1374 (11th Cir. 2009) .................................................................................30

*La Seguridad v. Transytur Line,*
   707 F.2d 1304 (11th Cir. 1983) .................................................................................21

*Lacey v. Cessna Aircraft Co.,*
   862 F.2d 38 (3d Cir. 1988) ......................................................................................37

*Lehman v. Humphrey Cayman, Ltd.,*
   713 F.2d 339 (8th Cir. 1983) .................................................................................43, 44

*Leon v. Millon Air, Inc.,*
   251 F.3d 1305 (11th Cir. 2001) ..................................................................................10

*Lleras v. Excelaire Servs. Inc.,*
   354 F. App'x 585 (2d Cir. 2009) .................................................................................14

*Lony v. E.I. Du Pont de Nemours & Co.,*
   886 F.2d 628 (3d Cir. 1989) .....................................................................................15

*Lueck v. Sundstrand Corp.,*
   236 F.3d 1137 (9th Cir. 2001) ...............................................................................passim

*Lumenta v. Bell Helicopter Textron, Inc.,*
   No. 01-14-00207-CV, 2015 WL 5076299 (Tex. App. Aug. 27, 2015) ...................................14

*Magnin v. Teledyne Cont'l Motors,*
   91 F.3d 1424 (11th Cir. 1996) ...................................................................................14

*Manu Int'l, S.A. v. Avon Prod., Inc.,*
   641 F.2d 62 (2d Cir. 1981) ...........................................................................10, 15, 31, 43

*Martino v. Viacao Aerea Riograndense, S.A.*,

    No. CIV.A . 90-1883, 1991 WL 13886 (E.D. La. Jan. 25, 1991) ................................................14

*McCafferty ex rel. Estate of Prant v. Raytheon Inc.*,

    No. 03-CV-6729, 2004 WL 1858080 (E.D. Pa. Aug. 19, 2004) ..........................................16, 45

*Melgares v. Sikorsky Aircraft Corp.*,

    613 F. Supp. 2d 231 (D. Conn. 2009) ................................................................14

*Ming v. Cordis Corp.*,

    704 F.Supp. 217 (S.D. Fla. 1989) ................................................................37

*Miskow v. Boeing Co.*,

    664 F.2d 205 (9th Cir. 1981)................................................................30

*Navarrete De Pedrero v. Schweizer Aircraft Corp.*,

    635 F. Supp. 2d 251 (W.D.N.Y. 2009) ................................................................14

*Nolan v. Boeing Co.*,

    919 F.2d 1058 (5th Cir. 1990)................................................................15

*Onita-Olojo v. Sellers*,

    12-62064-CIV, 2014 WL 1319304 (S.D. Fla. Mar. 31, 2014) ................................................11

*Overseas Programming Cos., Ltd. v. Cinematographische Commerz–Anstalt*,

    684 F.2d 232 (2d Cir. 1982)................................................................32

*Pain v. United Techs. Corp.*,

    637 F.2d 775 (D.C. Cir. 1980) ................................................................13, 35, 38

*Peregrine Myanmar Ltd. v. Segal*,

    89 F.3d 41 (2d Cir. 1996)................................................................15, 34

*Pettitt v. Boeing Co.*,

    No. 09 -cv- 3709, 2010 WL 3861066 (N.D. Ill. Sept. 28, 2010) ................................................14

*Pierre-Louis v. Newvac Corp.*,

    584 F.3d 1052 (11th Cir. 2009)................................................................14

*Piper Aircraft Co. v. Reyno*,

    454 U.S. 235 (1981) ................................................................ passim

*Ravelo Monegro v. Rosa*,

    211 F.3d 509 (9th Cir. 2000)................................................................12

*Reid-Walen v. Hansen*,

    933 F.2d 1390 (8th Cir. 1991)................................................................15

*Rubenstein v. Piper Aircraft Corp.*,

    587 F. Supp. 460 (S.D. Fla. 1984) ................................................................14

*Satz v. McDonnell Douglas Corp.*,

    244 F.3d 1279 (11th Cir. 2001)................................................................15

*Schertenleib v. Traum*,
  589 F.2d 1156 (2d Cir. 1978)..................................................................................15

*Sea Trade Co. v. FleetBoston Fin. Corp.*,
  No. 03 CIV 10254, 2008 WL 4129620 (S.D.N.Y. Sep. 4, 2008) ...........................21

*Sheffer v. Novartis Pharm. Corp.*,
  873 F.Supp.2d 371 (D.D.C. 2012) ......................................................................36, 37

*Shulman v. Compagnie Generale Transatlantique*,
  152 F.Supp. 833 (S.D.N.Y. 1956).........................................................................11

*Sinochem Intern. Co., Ltd. v. Malaysia Int'l. Shipping Corp.*,
  549 U.S. 422 (2007) ................................................................................................10

*Sluimer v. Verity, Inc.*,
  606 F.3d. 584 (9th Cir. 2010)..................................................................................21

*SME Racks, Inc. v. Sistemas Mecanicos Para Electronica, S.A.*,
  382 F.3d 1097 (11th Cir. 2004)...............................................................................11

*Tazoe v. Airbus S.A.S.*,
  631 F.3d 1321 (11th Cir. 2011)...............................................................................15

*Thompson v. Jamaica Hosp. Med. Ctr.*,
  13 Civ. 1896, 2015 WL 7430806 (S.D.N.Y Nov. 20, 2015) .................................23

*United States v. One Gulfstream G-V Jet Aircraft*,
  941 F.Supp.2d 1 (D.D.C. 2013) ..............................................................................41

*Van Cauwenberghe v. Biard*,
  486 U.S. 517 (1988) ................................................................................................27

*Van Schijndel v. Boeing Co.*,
  434 F. Supp. 2d 766 (C.D. Cal. 2006) ....................................................................14

*Varnelo v. Eastwind Transp., Ltd.*,
  No. 02-civ-2084, 2003 WL 230741 (S.D.N.Y. Feb. 3, 2003) ...............................12

*Vorbiev v. McDonnell Douglas Helicopters, Inc.*,
  2009 WL 1765675 (N.D. Cal. June 18, 2009) ......................................................9, 14

*Wilson v. Bradlees of New England, Inc.*,
  250 F.3d 10 (1st Cir. 2001) .....................................................................................22

*Zermeno v. McDonnell Douglas Corp.*,
  246 F.Supp.2d 646 (S.D. Tex. 2003) ......................................................................14

*Zipfel v. Halliburton Co.*,
  832 F.2d 1477 (9th Cir. 1987) .................................................................................12

**Statutes**

28 U.S.C. § 1330(a) .........................................................................................................45
28 U.S.C. § 1407 ..............................................................................................................44

## Rules

FED. R. CIV. P. 37(b)-(d) ...................................................................................................22

## Regulations

14 C.F.R. Pt. 21 (2017) ....................................................................................................7

## Other Authorities

11 AM. JUR. *Trials* 1 ......................................................................................................26

Adam K. Raymond, *CNN's 9 Most Deplorable Malaysia Airlines Flight 370 Moments*, DAILY INTELLIGENCER (Apr. 15, 2014) ("CNN's coverage of Malaysia Airlines Flight 370 has reached such astounding stupidity in the past five weeks …. CNN's ratings are through the roof[.]")…………………………………………………………………………40

AUSTRALIAN TRANSPORT SAFETY BUREAU, MH370–FIRST PRINCIPLES
REVIEW 6 (Dec. 20, 2016)…………………………………………………………………………3,4

Australian Transportation Safety Bureau ("ATSB"), *About the Search* (Feb. 23, 2017),
http://www.atsb.gov.au/mh370-pages/the-search/about-the-search..............................................41

BBC NEWS, *White House Says FBI "Aiding MH370 Investigation,"* BBC NEWS (Mar. 19, 2014),
http://www.bbc.com/news/world-us-canada-26649690................................................................41

Bill Carter, *CNN's Ratings Surge Covering the Mystery of the Missing Airliner*, NY TIMES (Mar. 17, 2014)………40

BOEING, *Boeing in Brief*, BOEING, http://www.boeing.com/company/general-info/index.page#/overview...............39

CONFÉRENCE DE LA HAYE, https://www.hcch.net/en/instruments/conventions/status-table/?cid=82.........................32

Convention between the United States of America and Other Governments on Aviation, at,

   S. Treaty Doc. No. 106-45, May 29, 1999,T.I.A.S. No. 13038 (effective Nov. 4, 2003)......................................6, 7

Convention on the Taking of Evidence Abroad in Civil or Commercial Matters, Mar. 18, 1970…………………31
Jeff Wise, *Exclusive: MH370 Pilot Flew a Suicide Route on His Home Simulator Closely Matching Final Flight*,
NEW YORK MAGAZINE (July 22, 2016), http://nymag.com/daily/intelligencer/2016/07/mh370-pilot-flew-suicide-
route-on-home-simulator.html................................................................................................41

EUROPEAN AVIATION SAFETY AGENCY, Type-Certificate Data Sheet for Boeing 777, No.
EASA.IM.A.003 (Dec. 15, 2015)…………………………………………………………………………..7

Jack Linshi, This is the Country That's Spent the Most Searching for MH370, TIME MAG.
(June 11, 2014), http://time.com/2854385/mh370-search- spending ...............................................3

Jim Miklaszewski, *Malaysian Jet Search Has Cost U.S. $11.4 Million* (Apr. 24, 2014)
http://www.nbcnews.com/storyline/missing-jet/malaysian-jet-search-has-cost-u-s-11-4-million-n88781................41
MH370 OFFICIAL SITE http://www.mh370.gov.my/index.php/en/media2/transcript/category/13-mh370-safety-

investigation-public..............................................................................................................30

Steve Almasy, *Report: MH370 Pilot Conducted Similar Route on Home Computer*, CNN (July 22, 2016),

http://www.cnn.com/2016/07/22/asia/mh370-pilot-simulation/index.html.......................................41

Tom Westbrook, *Underwater Search for Missing Malaysian Flight Ends Without a Trace*, REUTERS (Jan. 17, 2017),

http://www.reuters.com/article/us-malaysia-airlines-mh-idUSKBN1510GO........................................41

## INDEX OF EXHIBITS

| Exhibit No. | Description |
|:---:|:---|
| 1 | Declaration of Tommy Thomas |
| 2 | AUSTRALIAN TRANSPORT SAFETY BUREAU, MH370–FIRST PRINCIPLES REVIEW 6 (Dec. 20, 2016) |
| 3 | Philip Wood's 2013 United States Tax Returns |
| 4 | November 11, 2016 Amended Defence signed by MAS' attorney in Australia |
| 5 | Australian Court's Order confirming withdrawal of MAS' Defence |
| 6 | Boston Consulting Group's Letters to Rui Wang, dated December 16, 2011, December 24, 2012, and December 23, 2013 |
| 7 | Boeing's Answers to the Plaintiffs' First Set of Interrogatories |
| 8 | *Wood* Itinerary Receipt and Journey Details |
| 9 | *Gaspard* Itinerary Receipt and Journey Details |

## MEMORANDUM

In their motion to dismiss the Plaintiffs'[1] complaint under the doctrine of *forum non conveniens*, the Defendants[2] play a dangerous game: They facilely cite to, and eagerly quote from, no fewer than 49 federal cases—all attesting, the Defendants insist, to the simplicity of the question presented here, unanimously guiding this Court towards what the Defendants portray as little more than a foregone conclusion, all requiring (the Defendants go so far as to say)[3] this Court to take these Plaintiffs—who have lost so much at the Defendants' hands already—and ship them out to a far-off country most of them have never been to before. But the Defendants conveniently *never mention* three salient facts that distinguish this case from *every single case* they have cited, three undisputed facts that render *each of those cases* inapposite here, three crucial facts so central to this analysis that, had they appeared in *any one of the cases* upon which the Defendants rely, would have tilted the scales in those cases decisively *against* *forum non conveniens*. Those three facts are these: (1) *not one* of the 30 Plaintiffs represented in this Response is—or has ever been—a citizen or national of Malaysia, nor was *any one* of the 62 Decedents represented here a citizen of Malaysia; (2) *not one* piece of evidence from the Subject Aircraft—not the wings or the engines, not the Flight Data Recorder ("FDR") or the Cockpit Voice Recorder ("CVR"), not even the flaperon that washed ashore on the Island of Réunion—can be found in *any one* of the 127,724 square miles that comprise Malaysia, nor has *any one* of the approximately 31,579,000 citizens of Malaysia ever analyzed even a single data point from the FDR or listened to a split second of the CVR; and (3) Flight MH370 crashed—and all 227 of

---

[1] This Response is filed on behalf of all Plaintiffs represented by the law firms of Podhurst Orseck, P.A. ("Podhurst Plaintiffs"), and Wisner Law Firm P.C. ("Wisner Plaintiffs").

[2] The Defendants are Boeing and Malaysia Airlines. As the Defendants point out, there are, in fact, two Malaysia Airlines Defendants: Malaysian Airlines System Berhad (Administrator Appointed) ("MAS") and Malaysia Airlines Berhad ("MAB"). For purposes of this Response, the Plaintiffs refer to these two together as "Malaysia Airlines."

[3] [ECF 37-1, at 15 (suggesting that any decision by this Court denying the Defendants' motion "may even violate Due process")].

its passengers perished—not in Malaysia, nor anywhere near Malaysia, but thousands of miles away, in an ocean so deep and far from Malaysia's shores that Malaysian rescue ships and Malaysian rescue planes had to cede control over the search area to salvage teams from other, closer countries. The Defendants' motion should be denied.

<u>**The Facts**</u>

### I.    The Flight

On March 8, 2014, Malaysia Airlines Flight MH370 ("Flight MH370") departed from Kuala Lumpur, Malaysia, en route to Beijing, China. The flight's passengers and crew were onboard a Boeing 777-2H6ER airplane, with serial number 28420 and registration number 9M-MRO ("the Boeing Airplane"). Just seven (7) minutes after reaching its assigned cruising altitude, Flight MH370 issued its last acknowledged transmission using the Aircraft Communications Addressing and Reporting System ("ACARS") to a nearby ground station. [ECF 19, at 16]. ACARS is a system that transmits short messages and reports using either digital (via SATCOM)[4] or analog (via Very High Frequency) radio waves. [*Id.*]. The Boeing Airplane's SATCOM terminal transmitted data digitally from the aircraft using a network of satellites and Ground Earth Stations ("GES") managed by Inmarsat, plc., a company located in the United Kingdom. [*Id.*]. ACARS automatically transmits "position reports" at pre-determined time intervals. [*Id.* at 16-17]. It is through this ACARS data, then, that investigators have been able to extrapolate the route of Flight MH370, which is believed to have crashed into the southern Indian Ocean a little over seven hours after its departure, killing all 227 passengers and 12 crew members. No one knows why the plane crashed or where it is today. Notably, all of the critical SATCOM data from Flight MH370 is in the possession of Inmarsat in the United

---

[4] SATCOM is shorthand for "satellite communications." [*Id.* at n.2].

