# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| IN RE: AIR CRASH OVER THE SOUTHERN INDIAN OCEAN ON MARCH 8, 2014 | |
| This Document Relates To:<br>1:16-cv-00053-KBJ,<br>*Wood v. Malaysia Airlines Berhad;*<br>1:16-cv-00419-KBJ,<br>*Gaspard v. Malaysia Airlines Berhad;*<br>1:16-cv-00439-KBJ,<br>*Smith v. Malaysia Airlines Berhad;*<br>1:16-cv-01048-KBJ,<br>*Zhang v. Malaysia Airlines Berhad;*<br>1:16-cv-01062-KBJ,<br>*Kanan. v. Malaysia Airlines System Berhad;*<br>1:16-cv-01063-KBJ,<br>*Huang v. Malaysia Airlines Berhad.* | MDL Docket No:  2712<br><br><br>Misc. No. 16-1184 (KBJ) |

**DEFENDANT MALAYSIAN AIRLINE SYSTEM BERHAD (ADMINISTRATOR APPOINTED)'S REPLY IN SUPPORT OF ITS RULE 12(b)(1) MOTION TO DISMISS PLAINTIFFS' COMPLAINTS ON THE GROUND OF LACK OF SUBJECT MATTER JURISDICTION PURSUANT TO THE MONTREAL CONVENTION**

# TABLE OF CONTENTS

TABLE OF AUTHORITIES .......................................................................... iv

INTRODUCTION .......................................................................................1

ARGUMENT ..............................................................................................3

I.     Standard of Review...............................................................................3

II.    The Montreal Convention, as an International Treaty, Has Mandatory Interpretation Rules:  "Rules Of The Road" ........................................4

III.   The Wood Plaintiff Cannot Establish Art. 33.2 Subject Matter Jurisdiction Because the Decedent Philip Wood Had <u>No</u> Residence in the United States – Principal, Permanent, or Otherwise ....................................................5

     A.    The Wood Plaintiff Concedes that the Decedent Philip Wood Had No Actual Residence in the United States on the Date of the Accident ......................6

     B.    Grammar Requires Modifiers to Restrict the Scope of a Noun Rather than Give It Another Noun's Meaning ..........................................................7

          1.    Surplussage and Restriction ......................................................8

          2.    Syntax before Semantics ...........................................................10

     C.    The Application of Governing Treaty Interpretation Rules Here to the Terms "Residence" and "Abode" Confirms that MAS's Application of Art. 33.2 Is Correct ..................................................................12

          1.    Application of Clear Ordinary Language Meanings.................................12

          2.    The Wood Plaintiff's Resort to "Domicile" Imports Confusing Legal Meanings......................................................................14

          3.    Practical Considerations Mandate Rejection of the Wood Plaintiff's Addition of the Word "Domicile" to Art. 33.2 of the Convention ....................................................................15

          4.    Application of Mandatory Treaty Interpretation Rules Leads to the Conclusion that Plaintiff Wood Cannot Establish Art. 33.2 Subject Matter Jurisdiction ...............................................................16

IV.   Decedent Philip Wood's "Floating Intention" to "Return to the U.S. Someday" Does Not Establish a U.S. Domicile ....................................................17

A. The "Floating Intention" Rule .............................................................................17

B. The Wood Plaintiff's Proffered Evidence of "Floating Intention"......................19

V. Malaysia Is MAS's Place of Business Through Which the Contracts of Carriage Were Made with Philip Wood and the Gaspard Decedents.................................................22

A. A Computer Server Was Not MAS's Place of Business *Through Which* the Contracts Were Made ......................................................................................24

1. Irrelevance of Server Location....................................................................24

2. No Admissible Evidence Regarding Purported Servers ...........................26

B. The Alleged Automated Nature of the Booking Transactions Alters Neither The Requirement for MAS to Accept the Booking nor MAS's Place of Business ...................................................................................................27

1. The Alleged Automated Nature of the Booking Transactions Does Not Alter the Requirement for MAS to Accept a Booking Request to Make the Contract of Carriage .............................................................27

2. The Use of Computerized Communication Does Not Change the Fact that Malaysia is the Location of MAS's "Place of Business Through Which The Contract Was Made" ...............................................30

C. A Travel Agent's Place of Business in the United States Is Not MAS's Place of Business through Which the Contract Has Been Made .........................32

VI. The Remaining Plaintiffs Fail to Articulate a Basis for Jurisdiction Under Article 33 of the Montreal Convention .........................................................................................35

CONCLUSION..................................................................................................................35

# TABLE OF AUTHORITIES

**Cases**

*Abbott v. Abbott*, 560 U.S. 1 (2010)...................................................................................... 4

*Air France v. Saks*, 470 U.S. 392 (1985).............................................................................. 4

*Alaska v. United States*, 545 U.S. 75 (2005)......................................................................... 4

*Amberson Holdings, LLC v. Westside Story Newspapers*,
   110 F.Supp.2d 332 (D.N.J. 2000) ..................................................................................... 25

*Aponte–Dávila v. Municipality of Caguas*, 828 F.3d 40 (1st Cir. 2016) ............................... 14, 19

*Barnhart v. Thomas*, 540 U.S. 20 (2003)............................................................................ 10

*Boyar v. Korean Air Lines*, 664 F. Supp. 1481 (D.D.C. 1987)...................................... 32

*Brink's Limited v. South African Airways*, 93 F.3d 1022 (2d Cir. 1996)........................ 2

*Carefirst of Maryland, Inc. v. Carefirst Pregnancy Centers, Inc.*,
   334 F.3d 390 (4th Cir. 2003) ............................................................................................. 25

*Chan v. Korean Air Lines, Ltd.*, 490 U.S. 122 (1989) ........................................... *passim*

*Choi*, 2015 WL 394198............................................................................................. 16, 22

*Cornejo v. Cty. Of San Diego*, 504 F.3d 853 (9th Cir. 2007) ........................................ 5

*Dep't of Hous. & Urban Dev. v. Rucker*, 535 U.S. 125 (2002) ......................... 8, 10, 11

*Eck v. United Arab Airlines*, 360 F.2d 804 (2d Cir. 1966) .................................... 32, 33

*Eck v. United Arab Airlines, S.A.A.*, 241 F. Supp. 804 (S.D.N.Y. 1965) ..................... 33

*El Al Israel Airlines v. Tseng*, 525 U.S. 155 (1999) ..................................................... 4

*Fireclean LLC v. Tuohy*, No. 16-cv-294, 2016 WL 4414845 (E.D. Va. June 14, 2016)............. 25

*Fontaine v. Bank of America, N.A.*, 43 F. Supp. 3d 1 (D.D.C. 2014)............................ 3

*Garcia Perez v. Santaella*, 364 F.3d 348 (1st Cir. 2004)............................................ 18

*Herbert v. National Academy of Sciences*, 974 F.2d 192 (D.C. Cir. 1992) ................... 3

*Hornsby v. Lufthansa German Airlines*, 593 F. Supp. 2d 1132 (C.D. Cal. 2009) ......... 6, 7, 10, 17

*In Re Air Crash Over the Mid-Atlantic on June 1, 2009,*
    760 F. Supp. 2d 832 (N.D. Cal. 2010) ........................................................ 6, 17

*In Re Air Disaster Near Cove Neck, N.Y. on Jan. 25, 1990,*
    774 F. Supp. 718 (E.D.N.Y. 1991) .............................................................. 15

*In re Fin. Mgmt. Scis., Inc.*, 261 B.R. 150 (Bankr. W.D. Pa. 2001) ............................................ 14

*In re Marriage of Robinson*, 159 Wash. App. 162, 248 P.3d 532 (2010) ................................... 14

*Inhabitants of Warren v. Inhabitants of Thomaston*, 43 Me. 406 (1857) ................................... 14

*J. McIntyre Machinery Ltd. v. Nicastro*, 564 U.S. 873 (2011) .................................................... 16

*Joe Buck Coker*, 67 T.C.M. 2515 (1994) .................................................................................... 22

*Johnson v. United States*, 529 U.S. 694 (2000) .......................................................................... 12

*Klos v. Polskie Linie Lotnicze*, 133 F.3d 164 (2d Cir. 1997) ...................................................... 16

*Lisi v. Alitalia-Linee Aeree Italiane, S. p. A.*, 370 F.2d 508 (2d Cir. 1966) ............................... 33

*Lockheed Martin Corp. v. United States*, 35 F. Supp. 3d 92 (D.D.C. 2014) ............................... 12

*Luckett v. Bure*, 290 F.3d 493 (2d Cir. 2002) ............................................................................... 2

*Makarova v. United States*, 201 F.3d 110 (2d Cir. 2000) .............................................................. 2

*Michigan v. Little River Band of Ottawa Indians*, No. 5:05-CV-95,
    2007 WL 1238907 (W.D. Mich. Apr. 27, 2007) ............................................ 10

*Mutual Life Ins. Co. v. Hillmon*, 145 U.S. 285 (1892) ................................................................ 18

*Olympic Airways v. Husain*, 540 U.S. 644 (2004) ......................................................................... 4

*Rucker v. Davis*, 203 F.3d 627 (9th Cir. 2000) ........................................................................... 11

*Rucker v. Davis*, 237 F.3d 1113 (9th Cir. 2001) ......................................................................... 11

*Rucker v. Davis*, No. C 98-00781 CRB, 1998 WL 345403 (N.D. Cal. June 19, 1998) ............... 11

*Schill v. Cincinnati Ins. Co.*, 2014-Ohio-4527, 141 Ohio St. 3d 382, 24 N.E.3d 1138 ............... 19

*Seales v. Panamanian Aviation Co., Ltd.*, No. 07-cv-2901,
    2009 WL 395821 (E.D.N.Y. Feb. 18, 2009) ................................................. 17

*Shinn v. Heath*, 259 Ark. 577, 535 S.W.2d 57 (1976) ................................................................ 14

*Silverman v. Silverman*, 338 F.3d 886 (8th Cir. 2003) ............................................................... 14

*Solis v. Summit Contractors, Inc.*, 558 F.3d 815 (8th Cir. 2009) .................................................. 10

*Succo v. First Reliance Standard Life Ins. Co.*, 16 F. App'x. 53 (2d Cir. 2001) ......................... 13

*Sumitomo Shoji Am., Inc. v. Avagliano*, 457 U.S. 176 (1982) ......................................................... 8

*Swaminathan v. Swiss Air Transport Co., Ltd.*, 962 F.2d 387 (5th Cir. 1992) ............................ 16

*United States v. DiMaria*, 727 F.2d 265 (2d Cir. 1984) ................................................................ 18

*United States v. Louisiana*, 394 U.S. 11 ........................................................................................ 5

*Zaletel v. Prisma Labs, Inc.*, 226 F. Supp. 3d 599 (2016) ............................................................ 25

**Statutes**

26 U.S.C. § 864(c)(5)(A) ............................................................................................................... 34

26 U.S.C. §§ 877 & 877A .............................................................................................................. 22

26 U.S.C. § 6012(a)(1)(A) ............................................................................................................. 22

28 U.S.C. § 1332 ............................................................................................................................ 14

42 U.S.C. § 1437(d)(1)(5) .............................................................................................................. 11

**Rules**

Fed. R. Civ. P. 5 .............................................................................................................................. 1

Fed. R. Evid. 602 ........................................................................................................................... 18

Fed. R. Evid. 703 ........................................................................................................................... 18

Fed. R. Evid. 803 ........................................................................................................................... 18

Fed. R. Evid. 803(3) ...................................................................................................................... 18

Federal Rule of Civil Procedure 37(c)(1) ....................................................................................... 7

**Regulations**

Treas. Reg. 1.1-1(b) ...................................................................................................................... 22

