1

1      UNITED STATES DISTRICT COURT

2      FOR THE DISTRICT OF COLUMBIA

3

4  IN RE:   AIR CRASH OVER THE        :
   SOUTHERN INDIAN OCEAN, ON          :
5  MARCH 8, 2014                      :
                                      :   MISC. 16-1184
6  --------------------------------------------------------

7      TRANSCRIPT OF INITIAL STATUS CONFERENCE

8      BEFORE THE HONORABLE KETANJI BROWN JACKSON

9      UNITED STATES DISTRICT JUDGE

10      Tuesday, December 19, 2017

11  A P P E A R A N C E S :

12  For the Plaintiffs: PODHURST ORSECK, P.A.
    Wood, et al.       : BY:  ROY K. ALTMAN, ESQ.
13                            STEVEN C. MARKS, ESQ.
                          One S.E. 3rd Avenue, Suite 2300
14                        Miami, FL 33131

15
    For Plaintiffs     : MOTLEY RICE, LLC
16  Smith, et al.      : Transportation Practice Group
                          BY: MARY F. SCHIAVO, ESQ.
17                        28 Bridgeside Boulevard
                          Mt. Pleasant, SC 29464
18
    For the Plaintiff : CLIFFORD LAW OFFICES
19  Ganguli            : BY:  KEVIN P. DURKIN, ESQ.
                          120 N. LaSalle Street
20                        Suite 3100
                          Chicago, IL 60602
21

22  For Plaintiff      :  KREINDLER & KREINDLER, LLP
    Ries               :  BY:  MARC S. MOLLER, ESQ.
23                        750 Third Avenue
                          32nd Floor
24                        New York, NY 10017

25

2

1   A P P E A R A N C E S   (Continued):

2   For Plaintiffs Kanan:     SPAGNOLETTI & CO.
                              BY:  ERIC J. RHINE, ESQ.
3                             401 Louisiana Street
                              8th Floor
4                             Houston, TX 77002

5    For Plaintiffs Mustafa:WISNER LAW FIRM, P.C.
      et al.          :BY:  ALEXANDRA WISNER, ESQ.
6                             514 W. State Street
                              Suite 200
7                             Geneva, IL 60134

8    For Defendant Boeing:    PERKINS COIE
                              BY:  ERIC B. WOLFF, ESQ.
9                                  MACK J. SHULTZ, ESQ.
                              1201 Third Ave
10                            Suite 4900
                              Seattle, WA 98101
11

12   For Defendants Haagen:   KAPLAN, MASSAMILLO & ANDREWS,
      et al.,          :      LLC
13                            BY:  RICHARD A. WALKER, ESQ.
                                   TELLY ANDREWS, ESQ.
14                            200 West Madison Street
                              16th Floor
15                            Chicago, IL 60606

16

17   Proceedings reported by machine shorthand, transcript

18   produced by computer-aided transcription.

19

20

21

22

23

24

25

3

1           P R O C E E D I N G S

2           DEPUTY CLERK:  Your Honor, this is

3   Miscellaneous Case 16-1184, In Re: Air Crash over the

4   Southern Indian Ocean on March 8, 2014.  I am going to

5   ask counsel to please come forward and identify

6   yourselves for the record and state who you are

7   representing.

8           MR. ALTMAN:  Good morning, Your Honor.

9           THE COURT:  Good morning.

10          MR. ALTMAN:  Roy Altman of Podhurst

11   Orseck on behalf of what we called in our pleadings the

12   Podhurst and Wisner plaintiffs.  Good morning.

13          THE COURT:  Good morning.

14          MR. MARKS:  Good morning, Your Honor.

15   Steven Marks with Podhurst Orseck for the same parties.

16          THE COURT:  Mr. Marks.

17          MS. WISNER:  Good morning, Your Honor.

18   Alexandra Wisner on behalf of the same parties.

19          THE COURT:  Thank you.

20          MS. SCHIAVO:  Mary Schiavo, Motley Rice

21   law firm on behalf of the Smith and Zhang plaintiffs.

22          THE COURT:  Good morning.

23          MR. RHINE:  Eric Rhine from Spagnoletti

24   & Co. on behalf of the Kanan plaintiffs.

25          THE COURT:  Mr. Rhine.

4

1        MR. MOLLER:  My name is Marc Moller.

2        THE COURT:  Let me have you talk right

3   into the microphone so I can hear you.  Right there.

4   Thank you.

5        MR. MOLLER:  Marc Moller.  I'm here

6   simply to ask the Court to address the Reis compromise,

7   which you've had in chambers for quite a while.  We

8   would just ask you to take a look at it so that it can

9   be signed.

10        THE COURT:  All right.

11        MR. MOLLER:  It's on consent.  I've

12   said my piece for the day.

13        THE COURT:  You've said your piece,

14   thank you.  You appreciate there are a lot of moving

15   parts in this case and I'm trying to keep it all

16   together.

17        Is that it for the plaintiffs?  Yes.

18   All right.  Defendants.

19        MR. WOLFF:  Good morning, Your Honor.

20   I'm Eric Wolff at Perkins Coie, counsel for Boeing; and

21   my colleague, Mack Schultz from Perkins Coie is also

22   here, although I will likely present on behalf of all

23   the appropriate plaintiffs at the appropriate time.

24        THE COURT:  Thank you, Mr. Wolff.

25        MR. WALKER:  Good morning, Your Honor.

1   Richard Walker, Kaplan, Massamillo & Andrews on behalf

2   of Malaysian Airline System; Berhad, administrator

3   appointed; Malaysia Airlines Berhad; Allianz Global

4   Corporate & Specialty SE, and Mr. Henning Haagen.  And

5   I'll be representing our presenting argument on behalf

6   of all four of those parties.  I'm also here with my

7   colleague, Mr. Telly Andrews, who also represents the

8   same four defendants.

9           THE COURT:  Thank you very much.  I

10  appreciated hearing who you were going to argue on

11  behalf of, and I'm going to ask the plaintiffs as well,

12  but let me start by saying that this is a motion hearing

13  with respect to several dispositive motions that the

14  defendants have filed.  We've been managing this for a

15  while, so the Court now has 42 cases that it has been

16  assigned in the context of this MDL, and by my count we

17  have five separate motions to dismiss that have been

18  filed by the various defendants.

19           I have been considering them in

20  subcategories, and I think it's helpful that the

21  defendants have organized themselves to do argument.

22  But you might address them in this way:  The

23  forum non conveniens issue; the lack of jurisdiction

24  under Civil Procedure, Federal Rule of Civil Procedure

25  12(b)(1) pertaining to both the Montreal Convention and

1    the Foreign Sovereign Immunities Act; and then the

2    reinsurer issues.  That is, the lack of personal

3    jurisdiction under Rule 12(b)(2) and the failure to

4    state a claim under Rule 12(b)(6), both of which pertain

5    to the reinsurers.  So there are basically three

6    buckets, I think, and we will be considering them

7    probably even in that order.

8                    This is a complicated proceeding with a

9    lot of moving parts.  This hearing has been scheduled in

10   order to give the parties the opportunity to provide the

11   Court with oral argument, which hopefully will help to

12   illuminate some of the issues that you have put in your

13   papers.

14                   What I'm hoping to get is a clear

15   understanding of the parties' various positions

16   regarding whether or not the claims in this action can

17   proceed, and if not, why not.

18                   I am familiar with your arguments.  You

19   should certainly feel free to restate them in your

20   presentations and, of course, to provide as much

21   background detail as you think would be helpful to help

22   the Court to understand your arguments.

23                   You-all have appeared before me before,

24   although not at a motions hearing, so let me say that I

25   do tend to ask questions, although I will try to refrain

1    because I do want to hear your presentations.  But as

2    I'm sure you know, the purpose of this hearing is to get

3    my questions answered.  So don't be surprised if I ask

4    you a few.

5                     As far as the procedure that I tend to

6    follow with respect to my motions hearings, I try not to

7    worry too much about time limits.  I certainly don't

8    impose them on individual parties; but again, because

9    there's so much going on in this case, I thought we

10   might have a general time frame for the various issues

11   just so that we can keep it all under control.

12                     As I said, I've grouped the motions

13   into three categories, and I think what I will do maybe

14   is ask you-all what you have decided in terms of how to

15   present.  So if I say let's talk about

16   forum non conveniens, who is going to be presenting from

17   defendants' perspective?  Mr. Wolff.

18                     MR. WOLFF:  Your Honor, I will do my

19   best to answer all of your questions on

20   forum non conveniens, and I'd prefer to present on that,

21   with the caveat that if it's something that requires

22   deep knowledge about the airline, I'll probably turn to

23   Mr. Walker for that.

24                     THE COURT:  Okay.  So you've got forum,

25   and I'll get to the plaintiffs in a second.  What about

1    12(b)(1)?  Yes.  That's you?

2                    MR. WALKER:  Yes, Your Honor, Richard

3    Walker.  I'll be handling the Foreign Sovereign

4    Immunities Act and the Montreal Convention motions to

5    dismiss.

6                    THE COURT:  Okay.  And also the final

7    few, the personal jurisdiction and failure to state a

8    claim, those are your clients as well?

9                    MR. WALKER:  Yes, I will be handling

10   those as well, and those are probably the easier motions

11   among this group.

12                   THE COURT:  Okay.  I think that's

13   right, which is why I've allocated the least amount of

14   time for those and probably will leave them to the end.

15                   MR. WALKER:  I'm comfortable with that.

16                   THE COURT:  Okay, all right.  So let's

17   say we started with forum non conveniens, and Defendants

18   have presented from the plaintiffs' perspective who

19   intends to respond.

20                   MR. ALTMAN:  I usually say ladies

21   first.  But I will be arguing -- Roy Altman, Your Honor.

22                   THE COURT:  Yes.

23                   MR. ALTMAN:  I'll be arguing on behalf

24   of two sets of plaintiffs, the Podhurst plaintiffs and

25   the Wisner plaintiffs, on forum non conveniens, and if

1    the Court wants to skip ahead, I'll also be arguing the

2    Wood and Gaspard 12(b)(1) responses as well.

3                    THE COURT:  All right.  And then we'll

4    have additional plaintiffs' arguments for the other

5    plaintiffs in response to those same issues?

6                    MS. SCHIAVO:  Yes.  Mary Schiavo for

7    Smith, Zhang and Huang, and I will promise I will not

8    repeat anything that honorable counsel, plaintiffs

9    counsel says.  We will try to be efficient.

10                    THE COURT:  Great.  That would be very

11   helpful.  Yes.

12                    MR. RHINE:  Eric Rhine for the Kanan

13   plaintiffs.  If you remember in the initial conference

14   that we had, you asked us to jointly respond to the

15   motions where appropriate.

16                    THE COURT:  Yes.

17                    MR. RHINE:  We've jointly responded

18   along with Ms. Schiavo.

19                    THE COURT:  Right.

20                    MR. RHINE:  So I think she'll cover

21   everything that needs to be addressed, but in the event

22   I need to say anything, I may speak up.

23                    THE COURT:  You may jump up.  That's

24   fine.  I just am trying to keep track of what's

25   happening here.

1          Okay.  So hopefully we can manage this,

2   and my thought would be to start with defense counsel.

3   Let you present on forum non conveniens, have the

4   plaintiffs respond, and then a reply from defense

5   counsel and so on and so forth, leaving about 45 minutes

6   or so for forum non conveniens, 45 minutes or so for the

7   12(b)(1) issues and then we'll take a break, maybe ten

8   minutes, and then we'll finish up with the reinsurer

9   arguments.  Hopefully.  All right.

10          So I think that means, Mr. Wolff,

11   you're up.

12          MR. WOLFF:  Thank you, Your Honor.  So

13   it was our position on the defense side before we came

14   to see you this morning that forum non conveniens

15   presents sort of the easiest path through all the

16   briefing you've received; and as the preceding

17   discussion showed, the Court has received a lot of

18   briefing and attachments and everything.

19          But when it's all -- when it's kind of

20   boiled down and put into perspective, my count is we

21   have 105 decedents, and you mentioned 42 cases.  But in

22   these jurisdictional issues that the Court has, you

23   have, it's coming down to really like one or two people

24   with a lot of ink spilled on those.

25          And this sets up for exactly what the

1  Supreme Court kind of focused on in *Sinochem*, which is

2  actually a case that involved a Malaysian company.

3  Justice Ginsburg's writing for the Court, and she says

4  for the Court if you have thorny jurisdictional issues

5  and whatnot -- and the D.C. Circuit already held this in

6  *Papandreou* -- you have these thorny jurisdictional

7  issues but you have a relatively clear path on

8  forum non conveniens, go ahead and answer

9  forum non conveniens.

10                 THE COURT:  So your initial opening

11  salvo is that forum non conveniens gets rid of

12  everything if I agree with you?

13                 MR. WOLFF:  It does.  Yeah.  And it

14  also it gets rid of everything, and on the balance of

15  the other questions -- and, again, Mr. Walker will

16  address the merits of that -- but on the balance of the

17  other questions, you have nearly every decedent

18  represented can't get in this court against MAS or MAB.

19  There's no jurisdiction.  You only have a couple

20  people -- you'll hear a lot about Mr. Wood -- that are

21  trying to make this Montreal Convention jurisdictional

22  argument.  But most of the folks don't have that

23  jurisdictional argument.

24                 So there's this imbalance in sort of

25  who can be here against everyone.  And to quote

12

1    Judge Breyer in the *Air France* case -- and we've

2    presented *Air France* to you as really the most analogous

3    recent case and there are a lot of analogies in that

4    case, including the fact that when he ruled they had not

5    found the black boxes, that it was a crash in the middle

6    of the ocean, that you had passengers from different

7    countries, and that you also had Americans.  And he

8    granted forum non conveniens.

9                    But to quote Judge Breyer, he said he's

10   granted forum non conveniens because in his case the

11   alternative forum is the procedurally sensible choice.

12                    THE COURT:  Yes, but the defendants in

13   this -- excuse me, the plaintiffs in this case say there

14   are decedents from all over.  The crash that happened in

15   this case was in the middle of the ocean in a way that

16   is being investigated by multiple countries; Australia

17   has the lead.  So why is it sensible based on the claims

18   that have been brought here, especially the claims

19   against Boeing, which is not a Malaysian company, which

20   is a U.S. company, why is it the most sensible to do

21   this in Malaysia?

22                    MR. WOLFF:  So the Court's question had

23   a number of factual representations, and then there's

24   the question of why is it sensible in Malaysia and then

25   another question is why would it be convenient here.

1        So to start with the factual

2   representations, there are people from all over the

3   world.  But to be clear, we have Chinese, there were 38

4   Malaysians on the plane.  Most of the folks in the cases

5   before Your Honor are from China.  And then we have

6   various others.  You have I think five from India before

7   you among the decedents, and then I think there's a

8   New Zealander and an Australian, and then you have just

9   three people who have some tie to America.  You have two

10  young children who died who were American citizens

11  because they were born here, but they were living in

12  China with their parents.  You have Mr. Wood, who

13  previously resided in the U.S., and you've got a big

14  dispute over whether, you know, he thought he might come

15  back to the U.S.  He was not residing in the U.S.

16  Nobody resided in the U.S. at the time of the accident.

17              THE COURT:  Right.  But you're

18  answering the third question as you posit it, which is

19  whether it makes sense in the U.S.  My question to you

20  is does it make sense in Malaysia, which is what you're

21  asking for.

22              MR. WOLFF:  So that's the nature of who

23  you have before you.  And Malaysia -- Malaysia is

24  leading this investigation.  It's under the ICAO.

25  Malaysia leads the investigation.  Now, it's

1    understandable that the Court might think Australia is

2    leading the investigation, because Plaintiffs' counsel

3    multiple times has tried to represent the Australian

4    report as if it's making findings about the cause of the

5    accident.  That is false, that's demonstrably false, and

6    the Court has briefing on that issue.

7              The Australians, in coordination with

8    the Malaysians and the Chinese, had a joint command,

9    they're looking for the wreckage.  The Malaysians lead

10   the investigation into what caused the crash, and the

11   briefing has had this fundamental confusion in it trying

12   to say it's not a Malaysian thing.  In fact, if I were

13   to just summarize the FNC response briefing or at least

14   the Podhurst briefing in like one sentence, it would be

15   to diminish the Malaysian role in the investigation and

16   search.  That's kind of the theme of the brief.

17             And so it says, you know, they didn't

18   contribute any boats, they didn't contribute much money.

19   Those things are all false.  Our brief goes through the

20   public websites and shows how those things are all

21   false.

22             THE COURT:  All right.  So Malaysia is

23   leading the investigation.

24             MR. MARKS:  That's indisputable fact

25   number one.  Indisputable fact number two is that most

1    of those decedents here before you are already

2    represented in proceedings in Malaysia, and now those

3    proceedings are moving forward.  So if our FNC analysis,

4    what that does, that eliminates available forum.  It is

5    an available forum.  They're already there.  Nobody

6    really does dispute that.

7                 THE COURT:  But aren't they there in

8    part because the plaintiffs were worried about the

9    statute of limitations?  Didn't they really want it to

10   be here but they filed those cases there as a protective

11   measure?

12                MR. WOLFF:  I'm sure that's what they

13   will say, and that may even be true.  The point is for

14   the FNC analysis it demonstrates that it's available.

15   So that part of the analysis we're moving into it,

16   that's done.  It is adequate.  By the standards of

17   *Piper*, the Malaysian forum is adequate because it

18   provides some remedy -- and I'm now quoting *Piper* -- it

19   provides some remedy, that's not clearly unsatisfactory.

20   Clearly unsatisfactory would be no remedy or you can't

21   even litigate the, quote, subject matter of the dispute,

22   or it has a potential avenue for redress.  Okay.

23                Again, not seriously disputed by the

24   plaintiffs, if disputed at all.  The Podhurst firm has

25   an expert declaration from a solicitor in Malaysia.  He

1    explains the system.  It doesn't take issue with

2    adequacy in terms of *Piper* or anything like that.

3                    THE COURT:  All right.  Well, let's

4    shift from adequacy then into the balance and help me to

5    understand why Boeing, American company, is asking for

6    this case to be moved from the United States to a

7    foreign jurisdiction.

8                    MR. WOLFF:  So Boeing has appeared in a

9    number of the cases that we presented to Your Honor.  So

10   we gave you an appendix, and ever since *Piper*, the sort

11   of federal courts confronting foreign aviation accidents

12   have pretty consistently found forum non conveniens,

13   including in several cases involving Boeing.  The Ninth

14   Circuit had a Boeing case which I argued recently for

15   Tanner, which was a Spanish accident.  The *Clerides*

16   opinion in the Seventh Circuit was a Boeing case

17   involving an accident in Greece.  So this is -- there's

18   nothing new going on here.

19                    THE COURT:  I understand, but again can

20   you get to the bottom line, which is why Boeing would be

21   requesting that this happened in all of these cases.

22                    MR. WOLFF:  So the reason that Boeing

23   requests it is that these cases cannot be fairly

24   adjudicated in the United States because this Court is

25   not able to compel the kinds of witnesses and evidence

1   that Boeing would require for its defense, and Boeing

2   will not be able to implead the operator or to make a

3   case against third parties just as in *Piper* and many of

4   the other cases in order to defend itself.  And this is

5   why I fronted some of those jurisdictional problems.