Kingdom.[5] The Plaintiffs believe that this data is also in the possession of Boeing in the United States. As of this writing, there is no more probative evidence anywhere in the world on the causes of Flight MH370's disappearance.

## II.     The Search for Flight MH370

In the weeks following Flight MH370's disappearance, some 13 countries sent vessels or airplanes to participate in the search for the Boeing Airplane. [ECF 37-3, at 3-4]. Notably, Malaysia was not one of these. Indeed, at least one news source has noted that the Malaysian government was not pulling its own weight, so to speak, in the international search for the Boeing Airplane.[6] On March 12, 2014, four days after the accident, Malaysia "scaled back" its search efforts.[7] On March 31, 2014, just 23 days after the accident, the Malaysian government ceded control over the search effort to Australia.[8] Meanwhile, the United States continued its search for Flight MH370 for almost three years after Malaysia stopped looking, spending millions of dollars of its own money.[9]

Over the last two years, several pieces of the Boeing Airplane's debris have washed ashore along the western Indian Ocean. While these pieces of debris have undergone extensive examination, _not one_ is being—or has been—examined in Malaysia. For example, on July 29, 2015, a flaperon from Flight MH370 washed ashore on the French-controlled island of Réunion, 3,597 miles from Malaysia. This flaperon was taken to France, where France's Bureau d'Enquêtes et d'Analyses pour la Sécurité de l'Aviation civile ("BEA") has extensively analyzed

---

[5] AUSTRALIAN TRANSPORT SAFETY BUREAU, MH370–FIRST PRINCIPLES REVIEW 6 (Dec. 20, 2016) (**Ex. 2**).

[6] Jack Linshi, *This is the Country That's Spent the Most Searching for MH370*, TIME MAG. (June 11, 2014), http://time.com/2854385/mh370-search-spending (noting that both the United States and Australia outspent Malaysia).

[7] *Id.*

[8] Australian Transportation Safety Bureau ("ATSB"), *About the Search* (Feb. 23, 2017), http://www.atsb.gov.au/mh370-pages/the-search/about-the-search.

[9] Tom Westbrook, *Underwater Search for Missing Malaysian Flight Ends Without a Trace*, REUTERS (Jan. 17, 2017), http://www.reuters.com/article/us-malaysia-airlines-mh-idUSKBN1510GO.

it.[10] As of today, the flaperon is still in Paris, not in Malaysia—and there are no known plans to send it to Malaysia at any point in the future. Similarly, on December 27, 2015, a section of an outboard wing flap from the Boeing Airplane washed ashore in Mozambique, 4,788 miles from Malaysia.[11] Two months later, a segment of a horizontal stabilizer panel was recovered along the same coast just over 100 miles from where the wing flap was found.[12] Both the wing flap and the stabilizer panel were taken to Australia, where Australian authorities concluded that both pieces were "almost certainly" from Flight MH370.[13] Again, there are no known plans to send either of these pieces to Malaysia. On March 22 and 30, 2016, an engine cowling segment and an interior panel from the main cabin were found off the coasts of South Africa and Mauritius, respectively.[14] And, in early May 2016, a trailing edge splice strap of a left outboard flap washed ashore in Mauritius.[15] All three of these pieces were sent to Australia where Australian authorities concluded, with "near certainty," that the pieces were from Flight MH370.[16] On June 20, 2016, a large inboard section of a right outboard wing flap washed ashore in Tanzania.[17] Once again, this piece was sent to Australia, where Australian authorities confirmed that it came from Flight MH370.[18] As of the filing of this Response, then, all of the relevant direct evidence on the causes of Flight MH370's disappearance is located either in (1) England and, very likely, the United States (the SATCOM data); (2) France (the flaperon); or (3) Australia. None of it is in

---

[10] *See* BBC NEWS, *MH370 Search: Reunion Debris to be Tested in France*, BBC NEWS (July 30, 2015), http://www.bbc.com/news/world-asia-33714780.

[11] *See* ATSB, ASSISTANCE TO MALAYSIAN MINISTRY OF TRANSPORT IN SUPPORT OF MISSING MALAYSIA AIRLINES FLIGHT MH370, at 1 (DEBRIS EXAMINATION – UPDATE NO. 1, Apr. 2016).

[12] *Id.* at 1-2.

[13] *Id.* at 3.

[14] *See* ATSB, ASSISTANCE TO MALAYSIAN MINISTRY OF TRANSPORT IN SUPPORT OF MISSING MALAYSIA AIRLINES FLIGHT MH370, at 1 (DEBRIS EXAMINATION – UPDATE NO. 2, May 24, 2016).

[15] *See* ATSB, ASSISTANCE TO MALAYSIAN MINISTRY OF TRANSPORT IN SUPPORT OF MISSING MALAYSIA AIRLINES FLIGHT MH370, at 1 (DEBRIS EXAMINATION – UPDATE NO. 5, Oct. 7, 2016).

[16] *Id.*; ATSB, ASSISTANCE TO MALAYSIAN MINISTRY OF TRANSPORT IN SUPPORT OF MISSING MALAYSIA AIRLINES FLIGHT MH370, at 3 (DEBRIS EXAMINATION – UPDATE NO. 2, May 24, 2016).

[17] *See* ATSB, ASSISTANCE TO MALAYSIAN MINISTRY OF TRANSPORT IN SUPPORT OF MISSING MALAYSIA AIRLINES FLIGHT MH370, at 1 (DEBRIS EXAMINATION – UPDATE NO. 3, Sep. 15, 2016).

[18] *Id.* at 3.

Malaysia.

### III.    The Investigations

The International Civil Aviation Organization ("ICAO") ("ICAO Investigation") launched a protracted investigation into Flight MH370's disappearance. [ECF 37-1, at 15]. The Defendants do an adequate job of remaking this investigation into a kind of one-country show—conducted by Malaysians, led by Malaysians, relying only on Malaysian evidence. [*Id.*]. In fact, however, the ICAO Investigation involved a 19-member independent team that worked together with the Air Accident organizations of seven different countries, including the ATSB, The United Kingdom's Air Accidents Investigation Branch ("AAIB"), Singapore's Air Accident Investigation Bureau ("AAIB"), France's BEA, The Civil Aviation Administration of China ("CAAC"), The United States NTSB,[19] and The Indonesian National Transportation Safety Committee ("NTSC"). [ECF 19, at 22]. Boeing, as the Boeing Airplane's manufacturer, was also asked to participate. [ECF 37-7, at 2].

Malaysian authorities also launched a criminal probe into the disappearance of Flight MH370. [ECF 37-1, at 26]. Although the Defendants do not mention it, the FBI also participated in that criminal probe.[20] As far as the Plaintiffs are aware, neither the ICAO Investigation nor the Malaysian criminal probe has revealed any material clues as to what actually happened to the Boeing Airplane or who may be responsible for its disappearance.

---

[19] In her Declaration, Hillary Barr, a Boeing employee, speculates that "Boeing has not been involved with—and has no copies of documents collected or created by the investigation authorities relating to—many aspects of the investigation. I *believe* the same is true for the [NTSB]. I also *understand* that no entity from the United States has access to the complete MH370 investigation file." [ECF 37-7, at 5 (emphasis added)]. But Ms. Barr's speculation on this point is not based on personal knowledge and, as such, should be stricken from the record. *See Elliott v. Fed. Bureau of Prisons*, No. CIV. A. 04-1702 CKK, 2006 WL 5217760, at *6 (D.D.C. Oct. 17, 2006). In either event, given that Malaysia had never before suffered an international air accident like Flight MH370—[Ex. 1 ¶ 41–43]—Ms. Barr's speculation that Malaysian investigators would not consult the expertise of international—and, in particular, American—investigators is somewhat difficult to believe.

[20] Jeff Wise, *Exclusive: MH370 Pilot Flew a Suicide Route on His Home Simulator Closely Matching Final Flight*, NEW YORK MAGAZINE (July 22, 2016), http://nymag.com/daily/intelligencer/2016/07/mh370-pilot-flew-suicide-route-on-home-simulator.html; Steve Almasy, *Report: MH370 Pilot Conducted Similar Route on Home Computer*, CNN (July 22, 2016), http://www.cnn.com/2016/07/22/asia/mh370-pilot-simulation/index.html.

In addition to these two investigations, the ATSB launched its own investigation into the disappearance of Flight MH370, which the Defendants cite to but never discuss.[21] Of all the investigations to date, only the ATSB has ventured an evidence-based guess as to the causes of Flight MH370's disappearance. In doing so, the ATSB Report relied to a great extent on the Boeing Airplane's SATCOM data, which, as mentioned, is in the possession of Inmarsat in the United Kingdom and may well be in Boeing's possession in the United States.

## The Parties

### I.    The Plaintiffs

We file this Response on behalf of the Podhurst and Wisner Plaintiffs. The Podhurst Plaintiffs can be subdivided into two groups: Podhurst Group 1 includes two Podhurst Plaintiffs—Thomas Wood ("*Wood* Plaintiff") and Thomas Gaspard ("*Gaspard* Plaintiff")—who have sued Malaysia Airlines under the Montreal Convention[22] on behalf of four Podhurst Decedents ("*Wood* and *Gaspard* Decedents").[23] Podhurst Group 2 includes all 25 of the Podhurst Plaintiffs, who have sued Boeing in Cook County, Illinois, on behalf of all 30 Podhurst Decedents.[24] Podhurst Group 2's cases were brought under the wrongful death and products liability laws of the States of Illinois and Washington.[25]

The Wisner Plaintiffs likewise can be broken down into two groups: Wisner Group 1

---

[21] **Ex. 2.**

[22] Convention between the United States of America and Other Governments on Aviation, at S. Treaty Doc. No. 106-45, May 29, 1999, T.I.A.S. No. 13038 (effective Nov. 4, 2003) (hereinafter the "Montreal Convention").

[23] Thomas Wood is Personal Representative of the Estate of Philip Talmadge Wood, deceased ("Mr. Wood"). Mr. Gaspard is Personal Representative of the Estates of Rui Wang, Weiwei Jiao, and Shuling Dai, all of whom are deceased ("the *Gaspard* Decedents").

[24] Although there are 30 Podhurst Decedents, there are only 25 Podhurst Plaintiffs because there are three Podhurst Plaintiffs who, together, represent nine Podhurst Decedents.

[25] Pursuant to Illinois law, the Podhurst Plaintiffs initially filed their Boeing complaints separately in Illinois. On August 16, 2016, the Podhurst Plaintiffs filed with this Court a Motion for Leave to file a Consolidated Amended Complaint, which would have consolidated all of the Podhurst Plaintiffs' Boeing claims into a single complaint. [ECF 19]. Boeing objected to that motion [ECF 27], and the Podhurst Plaintiffs replied [ECF 32]. The Court has not ruled on the Podhurst Plaintiffs' motion for leave to amend. Accordingly, the Podhurst Plaintiffs hereby respectfully ask this Court to accept the Consolidated Amended Complaint and to refer to it as the operative Podhurst Complaint with respect to the Podhurst Plaintiffs' claims against Boeing.

includes one Wisner Plaintiff—Kerry Richards ("*Richards* Plaintiff")—who is the Personal Representative of 28 Wisner Decedents ("*Richards* Decedents"). The *Richards* Plaintiff has sued Boeing in the Western District of Washington under the wrongful death and products liability laws of the State of Washington. Wisner Group 2 includes four Plaintiffs—Weeks, Simanjuntak, Yvonne Li, and Emma Li ("*Weeks* Plaintiffs")—who are the Personal Representatives of four Wisner Decedents. The *Weeks* Plaintiffs have sued Boeing in Cook County, Illinois, under the wrongful death and products liability laws of the State of Illinois.

## II.    The Defendants

Boeing is a public company incorporated and headquartered in Illinois. [ECF 19, at 15]. Boeing designed the Boeing 777 airplane for commercial use in the State of Washington. [*Id.*]. In 1995, Boeing sought and obtained the Federal Aviation Administration's ("FAA") certification for the 777.[26] This process of applying for, and obtaining, FAA certification took many years and likely involved the work of hundreds, if not thousands, of Boeing employees—all of whom were in the United States. The certification process also required extensive review by dozens of U.S. regulators[27]—all of whom are likewise in the United States. Since obtaining certification for its design of the Boeing 777, Boeing has manufactured and sold approximately 1,502 model 777 aircraft around the world. Another 433 have been ordered. When those orders are filled, there will be 1,935 Boeing 777 airplanes in active use around the world. Approximately 380 of these Boeing 777 airplanes—398 counting planes that have been ordered—have been sold to American companies and are in commercial use in the United States. Together, these 380 Boeing

---

[26] EUROPEAN AVIATION SAFETY AGENCY, *Type-Certificate Data Sheet for Boeing 777,* No. EASA.IM.A.003 (Dec. 15, 2015).
[27] 14 C.F.R. Pt. 21 (2017).

777 airplanes carry millions of American passengers on their business and leisure travel every single year.[28]

After receiving the FAA's certification for its production of the Boeing 777, Boeing designed, manufactured, and tested the Boeing Airplane, along with its component parts, in the State of Washington. [ECF 37-7, ¶ 17]. Boeing completed the Boeing Airplane on May 29, 2002, and delivered it to Malaysia Airlines on May 31, 2002. [ECF 19, at 15]. All of the design and manufacturing records for this plane are located in the United States, as are all of the individuals who designed it, worked on it, built it, regulated its production, and oversaw its certification. [ECF 37-7, ¶ 17]. None of these records or parts—and, to the Plaintiffs' knowledge, not one of these people—are located in Malaysia.

Malaysia Airlines is a Malaysian airline owned by the Malaysian government. On November 7, 2014, faced with the twin disasters of MH370 and MH17,[29] the Malaysian government dissolved the Malaysian entity previously known as Malaysia Airlines ("MAS"), transferred its assets and many of its liabilities to a new entity ("MAB"), reconstituted all of MAS' shares as MAB shares, and then appointed virtually all of MAS' officers and directors as the new officers and directors of MAB. [**Ex. 1 ¶¶** 22-35].

### The Law

Dismissal on *forum non conveniens* grounds "is a drastic exercise of the court's 'inherent power[.]'" *Carijano v. Occidental Petroleum Corp.*, 643 F.3d 1216, 1224 (9th Cir. 2011). This "exceptional tool" should only be "employed sparingly." *Dole Food Co., Inc. v. Watts*, 303 F.3d 1104, 1118 (9th Cir. 2002). In this respect, *forum non conveniens* is "not a doctrine that compels

---

[28] Boeing, 777 Model Summary Through June 2017 (June 2017), http://www.boeing.com/commercial/#/orders-deliveries (including model summary charts for the Boeing 777).