**Other Authorities**

William Frawley, Linguistic Semantics 79 (2013) ......................................................................... 9

International Carriage by Air, May 28, 1999 (entered into force on Nov. 4, 2003), reprinted in S. Treaty Doc. 106-45, 1999 WL 33292734 .................................................... 1

Arthur R. Miller, 13E Fed. Prac. & Proc. Juris., Jurisdiction & Related Matters, Ch. 3, *Diversity of Citizenship Jurisdiction* §3612, *The Requirement and Meaning of Citizenship—Determination of a Person's Domicile* (3d ed. & Supp. Apr. 2017) .......... 19

Restatement (Second) of Conflict of Laws §§18 and 19 ............................................................ 14

Restatement (Second) of Contracts, §§ 63 and 64 ...................................................................... 30

Restatement (Third) of Foreign Relations Law § 325(1) (1987).......................................... 4, 5, 8
Vienna Convention on the Law of Treaties, art. 31(1) ................................................................ 4

J. Story, Commentaries on the Conflicts of Laws, Foreign and Domestic, §§39 – 49 (1841).............................................................................................................................. 14

United Nations Convention on the Use of Electronic Communications in International Contracts. *See* Art. 4(f), Art. 4(h), and Art. 6 ................................................................ 25

J. Warriner, M. Whitten & F. Griffith, English Grammar and Composition 9-13 (rev. ed. 1969) ......................................................................................................................... 9

Robert W. Wood, *Living Abroad Sounds Idyllic – Until You Consider Taxes*, Forbes, May 11, 2012 ....................................................................................................................... 22

## INDEX OF EXHIBITS

| Exhibit No. | Description |
|---|---|
| 1 | Power of Attorney to Purchase Property Located at 104 Dalton Street, Keller, Texas, Executed by Philip Wood on April 28, 2011 |
| 2 | Certified Warranty Deed to Philip and Elaine Wood for Purchase of Property Located at 104 Dalton Street, Keller, Texas Executed Dec. 15, 2011 |
| 3 | Wood v. Wood Divorce Proceedings Obtained from Teller County District Clerk |
| 4 | Texas Secretary of State Response to Subpoena (Redacted) with Notice of Intent to Serve Subpoena |
| 5 | Excerpts of Plaintiff, Thomas Wood, as Personal Representative of the Estate of Philip Talmadge Wood, Deceased Notice of Filing Unverified Answers to Defendants, Malaysian Airlines System Berhad (Administrator Appointed) and Malaysia Airlines Berhad's First Set of Interrogatories Regarding Threshold Issues |
| 6 | Excerpt of Plaintiff Thomas C. Gaspard, as Personal Representative of the Estate of Rui Wang, Deceased Answers to Defendants, Malaysian Airlines System Berhad (Administrator Appointed) and Malaysia Airlines Berhad's First Set of Interrogatories Regarding Threshold Issues |
| 7 | Excerpt of Plaintiff Thomas C. Gaspard, as Personal Representative of the Estate of Weiwei Jiao, Deceased Answers to Defendants, Malaysian Airlines System Berhad (Administrator Appointed) and Malaysia Airlines Berhad's First Set of Interrogatories Regarding Threshold Issues |
| 8 | Excerpt of Plaintiff Thomas C. Gaspard, as Personal Representative of the Estate of Shuling Dai, Deceased Answers to Defendants, Malaysian Airlines System Berhad (Administrator Appointed) and Malaysia Airlines Berhad's First Set of Interrogatories Regarding Threshold Issues |

## INTRODUCTION

The issue before the Court is whether it has subject matter jurisdiction over any of the cases against Malaysian Airline System Berhad (Administrator Appointed)[1] ("MAS") under of Article 33 of the Montreal Convention.[2]   There is no dispute that the Montreal Convention governs subject matter in these cases. Article 33 of the Convention sets forth the limited forums in which actions may be maintained against the air carrier.   In these cases certain plaintiffs assert jurisdiction under Art. 33.1's jurisdiction provision that turns primarily on "where [the carrier] has a place of business through which the contract [of carriage] has been made," commonly referred to as the "Third Jurisdiction;" and Art. 33.2's jurisdiction provision that turns primarily, but not exclusively, on where "at the time of the accident the passenger has his or her principal and permanent residence" commonly referred to as the "Fifth Jurisdiction."

Plaintiffs, divided into two groupings, have filed separate briefs, neither of which establishes subject matter jurisdiction under Art. 33 of the Convention.   The first of the two briefs was filed by plaintiffs in the *Wood* and *Gaspard* cases [ECF 63]  (referred to collectively as the "Wood-Gaspard Plaintiffs" or as the "Wood Plaintiff" or the "Gaspard Plaintiff" where individualization is necessary).  In the Response brief filed by the Wood-Gaspard Plaintiffs, the unavoidable facts are that:  (1) not one of the decedents had a residence of any kind in the United States; (2) not one of the decedents was in the United States when he or she offered to purchase transportation on Malaysia Airlines Flight MH370 ("MH370"); and (3) MAS did not accept a single one of those decedents' offers to purchase transportation in the United States – meaning

---

[1] Although this is the Reply of defendant Malaysian Airline System Berhad (Administrator Appointed) in support of its Motion to Dismiss [ECF 38], defendants Malaysia Airlines Berhad ("MAB") and Allianz Global Corporate & Specialty SE ("AGCS SE") have filed a Joinder in that motion [ECF 40].

[2] Convention for the Unification of Certain Rules for International Carriage by Air, May 28, 1999 (entered into force on Nov. 4, 2003), reprinted in S. Treaty Doc. 106-45, 1999 WL 33292734 ("Montreal Convention" or "Convention").  Hereafter citations to Articles of the Montreal Convention are cited simply as "Article" or "Art."

that not a single contract of carriage was made through a place of business of MAS in the United States. The Wood-Gaspard Plaintiffs ignore these inconvenient facts in their Response, instead arguing for an interpretation of Art. 33 that violates the mandatory rules of treaty interpretation. Ultimately, however, these facts deprive the Court of subject matter jurisdiction under the Montreal Convention to hear the *Wood* and *Gaspard* plaintiffs' claims against MAS as a matter of law.[3]

In the separate Response brief filed by plaintiffs in the *Smith, Zhang, Kanan* and *Huang* cases [ECF 66] ("SZKH Plaintiffs"), they concede there is no basis for Montreal Convention subject matter jurisdiction because they have failed to provide any legal basis under Art. 33 and they provide no admissible evidence.  The SZKH Plaintiffs opt instead to reassert arguments pertaining to their claim against defendant Allianz Global Corporate & Specialty SE on which briefing was closed on March 6, 2017, now more than six months ago. *See* [ECF 36-1] [ECF 46] and [ECF 56].  For this reason, the claims of the SZKH Plaintiffs must be dismissed for lack of Montreal Convention subject matter jurisdiction.[4]

As will be shown, the law and the facts do not permit the exercise of subject matter jurisdiction under either Art. 33.1 or Art. 33.2 of the Montreal Convention. Therefore, MAS is entitled to dismissal of all Plaintiffs' claims for lack of subject matter jurisdiction under the Montreal Convention.

---

[3] To be clear, MAS's pursuit of this and other jurisdictional defenses is not – as Plaintiffs would have this Court believe – an attempt by MAS to *avoid* liability but only an assertion of the right to have claims determined by a court with lawful authority over the parties and the controversy. *See Luckett v. Bure*, 290 F.3d 493, 496 (2d Cir. 2002)  ("'[a] case is properly dismissed for lack of subject matter jurisdiction under Rule 12(b)(1) when the district court lacks the statutory or constitutional power to adjudicate it[]'") (quoting *Makarova v. United States*, 201 F.3d 110, 113 (2d Cir. 2000)).

[4] Because the lack subject matter jurisdiction under the Convention for the claims against MAS has been conceded, the SZKH Plaintiffs' separate Response [ECF 65] in opposition to MAS and MAB's Motion to Dismiss [ECF 39] for Lack of Subject Matter Jurisdiction under the Foreign Sovereign Immunities Act ("FSIA") has been rendered moot.  Plaintiffs must establish, independently, subject matter jurisdiction both under the Convention *and,* an exception to immunity under the FSIA. One without the other is insufficient to establish subject matter jurisdiction. *See Brink's Limited v. South African Airways*, 93 F.3d 1022, 1026-27 (2d Cir. 1996).

## ARGUMENT

### I.      Standard of Review

No Plaintiff has established Montreal Convention subject matter jurisdiction by a preponderance of the evidence.   While it is correct that Rule 12(b)(1) requires a court to "accept as true all of the factual allegations in the complaint and draw all reasonable inferences in favor of the plaintiff," *Fontaine v. Bank of America, N.A.*, 43 F. Supp. 3d 1, 3 (D.D.C. 2014) (Jackson, J.), the case law belies the Wood-Gaspard Plaintiffs' contention that the court must "liberally construe" the pleadings and "plaintiff benefits from all inferences drawn from the facts alleged." [ECF 63] at 10.[5]   This Court "need not 'accept inferences unsupported by the facts alleged or legal conclusions that are cast as factual allegations[.]'" *Fontaine*, 43 F. Supp. 3d at 3.

The Wood-Gaspard Plaintiffs' argument starts backwards.   Any federal court deciding a Rule 12(b)(1) motion starts by presuming a claim is outside its limited jurisdiction. *Id.*   While a "court may consider the complaint supplemented by undisputed facts evidenced in the record, or the complaint supplemented by undisputed facts plus the court's resolution of disputed facts," *Herbert v. National Academy of Sciences*, 974 F.2d 192, 197 (D.C. Cir. 1992) (citations omitted), a plaintiff still "bears the burden of establishing jurisdiction by a preponderance of the evidence." *Fontaine*, 43 F. Supp. 3d at 3.   If plaintiffs do not meet their burden of establishing jurisdiction, MAS is entitled to dismissal of all Plaintiffs' claims.[6]

---

[5] Page-number citations to MAS's moving papers and Plaintiffs' Response Brief refer to the page numbers in the document header assigned by the Court's Electronic Court Filing system.

[6] The SZKH Plaintiffs offer no basis for the exercise of subject matter jurisdiction in the United States by naming a European company as a purported defendant pursuant to Art. 32.   For the most part their Response just repeats their already-briefed Article 32 [ECF 46] argument vis-à-vis defendants Allianz Global Corporate & Specialty SE and Mr. Henning Haagen.   The Convention does not expand Art. 33's jurisdiction to include the place of business of those persons alleged to be liable under Art. 32 – which is not even in United States.

## II.     The Montreal Convention, as an International Treaty, Has Mandatory Interpretation Rules: "Rules Of The Road"

The Supreme Court's binding rules for the interpretation of international treaties must be the starting point for the Court's ruling on this Motion.  The Supreme Court has repeatedly ruled that courts must interpret treaties differently from other legal documents in a number of critical respects.  This Court's ruling on MAS's Motion to Dismiss for Lack of Subject Matter Jurisdiction under the Montreal Convention, insofar as the terms of Article 33 are at issue, should begin with those rules.

The ultimate test for a court's interpretation of an international treaty is whether the interpretation fulfills the signatories' shared expectations, *Air France v. Saks*, 470 U.S. 392, 399 (1985); meaning that "[i]n interpreting any treaty, '[t]he opinions of our sister signatories' . . . are 'entitled to considerable weight,'" *Abbott v. Abbott*, 560 U.S. 1, 16 (2010); *see also, El Al Israel Airlines v. Tseng*, 525 U.S. 155, 176 (1999).  This overarching test mandates three additional canons of interpretation:

    i.     Add no word or clause;[7]

    ii.    Only use words in their ordinary meaning and not varying domestic legal senses;[8]

    iii.   Reach uniform results consistent with those of other signatories.[9]

---

[7] *Chan v. Korean Air Lines, Ltd.*, 490 U.S. 122, 134-35 (1989):

    "[Courts] must . . . be governed by the text – solemnly adopted by the governments of many separate nations . . . . [W]here the text is clear, as it is here, we have no power to insert an amendment. . . .'[T]o alter, amend, or add to any treaty, by inserting any clause, whether small or great, important or trivial, would be on our part an usurpation of power, and not an exercise of judicial functions. It would be to make, and not to construe a treaty . . .'" (citation omitted, quoting Story, J.).