6                So if all but one of the decedents,

7   let's say, or let's say all of them to start with, but

8   nearly all the decedents cannot sue Malaysia, MAS or MAB

9   in this proceeding, Boeing also can't sue MAS because of

10  the Foreign Sovereign Immunities Act.

11               THE COURT:  But doesn't that have -- so

12  you're saying because of the Foreign Sovereign

13  Immunities Act.  I'm trying to understand -- this was an

14  issue that came up were for me in the briefs -- is this

15  negatives of who can be sued.  Wouldn't that be the case

16  no matter where the jurisdiction is?  There's something

17  about the FSIA that is preventing Boeing from suing

18  these people.

19               MR. WOLFF:  Well, I think it's more

20  than the FSIA.  But the -- everybody can appear in

21  Malaysia, and that's why Malaysia is the procedurally

22  sensible place.  The plaintiffs decedents are already

23  there.  Boeing has agreed to produce its evidence, which

24  is, which the Court can also make a condition of

25  dismissal and is a routine condition in these cases.

1          THE COURT:  In one of the plaintiffs'

2   briefs there was a suggestion that while Boeing may have

3   agreed to be sued in Malaysia, it objected to

4   plaintiffs' counsel being involved in that lawsuit.  Is

5   that not true?  There was a representation that --

6          MR. WOLFF:  I don't recall --

7          THE COURT:  -- counsel sought to get

8   pro hac admission into the Malaysian courts to represent

9   people in the context of those lawsuits and that there

10   was an objection from the defendants.

11          MR. WOLFF:  My understanding is

12   Mr. Marks and Mr. Altman attempted to appear as counsel

13   in Malaysia, and the Malaysian court rejected that.

14          THE COURT:  At the defendants'

15   objection.

16          MR. WOLFF:  I don't know the answer to

17   that; Mr. Walker may know the answer to that.  But

18   Boeing is not in that proceeding.  So they have not

19   brought Boeing into that proceeding.  Boeing will make

20   its evidence available, and Boeing has stipulated that

21   we'll extend the statute of limitations for 120 days for

22   refiling in Malaysia.

23          Also, they used the word "transfer."

24   There's not a transfer to Malaysia.  There are cases in

25   China; if people would like to pursue their claims in

1    China, they can do that.  Mr. Schultz recently went to

2    China to watch proceedings in China.  He did not appear

3    in those proceedings.  There's Chinese counsel in those

4    proceedings just like, Your Honor, even the security at

5    the door is not going to recognize a bar card from

6    Malaysia or have a Malaysian lawyer appear here.  It's

7    not extraordinary.

8                    THE COURT:  I'm not sure I understand

9    that, where you are.  So you would or would not object

10   to -- you're not in the cases.

11                   MR. WOLFF:  We're not in the cases.

12                   THE COURT:  So it doesn't matter

13   whether you agree or disagree.

14                   MR. WOLFF:  I'll just say I take no

15   position today.  I don't know.  Honestly, Your Honor, I

16   have never confronted that in a foreign jurisdiction.  I

17   do not stand here as the expert in how to litigate in

18   foreign jurisdictions or anything like that.

19                   THE COURT:  All right.  Can I get back

20   to why Boeing believes that the information and evidence

21   that it needs is not in the United States when the

22   claims against Boeing are claims for design and

23   manufacture, both of which occurred in the United

24   States.  So what is it that Boeing thinks it needs

25   elsewhere?

1          MR. WOLFF:  Well, let's go into the

2   claims against Boeing.

3          THE COURT:  Yes.

4          MR. WOLFF:  So you have two different

5   types of claims.  You have the Podhurst claims, which is

6   essentially a res ipsa loquitur theory.  And in our

7   reply brief we kind of tick through all the things that

8   the Podhurst complaint claims it can rule out.  It

9   claims it can rule out intentional misconduct by someone

10  on the plane, and it can rule out terrorism, weather,

11  maintenance, all kinds of other things and then point

12  the finger at Boeing on the res ipsa loquitur theories.

13  We've eliminated all other causes.  Presumption shifts.

14  Now we think it must have been the plane.

15          The only way to do that is with

16  evidence from Malaysia and even on the defect theories

17  of some of the other plaintiffs.

18          THE COURT:  I'm sorry.  Before you go

19  on.  This res ipsa loquitur theory, is that in the

20  complaint?  How do you know that that's what Podhurst

21  and the plaintiffs are going to be pursuing?

22          MR. WOLFF:  Well, the Court has

23  actually received various representations that they can

24  rule out -- I mean, so if I had to summarize the

25  response briefing in another sentence, I would say

1   there's -- the plaintiffs say there's no evidence.

2   There's no evidence.  In fact, the Podhurst brief says

3   we don't know why the plane crashed and we don't know

4   where it is.

5                   And so then they say, Well, so there's

6   no evidence in Malaysia because there's just no

7   evidence.  But they still need to prove their case, and

8   in order to do that, they claim that they can rule out

9   these different causes.  So at pages 6 and 7 of our

10  reply brief, which is ECF 72, I went through their

11  complaint and I identified this -- it is

12  a res ipsa loquitur theory.  If you look at the

13  allegations of the complaint, that's what it is.

14                  And I note -- and here I'm just going

15  through their complaint.  It says it pleads, quote --

16  I'm quoting them -- "there is simply no evidence that

17  the disappearance and crash of Flight MH 370 was in any

18  way caused by intentional pilot misconduct."

19                  Well, how do you prove that?  Well, you

20  got to rule out intentional pilot misconduct.  How, what

21  evidence in the United States would rule that out?

22  Well, there is none.  It would have to be evidence in

23  Malaysia.

24                  And then they say, they purport that

25  they can also rule out the crew, terrorism, maintenance

1    and weather.  That's a res ipsa loquitur theory.

2                    THE COURT:  And you're quoting the

3    complaint here?

4                    MR. WOLFF:  Yes, I give the paragraphs

5    of the complaint.

6                    THE COURT:  All right.

7                    MR. WOLFF:  And that first line about

8    intentional pilot misconduct is a direct quote.

9                    So now let's get back, so what's

10   Boeing's problem, why can't you defend in the United

11   States.  Well, let's say that our defense is, it might

12   be that there's intentional misconduct.  Okay.  The

13   pilot did it.  Let's say that's our theory.  That

14   doesn't involve evidence from the state of Washington.

15   And what evidence would we seek to, regarding, say, the

16   pilot?  Well, we would want to hear about his living

17   situation.

18                    THE COURT:  I understand, but does the

19   defendants' defense really govern the Court's

20   consideration of forum non conveniens?

21                    MR. WOLFF:  Absolutely.

22                    THE COURT:  It does?

23                    MR. WOLFF:  Absolutely.

24                    THE COURT:  Interesting.

25                    MR. WOLFF:  That's clear under the case

1  law.

2              THE COURT:  Not the claims, not the

3  claims that are being brought by the plaintiff?

4              MR. WOLFF:  You assess, so, then

5  *Cobbard* [phon.]  Is another Supreme Court case that kind

6  of sketches out how you do the likely contours of the

7  case.  But this was very important in *Piper*.  This was a

8  very common maneuver, Your Honor, in these

9  forum non conveniens cases.

10              Let's just be clear.  You have

11  experienced aviation counsel on both sides.  We show up

12  and we do this like a minuet.  One of the things that

13  I'll do is they'll tell Your Honor, it's a products

14  liability case.  It's all about evidence in Washington.

15  That's what we need.  We got to see all those things

16  about how you certified it and designed it and whatever.

17  That argument has been made since *Piper*.

18              And that's fine.  That's true.  We're

19  not coming here and saying, Oh, yeah, there's nothing in

20  Washington that could possibly be relevant.  No, we

21  understand that.  If you have a products liability case,

22  you want to know about the product, okay.  All that

23  evidence will be available in Malaysia.

24              What the cases make clear, and

25  Judge Breyer gives it the back of the hand.  He's like,

24

1   you can't just plead out of these defenses that the

2   manufacturers are going to make, which involve the

3   operator.  And that's why in *Piper* and the D.C.

4   Circuit's opinion in *Payne*, which is also controlling,

5   is you have to allow the defendant, the American

6   manufacturer, to make its case that it wasn't the

7   product, that it was something else.

8                  So even if Mr. Altman didn't have a

9   res ipsa loquitur theory, even if it were just, say, the

10  other plaintiffs with these nebulous defect theories, I

11  mean, they're just total speculation at this point.  But

12  even if it were that, Boeing has the right to come in

13  and say, You know what, when that plane changed airspace

14  and the communication systems went off and it made a big

15  sweeping left turn, that wasn't the airplane flying

16  itself.

17                  THE COURT:  And what about it being in

18  the United States prevents Boeing from making that

19  argument?  It's that it can't get the witnesses here?

20  What?

21                  MR. WOLFF:  So the reality of

22  litigating it and because so many of these cases are

23  dismissed, like this has never played out, but I think

24  if it actually played all the way out, it would present

25  a serious due process question.  Because the only way

1  Boeing can present evidence from Malaysia is, first of

2  all, someone would have to willingly bring it here.  If

3  you can't do that, then this Court can't compel it.  So

4  you do a letter, letters rogatory.

5              So you write to Malaysia and ask a

6  court to essentially have folks answer interrogatories.

7  That's it.  No live testimony, no deposition testimony.

8  They -- essentially written the Answers to

9  Interrogatories, so, you know, people who knew the

10  pilot, people who examined things, you know, the

11  reports.  And the plaintiffs acknowledge these in their

12  response briefing.  The reports about the pilot may have

13  had a flight simulator that actually showed kind of a

14  line that the plane took out into the Indian Ocean,

15  things like that.  Who observed that, okay.  We get an

16  interrogatory that says that.  That is insufficient.

17  That goes --

18              THE COURT:  And that's because of the

19  state of the relationship between the United States and

20  Malaysia with respect to litigation?

21              MR. WOLFF:  I think it's just the

22  reality of letters rogatory.

23              THE COURT:  I mean, we're in letters

24  rogatory world as opposed to some other world because of

25  the legal relationship?

1      MR. WOLFF:  So that's how Boeing would

2   have to defend itself in one of these cases.  And let's

3   imagine a scenario, let's say the boxes are found.  This

4   is what happened in *Air France*, okay.  Contrary to what

5   is written in the Podhurst brief, at the time

6   Judge Breyer ruled, the boxes were not found.  They were

7   not already in France.  They were still unlocated.  They

8   get that wrong in their brief, okay.

9      So just as we are here, you need to

10  rule to this, the boxes haven't been found.  After he

11  dismissed the case, they were found.  That could happen

12  here too.  And then where do they go?  They go to

13  Malaysia.  No dispute about that.  That's indisputable.

14  They go to Malaysia because Malaysia is leading the

15  investigation.

16      Let's say that on the boxes there's a

17  recording, it shows clearly what happened, okay.  What

18  does Boeing do?  That evidence by treaty is not even

19  going to be released without the permission of the

20  Malaysian investigators.  Judge Breyer noted that as

21  well.  That is all --

22      THE COURT:  And this Court could not

23  compel them to release it, the courts here litigating

24  these cases?

25      MR. WOLFF:  That's right.  So let's

1   imagine, just play it out, who knows, but you play it

2   out and it's a clear case of intentional misconduct,

3   say.  And that evidence is in Malaysia.  But up here in

4   the United States we have a trial that says, Oh, no,

5   actually it was some like completely anomalous freakish

6   electrical failure, and then, you know, all this

7   argument about how Boeing should have foreseen that.

8   And then the failure ceased itself shortly before the

9   crash because the systems actually rebooted, and that's

10   what did it.  That is a completely unfair proceeding for

11   Boeing, not being able to bring that evidence in from

12   Malaysia.

13          THE COURT:  All right.  So we have

14   evidentiary impediments.  Do you have other reasons why

15   you think the forum non conveniens question clearly

16   tilts in Boeing's favor?

17          MR. WOLFF:  So the private interest and

18   public interest, and I'll just finish up with the

19   private interest.

20          So the private interest can kind of be

21   looked at, you know, there's the residence of the

22   parties and witnesses.  Well, residents, there were no

23   actual U.S. residents.  You have some folks with

24   American ties -- in *Payne*, the last portion of that

25   opinion in *Payne*, which came out shortly before *Piper*

28

1    but it is still controlling law in these points in this

2    Circuit.  That last section of *Payne* actually goes back

3    to an old Law Review article by Justice Ginsburg when

4    she was teaching at Rutgers.  And it says, you know, in

5    some of these cases American courts need to like stop

6    assuming that they have to provide a remedy when like

7    kind of everything is overseas.

8                 And the last part of that opinion says

9    that, you know, if the gravity of this thing is

10   overseas, it does not matter that one of the oil workers

11   in that case was from the U.S.  And it doesn't matter

12   that its representative which turned out it was his

13   mother, is from New Hampshire, because this accident is

14   not an American accident and it should be, it should be

15   handled in Norway.  And so, you know, here we actually

16   don't have any U.S. residents.

17                Then you go, if you kind of break up

18   the rest of the factors, it's really burden and then

19   compelling evidence.  And I've already talked about

20   compelling evidence and the serious limitations on

21   compelling evidence.  The Supreme Court in *Gulf Oil*

22   actually says live testimony is significant, and there

23   will be no live testimony from any of the folks in

24   Malaysia.

25                THE COURT:  All right.  Let me just ask

1    you one other question, which is, does this Court have

2    to issue a uniform ruling that covers all 42 of my cases

3    in the context of the MDL, or could because let's say

4    there are -- you know, what if the Court decided to keep

5    the Boeing cases and dismiss the other cases, have you

6    ever seen that happen?

7                    MR. WOLFF:  I have seen carve-outs --

8    when I sit down, I can go back in and check a couple

9    things.

10                   THE COURT:  Yes.

11                   MR. WOLFF:  But I have seen carve-outs

12   of like one or two Americans.

13                   THE COURT:  Yes.

14                   MR. WOLFF:  But which Judge Breyer

15   rejected that.  I mean, he found that the Harrises, who

16   still actually maintained a home in Texas even though

17   they had been working in Brazil, he said they do have

18   Montreal jurisdiction.  But they should go to France

19   with everyone else.

20                   And so I can't -- I think I've seen

21   carve-outs in other cases, but a big carve-out of Boeing

22   I have not seen.  And, you know, Boeing has had a few

23   cases in Illinois state court where the Illinois trial

24   courts apply Illinois forum non conveniens.  I mean,

25   frankly we think it's like just -- well, just as

1  objectively is not what a federal court would do.  It's

2  just not.

3           THE COURT:  All right.

4           MR. WOLFF:  But if I could just talk

5  about -- could you do it is a question of like would it

6  be an abuse of discretion.  And I think it would be an

7  abuse of discretion because I think it would be very

8  difficult to justify without making an error of law

9  under the *Piper* standard.  Like I think you would have

10  to give weight to something or an amount of weight that

11  the case law clearly says either there's no weight to

12  that or that's too much weight to that.

13           So if Boeing stands alone, which is

14  what the carve-out would do, I think that that is going

15  to be extremely difficult to justify under *Piper* and

16  *Payne*.  Because under *Piper*, the fact that the American

17  manufacturer of the plane would not be able to bring in

18  the operator or would stand alone, was crucial to the

19  determination of forum non conveniens, that's the

20  Supreme Court's word.

21           In *Payne* it was a major factor.

22  Actually I think I have those swapped.  In *Piper* it was

23  major and in *Payne* it was crucial.  So the contemplated

24  order is Boeing stands alone.  And that is precisely the

25  scenario in much smaller cases.  So cases with much less

1    evidence to compel, much less burden of traveling.  I

2    mean --

3                    THE COURT:  Because of these compulsion

4    problems you're saying, because Boeing could not bring

5    in the evidence that it needed?

6                    MR. WOLFF:  Two things.  It's

7    compulsion but it's also burden.  Because getting

8    evidence from Malaysia or China, in the case of damages

9    evidence, is very burdensome.  And Plaintiffs can say,

10   Well, we'll make it available and they are making it

11   available in the Malaysian proceeding.  But they can't

12   make available what Defendants would want to evaluate

13   those claims.  And it would be burdensome to go get that

14   evidence over there.

15                   So -- and the burden in *Piper* and *Payne*

16   was minimal.  I mean, you're talking about the UK,

17   whereas here you're talking about Malaysia.  So it's

18   both burden and then the Court's ability to compel that

19   it sort of tip the private -- no American residents,

20   burden, you can't compel, and then if Boeing stands

21   alone, it's just completely unfair.  It's actually

22   several times the burden and unfairness of what would

23   have been in *Piper* or *Payne*.  I mean, it's the same

24   scenario.

25                   THE COURT:  All right.

1                    MR. WOLFF:  And then lastly, it's

2       public interest.  And on public interest there's no

3       distinguishing this case from the others.  I mean, the

4       plaintiffs attempt to diminish Malaysia and try to say,

5       Oh, it's not pulling its weight.  Those representations

6       are false.  And the only claimed U.S. interest is well,

7       Boeing is an American manufacturer.  That is the exact

8       same interest as in *Piper*.  That's the exact same

9       interest as in *Payne*.  It's appeared in lots of other

10      cases.

11                    Malaysia runs a civil investigation in

12      a criminal investigation.  There are 38 Malaysians on

13      the flight.  Its Malaysian national carrier took off

14      from the Malaysian capital.  This is a Malaysian

15      tragedy.  Malaysia has -- the public interest balance

16      clearly tips to Malaysia, and so with not any really

17      dispute over available adequate forum, alternative

18      forum, private interest tipping because of burden and

19      inability to compel, the unfairness of Boeing standing

20      alone and then the public interest being the same as in

21      these other cases, you know, we've put it to Your Honor

22      as being kind of right in the heartland of these cases.

23                    THE COURT:  All right.  Thank you.  I

24      don't know, Mr. Walker, whether you wanted to add

25      anything.  You are joining in the forum non conveniens

33

1    issue.  You don't have to.

2              MR. WALKER:  Your Honor, I just do want

3    to make it clear for the record that this is a joint

4    motion that's been brought on behalf of Boeing,

5    Malaysian Airline System Berhad and Malaysia Airlines

6    Berhad and Allianz Global Corporate & Specialty SE.

7              THE COURT:  Yes.

8              MR. WALKER:  And I would just like to

9    highlight that although the Allianz question is being

10   dealt with in separate motions, it is a European

11   company.  There's no connection to the U.S. forum in any

12   event.  The plaintiffs, some of the plaintiffs that are

13   suing Allianz in the United States are also suing

14   Allianz in Malaysia.

15             THE COURT:  Right.  All right.  Thank

16   you.  Mr. Altman.

17             MR. ALTMAN:  Thank you, Judge.  If I

18   could just answer directly the last question that you

19   asked, to which I don't know that you received a clear

20   answer, the answer is yes.  You can carve out certain

21   plaintiffs for a variety of reasons under an abuse of

22   discretion standard.  And yes, since *Piper* the Circuit

23   Courts of the United States have repeatedly affirmed

24   such carve-outs, carve-outs, by the way, handled by our

25   firm, cases like *King*, the *Nigerian Air* case, the *West*

1    *Caribbean* case, the *SAS* case and the *Dana Air* case.