[29] On July 17, 2014, Malaysia Airlines Flight MH17, en route from Amsterdam to Kuala Lumpur, was shot out of the sky above Ukraine by Russian-backed rebels. All 298 people onboard lost their lives.

plaintiffs to choose the optimal forum for their claim." *Id.* (quotation omitted). Rather, it is a doctrine to be invoked only when "defendants have made a clear showing of facts which establish such oppression and vexation of a defendant as to be out of proportion to plaintiff's convenience, which may be shown to be slight or nonexistent." *Bos. Telecomms. Grp., Inc. v. Wood*, 588 F.3d 1201, 1212 (9th Cir. 2009) (quotation marks omitted). Accordingly, a defendant moving for *forum non conveniens* dismissal bears the "heavy burden" of demonstrating that "the balance of private and public interest factors favors dismissal." *Carijano*, 643 F.3d at 1224 & 1227; *accord Vorbiev v. McDonnell Douglas Helicopters, Inc.*, 2009 WL 1765675, at *1 (N.D. Cal. June 18, 2009) (whether or not the plaintiff is a resident of the forum, "a defendant's burden in moving to dismiss based on *forum non conveniens* is quite high"). Because the Defendants fail to meet their considerable burden here, their motion to dismiss should be denied.[30]

## I.    The Private Interest Factors

The Supreme Court has set out the following "private interest factors" for courts to consider in adjudicating motions for *forum non conveniens* dismissal:

> (1) the residence of the parties and the witnesses; (2) the forum's convenience to the litigants; (3) access to physical evidence and other sources of proof; (4) whether unwilling witnesses can be compelled to testify; (5) the cost of bringing witnesses to trial; (6) the enforceability of the judgment; and (7) "all other practical problems that make trial of a case easy, expeditious and inexpensive."

*Lueck v. Sundstrand Corp.*, 236 F.3d 1137, 1145 (9th Cir. 2001) (quoting *Gulf Oil Corp. v. Gilbert*, 330 U.S. 501, 508 (1947)). In other words, the *forum non conveniens* analysis implicates *at least* seven "private interest factors"—though the Defendants, in their motion, make two of these disappear.[31]

---

[30] The Plaintiffs do not contest either the adequacy or the availability of Malaysia as an alternative forum. We simply suggest that, for the reasons set forth below, trial in Malaysia would be far less convenient for everyone—except, of course, for Malaysia Airlines.
[31] The "disappeared factors" are numbers 6 and 7.

The "private interest factors" must be weighed in light of the "strong presumption that the plaintiff has chosen a sufficiently convenient forum," because of which defendants must "prove 'vexation' and 'oppressiveness' that are 'out of all proportion' to the plaintiff's convenience." *Leon v. Millon Air, Inc.*, 251 F.3d 1305, 1314-15 (11th Cir. 2001) (quotations omitted).[32] Indeed, a defendant moving for *forum non conveniens* dismissal "bears a heavy burden in opposing the plaintiff's chosen forum." *Sinochem Intern. Co., Ltd. v. Malaysia Int'l. Shipping Corp.*, 549 U.S. 422, 430 (2007).[33] Significantly, "[t]he mere facts that a case involves conduct or plaintiffs from overseas is not enough for dismissal." *Gulf Oil*, 330 U.S. at 508.

### a. The Residence of the Parties[34]

This first factor weighs strongly against dismissal. Of the 25 Podhurst Plaintiffs, three are citizens of the United States (Wood, Gaspard, and Li Li[35]); one is a resident of the United States (Yang Chen[36]); three are citizens and residents of India; and the remaining 18 are citizens and residents of China. Of the 30 Podhurst Decedents, one was a citizen of the United States (Wood); five were citizens and residents of India; and 24 were citizens and residents of China. In short, _not one_ of the Podhurst Plaintiffs is either a citizen or resident of Malaysia. Likewise, _not one_ of the Podhurst Decedents was at any time a citizen or permanent resident[37] of Malaysia. Of the five Wisner Plaintiffs, one is a citizen and resident of the United States (Richards); one is a

---

[32] S*ee also ISI Int'l, Inc. v. Borden Ladner Gervais LLP*, 256 F.3d 548, 553 (7th Cir. 2001) ("[T]here is a strong preference for conducting the litigation in the plaintiff's chosen forum, and [] only rare circumstances make honoring this choice inequitable."); *Lueck*, 236 F.3d at 1145 ("Ordinarily, a plaintiff's choice of forum will not be disturbed unless the 'private interest' and the 'public interest' factors strongly favor trial in a foreign country." (quoting *Gulf Oil*, 330 U.S. at 509)).

[33] *Accord Gulf Oil*, 330 U.S. at 508 ("Unless the balance is strongly in favor of the defendant, the plaintiff's choice of forum should rarely be disturbed."); *Manu Int'l, S.A. v. Avon Prod., Inc.*, 641 F.2d 62, 65 (2d Cir. 1981) ("The plaintiff's choice of forum is to be respected unless the balance of both public and private interests strongly justifies a transfer.").

[34] The Plaintiffs examine the "residence of the ... witnesses" together with the third factor—"access to physical evidence and other sources of proof"—in Section I.c., *infra*.

[35] Li Li is the Personal Representative of the Estate of Ming Vhong Li.

[36] Yang Chen is the Personal Representative of the Estate of Xiao Ming Yang.

[37] The *Wood* Decedent had been living in Malaysia for approximately 30 days when he was killed on Flight MH370. [ECF 63, at 36].

resident of the United States and a citizen of Indonesia (Simanjuntak); and three are citizens and residents of Australia (Weeks, Yvonne Li, and Emma Li). Of the 32 Wisner Decedents, three were citizens and residents of Australia (Weeks, Gu, and Li); one was a resident of the Netherlands and a citizen of Indonesia (Simanjuntak); one was a citizen and resident of Japan (Fengying Liu); and the remaining 27 were citizens and residents of China. Like the Podhurst Plaintiffs, _not one_ of the Wisner Plaintiffs is either a citizen or resident of Malaysia. Likewise, _not one_ of the Wisner Decedents was at any time a citizen or resident of Malaysia. In total, then, of the 96 individuals and entities whose claims and defenses are at stake here—62 Decedents, 30 Plaintiffs, Boeing, and Malaysia Airlines—_only one_ is Malaysian.

"The presumption in favor of a plaintiff's choice of forum is strongest when the plaintiff is a United States citizen, resident, or corporation." *SME Racks, Inc. v. Sistemas Mecanicos Para Electronica, S.A.*, 382 F.3d 1097, 1101 (11th Cir. 2004). For this reason, a court must find "positive evidence of unusually extreme circumstances, and should be thoroughly convinced that material injustice is manifest before exercising any such discretion as may exist to deny a United States citizen access to the courts of this country." *Id.* (quotations omitted).[38]

Of the 30 Plaintiffs, five are either citizens or residents of the United States. Their choice of an American forum should not be disturbed. *See Iragorri v. United Techs. Corp.*, 274 F.3d 65, 71 (2d Cir. 2001) (en banc) ("[P]laintiff's choice of forum is generally entitled to great deference when the plaintiff has sued in the plaintiff's home forum."). As for the remaining 25 Plaintiffs, although a foreign plaintiff is entitled to less deference than a domestic plaintiff, "less deference

---

[38] *Accord Ciprari v. Servicos Aereos Cruzeiro do Sul, S.A.*, 232 F.Supp. 433, 443 (S.D.N.Y. 1964) ("[W]here application of the doctrine of *forum non conveniens* would force American citizens to seek redress in a foreign court, … courts of the United States are reluctant to apply the doctrine." (quoting *Shulman v. Compagnie Generale Transatlantique*, 152 F.Supp. 833, 836 (S.D.N.Y. 1956))); *Esfeld v. Costa Crociere, S.P.A.*, 289 F.3d 1300, 1311 (11th Cir. 2002) ("There is a strong federal interest in making sure that plaintiffs who are United States citizens generally get to choose an American forum for bringing suit, rather than having their case relegated to a foreign jurisdiction."); *Onita-Olojo v. Sellers*, 12-62064-CIV, 2014 WL 1319304, at *6 (S.D. Fla. Mar. 31, 2014) (same).

is not the same thing as no deference." *Ravelo Monegro v. Rosa,* 211 F.3d 509, 514 (9th Cir. 2000). Counting Decedents, of the 62 Decedents represented here, one (Mr. Wood) was an American citizen. Mr. Wood's case bears special mention because it is the one case in which the Plaintiff is—and the Decedent was—a citizen of the United States. *See Zipfel v. Halliburton Co.*, 832 F.2d 1477, 1486 (9th Cir. 1987) ("The fact that this claim has been filed in an American court on behalf of an American is a factor which points towards retention.").

The Defendants suggest that the *Wood* Plaintiff's choice of forum should receive lesser deference because the *Wood* Decedent was temporarily living abroad at the time of his death. [ECF 37-1, at 34]. In support, the Defendants cite to *Varnelo v. Eastwind Transp., Ltd.*, No. 02-civ-2084, 2003 WL 230741, at *12 (S.D.N.Y. Feb. 3, 2003), for the proposition that the "choice of forum of an expatriate U.S. citizen living abroad receives a diminished degree of deference." [ECF 37-1, at 24]. But the Defendants' citation to *Varnelo* is, in two ways, misleading. First, *Varnelo*—and the cases upon which it relies—opined that an American *plaintiff* residing abroad should receive less deference than an American *plaintiff* living in the United States. *Varnelo*, 2003 WL at *12 ("Accordingly, because *plaintiff* Helga Varnelo resides in Russia, treaty obligations between Russia and the United States do not require any greater deference to her choice of this forum.") (emphasis added). Whatever the merits of this position, the *Wood* Plaintiff is—and has always been—both an American citizen and an American resident. As such, *Varnelo* does not diminish the deference he—or, for that matter, any of the other four U.S. Plaintiffs—is due here.[39] The *Varnelo* citation is misleading, too, because *Varnelo*—and the cases it cites—involved American Plaintiffs who had *permanently* moved abroad. *See id.* ("'[I]t would be less reasonable to assume' that an 'expatriate U.S. citizen *residing permanently* in a

_____

[39] The Defendants' citation to *Pain v. United Techs. Corp.*, 637 F.2d 775, 797 (D.C. Cir. 1980), is for similar reasons inapposite here. *See id.* ("At best, citizenship serves as an inadequate proxy for the American residence of *plaintiff*[.]") (footnote omitted) (emphasis added).

foreign country bring[ing] suit in the United States' chose this forum 'based on convenience.'" (quoting *Iragorri*, 274 F.3d at 73 n.5)) (emphasis added). Because Mr. Wood always remained, until his death, a "*permanent*" resident of the United States, *Varnelo* does not relegate his claims to any lesser deference here.[40]

The remaining 61 Decedents were citizens of India, China, Japan, Australia, and Indonesia. *Not one* was a citizen of Malaysia. In their motion, the Defendants say that "[t]he majority of passengers were residents and citizens of Malaysia or China." [ECF 37-1, at 4]. Although technically true, the statement is misleading in at least two respects. First, the statement is uncomfortably reminiscent of Stacey King's famous quip after a 1990 basketball game between his Cleveland Cavaliers and Michael Jordan's Chicago Bulls—a game that saw Jordan score 69 points to Mr. King's one. As King said after, in a line that might have been written by the Defendants: "I'll always remember this as the night Michael and I combined to score 70 points." The line is misleading, also, because the question here is whether the Defendants have met their "heavy burden" of establishing that the *Malaysian* forum is more convenient than the American forum. In other words, to show that dismissal is appropriate, it is not sufficient under the first "private interest factor" for the Defendants to show that there are more Plaintiffs—or, as the case may be, Decedents—from China or India or Australia than there are from the United States. The question, instead, is whether there are more Plaintiffs or Decedents from *Malaysia* than there are in the United States, because it is *to Malaysia*—and not to China or India or Australia—that the Defendants have moved this Court to transfer the Plaintiffs' cases.

---

[40] For a full exposition on Mr. Wood's status as a "permanent" resident of the United States, please see the Plaintiffs' Montreal Convention Response [ECF 63 § I].

This brings us back to the 49 cases the Defendants tout as support for their motion.[41] A closer inspection of those cases reveals that, in no fewer than 27 of them, _not one_ of the plaintiffs was a U.S. citizen or resident.[42] In fact, in 16 of these 27, _all_ of the foreign plaintiffs were citizens and residents of the specific foreign forum to which the defendant sought transfer.[43] What's more, in 27 of the 49 cases, _not one_ of the decedents was a U.S. citizen or resident.[44] Indeed, in 28 of the 49 cases, either all or a majority of the decedents were citizens or residents of the forum to which the defendants sought transfer.[45] This, of course, includes *Piper Aircraft Co., v. Reyno*, 454 U.S. 235 (1981), the one case the Defendants cite more than any other. In total, then, 28 of the 49 cases the Defendants rely on are simply not analogous to our facts

---

[41] In Appendix A, the Plaintiffs have listed all of the aviation cases since 1980 in which a federal court has denied a defendant's *forum non conveniens* motion.

[42] *Fosen v. United Techs. Corp.*, 484 F. Supp. 490 (S.D.N.Y.), *aff'd*, 633 F.2d 203 (2d Cir. 1980); *Lumenta v. Bell Helicopter Textron, Inc.*, No. 01-14-00207-CV, 2015 WL 5076299 (Tex. App. Aug. 27, 2015); *Jennings v. Boeing Co.*, 660 F. Supp. 796 (E.D. Pa.), *order amended on denial of reconsideration*, 677 F. Supp. 803 (E.D. Pa. 1987), *aff'd*, 838 F.2d 1206 (3d Cir. 1988); *Dahl v. United Techs. Corp.*, 632 F.2d 1027 (3d Cir. 1980); *Chhawcharia v. Boeing Co.*, 657 F. Supp. 1157 (S.D.N.Y. 1987); *Navarrete De Pedrero v. Schweizer Aircraft Corp.*, 635 F. Supp. 2d 251 (W.D.N.Y. 2009); *Baumgart v. Fairchild Aircraft Corp.*, 981 F.2d 824 (5th Cir. 1993); *Galbert v. W. Caribbean Airways*, 715 F.3d 1290 (11th Cir. 2013); *Melgares v. Sikorsky Aircraft Corp.*, 613 F. Supp. 2d 231 (D. Conn. 2009); *Vorbiev v. McDonnell Douglas Helicopters, Inc.*, No. C 08-05539 JSW, 2009 WL 1765675 (N.D. Cal. June 18, 2009); *Magnin v. Teledyne Cont'l Motors*, 91 F.3d 1424 (11th Cir. 1996); *Can v. Goodrich Pump & Engine Control Sys., Inc.*, 711 F. Supp. 2d 241 (D. Conn. 2010); *Pierre-Louis v. Newvac Corp.*, 584 F.3d 1052 (11th Cir. 2009); *Lleras v. Excelaire Servs. Inc.*, 354 F. App'x 585 (2d Cir. 2009); *Da Rocha v. Bell Helicopter Textron, Inc.*, 451 F. Supp. 2d 1318 (S.D. Fla. 2006); *Gschwind v. Cessna Aircraft Co.*, 161 F.3d 602 (10th Cir. 1998)  *Piper Aircraft Co. v. Reyno*, 454 U.S. 235 (1981); *Grodinsky v. Fairchild Indus., Inc.*, 507 F. Supp. 1245 (D. Md. 1981); *Rubenstein v. Piper Aircraft Corp.*, 587 F. Supp. 460 (S.D. Fla. 1984); *Clerides v. Boeing Co.*, 534 F.3d 623 (7th Cir. 2008); *Pettitt v. Boeing Co.*, No. 09 C 3709, 2010 WL 3861066 (N.D. Ill. Sept. 28, 2010); *Faat v. Honeywell Int'l, Inc.*, No. CIV.A.04-4333, 2005 WL 2475701 (D.N.J. Oct. 5, 2005); *Van Schijndel v. Boeing Co.*, 434 F. Supp. 2d 766 (C.D. Cal. 2006), *aff'd sub nom. Schijndel v. Boeing Co.*, 263 F. App'x 555 (9th Cir. 2008); *Helog Ag v. Kaman Aerospace Corp.*, 228 F. Supp. 2d 91 (D. Conn. 2002); *In re Air Crash Disaster Over Makassar Strait, Sulawesi*, No. 09-CV-3805, 2011 WL 91037 (N.D. Ill. Jan. 11, 2011); *Lueck v. Sundstrand Corp.*, 236 F.3d 1137 (9th Cir. 2001); *Martino v. Viacao Aerea Riograndense, S.A.*, No. CIV.A . 90-1883, 1991 WL 13886 (E.D. La. Jan. 25, 1991).