[8] *See* Vienna Convention on the Law of Treaties, art. 31(1), which the United States follows but has not officially adopted. ("A treaty shall be interpreted in good faith in accordance with the *ordinary meaning* to be given to the terms of the treaty in their context and in the light of its object and purpose) (emphasis added); *see also Chan*, 490 U.S. at 128–29 (consulting Webster's Second for meaning of "irregularity" in issuing a ticket); *Alaska v. United States*, 545 U.S. 75, 92-96, (2005) (taking treaty term "bay" in ordinary non-legal sense); *Olympic Airways v. Husain*, 540 U.S. 644, 655 (2004) (similar); Restatement (Third) of Foreign Relations Law § 325(1) (1987) (a treat is to be interpreted in accordance with ordinary meaning of words).

The entire point of Article 33 is to provide administrable rules plainly telling one sovereign when to yield adjudicatory power to another in international air transportation cases. Figuratively speaking, the rules above require that treaty terms are to be applied as clearly, as simply and, above all, as *predictably* as the rules of the road for when one vehicle at an intersection yields to another, with no occasions for protracted threshold mini-trials.  *See Cornejo v. Cty. Of San Diego*, 504 F.3d 853, 858 (9th Cir. 2007) ("Treaties are different from statutes, and come with their own rules of the road"); *compare United States v. Louisiana*, 394 U.S. 11, 83, 89 n.7, *decision supplemented*, 525 U.S. 1 (1998) (colloquy with Solicitor General describing lines demarcating territorial and international waters as "rules of the road").  The Wood-Gaspard Plaintiffs' arguments violate all four rules of the road.

## III.    The Wood Plaintiff Cannot Establish Art. 33.2 Subject Matter Jurisdiction Because the Decedent Philip Wood Had <u>No</u> Residence in the United States – Principal, Permanent, or Otherwise

MAS's initial Memorandum in Support of its Motion to Dismiss [ECF 38-1] ("Memorandum") demonstrated that the Wood Plaintiff cannot establish Article 33.2 subject matter jurisdiction because he concedes that the decedent Philip Wood (the "Decedent") lived in Malaysia on March 8, 2014, when  Flight MH370  went missing (the "Accident").  Article 33.2 provides for subject matter jurisdiction "in the territory of a State Party in which at the time of the accident the passenger has his or her principal and permanent residence[.]" Art. 33.2. "Principal and permanent residence" means "the one fixed and permanent abode of the passenger at the time of the accident," as to which his or her "nationality . . . shall not be the determining factor[]." Art. 33.3(b).

MAS's Memorandum addressed the two inconsistent, non-binding court decisions

---

[9] *See* RESTATEMENT (THIRD) OF FOREIGN RELATIONS LAW, §325, *Comment d* (1987) ("Treaties that lay down rules to be enforced by the parties through their internal courts . . . should be construed so as to achieve uniformity of result despite differences between national legal systems").

interpreting "principal and permanent residence" in Articles 33.2 and 33.3(b); in part by relying

on Article 33.2's drafting history to show why the two decisions on which  the Wood Plaintiff

relies, which take this special subset of "residence" to be "akin to" "domicile," were wrong.  The

Wood Plaintiff responded by arguing that: (i) Article 33.2 & 33.3(b)'s terms should be

determined by dictionary meanings of words in the English Convention version, not its drafting

history; (ii) its drafting history is of limited value, and (iii) this Court should follow then District

Court decisions in *Hornsby v. Lufthansa German Airlines*, 593 F. Supp. 2d 1132 (C.D. Cal.

2009) and *In Re Air Crash Over the Mid-Atlantic on June 1, 2009*, 760 F. Supp. 2d 832 (N.D.

Cal. 2010), *motion for reconsideration on other grounds denied* , 792 F.Supp.2d 1090 (N.D. Cal.

2011).

Required treaty interpretation rules mandate using ordinary English dictionary meanings

which conclusively prohibit reading "domicile" into Articles 33.2.  Neither *Hornsby* nor *In re Air

Crash over the Mid-Atlantic* mentioned or followed these rules and therefore the analysis in each

of those cases is not only incorrect, but also contrary to binding Supreme Court treaty

interpretation rules for determining just what "residence" or "abode" mean here for the Fifth

Jurisdiction.

### A.    The Wood Plaintiff Concedes that the Decedent Philip Wood Had No Actual Residence in the United States on the Date of the Accident

Despite the Wood Plaintiff's allegation that "[a]t all times material to this Complaint, the

Decedent . . . was a resident of the State of Texas" (*See* 16-cv-00053-KBJ, [ECF 1] ¶ 2), the

Wood Plaintiff concedes that in 2014 Wood had no place in the United States where he currently

lived or resided – principal, permanent or otherwise – in any recognized sense of those words,

i.e. a current address, a home a person owns or has some interest in, a place he is staying at, etc.[10]

---

[10]There is no admissible evidence that the Decedent had any residence in the U.S. on the date of the Accident so the

The Wood Plaintiff thus attempts to change the subject to the Decedent's nationality, and supposed subjective intent to someday return to the United States.

But, it is undisputed that well before the Accident, the Decedent disposed of his entire interest in the very Dalton Street residence the Wood Plaintiff alleges to be the Decedent's "principal and permanent residence." *See*, [ECF 63-3] Exhibit A ("Decree of Divorce and Deed of Trust").    The Wood Plaintiff attempts to eke out the Decedent's fictional "residence" with some personal effects in storage, and a few stays with Texas family when he visited them. *See*, *e.g.*, [ECF 63-1] at 2-3.  Plaintiff's problem with logic, however, is that someone who has "no residence" at all in Place X cannot have a "principal and permanent residence" in Place X.  The Wood Plaintiff hopes to escape that outcome by adopting *Hornsby's* "no surplussage" thought, saying that adding "principal and permanent" to "residence," turns a "residence" from "a place where the person lives" to "a place where the person does not live but used to" (or else means nothing).  The following section shows how that awkward construction violates (i) the plain text and syntax of the Convention, and (ii) injects deleted words back into Article 33, thereby (iii) breaking all four of the Supreme Court's mandatory treaty interpretation rules, by "alter[ing], amend[ing, and], add[ing] to" Artcle 33's actual text.  *Compare Chan v. Korean Air Lines, Ltd., above,* 490 U.S. at 134 n.5, 135 (1989).

**B.     Grammar Requires Modifiers to Restrict the Scope of a Noun Rather than Give It Another Noun's Meaning**

The above discussion illustrates how the Wood Plaintiff's attempt to read a glaringly absent word – "domicile"[11] – back into either Article 33.2 or its 33.3(b) definition, leaning

---

Wood Plaintiff relies on inadmissible evidence of the Decedent's subjective intentions. As shown below, the proffered evidence on which he relies is not admissible. Worse, most of the inadmissible material was never produced to MAS in discovery, despite falling within MAS' specific discovery requests. MAS objects to Plaintiff's attempted use of documents withheld in violation of Federal Rule of Civil Procedure 37(c)(1).

[11] Amending Article 33 by inserting "domicile" also overwrites the extensive drafting history as shown in MAS's

primarily on a decedent's subjective intent, violates common sense and the simple meaning of very ordinary English words.  Crucially, for this motion the only words at issue are "residence" and "abode," and a technical or domestic legal sense of those words must be rejected in favor of a common meaning consistent with the signatories' shared or overlapping understandings.  *See* RESTATEMENT (THIRD) OF FOREIGN RELATIONS LAW §325, *Reporters' Note 4* (1987) (U.S. courts "avoid giving to an international agreement a meaning in domestic law different from its international meaning"); *see also*, *Sumitomo Shoji Am., Inc. v. Avagliano*, 457 U.S. 176, 180 (1982) (requiring "application of the words of the treaty according to their obvious meaning") (citation and quotation omitted).  The Wood Plaintiff's argument fails when the ordinary meanings of "residence" and "abode" are considered.

The Wood Plaintiff and *Hornsby* arrived at their conclusions by misapplying the canon against surplus words, and jumping head-first into meanings Art. 33.2's syntax foreclosed.  The Supreme Court unanimously rejected a similar interpretive detour in *Dep't of Hous. & Urban Dev. v. Rucker*, 535 U.S. 125, 126 (2002) (unanimous opinion) (Breyer, J., abstaining), discussed below.

### 1.    Surplussage and Restriction

The Wood Plaintiff is right that a word or a sentence in a statute or treaty  should not be read to render it surplus.  [ECF 63] at 13-14. There is no dispute about that issue here and MAS's advocacy of a straightforward, ordinary meaning of "residence" and "abode" follows that rule

---

Memorandum [ECF 38-1] at 22-23.  MAS noted that the Fifth Jurisdiction at issue appeared earlier in the Guatemala City Protocol of 1971, providing a forum of the carrier's establishment if the passenger has his *domicile* or permanent residence in the territory of the same High Contracting Party.  *See* PROTOCOL TO AMEND THE CONVENTION FOR THE UNIFICATION OF CERTAIN RULES RELATING TO INTERNATIONAL CARRIAGE BY AIR, SIGNED AT WARSAW ON 12 OCTOBER 1929, AS AMENDED BY THE PROTOCOL DONE AT THE HAGUE ON 28 SEPTEMBER 1955, SIGNED AT GUATEMALA CITY, ON 8 MARCH 1971, at Article XII (proposed amendments to Art. 28).  The drafters of the Montreal Convention declined the use of that word.  Section IV.C. below shows how injecting a shifting domestic legal concept like "domicile" disrupts application of an international multilateral treaty.

perfectly. Without actually explaining a step in his reasoning that would be awkward at best, the Wood Plaintiff tacitly assumes for his argument that if "principal and permanent" do not change a "residence" from a place where a person does live to a place where a person does not live, then the words "principal and permanent" mean nothing at all – merely empty surplussage – which is prohibited.

Contrary to the Wood Plaintiff's argument (and as a general rule of syntax), the modifiers "principal and permanent" serve to restrict the set of items otherwise identified by the noun "residence," but "principal and permanent" cannot read to just eliminate the reference to a "residence" altogether.[12]   This is the Wood Plaintiff's fallacy.  He first asserts that "principal and permanent" must affect the meaning of "residence" in Article 33.2. (True).  Next, therefore, it must be that a "principal and permanent" residence at the time of the accident is not really a "residence" in the conventional sense – a place you are currently residing – but rather something that is not exactly a residence.  (False).

A qualifier like "principal and permanent [residence]" means that if a person has more than one "residence," then only one of those residences is the person's "principal and permanent" one,[13] and it is that "residence" that is relevant to establishing jurisdiction under Art. 33.2.    It is not surprising that the Convention takes into account the reality that some international travelers who spend significant time in two countries would have a residence in each; and to that circumstance the Fifth Jurisdiction responds.  Thus, a "principal and permanent residence" must be just as much a "residence" or "place you are living in," as a "big and

---

[12] Modifying a noun by restrictive adjectives is to take the members of the set called out by the noun unmodified, and to create a new subset that rejects all but the members of the larger set meeting the additional restriction. *See* WILLIAM FRAWLEY, LINGUISTIC SEMANTICS 79 (2013); J. WARRINER, M. WHITTEN & F. GRIFFITH, ENGLISH GRAMMAR AND COMPOSITION 9-13 (rev. ed. 1969) (unlike other modifiers that cancel a noun's meaning like "anti-matter" or "former residence."