2              THE COURT:  All right.  But Mr. Wolff

3    says terrible abuse of discretion in this context if you

4    carve out Boeing.

5              MR. ALTMAN:  Your Honor, let me just

6    start with that point.  This case is completely

7    different than every other case that Boeing has cited in

8    their papers.  And it's completely different for the

9    three reasons that we've pointed out.

10             They've cited 49 cases in their brief,

11   and by the way, Mr. Wolff said today that the federal

12   courts have consistently or uniformly, I think was the

13   word, granted forum non conveniens since *Piper* in cases

14   like this.

15             The reality is that we've presented 25

16   or 30 cases where the courts have denied

17   forum non conveniens, and the fact is that the 49 cases

18   that they've cited all involved three factors, one of

19   three factors, not one of which is present here.  Those

20   factors are either all or a majority of the plaintiffs

21   and decedents resided in the specific foreign forum to

22   which the defendant sought transfer or dismissal.

23             In other words, and I cited this for

24   you, in 28 of those 49 cases either all or a majority

25   were from France or Scotland or New Zealand or Greece,

 1    the country that the defendant was seeking to dismiss

 2    the case.  That's not true here, Judge.  In this case 38

 3    of the plaintiffs were from -- 38 out of the 239 people

 4    on board were from --

 5                    THE COURT:  Yes, but only three are

 6    from the U.S.

 7                    MR. ALTMAN:  Your Honor, the reality is

 8    that I think there's a big difference between how many

 9    are on the plane or how many are before the Court.  And

10    when you consider how many are going to be before the

11    Court, in my opinion, in a few weeks' time when the

12    Court deals with the jurisdictional questions -- and

13    I'll get to that in a second, because I do and I think

14    it's important for the Court to review the

15    jurisdictional questions first for this very reason.

16                    I think the Court will find that the

17    Podhurst and Wisner plaintiffs are situated very

18    differently than the other plaintiffs.  And I'm not the

19    judge, and I'm not going to make jurisdictional

20    relation, of course, but I think that there is a chance

21    that the Court will find in a few weeks' time that the

22    only plaintiffs remaining are the Podhurst and Wisner

23    plaintiffs.  And in that case not one of the plaintiffs

24    in the United States before this Court will be a citizen

25    or resident, and not one of the decedents in this case

1   before this Court will have ever been a citizen or

2   permanent resident of Malaysia.  It instantly

3   distinguishes this case from all of the cases that the

4   defendants rely on in their brief.  That's point one.

5                    Point two, Your Honor, is that a large

6   number of those cases, I think 41 out of the 49, either

7   we have the passenger problems I just described or the

8   crash happened in the specific country that the

9   defendant sought transfer to.

10                   THE COURT:  Even in the *Air France*

11  case?

12                   MR. ALTMAN:  Not the *Air France* case.

13  The *Air France* case is a case where the majority of the

14  passengers were from France.

15                   THE COURT:  I see.  So these are

16  disjunctive.

17                   MR. ALTMAN:  That's right.

18                   THE COURT:  Okay.

19                   MR. ALTMAN:  All 49 of the cases,

20  Your Honor, either all or a majority of the passengers

21  were from the specific country to which the defendants

22  sought forum, or there were no Americans on board.  Or

23  the wreckage was available for inspection in the foreign

24  forum precisely because the crash actually happened in

25  the foreign forum.

1           Judge, those three factors are not

2   present here.  We have, as I've said, five Americans --

3           THE COURT:  That's only because the

4   wreckage is in the ocean and Mr. Wolff says, I think

5   fairly persuasively, that Malaysia is running this

6   investigation.

7           So to the extent the evidence turns up,

8   it will be under their control, and isn't that something

9   for the purpose of this issue?

10           MR. ALTMAN:  Judge, that's a very

11   important point, because the federal courts have

12   repeatedly said -- and there's a case called *Lueck*,

13   L-U-E-C-K, from the Eleventh Circuit that's directly on

14   point -- that the defendants can point to hypothetical

15   evidence all over the world all they want, but the fact

16   of the matter is the question before the Court is where

17   the relevant evidence is.

18           And the reality is they can denigrate

19   the Australian Transportation and Safety Bureau report

20   all they want.  But it and the FBI's findings on the

21   simulator of the computer that was at the home of the

22   pilot are the only two ventured guesses anywhere in the

23   world about what actually happened to this plane.

24           And there is not a single shred of

25   relevant evidence to date that is available in Malaysia

1    that can't also be available here.  I'll give you an

2    example.  They talk about all the -- how do we know that

3    for a res ipsa loquitur theory that this was --

4                    THE COURT:  Let me stop you there.  Are

5    you going with the res ipsa loquitur claim?

6                    MR. ALTMAN:  We have a product

7    liability claim, and we also have a res ipsa loquitur

8    claim.

9                    THE COURT:  Those two don't collapse

10   the products liability claim you intend to bring, sort

11   of original evidence and information attacking the

12   design and manufacture of this aircraft?

13                   MR. ALTMAN:  That's correct,

14   Your Honor.

15                   THE COURT:  All right.

16                   MR. ALTMAN:  So we have both theories

17   as an alternative in the complaint.  And what I'll tell

18   you about, for example, the example that Mr. Wolff gave

19   with respect to how do we know that this pilot didn't

20   commit suicide.  Well, that's very simple, because we

21   have experts who have investigated in the United States

22   hundreds of plane crashes from around the world, some of

23   which unfortunately involve pilot suicide like, for

24   example, the *Germanwings* case, which our firm is also

25   handling in France.  And guess what.  We're going to

1   have experts testify that no case involving pilot

2   suicide involves a flight that flies for seven and a

3   half hours after the pilots lose contact with the

4   ground --

5              THE COURT:  I understand, but Mr. Wolff

6   says, Yeah, but in order for us to be able to adequately

7   defend ourselves, right, that might be your theory, but

8   it looks as though courts have taken into account the

9   defendant's ability to respond with respect to, I would

10  suppose, evidence about this particular pilot and his

11  psychological status, and all of that evidence would be

12  in Malaysia, wouldn't it?

13             MR. ALTMAN:  All of that evidence is

14  already in the possession of the FBI, as the articles

15  and websites that we've cited in our papers have already

16  demonstrated.

17             But putting that aside about the

18  psychological profiles of the pilot, the reality is what

19  Boeing never does is it has to balance those different

20  ones, those different burdens.  It's true that Boeing is

21  going to want to bring in evidence in favor of its

22  defense from Malaysia.  My point is, as of right now

23  where the Court is sitting, there is no such evidence

24  that Boeing is going to be able to bring in because

25  there is no evidence in Malaysia relevant to the

1    question of what happened to this plane.  That's first.

2            THE COURT:  How can that be so?  If

3    Malaysia is running the investigation, I don't

4    understand what you mean.  I get that there's a report

5    that someone has done, there are questions about its

6    admissibility.  But to the extent that Malaysia is

7    running a still open investigation regarding that crash,

8    how could it be that there is no evidence in Malaysia?

9            MR. ALTMAN:  Because there is no plane,

10   Your Honor.  They haven't been able to determine, and he

11   won't deny it -- that investigation has gone on without

12   finding a single shred of evidence as to a single

13   potential cause as to what happened to this plane.

14   Zero.  There is nothing.

15            So, again, there is hypothetical

16   evidence in there.  Maybe a year or two years from now

17   someone in Malaysia will discover what happened to this

18   plane.  But as of right now when the Court is deciding

19   this question, there is no relevant evidence in Malaysia

20   as to what actually happened to this plane as opposed

21   to, for example, maintenance records on the plane which

22   aren't going to tell us what actually happened to this

23   plane and which, by the way, maintenance records that

24   have already been posted online and can easily be

25   distributed in the United States because a lot of them

1    have already been translated into English.

2                    But my point, Judge, is that you have

3    to balance the burdens and the evidentiary needs of both

4    the defendants and the plaintiffs.  And what Boeing's

5    pleadings fail from, the great defect in their pleadings

6    is that they failed to conduct that balance.

7                    And so our argument is this, Judge:

8    I'm not denying that there's not potentially relevant

9    evidence in Malaysia.  I'm just suggesting that there's

10   also potentially relevant evidence in the United States.

11   And when you gleave those two in that level of

12   equipoise, arguably equipoise, we're going to argue that

13   Boeing evidence here is more important.  They're going

14   to argue the Malaysian evidence --

15                    THE COURT:  What is -- on the

16   res ipsa loquitur theory and taking into account how the

17   litigation would proceed, what is the evidence in the

18   United States?

19                    MR. ALTMAN:  Well, Your Honor, we also

20   have a product defect theory, and the product defect

21   theory would rely presumably on the thousands of people

22   who have worked on this airplane for 30 years, testing

23   it, certifying it, building it.  The regulators who

24   regulated its certification process.  And more

25   importantly, and this is an important point, and the

1   federal courts have said this and we've cited this in

2   our papers.  Boeing can say all at once that it's going

3   to produce all the relevant evidence in Malaysia.  But I

4   guess federal courts haven't really thought that that

5   was so important because the reality is in cases like

6   this the evidence often comes from people who 20 years

7   ago, 15 years ago worked on this plane and now have

8   left.  Either they're disgruntled employees or they're

9   former regulators who worked for the federal government

10  or they just retired from Boeing and are willing to talk

11  about what happened with these airplane tests that were

12  done, that weren't done that should have been done.  And

13  those people Boeing has absolutely no control over them.

14  And --

15              THE COURT:  Do you have the ability

16  to -- Boeing doesn't presumably want to find those

17  people.  It would be up to you as the plaintiff, right?

18  So --

19              MR. ALTMAN:  And that's how these cases

20  are made oftentimes.  Mr. Marks can tell you how many

21  cases our firm has made over the last 30 years by

22  finding those disgruntled employees.

23              THE COURT:  I understand, but what is

24  the impediment to your doing that if this is happening

25  in Malaysia?

1          MR. ALTMAN:  Right, because in Malaysia

2    we have no authority to compel those people precisely

3    for the letters rogatory argument that you were

4    describing and Mr. Wolff was describing, and I want to

5    talk about that for a second.

6          There's two problems with the letters

7    rogatory argument.  The first is the federal courts have

8    consistently held that a country that allows letters

9    rogatory satisfies the requirements for purposes of FNC.

10   In other words, just because the country has elected not

11   to become a party to the Hague Convention on

12   international evidence doesn't mean that FNC is

13   appropriate.

14          But the second point is this, and we

15   talked about this in our papers.  The reality is that

16   the letters rogatory argument turns logic on its side.

17   Because the reality is Malaysia is the only country with

18   potentially relevant evidence here that isn't a party to

19   the Hague Convention.

20          What do I mean by that?  Let's talk

21   about damages evidence.  Where is that evidence going to

22   come from?  That's all going to come from places where

23   the plaintiffs are from and where the decedents were

24   from.  And again, none of them are or were from

25   Malaysia.

1          So all of those financial records, tax

2    records, housing records, support records, medical

3    records --

4                 THE COURT:  Thirty-eight were as it

5    currently stands, you say, you know, those aren't going

6    to be real plaintiffs at the end of the day, but --

7                 MR. ALTMAN:  I'm sorry.  I don't think

8    all 38 are before the Court.  I'm sorry.  There's only a

9    few of them that are represented.

10                THE COURT:  Only a few of the Malaysian

11   decedents are here.

12                MR. ALTMAN:  Correct.  I don't know

13   exactly the number, but it's a small number compared to

14   the overall number of cases that are before the Court.

15   I'm sorry, I don't know the exact number.

16                But my point is that all that damages

17   evidence is going to be in the nine countries that house

18   evidence.  We've got the United States, we've got

19   Indonesia, Japan, India, Australia, France, the United

20   Kingdom.  All of these places will have evidence

21   relevant to this case.  All of those countries

22   participate in the Hague Convention.

23                So guess what?  If this case is brought

24   in the United States, Boeing and Malaysian Airlines, as

25   well as us, will have the benefit of what they want:

1    the Hague Convention to pursue that evidence through

2    legal means from all of those different countries.

3                     THE COURT:  Yes, of course they hope

4    not to because it could be threshold issues with

5    liability, right?

6                     MR. ALTMAN:  Correct.

7                     THE COURT:  And that's where they're

8    saying they're not going to be able to get the evidence

9    that they need from Malaysia.

10                    MR. ALTMAN:  But if this case were in

11   Malaysia, we would never be able to obtain, and neither

12   would they, any of that evidence through the Hague

13   Convention because Malaysia doesn't participate in the

14   Hague Convention, and so letters rogatory, what they

15   denigrate, would be required in every instance for every

16   piece of liability and damages evidence from every other

17   country in the world, a fact that militates strongly

18   against dismissal in favor of Malaysia precisely for the

19   purpose that they're seeking.

20                    So to go back, if you take the two

21   concerns, the burden on both parties in equipoise, the

22   burden on the plaintiffs and the burden on the

23   defendants, the Court has to look at the threshold

24   burden questions that the Supreme Court has made clear

25   apply in this context, which is that this remedy should

1    be used sparingly; that there's a heavy burden that the

2    defendant must meet to show oppression and vexation

3    beyond all calculation with respect to the plaintiffs'

4    burden.  And that's particularly true where you have

5    American citizens and plaintiffs involved in this case,

6    which we do here, Your Honor.

7                    THE COURT:  Can you say a little bit

8    about choice of law?  I'm trying to understand the

9    implications of these cases proceeding in a Malaysian

10   court and whether or not if they stayed here U.S. law

11   would govern in any event.  Wouldn't the U.S. courts

12   have to make some sort of choice-of-law determination?

13                   MR. ALTMAN:  Yes.  A number of

14   important things there, Your Honor.  First of all, a

15   public interest -- yes, we would have to make

16   choice-of-law decisions here.  But remember, all the

17   Boeing cases arise out of U.S. law, Washington law and

18   Illinois law.  In fact, the precise res ipsa arguments

19   that we make in our complaint are specific arguments

20   tailored to specific Supreme Court decisions of the

21   states of Illinois and Washington that, frankly, don't

22   exist in most of the 50 states.  They exist in Florida,

23   they exist in Illinois, they exist in Washington.

24                   And so the Court, this Court will have

25   to apply specific and pretty nuanced aspects of Illinois

1   and Washington law.  And I submit, Your Honor, that

2   you're in a better position to do that than a Malaysian

3   judge, that's first of all.  With respect to --

4                THE COURT:  Do you know whether as a

5   matter of law they would even undertake the effort in

6   Malaysia?

7                MR. ALTMAN:  I know because we've

8   attached a declaration from our expert who is a

9   solicitor in Malaysia that Malaysian courts have no idea

10  what they would do here because no case like this has

11  ever been presented in the Malaysian courts.

12               And so every decision the Malaysian

13  court would be engaging in is a decision of complete

14  first impression in this case.  Something that, of

15  course, isn't true here, and that's an important public

16  interest factor that the defendants never address either

17  in their motion or in their reply brief.

18               One of the public interest factors that

19  the Supreme Court has said is important is what is the

20  relative court's familiarity with the relevant choice of

21  law and the relevant issues at stake in the case.  As

22  that declaration, which has gone unrebutted and makes

23  clear, Malaysian courts, Malaysian lawyers have never

24  dealt with these issues or this case and they have no

25  idea which law will apply or how it will be applied.

1    That's obviously not true in the United States, as the

2    defendants' filing suggests.  Hundreds of cases on these

3    airplane crash issues have taken place in the United

4    States, unfortunately, and we have a rich tradition of

5    common law to follow in that respect.

6              I wanted to say one thing about counsel

7    of choice because I think it is an important private

8    interest factor.  Mr. Wolff, I don't know if you forgot,

9    but Mr. Marks and I did try to become the lawyer for our

10   clients in Malaysia, and, of course, Malaysia Airlines

11   objected to that in the court.  I'm happy to attach the

12   pleadings to a supplemental filing.  They objected, and

13   the Malaysian court in Malaysia excluded our admissions.

14   So our clients are now being represented in Malaysia by

15   lawyers they've never met before.

16              By contrast, of course, the lawyers for

17   Malaysian Airlines in Malaysia are representing

18   Malaysian Airlines in Malaysia.  I think a significant

19   disparity in counsel of choice that again militates

20   against dismissal here.

21              I want to talk a little bit about *Air

22   France*, Your Honor.

23              THE COURT:  Before you do that, let me

24   just ask you what weight -- speaking of the issues that

25   are being litigated in the context of the Malaysian

1    cases -- what weight should the Court give to the fact

2    of a parallel proceeding involving the same decedents

3    going on actively in Malaysia even as we speak?

4                    MR. ALTMAN:  Very little weight,

5    Your Honor, as I think the Court correctly pointed out.

6    We only filed there because for two years they've been

7    telling us that this is a forgone conclusion.  No way

8    the judge keeps your cases here.  You have no chance.

9    You're going to get kicked out anyway.

10                   And so we would rather be here.  Our

11   clients would rather be here, particularly the

12   Americans, and in particular all the clients who are

13   suing Boeing whose evidence is strictly speaking in the

14   United States.  But we also don't want to be accused of

15   malpractice, and we don't want to lose an opportunity to

16   file before the statute of limitations, so we filed our

17   cases in Malaysia as well.

18                   But let me say this, Your Honor:  If in

19   respect to our Wood and Gaspard clients who have sued

20   Malaysian Airlines here, the Court denies their motions

21   and allows those cases to remain here, then we would be

22   fine with dismissing those cases in Malaysia and

23   avoiding the parallel proceeding problem that they've

24   identified.

25                   THE COURT:  All right.

1          MR. ALTMAN:  So that's I think an issue

2     that should receive very little weight in this case.

3          You've asked the Court [sic] why Boeing

4     has requested this FNC dismissal and you got no answer.

5     And the answer, of course, Your Honor, is because Boeing

6     doesn't want to be subject to the discovery rules in the

7     United States that are much more permissive, as the

8     declaration that we've submitted made clear.

9          THE COURT:  Let me just say in all

10    fairness, I heard the answer to be because they would

11    have a much harder time getting the evidence that they

12    needed under the current system in terms of having the

13    case litigated here.

14          MR. ALTMAN:  And because I think

15    Mr. Wolff said he couldn't implead his co-defendant, but

16    that codefendant actually doesn't need to be impled

17    because that codefendant is actually already here; and

18    that presumes, of course, that that codefendant is going

19    to be dismissed under FSIA and the Montreal Convention,

20    which we submit is also not at all clear.

21          But my point is Boeing knows -- and

22    that's why they seek dismissal on all of these other

23    cases to other countries -- Boeing knows that the

24    damages regime and the discovery protocols and

25    procedures are very, very different and much more

1  restrictive for our clients than they would be in the

2  United States.

3            And in particular they know that the

4  American passengers and that Mr. Wood in particular who

5  was earning $650,000 a year at 50 years old in Malaysia

6  would be capped as if he would have stopped working at

7  55 and would have been subject to a liability -- a

8  damages finding of no more than a million or two

9  dollars.  That unfairness, Your Honor, I think should

10  also militate against shipping these cases over to

11  Malaysia.

12            Your Honor, I just want to talk for a

13  moment about *Air France*, because Mr. Wolff talked a

14  great deal about *Air France*.  *Air France* is different

15  for two reasons, not just the one that I pointed out.