[43] *Fosen*; *Lumenta*; *Jennings*; *Dahl*; *Chhawcharia*; *Navarrete*; *Baumgart*; *Galbert*; *Melgares*; *Vorbiev*; *Magnin*; *Can*; *Pierre-Louis*; *Lleras*; *Da Rocha*; *Gschwind*.

[44] *Fosen*; *Jennings*; *Rubenstein*; *Dahl*; *Chhawcharia*; *Navarrete*; *Baumgart*; *Melgares*; *Magnin*; *Can*; *Pierre-Louis*; *Lleras*; *Da Rocha*; *Piper*; *Faat*; *Ahmed v. Boeing Co.*, 720 F.2d 224 (1st Cir. 1983*)*; *Zermeno v. McDonnell Douglas Corp.*, 246 F.Supp.2d 646 (S.D. Tex. 2003).

[45] *Fosen*; *Jennings*; *Rubenstein*; *Dahl*; *Chhawcharia*; *Navarrete*; *Baumgart*; *Melgares*; *Magnin*; *Can*; *Zermeno*; *Pierre-Louis*; *Lleras*; *Da Rocha*; *Piper*; *Ahmed*; *Faat*; *In re Air Crash Over Taiwan Straits*; *In re Air Crash Near Athens, Greece*; *Zipfel*; *Lueck*; *Clerides*; *In re Air Crash Over Mid-Atl. on June 1, 2009*, 760 F.Supp.2d 832 (N.D. Cal. 2010); *Satz v. McDonnell Douglas Corp.*, 244 F.3d 1279 (11th Cir. 2001); *Tazoe v. Airbus S.A.S.*, 631 F.3d 1321 (11th Cir. 2011); *Esheva v. Siberia Airlines*, 499 F.Supp.2d 493 (S.D.N.Y. 2007); *Nolan v. Boeing Co.*, 919 F.2d 1058 (5th Cir. 1990); *Gambra v. Int'l Lease Fin. Corp.*, 377 F.Supp.2d 810 (C.D. Cal. 2005).

precisely because (1) five of the Podhurst and Wisner Plaintiffs are either U.S. citizens or residents, (2) one of the Podhurst Decedents was a U.S. citizen and permanent resident, and (3) not one of the Plaintiffs or Decedents is—or was—a citizen or resident of Malaysia.[46]

There is yet another aspect of the first "private interest factor" that weighs against dismissal here: Boeing, one of the two Defendants, is a U.S. company, headquartered and incorporated in the United States. *See Gschwind*, 161 F.3d at 609 ("It is true that a forum resident should have to make a stronger case than others for dismissal based on *forum non conveniens*.").[47] This presumption against Boeing's efforts to litigate this case elsewhere applies notwithstanding the presence of foreign parties. *See Carijano*, 643 F. 3d at 1229. Indeed, the federal courts have routinely held that a company's decision to incorporate in the United States reflects a certain corporate preference to be sued here rather than abroad and is thus a compelling factor that weighs heavily against dismissal.[48]

In response, the Defendants cite the Supreme Court's opinion in *Piper* for the proposition that "the significance of the manufacturer's evidence in the U.S. to a design claim does not tip the balance when compared with the evidence in the foreign country where the airline is, where the accident occurs, and where the investigation is held." [ECF 37-1, at 18]. But, as we have shown, *Piper* was an easy case for dismissal because, despite the manufacturer's presence in the United States, (1) *all of* the Decedents were citizens and residents of the foreign forum (the United Kingdom); (2) the accident took place in the foreign forum; and (3) *all of* the wreckage

---

[46] As we will soon see, the remaining 21 cases are inapplicable either because they involved an accident that occurred in the foreign forum or because the wreckage from that accident was stored in the foreign forum or both.

[47] *Cf. Reid-Walen v. Hansen*, 933 F.2d 1390, 1395–96 (8th Cir. 1991) ("In this unusual situation, where the forum resident seeks dismissal, this fact should weigh strongly against dismissal."); *Schertenleib v. Traum*, 589 F.2d 1156, 1164 (2d Cir. 1978) ("We begin by noting that plaintiff chose this forum and defendant resides here. This weighs heavily against dismissal.").

[48] *See, e.g.*, *Peregrine Myanmar Ltd. v. Segal*, 89 F.3d 41, 46 (2d Cir. 1996); *Reid-Walen*, 933 F.2d at 1395–96; *Lony v. E.I. Du Pont de Nemours & Co.*, 886 F.2d 628, 634 (3d Cir. 1989); *Manu Int'l*, 641 F.2d at 67; *Founding Church of Scientology of Washington, D. C., v. Verlag*, 536 F.2d 429, 436 (D.C. Cir. 1976).

was stored—and available for inspection—in the foreign forum. *Piper*, 454 U.S. 235, 239 & 260. When balanced against the manufacturer's presence in the United States, these overwhelming factors for dismissal rendered the *Piper* outcome, in retrospect, rather uncontroversial. Here, by contrast, (1) *none* of the Podhurst or Wisner Decedents were citizens or *residents* of Malaysia; (2) the accident took place thousands of miles from Malaysia; and (3) *none* of the wreckage is stored—or available for inspection—anywhere in Malaysia. As such, *Piper* is simply not applicable here. More relevant to our facts is *McCafferty ex rel. Estate of Prant v. Raytheon Inc.*, No. 03-CV-6729, 2004 WL 1858080, at *3 (E.D. Pa. Aug. 19, 2004), which held: "Although … some of the connections to Indonesia include the site of the accident, the location of the beneficiaries of the estates, etc., … the nature of the Plaintiffs' claims primarily involve theories of liability based upon manufacturing and/or design defect of the aircraft or engine by Defendants." *McCafferty*, 2004 WL at *3.[49] Accordingly, the court denied the defendant's motion for *forum non conveniens* dismissal.

### b. Convenience to the Litigants

The Defendants say that the Plaintiffs have conceded the superior convenience of the Malaysian system by submitting themselves to its jurisdiction. [ECF 37-1, at 11-13]. Nothing could be further from the truth. The Plaintiffs filed their lawsuits in Malaysia only to protect their legal rights. After all, since the inception of this litigation, the Defendants have time and again insisted that this Court's dismissal of the Plaintiffs' lawsuits was little more than a foregone conclusion. Plaintiffs' counsel continues to feel confident that the Plaintiffs will prevail in their efforts to keep these cases in the United States. That said, Plaintiffs' counsel always recognized the possibility that this Court could, a year or more after the statute of limitations had expired,

---

[49] *Accord* Varnelo, 2003 WL at *3 & *6; *In re Cessna 208 Series Aircraft Prod. Liab. Litig.*, 546 F.Supp.2d 1191, 1195-97 (D. Kan. 2008), opinion supplemented upon denial of reconsideration, No. 08-MD-1721-KHV, 2009 WL 229796 (D. Kan. Jan. 30, 2009).

dismiss these cases from the United States. In order to protect the Plaintiffs against that possibility, Plaintiffs' counsel filed protective suits for the Plaintiffs in Malaysia.

But it would be absurd to suggest that this filing somehow establishes the Malaysian forum's superior convenience. To the contrary, the Plaintiffs submit the following three facts, which strongly suggest that Malaysia is _not_ a convenient forum. First, the Podhurst Plaintiffs have been denied their counsel of choice in Malaysia. In fact, the Defendants specifically filed an objection in the Malaysian High Court to the admission of Podhurst counsel, and that objection has been granted. **Ex. 1** ¶ 11. As a result, the Plaintiffs are proceeding in Malaysia with lawyers they have never met or corresponded with before. _Id._ The Defendants, by contrast, have the benefit of counsel of their own choosing here in the United States—a substantial disparity in convenience that, we submit, weighs heavily in favor of the American forum. Second, none of the Plaintiffs or Decedents is—or was—Malaysian, and none are remotely confident that the Malaysian court system will conduct itself fairly or independently in adjudicating the claims of foreigners against its own national airline.[50] In this respect, the actions of the Malaysian High Court in excluding the Plaintiffs' counsel of choice—not to mention the Malaysian legislature's "stripping" of MAS' assets and its subsequent transfer of those assets to MAB, _id._ ¶ 33—breed little confidence in the outcome. Third, there is the all-important issue of damages. As the Court might well imagine, Boeing counsel is not pushing to litigate this case 9,000 miles from home because its lawyers like to travel. Boeing is doing so because it hopes to persuade the Malaysian High Court to apply Malaysian damages law to these cases.

---

[50] We note, in this respect, that neither the _Wood_ Plaintiff nor his beneficiaries—Mr. Wood's sons, Nick and Chris Wood—have ever been to Malaysia. Trial in Malaysia will require them to apply for temporary visas, to travel repeatedly halfway around the world, and to adjudicate their purely American damages claims under a foreign legal system and in front of a foreign court. The timing of this foreign litigation would be particularly oppressive for Nick and Chris because both have recently graduated from college and embarked on new careers—careers they will attempt to manage without help, guidance, or financial support from their deceased father.

Under Malaysian law, an individual is presumed to have lost her earning capacity on her 55th birthday. Accordingly, if these cases were litigated in Malaysia—and if, as the Defendants have urged, Malaysian damages law applies—six of the 30 Podhurst Decedents and three of the Wisner Decedents, none of whom were Malaysians, would be almost completely shut out of the Malaysian compensation tables.[51] Even in those cases where the Decedents were not 55 or older, Malaysian damages law would result in significant damages disparities that further underscore the inconvenience of litigating these cases in Malaysia. Take the *Wood* case, for example—likely the most substantial damages case to come out of the MH370 litigation. Mr. Wood was 50 years old at the time of his death and was earning $684,889 per year. **Ex**. 3. Under American law, an economist would extrapolate how much money Mr. Wood would have been likely to earn over his work-life expectancy—say, until he was 75. Multiplying his annual salary by 25 (75-50), an economist may well conclude that the *Wood* economic damages exceeded $17,000,000. And, because American law permits juries to award uncapped non-economic damages, the *Wood* Plaintiffs could well see a verdict in excess of $30 million. Malaysian law, by contrast, would presume that Mr. Wood would have retired on his 55th birthday. **Ex. 1** ¶ 50. Accordingly, under the complicated "multiplicand" system the Malaysian courts employ, the *Wood* Beneficiaries could recover no more than the multiple of (1) the amount of money Mr. Wood was giving them as support every year—presumably a small percentage of the $689,889 he earned overall—and (2) 2.5. *Id*. ¶ 53. Put simply, if we generously assume that Mr. Wood gave his sons $100,000 per year, the *Wood* Beneficiaries would be entitled, under Malaysian law, to recover $250,000, plus a few thousand dollars in non-economic damages. In short, there is almost nothing about the Malaysian system that would be convenient for the Plaintiffs.

---

[51] Under Malaysian law, there is very little allowance for non-economic damages—typically no more than a few thousand dollars. **Ex. 1** ¶ 47. As a result, the application of Malaysian damages law would sound the death knell for these cases.

### c. The Location of Relevant Evidence; the Residence of Witnesses; and the Cost of Bringing Those Witnesses to Trial

These third and fourth "private interest" factors likewise militate against dismissal. We start with the claims against Malaysia Airlines. The *Wood* and *Gaspard* Plaintiffs have brought suit against Malaysia Airlines under the terms of the Montreal Convention. Pursuant to Article 17 of that Convention, Malaysia Airlines is "liable for damage sustained in the case of death or bodily injury to a passenger upon condition only that the accident which caused the death or injury took place on board the aircraft or in the course of any of the operations of embarking or disembarking." Montreal Convention, Art. 17. The U.S. Supreme Court has defined the term "accident" in this context as any "unexpected or unusual event or happening that is external to the passenger." *Air France v. Saks*, 470 U.S. 392, 405 (1985). Malaysia Airlines does not dispute the proposition that the disappearance of Flight MH370 was an "unexpected or unusual event." [ECF 54, at 3.].[52]

Under Article 21(1) of the Montreal Convention, once the plaintiff proves that an "accident" occurred on an international flight between two "States Parties," liability for the passenger's death is premised on strict liability up to 113,000 Special Drawing Rights ("SDR").[53] Above that figure, an air carrier is liable unless *it* can establish that *some other entity* was *solely* responsible for the accident. *See* Montreal Convention, Art. 21(2)(b) ("The carrier shall not be liable for damages . . . if the carrier proves that . . . such damage was *solely* due to the negligence or other wrongful act or omission of a third party.") (emphasis added).

---

[52] Indeed, far from contesting this point, on January 29, 2015, the Director General of Malaysia's Department of Civil Aviation ("DCA"), conceded that Flight MH370 resulted in an "accident" that killed all 239 people onboard. [ECF 37-1, at 37].
[53] Approximately $160,000.

In its Answer, Malaysia Airlines alleges that some other entity was "solely" responsible for the Subject Accident.[54] During jurisdictional discovery, the Plaintiffs asked Malaysia Airlines to turn over any evidence in its possession of this alleged third party's liability. [ECF 50, at 5-6]. Malaysia Airlines refused. *Id.* at 6. The *Wood* and *Gaspard* Plaintiffs filed a motion to compel that discovery, the Court granted that motion in part, and Malaysia Airlines provided what amounts to a lawyer's response to the *Wood* and *Gaspard* Plaintiffs' request—suggesting, in effect, that it would try to blame whichever other parties the *Wood* and *Gaspard* Plaintiffs sued. *See* MAS' Disclosure in Accordance with Minute Order of April 26, 2017. As of this writing, then, Malaysia Airlines has proffered *not a single piece of evidence*—not a document or a recording or a witness—that would even begin to establish that some other entity is "solely" responsible for Flight MH370's disappearance. This is not surprising, for, as we have said, *all* of the wreckage from Flight MH370—including the FDR and CVR—has been lost at sea, and *none* of the people who knew anything about what happened have survived.