[13] The only meaning "principal" can bear is "first or most important among multiple."

expensive photograph" must be as much of a "photograph" as a "little and cheap photograph."

The Wood Plaintiff's unorthodox construction which uses "principal and permanent" to change a "residence" into a "domicile" presumes that the Decedent's forever attachment to Texas is "a more principal and more permanent *something*" (since he had no "residence" there) than Malaysia, where he did live and had a residence. But tacitly replacing "residence" by "something similar" is like saying "the world's greatest photograph" is Da Vinci's Mona Lisa painting in the Louvre, because that "painting" is a more important "picture" than a mere "photograph." The Wood Plaintiff's argument does not survive scrutiny and should be rejected.

### 2.   Syntax before Semantics

Before a court starts speculating on the possible meanings of a word, it has to first limit its inquiry to only those interpretations actually permitted by the sentence structure. *Rucker*, 535 U.S. at 126; *Chan*, 490 U.S. at 128-29. Here, Article 33.2 puts modifiers in front of "residence," and this can only *reduce* the qualifying members of the set of literal residences; they cannot add to that set things which are not "residences" but are some other kind of "principal and permanent 'things.'" *See, e.g.*, *Barnhart v. Thomas*, 540 U.S. 20, 26–29 (2003) (The Court unanimously held, under "rule of last antecedent," that limiting phrase "existing in the national economy" governed and reduced the scope of "gainful work," leaving unrestricted "previous work").[14]

The Supreme Court's unanimous reversal of Northern District of California and a Ninth Circuit *en banc* decisions vividly illustrates the Wood Plaintiff and *Hornsby* court's error on the interpretive question here. The question in *Rucker v. Davis* was whether a subsidized housing tenant could be evicted because of some criminal drug activity of resident family members other guests, if the tenant had no control or awareness of the activity or perpetrators. The Northern

---

[14] This rule is universal. *See, e.g., Solis v. Summit Contractors, Inc.*, 558 F.3d 815, 824–25 (8th Cir. 2009) (OSHA law); *Michigan v. Little River Band of Ottawa Indians*, No. 5:05-CV-95, 2007 WL 1238907, at *6–8 (W.D. Mich. Apr. 27, 2007) (U.S.-Native American law).

District of California believed this was not permitted by the statute, which read:

> Congress has directed that every public housing agency utilize leases which provide that any criminal activity that threatens the health, safety, or right to peaceful enjoyment of the premises by other tenants or any drug-related criminal activity on or off such premises, engaged in by a public housing tenant, any member of the tenant's household, or any guest or other person *under the tenant's control*, shall be cause for termination of tenancy.

42 U.S.C. §1437(d)(1)(5) (emphasis added).

The question before the Court was the force of "under the tenant's control" in the prohibition – specifically whether and when these words permitted the eviction of an "innocent tenant" who was either unaware of, or in no position to prevent, the criminal activity in question. The District Court and the *en banc* Ninth Circuit used the same interpretation method as the Wood Plaintiff here, creating meanings that syntax forbade, by having the force of "under the tenant's control" wander throughout the sentence.  The initial Ninth Circuit panel, and the U.S. Supreme Court, used MAS's method here, pointing out the basic rules of grammar prevented the interpretive issues from arising in the first instance.[15]

In moving from the truism that qualifiers "principal and permanent" must have some meaning, to the fallacious conclusion that "principal and permanent" turn a place where a person lives ("residence") into a place where a person doesn't live ("domicile"), the Wood Plaintiff greatly distorts Art. 33.2 of the Convention.  Further, the Wood Plaintiff's reading violates the norm of treaty interpretation that requires taking words in their ordinary language sense, and not

---

[15] The District Court and *en banc* Ninth Circuit panel moved the end phrase, "under the tenant's control," to reach back through the whole sentence modifying "person," "criminal activity," etc.  *See Rucker v. Davis*, No. C 98-00781 CRB, 1998 WL 345403, at *5 (N.D. Cal. June 19, 1998); *Rucker v. Davis*, 237 F.3d 1113, 1120 (9th Cir. 2001), *rev'd*, 535 U.S. 125 (2002).  The first Ninth Circuit panel to review the matter reversed the District Court, applying "basic principles of grammar" to foreclose the "innocent tenant" issue.  *See Rucker v. Davis*, 203 F.3d 627, 636–37 (9th Cir. 2000).  A unanimous Supreme Court rejected the District Court's and the *en banc* Ninth Circuit's efforts to create an interpretive exercise about how widely Congress intended the word "control" to apply in the text, since basic syntax forbade taking "under tenant's control" to modify anything but the phrase "other person." *See Dep't of Hous. & Urban Dev. v. Rucker*, 535 U.S. 125, 126 (2002) (Breyer, J., abstaining) ("The Ninth Circuit's ruling . . . *runs counter to basic grammar rules* and would result in a nonsensical reading") (emphasis added).

in some technical legal sense which can vary according to different domestic legal systems.

### C. The Application of Governing Treaty Interpretation Rules Here to the Terms "Residence" and "Abode" Confirms that MAS's Application of Art. 33.2 Is Correct

#### 1. Application of Clear Ordinary Language Meanings

Using the mandatory rules governing treaty interpretation, it is simple to apply them directly to Articles 33.2 and 33.3(b) of the Convention:  under both sections the Decedent had neither residence, nor abode, nor any place to live in the United States on the date of the Accident, ergo he could not have a "principal" "permanent," or "fixed" "abode" or "residence" in the United States at that time. That conclusion logically follows from confining discussion to only the ordinary language meanings of "abode" and "residence," and excluding divergent legalistic meanings, as required by the canons of interpretation set forth in Section II, above. This Court should decline the invitation to gloss Article 33 with the specialized legal term, "domicile," which has neither common currency nor consistent legal meaning.[16]

Those ordinary meanings of "residence" and "abode" unequivocally block the Wood Plaintiff's insertion of "domicile" into Article 33.  These two words have very similar meanings, and as MAS argued in its moving papers, both of them require contemporaneous physical presence plus residence, which is shown by reference to general dictionaries providing ordinary meanings:

SHORTER OXFORD DICTIONARY:

**Residence**:   1. The circumstance of having one's permanent or usual abode in or at a certain place; the fact of residing or being resident.  2. The fact of staying regularly at or in a specified place for the performance of official duties or

---

[16] The distinction between the ordinary meaning of a contested term in a legal document, versus various specialized or technical legal definitions, is fundamental whenever a court reads a legal document.  *Compare Lockheed Martin Corp. v. United States*, 35 F. Supp. 3d 92, 143 & n.68 (D.D.C. 2014), *aff'd*, 833 F.3d 225 (D.C. Cir. 2016) (ordinary meaning to be used where no clear indication of contrary legal or specialized, "damages" in CERCLA) *with Johnson v. United States*, 529 U.S. 694, 707 (2000) (specialized meaning used to avoid absurdity).

for work; a period of time required for this.

Abode: †1. The action of waiting. †2. A temporary stay.  3. Habitual residence; a house or home.

**WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY OF THE ENGLISH LANGUAGE, UNABRIDGED:**

**Abode:** 1. obs:  The act of waiting. 2. Continued stay in a place: RESIDENCE: SOJOURN (during one's ~ in the country). 3. Place where one abides or dwells.  HOME (a cottage became their ~).

**Residence:** 1. a. The act or fact of abiding or dwelling in a place for some time:  An act of making one's home in a place. 2. A.(1) The place where one actually lives or has his home as distinguished from his technical domicile; (2) a temporary or permanent dwelling place, abode, or habitation to which one intends to return as distinguished from a place of temporary sojourn or transient visit. (3) a domiciliary place of abode.

None of these definitions of "residence" or "abode" applies to the Wood Decedent.[17]  As for definition 1.a of "residence" in Webster's, the Decedent was not abiding or dwelling in Texas at the time of the Accident. He clearly does not meet the definition in Webster's 2(A)1 because, at best, Plaintiff argues Texas was only the Decedent's domicile and does not dispute that the Decedent had no place to live in Texas.  Plaintiff also cannot satisfy part 2(A)(2) of the Webster's definition because, again, the Decedent did not at the time of the Accident have any "dwelling place, abode, or habitation" (all concrete physical things) in Texas.  Finally, the part 2(A)(3)  definition emphasizes the need for *both* "domicile" in the sense of long-intentions, and "abode," which from the definition above requires a physical dwelling.

In short, no general dictionary of the English language allows a sense of "residence"

---

[17] Using an actual functional English dictionary definition here is far preferable to synonyms from Black's Law Dictionary, none of which is interchangeable.  *Compare Succo v. First Reliance Standard Life Ins. Co.*, 16 F. App'x. 53, 55 (2d Cir. 2001) (District Court correctly went beyond list of synonyms "wage, salary and fee" to focus on more meaningful usage distinctions, noting "'wage'" was . . . more accurately [] 'a term associated with manual labor, done on an hourly, daily, or piecework basis.'")  The most mischievous part of the Wood Plaintiff's suggestion to define "abode" using only Black's Law dictionary is that it is utterly circular and inconclusive: Black's two "abode" synonyms "domicile" and "residence" just lead back to the original impasse, with no basis for choosing one term over the other, or for choosing a narrow versus a broad legal meaning for "domicile."

where the individual in question does not have an actual physical "dwelling place, abode, or habitation" in which to live. While the Convention uses two different words to narrow down the types of plaintiff's "things" (residence and abode) out of which the court must choose, the subset of *only* those things is further restricted by "principal, permanent, fixed."[18]  Because the United States was not such a place for the Decedent on the date of the Accident, it is not a proper jurisdiction under Article 33.2.

### 2. The Wood Plaintiff's Resort to "Domicile" Imports Confusing Legal Meanings

Plaintiffs argue this Court should define "residence" by choosing a specialized legal meaning for the purpose of Art. 33.2, but doing so violates the rule of treaty interpretation even more conspicuously here because courts have, for centuries, noted the varying and, at times, inconsistent and confusing, legal senses of the word "domicile."  The variation in "domicile's" meaning has persisted from the very beginnings of the American legal system,[19] and continues to this day.[20]  Remarkably, to read "principal and permanent residence" here as "akin to domicile" would yield inconsistent outcomes even within the narrow range of American and English law. See RESTATEMENT (SECOND) OF CONFLICT OF LAWS §19, *Comment b* (1971).  It goes without saying that chaotic outcomes would spread further under other countries' versions of Article 33.

---

[18] Using both "residence" and "abode" is not surplussage despite similar meanings: the definition of a term should avoid using the word it is defining.  *See, e.g., In re Fin. Mgmt. Scis., Inc.*, 261 B.R. 150, 154 (Bankr. W.D. Pa. 2001). Using both these words emphasizes their common sense of "physically staying" somewhere.

[19] *See, e.g., Inhabitants of Warren v. Inhabitants of Thomaston*, 43 Me. 406, 412–21 (1857) (noting overlapping and perplexing meanings of legal senses of "residence," "domicile," and "abode" re pauper laws), J. STORY, COMMENTARIES ON THE CONFLICTS OF LAWS, FOREIGN AND DOMESTIC, §§39 – 49 (1841) (noting seventeen different rules in common law rules on moving within "the same country or territorial sovereignty, although many [but not all] of them are applicable to residence in different countries or sovereignties," §48)

[20] *See, e.g., Aponte–Dávila v. Municipality of Caguas*, 828 F.3d 40, 48 n.4 & 49–51 (1st Cir. 2016) (varying definitions of residence and domicile purely in tort law "domicile" under 28 U.S.C. §1332 when moving "to . . . obtain[]medical treatment");  *Silverman v. Silverman*, 338 F.3d 886, 897–98 (8th Cir. 2003) (special Hague Convention sense); *Shinn v. Heath*, 259 Ark. 577, 585, 535 S.W.2d 57, 61 (1976) ("resident" varies between different legal subject matters); *see also In re Marriage of Robinson*, 159 Wash. App. 162, 168, 248 P.3d 532, 534 (2010), *as amended on reconsideration* (Feb. 17, 2011) ("residence" and "domicile" in divorce).