16  First of all, the plane in *Air France*, unlike the plane

17  here, was manufactured by a French airplane

18  manufacturer, Airbus.  And the passengers in *Air France*,

19  a majority of them were also from France, and so it was

20  kind of an easy call for Judge Breyer to say, Well, the

21  manufacturer is in France.  Most of the passengers are

22  from France.  The airline was French, and the flight was

23  going to France.  So we're going to send the case to

24  France.

25            THE COURT:  Was there a products

1   liability claim in that case as well?

2               MR. ALTMAN:  There was a products

3   liability claim against Airbus that wasn't in France.  I

4   don't know if there was a separate products liability

5   claim against some other American manufacturer.  What I

6   do know is that the airplane was not a Boeing airplane.

7   It was an Airbus airplane, which is a French company.

8   And so Judge Breyer did consider that in rendering his

9   decision as well.

10              THE COURT:  All right.  Thank you.

11              MR. ALTMAN:  Thank you very much.

12              THE COURT:  Ms. Schiavo.

13              MS. SCHIAVO:  Yes, Your Honor.

14              THE COURT:  You might address, in the

15   interest of not being duplicative, the arguments that

16   you made about the adequacy of the forum.  I understood

17   that to be a distinction between you and Mr. Altman and

18   the Podhurst plaintiffs.

19              MS. SCHIAVO:  Your Honor.  Not only the

20   adequacy of the forum but a slightly different take, and

21   I certainly don't contradict anything that learned

22   fellow plaintiff counsel said, and heartedly endorse it.

23              We have a slightly different take on

24   the evidence and what is proceeded in Malaysia.  The

25   adequacy of the forum there was a big argument for us,

1    including in the papers that the motions that we'll take

2    up later because of the things that have happened in

3    Malaysia already, not the least of which was Malaysian

4    law 765.  But also I can address one of the questions

5    Your Honor said about the insufficiency of the forum by

6    mentioning the parallel proceedings.

7                    So they're going on, it's a fact.  As

8    you correctly noted, you must file.  Plaintiffs said for

9    their -- and their counsel must file a protective filing

10   because, of course, in any case involving some kind of a

11   foreign crash; and sometimes, as I just did with learned

12   Boeing counsel, even in crashes in the United States,

13   they tried to move the crash out of the United States.

14   So of course there's backup filings in Malaysia, and

15   those cases are proceeding, Your Honor.

16                    THE COURT:  I understand, but I'm

17   trying to figure out the standard for adequacy.

18   Mr. Wolff says the fact that you have cases going

19   forward in Malaysia indicates and is dispositive of the

20   issue of the adequacy of that forum.  You say no, and

21   I'm trying to understand why.

22                    MS. SCHIAVO:  Well, I say no for a

23   couple of reasons.  Well, for many reasons, but in our

24   pleadings we said no because, first of all, Boeing is

25   not involved in those cases, and those cases are already

1  proceeding to have trial settings as against the

2  carrier, the government of Malaysia, which in some cases

3  has already been dismissed, and because you cannot

4  obtain -- and you haven't thus far because Boeing is not

5  in those cases -- the kind of evidence that we pointed

6  out in our brief.

7              In Boeing's brief, for example, they

8  said -- and I believe it is on page, document, I think

9  it's Boeing's brief, Document 37, page 16, and also

10  there's some reference to it in Document 68, pages 7 and

11  8.  They said, Boeing's position was that they had very

12  little to do with the Malaysian investigation.  They

13  said, "Boeing has not been involved with" -- this is

14  Document 37-1, page 6.  "Boeing has not been involved

15  with and has no copies of documents collected or created

16  by investigative authorities relating to many aspects of

17  the investigation."

18              Now, that's very important because

19  that's not being addressed in the Malaysia cases right

20  now.  Why?  Because Boeing is not there and because the

21  Malaysia investigation was so limited.  For example --

22  and we pointed this out in the brief, this is not

23  something I'm raising here for the first time -- for

24  example, as we pointed out in our brief, I think it was

25  Document 67, page 7 and 8 -- I was trying to look up my

1    references really quickly while they were arguing -- we

2    cited, for example, 367 airworthiness directives, there

3    are warnings on this very kind of plane.  The Malaysia

4    investigation looked at one.  They looked at one

5    airworthiness --

6                    THE COURT:  I understand your point.

7    The Malaysia investigation is not sufficient, perhaps,

8    to make the entire case.  What I'm trying to understand

9    is whether the forum, the court in Malaysia is

10   sufficient or adequate for litigating whatever

11   substantive issues you have.

12                   MS. SCHIAVO:  No.  We have taken the

13   position for the same reasons that learned fellow

14   plaintiffs' counsel has, that it is not.

15                   THE COURT:  No, he hasn't, though.  He

16   hasn't made that issue.  That's why I'm asking you why.

17   He, I think, concedes that it may be adequate, but he

18   says nevertheless, leave it in the United States for all

19   of these good reasons about balancing and whatever else.

20   So what is your argument that it is inadequate in the

21   Malaysian court system?

22                   MS. SCHIAVO:  The ability to obtain the

23   evidence; the ability to compel the evidence production

24   there, the ability to engage in discovery; the ability

25   to compel Boeing to produce all of those things.

1            I think Boeing knows that too, because

2    their proposed order says that they will fully comply

3    and produce the documents, do everything that the Court

4    requires.  And so they're repairing -- and granted, I

5    mean, I have to hand it to Boeing, it's, you know, in

6    many cases it's a very effective move, but they're

7    repairing the admitted shortcomings of foreign courts

8    and the ability to get discovery, because for our

9    plaintiffs we intend, and as we pled in the complaint,

10   to delve deeply into the condition of the plane.  We

11   didn't have a, you know, we didn't have any alternative

12   theories about suicide or somebody hiding electronics.

13   We took the position that there was a defect with the

14   plane.

15            THE COURT:  In its manufacture and

16   design?

17            MS. SCHIAVO:  Yes.

18            THE COURT:  Or in its maintenance?

19            MS. SCHIAVO:  Design, engineering,

20   manufacturing, assembly and parts supply maintenance.

21   And all those records --

22            THE COURT:  Maintenance is different,

23   right, because it was maintained overseas.  So you got

24   to have evidence overseas to deal with maintenance,

25   right?

1                     MS. SCHIAVO:  Partially.  Part of the

2      theories, of course, because we don't have this plane,

3      what we're going to have to look at and what experts do

4      in every aviation crash case, hundreds of cases -- I

5      mean, we've got some cases going on now we're doing

6      this, you look at other circumstances.  So we would be

7      looking at similar instances, for example, some of these

8      364 airworthiness directives and our experts would say

9      what happened in this case, what happened in that case.

10                     In those cases, those records and those

11     cases and the things that Boeing has discovered and the

12     many other cases we would look at to help determine what

13     happened here would be in the United States.  So it's

14     not the Malaysian Airlines maintenance records that are

15     so important.  It's the importance of what happened to

16     this kind of plane.

17                     THE COURT:  And you have an argument

18     that the Malaysian court would not entertain such

19     evidence and information?  Is that your point?

20                     MS. SCHIAVO:  Or have the ability to

21     get it, which is, of course, I think Boeing realizes

22     that too, and they attempted to remedy that in their

23     proposed order where they said they fully submit all the

24     evidence, et cetera.  They did say "as required by the

25     Malaysia courts," which is a problem because we don't

1    have that kind of discovery.

2              And so yes, it's a very intensive case,

3    I'm looking at other problems with other aircraft,

4    what's gone wrong with other aircraft.  Not so much this

5    aircraft, because we don't have it.  I mean, there's

6    nothing like this in the world.  There's nothing like

7    this in the world of aviation history.  Even pieces of

8    Amelia Earhart's plane, people posit have been

9    discovered.

10             And so we would be looking at other

11   problems, other instances, other warnings, other

12   records, other design engineering --

13             THE COURT:  What is your response to

14   Mr. Wolff's point that while that is what you would be

15   looking at with respect to attempting to establish a

16   design and manufacturing claim, you would also have to

17   exclude other causes, precisely because we don't have

18   the plane, and that is going to involve evidence that is

19   only in Malaysia?

20             MS. SCHIAVO:  Wait a minute.  Evidence

21   that it is Malaysia or lack of evidence.  The fact of

22   the matter is there is no evidence of pilot suicide, and

23   this isn't in my brief because I don't give any credence

24   for it, but somebody have heard on the news somebody

25   hiding in the electronics bay.

1          THE COURT:  What's your evidence for

2   that?  There's the investigation, which we don't even

3   know is admissible, right?  I mean, you're saying Boeing

4   is not entitled to evaluate these other causes, that

5   it's a done deal at this point?

6          MS. SCHIAVO:  Oh, I anticipate they

7   will.  I mean, learned Boeing counsel explores all,

8   everything and every way they can.  Of course they're

9   going to explore that.

10          But what I'm saying is the fact that

11   there is no evidence of that is evidence.  Sometimes you

12   have to say, Look, there's no evidence of pilot suicide.

13   There's no evidence.  It's not that they haven't found

14   it.

15          THE COURT:  Yes, but here is my

16   problem.  Here is my problem in the context of this case

17   and where we are procedurally.

18          MS. SCHIAVO:  Sure.

19          THE COURT:  Is that ordinarily the

20   Court comes to that conclusion in the context of summary

21   judgment, because people have actually done the

22   discovery and then you say, Okay, now there's no

23   evidence, so as a matter of law I rule in one party's

24   favor or the other.  It's very hard for the Court to

25   reach the conclusion that there is no evidence related

1    to claims that have not yet been subjected to discovery.

2                    So I'm trying, I appreciate the

3    argument.  I hear it.  It seems to be based on the

4    investigation that has been done, but there are

5    questions about whether that investigation is

6    sufficient, and I don't know that it's going to be

7    persuasive in terms of the Court's determination that

8    that's, that that should be driving its forum decision.

9                    MS. SCHIAVO:  I hear you, and I agree

10   with you.  It's unfortunate that what we're dealing

11   with -- I mean, you know, and I don't mean to be, you

12   know, sort of culturally insensitive, but based on what

13   we're used to seeing from the National Transportation

14   Safety Board, the NTSB, that report -- and I'm going to

15   separate them here.

16                   The Malaysia report is not as robust as

17   we're used to seeing out of the NTSB.  And that is why

18   in my briefing I attached so many of the Australian

19   reports, and Mr. Wolff did make a point saying, Look,

20   the lead on this investigation is Malaysia.  Well, by

21   treaty, by International Civil Aviation Organization

22   rules that's correct, but the entity, the government

23   that's gone out and done this work and searched for the

24   plane and provided the most useful reports -- and I

25   attached them except the last one, there's one more that

1    came out after briefing was closed, I talked to the

2    defendants about it, so they're aware it exists too and

3    I didn't attach it so it's not part of the evidence.

4    But all of those have come from Australia, and it's

5    those reports that are particularly important because

6    the whole world has come to know the language, for

7    example, of Inmarsat, handshakes, things that happened

8    to this plane.  And it's that evidence that indicates

9    that at the last moment of this flight what was

10   happening is the, the you know, engines were failing,

11   there was attempted restart, there were problems.

12                   THE COURT:  All right.  In the interest

13   of time, let me just ask you one quick question that I

14   think is particular to your plaintiffs and your

15   argument.  And that is the status of MAS and MAB and why

16   that has some sort of bearing on a Malaysian forum.

17                   I'm not sure I understand your argument

18   about MAS having no assets and MAB not being held liable

19   under Malaysian law and what difference that makes with

20   respect to the forum.  If the Court -- even if those

21   cases proceeded in the United States, why wouldn't those

22   same arguments pertain?

23                   MS. SCHIAVO:  Well, I'm sure -- well,

24   they had made those same arguments in the United States,

25   but it's very important in the Malaysia forum because of

1  Malaysia Act 765 and the fact that the proceedings in

2  Malaysia are already proceeding through those things,

3  MAB under the Malaysia Law 765, which was briefed by

4  both sides, you know, literally at the stroke of

5  midnight after Malaysia Airlines had two horrific

6  crashes --

7                    THE COURT:  Yes, I understand where the

8  law comes from.  My question is due to choice-of-law

9  principles, the fact that you sued Malaysia Airlines in

10  a couple of these cases that are here being brought in

11  the United States, wouldn't this Court or any court in

12  the United States be applying that same law?  So what

13  difference does it make that it's here versus Malaysia?

14                    In other words, your argument seems to

15  suggest that if this Court dismisses and these cases are

16  brought in Malaysia, we would have this big law 765

17  problem in a way that we wouldn't if we kept the cases

18  here, and I'm not sure that's true.

19                    MS. SCHIAVO:  Well, because under -- in

20  Malaysia they're just summarily dismissing MAB.  There's

21  no MAS, so we come back to the problem that we attempted

22  to address with the section of --

23                    THE COURT:  But if that law requires

24  it, wouldn't I have to do the same thing, whether the

25  case was kept here or not?

1          MS. SCHIAVO:  Well --

2          THE COURT:  Wouldn't I have to apply

3    Law 765 under choice-of-law principles in this

4    jurisdiction?

5          MS. SCHIAVO:  Well, certainly you'd

6    have to look at it and you'd have to apply it.  We would

7    brief whether we would have to apply that law, but we

8    would also be looking at the treaty provision that says

9    since the airline has ceased to exist and you say MAB

10   isn't the successor airline, then we would have to look

11   for what entity is the entity that is still surviving to

12   sue.  And that's why I used the treaty provision that

13   says if the liable party -- in this case MAS -- ceases

14   to exist, that's why I used that section of the treaty.

15         THE COURT:  I think I understand --

16         MR. RHINE:  Somebody has to be

17   responsible for these lost people, and that was the only

18   entity left.  So we would have to look at Malaysia Law

19   765.  We would have to look at the treaty and say, Who

20   is left?  And yes, I think that's better done in the

21   United States because Malaysia, that's one of the

22   reasons we think Malaysia is not a fair and adequate

23   forum, because we already know --

24         THE COURT:  Because they've already

25   decided the issue against you and so --

1          MS. SCHIAVO:  Well, no.  Because the

2     king has signed this ruling and it is counter -- well,

3     it's not exactly counter.  It can be used in accordance

4     and in conjunction with Article 32 of the treaty.  So if

5     you say they don't exist, Article 32 says the successor

6     is responsible.

7          So there is a conflict there in how it

8     would be applied and yes, this Court would have to

9     resolve it.

10          THE COURT:  All right.  Let me, in the

11     interest of time, move to the next issue, but I'll have

12     you respond if you want, Mr. Wolff.

13          MR. WALKER:  Your Honor, I also have a

14     few comments.

15          THE COURT:  Well, we'll let Mr. Wolff

16     go, then you can go, and then you'll segueway into the

17     FSIA and other issues, all right?

18          MR. WOLFF:  This is very, very, very

19     important.  The Malaysian investigation, and you've

20     got -- you now have a concession that Malaysia is

21     leading the investigation, which is accurate.  They have

22     a preliminary report, but both Mr. Altman and

23     Ms. Schiavo argued to you as if they're done.

24          They're not done.  Investigation is

25     ongoing and a final report will come out.  It is in the

1    final report that you get the conclusion.  So

2    Ms. Schiavo is referring to the Malaysian investigation

3    in the past tense.  We are still waiting for a report.

4                    THE COURT:  All right.  So what, the

5    final report comes out.  Are you conceding that that's

6    going to be the issue that's going to resolve the matter

7    of what caused this --

8                    MR. WOLFF:  No.

9                    THE COURT:  -- crash?

10                   MR. WOLFF:  But for counsel to argue

11   their case and say the Malaysians found nothing, there's

12   no evidence in Malaysia, the only people who have

13   hazarded a guess as to what caused it are the

14   Australians, which is not true.  The Malaysians have not

15   finished their report in which they will say what they

16   know about what caused it.  They will go over all the

17   evidence they have looked at.  They are still working on

18   it.  They have predicted that they will get done by the

19   end of the year.

20                   THE COURT:  This year or next year?

21                   MR. WOLFF:  This year, and we put a

22   citation, and if you just Google the investigation, you

23   can find it.  But we put a citation in about the report

24   in our reply brief.  And you can go there and look at

25   whatever they have.  And we also --

1          THE COURT:  Is their report and final

2   conclusion when it comes out admissible, dispositive,

3   what impact?

4          MR. WOLFF:  In Malaysia I don't know.

5   In the United States, as the parties both know,

6   typically NTSB reports are very limited in terms of how

7   you can use them in a tort case.

8          But my point is these arguments you're

9   hearing about, there's no evidence, they don't know,

10  they don't have anything, that is an unfair argument,

11  given that we don't have the report.  It hasn't been

12  issued, and it is the report that will tell us what they

13  have.

14         THE COURT:  All right.  I understand.

15         MR. WOLFF:  So that was the most

16  important point in listening to all of that.

17         On *Air France*, I will just say we are,

18  we welcome the Court to review the *Air France* case.

19         THE COURT:  Was it Airbus?

20         MR. WOLFF:  Yes, it was Airbus, but it

21  was also a plurality, not a majority of French

22  passengers involved.  And there were all these

23  Brazilians, who stand in the same position as the

24  Chinese in this case.  Same situation.

25         Judge Breyer says I think this should

1    all go to France.  Mr. Altman's firm jumps up and says,

2    What about the Brazilians, that doesn't make any sense.

3    And he says France is still more convenient.  If you

4    want to refile in Brazil, that's your prerogative.

5    That's right in the opinion, and that's the same

6    position for the Chinese plaintiffs here, which is

7    Malaysia is still more convenient.  It's still the right

8    answer under FNC, but if you would like to refile in

9    China, you can do that.

10                   We have 28 cases that have been filed

11   over there, and 14 of the decedents before Your Honor

12   that my understanding is are in those Chinese

13   proceedings.

14                   THE COURT:  So you're unmoved by

15   Mr. Altman's point that at least as it stands today

16   there isn't any more evidence in Malaysia than would be

17   available in the court in the United States?  That

18   everything that exists is easily transportable to the

19   United States or we already have it or it's the FBI's

20   investigation anyway?

21                   MR. WOLFF:  I am glad you mentioned

22   that.  How he knows what the FBI has in this, I do not

23   know.  I mean, there are these articles that speculate.

24   I mean, there's no FBI log of what they have or that

25   these -- that an FBI agent could come and testify about

1    what they heard or saw in Malaysia and who that would

2    be.

3                 THE COURT:  So do you understand or can

4    you respond to his point about the discovery rules being

5    different in Malaysia?  I'm trying to appreciate the

6    difference between litigating this case in the United

7    States and litigating it in Malaysia, and there must be

8    some because Boeing, you know, waived attempts to get

9    its cases litigated elsewhere.  So what is it?

10                MR. WOLFF:  Just to be fair, again, I

11   recommend *Air France*.  Judge Breyer says the reality

12   here is both sides are forum shopping.  Okay.  It is --

13   we cannot have a fair proceeding here in the view of

14   Boeing, given the limitations on what we can get from

15   Malaysia.  What is in Malaysia?  Like everything

16   concerns the crew is in Malaysia.  Everyone who knew

17   those people, every --

18                THE COURT:  But Mr. Altman suggests

19   that even if that's the case, under Malaysia's discovery

20   rules, Plaintiffs will not be able to access it in the

21   same way.  So I'm trying to appreciate the extent to

22   which the evidence in Malaysia can actually be accessed

23   by both sides.