In other words, the liability phase of these Montreal Convention cases will go in one of two—and only two—ways. Either Malaysia Airlines will accept that no third party is "solely" responsible for this accident—in which case Malaysia Airlines will be *strictly liable* to the full extent of the Plaintiffs' damages—or Malaysia Airlines will insist that some third party is "solely" responsible. Fortunately, the Court need not speculate on which outcome is more likely because this process has already played itself out in a very similar proceeding in Australia between Malaysia Airlines and other representatives of deceased MH370 passengers. In that Australian case, Malaysia Airlines, after initially alleging (as it did here) that some third party was "solely" responsible for the accident, ultimately withdrew this defense after incisive probing

---

[54] *See, e.g.*, MAS Answer to *Gaspard* Complaint. *Gaspard v. Malaysia Airlines Berhard, et al.,* No. 16-cv-00419, ECF 10, at 18.

from the Australian court.[55] Because the causes of Flight MH370's disappearance, whatever they are, apply equally well to the Australian passengers as to the American or Chinese or Indian ones, it seems far less than likely that Malaysia Airlines will, in the end, take a different position here. Indeed, it may be that Malaysia Airlines is estopped from arguing that some third party is "solely" responsible for the accident after having conceded in Australia that no other such responsible third party existed.[56]

Because of the strict liability provisions in Article 21, this concession that no other party was "solely" responsible for the accident would turn this case into a damages-only trial that, for two reasons, would dismantle Malaysia Airlines' position on *forum non conveniens*.[57] First, Mr. Wood was a citizen and permanent resident of the United States whose beneficiaries are _all_ American citizens and residents. More than that, _all_ of Mr. Wood's damages evidence is located in the United States. This includes _all_ of his medical records; his tax returns; his brokerage, security, banking, and investment accounts; his health and life insurance policies; his car, motorcycle, and home insurance policies; his personal property and stowed-away valuables; and _all_ of his employer's records relating to his past compensation, promotions, and employment history. [ECF 63 § I.d.]. In addition, Mr. Wood's estate has been duly administered in the United States, and several life insurance policies have, upon his death, issued to his beneficiaries in the

---

[55] *See* **Ex. 4** (11/11/16 Amended Defence signed by Malaysia Airlines' attorney in Australia) & **Ex. 5** (Australian Court's orders confirming withdrawal of Malaysia Airlines' defense).

[56] *See, e.g.*, *Sluimer v. Verity, Inc.*, 606 F.3d. 584, 592 (9th Cir. 2010) ("Plaintiff correctly contends that the decision of a foreign court may have preclusive effect in federal court" if the issue at stake is "identical to the one alleged in the prior litigation."); *ICC Chem. Corp. v. TCL Indus. (Malaysia SDN)*, 206 F. App'x 68, 70 (2d Cir. 2006) (granting preclusive effect to a Singapore Court's finding as a matter of comity); *Sea Trade Co. v. FleetBoston Fin. Corp.*, No. 03 CIV 10254, 2008 WL 4129620, at *4-5 (S.D.N.Y. Sep. 4, 2008) (when determining preclusive effect of issues determined by Argentinean Court, noting that "Courts are especially inclined to extend comity to foreign proceedings when a party in a subsequent proceeding in the United States makes arguments that smack of inconsistencies seeming designed to game the system").

[57] The Eleventh Circuit has instructed that the question of "what witnesses and documents might be relevant" requires an assessment of "the issues in the case." *C.A. La Seguridad v. Transytur Line*, 707 F.2d 1304, 1308 (11th Cir. 1983). For this reason, the trial court "'should focus on the precise issues that are likely to be actually tried.'" *Duha v. Agrium, Inc.*, 448 F.3d 867, 879 (6th Cir. 2006) (quoting *Iragorri*, 274 F.3d at 74).

United States. *Id*. Against all this, Malaysia Airlines has managed to point to *no aspect* of the Wood Estate's damages portfolio that would require discovery anywhere abroad—let alone in Malaysia.

Similarly, while the *Gaspard* Decedents were all Chinese citizens, they lived off of the earnings of Rui Wang, the lead *Gaspard* Decedent, who was a full-time employee of the Boston Consulting Group, an American company.[58] As with Mr. Wood, then, all of the *Gaspard* Plaintiffs' financial records—the financial records upon which the great bulk of their damages claims will be based—are located in the United States. In any event, for those pieces of the *Gaspard* damages evidence that are abroad—the family's physicians and medicals records, for example—*all* of that evidence is in China; *none* is in Malaysia. Accordingly, the Defendants cannot demonstrate, with respect to those witnesses or that evidence, that *Malaysia*—the *only* forum to which it seeks transfer—is more convenient than the United States. This is especially true where, as here, much of this evidence has been translated into English and turned over to Malaysia Airlines already.[59] **Ex. 1** § 8-9. In this more likely of the two scenarios, then—in which the case against Malaysia Airlines becomes a damages-only trial—the whole long litany of

---

[58] *See* Boston Consulting Group's Letters to Rui Wang, dated December 16, 2011, December 24, 2012 and December 23, 2013 (**Ex. 6**).

[59] To the extent that, during the course of this damages-only discovery, Malaysia Airlines wants more than what the Plaintiffs have provided, the Plaintiffs hereby commit to provide them with any evidence the Court deems relevant. Indeed, the Plaintiffs could hardly do otherwise, given the Court's power to sanction parties—by, for instance, excluding damages claims—who have failed to comply with their discovery obligations. *See, e.g.*, FED. R. CIV. P. 37(b)-(d); *Design Strategy, Inc. v. Davis*, 469 F.3d 284, 294 (2d Cir. 2006) ("A district court has wide discretion to impose sanctions, including severe sanctions, under Federal Rule of Civil Procedure 37[.]"); *Finley v. Marathon Oil Co.*, 75 F.3d 1225, 1230 (7th Cir. 1996) ("Rule 37(c)(1) provides that "a party that without substantial justification fails to disclose information required by Rule 26(a) ... shall not, unless such failure is harmless, be permitted to use as evidence at a trial ... any ... information not so disclosed.") (emphasis added). The sanction of exclusion is thus automatic and mandatory unless the party to be sanctioned can show that its violation of Rule 26(a) was either justified or harmless."); *Wilson v. Bradlees of New England, Inc.*, 250 F.3d 10, 21 (1st Cir. 2001) ("[I]t is the obligation of the party facing sanctions for belated disclosure to show that its failure to comply with the Rule was either justified or harmless and therefore deserving of some lesser sanction. This is a burden that plaintiff made no attempt to shoulder, and the district court did not abuse its discretion in imposing Rule 37(c)(1)'s 'self-executing' sanction."); *Thompson v. Jamaica Hosp. Med. Ctr.*, 13 Civ. 1896, 2015 WL 7430806, at *2 (S.D.N.Y Nov. 20, 2015) ("Having failed to comply with his Rule 26 obligations and the Orders of this Court, the Plaintiff will be precluded from presenting any evidence with respect to damages other than that produced so far in discovery[.]").

Malaysian liability witnesses and Malaysian liability evidence, which the Defendants proffer in their motion, becomes wholly irrelevant. [ECF 37-1, at 16-17].

The second scenario arguably helps the Defendants even less, for even if Malaysia Airlines elects to blame Boeing—and even if Malaysia Airlines is not estopped from altering its position on this issue—the only relevant evidence in Malaysia Airlines' third-party claim against Boeing would be whatever evidence Malaysia Airlines can proffer of Boeing's liabilities—evidence that both Defendants have already admitted is exclusively in the United States.[60] In this scenario, the Court would be faced, on the one hand, with a liability case that focused almost-exclusively on whatever evidence Malaysia Airlines could find of a design or manufacturing defect in the Boeing Airplane. *McCafferty*, 2004 WL at *3. But, because the Boeing Airplane has never been found, Malaysia Airlines—like the ATSB—would need to rely on some combination of (1) the design, manufacturing, and testing specifications of the Boeing 777, which are located in the United States, and (2) the SATCOM data from the doomed flight, which is located in the United Kingdom and which, very likely, is also in Boeing's possession in the United States.[61]

In response, the Defendants argue that Boeing would be prejudiced if, in this third-party case—or, for that matter, in the Plaintiffs' direct claims against Boeing—it could not defend itself by relying on the same long list of witnesses and evidence the Defendants proffer in their motion. [ECF 37-1, at 16-17]. But, in citing that list, the Defendants notably do not say—nor can

---

[60] [ECF 37-7, at 12 ("Boeing maintains custody and control over documents relating to the design, manufacture, assembly, testing, and certification of the [Subject Aircraft] in the [United States]. Boeing employees with knowledge of the design, manufacture, assembly, testing, and certification for the [Subject Aircraft] are located in the [United States].")]; [ECF 37-1, at 28].

[61] Even in the event that Malaysia Airlines claims that there is some other third party, besides Boeing, that is "solely" responsible for the accident, Boeing—the manufacturer of the Boeing Airplane—would comprise the substantial bulk of the liability case. Indeed, since the Boeing Airplane was never found, there is very little likelihood that significant evidence of this other third party's liability will be easily located abroad. As a result, whether Boeing is the only allegedly liable third party or one of several, Boeing's evidence will form the greatest part of Malaysia Airlines' third-party liability case. And that evidence, we stress again, is located exclusively within the United States. *See McCafferty*, 2004 WL at *3.

they—that any of these witnesses has anything even remotely relevant to say about what happened to Flight MH370. *See Lueck*, 236 F.3d at 1146 ("We have said previously that a court's focus should not *rest on the number of witnesses or quantity of evidence* in each locale. Rather, a court should evaluate *the materiality and importance* of the anticipated [evidence and] witnesses' testimony and then determine[] their accessibility and convenience to the forum.") (emphasis added). Neither the ICAO Investigation nor the Malaysian criminal probe has posited even a single relevant data point by which a judge or jury could conclude that the cause of the Boeing Airplane's disappearance was, as the case may be, one thing or another. Notably, both the NTSB and Boeing participated in the ICAO Investigation, and the FBI was actively involved in the criminal probe.[62] Indeed, it was the FBI—and not Malaysian investigators—that conducted the forensic analysis on the home computer of MH370 pilot Zaharie Shah—a forensic analysis in which it was revealed that Shah had, before his death, practiced MH370's doomed route on his home computer. This was the most probative evidence on the causes of Flight MH370's disappearance that ever came out of the criminal probe—and it came from American, not Malaysian, investigators.

The Defendants also never say why any of the Malaysian witnesses or evidence would necessarily be more relevant on the causes of MH370's disappearance than the testimonies of the hundreds of Boeing employees who worked on the Boeing Airplane in the United States, the hundreds of engineers who designed the Boeing Airplane's component parts in the United States, the dozens of U.S. regulators who oversaw the Boeing Airplane's certification in the United States, or the likely thousands of pieces of physical, digital, and documentary evidence relating to every aspect of the Boeing Airplane's design, manufacture, and certification—all of which are

---

[62] *See* Wise, *supra* n.20.

exclusively in the United States.[63] Without the Boeing Airplane's wreckage, no party can say, with any reasonable degree of certainty, which country's evidence is more likely to be relevant to the ultimate determination of what happened to Flight MH370. Given the Defendants' "heavy burden," *Carijano*, 643 F.3d at 1227, which requires them to make "a *clear* showing of facts which establish such oppression and vexation of a defendant as to be out of proportion to plaintiff's convenience," *Bos. Telecomms.*, 588 F.3d at 1212 (emphasis added), this arguable[64] equipoise in the potential relevance of the American versus the Malaysian evidence leans strongly against dismissal.[65]

But it is the location of the damages evidence—that is, its exclusively *extra*-Malaysian character—that lends the most support to the Plaintiffs' position. The Defendants carp about the "significant" and "unreasonable" burdens involved in trying damages questions in the United States. [ECF 37-1, at 29]. By their very nature, however, damages calculations require courts to answer the following questions, among others: How much did the Decedents earn? How long were they likely to earn it? And how much have the Plaintiffs suffered in their absence? By definition, the answers to these questions will come, not from the Defendants, but from the Plaintiffs themselves—in particular, from the countries in which the Decedents lived. In the *Wood* and *Gaspard* cases, as we have said, much of that evidence—in *Wood*, all of that

---

[63] **Ex. 7.**

[64] We say "arguable" only because, it goes without saying, the Plaintiffs believe that the Boeing evidence will prove more relevant, while the Defendants will insist the same about the Malaysian evidence. But, without the wreckage, this dispute is—even viewed in the light most favorable to the Defendants—academic.

[65] In any event, even if this evidence were relevant—and even if it were more material to this case than the Boeing evidence in the United States—there is reason to believe that Malaysian investigators have already made much of this Malaysian evidence available to American investigators in the United States. *See* BBC NEWS, *White House Says FBI 'Aiding MH370 Investigation*,' (Mar. 19, 2014) http://www.bbc.com/news/world-us-canada-26649690 ("A US law enforcement official told the Reuters news agency the Malaysian officials gave the FBI access to data generated by both pilots including from a hard drive attached to the captain's flight simulator and electronic media used by a co-pilot.").

evidence—will be in the United States.[66] In the other cases, to be sure, much of that evidence will be outside of the United States—in places like China, India, Indonesia, Japan, the Netherlands, and Australia. But, because none of the 30 Podhurst and Wisner Plaintiffs—and none of the 62 Podhurst and Wisner Decedents—are or were citizens of Malaysia, the operative point here is that _none_ of that evidence will be in Malaysia. As such, it is simply not clear how, on the issue of damages, Malaysia can be a more convenient forum than the United States.

The Defendants' argument on the difficulty of translating damages documents into English is similarly mystifying. [ECF 37-1, at 13 & 29-30]. To begin with, all of the Plaintiffs' damages materials have already been translated into English and turned over to the Defendants. **Ex. 1** ¶ 8–9. And, again, to the extent that the Defendants believe that certain pieces of damages information are missing from those productions, that evidence—when it is produced—would, if this litigation proceeds in Malaysia, have to be translated into Malay anyway, because Malay is the official language of the Malaysian court system and because _none_ of the damages evidence would come from Malaysia. Indeed, if the cost of translation were the only salient issue, then Malaysia would be the _least convenient_ of all the potentially interested forums—including Australia, Indonesia, Japan, China, the Netherlands, and the United States—because, of these, Malaysia is the only country from whom no damages materials will be discovered. The Defendants somehow seem not to recognize this contradiction.[67]

---

[66] _See Onita-Olojo_, 2014 WL at *5 ("[E]vidence of damages for the cases where the decedent was a United States citizen or resident at the time of his or her death will be more accessible in the United States because, again, this evidence will come from testimony from the decedent's family members, friends, neighbors, and coworkers, as well as from the decedent's employment records, school records, and tax records." (citing 11 AM. JUR. Trials 1, §§ 12–16 (1966))).