Plaintiff's insertion of the new varying legal term "domicile" based on legalistic synonyms for "residence" and "abode" flouts the mandate for using clear meanings in ordinary language when interpreting an international treaty.

**3.      Practical Considerations Mandate Rejection of the Wood Plaintiff's Addition of the Word "Domicile" to Art. 33.2 of the Convention**

The Wood Plaintiff's insertion of "domicile" into Articles 33.2 and 33.3(b) must finally be rejected for conspicuously frustrating the signatories' expectations, in spite of the Supreme Court's, the Restatement's, and international law's contrary admonitions.  The serious disruption to these expectations (by adding a word to the Convention and relying on a specialized domestic legal definition that heavily incorporates subjectivity) is vividly illustrated by the wandering legalistic senses of "domicile" and "residence" above.

The frustration is underscored by the prospect of Fifth Jurisdiction mini-trials, which Plaintiff does not dispute will arise should a "domicile" test – unhinged from any actual physical residence in the forum – be applied in U.S. courts.  Adopting such a fact-dependent test using a concept unique to United States jurisprudence would do violence to the purpose of the treaty's jurisdictional provision, which was drafted to easily identify discrete forums available for adjudication of disputes arising out of international air transportation. *In Re Air Disaster Near Cove Neck, N.Y. on Jan. 25, 1990*, 774 F. Supp. 718, 722-24 (E.D.N.Y. 1991).

The Wood Plaintiff's contention that this is properly consistent with the Convention's intention of expanding passenger rights compared to the Warsaw Convention, [ECF 63] at 24-25, is misguided.  There is no doubt that addition of the Fifth Jurisdiction by itself greatly increases international passengers' remedies.  Since including a new forum by itself enhanced passenger rights, there is no warrant for the far more dramatic inference that this forum was to be available, in addition, to any passenger who could create a dispute about his subjective intent to return

someday to a place where he did not live at the time of the accident in question.[21]

Plaintiff would have this Court disregard the easily identifiable, physical place where a passenger was actually residing at that time in favor of a standard requiring a determination of a passenger's subjective future intent – a determination of which renders the question of jurisdiction under Article 33.2 a mixed question of law and fact, requiring extensive discovery in every case in which "principal and permanent residence" is merely alleged. *See* [ECF 38-1] p. 18. The Wood Plaintiff's request – to drag a carrier into any country the passenger/estate wished simply by *alleging*, based on hearsay, the passenger had his or her "principal and permanent residence" there – convenes a jurisdictional mini-trial at plaintiff's option, implicating diverse substantive doctrines of many different jurisdictions' law, including arguments about the tax, marriage, property, voting, etc. laws of all jurisdictions in play for every decedent.  The Supreme Court prohibits using jurisdictional rules this way,[22]  all the more when reading multilateral international treaties, and so rules out the Wood Plaintiff's assertion of jurisdiction untethered to any actual forum residence.

### 4.    Application of Mandatory Treaty Interpretation Rules Leads to the Conclusion that Plaintiff Wood Cannot Establish Art. 33.2 Subject Matter Jurisdiction

The preceding analysis of the principles and rules of treaty interpretation that the court should follow in interpreting "residence" and "abode" here require treating the Wood Decedent's

---

[21] By way of analogy, the intent of the passenger is irrelevant for determining the jurisdiction under the "place of destination" prong of Article 33.1 (formerly Article 28 of the Warsaw Convention) and cannot alter destination specified on the ticket. *Klos v. Polskie Linie Lotnicze*, 133 F.3d 164, 167-68 (2d Cir. 1997); *Swaminathan v. Swiss Air Transport Co., Ltd.*, 962 F.2d 387, 389 (5th Cir. 1992). Similarly, an undefined future intent to reside in a country lends no physical gravity to the passenger's relationship with that country when jurisdiction is pursuant to Article 33.2, and cannot alter the actual residence of the passenger on the date of the accident. *See, e.g., Choi*, 2015 WL 394198, at *3 - *4.

[22] *Compare J. McIntyre Machinery Ltd. v. Nicastro*, 564 U.S. 873, 885 (2011) (rejecting test for specific personal jurisdiction based on foreseeability alone, noting that "the issue of foreseeability may itself be contested so that significant expenses are incurred just on the preliminary issue of jurisdiction. Jurisdictional rules should avoid these costs whenever possible").

"residence" and "abode" in the ordinary sense of where he "lived" or "was staying" or his "home" at the time of the accident – Malaysia.[23]  This interpretation is the only one permitted by the principles of treaty interpretation that govern this motion and require: (i) limiting the definitions considered to be ordinary language; (ii) rejecting the adding of the deleted word "domicile" back into the text; and (iii) taking the qualifying adjectives in 33.2 and 33.3(b) (principal, permanent, fixed) in a way that obeys the rules of English syntax (restricting the "residences" and "abodes" called out to only a subset of these in their shared clear sense, rather than turning an abode into something that is not an abode in ordinary language).  For all these reasons, the Wood Plaintiff's strained interpretation of Article 33.2 and 33.3(b), and his claims against MAS should be dismissed for lack of Montreal Convention subject matter jurisdiction.

## IV. Decedent Philip Wood's "Floating Intention" to "Return to the U.S. Someday" Does Not Establish a U.S. Domicile

### A. The "Floating Intention" Rule

Even if the Court were to treat "principal and permanent residence" as "akin to domicile," contrary to MAS's application of Art. 33.2, the Wood Plaintiff's claims would still have to be dismissed because all that he can establish – and then only by the submission of declarations packed with hearsay[24] and reams of inadmissible documentary evidence[25] – is the

---

[23] As MAS pointed out in its Memorandum, this interpretation is consistent with the decision in *Seales v. Panamanian Aviation Co., Ltd.*, No. 07-cv-2901, 2009 WL 395821, *10 (E.D.N.Y. Feb. 18, 2009) showing Plaintiff is wrong in saying that the federal cases *unanimously* support his position. [ECF 63] at 16, subheading B. Despite making this representation to the Court, Plaintiff later acknowledges, but brushes off *Seales* in a footnote as having "absolutely no bearing here" but fails to explain why the opinions of the district courts in California should be controlling. Moreover, it is not the case that "the salient facts of *Hornsby* and *Mid-Atlantic* appear to be on all fours, so to speak, with [Plaintiff's]." [ECF 63] at 23. The decedents in *In re Air Crash over the Mid-Atlantic*, unlike the Decedent here, actually maintained an actual physical residence in the United States to which they had the right to return to live there at any time without restriction. 760 F. Supp. 2d 832, 837 (N.D. Cal. 2010). It is inexplicable how Plaintiff could represent to this Court that "[a]fter all, Hornsby was an American citizen who was temporarily living and working in Germany when he was killed in a German plane crash[,]" [ECF 63] at 23. *Hornsby* plainly involved a personal injury claim – not a death action – and Plaintiff had in fact moved back to the United States and testified to her then-existing subjective domiciliary intent. *See* 593 F. Supp. 2d 1132, 1133 (C.D. Cal. 2009).

[24] The Wood Plaintiff has submitted six declarations which, without exception, contain hearsay statements that are variations on "he 'always' / 'several times' told me that he intended to return to the United States." *See* [ECF 63-1]

Decedent's inadequate "floating intention" to "return to the U.S. someday." Contrary to

Plaintiff's suggestion, it takes no dramatic announcement of intention for a U.S. citizen taking a

number of multi-year overseas assignments to abandon his U.S. domicile.[26]  Significant changes

in the Decedent's life circumstances, as evidenced by objective indicia of intent – such as

divorce and starting a relationship with a new domestic partner in China – may be all that is

required.  A person who resides in a location for a few years and who has no definite plans to

return to an earlier residence of asserted domicile, nor any fixed date of planned return, may have

---

¶¶ 4, 5, 8-10, 14; [ECF 63-2] ¶¶ 4, 5, 8-10, 14; [ECF 63-3] ¶¶ 5, 9, 11, 12; [ECF 63-4] ¶¶ 4, 7, 8, 10; and [ECF 63-5] ¶ 4.  MAS objects to these statements because none is admissible or relevant.  Each statement merely express open-ended sentiments, none of which is identified as taking place at any specific time, in any specific circumstances or context, or using any particular words other than the verbatim paraphrase copied into each Declaration.  These statements do not meet the requirements of Fed. R. Evid. 803(3) as claimed by the Wood Plaintiff. Fed. R. Evid. 803's requirements are not mentioned and the Wood Plaintiff does not explain how the statements meet those requirements, but asserts in passing only that it is "pellucid" that the hearsay exception applies.  Defendant MAS objects to the admission of these statements as evidence on the ground that they do not meet Fed. R. Evid. 803(3) requirement that the statement purportedly reflecting a state of mind must be made contemporaneously with an action based on that state of mind.  *Mutual Life Ins. Co. v. Hillmon*, 145 U.S. 285, 294,300 (1892); *United States v. DiMaria*, 727 F.2d 265, 270 (2d Cir. 1984). MAS's objections are fully set out in its contemporaneous Motion to Exclude Certain Proffered Evidence incorporated here by reference.

[25] More egregiously objectionable is the Declaration of Stacey Blaustein [ECF 63-6] and attached exhibits because her declaration does not meet the fundamental requirement of Fed. R. Evid. 602 that the witness must have personal knowledge and it is packed with rank hearsay. Blaustein admits that her statements are based only on information she has acquired from responding to the Wood Plaintiff's attorney and the Decedent's sons, *see e.g.* ¶ 17 (where the Decedent stayed and what he did in Texas even though she was not present), or that she was informed by unidentified persons of some facts and the meaning of documents attached as exhibits to her declaration. *See e.g.* ¶¶ 19-20, 23-26.  Blaustein also purports to explain the meanings of codes in documents based solely on looking at those documents (which are not IBM documents).  *See e.g.* ¶¶ 21-22.  Such statements are inadmissible because they are in the form of expert opinion without meeting the requirements of Fed. R. Evid. 703.  MAS's objections are fully set out in its contemporaneous Motion to Exclude Certain Proffered Evidence incorporated here by reference.

[26] The Restatement Second of Conflict of Laws states the rule as follows:

> To acquire domicile of choice in a place, a person must intend to make that place his home for the time at least.

RESTATEMENT SECOND, CONFLICT OF LAWS, §18, *"Requisite Intention."*  The meaning of this rule is made clear by the following comment, *id.*, *comment b*:

> b. *Type of intention required.*  There must be a present intention to make a home. One must be able to say, "This is now my home," and not, "This is to be my home."  If there is an intention to make a home at present, the intention is sufficient although the person whose domicile is in question intends to change his home upon the happening of some future event.

*See also Garcia Perez v. Santaella*, 364 F.3d 348, 351 (1st Cir. 2004) (court erred in giving weight to party's testimony "that he thought 'just about every other day' of returning to Puerto Rico [because] a 'floating intention' to return to a former domicile at some unspecified future date does not prevent a party from acquiring a new domicile").

18

a "floating intention" to return, but that is not sufficient to defeat acquisition of a new domicile in the place of residence – consistent with the rule that place of residence is prima facie the place of legal domicile, *see Aponte–Dávila v. Municipality of Caguas*, 828 F.3d 40, 47 (1st Cir. 2016).[27]

## B.   The Wood Plaintiff's Proffered Evidence of "Floating Intention"

Even read charitably, the Wood Plaintiff's own evidence of the Decedent's absence from the U.S. to take on a succession of "temporary assignments" (plural "assignments," even in the verbatim identical words of all family declarations), all of which could be extended indefinitely by him and his successive employers' "mutual consent," and during which the Decedent acquired a new "domestic partner," demonstrate at best an intention to return to the U.S. "someday."