24                MR. WOLFF:  So in Malaysia they can

25   seek, they can seek discovery.  And, in fact, the

1   defendants in Malaysia include some of these government

2   entities.

3               So it's a very different proceeding in

4   Malaysia in terms of who has been sued, and they have

5   sued entities that they cannot sue here, including the

6   civil aviation authority and an immigration authority

7   and others.  So they've set off against these other

8   defendants, and they can attempt to seek the evidence

9   that those entities have.

10               Whether they get it or not I don't

11   know, but I know one thing:  This Court can never get

12   it.  He said without any citation -- in fact, he claimed

13   there were these similar cases and cited none of them.

14   But he said there are cases that say letters rogatory

15   are just fine.  I have no idea what he's talking about.

16               *Air France*, Judge Breyer said

17   specifically the only way we would get any evidence here

18   is Hague Convention or letters rogatory.  The balance

19   tips heavily toward the defendants on forum, on the

20   private interest factors.  And that's like standard in

21   the case law.

22               THE COURT:  All right.

23               MR. WOLFF:  So that's letters rogatory.

24   Choice of law.  It is very complicated.  It is like law

25   school exam complicated.  So --

1          THE COURT:  I've taken a few of those

2     in my day.

3          MR. WOLFF:  Yes.  I think I'm familiar

4     with the case you had involving Switzerland that was

5     pretty complicated.  Plane goes down in international

6     waters, that's admiralty.  So he gets up and says, Oh,

7     it's Illinois, no, it's not.  It's admiralty.

8          And so you do admiralty choice of law

9     and then you have the Death on the High Seas Act.  The

10    admiralty choice of law, you go back to the Supreme

11    Court's 1952 decision in *Lauritzen*.

12          THE COURT:  But what do you say to his

13    response that one of the factors that has to be

14    considered is the transferee jurisdiction -- not

15    transferee, but is the other jurisdiction that you say

16    is adequate ability to do this, and this is an absolute

17    case of first impression over there.

18          MR. WOLFF:  Yeah.  In terms of like

19    actually going through to trial, it would pretty much be

20    a case of first impression here too.

21          So let's just be clear about how

22    lacking in experience courts are with taking something

23    like this, an entirely foreign accident involving

24    hundreds of people, very mysterious circumstances in a

25    country that you can't compel evidence from.  What's the

1          They have done kind of a cursory choice

2   of law just to kind of, you know, take a look under the

3   hood.  And they say, I think I'll probably have to apply

4   foreign law.  So coming to the conclusion that it's

5   going to be Malaysian law would be consistent with those

6   cases.

7          But secondly, I don't think -- and, you

8   know, I did not actually come prepared to do a law

9   school exam on this -- but I don't think it's crazy to

10  say let's say we're just in the 50 states, you know,

11  that where the crash occurred if that state's folks were

12  on that plane and it was that state's airplane that was

13  operated out of there, that that state would say it's

14  our law, not where it was manufactured.

15          THE COURT:  On the manufacture claim?

16          MR. WOLFF:  Yes.  I could see that

17  result.  I mean, you know these choice-of-law things.

18  It's some loosey-goosey balancing test.  So that -- who

19  knows?  Who knows?  But I don't think it's -- it is

20  entirely likely that that would be the answer.  And

21  that's just another reason on top of all the other

22  reasons.

23          THE COURT:  All right.  I have to move

24  you along.

25          MR. WOLFF:  Sure.  The Court noted

1    parallel proceedings.  Other cases have noted that

2    that's an interest that points toward dismissal if

3    you're going to have parallel proceedings.

4                    What Plaintiffs might like is not only

5    would you have a parallel proceeding but you'd have this

6    kind of rough proceeding where it's only a few people or

7    it's only against Boeing or something like that.  That's

8    even worse, because you can't get everybody together.

9                    Lastly, I'll just say on the adequacy

10   issues and whatnot, I think it's Footnote 1 in our reply

11   notes that there is insurance coverage here that is

12   enough to cover the claims.  There's no issue of because

13   of, you know, because of MAB and Malaysian law that

14   somehow there's going to be an escape of liability and

15   no money or something like that.  There's no evidence in

16   support of that.

17                   THE COURT:  From Boeing's perspective.

18   We haven't talked about Malaysia.

19                   MR. WOLFF:  The footnote is

20   specifically about the operator's insurance.

21                   THE COURT:  I see, all right.  Thank

22   you.

23                   MR. WOLFF:  Thank you.

24                   THE COURT:  Mr. Altman is chomping at

25   the bit, even though I wanted to give Mr. Walker a

74

1    chance.

2                    MR. ALTMAN:  Would you mind,

3    Your Honor, just for one minute?

4                    THE COURT:  One minute.

5                    MR. ALTMAN:  I just wanted to respond

6    very briefly to the point that there was no citation to

7    cases that say that letters rogatory are sufficient in

8    the context of FNC.  I'll point the Court to Footnote 76

9    of our response brief.  I think there are five published

10   federal court decisions, and we've quoted them in

11   parentheticals that say exactly that.

12                   THE COURT:  Thank you.

13                   MR. ALTMAN:  Thank you, Judge.

14                   THE COURT:  Mr. Walker.

15                   MR. WALKER:  I just, I'll keep my

16   comments brief on the forum non conveniens --

17                   THE COURT:  Thank you, sir.

18                   MR. WALKER:  -- issue.  And these are

19   primarily targeted or are responsive to arguments raised

20   by Ms. Schiavo.

21                   THE COURT:  Let me have you speak right

22   into the microphone.

23                   MR. WALKER:  I'm sorry.  My comments

24   are primarily targeted towards comments made by

25   Ms. Schiavo, and some of them will be to the questions

1    that you've asked.

2             But I'm standing here today as counsel

3    for Malaysian Airline System Berhad, the operator of the

4    aircraft.  This contention that the airline is dead or

5    has somehow disappeared has no basis.  There's an

6    administrator appointed.  There is adequate insurance

7    for this.

8             These plaintiffs that are represented

9    by Ms. Schiavo and also by the Podhurst firm are

10   litigating in Malaysia against Malaysian Airline System

11   Berhad, present and actively litigating against them.

12             THE COURT:  Well, not exactly

13   Mr. Altman, because he says I've been excluded because

14   the Malaysian court won't let me represent my client.

15   So did you-all take a position on that issue?

16             MR. WALKER:  Let me qualify what I was

17   saying.  I don't mean Mr. Altman or the Podhurst firm,

18   but the plaintiffs that they represent are litigating in

19   Malaysia against Malaysian Airline System Berhad.

20             THE COURT:  Would you object to

21   Mr. Altman representing his client in the context of

22   that litigation?

23             MR. WALKER:  I have no objection to

24   that, but my understanding is that the Malaysian bar is

25   the one that came in and objected to that.  I'm not

1   familiar enough with the proceedings that took place

2   there, so it's very difficult --

3                    THE COURT:  So you aren't the actual

4   lawyer in that proceeding on your side?

5                    MR. WALKER:  No.  We are the lawyers in

6   the United States for the airlines.  There are separate

7   counsel in Malaysia; a Malaysian lawyer, just as all the

8   other lawyers involved in this case as you would expect

9   them to be, are Malaysian.

10                    But my point here is that, you know,

11   there was a attempt to jump ahead to this Article 32

12   argument that relates to the action against Allianz and

13   trying to make them an involuntary agent here.

14                    But Malaysian Airlines System Berhad,

15   the actual operator of the aircraft is present and

16   litigating, and the parties know this.  And, in fact, in

17   the litigation in Malaysia in those cases where the same

18   decedent or the families represented by the Podhurst

19   firm are being represented, they have sought discovery

20   from Malaysia Airlines in Malaysia after representing to

21   this Court that they would never need any such discovery

22   from Malaysia Airlines in this courtroom.

23                    There's active litigation going on

24   there.  They have characterized it as a protective

25   filing, but they are actively litigating there.  They

1    have sued other parties that are not present in the

2    United States.  Ms. Schiavo sought a stay of proceedings

3    or her cocounsel in Malaysia sought a stay of

4    proceedings in Malaysia.  The Malaysian court rejected

5    that stay.  It said you have filed it, I have to hear

6    these cases, I have an interest in them.  That was taken

7    to the Court of Appeals, their intermediate Court of

8    Appeals.  That was affirmed.  It was appealed into the

9    federal court, which is the highest court of Malaysia,

10   and it was affirmed again that the stay, denial of the

11   stay was proper.

12                  THE COURT:  All right.  I think I

13   understand your point with respect to

14   forum non conveniens.  What about this Court's

15   jurisdiction to be able to continue to hear these

16   matters?

17                  MR. WALKER:  I'll segueway into that.

18                  THE COURT:  Please.

19                  MR. WALKER:  The Foreign Sovereign

20   Immunities.  But I did want to just tie that back into

21   the forum non conveniens --

22                  THE COURT:  Okay.

23                  MR. WALKER:  -- issue.

24                  Although the issue of sovereign

25   immunity is separate, the arguments that have been

1    raised by the plaintiffs relate primarily to a waiver of

2    sovereign immunity.  And that applies to only a very few

3    claimants in these proceedings.

4                  But I want to be clear about one point

5    and why it's relevant to forum non conveniens.  Even if

6    the Court were to find that Malaysia Airlines had waived

7    its sovereign immunity for the purpose of those

8    passenger claims, that is not a general waiver that

9    would permit Boeing to file a cross-claim or a

10   third-party claim against Malaysia Airlines in the

11   United States.

12                  And that is a fundamental fact that

13   goes to the ability of Boeing to obtain discovery from

14   Malaysia Airlines or from Malaysia, and it also relates

15   to discovery that might be necessary going in the other

16   direction.

17                  THE COURT:  Very interesting.  So let

18   me just take a second and appreciate what it is that

19   you've just said.  That even if under the Foreign

20   Sovereign Immunities Act or otherwise the Court finds

21   that Malaysia has waived its sovereign immunity, it

22   would be limited to --

23                  MR. WALKER:  Two to three passengers.

24                  THE COURT:  -- two to three passengers,

25   and that's because it's arising out of what?  Tell me

1  what you mean.

2              MR. WALKER:  Well, their argument is

3  premised on the Foreign Air Carrier permit in which they

4  claim --

5              THE COURT:  Well, hold on one second.

6  So we're in Foreign Sovereign Immunities Act world.

7              MR. WALKER:  Yes.

8              THE COURT:  And you are claiming, first

9  of all, that these -- that the -- what I call MAS and

10  MAB, but I don't know if that's right, are

11  instrumentalities of the Malaysian government that are

12  entitled to immunity under the Foreign Sovereign

13  Immunities Act.  That's your point?

14              MR. WALKER:  Correct.

15              THE COURT:  Okay.

16              MR. WALKER:  I don't think there's any

17  contest that both of them are agencies or

18  instrumentalities of a foreign state either as direct

19  ownership or as an organ.  There's no dispute over that.

20              THE COURT:  Okay.  And setting aside

21  the exceptions within the Foreign Sovereign Immunities

22  Act, you read the plaintiffs' briefs as saying there is

23  a waiver that has arisen in this other context, the

24  permit and/or the Montreal Convention or something like

25  that?

1              MR. WALKER:  Yes.

2              THE COURT:  Okay.  So now we're in --

3    I'm sorry, I just have to figure out where we are.

4              MR. WALKER:  I was trying to focus

5    first on the Foreign Sovereign Immunities Act.  The

6    Montreal Convention, it would be a little bit different.

7              THE COURT:  Correct.  The Foreign

8    Sovereign Immunities Act, you say they say there is a

9    waiver in the DOT permit --

10             MR. WALKER:  Yes.

11             THE COURT:  -- for the purposes of the

12   Foreign Sovereign Immunities Act.

13             MR. WALKER:  Yes.  Well, the Foreign

14   Sovereign Immunities Act does recognize an exception for

15   waiver, and those usually are in the context of

16   transactional matters where the parties have litigated

17   and not raised the issue or they have entered into an

18   arbitration agreement, setting up application of a

19   foreign law or they've agreed to a jurisdiction.  Here

20   the plaintiffs are arguing for explicit or implicit

21   waiver through the --

22             THE COURT:  DOT permit?

23             MR. WALKER:  -- DOT permit.  The point

24   that I was trying to make relevant to

25   forum non conveniens is that that waiver pertains only

1    to the -- potentially pertains only to three, three or

2    four passengers on the aircraft.

3                    THE COURT:  Per the terms of the

4    permit?

5                    MR. WALKER:  Yes.

6                    THE COURT:  Per the explicit language

7    in the permit?

8                    MR. WALKER:  Yes.  The courts have

9    said, the D.C. Circuit has said this unequivocally, that

10   in terms of foreign sovereign immunity, it has to be

11   evaluated on a claim-by-claim basis.

12                    So the Court would be focusing on

13   whether there's a waiver as to certain passengers.  But

14   even if the Court was to find that there was a waiver,

15   which we dispute would be proper, that does not give

16   Boeing an opportunity or a basis for suit against

17   Malaysia Airlines, because it is not a finding of

18   general waiver.  It would only be a finding of waiver as

19   to specific passengers.

20                    THE COURT:  I see.  So these are

21   related in that if the Court kept it, thinking that it

22   was not dismissible on forum non conveniens, it would be

23   a mess, you say, because to the extent that Boeing tries

24   to cross-claim or whatever, suing Malaysia Airlines,

25   Malaysia Airlines would invoke sovereign immunity with

1    respect to those claims or those allegations.

2                    MR. WALKER:  Yes, absolutely.

3                    THE COURT:  Yes.  All right.  I mean, I

4    understand it.  I don't know the answer.  That's why

5    we're having the conversation.

6                    MR. WALKER:  That's why it's important

7    to draw that distinction, because the Court was focused

8    on the issue of availability of matters through

9    discovery.

10                   THE COURT:  Right.

11                   MR. WALKER:  And I just thought it was

12   important to make that distinction here so that there

13   wasn't some later confusion about whether or not our

14   presence here would allow Boeing to get the discovery

15   that Mr. Altman suggests they would be entitled to

16   obtain.

17                   THE COURT:  Yes, I understand.  You've

18   made your record with respect to that.  But, of course,

19   your threshold issue is whether, or question is whether

20   or not there is even a waiver.

21                   MR. WALKER:  Yes.

22                   THE COURT:  Per the permit or anything

23   else.

24                   MR. WALKER:  Yes.  I'll proceed on

25   that.

83

1          THE COURT:  Yes.

2          MR. WALKER:  We've read the Court's

3    recent decision on foreign sovereign immunity, so -- in

4    the *SACE S.p.A. v. the Republic of Paraguay* case.  I

5    don't want to plow old ground here or explain it.  But

6    in our opening brief we did set out what is the basis

7    for our claim as a foreign agency or instrumentality,

8    foreign state on behalf of MAS, which is Malaysian

9    Airline System Berhad, Administrator appointed, and MAB,

10   which is Malaysia Airlines Berhad, the current national

11   carrier --

12          THE COURT:  Let me tell you what I

13   found confusing, and maybe this will be helpful to cut

14   right into it.  I'm not sure I understand your argument

15   that MAB has to be dismissed because of the timing or

16   the act of -- is that somebody else's argument?

17          MR. WALKER:  No.  Would you mind if I

18   get a drink of water?

19          THE COURT:  Please, please.

20          MR. WALKER:  I'm sorry.

21          THE COURT:  That I found very

22   confusing, because it felt to me like you were trying to

23   have it both ways in a certain sense.

24          MR. WALKER:  The arguments that we've

25   raised, there's no contest, there's been no dispute in

1    either, in any of the responses filed that MAS and MAB

2    are agencies or instrumentalities of a foreign state.

3                    THE COURT:  Right.

4                    MR. WALKER:  That issue isn't before

5    the Court because that hasn't been contested.

6                    THE COURT:  Right.

7                    MR. WALKER:  The issue that we raised

8    about MAB relates to whether or not it is the successor

9    in interest to MAS.

10                    THE COURT:  But why does that matter

11   from the standpoint of the FSIA?  I mean, the reason why

12   you get either of these entities or both of these

13   entities are entitled to immunity is because of their

14   relationship to the government, right?

15                    So what difference does it make if the

16   U.S. government decides to carve up these different

17   agencies or whatever for the purpose -- I don't

18   understand why it matters that we're talking about MAB

19   versus MAS.

20                    MR. WALKER:  Well, in our opening brief

21   we pointed out that from a temporal perspective it boils

22   down to an argument by the plaintiffs that there's a

23   waiver under the DOT permit or through the Montreal

24   Convention.  But our argument here is MAB did not exist

25   at the time of the --

1          THE COURT:  Yes, but the Malaysian

2     government did, and that is the relevant actor for the

3     purpose of the Foreign Sovereign Immunities Act because

4     that is the entity that is being granted immunity.  And

5     to the extent these are political subdivisions, I don't

6     understand why it matters that this particular political

7     subdivision existed versus that one.  The Malaysian

8     government is the one that made the decision to engage

9     in these commercial activities through these different

10     subdivisions.  I don't get the distinction.

11          MR. WALKER:  I think there is a

12     distinction between the foreign state itself and its

13     agencies and instrumentalities, because the agencies and

14     instrumentalities can be separate corporations.  And

15     they are dealt with just like corporations are dealt

16     with in their separateness under U.S. law.

17          The permit was issued to Malaysian

18     Airline System Berhad, MAS.  MAB as a later constituted

19     entity could not have waived sovereign immunity under a

20     permit issued at a time when it didn't exist.

21          THE COURT:  I understand, but you have

22     case law that suggests that a foreign government that is

23     entitled to sovereign immunity can parse its waivers in

24     this way.

25          I mean, what the plaintiffs are saying

1   is to the extent that the Malaysian government was

2   running an airline and the airline had a crash and they

3   were running it under MAS, they should not -- and, and

4   assuming for a moment that there is a waiver of

5   sovereign immunity with respect to that event and the

6   commercial activities that were involved, why is it that

7   the FSIA should be read to permit that foreign

8   government to essentially create another entity, right,

9   and say:  But that entity didn't waive its immunity with

10  respect to this.

11          I mean, it was the Malaysian government

12  that is at the heart of all of this, and so what if it

13  created MAB or MAS?  To the extent we're talking about

14  sovereign immunity, I don't understand why they get to

15  back out of it in this way.

16          MR. WALKER:  The Malaysian government

17  is not a party to this litigation.  It's the two airline

18  entities that are separate corporations that have been

19  sued.  And they have qualified as agencies and

20  instrumentalities under the various tests of the Foreign

21  Sovereign Immunities Act.  And they're accorded

22  certain -- but that does not negate or nullify corporate

23  separateness.

24          The reason that we have been raising

25  this issue about the separateness is that in enacting

1   the Malaysia Airline Act 765 that has come up, they did

2   separate in the constitution of this specifically the

3   liabilities of Malaysia Airline System Berhad, MAS, were

4   not transferred to MAB.

5                   THE COURT:  All right.

6                   MR. WALKER:  Okay.  So that's why we're

7   drawing a distinction here.  We're not asking --

8                   THE COURT:  But how is that part --

9   just help me to understand.  Fine.  MAB was created

10  after the accident, after the incident about which this

11  suit is related.  So what is it about sovereign immunity

12  that makes it so that the new entity can still claim

13  sovereign immunity with respect to the event?