[67] The Defendants also say that "[i]n this case, the great majority of the evidence relating to liability and damages is located outside of the United States, primarily in Malaysia and China." [ECF 37-1, at 15]. This statement is painfully misleading in at least three important ways. First, again, the question here is not whether the "vast majority" of the evidence is "outside of the United States," but whether it is _in Malaysia_. To this point, the Defendants' suggestion that the evidence is "primarily in Malaysia _or China_" is no more meaningful than Stacey King's comment about how many points he and Michael Jordan scored together. Second, in pointing to what

In support of their argument that the "location of relevant evidence" weighs in favor of dismissal, the Defendants cite to eight federal cases. [ECF 37-1, at 15 & 17-18 (citing *Van Cauwenberghe v. Biard*, 486 U.S. 517, 528 (1988); *Piper*, 454 U.S. at 257-58; *Lueck*, 236 F.3d at 1146; *Clerides*, 534 F.3d at 629; *Baumgart*, 981 F.2d at 836; *Mid-Atlantic*, 760 F.Supp.2d 832; *Fredriksson v. Sikorsky Aircraft Corp. Inc.*, CIV No. 3:08 CV 450 (WWE), 2009 WL 2952225, at *6 (D. Conn. Sept. 2, 2009); *Da Rocha*, 451 F.Supp.2d at 1323-24]. But, upon close inspection, each of these cases undermines the Defendants' position.

We begin with *Biard*. In that case, the Court instructed district courts to "scrutinize the substance of the dispute between the parties to determine whether the pieces of evidence cited by the parties *are critical, or even relevant*, to the plaintiff's cause of action and to any potential defenses to the action[.]" *Biard*, 486 U.S. at 528 (quoting *Gulf Oil*, 330 U.S. at 508) (emphasis added). Because, as noted, the Defendants cannot say, without the wreckage, whether any of the pieces of evidence they cite will be "critical"—indeed, because they cannot show how or why any such piece would be more "critical" than any of the thousands of pieces of evidence in Boeing's possession—*Biard* does not further their cause. Even more problematic is *Piper*, which, as mentioned, could hardly be less applicable here. After all, in *Piper*, the accident occurred in the United Kingdom, and all of the wreckage had been recovered in the United Kingdom, analyzed in the United Kingdom, and was subject to further inspection (if needed) there. Under those circumstances, the Supreme Court could quite rightly say, as the Defendants note, that "few[] evidentiary problems would be posed if the trial were held in Scotland" and that

---

evidence might be in Malaysia, the Defendants conveniently leave out the adjective "relevant." Again, the object here is not to determine where certain things are, but rather where certain "relevant" things are. *See Lueck*, 236 F.3d at 1146 ("We have said previously that a court's focus should not *rest on the number of witnesses or quantity of evidence* in each locale. Rather, a court should evaluate *the materiality and importance* of the anticipated [evidence and] witnesses' testimony and then determine[] their accessibility and convenience to the forum.") (emphasis added). Third, the Defendants make no effort to juxtapose the evidence they say is in Malaysia against the thousands of pieces of potentially relevant evidence in Boeing's possession in the United States.

a "large proportion of the relevant evidence is located in Great Britain." *Id.* at 257-58. This was particularly true because all of the *Piper* decedents and their families were citizens and residents of the United Kingdom—as a result of which all of the relevant damages evidence was located in the United Kingdom. *Id.* at 259. Neither of these factors is present here.

*Lueck* is for similar reasons unpersuasive. In that case, the airplane crashed in New Zealand during a domestic New Zealand flight, all of the decedents (except one) were citizens of New Zealand, and the airplane's wreckage was located in New Zealand. 236 F.3d at 1140. Because the decedents were from New Zealand—and in light of the presence of the wreckage in New Zealand—the Ninth Circuit had little difficulty holding that New Zealand was the more convenient forum on the dual issues of liability and damages. In pertinent part, it explained:

> [T]he performance of the components during Flight 703 is ultimately in issue, and, for that reason, the New Zealand evidence relating to the accident is essential to this suit as well. The New Zealand evidence will go to the liability of Defendants for the crash, because the jury will need to consider the performance of the equipment in relation to the performance of the flight crew. As Defendants note, evidence relating to Plaintiffs' injuries, medical expenses, and loss of earnings, are crucial to the damages portion of this suit, and these witnesses and documents, although under Plaintiffs' control, are all in New Zealand.

*Id.* Likewise, in *Clerides*, the plaintiff was a citizen and resident of Greece, the decedent was a citizen and resident of Greece (as were the vast majority of the other passengers on the plane), the crash happened in Greece, and all of the wreckage was still located in Greece. *Clerides*, 534 F.3d at 626-630. Undoubtedly, Greece was the more convenient forum. *Id.* at 630. *Mid-Atlantic* is similarly unpersuasive. In that case, the vast majority of the decedents were from France, as were many of the plaintiffs, and all of the wreckage (including the critical FDR and CVR) were located in France. *Mid-Atlantic,* 760 F.Supp.2d at 843, 845-46.

*Baumgart* is probably the case that helps the Defendants the least. In that case, all of the plaintiffs were citizens of Germany, all of the decedents were citizens of Germany, all of the

damages evidence was in Germany, the crash happened in Germany, all of the wreckage was still in Germany, the FDR and CVR were available for inspection in Germany, all of the eyewitnesses to the accident lived in Germany, and, it goes without saying, none of the plaintiffs or decedents or eyewitnesses were citizens or residents of the United States. *Baumgart,* 981 F.2d at 827, 836. We do not think it too much of a stretch to say that the Defendants would have been hard-pressed to find a case whose facts were <u>*less*</u> analogous to ours—except, that is, for *Da Rocha*. As in *Baumgart*, in *Da Rocha* all of the plaintiffs were Brazilian, all of the decedents were Brazilian, the crash occurred in Brazil, the wreckage (including the critical FDR and CVR) was available in Brazil, the only eyewitnesses to the accident were in Brazil, and none of the plaintiffs or decedents were American. *Da Rocha,* 451 F.Supp.2d at 1323-1325. Unsurprisingly, the court easily determined that the locus of relevant evidence was in Brazil. *Id.* at 1325.

Finally, in *Fredriksson*, all of the plaintiffs were citizens and residents of Finland, all of the decedents were citizens and residents of Finland, none of the plaintiffs or decedents were citizens or residents of the United States, and the crash happened in the narrow strip of water between Estonia and Finland. *Fredriksson*, 2009 WL 2952225 at *5-6. What is, perhaps, most significant about *Fredriksson*, however, is something the Defendants somehow never mention—that the magistrate judge's Report and Recommendation, which the district court adopted, was later vacated by the Second Circuit Court of Appeals. *Fredriksson v. HR Textron, Inc.*, 484 F. App'x 610, 613 (2d Cir. 2012). In issuing its decision, the Second Circuit noted, in words that apply just as well to Boeing here: "We also observe that when an American defendant claims that a foreign forum is more convenient than a home forum, some suspicion of forum shopping must arise." *Id.* at 612-13 (page number omitted). Needless to say, virtually nothing about *Fredriksson* advances the Defendants' position.

In fact, of the 49 cases the Defendants have cited, 42 involved accidents that occurred in the specific foreign forum to which the defendants sought transfer.[68] In 37 of these, the wreckage, too, was located in the foreign forum.[69] Indeed, in *all* 49 cases, either (1) all of the decedents were citizens or residents of the foreign forum, (2) the accident occurred in the foreign forum, or (3) the wreckage was located in the foreign forum—all crucial "private interest" factors that are indisputably absent here. Not one of these 49 cases, therefore, is analogous here.

Even if the Defendants could show that some of the pieces of evidence they have listed—for example, the transcripts of the air traffic control communications, the video recordings of the pilots walking through the airport, the Boeing Airplane's maintenance manuals, Malaysia Airlines' business records, or the online ticket reservations [ECF 37-1, at 15-16]—are somehow relevant to the question of what happened to Flight MH370, the Defendants still cannot meet their "heavy burden" because many, if not all, of these documents are Malaysia Airlines' own documents,[70] because Malaysia Airlines has access to many of these documents (e.g., the maintenance manuals), because many of these documents are already available online and in English,[71] and because the Defendants fail to explain why all of these documents cannot be easily transported to the United States. *See DiRienzo v. Philip Servs. Corp.*, 294 F.3d 21, 30 (2d

---

[68] *Grodinsky*; *Fosen*; *Lumenta*; *In re Disaster at Riyadh Airport, Saudi Arabia; Jennings*; *Dahl*; *Navarrete*; *Nolan*; *Fortaner; Pettitt*; *Esheva*; *Tazoe*; *Baumgart*; *Kryvicky*; *Melgares*; *Vorbiev*; *Gschwind*; *Magnin*; *Van Schijndel*; *Can*; *Helog*; *In re Air Crash Disaster Over Makassar Strait, Sulawesi*; *Lueck*; *Martino*; *Onita-Olojo*; *Pierre-Louis*; *Lleras; Da Rocha*; *Piper*; *Satz*; *Ahmed*; *Zermeno*; *In re Air Crash Over Taiwan Straits on May 25, 2002*; *In re Air Crash Near Athens, Greece on Aug. 14, 2005*; *Zipfel; Pain*; *Harp v. Airblue Ltd.*, 879 F. Supp. 2d 1069 (C.D. Cal. 2012); *Cheng v. Boeing Co.*, 708 F.2d 1406 (9th Cir. 1983); *Kern v. Jeppesen Sanderson, Inc.*, 867 F. Supp. 525 (S.D. Tex. 1994); *King v. Cessna Aircraft Co.*, 562 F.3d 1374 (11th Cir. 2009); *De Aguilar v. Boeing Co.*, 11 F.3d 55 (5th Cir. 1993); *Miskow v. Boeing Co.*, 664 F.2d 205 (9th Cir. 1981).

[69] *Grodinsky*; *Fosen*; *Lumenta*; *In re Disaster at Riyadh Airport, Saudi Arabia; Jennings; Dahl*; *Navarrete*; *Gambra*; *Clerides*; *Fortaner*; *Pettitt*; *Esheva*; *Tazoe*; *Baumgart*; *Kryvicky*; *Harp*; *Melgares; Vorbiev*; *Gschwind*; *Magnin*; *Van Schijndel*; *Can*; *Lueck*; *Martino*; *Onita-Olojo*; *Cheng*; *Satz*; *In re Air Crash Over Mid-Atl. on June 1, 2009*; *Lleras*; *Da Rocha*; *Kern*; *In re Air Crash Over Taiwan Straits on May 25, 2002*; *In re Air Crash Near Athens, Greece on Aug. 14, 2005*; *Zipfel*; *Pain*; *Zermeno*.

[70] *See Wood* Itinerary Receipt and Journey Details (**Ex. 8**); *Gaspard* Itinerary Receipt and Journey Details (**Ex. 9**).

[71] *See* MH370 OFFICIAL SITE, http://www.mh370.gov.my/index.php/en/media2/transcript/category/13-mh370-safety- investigation-public.

Cir. 2002) (noting that the defendants had failed to explain how transporting the documents (or copies of the documents) would be "oppressive" or "vexatious" and holding that, "absent an explanation, less weight should be accorded this factor"); *Gates Learjet Corp. v. Jensen*, 743 F.2d 1325, 1336 (9th Cir. 1984) (quoting *Manu*, 641 F.2d at 65) ("[T]he increased speed and ease of travel and communications … makes … no forum as inconvenient [today] as it was in 1947 when the Supreme Court decided *Gilbert*."); *Itoba Ltd. v. LEP Group PLC*, 930 F.Supp. 36, 44 (D. Conn. 1996) ("To the extent documents exist in England, advances in transportation and communication accord this issue less weight.").[72] In short, neither the fact that potential witnesses may live in Malaysia nor the possibility that some evidence may be found in Malaysia satisfies the Defendants' "heavy burden" here.

### d.  Compulsory Process

The Defendants raise two arguments in support of their position that this fifth "private interest" factor weighs in favor of dismissal. First, noting that Malaysia is not a signatory to the Hague Evidence Convention,[73] they point out that, if this case were to remain in the United States, any discovery with Malaysian entities will require the use of letters rogatory. [ECF 37-1, at 31]. Second, Boeing argues that litigation in the United States would prejudice its efforts to obtain evidence from Malaysia. [ECF 37-1, at 30-32]. Each of these arguments is unpersuasive and should be rejected.

As a preliminary matter, the Defendants make no effort to explain the "relevance" (as opposed to the mere existence) of any of the witnesses they list on pages 16-17 of their motion— a deficiency that renders the availability of letters rogatory perfectly satisfactory for purposes of

---

[72] In fact, the Plaintiffs have already transmitted all of the discovery they have received in Malaysia from their Malaysian counsel to their American counsel at the click of a button. **Ex.** ¶ 8.

[73] Convention on the Taking of Evidence Abroad in Civil or Commercial Matters, Mar. 18, 1970, 23 U.S.T. 2555, 847 U.N.T.S. 231.

this analysis.[74] Moreover, for all their speculation about the need to compel unavailable or recalcitrant witnesses, the Defendants have failed to name even a single witness who has demonstrated—or who is likely to demonstrate—an unwillingness to participate in discovery. The court should reject the Defendants' speculation out of hand.[75]

These deficiencies aside, the availability of letters rogatory, far from supporting the Defendants' position, is a factor that weighs strongly against *forum non conveniens* dismissal.[76] In either event, the Defendants' letters rogatory argument appears to turn logic on its side. After all, there are nine countries that may have probative evidence relating to this case: the United States (Boeing's liability and the *Wood* and *Gaspard* Plaintiffs' damages); Malaysia (Malaysia Airlines' liability); Japan, India, the Netherlands, and China (Plaintiffs' damages); France (the flaperon); the United Kingdom (the Inmarsat data); and Australia (multiple pieces of debris and Plaintiffs' damages). Of these, only Malaysia and Japan are <u>not</u> signatories to the Hague Evidence Convention.[77] In other words, a trial in any of the remaining seven countries— including the United States—would allow litigants in those countries to obtain relevant evidence from each of the other countries with a simple, and enforceable, Hague Convention Letter of

---

[74] *See Anglo Am. Ins. Grp., P.L.C. v. CalFed Inc.*, 940 F.Supp. 554, 564 (S.D.N.Y. 1996) (finding that the use of letters rogatory, although "more time-consuming than compelling witnesses subject to process under the Federal Rules of Civil Procedure in the United States, … does not reach the requisite level of oppressiveness or vexatiousness because the relevance of the many witnesses is indeterminate at this time").

[75] *See Duha v. Agrium, Inc.*, 448 F.3d 867, 877 (6th Cir. 2006) ("When no witness' unwillingness has been alleged or shown, a district court should not attach much weight to the compulsory process factor.").