But even if the Decedent had such a floating intention, he had established his new domicile of choice in Malaysia by the time of the Accident when he (i) elected to take serial overseas employment with IBM Malaysia Sdn. Bhd. in 2013 upon the expiration of his term of employment in China rather than return to the United States; and (ii) established his actual residence there.  [ECF 38-1] at 39-42.

The Wood Plaintiff's argument boils down to the following: the Decedent was a United States citizen and as such he was bound to eventually return to live in the United States someday. The Wood Plaintiff appears to believe that a United States citizen can never lose his or her domicile in the United States and that an intent to return to the United States fixed at one time

---

[27] *See also* ARTHUR R. MILLER, 13E FED. PRAC. & PROC. JURIS., JURISDICTION & RELATED MATTERS, CH. 3, *Diversity of Citizenship Jurisdiction* §3612, *The Requirement and Meaning of Citizenship—Determination of a Person's Domicile* (3d ed. & Supp. Apr. 2017); STORY, supra, §46 ("Eighteenthly, if a person has actually removed to another place, with an intention of remaining there for an indefinite time, and as a place of fixed present domicil, it is to be deemed his place of domicil, notwithstanding he may entertain a 'floating intention to return at some future period'"); *Schill v. Cincinnati Ins. Co.*, 2014-Ohio-4527, ¶ 31, 141 Ohio St. 3d 382, 390, 24 N.E.3d 1138, 1145 (paraphrasing "floating intention" rule as "[h]ome may be where the heart is, but the rest of a person must be there, too, to establish domicile").

based on circumstances then-existing is fixed forever and is unalterable notwithstanding changed circumstances. The preceding authorities show that is false.

Here, the objective evidence in the record supports MAS's contention that the Decedent abandoned his domicile in the United States, if not when he first moved to China and established his residence there in 2011 – as MAS submits – then at least during the time he was living there. Even assuming *arguendo* that the Decedent originally intended to return to live with his wife in the United States[28] by 2012 – only one year later – his circumstances changed.[29] Specifically, while living in China: (i) the Decedent and his wife divorced (*see*, **Exhibit 3** attached hereto); (ii) he disposed of his only residence in the United States (*see* [ECF 63-3] at 4-21); (iii) he found a new "domestic partner" with whom he was living in China " (*see* [ECF 63-1] at 24); (iv) in 2013, he negotiated his employment agreement with IBM Malaysia Sdn. Bhd., forfeiting whatever right he had to return to his prior employment with IBM in the United States upon the expiration of his employment in China (*see* [ECF 63-6] at 26-41; [ECF 63-17]); and (v) in the beginning of 2014, he moved to Malaysia and established his actual residence there where he and his domestic partner intended to live (*see*, [ECF 63-6] at 46).

During this time, Wood never reestablished any actual residence in the United States; he had not voted in a U.S. election since 2008; and he did not even update his "residence address"

---

[28] Even that assumption is questionable. Although the Decedent's sons testify about their parents' unexpressed intention to own the house together, *see*, *e.g.*, Declaration of Nicholas Wood, [ECF 63-1] at ¶ 5, the Decedent's outward manifestations of his intent after moving to China in January of 2011 belies that unfounded speculation. For example, certified property records show that on April 28, 2011, while living in China, the Decedent granted his then-wife statutory durable power of attorney to execute any documents necessary to complete the purchase of the property at 104 Dalton Street in Keller, Texas (*see* **Exhibit 1,** Statutory Durable Power of Attorney executed on April 28, 2011). The purchase did not close until around December 15, 2011 (*see* **Exhibit 2**, General Warranty Deed executed December 15, 2011). And in the Original Petition for Divorce, filed on September 19, 2012, the Decedent stated he and his then-wife had ceased living together as husband and wife as early as February 10, 2012, just about two months after the purchase of the property was finalized. *See* **Exhibit 3**, Divorce Proceedings obtained from Tarrant County District Clerk, at 2.

[29] This conclusion is supported by the fact that the Decedent visited Texas four (4) times in 2012 but only once in 2013. *See* [ECF 63-1] at ¶ 6.

associated with his voter registration to the 104 Dalton Street address. *See*, **Exhibit 4**, Voting Records produced by Texas Secretary of State in response to Subpoena. Therefore, the Decedent's entire course of conduct indicates that he abandoned his domicile in the United States while living abroad.

The "fixed end date" under the Decedent's employment contract with IBM-Malaysia on which Plaintiff heavily relies is spurious, and is not probative of the Decedent's intent to keep his U.S. domicile:  The Global IBMer agreement for Wood's overseas assignments provided each assignment could be extended, without any stated limitation, by mutual consent. *See, e.g.*, [ECF 38-43], at 2.  In any case, any nominal end-date was invalidated by the Decedent's conduct in extending his stays.  Plaintiff does not dispute that the Decedent's domestic partner Sarah Bajc, whom he met while living in China, was in the process of moving to Malaysia to live with him there. Tellingly, Plaintiff did not produce a declaration from Ms. Bajc stating the Decedent told her he always intended to return to live in his ex-wife's Dalton Street residence in Keller, Texas upon the expiration of the term set forth in the Malaysian employment agreement. At best, the belated documents and self-serving hearsay Declarations submitted by Plaintiff establish that the Decedent had some continuing ties to the United States and may have had a floating someday intent to eventually return to the United States – but even that is insufficient to establish domicile, as the "floating intention" rule provides.

Plaintiff's limited objective evidence is sparse and falls short of the "preponderance of the evidence" standard.  As but one obvious example, Plaintiff argues that the Decedent actively maintained U.S. ties merely by filing U.S. income tax returns, *see* [ECF 63] at 36, "a bizarrely complicated and unnecessary hassle for someone who . . . had given up his status as an American domiciliary and who had no intention of returning."  This statement is either disingenuous or

remarkably careless, since it is well-known that all U.S. citizens wherever resident must file U.S. returns and pay taxes on their world-wide income.[30] S*ee, e.g.*, Robert W. Wood, *Living Abroad Sounds Idyllic – Until You Consider Taxes*, FORBES, May  11, 2012.  Not even renouncing citizenship gives one any automatic release, *see* 26 U.S.C. Secs. 877 & 877A (expatriation tax).

Relatively trivial and passive actions by Wood are in the same vein, viz. listing as one of his mailing addresses – but not his main business address – his former wife's Dalton Street home in Keller, maintaining U.S. bank accounts, continuing Texas voter registration (but not voting since 2008), visiting his family only once in 2013 after he met his new domestic partner, etc. Most of these things are simply inertial, and outweighed by the lack of any active effort of Wood to continue his U.S. domicile.   These residual Texas ties do not overcome evidence Wood established his new domicile in Malaysia by the date of the Accident and never reestablished his residence in the United States.[31] Therefore, the Wood Plaintiff's claims should be dismissed (even if the court finds "domicile" controlling under the convention rather than "residence" or "abode") for lack of subject matter jurisdiction.

## V.    Malaysia Is MAS's Place of Business Through Which the Contracts of Carriage Were Made with Philip Wood and the Gaspard Decedents

Article 33.1 of the Convention provides that "[a]n action for damages must be brought . . . in the territory of one of the States Parties . . . where [the carrier] has a *place of business through which* the contract has been made." (Emphasis added.)   The Wood-Gaspard Plaintiffs attempt to avoid the clear language requirement that the focus of the place of the Third Jurisdiction is the carrier's place of business *through which* the contract was made.   Instead the

---

[30] *See* 26 U.S.C. Sec. 6012(a)(1)(A); Treas. Reg. 1.1-1(b) ((b); *Joe Buck Coker*, 67 T.C.M. 2515 (1994).

[31] *Compare Choi*, 2015 WL 394198, at *3-4 (finding that in form, at the time of the alleged accident the Plaintiff's immigration status was that of a U.S. permanent resident, but in reality and in substance, she never established her actual residence in the United States; maintenance of driver's license, bank accounts, and presence of family members may have made visits more convenient but could not be attributed to her residence).

Wood-Gaspard Plaintiffs go on at length to attempt to read that requirement out of the Convention by arguing about where formation of the contract was completed:  purportedly at an independent travel agent's place of business or at the unidentified location of a remote computer server.

When MAS accepted decedents Philip Wood and Rui Wang's booking requests – offers to purchase - through its place of business in Malaysia, that was MAS's place of business *through which* the contract of carriage was made, notwithstanding the Wood-Gaspard Plaintiffs' argument that some further act was needed to finalize the contract.   Whatever was required of MAS to make the contract of carriage occurred thorough their place of business in Malaysia to which the booking requests were transmitted.   Additionally, the Wood-Gaspard Plaintiffs have admitted in their discovery responses that Philip Wood was in Malaysia when he made his booking request to MAS in Malaysia.   The Gaspard Plaintiff has similarly admitted in his discovery response that Rui Wang was in China when he made his booking request to MAS in Malaysia.

Despite these facts, the Wood-Gaspard Plaintiffs seek to create jurisdiction in the United States under Article 33.1 of the Convention.  Like the Wood Plaintiff's argument about Art. 33.2, discussed above, the Wood-Gaspard Plaintiffs' arguments – and the single case on which they rely[32] – violate the mandatory rules of treaty interpretation set out under Parts II and III above. The text of Article 33.1 provides for jurisdiction only in a forum where the carrier has a *place of business* and *through which* the passenger's contract of carriage was made. In an effort to implicate the United States into the contract of carriage, Plaintiffs suggest that the Court should replace the Montreal Convention's requirement as to MAS' place of business (in Malaysia) with

---

[32] The reasoning of which – on the method of construing the Warsaw Convention – has been abrogated by *Chan*. *See* discussion of *Eck*, *infra* at 32-33.

the concept of cloud-based computer servers that may or may not have transmitted data in the United States, or with the place of business of an independent travel agent. The plain language of the Montreal Convention does not support these inventions; the facts of the case do not support Plaintiffs' theory of jurisdiction; and established contract law rejects Plaintiffs' interjection of additional parties to the contract between MAS and its passengers. For these reasons Plaintiffs cannot establish jurisdiction under the Third Jurisdiction and MAS is entitled to dismissal.

### A.    A Computer Server Was Not MAS's Place of Business *Through Which* the Contracts Were Made

#### 1.    Irrelevance of Server Location

Although MAS disagrees with the Wood-Gaspard Plaintiffs' unsupported arguments regarding the electronic processing of their tickets, even if the Court were to accept the conclusion that computer servers within the United States transmitted some of the communication between MAS and its passengers, neither the Convention nor any of the cases interpreting it indicate that a "server" can be the carrier's "place of business through which a contract has been made."[33]   A server is a "thing," not a "place" and calling a server a "place of business through which a contract is made" stretches credibility beyond the breaking point. A U.S. computer server is not a location a customer could visit to complete a contract with MAS. That a piece of unknown computer hardware MAS *could have leased* (or through which travel agent booking requests *may or may not* transit) was in the United States, is irrelevant to Third Jurisdiction.   These diverting Wood-Gaspard data points ignore that Article 33.1 literally requires – making a contract of carriage through *the carrier's place of business* in the forum. An

---

[33] Plaintiffs' speculate that MAS data is stored on a server in Atlanta, Georgia, based on an entry labeled "ATL XS" in the Decedents' Journey Details. While that may or may not be true, Plaintiffs' inadvertent candor in footnote 42 is illuminating with respect to all of its arguments regarding Article 33.1: although they argue about what *might* have happened or how the contract of carriage could have been made, they have offered no admissible evidence about the location of MAS's place of business through which the contract *was* made.   The Declaration of Alpa Panalal [ECF 38-54] remains unrebutted.

unknown computer's unknown location is not MAS's "place of business" in any intelligible sense.