14                  MR. WALKER:  Well, maybe I'll just --

15  I'll say this to the Court:  Both entities are claiming

16  sovereign immunity, and they're also claiming that there

17  hasn't been a waiver.  But, you know, that is an issue

18  that I don't think was really addressed in the briefs

19  about the separateness other than to point out the

20  Malaysian Act 765 and what it was intending to

21  accomplish.

22                  And before the Court can preemptively

23  say, Well, I can allow a suit to proceed against MAB in

24  this court, the Court has to look at Act 765, and we

25  suggest that would be inappropriate under the active

1    state doctrine that says well, if the Malaysian

2    government has made such a determination that MAB is

3    separate and not the same, this Court would have to say

4    that I don't agree or accept what the Malaysian --

5              THE COURT:  I think I understand your

6    argument.  It's just peculiar to me.  Because the whole

7    point of the FSIA is that you really don't want foreign

8    entities to sort of be able to make it up on the back

9    end.

10             I mean, the reason why it exists is

11    because we're trying to develop or establish -- Congress

12    developed the ground rules under which these foreign

13    entities are going to be subject to suit.  And it seems

14    odd to me that a foreign government that for the moment

15    presumably meets all the criteria can get out of the

16    FSIA by forming a new entity in this way.

17             I don't know that that's really what

18    Congress intended.  So do you see what I'm saying?  I'm

19    having a little bit of a hard time reconciling --

20             MR. WALKER:  I understand your

21    question, but I will sort of conclude this aspect of it.

22    I think this is really a side show.  It's not important

23    to -- even if the Court says I don't draw this

24    distinction based on the temporal establishment of MAB,

25    the real argument here is whether there's been a waiver.

1          THE COURT:  Okay.  So you say no.  And

2   why?

3          MR. WALKER:  Well --

4          THE COURT:  Isn't there a language in

5   the DOT permit that suggests waiver of sovereign

6   immunity?

7          MR. WALKER:  Yes, under very limited

8   circumstances.

9          THE COURT:  All right.

10          MR. WALKER:  Okay.  And I think it's

11   important, and I'm going to refer to the Exhibit 5 to

12   Defendant Malaysian -- MAS and MAB's motion.  And that

13   is the actual --

14          THE COURT:  Permit.

15          MR. WALKER:  -- order issued for a

16   carrier permit, the permit itself and its attachment.

17   But, you know, when we look at the first page of the

18   permit to foreign air carrier, which unfortunately I

19   don't have the numbered page, but --

20          THE COURT:  That's all right.  I have

21   the document.

22          MR. WALKER:  The one that looks like

23   this.

24          THE COURT:  Yes.

25          MR. WALKER:  Okay.  It starts out by

1  saying what is authorized under this permit.  And it

2  specifically says that the foreign, it relates to

3  foreign air transportation, which means that's a term of

4  art.  Foreign air transportation means air

5  transportation to and from the United States for the

6  purposes of United States law.  Okay.

7                    It doesn't have a generalized

8  international carriage by air meaning, meaning between

9  any two points -- I'm sorry.

10                    THE COURT:  That's all right.

11                    MR. WALKER:  It doesn't pertain to

12  international carriage between any two points in the

13  world.  It starts out saying --

14                    THE COURT:  So let me just summarize,

15  in the interest of time.  You say that the scope of this

16  permit really is only about foreign -- I'm reading

17  here -- foreign air transportation of persons, property

18  and mail between Malaysia and the United States.

19                    MR. WALKER:  Yes.

20                    THE COURT:  And that any waiver of

21  sovereign immunity has to be under those circumstances

22  to the extent it arises out of this document.

23                    MR. WALKER:  Yes, and indeed when you

24  go to the Attachment A to it and the -- go down to

25  Paragraph 7 on which the plaintiffs rely.

1          THE COURT:  Yes.

2          MR. WALKER:  Okay.  This paragraph

3     again recites that operation -- it refers back to agree

4     that operations under this authority, which is -- which

5     relates back to the initial preamble authorizing

6     transportation to and from or through points in the

7     United States.

8          THE COURT:  All right.  Let me ask you

9     a broader question about another point -- I understand

10    this point -- about the suggestion that the agency did

11    something untoward with respect to its allowing a waiver

12    of sovereign immunity.  There's some argument that you

13    make --

14         MR. WALKER:  There's essentially two

15    parts to that.  Did you want me to finish?

16         THE COURT:  No.  I understand this

17    point.

18         MR. WALKER:  We don't think it applies

19    for that reason.

20         THE COURT:  Got it.

21         MR. WALKER:  And I just want to

22    reemphasize before moving on that there's only a small

23    handful of claimants involved in this litigation that

24    even claim to have purchased a ticket in the United

25    States.  Not one of the plaintiffs -- not one decedent

1    involved in this litigation had an itinerary to, from or

2    through the United States.

3                    THE COURT:  Yes.

4                    MR. WALKER:  Okay.  So I just want to

5    make sure that there's an understanding that it's very

6    limited.

7                    THE COURT:  Yes.

8                    MR. WALKER:  But there are two points

9    that relate to the DOT's action.  Part of it relates to

10   an attempt in 1986 to engage in rule-making where they

11   were trying to extend this to mean worldwide

12   extraterritorial application between two points.  There

13   were a lot of objections to that, they're documented in

14   the briefs about what different parties, what IATIS had

15   to say about it.  The DOT pulled from that.

16                   But in any event, they never modified

17   the air carrier permit to give it a broader scope.  So

18   the actual language of this permit is what is

19   controlling, not what the DOT attempted to do and then

20   never, in fact, modified the permit.

21                   THE COURT:  Is it your argument that a

22   sovereign can't contract away its sovereign immunity at

23   all, or is it that it can't contract with an agency?

24   There was something in your brief --

25                   MR. WALKER:  The second, a lengthy part

1    of the brief has to do with the DOT's exceeding its

2    authority --

3                    THE COURT:  Right.

4                    MR. WALKER:   -- in terms of coercing or

5    imposing a condition of waiver of sovereign immunity.

6    The DOT is a part of the Executive Branch.

7                    THE COURT:  Right.

8                    MR. WALKER:  And in the enactment of

9    the Foreign Sovereign Immunities Act, Congress

10   transferred determinations of immunity, foreign

11   sovereign immunity, to the courts.  There's no authority

12   granted to the Department of Transportation to make

13   those or to --

14                   THE COURT:  But this is not a

15   determination.  This is -- is it your position that a

16   foreign sovereign, in seeking a permit in the United

17   States, cannot agree to waive its sovereign immunity

18   with respect to that?  It's not a determination of

19   sovereign immunity.

20                   MR. WALKER:  I'm not taking that

21   position.

22                   THE COURT:  Okay.  You're not taking

23   that position.

24                   MR. WALKER:  Clearly the Foreign

25   Sovereign Immunities Act does contemplate that in

1   transactional situations a foreign sovereign or its

2   agencies or instrumentalities can waive by engaging in

3   certain acts.  But here --

4                THE COURT:  And expressly in the

5   context of an agreement.  They can waive their sovereign

6   immunity expressly.  I know you don't think this is it

7   for the purpose of this litigation, but as a matter of

8   law it can be done; right?

9                MR. WALKER:  It can be done.  We don't

10  believe that it's proper through coercion.  We don't

11  believe that the law shows that the DOT -- the courts

12  are not bound to uphold agency actions when they are

13  unlawful.

14               THE COURT:  And I guess my question to

15  you is why is it unlawful for DOT to say if you would

16  like a permit you're going to have to agree to waive

17  your sovereign immunity in the limited -- even in the

18  limited sense that you're talking about with respect to

19  actions that arise from this permit.  Why is that

20  unlawful?

21               MR. WALKER:  Because that is

22  conditioned beyond their authority to impose on any

23  foreign carrier.  The DOT does not have authority to

24  impose that type of a condition.

25               THE COURT:  And is that because, you're

 1    saying because they're not the court or because Congress

 2    has restricted DOT's authority or what?

 3                    MR. WALKER:  Because Congress has not

 4    delegated that authority to the DOT.

 5                    THE COURT:  Okay.

 6                    MR. WALKER:  I would like to turn to

 7    the explicit/implicit waiver apart from the --

 8                    THE COURT:  And then we're going to

 9    take a quick break and I'll have the response to you

10    afterwards, and we may just end up not getting to the

11    third area.

12                    MR. WALKER:  Anyway, I'd just like to

13    say that to the extent that Plaintiffs make an argument

14    that paragraph 7 of the attachment compels a different

15    conclusion, all that that argument does is point to an

16    ambiguity, a potential ambiguity in the wording of this

17    permit waiver.  We think it's quite unambiguous in terms

18    of limiting it only to transportation to or from the

19    United States and within the context of the

20    subcategories here.

21                    But to the extent that it seems it may

22    appear ambiguous, which we think that it is not, but the

23    plaintiffs' argument that it means something else is

24    only a demonstration of an ambiguity that has to be

25    resolved in favor of the foreign sovereign because an

1    explicit waiver, waivers of sovereign immunity are

2    highly disfavored; that is, a line of cases stand for

3    that proposition.  Implicit waiver is almost impossible

4    to obtain.  But explicit waiver here, to the extent this

5    is ambiguous, it has to be resolved in favor of the

6    foreign sovereign --

7                    THE COURT:  Right.

8                    MR. WALKER:  -- because you have to

9    know what right it is that you're giving up.

10                   THE COURT:  I understand.  Can we take

11   a break now?

12                   MR. WALKER:  Sure.

13                   THE COURT:  All right.  Ten minutes.

14   Thank you.

15                        (Recess)

16                   THE COURT:  All right, thank you.

17   Mr. Walker, I sort of cut you off because we were ready

18   for a break, but I do think I understand your argument.

19   I didn't know if there was anything more that you wanted

20   to say.

21                   MR. WALKER:   If I could be brief.

22   Because I thought I was finished, I didn't really, you

23   know, prepare any additional --

24                   THE COURT:  You'll come back again.

25                   MR. WALKER:  I would like to --

1          THE COURT:  Yes.

2          MR. WALKER:  -- reserve an opportunity

3     to reply.

4          THE COURT:  Yes, I will let you do so.

5          MR. WALKER:  Thank you.

6          THE COURT:  Let me turn to Plaintiffs.

7     Mr. Altman, one thing that has been nagging me from the

8     beginning --

9          MR. ALTMAN:  Yes, Your Honor.

10          THE COURT:  -- is your comment or

11     suggestion that once I dealt with the jurisdictional

12     issues, your plaintiffs would be the last ones standing.

13     And so is that not what you intended to suggest?

14          MR. ALTMAN:  Look, Judge, we thought a

15     lot about how I would say that, to be honest, and I

16     realize that I'm on treacherous ground here.  I don't

17     want to impugn anyone else's claims.  I certainly

18     haven't reviewed everyone else's pleadings the way that

19     I have reviewed our papers, and I don't feel comfortable

20     opining on that.

21          THE COURT:  But could you explain to me

22     what you see to be the distinction?  In other words, are

23     you making a jurisdictional argument that is different

24     from the other plaintiffs, and if so, how so?

25          MR. ALTMAN:  Again, I believe that I am

1    because I believe that I'm making an argument with

2    respect to the Montreal Convention and the jurisdiction

3    in the United States under the Montreal Convention that

4    I could be wrong, but I don't think was made necessarily

5    by some of the other plaintiffs.  And, of course,

6    they'll correct me if I'm wrong about that.  My point

7    with respect to that is that the Montreal Convention

8    issues with respect to someone who purchased their

9    ticket in the United States or was a principal and

10   permanent resident of the United States of course are

11   different from those of someone who was not.

12                   THE COURT:  All right.  Before you go

13   there, do you have an argument on FSIA, or are you

14   putting all of your eggs in the Montreal Convention

15   basket?

16                   MR. ALTMAN:  No, Your Honor.  Sorry.

17   We need to prove jurisdiction under both.

18                   THE COURT:  Under both.

19                   MR. ALTMAN:  Yes.

20                   THE COURT:  Okay.  So how do you have

21   jurisdiction under the FSIA?

22                   MR. ALTMAN:  Judge, I mean, you've

23   already hit on these arguments, and I don't want to

24   belabor the point.  The DOT clearly had authority to

25   enter into a contract with a foreign entity.  The

1    statute that gave them that authority is a congressional

2    statute that, frankly, could not have given them more

3    unbridled discretion in this respect.  We cited in our

4    papers, it's a 1958 statute, FAA Section 402(e).

5                    THE COURT:  All right.  Let me just,

6    before you go there, sorry.  I'm trying to put everybody

7    in the right basket so that I can figure out where we

8    are.

9                    You're proceeding under the waiver

10   exception of the FSIA pursuant to the DOT permit.  Is

11   there any other exception to the FSIA that you feel

12   applies in this circumstance?

13                   MR. ALTMAN:  Yes, Your Honor.  We

14   believe that by signing on to the Montreal Convention,

15   the Malaysian government was also impliedly waiving its

16   sovereign immunity in the courts where jurisdiction

17   would lie under the terms of the Montreal Convention.

18   And I've laid that out in our papers as well.

19                   THE COURT:  Okay.  Express and implied

20   waiver but not commercial activity.  None of the other

21   FSIA express exceptions in the FSIA.

22                   MR. ALTMAN:  You have it exactly right.

23                   THE COURT:  Okay.  So we're in waiver

24   world.  Thank you.  You can make your DOT -- so DOT has

25   authority, you say, fine.  But Mr. Walker says, Pull out

1    the permit, Judge.  When you look at it, even though

2    they may have had authority, it certainly doesn't cover

3    this circumstance.

4                    MR. ALTMAN:  Judge, it clearly does.

5    If you look at their reply, there's really no answer to

6    our textual argument with respect to the permit.  If you

7    look at the permit itself, the permit says, "In the

8    conduct of the operations authorized," which is to say

9    in the conduct of flying into and out of the United

10   States.

11                   We're asking you to waive a sovereign

12   immunity in the courts of the United States as to a

13   broader class of cases.  Which class of cases?  Those

14   are the class of cases listed in 7(a) and 7(b).  7(a)

15   says cases where there's a stopping point in the United

16   States, which is Mr. Walker's argument.

17                   But then it goes on.  It says, "Or"

18   disjunctive, "where the contract of carriage was

19   purchased in the United States."  Of course, by using

20   the disjunctive, the DOT was clearly saying that they

21   were allowing for FSIA waivers not just in cases where

22   there was a stopping point in the United States, but

23   again in a broader class of cases.  For example, where

24   you purchased your ticket in the United States although

25   your flight never goes there.

1          And then in addition, it then says "Or"

2    again -- and that's when you go to 7(b) -- "when it's

3    subject to some other international treaty like the

4    Montreal Convention."

5          Again, Your Honor, our argument is the

6    Montreal Convention applies for two reasons.  Because

7    under the third jurisdiction, Mr. Wood and the Gaspard

8    plaintiffs purchased their tickets in the United

9    States -- that's third jurisdiction -- and because

10   Mr. Wood was a principal and permanent resident of the

11   United States, that's fifth jurisdiction.

12          If the Court finds that that's true,

13   then we would meet the requirements of 7(b) and there

14   would be a waiver as to those cases precisely for that

15   reason.

16          The operative point, Judge, is that the

17   DOT specifically used the word "or" in the disjunctive

18   to clearly articulate its position:  that the waiver

19   of sovereign immunity was with respect to more than just

20   flights with a stopping point in the United States.  As

21   we have articulated in our brief, the DOT explained this

22   amendment to its waiver in 1987 through a lengthy order,

23   which it issued which means --

24          THE COURT:  Mr. Walker says they also

25   apparently attempted to press the broader category of

1    cases and never actually changed the language and pulled

2    away from that determination.

3                    MR. ALTMAN:  That's just not true,

4    Judge.  It's in there, and I'll read the old order.

5    This is on page -- the previous -- the previous waiver

6    language is on page 18 of our brief, and it read, "The

7    holder shall waive any right it may possess to assert

8    any defense of sovereign immunity from suit in any

9    action or proceeding instituted against it in any court

10   or other tribunal in the United States based upon any

11   claim arising out of operations under this permit."

12                    In other words, there was no

13   disjunctive like the one that we're talking about that

14   applies here.  In 1987 the DOT made clear that it was

15   changing this order for the purpose -- for five reasons.

16   Those five reasons all were to make a foreign airline

17   owned by a foreign government on equal footing with

18   foreign airlines and American airlines who were not

19   owned by foreign governments.

20                    In other words, to have foreign

21   airlines owned by foreign governments waive their

22   sovereign immunity in the courts of the United States

23   for any flight that meets the criteria under 7(a) or

24   7(b), and that's why you have the new permit language

25   that Mr. Walker has read to you from Attachment A to the

1   permit at issue here, which clearly, or course, is

2   different from the permit language that used to exist

3   before 1987 and under its own clear terms countenances

4   the flight that we have here, even though there was no

5   stopping point in the U.S.

6               THE COURT:  All right.  Let's talk a

7   little bit about the contract of carriage being

8   purchased in the United States.  I see that language in

9   the context of the permit.  It also comes up in the text

10  of the Montreal Convention, although slightly

11  differently, I think.

12              So first of all, are you suggesting

13  that the contract-of-carriage language in the permit and

14  the language in the Montreal Convention should be

15  construed similarly or are the same, or is there a

16  difference?

17              MR. ALTMAN:  I'm not.  There is a

18  slight difference, Your Honor.  In the Montreal

19  Convention the contract of carriage has to be purchased

20  through a place of business of the defendant in the

21  United States, of the airline in the United States.  The

22  contract-of-carriage language in the FSIA permit only

23  says that the contract of carriage must be purchased in

24  the United States.  So there's a slight difference

25  there, in response to your question.

1          My only point in saying that, though,

2     Your Honor, was to the extent that the contract of

3     carriage for the Gaspard and Wood plaintiffs was

4     purchased in the United States, that that would satisfy

5     the 7(a) exception to the sovereign immunity --

6          THE COURT:  But was it?  Let's talk

7     about the facts.  I mean, you know, just because there

8     was a computer server in the United States or the travel

9     agent issuer, does that qualify as contract of carriage

10    purchased in the United States?

11         MR. ALTMAN:  Right, Judge.  There

12    wasn't just a computer server in the United States.

13    Just to be clear, in the United States there was a whole

14    array of travel agencies with brick and mortar offices

15    who also happened to have computer servers in their

16    offices.  And those travel agencies contracted with

17    Malaysia Airlines.  Malaysia Airlines came here,

18    developed a clear contractual principal-agent

19    relationship, which is reflected in the attachments that

20    we filed to our Montreal Convention brief; and in that

21    contractual relationship, Malaysia Airlines authorized

22    these agents of Malaysia Airlines to sell tickets on its

23    behalf to book reservations, take requests, query its

24    airplanes to see if there were seats and then to issue

25    tickets and reservations on its behalf to American

1    citizens and people in the United States.

2                And that's precisely what happened

3    here.  Both of the transactions that we're talking about

4    here, the Wood transaction was through a travel agency

5    called Travelport, and the Gaspard transactions were

6    through an American travel agency that the Court knows

7    very well called Orbitz, which is headquartered in

8    Chicago, which of course, is a brick-and-mortar business

9    in the United States.