[76] *See DiRienzo*, 294 F.3d at 30. ("Despite the preference for live testimony, we have recognized the availability of letters rogatory as relevant in deciding whether plaintiffs' chosen forum is inconvenient."); *Overseas Programming Cos., Ltd. v. Cinematographische Commerz–Anstalt*, 684 F.2d 232, 235 (2d Cir. 1982) (noting that "any difficulties ... regarding witnesses whose attendance the Court is unable to compel can most likely be resolved by the use of deposition testimony or letters rogatory"); *In re Livent, Inc. Sec. Litig.*, 78 F.Supp.2d 194, 211 (S.D.N.Y. 1999) ("Letters rogatory are available to obtain the depositions of non-party witnesses unwilling to come to New York to testify, and such depositions can be videotaped to preserve the ability of the trier of fact to weigh the credibility of the witnesses."); *Armco Inc., v. N. Atl. Ins. Co.*, 68 F.Supp.2d 330, 342 (S.D.N.Y. 1999) ("[T]he unavailability of witnesses [is] not a sufficiently weighty concern to require *forum non conveniens* dismissal because any testimony [that the defendant] needs from witnesses whose attendance cannot be compelled can be obtained, for example, through the use of letters rogatory.") (quotations omitted).

[77] For a list of signatories to the Hague Evidence Convention, see CONFÉRENCE DE LA HAYE, https://www.hcch.net/en/instruments/conventions/status-table/?cid=82.

Request. If, then, the Defendants are right that Hague Convention Letters are preferable to letters rogatory—something that is not at all clear—litigating these claims in the United States would facilitate, rather than frustrate, the collection of evidence from seven of the nine countries with potentially relevant information. If, by contrast, this case were litigated in Malaysia, the parties would need to resort to letters rogatory—a process the Defendants malign [ECF 37-1, at 31-32]—to obtain evidence from *every other country* in the world. In short, if the Defendants are correct that letters rogatory are less efficient, less reliable, and less convenient, Malaysia' refusal to accede to the Hague Evidence Convention would weigh against dismissal here.

Boeing's argument that litigation in the United States would prejudice its efforts to obtain competent evidence from Malaysia is, for similar reasons, misplaced. In the United States, it is true, Boeing—like everyone else—must resort to letters rogatory to obtain evidence from Malaysia. It is no less true, however, that, by litigating this case in the United States, Boeing would avail itself of the Hague Convention process with respect to any discovery it propounds on entities or individuals in any of the remaining countries—for instance, on Inmarsat for the SATCOM data;[78] on the Decedents' employers, physicians, academic institutions, or family members in the United States, the Netherlands, Australia, or India; on the French BEA for an analysis of the flaperon; or on the Australian team in possession of the other pieces of debris. By contrast, by litigating in Malaysia, Boeing—and everyone else—will have to resort to letters rogatory for any piece of evidence located outside Malaysia. In its motion, Boeing attempts to preempt this point by agreeing to produce any relevant evidence in its possession or control. [ECF 37-1, at 32]. But Boeing's concession ignores the fact that the Boeing 777 was designed and certified in the 1990s, that the Boeing Airplane was manufactured in 2002, and that, as such, there are likely dozens—if not hundreds—of former Boeing employees who may be in

---

[78] This presumes, of course, that Boeing does not already have access to the SATCOM data in the United States.

possession of relevant evidence and over whom Boeing can exercise no control.[79] Boeing's accession to provide discovery in its control, then, as the *West Caribbean* Court recognized, should carry little weight.

In sum, Malaysia's refusal to sign onto the Hague Evidence Convention—coupled with the availability of letters rogatory for American litigants seeking information from Malaysia— militate against dismissal in this case.

### e.  Enforceability of Judgments

The Defendants never even bother to address this sixth factor—an implicit concession, we presume, that this factor weighs heavily against *forum non conveniens* dismissal. The federal courts have held that the more convenient forum is often that forum in which a defendant's assets are located or the one to which the defendant has the most significant ties. *See, e.g.*, *Segal*, 89 F.3d at 47 ("[Defendant's] 'significant ties to New York' and her 'lack of contacts with Hong Kong' meant that a New York judgment would be more meaningful than a Hong Kong judgment."); *Allstate Life Ins. Co. v. Linter Grp. Ltd.*, 994 F.2d 996, 1001 (2d Cir. 1993) (noting that "any judgment … will have to be enforced in Australia, where all of the [defendant's] assets are located"). Boeing, of course, is an American company with all—or at least the great majority—of its assets in the United States. And, so far as the record in this case is concerned, all of Boeing's "significant ties" are in the United States. In any case, none are in Malaysia. Notably, Boeing's *a priori* agreement to pay any judgment does not lessen the impact of this

---

[79] *See, e.g.*, *In re W. Caribbean Crew Members*, 632 F.Supp.2d 1193, 1202 (S.D. Fla. 2009) ("*West Caribbean*") ("While this imbalance is addressed to a degree by Defendants' willingness to make their current employees available to testify in Colombia, Defendants cannot ensure that all of the critical liability evidence is in its possession or control given the lengthy history associated with the aircraft. For example, there surely will be former employees with knowledge of the construction and maintenance of the aircraft and the engine parts, … over whom Defendants will have no control. Accordingly, Plaintiffs are far more likely to be able to secure the appearance of all relevant liability witnesses if the case is heard in a United States court.").

factor. *See Hassanti v. Int'l Lease Fin. Corp.*, No. CV1102251MMMMAN, 2012 WL 12950285, at *14 (C.D. Cal. Aug. 3, 2012).[80] This factor weighs heavily against dismissal.

## II.    Any other factors

The doctrine of *forum non conveniens* was never intended to accommodate "reverse forum-shopping" by a defendant. *Pain*, 637 F.2d at 793–94. "It is a fact that defendants will generally seek to relegate actions to the forum in which they believe their exposure is minimized, and that forum is often outside of the U.S." *In re Air Crash Near Peixoto De Azeveda, Braz., on Sept. 29, 2006*, 574 F.Supp.2d 272, 279 (E.D.N.Y. 2008). Boeing is an American defendant with virtually no ties to Malaysia. Its request to litigate this case some 9,266 miles from where it is incorporated—some 8,033 miles from where its operations are centered—should be seen for what it plainly is: an unvarnished attempt to ship these 30 Plaintiffs and their families—none of whom are citizens or residents of Malaysia—to a country whose court system is operated by one of the Defendants' employers, to a legal regime that does not permit depositions, to a system of compensation that will drastically reduce the damages they would otherwise be eligible to receive in the United States. [**Ex. 1** ¶ 45–53]. This Court should not condone this blatant exercise in reverse forum-shopping.

The Defendants raise one final argument in their discussion of the "private interest factors"—that, as a result of Malaysia Airlines' "jurisdictional objections," "it is likely that the only defendant available in the United States is Boeing, and that the only avenue for Boeing to pursue contribution or indemnification would be by a separate action in another jurisdiction."

---

[80] That Malaysia Airlines has its assets in Malaysia does not alter this result for two reasons. First, as Malaysia Airlines has pointed out, MAS no longer owns any assets. **EX. 1** ¶ 32; [ECF 39-3, at 5 ¶ 16, 14 ¶ 61]. By definition, then, MAS has nothing by which it can be "tied" to Malaysia. As for MAB, Malaysia Airlines is adamant that it is simply not a successor to MAS' liabilities. Whatever the merits of this position, the point is this: If Malaysia Airlines is right—that is, if MAB is not the successor to MAS, and if, as a result, MAB bears no liability for the Plaintiffs' claims—then *ipso facto* its Malaysian assets are simply not relevant here.

[ECF 37-1, at 32-33]. But there are two problems with this argument. First, at least with respect to *Wood* and *Gaspard*, it assumes that Malaysia Airlines will prevail on either or both of its motions to dismiss—an assumption that, we submit, the Plaintiffs' Responses to those motions have called into serious doubt. [ECF 62 & 64]. Second, even if this factor did weigh in Boeing's favor, it is typically given lesser weight than other "private interest factors" and is not considered "determinative."[81] *Bos. Telecomms.*, 588 F.3d at 1211 ("Nevertheless, the fact that Wood may be unable to implead alleged joint tortfeasors in California is by no means determinative of the *forum non conveniens* inquiry[.]").

## III.    The Public Interest Factors

Because the Defendants have failed to carry their "heavy burden" of proving that the "private interest factors" favor Malaysia as a more convenient forum, the Court need not weigh the "public interest factors" at all.[82] Even if this Court were to analyze these factors, however, they weigh against dismissal here. The "public interest factors" include: "(1) the local interest in the lawsuit, (2) the court's familiarity with the governing law, (3) the burden on local courts and juries, (4) congestion in the court, and (5) the costs of resolving a dispute unrelated to a particular forum." *Carijano*, 643 F.3d at 1232.

### a.    Interest in the Lawsuit and the Costs of Resolving a Dispute Unrelated to the Forum

---

[81] The Defendants also bemoan the possibility that allowing these cases to proceed in the United States will, given the simultaneous proceedings in Malaysia, result in "inconsistent verdicts." [ECF 37-1, at 33]. To begin with, this argument is premised on nothing more than speculation about what the outcomes in each case will be. In any event, if the Defendants' motions are denied (and barring an appeal), the *Wood* and *Gaspard* Plaintiffs hereby commit to dismiss their cases in Malaysia—thereby significantly reducing the possibility of inconsistent verdicts.

[82] *Ingram v. Eli Lilly & Co.*, 251 F.Supp.2d 1, 3 (D.D.C. 2003) ("Because the Court has concluded that the private interest factors do not support the transfer of this action, it is not required to weigh the public interest factors."); *Sheffer v. Novartis Pharm. Corp.*, 873 F.Supp.2d 371, 379 (D.D.C. 2012) ("Therefore, the balance of private-interest factors must be unclear … before these public-interest factors would be given decisive weight.").

"The domiciliary state has the *strongest* interest in providing prompt and adequate compensation of a decedent's survivors." *Chhawcharia*, 657 F.Supp. at 1162 (emphasis added). The United States, therefore, has a significant interest in the outcome of this litigation—an interest the Defendants all but dismiss out of hand—because five of the Plaintiffs are American citizens or residents and because one of the Decedents (Wood) was an American "domiciliary." *Id.* ("India … has a strong interest in assessing damages since plaintiff and her two minor children are all citizens there."); *see also Sheffer*, 873 F.Supp.2d at 381 ("Each state has an interest in redressing the harms of its citizens.") (quotations omitted).

This significant American interest in this litigation is strengthened by the Plaintiffs' allegations that an American manufacturer designed or manufactured a defective product, which resulted in injury or death to hundreds of innocent people.[83] And, because the Plaintiffs' claims against Boeing are centered around Boeing's design and manufacture of the Boeing Airplane in the United States, this close interrelationship between the American "locus of the alleged culpable conduct" and the American forum weighs against dismissal. *See, e.g. Lacey*, 862 F.2d at 48 ("In evaluating the public interest factors the district court must 'consider the locus of the alleged culpable conduct, often a disputed issue, and the connection of that conduct to plaintiff's chosen forum.'" (quoting *Biard*, U.S. at 529)).[84]

The Defendants offer eight arguments in support of their position that Malaysia has a

---

[83] *Cf. Carlenstolpe v. Merck & Co., Inc.*, 819 F.2d 33, 35 (2d Cir. 1987) (There is a "public interest in having a United States court decide issues concerning possibly tortious conduct in this country."); *Lacey*, 862 F.2d at 48 (The United States has an "interest in deterring the manufacture of unsafe products within its borders."); *West Caribbean*, 632 F.Supp.2d at 1204 ("[T]he United States generally has a strong interest in assuring that United States manufacturers and airlines do not produce defective products or engage in conduct that endangers users wherever located."); *Gambra*, 377 F.Supp.2d at 825 ("The United States has an interest in ensuring that products produced by United States companies in the United States are safe."); *Ming v. Cordis Corp.*, 704 F.Supp. 217, 219 (S.D. Fla. 1989) ("Here, as the site of the pacemaker's manufacture, development and testing occurred in Florida, this forum certainly has a significant interest in the outcome of the litigation.").

[84] Because of the presence of American plaintiffs, an American decedent, an American manufacturer, and operative allegations that the American manufacturer designed or manufactured a defective product in the United States, this "dispute" is not "unrelated to [the] forum." *Carijano*, 643 F.3d at 1232. As such, the Defendants cannot meet their "heavy burden" under the fifth "public interest factor."

more significant interest in this litigation than the United States. Before addressing these arguments, however, we point out that the Defendants cite no case to support the convenient comparison they have drawn between the interests of isolated American cities and Malaysia as a whole. [ECF 37-1, at 38-39]. The Plaintiffs, too, would prefer to compare the interests of the United States as a whole to the local interest of, say, Kota Kinabalu, but the weight of applicable *forum non conveniens* decisions strongly suggests that we should not do so. *See Piper*, 454 U.S. at 242 ("Although evidence concerning the design, manufacture, and testing of the plane and propeller is located *in the United States*, the connections with *Scotland* are otherwise overwhelming.") (emphasis added); *Dahl*, 632 F.2d at 1033 ("Thus, *Norway's* interest in the case is equal if not superior to the *United States'* and the national interest factor does not shift the balance in favor of Delaware as the forum.") (emphasis added).

The Defendants' first argument is that Malaysia has an interest in the litigation because the controversy arose in Malaysia. [ECF 37-1, at 25]. In support, they cite three cases. *See Pain*, 637 F.2d at 791; *MGI Grp., v. Credit Foncier du Cameroun*, 558 F.Supp.2d 21, 34-35 (D.D.C. 2008); and *Irwin v. World Wildlife Fund, Inc.*, 448 F.Supp.2d 29, 36 (D.D.C. 2006). But each of these cases involved injuries or deaths that actually occurred in the foreign forum. The plane in *Pain*, for instance, actually crashed in the waters off the Norwegian coast, and the wreckage was brought back to Norway. *Pain*, 637 F.2d at 779. The allegedly corrupt officials in *MGI* were all Cameroonian, and all of the allegedly corrupt acts occurred in Cameroon. *MGI Grp.*, 448 F.Supp.2d at 22, 36. And the plaintiff in *Irwin* brought suit in Gabon under Gabonese law for allegedly negligent conduct that took place in Gabon, which caused him injuries in Gabon. *Irwin*, 448 F.Supp.2d at 31. Here, by contrast, not one of the Decedents was killed in Malaysia, none of the Plaintiffs' claims arise out of Malaysian law, and there is, as of this writing, no evidence that

any accident occurred in Malaysia. To the contrary, Flight MH370 disappeared thousands of miles from Malaysia, and its wreckage has never been found.

Second, the Defendants note that the Boeing Airplane was "operated by Malaysia's national airline, during a flight originating from Kuala Lumpur, Malaysia, over the high seas on an aircraft registered under the Laws of Malaysia, and carrying 38 Malaysian citizens." [ECF 37-1, at 26]. This is, of course, true, though it ignores three extremely salient facts: One, 28 of the 30 Plaintiffs here have sued only Boeing, not Malaysia Airlines, and Boeing is unquestionably the flagship manufacturer of American airplanes and their component parts.[85] Two, an American citizen also died onboard Flight MH370. Thus, while Malaysia may have an interest in adjudicating claims arising from the deaths of its citizens against its national airline, the United States has no less compelling an interest in adjudicating claims arising from its citizen's death against its flagship airplane manufacturer. Finally, while 38 Malaysian citizens died on the flight, not one of those decedents is represented here. In fact, none of the Plaintiffs or Decedents here has any meaningful relationship to Malaysia that might trigger a significant Malaysian interest in the outcome of their claims.