Courts everywhere confirm the irrelevance of server location for purposes of legal locus, holding that ubiquitous use of computerized storage systems, present in clouds of connected servers throughout the world, makes their physical location legally irrelevant. For example, the location of a data server is not treated as a corporation's place of business under the United Nations Convention on the Use of Electronic Communications in International Contracts. *See* Art. 4(f), Art. 4(h), and Art. 6[34]. Nor is the location of a server considered sufficient to create a meaningful nexus to a forum for purposes of personal jurisdiction. *See  Carefirst of Maryland, Inc. v. Carefirst Pregnancy Centers, Inc.*, 334 F.3d 390, 402 (4th Cir. 2003) (citation omitted) ("we have described as "*de minimis*" the level of contact created by a connection between an out-of-state defendant and a web server located within the forum"); *Fireclean LLC v. Tuohy*, No. 16-cv-294, 2016 WL 4414845, *6-7 (E.D. Va. June 14, 2016) (Slip Copy) (similar, re personal jurisdiction); *Amberson Holdings, LLC v. Westside Story Newspapers*, 110 F.Supp.2d 332, 337 (D.N.J. 2000) (similar); *Zaletel v. Prisma Labs, Inc.*, 226 F. Supp. 3d 599 (2016) (server location not jurisdictionally relevant "because the users who initiate contact with the server unilaterally control the location where the server's response will wind up").

---

[34] United Nations Convention on the Use of Electronic Communications in International Contracts, G.A. Res. 60/21, U.N. Doc. A/RES/60/21, at Art. 4(f) and Art. 4(h) (November 23, 2005), available at: http://www.uncitral.org/pdf/english/texts/electcom/06-57452_Ebook.pdf ("UN Convention").  Articles 4(f) and 4(h) provide the following definitions:

(f) "Information system" means a system for generating, sending, receiving, storing or otherwise processing data messages;

(h) "Place of business" means any place where a party maintains a non-transitory establishment to pursue an economic activity other than the temporary provision of goods or services out of a specific location.

## 2.     No Admissible Evidence Regarding Purported Servers

The more fundamental flaw in the Wood-Gaspard Plaintiffs' proposition, [ECF 63] at 42-44, is that they have offered no admissible evidence as to what IAD or ATL mean in the context of the documents they have submitted;[35]  that IAD or ATL – whatever those codes represent – are in fact located in the United States; that IAD or ATL are even within MAS's control by ownership, lease or operation; that MAS has any employees at the IAD or ATL locations, wherever they may be; or that MAS can or does undertake any business activity from those locations.   Moreover, the Wood-Gaspard Plaintiffs offer no admissible evidence that MAS's data and information that may be moving through a remote server, wherever they may be located, was not entered and controlled from MAS's place of business in Malaysia.

Even if the Wood-Gaspard Plaintiffs' contentions about IAD and ATL are true – which is disputed due lack of any admissible evidence – they have no legal significance.

Therefore, regardless of the Wood-Gaspard Plaintiffs' speculations as to the nature of electronic data that may or may not pass through computerized systems that electronically exist in the United States, the location of a server bears no relationship to the Montreal Convention's jurisdictional requirement based on the carrier's "place of business through which the contract has been made." The contract for carriage is a contract between two parties – the carrier who must provide air transportation and the passenger who must pay for it. Absent the agreement of both the carrier and the passenger on the terms of the contract, it cannot be consummated. By

---

[35] *See* fn. 25, above.  The proffered evidence on which Plaintiffs rely as to the Wood Decedent hinges entirely on the improper Declaration of Stacey Blaustein [ECF 63-6] referred to as Exh. 6 in Plaintiffs' Response [ECF 63] and exhibits introduced through the Blaustein Declaration at 33-34.   For reasons set forth in the Motion for Exclusion of Certain Proffered Evidence filed contemporaneously herewith, Plaintiffs have not established any evidentiary foundation for Blaustein's assertions of the meanings of IAD and ATL, *see e.g.* [ECF 63-6] at ¶ 24, 26, and Exhibits 14 and 15 [ECF 63-6] at 53-58 and 59-60 on which Blaustein relies.  Blaustein's complete lack of qualifications to make such statements is proved by the fact that she bases her foundation for opinions on the very documents she claims to interpret!  *See* ¶ 21:  "I have been informed through Exhibit14 and Exhibit 15 of the meaning of the codes contained in these documents."   Moreover, Exh. 15 is a MAS document on which Blaustein has no qualification whatsoever to testify.

transmitting a request to purchase a ticket, the decedents (located in Malaysia (Wood) and China at the time) personally communicated the request – that was carried through a complex chain of agents and servers accessed through the internet, to MAS, which accepted each decedent's offer at its location in Malaysia.  The existence of servers played no role other than as conduits for the transmission of electrons, because but for MAS' agreement to accept the booking request and to provide transportation, and the Decedents' agreement to pay, the contract of carriage would not have been formed. Malaysia is the MAS's place of business through which the contract of carriage for these Plaintiffs' decedents were made.

**B.    The Alleged Automated Nature of the Booking Transactions Alters Neither The Requirement for MAS to Accept the Booking Nor MAS's Place of Business**

In an effort to create the illusion that MAS does not agree to its contracts of carriage through its headquarters in Malaysia, as set forth in the Panalal Declaration, the Wood-Gaspard Plaintiffs argue that the computerized and automated nature of MAS's response to passenger booking requests removes the requirement for MAS to accept the proposed contract for carriage, and also transports MAS's place of business from Malaysia to the United States. These arguments as to the process and timing of acceptance of bookings in no way support the contention that MAS agreed to these contracts of carriage at any location other than MAS's place of business in Malaysia, or that MAS's consent is inferred and not required. Accordingly, MAS is entitled to dismissal for lack of subject matter jurisdiction under Art. 33.1 for this reason as well.

**1.    The Alleged Automated Nature of the Booking Transactions Does Not Alter the Requirement for MAS to Accept a Booking Request to Make the Contract of Carriage**

The Wood-Gaspard Plaintiffs attempt to create fodder for speculation and argument, by

citing the potential for Interactive Sell functionality within the Global Distribution System contract between MAS and Travelport.   The Wood-Gaspard Plaintiffs argue that MAS cannot reject a passenger's request for booking.   However, a review of the terms of the Interactive Sell functionality documents supports, rather than contradicts, MAS's position as set forth in the Panalal Declaration because the terms expressly require acceptance or other appropriate response from MAS's system in Malaysia to form a binding contract of carriage.   *See* [ECF 63-35] (sealed exhibit).   As set forth in Clause 1 of Schedule 11, the Interactive Sell functionality allows a travel agent communicating a passenger's offer to purchase transportation from MAS to submit a real time *query of MAS's system* "with immediate confirmation or response *required from [MAS's] system.*" *Id.* at Document No. MH370-0003267[36] (emphasis added). Clause 2.B provides that, "[w]hen a flight of [MAS] is sold by a [Travelport] subscriber, the [Travelport] System will *interrogate [MAS's] System* at the moment of sell to *hold space temporarily* on specific flight/class/date of [the carrier]." *Id.* (emphasis added). Clause 2.C further provides that "[u]pon completion of the Booking File, the [Travelport] System will send a message containing a unique action/advice code and further data to [MAS's] System in order to complete creation of a [Passenger Name Record ("PNR")] *for which space has been temporarily held*, using a unique action/advice code for all such sales." *Id.* (emphasis added). Therefore, under the terms of the Interactive Sell functionality, the submission of a booking request to MAS does not create a binding contract of carriage but merely holds space temporarily in MAS's system while awaiting confirmation that MAS has accepted the passenger's offer.

The terms of Clause 3 – Responsibilities of the Participant – further reinforce MAS's

---

[36] Because the referenced Exhibit was filed under seal MAS cannot refer to the page numbering in the headers that are automatically assigned the Electronic Filing System.  To assist the Court, MAS refers to the numbering at the lower right corner of the page assigned by MAS at the time of production in response to the Wood Plaintiff's discovery requests.

position. Pursuant to Clause 3.A, "[i]mmediately following a sell *request*, [MAS's] System will *send* to the [Travelport] System either a *confirmation* of any space that has been temporarily reserved in [MAS's] System or *another appropriate response*."[37] *Id.* (emphasis added). Further, Clause 3.B provides that "[u]pon completion of the [Travelport] PNR as described in Clause 2.C of this Schedule, [MAS's] System will supply to the [Travelport] System a *confirmation* in the form of [*MAS's*] *Record Locator* in a format determined by [Travelport]. *Id.* (emphasis added). Thus, consistent with the Panalal Declaration, Schedule 11 requires that MAS *accept* the booking request and communicate its acceptance by reference to the E-ticket number created by and entered into its system in Malaysia before any binding contract of carriage may be formed. The Wood-Gaspard Plaintiffs fail to mention or address these specific terms, choosing instead to focus on the terms of an optional service (Schedule 12) that MAS did not elect (*see* [ECF 63] at 38), because the terms of Schedule 11 confirm that the contract of carriage is not formed until MAS's system in Malaysia accepts and confirms the booking request. Thus, the possibility that MAS may have responded immediately to the booking requests at issue here – which Plaintiffs have admittedly not established by way of any evidence – does not alter the fact that MAS's acceptance of the booking request is "put out of [MAS's] possession" from MAS's place of business in Malaysia.

More importantly, the documents produced by the parties in discovery contradict any inference that the booking requests at issue here were accepted by MAS immediately. *See* [ECF 63-32] at 1 (showing confirmation of Gaspard Decedents' booking request by reference to Orbitz booking number but indicating MAS record locator "not yet available. The flight reservation request has been sent to the airline(s)"); [ECF 63-31] at 2 (showing Wood's booking request

---

[37] The fact that under Schedule 11 "another appropriate response" is permissible establishes that a decision on the part of MAS is required.

generated at 0543 on 8 January 2014 and eTicket acknowledgment received more than ten minutes later).

Thus, the terms of Schedule 11 do not support Plaintiffs' argument.  A more fundamental flaw in the Wood-Gaspard Plaintiffs' argument is that they have not presented even a shred of admissible evidence that the bookings were, in fact, made using the Interactive Sell functionality. The Wood-Gaspard Plaintiffs' argument is entirely speculative and should be rejected on that basis alone.