10               And there's a couple of cases that are

11   important in this respect, Your Honor.  The first, of

12   course, is all of the cases and the Restatement that

13   says that a contract is formed for purposes of lex loci

14   at the place where the acceptor manifests his or her

15   assent to the offeror.  Right.  And that makes sense.

16               If you're in the jungle by yourself and

17   I have offered you something two weeks ago, you can't

18   say I accept and nobody hears you and you can come back

19   and say a contract was formed.  You have to manifest

20   your assent, your acceptance to the offeror.  And it's

21   the place where the acceptor is standing.

22               THE COURT:  I'm sorry, the offeror is

23   the carrier?

24               MR. ALTMAN:  Sorry.  The offeror is the

25   passenger.

1          THE COURT:  Is the passenger.

2          MR. ALTMAN:  And there's no dispute

3  about that.  They agree with that.

4          THE COURT:  All right.

5          MR. ALTMAN:  The offeror is the

6  passenger who is offering to purchase this ticket at a

7  certain price through a travel agent in the United

8  States.

9          Mr. Wood -- just to go back, Mr. Wood

10  went on to the IBM Internet portal that was given to him

11  by IBM, his computer system.  IBM has contracted with an

12  American agent.  Mr. Wood is sitting in Kuala Lumpur.

13  He contracts with an American agent, American Express,

14  through Travelport to authorize it to purchase tickets

15  on his behalf for international travel.  That travel

16  agent then connects with Malaysia Airlines' authorized

17  travel agent, Travelport, in the United States, to

18  engage in a contract, to engage in an offer to purchase

19  a ticket at a certain price and then to manifest an

20  acceptance of that offer, all of which, by the way,

21  takes place in the United States.

22              And the case law that we've cited in

23  our briefs and the Restatement on Contracts makes clear

24  that the lex loci for contracts takes place at the place

25  where the acceptor of the offer manifests or speaks that

1    assent rather than the place where the offeror receives

2    the acceptance.

3            So, again, Mr. Wood was sitting in

4    Malaysia when he received the acceptance, but the

5    offeror, the acceptor, which was Malaysia Airlines'

6    agent, Travelport in the United States, manifested that

7    communication from the United States, and that's the

8    place that matters.

9            And there's actually only one federal

10   case on point here.  It's a Second Circuit case from

11   1966 called *Eck*, and we've cited it for the

12   proposition -- here is what happened in *Eck*:  In *Eck*

13   very similarly a person goes to buy a ticket on a United

14   Arab Emirates flight.  The ticket is purchased not from

15   a United Arab Emirates office but from an SAS office in

16   the United States.  The SAS office had contracted with

17   United Arab Emirates Airlines in order to sell tickets

18   on its behalf.

19           The Court said that agent sitting in

20   the United States steps into the shoes of the acceptor,

21   United Arab Emirates, who is the foreign airline who has

22   sold the ticket.  And because you as a foreign airline

23   have come to the United States, you've engaged a local

24   agent in order to sell your tickets on your behalf to

25   Americans in the United States, what the *Eck* court said

1    under principal-agent relationships, the agent stands in

2    your shoes in the United States, and there's third

3    jurisdiction in the United States because the contract

4    was purchased through a place of business of the

5    defendant, the airline in the United States through its

6    agent.

7                THE COURT:  All right.  So that would

8    seem to address the 7(a) piece of this.  My question,

9    though, that was borne out of my appreciation of the

10   distinction of the language, the distinction between the

11   language in 7(a) and the Montreal Convention, is, is

12   that enough to get you into the Montreal Convention with

13   respect to the, what is it, the third, I guess --

14                MR. ALTMAN:  Jurisdiction, yes.

15                THE COURT:  The third jurisdiction.

16                MR. ALTMAN:  And I'm sorry, Judge.  I

17   obviously wasn't clear, because I had moved on.

18                THE COURT:  Yes.

19                MR. ALTMAN:  *Eck* was decided under the

20   third jurisdiction.

21                THE COURT:  It was?

22                MR. **ALTMAN**:  And the reason *Eck* is so

23   important, Judge, and I'll just be very candid, is the

24   difference that Your Honor has pointed out in the waiver

25   is the waiver just says the contract of carriage was

purchased in the United States.  Our position is that's
clear.  It was bought in the United States, issued by an
American agent in the United States on behalf of
Malaysia Airlines.

The defendants' main argument is well,
but the Montreal Convention third jurisdiction requires
a little bit more, and they're right about that.  It
requires that the contract of carriage not just be
purchased in the United States, but that the contract of
carriage be purchased in the United States through a
place of business of the airline.  Right.

And so what *Eck* does is *Eck* connects
those dots.  What *Eck* says -- which is on all fours with
us -- what *Eck* says is when you as the foreign airline
contract with an agent in the United States to sell
tickets on your behalf, then you can't turn around and
say, Oh, you know what, that's not my office, that's not
a place of business of me, the foreign airline in the
United States.

*Eck* is a published decision from the
Second Circuit that said when you affirmatively come to
the United States and hire an agent to sell tickets on
your behalf, that becomes a place of business in the
United States through which a contract of carriage has
been made.

1          THE COURT:  I do appreciate, however,

2     that *Eck* -- I have not read it -- but based on the date

3     of the case, I wonder if they were in the world that we

4     live in today such that, you know, it's not really about

5     hiring an agent in a brick and mortar kind of dynamic,

6     which I think it would make sense to then call that a

7     place of business of the airline.  But in the modern

8     world it seems a little bit of a stretch to suggest that

9     a contract of this nature with the Internet and travel

10    agents and whatever else becomes a place of business for

11    the purpose of the carrier.

12          MR. ALTMAN:  And let me address that in

13    two ways, because I think that's a very fair point.

14          The first is that *Eck* actually -- and

15    we address this in the papers -- *Eck* was actually a case

16    where there was much less evidence of principal-agent

17    relationship than we have here.  In fact, in *Eck* it was

18    undisputed that SAS, the American travel agent, had

19    never before sold a ticket on behalf of United Arab

20    Emirates Airlines.  Had never before.  It was the first

21    time, and it wasn't totally clear what the actual terms

22    of their contract was.

23          Here, Your Honor, we've provided to the

24    Court -- and there's no dispute about this -- there is a

25    contract of long-standing for many years between

111

1    Malaysia Airlines and Travelport.  Before that there was

2    a different contract that has since been amended.  I've

3    noted that in the papers.  And that contract has

4    resulted in tickets being sold on behalf of Malaysia

5    Airlines in the United States by Travelport for many

6    years.  And that's undisputed as well.

7              And the second point I'll make about

8    that is that *Eck* is still good law.  In fact, if you go

9    on to Westlaw, you'll see that *Eck* was last cited

10   favorably in an American case from the Eastern District

11   of New York in 2005, a case called Pulasky Airlines,

12   which we cite in our brief.

13             So the only response, Your Honor, I'll

14   tell you that the defendants make in their reply brief

15   to *Eck* is they say our reliance on *Eck* is, "frivolous"

16   because *Eck* has been bad law for 30 years.  So I said,

17   Wow, okay.  Well, I really messed up.

18             *So I went to look up the case they were*

19   *talking about.*  They said *Eck* was overruled by a Supreme

20   Court case called *Chan v. Korean Airlines*.  So I go up,

21   I read *Chan v. Korean Airlines*, and would you believe

22   it, *Chan v. Korean Airlines* never mentions *Eck*, never

23   overrule rules *Eck*, never abrogates any portion of *Eck*.

24   In fact, *Chan v. Korean Airlines* never even dealt with

25   the third jurisdiction under either the Warsaw

112

Convention or the subsequent Montreal Convention.  All

that Chan said was that you have to look at a treaty for

what it says, and you can't look at the Montreal

Convention or at that point it was the Warsaw Convention

at one part of it in a way that contradicts a different

part of it.  It says nothing about *Eck* or the

principal-agent relationship that was at the heart of

*Eck*.  And that's, Your Honor, good law still in the

United States.

THE COURT:  All right.  So you have

then these two different, I guess, bases for waiver.  Is

that what I'm understanding?

MR. ALTMAN:  Yes, Your Honor.

THE COURT:  7(a) under the DOT permit

and separately the third jurisdiction under the Montreal

Convention.

MR. ALTMAN:  Yes, Your Honor.

THE COURT:  Both of which make the

similar argument.

MR. ALTMAN:  There's one difference,

which is that with respect to Mr. Wood alone --

THE COURT:  Yes.

MR. ALTMAN:  -- our argument is that he

was also a principal and permanent resident of the

United States.  By virtue of that he qualifies, in our

view, for the fifth jurisdiction, which would also bring

it within the waiver of 7(b), obviously.

THE COURT:  Right.

MR. ALTMAN:  Because the Montreal

Convention is a treaty.

THE COURT:  And then we have the whole

evidentiary issues about whether -- how you intend to

establish or have intended to establish that he meant to

have the United States as his principal and permanent

residence.

MR. ALTMAN:  That's correct.  And I'm

happy to address that.

THE COURT:  I think I understand them.

Let me just appreciate the distinction, if there is any,

between you and the other -- your plaintiffs and the

other plaintiffs.  I think I get your argument.  Is

there anything more you want to say on this?

MR. ALTMAN:  I only want to make one

point that Mr. Walker made at the very beginning, and

that was that Mr. Walker said that under this permit,

this sovereign immunity wouldn't permit the airline to

implead --

THE COURT:  Yes.

MR. ALTMAN:  That wouldn't permit

Boeing to implead the airline because this permit only

114

1    allows for passenger claims.  I'll leave the Court to

2    read the permit itself.  I'm sure you've read it many

3    times.  It absolutely doesn't say that.  It does not

4    restrict the kinds of claims that can be brought against

5    the airline.  It doesn't say it can only be brought by

6    passengers.  It doesn't say that it can't be brought by

7    the manufacturer of an airline.

8                     In an impleader it actually is actually

9    very broad, and it just says that they waive sovereign

10   immunity as to all cases in the U.S. courts that blah,

11   blah, blah, fall into the two categories in 7(a) and

12   7(b).

13                    And the reason that's so important,

14   Judge, obviously, is because if Malaysia Airlines is

15   here with Boeing, then the Court can compel Malaysia

16   Airlines, of course, to produce any evidence that Boeing

17   thinks it needs for Malaysia, which would negate the

18   whole argument for forum non conveniens.

19                    THE COURT:  The Court could -- I'm

20   sorry.  Say the last sentence again.

21                    MR. ALTMAN:  The entire argument that

22   Boeing has made is that they can't get these documents

23   that they need from Malaysia.

24                    THE COURT:  Right.

25                    MR. ALTMAN:  They're saying there's a

1   report that's coming out next week and that report is

2   going to be the final report, and all that evidence is

3   in Malaysia.  Well, if Malaysia is still in the case,

4   either because you didn't dismiss them under the FSIA

5   and the Montreal Convention, or because Boeing has the

6   right to implead them as a third party, which I submit

7   it does, then, Your Honor, our point is that Malaysia

8   Airlines would be here in the United States and the

9   Court could compel Malaysia Airlines as a party to

10  produce any evidence to Boeing or to the plaintiffs that

11  Boeing or the plaintiffs think they need.

12                  THE COURT:  Would that cover evidence

13  related to the investigation that the Malaysian

14  government is conducting?

15                  MR. ALTMAN:  Presumably if that's what

16  Boeing wanted.  If Boeing said, Look, this is our

17  defense, we're attacking Malaysia Airlines for not

18  producing --

19                  THE COURT:  I understand, but Malaysia

20  Airlines is a party.  The government of Malaysia is not.

21  That's precisely the point that defense counsel was

22  making.

23                  MR. ALTMAN:  Your Honor, all of that,

24  Malaysia Airlines is now wholly owned by the government.

25  And as the Court has pointed out earlier, Malaysia

116

1    Airlines is just an agency of the federal government.

2    To compel Malaysia Airlines to produce this

3    documentation would, first of all, require it to produce

4    all of the many documents that are in the FNC brief that

5    Boeing says it needs that are in Malaysia Airlines'

6    possession.  Let's be clear, a bulk of those

7    documentation are Malaysia Airlines documents, not

8    necessarily Malaysian government documents.

9              That includes, for example, the

10   maintenance manuals; information about the past history

11   and training of the pilots;  information about the past

12   history and training of all the crew members.  All of

13   that stuff is in Malaysia Airlines' possession, not in

14   the Malaysian government's possession; and, Your Honor,

15   if we ever got to that point, I would argue to the Court

16   and I'm sure Boeing counsel would argue to the Court

17   that the Court can also compel Malaysia Airlines as an

18   agency of the Malaysian government to produce whatever

19   other evidence Boeing thinks it needs that are the

20   Malaysian government's evidence that is not in Malaysia

21   Airlines' possession.

22              THE COURT:  I think if we ever got to

23   that point, we would have to have some sort of briefing

24   and discussion.

25              MR. ALTMAN:  Undoubtedly that's true.

117

1          THE COURT:  Because I'm not sure about

2     that.

3          MR. ALTMAN:  My point is, Judge, don't

4     kick us out on that equity, given that possibility.

5          THE COURT:  All right.

6          MR. ALTMAN:  Thank you, Judge.

7          THE COURT:  Thank you.  Ms. Schiavo.

8          MS. SCHIAVO:  Yes, obviously our

9     position with our plaintiffs is different because they

10    don't claim to reside or purchased their ticket here.

11    Of course, when the complaint was filed, what, two and

12    three years ago, there was a question because two of

13    them are citizens, one is a resident that was a resident

14    alien and they had much commerce --

15          THE COURT:  Let me focus your attention

16    on the sort of beginning of the question of

17    jurisdiction.  So they claim that they, the defendants

18    claim that this Court does not have jurisdiction over

19    the complaints and the claims that you have brought in

20    this matter.  What is your basis for being able to sue,

21    legal basis, MAS and MAB and the reinsurers?

22          MS. SCHIAVO:  All right.  First of all,

23    we have to shrink that down because the Montreal

24    defenses that they're using apply to the carrying

25    carrier.  So it wouldn't apply to the other defendants

1    in the case, because MAS, which now doesn't exist, was

2    the carrying carrier.

3                    And so we have conceded yes, we do not

4    have residency or purchase of ticket in the United

5    States.

6                    THE COURT:  Do you concede that the

7    FSIA applies to -- I know you think MAS is dead, but

8    just humor me.

9                    MS. SCHIAVO:  Right.

10                    THE COURT:  MAS and MAB, do they get

11    the benefit of being an instrumentality of the

12    government, at least that initial threshold issue?

13                    MS. SCHIAVO:  They are an

14    instrumentality of the government.  Of course, MAS was

15    not total, they had some outside shareholders.

16                    THE COURT:  Right.

17                    MS. SCHIAVO:  But we take the position

18    that the waiver was complete by the government.  That

19    our U.S. government required them -- what's so

20    astonishing is there's myriad cases where foreign

21    carriers, including carriers owned by the government and

22    MAS, have been sued.  The waiver when you're conducting

23    a business enterprise running a carrier, we take the

24    position that the government, the United States

25    government intended that waiver to be complete.

1           THE COURT:  All right.  So you're going

2    with waiver.

3           MS. SCHIAVO:  Right.

4           THE COURT:  Not commercial activity or

5    anything else.

6           MS. SCHIAVO:  No, no, including

7    commercial activity.  Running an airline is a commercial

8    activity which under, of course, the provisions of the

9    United States Department of Transportation rules to get

10   you permission to fly requires a waiver of your

11   sovereign immunity.

12           THE COURT:  Right.  I'm just trying to

13   understand the basis for your claiming an exception or

14   a, you know, that there is no ability to assert

15   sovereign immunity.  And you know, there's the statute,

16   the FSIA.

17           MS. SCHIAVO:  Yes.

18           THE COURT:  And waiver is one of the

19   ways in which you get out from under immunity.

20           MS. SCHIAVO:  Right.

21           THE COURT:  And then there are others.

22   I'm looking at 1605(a)(2).  There's a commercial

23   activity provision of the FSIA.  You're not pointing to

24   that; you're in waiver.  Is that correct?

25           MS. SCHIAVO:  Well, our briefing, we

1    pointed to both.  But we fully admit we can't argue the

2    residency or the ticket purchase.

3                    THE COURT:  Which would be necessary

4    for 1605(a)(2)?  Is that what you're saying?

5                    MS. SCHIAVO:  Well, the defendants say

6    that it is.  We don't agree because we have relied

7    also -- and it's novel, I fully admit that it's novel --

8    we also relied on Article 32 as concerns MAB and the

9    insurer, and by not being a carrying carrier, they don't

10   get the defenses of the carrying carrier.  So they are

11   responsible as a subsequent entity under Article 32.

12                   THE COURT:  Article 32 of?

13                   MS. SCHIAVO:  I'm sorry.

14                   THE COURT:  That's all right.

15                   MS. SCHIAVO:  Warsaw and Montreal.

16   That was the successor since MAS is dead, that's the

17   successor argument.

18                   THE COURT:  Yes, I understand that

19   argument.  Okay.

20                   MS. SCHIAVO:  So under those, only the

21   carrying carrier, the carrier gets Montreal defenses,

22   but there's nothing that says that in Article 32 a

23   subsequent entity can take advantage of a carrying

24   carrier's defenses.  And we pointed that out on page 15

25   of our brief, Document 66.

1    THE COURT:  Okay.  So just turning back

2    to jurisdiction really quickly.  Are you in agreement

3    with Mr. Altman and the Podhurst plaintiffs that the

4    basis of the waiver or at least one of them is the DOT

5    permit?

6    MS. SCHIAVO:  Yes.

7    THE COURT:  And it's the 7(a) argument.

8    Are you making the same argument?  Do you have

9    additional arguments related to that?

10    MS. SCHIAVO:  No.  We agree.

11    THE COURT:  With them, okay.

12    MS. SCHIAVO:  I was just pointing out

13    that although we don't have the same claims as they have

14    made about -- well, we did make similar claims about

15    residency that they intended to reside here, but they

16    weren't at the time, but they did not have addresses

17    here.

18    And we also make it clear, I mean,

19    we're not trying to say that they bought the ticket

20    here.  So we do differ from them on that.  We do have

21    the same jurisdictional arguments.

22    THE COURT:  Okay.  So how do you get

23    into 7(a) then if the contract of carriage was not

24    purchased in the United States for your cases?

25    MS. SCHIAVO:  Well, as concerns MAS

1    only, which no longer exists, we may not be able to get

2    in there because we don't have the residency or the

3    ticket purchase.  But what I am saying is that simply

4    does not apply to MAB, who we've also sued and we insist

5    should stay in, or the successor entity, the insurers,

6    because they're not the carrier, they were not the

7    carrying carrier.

8                    THE COURT:  I think I understand, but I

9    think I need to ask you a question.  So you don't

10   have -- you concede that you don't have a contract of

11   carriage purchased in the United States.

12                   MS. SCHIAVO:  That's correct.

13                   THE COURT:  So on what grounds do you

14   say that the waiver in the DOT permit applies to your

15   cases?

16                   MS. SCHIAVO:  Well, we're saying that

17   the waiver in the permit doesn't apply -- doesn't have

18   to apply to MAB and the insurers.