Third, Malaysia airlines says that "[Flight MH370] was the worst accident in Malaysian aviation history." [ECF 37-1, at 26]. Without for a moment minimizing the scale of the damages from Flight MH370, this statement is false. Flight MH17, which killed 298 people, was the worst aviation accident in Malaysian history. Either way, the Defendants cite no case for the proposition that the relative gravity of this accident versus some other accident should have any bearing on the *forum non conveniens* analysis.

---

[85] Boeing's own website proudly promotes that it is "America's biggest manufacturing exporter," employing 140,000 Americans across all 50 states. Boeing also boasts that, "[i]n 2015 alone, Boeing paid nearly $50 billion to more than 13,600 businesses, supporting an additional 1.5 million supplier-related jobs in the United States." BOEING, *Boeing in Brief*, BOEING, http://www.boeing.com/company/general-info/index.page#/overview.

Fourth, the Defendants say that "MAS is governed by the Malaysian regulators, the aircraft was inspected and certified by Malaysian regulators and the MAS aircrews were Malaysian citizens who received certification and pilot training in Malaysia. Additionally, Malaysia's civil aviation authority was charged with the official investigation of the Accident and Malaysian police conducted their own independent investigation of the Accident. The safety of flights originating from Malaysia is also a major concern for the Malaysian people." *Id*. But all of these factors apply equally to Boeing: It is "governed by [U.S.] regulators"; "the aircraft was inspected and certified by [U.S.] regulators"; the men and women who designed and built the aircraft received their "certification" and "training" in the United States; the American NTSB (not to mention Boeing itself) participated in that "official investigation"); the FBI likewise participated in that investigation; and the "safety of flights [on Boeing airplanes] is also a major concern for the [American] people."

Fifth, the Defendants note that the "Malaysian press has reported extensively on the accident, the investigation, the search for the aircraft, and the litigation pending in Malaysia." [*Id*.] This is no less true of the American press.[86] Sixth, noting that the Malaysian police participated in a criminal probe and that Malaysian regulators launched a civil investigation, the Defendants say that "[t]he initiatives taken by the Malaysian government underscore Malaysia's compelling interest in this controversy." [ECF 37-1, at 27]. But, as we have noted, the American NTSB, Boeing, and the FBI—in addition to the investigative agencies of at least six other countries—also participated in these investigations. The Defendants do not explain why the Malaysian investigations should receive any more credence than, say, the Australian or

---

[86] *See, e.g.*, Adam K. Raymond, *CNN's 9 Most Deplorable Malaysia Airlines Flight 370 Moments*, DAILY INTELLIGENCER (Apr. 15, 2014) ("CNN's coverage of Malaysia Airlines Flight 370 has reached such astounding stupidity in the past five weeks …. CNN's ratings are through the roof[.]"); *accord* Bill Carter, *CNN's Ratings Surge Covering the Mystery of the Missing Airliner*, NY TIMES (Mar. 17, 2014).

American probes—particularly where, as mentioned, it was the FBI (and not the Malaysian investigators) who uncovered that Mr. Shah pilot had, before his death, simulated Flight MH370's doomed route on his home computer.[87]

Seventh, the Defendants quote a Malaysian official's statement that "[t]he Government[] of Malaysia … ha[s] spared no expense and resources in the search for MH370." [ECF 37-1, at 27]. But President Barack Obama said exactly the same thing about the American search efforts: "On Wednesday, US President Barack Obama said 'we have put every resource that we have available at the disposal of the search process.'"[88] And there is reason to believe President Obama's resolve over the Malaysian government's. After all, while Malaysia "scaled back" its search efforts just four days after the accident—and then ceded control over the search area 19 days after that[89]—the United States continued looking for the plane for _almost three more years_, spending millions of taxpayer dollars in the process.[90]

Eighth, the Defendants contend that, under the "act of state" doctrine, the United States should not be opining on the acts of foreign governments. [ECF 37-1, at 30]. As we explain in our Response to Malaysia Airlines' Motion to Dismiss under the FSIA, however, the "act of state doctrine" is inapplicable here. [ECF 64 § III]. In any case, if the doctrine did apply, it would bar this Court from passing on the validity of Act 765—thereby mooting the Defendants' concerns.[91]

Malaysia has a compelling interest in the outcome of this case, to be sure, but so too does the United states. Because the Defendants bear the "heavy burden" of establishing that the

---

[87] Wise, _supra_ n.20; Almasy, _supra_ n.20.

[88] BBC NEWS, _White House Says FBI "Aiding MH370 Investigation,"_ BBC NEWS (Mar. 19, 2014), http://www.bbc.com/news/world-us-canada-26649690.

[89] _See_ ATSB, _supra_ n.8.

[90] _See_ Westbrook, _supra_ n.9; Jim Miklaszewski, _Malaysian Jet Search Has Cost U.S. $11.4 Million_ (Apr. 24, 2014) http://www.nbcnews.com/storyline/missing-jet/malaysian-jet-search-has-cost-u-s-11-4-million-n88781.

[91] _See United States v. One Gulfstream G-V Jet Aircraft_, 941 F.Supp.2d 1, 11 (D.D.C. 2013) ("The act of state doctrine precludes domestic courts from inquiring into the validity of the public acts that a recognized foreign sovereign power committed within its own territory.").

"balance of … public interest factors favors dismissal," *Carijano*, 643 F.3d at 1224 & 1227, the relative equivalency in the countries' interests militates against the Defendants' motion.

### b. Court's Familiarity with the Governing Law

This factor weighs heavily against dismissal. All 30 of the Plaintiffs here have sued Boeing. All of those complaints allege that Boeing engaged in various violations of Illinois and Washington law when it designed and manufactured a defective product in the United States. None of the liability aspects of those Boeing cases, then, will require any reference to, or interpretation of, foreign law. The *Wood* and *Gaspard* complaints against Malaysia Airlines will likewise require no reference to foreign law—at least so far as liability is concerned—precisely because, if Malaysia Airlines' position in Australia is any indication, these will be damages-only trials under Article 21 of the Montreal Convention. Even if Malaysia Airlines did allege that Boeing was "solely" responsible for the accident, as mentioned, that third-party claim would arise out of the laws of Washington or Illinois and would allege no more than what the Plaintiffs have already averred—that Boeing violated Illinois or Washington law when it designed and manufactured a defective product. This Court—and the trial courts in Washington and Illinois— will be, it goes without saying, far better positioned to interpret Illinois or Washington law than any court in Kuala Lumpur.

On the question of damages, the *Wood* claim will require this Court to interpret and apply the law of this Circuit. *See Dammarell v. Islamic Republic of Iran*, No. CIV.A. 01-2224JDB, 2005 WL 756090, at *19 (D.D.C. Mar. 29, 2005) (citing *In re Aircrash Disaster Near Roselawn, Ind. on Oct. 31, 1994*, 948 F.Supp. 747, 758 (N.D. Ill. 1996) (applying the law of an air crash

decedent's domicile to the plaintiff's damages claim).[92] And, while the courts adjudicating the Plaintiffs' Boeing complaints in Washington and Illinois may well apply foreign damages law to the claims that the foreign Plaintiffs have brought on behalf of foreign Decedents, none of that foreign law will be Malaysian law because none of the Decedents here were Malaysian.[93] [*Id.*]. In any case, "the need to apply foreign law is not in itself a reason to apply the doctrine of *forum non conveniens*." *Manu*, 641 F.2d at 67 (quotations omitted); *accord id*. at 67-68 ("[Courts] must guard against an excessive reluctance to undertake the task of deciding foreign law, a chore federal courts must often perform."); *Piper*, 454 U.S. at 245 (1981) ("[T]he mere fact that the court is called upon to determine and apply foreign law does not present a legal problem of the sort which would justify the dismissal of a case otherwise properly before the court.") (quotations omitted); *Lehman v. Humphrey Cayman, Ltd.*, 713 F.2d 339, 345 (8th Cir. 1983) ("[T]he fact that a federal court may be required to apply foreign law is not dispositive on the *forum non conveniens* issue. Federal courts are quite capable of applying foreign law when required to do so[.]").

But, however much American courts will have to grapple with foreign law, Malaysian courts would need to do the same—the only difference being that Malaysian courts will have no precedent to guide them in the complicated choice-of-law issues in which this litigation, if it does

---

[92] The question is admittedly more complicated in the *Gaspard* matter. While Rui Wang earned all of the money that sustained the *Gaspard* Decedents in the United States, the *Gaspard* Decedents were all citizens of China. Either way, the analysis will focus only on American or Chinese law—not Malaysian.

[93] The Defendants cite to *Piper*, *Fredriksson*, and *Satz* for their position that Malaysian law will apply to the Plaintiffs' claims. [ECF 47-1, at 42-43]. But in each of these cases, all—or the vast majority—of the Decedents were citizens and residents of the foreign forum to which the defendant sought transfer. Given the choice of law rules applying the damages regime of the decedents' domicile, this factor weighed heavily in favor of dismissal. Here, by contrast, none of the Decedents were Malaysian and, as such, Malaysian damages law will not apply. In any event, Malaysian law is derived from English common law and thus appeals to legal concepts that are familiar to American courts. [ECF 37-12, at 43-45]. Given these similarities between the two legal regimes, an American court would not be overly burdened by the need to apply Malaysian law. *See, e.g.*, *Ericson v. Wyndham Worldwide Corp.*, No. 12-20103-civ-Cooke, 2014 WL 11822749, at *6 (S.D. Fla. Feb. 28, 2014) ("[T]he application of Bahamian law would pose little problem given the similarities between Bahamian and United States law, as both are derived from English common law.").

end up in Malaysia, will inevitably become embroiled. **Ex. 1** ¶ 41–43. Indeed, perhaps the most important thing that can be said about this penultimate "public interest factor" is that, at the very least, American courts have access to a rich common law of judicial experience in international aviation accident cases—a common law that will at once guide the courts' decision-making and, at the same time, give the parties a certain needed transparency with respect to ultimate outcomes. The Malaysian court system, by contrast, has never handled an international aviation accident under the Montreal Convention. *Id*. As a result, Malaysian lawyers and judges alike will be forced, so to speak, to reinvent a wheel American courts have been turning for decades.[94] To the extent that the relevant "public interest factor" is "familiarity with governing law," *Carijano*, 643 F.3d at 1232, this significant disparity in the relative experiences of the two court systems in adjudicating claims of this magnitude should militate heavily against dismissal.

### c.   Burden on Local Courts and Juries; Congestion in the Court

This final public interest factor likewise weighs against dismissal. As a preliminary matter, all of the cases arising from Flight MH370 have been "consolidated … for the convenience of parties and witnesses and [to] promote the just and efficient conduct of such actions." 28 U.S.C. § 1407. The Joint Panel on Multidistrict Litigation transferred these MH370 cases to this Court, in part, after the Plaintiffs presented evidence that (1) "Judge Brown Jackson's three [previous] MDL cases were resolved, on average, within twelve months of filing—a fact that compares favorably with" other courts; and (2) "Judge Brown Jackson … has a far more available caseload than Judge Leinenweber [the judge to whom the Defendants sought transfer] does. In fact, over the previous three years, Judge Leinenweber has had 771 cases filed

---

[94] *Id.* at ¶ 41 ("Unlike the courts of the United States, the Malaysian courts will have to deal with all issues of law and fact with regard to liability and damages, whether under the Montreal Convention or otherwise, in the MH370 litigation for the very first time. All arguments and submissions put forward by counsel for all the parties to that litigation will, by definition, be novel and untested.").

in his courtroom, compared with just 316 in Judge Brown Jackson's." [MDL No. 2712, ECF 20, at 19-20]. The Defendants make no effort to show that the Plaintiffs were wrong on these points. Instead, they make several conclusory statements to the effect that these MH370 cases will only serve to congest the American court system, [ECF 37-1, at 41], though they provide absolutely no evidence in support of those assertions. *See Aerolineas Argentinas S.A. v. U.S. Dep't of Transp.*, 415 F.3d 1, 4 (D.C. Cir. 2005) ("Aerolineas' first 'argument' is really a conclusion, for which it offers no support whatsoever. We reject it in kind.").

Moreover, to the extent that the *Wood* and *Gaspard* cases will become damages-only trials, discovery and trial in those cases will be extremely circumscribed.[95] In addition, any claims against Boeing would be just the sort of multi-party product liability cases that American judges and juries have been presiding over for decades. *See McCafferty*, 2004 WL 1858080 at *3 ("[Product liability claims] are the type of controversy regularly decided in federal courts of the United States."). The Malaysian court system, by contrast, has never dealt with a case of this kind (**Ex. 1** ¶ 41-43)—a reality that strongly suggests the process would be far more burdensome on the Malaysian court system (and on Malaysian litigators) than it would be on the American.[96]

## Conclusion

For the foregoing reasons, the Plaintiffs respectfully request that the Court deny the Defendants' motion to dismiss under the doctrine of *forum non conveniens*.

---

[95] The Defendants cite *Gulf Oil* for the proposition that the "public interest factors" should be balanced so as to avoid "imposing jury duty on citizens in a community which has no relation to the litigation[.]" [ECF 37-1, at 25]. But, to the extent that this is a relevant consideration, it is inapplicable to the *Wood* and *Gaspard* cases, which, under the FSIA, will proceed as non-jury trials. 28 U.S.C. § 1330(a); *see also Aboeid v. Saudi Arabian Airlines, Inc.*, No. CV-10-2518, 2011 WL 2222140, at *3 (E.D.N.Y. June 1, 2011).

[96] *Id*. at 13 ("To my knowledge, no legal proceedings have ever been instituted in the Courts of Malaysia arising from the loss of a commercial airliner until the spate of suits filed after the MH370 disappearance."); *id*. at 14 ("There are accordingly no Malaysian lawyers with experience in aviation accidents[.]").

45

Dated:  July 21, 2017

Respectfully Submitted,
PODHURST ORSECK, P.A
 _/s/   Roy K. Altman_
Steven C. Marks, Esq.
DC Bar No.: FL0004
FL Bar No. 516414
smarks@podhurst.com
Roy K. Altman, Esq.
FL Bar No. 116885
raltman@podhurst.com
One SE 3rd Avenue, 2700
Miami, FL 33131
(305) 358-2800

WISNER LAW FIRM
Floyd Wisner
fwisner@wisner-law.com
Alexandra Wisner
awisner@wisner-law.com
514 W. State Street, Suite 200
Geneva, Illinois 60134
*Counsel for Plaintiffs*

## <u>CERTIFICATE OF SERVICE</u>

The undersigned certifies that, on July 21, 2017, pursuant to Fed. R. Civ. P. 5 and LCvR5.3, a true and correct copy of the foregoing PLAINTIFFS' RESPONSE TO THE DEFENDANTS' MOTION TO DISMISS UNDER THE DOCTRINE OF *FORUM NON CONVENIENS* was filed with the Clerk of Court using the CM/ECF System, which will send notification of such filing to the attorneys of record at the e-mail addresses on file with the Court.

*/s/  Roy K. Altman*
Roy K. Altman