> **2.    The Use of Computerized Communication Does Not Change the Fact that Malaysia is the Location of MAS's "Place of Business Through Which The Contract Was Made"**

The Wood-Gaspard Plaintiffs further attempt to conjure some place other than Malaysia as the location of MAS's "place of business through which contracts of carriage were made" by arguing that computerized communications between MAS and its passengers pass through computer servers located in other locations. However, the Wood-Gaspard Plaintiffs cannot escape the fact that at the time of entering into the contracts for carriage, MAS was in Malaysia, Wood was in Malaysia, and the Gaspard decedents were in China. The Restatement (Second) of Contracts specifically provides that "[a]cceptance given by telephone or other medium of *substantially instantaneous two-way communication* is governed by the principles applicable to acceptances where the parties are in the presence of each other." Restatement (Second) of Contracts, § 64. Moreover, under Section 63, "an acceptance . . . is operative and completes the manifestation of mutual assent as soon as put out of the offeree's possession, without regard to whether it ever reaches the offeror." *Id.* at § 63. These principles accord with international law similarly specifying that the automated or instantaneous nature of electronic commerce does not

alter basic principles of contract law. *See, e.g.*, UN Convention Articles 6, 10 and 12.[38]

Therefore, the contract of carriage between MAS and Wood became complete when MAS issued its acceptance and confirmation of the contract of carriage from its headquarters in Malaysia to Wood, who was also in Malaysia, where the Wood Plaintiff has admitted that the Decedent "purchased his ticket for Flight MH370."[39] Likewise, the contract of carriage between MAS and the Gaspard Decedents became complete when MAS issued its acceptance and confirmation of the contract of carriage from its Malaysian headquarters to the Plaintiff's Decedents in China, since the Gaspard Plaintiff has admitted the Decedent Rui Wang "was in Beijing, China, at the time of the purchase."[40] Although MAS took the final action in Malaysia required to consummate the contracts of carriage with Wood and the Gaspard Decedents, for purposes of argument even if Wood or the Gaspard decedents had taken the last required action, the outcome of the Motion to Dismiss would remain the same: none of the parties involved in the contracts for carriage took any actions with regard to the contract of carriage in the United

---

[38] See fn. 34 above; **Article 6** of the UN Convention provides, in relevant part: " [a] location is not a place of business merely because that is: (a) where equipment and technology supporting an information system used by a party in connection with the formation of a contract are located; or (b) where the information system may be accessed by other parties" and "[t]he sole fact that a party makes use of a domain name or electronic mail address connected to a specific country does not create a presumption that its place of business is located in that country." **Article 10(3)** provides: "An electronic communication is deemed to be dispatched at the place where the originator has its place of business and is deemed to be received at the place where the addressee has its place of business, as determined in accordance with article 6." **Article 12** provides: "A contract formed by the interaction of an automated message system and a natural person, or by the interaction of automated message systems, shall not be denied validity or enforceability on the sole ground that no natural person reviewed or intervened in each of the individual actions carried out by the automated message systems or the resulting contract."

[39] *See* Answers of Plaintiff Thomas Wood to MAS and MAB' First Set of Interrogatories Regarding Threshold Issues, Answer to Interrogatory No. 8: "The Decedent was temporarily in Kuala Lumpur, Malaysia, when, on January 7, 2014, he purchased his ticket for Flight MH370." Relevant pages attached hereto as **Exhibit 5**.

[40] See Answers of Plaintiff Thomas C. Gaspard to MAS and MAB's First Set of Interrogatories Regarding Threshold Issues for Decedents Rui Wang, Weiwei Jiao and Shuling Dai: Answers to Interrogatories Nos. 8 and 10 for  Rui Wang: (8) "Mr. Wang was in Beijing, China, at the time of the Purchase"; (10) "Decedent received reservation confirmation and electronic ticketing receipt through his email . . . while he was in Beijing, China. . ."; (15) "Decedent was in Beinjing (relevant Pages attached hereto as **Exhibit 6**); Answers to Interrogatory No. 8 for: Weiwei Jiao – "Decedent's husband, Rui Wang, purchased the subject ticket . . . .  Mr. Wang was in Beijing, China at the time of purchase" (relevant pages attached hereto as **Exhibit 7**); and Shuling Dai – "Decedent's son-in law, Rui Wang, purchased the subject ticket . . . . Mr. Wang was in Beijing, China, at the time of purchase" (relevant pages attached hereto as **Exhibit 8)**.

States, and thus Article 33.1 jurisdiction does not exist here.

**C.  A Travel Agent's Place of Business in the United States Is Not MAS's Place of Business through Which the Contract Has Been Made**

As the above discussion has demonstrated, the Wood-Gaspard Plaintiffs' argument that a travel agent in the United States using a GDS can accept a passenger's offer to purchase air carriage, and bind MAS to the contract of carriage, must be rejected. The same is true with respect to the argument that a travel agent's physical address or place of business in the United States can be attributed to MAS so as to be considered "the carrier's place of business through which the contract has been made." Art. 33.1. Plaintiffs' argument that because a ticket may be *issued* by a travel agent with a physical address in the United States means that the *contract was made* through the carrier's place of business in the United States confuses ticket issuance with contract formation.

As MAS explained in its moving papers, an airline ticket is not the contract of carriage, but rather evidence of that contract, and this Court has recognized that the place where a ticket is purchased or issued is not necessarily the carrier's place of business through which the contract has been made. *See Boyar v. Korean Air Lines*, 664 F. Supp. 1481, 1485 (D.D.C. 1987) (holding that "the place that the ticket is issued" is not always "the place where the mutual consent of the parties … occurs.")

Similar to the Wood Plaintiff's interpretation of Article 33.2, discussed above, the Wood-Gaspard Plaintiffs' interpretation of Article 33.1 reads a meaning into the Third Jurisdiction that is inconsistent with the text of that provision and violatesion of mandatory rules of treaty interpretation. The single case on which Plaintiffs rely, *Eck v. United Arab Airlines,* was decided over two decades before the seminal Supreme Court decision in *Chan v. Korean Air Lines,* and suffers from the same interpretive flaw. *Eck v. United Arab Airlines*, 360 F.2d 804 (2d Cir.

1966).  In *Eck*, the Second Circuit reversed the district court dismissal for improper venue under

the Warsaw Convention and held that the suit was properly brought in the district court for the

Southern District of New York because the carrier had a place of business there and it regularly

sold tickets from that place of business even though the passenger actually purchased the ticket

at a different carrier's office in California and the carrier accepted the booking request though its

office in Cairo, Egypt.[41]

There, the district court had used a literal reading of the Warsaw Convention, under

which was "clear in its meaning and that to permit suit by this plaintiff in this district, however

attractive that may be, would read a meaning into the treaty not originally intended." *Eck v.

United Arab Airlines, S.A.A.*, 241 F. Supp. 804, 807-08 (S.D.N.Y. 1965).

The Second Circuit reversed, using a flexible, avowedly non-textual non-literal, reading

of the Warsaw Convention:

> The language of the provision that is to be interpreted is, of course, highly
> relevant to this inquiry but it should never become a verbal prison . . . [T]he
> inquiry may lead the court to conclude that the language of the provision only
> imperfectly manifests its purpose, [in which case the court must] depart[]in some
> measure from the letter and read[]  the language in a practical rather than literal
> fashion. . . [and not allow the text to] become a 'verbal prison.'"

*Id.* (internal quotations and citations omitted).

This "verbal prison" language *Eck* used to "flexibly" interpret the Warsaw Convention

non-literally was also followed by the Second Circuit in *Lisi v. Alitalia-Linee Aeree Italiane, S.

p. A.*, 370 F.2d 508, 511–12 (2d Cir. 1966), *aff'd sub nom. Alitalia-Linee Aeree Italiane, S.p.A. v.

Lisi*, 390 U.S. 455, 88 S. Ct. 1193, 20 L. Ed. 2d 27 (1968) *abrogated by Chan v. Korean Air

Lines, Ltd.*, 490 U.S. 122, 109 S. Ct. 1676, 104 L. Ed. 2d 113 (1989).  *Chan* expressly repudiated

---

[41] *Eck* was also a venue case, in which the carriage contract was made through Oakland office of another airline, and
directly confirmed by United Arab Airlines' Cairo office, *see* 360 F.2d at 812.

the Second Circuit's use of this flexible "avoid a verbal prison" reasoning from dictum in a Frankfurter dissent, see C*han v. Korean Air Lines, Ltd.*, 490 U.S. at 127–28.  Plaintiff's only case to support their contract formation point – *Eck* – has been bad law for almost thirty years.

Additionally, contrary to the Plaintiffs' unsupported argument, the Panalal Declaration establishes that a travel agent cannot accept a proposed passenger's offer to purchase transportation on MAS flights; the terms of the TIGADA do not contradict her Declaration. As previously demonstrated, the Wood-Gaspard Plaintiffs' reliance on Clause 3.J (that MAS "shall not reject" a booking made via the optional service set forth in Schedule 11) puts the cart before the horse. Plaintiffs have not shown whether any optional service *was* used by the travel agents who submitted the booking requests on behalf of the Decedents at issue here.[42] Nor have the Wood-Gaspard Plaintiffs offered any admissible evidence to contradict the Panalal Declaration, by showing any travel agent actually *had* authority to enter into a contract of carriage on MAS's behalf.  The fact that a travel agent has a physical place of business in the United States does not transform the travel agent's place of business into MAS's place of business.

The Wood-Gaspard Plaintiffs have produced no evidence to support bare argumentation on legal effects of what might have happened.

The law also contradicts the Wood-Gaspard Plaintiffs' argument.  In the context of tax law, an independent agent's place of business in the United States is not attributed to a foreign corporation principal, for purposes of determining whether the foreign corporation is engaged in business activities in the United States, when that independent agent acts as such in the ordinary course of its business on behalf of various different principals. *See* 26 U.S.C. §864(c)(5)(A).

Air transportation is sold through a worldwide network of carriers and travel agents, who

---

[42] Even if they had established that fact by admissible evidence, the express terms of that provision require "confirmation or other appropriate response" from MAS's system in Malaysia before a binding contract can be formed.

act as independent agents in their ordinary course of business, both for other carriers and for passengers who may themselves be located anywhere throughout the world.[43] As such, a travel agent's physical place of business is not "the carrier's place of business through which the contract has been made," and the attribution of the travel agent's "place of business to the carrier for purposes of Article 33.1 is contrary to its own plain language. Indeed, such a reading would render the scope of the jurisdictional provision unacceptably unbounded. Because the place where MAS had its "place of business through which the [*Wood* and *Gaspard* Decedents'] contract[s] of carriage [had] been made" was in Malaysia – not the United States – MAS is entitled to dismissal for lack of subject matter jurisdiction.

## VI.   The Remaining Plaintiffs Fail to Articulate a Basis for Jurisdiction Under Article 33 of the Montreal Convention

In their Response [ECF 66], the SZKH Plaintiffs do not identify a single basis under Article 33 of the Convention on which the Court may exercise subject matter jurisdiction.   For this reason, their claims can be dismissed without further consideration.   The SZKH Plaintiffs' reliance on their separate claim against AGCS SE is of no help because there is no provision of Article 33 that expands the forums when a party when Article 32 is invoked, and the SZKH Plaintiffs cite no other authority for such a proposition.

## CONCLUSION

For all the reasons set forth herein and in MAS's Memorandum [ECF 38-1] this Court should grant MAS's motion to dismiss all of the plaintiffs' claims against MAS for lack of subject matter jurisdiction under the Montreal Convention.

---

[43] While MAS does not dispute that it had a ticketing office in the United States *when* the Decedents' contracts of carriage were made, it is undisputed that neither the Wood nor the Gaspard Decedents' contracts were *made through* that MAS place of business.

Dated: September 8, 2017          Respectfully submitted,

                            KAPLAN, MASSAMILLO & ANDREWS LLC

By:    /s/ Richard A. Walker
        Telly Andrews, IL Bar No. 6242431
        tandrews@kmalawfirm.com
        Richard A. Walker, IL Bar No. 6196947
        rwalker@kmalawfirm.com
        200 W. Madison Street, 16th Floor
        Chicago, Illinois 60606
        Telephone:  (312) 345-3000
        Facsimile:  (312) 345-3119

        *Attorneys for Defendant*
        Malaysian Airline System Berhad
        (Administrator Appointed)

**CERTIFICATE OF SERVICE**

The undersigned certifies that, on September 8, 2017, pursuant to Fed. R. Civ. P. 5 and LCvR 5.3, a true and correct copy of the foregoing Defendant Malaysian Airline System Berhad (Administrator Appointed)'s Reply in Support of Rule 12(b)(1) Motion to Dismiss Plaintiffs' Complaints on the Ground of Lack of Subject Matter Jurisdiction Pursuant to the Montreal Convention was filed with the Clerk of Court using the CM/ECF System, which will send notification of such filing to the attorneys of record at the email addresses on file with the Court.

/s/ Richard A. Walker
      Richard A. Walker