19                   THE COURT:  Because?  There's a waiver

20   somewhere else?

21                   MS. SCHIAVO:  No, because they don't

22   get the Montreal defenses.  They weren't the carrying

23   carrier.  The Montreal defenses and the Montreal

24   defenses apply to the airline that was carrying you, MAB

25   and Allianz.

1          THE COURT:  Okay.  I think I am

2   confused, but I will go back and I will look at your

3   briefs and see if I can discern --

4          MS. SCHIAVO:  That was Document 66.

5          THE COURT:  Document 66, okay.

6          Do you have any other arguments about

7   jurisdiction?

8          MS. SCHIAVO:  Well, no.  I mean, I

9   think I've covered it quite -- several different ways

10  about our, our using the novel approach of Article 32 as

11  concerns MAB and Allianz.

12         THE COURT:  And why is it that you

13  think you get to use 32 as -- I mean, that sort of gets

14  us into the third area of cases, third area of motions.

15  But the death of a person liable, why is it that you

16  suddenly say that MAS is legally representing or

17  whatever?

18         MS. SCHIAVO:  MAB.

19         THE COURT:  MAB, excuse me.

20         MS. SCHIAVO:  Well, because Act 765

21  declared MAS completely gone.

22         THE COURT:  That doesn't mean that MAB

23  becomes the legally, legal representative for the

24  purpose of the estate.

25         MS. SCHIAVO:  Not the legal

124

1     representative, but they took all of their assets.

2                    THE COURT:  But they didn't.  As a

3     matter of fact, according to Defendant -- and I haven't

4     delved into the documents -- they clearly set it up

5     precisely to avoid transferring the assets and the

6     liabilities in this way.

7                    MS. SCHIAVO:  Well, they said they did,

8     but in our brief we attached a number of documents.  Of

9     course, you know, both sides attached a number of

10    documents.  But we attached a number of documents

11    setting forth exactly where the shares of stock went,

12    where the flying stock went.

13                   Even the same officers, I attached, for

14    example, exhibits where at the stroke of midnight the

15    head of MAS was handing out teddy bears and at 12:01 was

16    handing out teddy bears for MAB.  They did take the

17    assets.  In fact, MAB in -- excuse me -- in Act 765 the

18    assets were literally given to MAB.  It's down to the

19    shareholders are identical except the two that were

20    nongovernmental.

21                   THE COURT:  All right.  So what you say

22    is novel, and I agree with you about your argument is to

23    apply this Article 32 to corporations in this way.

24                   MS. SCHIAVO:  Yes.

25                   THE COURT:  Is that what's novel about

125

1  it?

2           MS. SCHIAVO:  Yes, absolutely.

3           THE COURT:  I think I understand.

4           Mr. Walker.  I think I may have to let

5  you have the last words here.  But we'll see.

6  Mr. Altman might, you know --

7           MR. WALKER:  Mr. Altman has commented

8  on practically everything going back to

9  forum non conveniens again.  But I'll try to be brief

10  here.

11           I just quickly would like to dispense

12  with the arguments made by Ms. Schiavo here.  She

13  clearly concedes that none of her clients were residents

14  of the United States.  She concedes that none of them

15  purchased their ticket in the United States.  That

16  automatically removes them from the waiver argument

17  under the foreign carrier permit.

18           There's no basis for claiming that

19  because Malaysia Airlines is dead or that MAB is the

20  successor that suddenly that negates or changes up this

21  waiver argument.  But I don't see how it, even within

22  what is the basis for the waiver, if it's no longer

23  applicable to these --

24           THE COURT:  Yes.  So you say there's no

25  waiver that applies to her people either under the

126

1    permit or under the Montreal Convention.

2              MR. WALKER:  Yes.  I think that

3    automatically just takes, eliminates her claims here

4    under both FSIA and Montreal Convention both.  Because

5    she concedes that she does not have Article 3 Montreal

6    Convention jurisdiction, and she also concedes that she

7    has not met the conditions that they argue that make the

8    waiver in the foreign carrier permit applicable to her

9    clients.

10             THE COURT:  All right.

11             MR. WALKER:  That's the end of the

12   story, and they should be dismissed.

13             Okay.  I'm not really sure how to

14   address the comments of Mr. Altman, because he blended

15   several things between foreign sovereign immunity and

16   Montreal Convention, and I'm assuming that my comments

17   here are meant to cover both aspects, the aspects of

18   both --

19             THE COURT:  That's fine.

20             MR. WALKER:  Okay.

21             THE COURT:  I mean, he says *Eck* decided

22   under third jurisdiction, still good law.

23             MR. WALKER:  Well, I'll comment.  I

24   mean, Mr. Altman seems to hang his hat on *Eck* as being

25   decisive of some issue.  But *Eck* is not good law.  A

127

1    specific case that is *Alitalia, S.p.A. v. Lizi*.  It was

2    a Second Circuit case in which the Second Circuit

3    adopted and followed the logic and the reasoning of *Eck*

4    with regard to treaty interpretation and how it

5    interprets, they could expand this.  Okay.  *Chan*

6    specifically repudiates the Second Circuit case, that's

7    the *Alitalia v. Lizi* case.  *Lizi, Alitalia v. Lizi* was

8    entirely dependent on *Eck* as the precedent in which they

9    relied.  *Chan* has overruled that case.  Therefore*, Eck*

10   is bad law.

11                   THE COURT:  All right.

12                   MR. WALKER:  I think that that

13   absolutely destroys their argument in that respect.  But

14   the argument -- I do want to address the issue about

15   purchase of the ticket.  Mr. Altman is trying to say

16   that American Express or Travelport somehow, you know,

17   is the acceptor of the --

18                   THE COURT:  It says they're the agent.

19                   MR. WALKER:  The agent.

20                   THE COURT:  Yes.

21                   MR. WALKER:  He's trying to make that

22   agent act in the role of Malaysia Airlines.

23                   THE COURT:  That's what an agent is.

24   Right?  I mean, by law when you have an agent, then the

25   agent stands in your shoes for the purpose of whatever

128

1    transaction we're talking about.

2                    MR. WALKER:  Well, but these are online

3    activities.  He talks about brick and mortar.  Nobody

4    went to a brick and mortar office.  Nobody engaged with

5    Malaysia Airlines.  As is explained in our Montreal

6    Convention briefing, these online global distribution

7    systems transmit all these proposed bookings to

8    Malaysia.

9                    THE COURT:  All right.  So --

10                   MR. WALKER:  In Malaysia.  That's where

11   Malaysia makes the contract.  But --

12                   THE COURT:  So --

13                   MR. WALKER:  I'm sorry.

14                   THE COURT:  I was just going to say

15   your -- both sides' arguments have a lot of nuances, and

16   there are a lot of points at which you say "We win."  We

17   win, you say, because the DOT thing doesn't even apply

18   to this kind of situation.  We win because DOT didn't

19   have the authority to waive sovereign immunity.  I

20   understand you have those arguments.

21                   Focusing in on the particular argument

22   that Mr. Altman is making about the applicability of

23   7(a), you say there is or is not a contract of carriage

24   purchased in the United States under these

25   circumstances.  Where was the contract of carriage

1   purchased for the purpose of the Gaspard plaintiffs and

2   Mr. Wood?

3                   MR. WALKER:  Mr. Wood was in Malaysia

4   when he purchased the -- in Malaysia where Malaysia

5   Airlines is located.

6                   THE COURT:  So it's Malaysia or -- it's

7   Malaysia for your purposes?

8                   MR. WALKER:  Yes, and the Gaspard

9   decedents were all in China when they interacted through

10  the Internet with Orbitz.

11                  THE COURT:  So the lex loci for your

12  purposes is where the original person makes the offer to

13  purchase or offer to contract?

14                  MR. WALKER:  Where they paid.

15                  THE COURT:  And where they pay.

16                  MR. WALKER:  Yes.  They were outside

17  the country.  Under Mr. Altman's theory, someone who is

18  traveling and who is in the United Kingdom could

19  purchase a ticket online from Orbitz or something that

20  passes through the United States and processes that

21  transaction in order to purchase passage between Munich,

22  Germany and --

23                  THE COURT:  I understand as a matter of

24  logic why yours might make sense.  I want to know

25  whether this is a case of first impression with respect

1   to this Court being the one to decide in the modern age

2   where the contract of carriage is purchased.  Do you

3   have other cases that suggest that someone has said

4   today in an Orbitz kind of transaction the contract is

5   where the person sits at their computer and, you know,

6   offers and pays?

7                    MR. WALKER:  Well, yes.  I mean, I

8   would like to just emphasize, though, that this is an

9   argument that Mr. Altman has raised, but there's no

10  evidence in the record.  I'm putting aside the arguments

11  about the admissibility, which is a separate issue.  But

12  there's been nothing offered to the Court that

13  establishes that the purchase occurred in the United

14  States.

15                   THE COURT:  It's not an evidentiary

16  question.  It's a legal question.  Do you dispute that

17  Mr. Wood was in Malaysia but that there were airline

18  agents in the United States?  This is not a question of

19  facts that I thought.

20                   MR. WALKER:  These are IATA agents that

21  service many airlines, and the IATA agency agreement

22  says that they do not stand in the shoes of the airline

23  and they have no authority to bind the --

24                   THE COURT:  Were they in the United

25  States?  Were they -- was the travel agency through

131

1    which the purchase was made in the United States or not?

2                    MR. WALKER:  Well, we say no because we

3    say the purchase did not occur through American Express.

4                    THE COURT:  That's a legal question.

5    I'm asking you where were the people, the relevant

6    players in this transaction located.  Do you dispute

7    that the travel agency was in the United States?

8                    MR. WALKER:  The travel agency was in

9    the United States.

10                   THE COURT:  All right.  And Mr. Wood

11   was in Malaysia.

12                   MR. WALKER:  And Malaysia Airlines was

13   in Malaysia.

14                   THE COURT:  I just want to make sure we

15   have the facts straight.

16                   MR. WALKER:  Yes.

17                   THE COURT:  Given those facts, now we

18   ask the legal question, where was the contract made?

19   Right.  That's a legal question under, given those --

20   holding those facts constant, I hear you arguing it

21   should be the place of Malaysia because that's where the

22   offeror and the ultimate acceptor were.

23                   Mr. Altman has provided what he says is

24   case law that indicates that it's actually where the

25   offer and the acceptance occurred, and that is in the

1    United States.  And I will look at it.  I'll look at the

2    cases and try to figure it out.

3                    MR. WALKER:  Okay.  But I just want to

4    draw a distinction here, you did touch upon this, that

5    there is a distinction between the wording of the waiver

6    provision, the purchase of a contract of carriage and

7    the language of the Montreal Convention under

8    Article 33.1(3) that relates to the place, the carrier's

9    place of business through which the contract -- I think

10   those are very different.

11                   THE COURT:  Right, but he only needs

12   one; right?

13                   MR. WALKER:  No.

14                   THE COURT:  He needs both?  Tell me

15   why.

16                   MR. WALKER:  Because the plaintiffs, to

17   stay in the United States court, they have to establish

18   that the carrier doesn't have immunity.

19                   THE COURT:  Uh-huh.

20                   MR. WALKER:  And they also have to

21   separately establish that they have jurisdiction under

22   the Montreal Convention.  It takes both, not one.

23                   THE COURT:  I see.

24                   MR. WALKER:  And so --

25                   THE COURT:  I see.

1          MR. WALKER:  There are different tests

2    here.  They could succeed on foreign sovereign immunity,

3    which we think they are wrong.

4          THE COURT:  Right.

5          MR. WALKER:  They could fail on

6    Montreal Convention or vice versa, but under either

7    scenario, there's no jurisdiction.  The Supreme Court

8    has said you have to have both.

9          THE COURT:  I understand.  And you want

10   me to focus on the distinction.  Even if they get the

11   DOT waiver scenario and therefore get out from under

12   FSIA, you still think they don't meet the place of the

13   carrier's purchase of the contracts scenario.

14         MR. WALKER:  Still fail under the

15   article --

16         THE COURT:  I understand, all right.

17         MR. WALKER:  -- provision.

18         But I'd like to address briefly the

19   principal and permanent residence aspect of that.

20         THE COURT:  Sure.

21         MR. WALKER:  Because Mr. Altman has

22   primarily focused on Wood.  And that's really the only

23   passenger which there has been put forth a real argument

24   about principal and permanent residence.  Ms. Schiavo

25   has conceded that none of the persons who were the

134

1    two --

2                    THE COURT:  Yes.  We're only looking at

3    Wood.

4                    MR. WALKER:  Yes, and Gaspard doesn't

5    matter here for the principal and permanent residence.

6                    The clear language of the convention

7    talks about a physical place, the principal and

8    permanent residence, and that is later described as an

9    abode.  It's tied to a physical place.

10                   The purpose of Article 33 was to limit

11   the number of jurisdictions where litigation would be

12   brought, contrary to the argument of Plaintiffs that

13   this was supposed to be a consumer-friendly expansion

14   allowed for jurisdiction wherever you can make this

15   argument.

16                   But all of the evidence that's been

17   admissible evidence that's been put before the Court

18   show that Mr. Wood was, in fact, residing in Malaysia at

19   the time.  He had had a three-year period in China, had

20   taken another contract, he was working for a foreign

21   company, Malaysia --

22                   THE COURT:  Even though it was

23   temporary, you're still saying that's where he resided.

24                   MR. WALKER:  Temporary is, I think, is

25   a flag of convenience here, because he did work three

1    years in China and then instead of returning to the

2    U.S., took another assignment.  The contracts had a term

3    on them, but they were renewable.  They had to be

4    canceled by one side or the other.  There's no

5    indication of cancellation.

6                    The documentation shows that he was

7    establishing a household with a woman that he had met in

8    China.  Those are not indications of returning to the

9    United States.

10                   But even if he had some intent, you

11   know, we have set forth why the argument about domicile

12   is a nonstarter --

13                   THE COURT:  Do you lose if I agree that

14   domicile is the right standard?

15                   MR. WALKER:  No, we don't, because

16   we've shown that even under the domicile test Mr. Wood

17   does not meet that test, because almost all the tests

18   for domicile look at residence.

19                   THE COURT:  All right.

20                   MR. WALKER:  So we do not lose even if

21   you adopt the domicile test.  But we think that it would

22   be a serious departure from the Montreal Convention to

23   adopt the domicile test.  The two cases that address

24   that issue we don't think -- we've explained why they

25   don't really address the issue or the drafting history

1    or the plain language.  And they did, you know, allow

2    this intent which has nothing to do with --

3                    THE COURT:  I understand.

4                    MR. WALKER:  So I won't belabor the

5    point, but I don't think that they win on domicile even

6    if you adopt that.

7                    THE COURT:  That test, all right.

8                    MR. WALKER:  I did want to address one

9    comment that Mr. Altman made about the purpose of

10   putting the foreign carriers and domestic carriers on

11   equal footing with sovereign-owned carriers in the

12   domestic permit.  I think it's important to notice that

13   for other foreign airlines there's nothing in that

14   permit that talks about a waiver of an objection to

15   personal jurisdiction in that --

16                   THE COURT:  Let me let you --

17                   MR. WALKER:  In other foreign carriers,

18   and I want to talk about that only because, not because

19   that's an argument that we're making with regard to

20   personal objection -- personal jurisdiction -- but a

21   foreign carrier that's publicly owned, let's say that

22   there is also one in Malaysia, not owned by the

23   government, if there was no personal jurisdiction over

24   that carrier, they would be still entitled to raise the

25   lack of personal jurisdiction.  This carrier permit

1    actually puts the foreign sovereign-owned carrier on a

2    lesser footing when the FSIA is intended to actually be

3    more strictly applied, more protective of the foreign --

4               THE COURT:  Let me just, let's end on

5    this interesting point, which is Mr. Altman comes back

6    and says that the point that you began with when you got

7    up were, the impleader, you know, this is going to be a

8    mess because we have not -- there's no argument that we

9    have waived sovereign immunity with respect to a claim

10   against Boeing.  He says it's not so when you look at

11   the permit.  That there's nothing in the permit that

12   suggests that the waiver is limited to passenger claims.

13              What is your response to that?  You

14   seem to be saying yeah, but there's nothing in the

15   permit that suggests that the waiver isn't applicable.

16   Do you know what I mean?  What in the permit makes you

17   think that the waiver that exists here only applies to

18   passenger claims and would not apply to a claim brought

19   against you by Boeing?

20              MR. WALKER:  Well, first of all, this

21   document relates to carriage of passengers.

22              THE COURT:  In cargo.

23              MR. WALKER:  In cargo, but it does not

24   relate to doing business in the United States, a more

25   general concept here.  But even if you look at the

1   language of 7(a) and (b), what is the contract of

2   carriage between Boeing and Malaysia Airlines?  Where

3   did Boeing purchase a ticket?  What international

4   agreement or treaty cognizable in the United States

5   applies to Boeing in this situation?  This shows that

6   this is, 7(a) and (b) are directed to passengers or

7   cargo.

8             THE COURT:  So it's the dog that didn't

9   bark.  You think that given its organization, what it's

10  talking about, what the scenario is, it's clearly

11  limited to passengers.  It's not about waiving anything

12  with respect to a commercial relationship between you

13  and Boeing.

14            MR. WALKER:  Absolutely.  Because --

15            THE COURT:  All right.

16            MR. WALKER:  The silence of it can't be

17  construed as -- silence is never a waiver.

18            THE COURT:  Okay.  I think I

19  understand.  We are all exhausted, but thank you very

20  much.  Interesting set of issues, and I will look at it

21  and get back to you in writing, taking the motions under

22  advisement.  Thank you.

23            MS. WISNER:  Your Honor, just a quick

24  housekeeping matter.  I just want to let the Court know

25  that -- I'm Alexandra Wisner, speaking on behalf of --

139

1          THE COURT:  I'm sorry.

2          MS. WISNER:  I'm a little shorter than

3  Mr. Altman.  I'm Alex Wisner speaking on behalf of the

4  Wisner plaintiffs, which includes the Richards complaint

5  as well as the Reis complaint.  One of the plaintiffs in

6  the Reis complaint, Your Honor, I will be entering a

7  stipulation of dismissal pursuant to settlement.  So I

8  just wanted to bring that to the Court's attention.  The

9  plaintiff is Simanjuntak, S-i-m-a-n-j-n-u-t-a-k [sic].

10          THE COURT:  Okay.

11          MS. WISNER:  I switched up the letters.

12  Let me start over.  S-i-m-a-n-j-u-n-t-a-k.  So I'll be

13  filing a stipulation of dismissal.  That's all I have,

14  Your Honor.

15          THE COURT:  All right.  We will look

16  forward to receiving it.  Thank you.

17          (Proceedings adjourned at 1:28 p.m.)

18          * * * * * * * * * * * * * * * * * * *

19

20

21

22

23

24

25

140

1                CERTIFICATE OF OFFICIAL COURT REPORTER

2

3    I, Barbara DeVico, certify that the foregoing is a

4    correct transcript from the record of proceedings in the

5    above-entitled matter.

6

7

8

9

10

11   _____          1-11-17

12   SIGNATURE OF COURT REPORTER              DATE

13

14

15

16

17

18

19

20

21

22

23

24

25